## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| BARBARA LODER HILDEBRANDT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. C-1-02 0003** |
| | ) | |
| HYATT CORPORATION, et al., | ) | **Judge Sandra Beckwith** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants HYATT CORPORATION ("Hyatt"), TY HELMS ("Helms"), BRIAN J. BOOTH ("Booth") and JACK HORNE ("Horne"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56 and S.D. Ohio Civ. R. 7.2, file this Memorandum of Law in Support of Defendants' Motion for Summary Judgment, and state as follows:

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Introduction.

In her Complaint, Plaintiff Barbara Loder Hildebrandt ("Plaintiff"), has alleged that Hyatt and individual Defendants Helms, Booth and Horne, discriminated against her on the basis of her gender and age in violation of the Ohio Civil Rights Act ("OCRA"), Ohio Revised Code ("O.R.C.") Chapter 4112, Ohio Public Policy, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, ("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title

Orlando 37921.1

VII").[1]  Hyatt and each of the individual Defendants are entitled to entry of Summary Judgment in their favor because there are no genuine issues of material fact as to any of Plaintiff's claims.

Hyatt is an international corporation in the business of managing and operating Hyatt hotel and resort properties throughout the United States and Caribbean. (Charlson Aff. ¶2).[2]  Although Hyatt does not own all of the approximately 122 Hyatt hotel and resort properties, it has management agreements with property owners whereby Hyatt provides management services to the 122 Hyatt properties within the United States. (Charlson Aff. ¶2).  Hyatt employs over 35,000 individuals in its various divisions, including its marketing, finance, operations, human resources, legal and sales divisions. (Charlson Aff. ¶2).

Hyatt has in place specific policies prohibiting discrimination and harassment on the basis of all protected categories, including, age and gender. (Pl. Depo. 199-200).[3]  These policies, which demonstrate that Hyatt does not tolerate discrimination or harassment of any kind, are distributed to all employees, including Plaintiff. (Pl. Depo. 208).

---

[1]  Plaintiff originally filed a Complaint and Amended Complaint in the Court of Common Pleas in Hamilton County, Ohio against Hyatt, Horne, and Booth, alleging claims under O.R.C. Chapter 4112, and alleging violation of Ohio Public Policy. Later, after filing a Charge of Discrimination with the EEOC, Plaintiff filed a second Complaint in this Court, alleging claims of age and gender discrimination pursuant to Title VII against Hyatt and claims of age and gender discrimination pursuant to O.R.C. Chapter 4112 and violation of Ohio Public Policy against individual Defendant Jack Horne.  On or about December 20, 2002, these cases were consolidated into one case, with an instruction by the Court that the two cases were to be treated as one action for all purposes.

[2]  "Charlson Aff." refers to a copy of the Affidavit of Eric Charlson, attached hereto as Exhibit A.  The original Affidavit of Eric Charlson was attached as Exhibit A to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery.

[3]  Excerpts from Plaintiff's deposition taken on March 19, 2002 are attached hereto as Exhibit B.

**B.    Plaintiff's Employment With Hyatt.**

Plaintiff, who was born September 23, 1952, was employed at Hyatt for approximately 22 years. (Booth Depo. 7).[4]  Plaintiff's first position was in the field sales office at the Hyatt Regency Phoenix. (Charlson Aff. ¶3).  She began her employment there on October 1, 1979, in the position of Sales Manager. (Charlson Aff. ¶3). In 1983, Plaintiff began work in the same capacity at the Hyatt Regency Tampa. (Charlson Aff. ¶3).  In 1984, Plaintiff moved to the Hyatt Regency Savannah in the position of Director of Sales. (Charlson Aff. ¶3). In June 1986, Plaintiff moved to the Hyatt Regency Cincinnati in the same capacity.  (Charlson Aff. ¶3). On February 1, 1996, Plaintiff left her sales position in a hotel and joined Hyatt's National Sales Force in the position of Director of National Accounts. (Charlson Aff. ¶4; Booth Depo. 6).[5]  As the Director of National Accounts, Plaintiff was responsible for securing business with companies or entities requiring hospitality services from a number of Hyatt's properties in different geographic locations.

**C.    Hyatt's National Sales Force.**

At the time of her termination, Plaintiff worked in Hyatt's National Sales Force ("NSF"), which sells hospitality services to large companies or organizations undertaking business in multiple cities, and consequently, offering business opportunities with multiple Hyatt hotels.  (Charlson Aff. ¶5; Helms Depo. 97-98).[6]    An example of an NSF account would be the American Medical Association. (Helms Depo. 99).  This organization conducts many meetings every year in locations

---

[4] "Booth Depo." refers to excerpts from the deposition of Brian Booth taken on March 20, 2002, attached hereto as Exhibit C.

[5] Both National Account Managers and Directors of National Accounts work within the NSF.  The only differences between the two positions are that Directors have the additional benefit of participating in the Hyatt savings program and slightly higher compensation. (Horne Depo. 163-167). "Horne Depo." refers to excerpts from the deposition of John ("Jack") Horne taken on March 21, 2002, attached hereto as Exhibit D.

[6] "Helms Depo." refers to excerpts from the deposition of Ty Helms taken on April 17, 2002, attached hereto as Exhibit E.

Orlando 37921.1

3

throughout the world. (Helms Depo. 99). Because of its worldwide meeting space needs, the American Medical Association has the ability to impact a number of Hyatt properties, and therefore is serviced by NSF sales staff because of their global sales reach. (Helms Depo. 99). In addition to the NSF, each Hyatt hotel property has a "field sales office" which is made up of salespersons who are responsible for generating business for that particular Hyatt property. (Helms Depo. 97). A typical field (individual hotel) sales account is a company based in a particular city that conducts most of its business in the city of origin. (Helms Depo. 99). The field salespersons are employed by the Hyatt property owner; work solely for that hotel property; and have no ability to schedule conferences, commit room nights or other hotel services beyond the reach of their singular property. (Helms Depo. 97).

The NSF sales staff is ordinarily responsible for approximately 40% of Hyatt's annual business. (Helms Depo. 98). To determine its sales goals for the year, Hyatt's senior sales executives review future group target projections, and then utilize the data to establish sales quotas for NSF staff. (Helms Depo. 100-101). Quotas are set twice each year, in January and July. (Horne Depo. 25.) Jack Horne, the Assistant Vice President of National Sales for Hyatt, determines the quota for the entire NSF. (Horne Depo. 153-154). Quotas are then disseminated to NSF sales persons by the managers or directors, in the case of Plaintiff, by her manager, Brian Booth. (Horne Depo. 153-154).

### D.    Promotional Opportunities In The NSF.

In this case, Plaintiff contends she was qualified and/or overlooked for a number of promotional opportunities in the NSF, including an Associate Director of Sales Position in 1999, a Vice President for International Sales and Individual Travel position in 2000, and a Director of Sales Position. (Pl. Depo. 108-111, 119). At the outset, it is important to note that Hyatt provides a

Orlando 37921.1

4

mechanism for employees to express interest in promotional opportunities in the evaluation process. (Patrick Aff. ¶3).[7]   Notably, despite her contention that she was denied various promotional opportunities, Plaintiff never indicated on any of her evaluations that she wished to advance within the NSF. (Pl. Depo. 140-143).  In fact, for all of the positions Plaintiff cites as denied promotional opportunities, she would have been required to relocate to Chicago, something she indicated to her immediate supervisor, Bruce Small, she was unwilling to do.  Moreover, and as will be discussed infra, Plaintiff's claims of illegally denied promotional opportunities are time-barred. (Small Depo. 44; Pl. Depo. 128-129).

### 1.    The 1999 Associate Director Of Sales Position.

The first position Plaintiff contends she was wrongfully denied was the Associate Director of Sales position which was filled in or about December 15, 1999.  (Pl. Depo. 122; Charlson Aff. ¶ 7).  The Associate Director of Sales position had been vacated by Christie Hicks, a female, and Mark Henry, a 50-year old male, older than Plaintiff, was ultimately selected to fill the position. (Pl. Depo. 122, 125; Small Aff. ¶3; Patrick Aff. ¶5).[8]  This position was located at Hyatt's Corporate office in Chicago. (Small Aff. ¶4). Around this same time period, Plaintiff had conversations with her immediate supervisor, Bruce Small, the Director of Sales for the Central National Sales Office, regarding her desire to remain in Cincinnati. (Pl. Depo. 128, 130).  Plaintiff cannot identify the decision-maker with respect to this position, but nevertheless concluded she was denied the opportunity because of a gender animus in light of the fact Henry is male. (Pl. Depo. 126).  It is undisputed Small made the decision to select Mark Henry for the position. (Charlson Aff. ¶7; Small Aff. ¶3). Plaintiff acknowledges she never expressed an interest in or applied for the Associate

---

[7] "Patrick Aff." refers to the Affidavit of Douglas Patrick, attached hereto as Exhibit F.

[8] "Small Aff." refers to the Affidavit of Bruce Small, attached hereto as Exhibit G.

Orlando 37921.1

Director of Sales position. (Pl. Depo. 127). She further concedes that if Small was the decision-maker, and it is undisputed he was, she cannot characterize his actions as gender discrimination. (Pl. Depo. 127). Indeed, Plaintiff considers Small a friend and she testified in her deposition that he has never discriminated against her or treated her unfairly. (Pl. Depo. 72-73).

Plaintiff's rationale for her belief she was the victim of gender discrimination with respect to this promotional opportunity reveals the futility of her claim:

> Q.   On the Associate Director of Sales position, what is the basis on which you believe the placement of Mark Henry in that job had something to do with your gender?
>
> A.   I don't know how Mark Henry got that job, he just all of a sudden had the job.
>
> Q.   But I am asking you a different question. What is the basis on which you've said under oath that it has something to do with gender?
>
> A.   I believe he got the job because he's a male.
>
> Q.   And what do you base that on?
>
> A.   Nobody else was informed of the decision to have an Associate Director of Sales.
>
> Q.   Doesn't that mean other males weren't informed of the decision, too?
>
> A.   That I don't know. I know I was not --
>
> Q.   You just know you weren't?
>
> A.   -- informed.
>
> Q.   And it's your view that if you weren't [informed] and you are a woman it must be because you're a woman?
>
> A.   I don't know that for a fact.

(Pl. Depo. 132).

Orlando 37921.1

**2.      The 2000 Assistant Vice President For International And Individual Travel Position.**

Plaintiff contends she was unlawfully denied the position of Assistant Vice President for International and Individual Travel, which was filled in or about April 10, 2000. (Charlson Aff. ¶8; Pl. Depo. 108-109). Ty Helms, the Vice President of Sales, was the decision-maker with respect to this position and he selected Rob Sarmiento, who had 16 years of experience with Hyatt, including six years of experience as a Divisional Director of Sales, with responsibility over 24 hotels, and approximately four years of experience as a Director of Sales for two large hotels. (Helms Depo. 82; Helms Aff. ¶4).[9]  It is undisputed Plaintiff lacked Divisional or Executive sales experience. (Charlson Aff. ¶¶3-4). It is also undisputed that Helms initially offered the position to Terri Benich, a 40-year old female, who at the time, was the Director of Marketing for the Hyatt property in Scottsdale, Arizona. (Helms Depo. 82; Benich Aff. ¶5; Helms Aff. ¶6).[10]  Benich did not accept the position because she did not want to leave Scottsdale and move to Chicago, which was a requirement of the position.  (Benich Aff. ¶¶ 6, 7; Helms Depo. 82).  After Benich declined the position, Helms turned his attention to Sarmiento, a Divisional Director of Sales for Hyatt, who had responsibility for the sales functions of 24 Hyatt hotels. (Helms Depo. 82-83; Helms Aff. ¶4).  In addition, he speaks Spanish fluently and had an understanding of the international market Hyatt desired to attract. (Helms Depo. 83).  Sarmiento met the position requirements of a person who had international experience, as well as multiple hotel experience in much the same way Benich was similarly qualified. (Helms Depo. 82-83).

Plaintiff testified she told Small and Mike Cheatham, another NSF executive, that she was interested in this position. (Pl. Depo. 111).  However, when Plaintiff spoke with Helms, he informed

---

[9]  "Helms Aff." refers to the Affidavit of Tyson Helms, attached hereto as Exhibit H.

[10]  "Benich Aff." refers to the Affidavit of Terri Benich, attached hereto as Exhibit I.

her he had already selected another candidate, first Benich and secondly Sarmiento. (Pl. Depo. 111; Helms Depo. 82-83). Helms also told Plaintiff that "it's good to know that you're interested in advancement." (Pl. Depo. 117). Nonetheless, Plaintiff alleges Helms's selection of Sarmiento was a gender-based decision because he did not take her request for the position seriously or select her. (Pl. Depo. 119-120). In explaining her rationale for contending that Helms discriminated against her on the basis of her gender in selecting Sarmiento, Plaintiff testified:

> Q. ...Then who are you accusing of gender discrimination in the selection of Rob Sarmiento? ...
>
> A. Ty Helms. . .
>
> Q. . . . Has he ever said anything to you that explicitly focused on gender pre-occupation or gender bias?
>
> A. No.
>
> Q. How did you determine in your mind that he had such a gender bias?
>
> A. That I was not seriously considered for a position that I was qualified for.
>
> Q. So you came to the conclusion in your own mind that the only way that you, with your qualifications, couldn't have been taken seriously was because you're a woman, is that correct?
>
> A. I was not, I believe I was not taken seriously to be considered for the position.

(Pl. Depo. 118-119). It is without contradiction, however, that Helms based his decision to hire Sarmiento, his second choice after a 40-year old female, based strictly on his qualifications and not on his gender or his age, or the gender or age of any other individual. (Helms Aff. ¶¶5, 7).

### 3.    The 2001 Director Of Sales For The Central National Sales Office Position.

The final position Plaintiff contends she was denied was the Director of Sales position for the Central National Sales Office. (Pl. Depo. 108). In the Fall of 2000, Bruce Small announced that he was vacating his position as the Director of Sales for the Central Region. (Small Depo. 45). [11] Small made this announcement in late September or early October at a sales meeting where Plaintiff was present. (Small Depo. 45). Although Plaintiff was aware that the position of Director of Sales for Central National Sales Office was vacant, she never applied for or asked anyone to consider her for the position. (Pl. Depo. 134; Small Depo. 46; Horne Depo. 125). Horne chose Booth for the position because he wanted to bring a "field [sales] perspective" to the NSF. (Horne Depo. 106; Booth Depo. 60-63). Booth had worked at the Dallas/Ft. Worth Hyatt property, which is the second largest Hyatt hotel in the United States. (Booth Depo. 64-65). Booth had also been Director of Sales for two major hotel chains, Hyatt and Marriott. (Booth Depo. 64-65). In these capacities, Booth gained valuable experience in national sales, working with large convention hotels. (Booth Depo. 64-66). Plaintiff contends she was never given an opportunity to apply for the Director of Sales Central Region position because it was never posted. (Pl. Depo. 209). However, Plaintiff testified she knew the position was open and did nothing affirmatively to indicate her interest. (Pl. Depo. 209-210). In any event, the apparent failure to post the job was gender-neutral and age-neutral. Persons under and over the age of 40 were similarly uninformed, as were females other than Plaintiff, as well as males other than Booth.

---

[11] "Small Depo." refers to excerpts from the deposition of Bruce Small taken on April 16, 2002, and attached hereto as Exhibit J.

Orlando 37921.1

### E.    Plaintiff's Quota.

In the year 2000, Hyatt experienced one of its best years ever in terms of sales. (Horne Depo. 25). Indeed, Hyatt far exceeded its 2000 sales quota. (Horne Depo. 25-26). Based on the success of 2000, Hyatt raised its 2001 sales quota for the first half of 2001. (Horne Depo. 25-26). This meant that most salespersons were assigned larger individual quotas. (Booth Depo. 160-162). Plaintiff also had experienced an outstanding year in 2000. (Booth Depo. 150-152). In fact, Plaintiff achieved 136% of her quota, exceeding her quota by two million dollars. (Booth Depo. 152-153). Because of her outstanding performance, Booth nominated Plaintiff for the National Sales Manager of the year award for 2000, conduct clearly inconsistent with age or gender biases. (Booth Depo. 138-139).

For the first six months of 2001, Booth increased Plaintiff's quota to 4.1 million dollars, based in part on her excellent 2000 performance. (Booth Depo. 163). Although Plaintiff was displeased with this higher quota, she did not believe the setting of her quota was age or sex based. (Pl. Depo. 52). Plaintiff also admitted that everyone in the NSF experienced an increase in quota in January 2001, irrespective of age or gender. (Pl. Depo. 46-47; Booth Depo. 160-162). Interestingly, in the self-assessment of her evaluation for 1999, Plaintiff indicated she wanted to increase her revenue in 2001 by 10% over her 2000 performance. (Booth Depo. 153-154). Her own stated goal was consistent with the assessment of her manager, Booth, casting considerable doubt on any suggestion of an adverse employment action.

### F.    The Economic Downturn In 2001.

As became apparent a few months following the setting of quotas for the NSF, the economy had begun to slow and the country was headed into a recession. Indeed, the nation was in financial turmoil with many businesses, including Hyatt's competitors, faced with a number of

Orlando 37921.1

reductions and forced layoffs.   (Helms Depo. 8-9).   Due to the ailing economy, Hyatt was experiencing financial difficulties as well. (Helms Depo. 8-9).  As a result, all departments and hotels within Hyatt were asked to examine and implement various methods by which costs could be reduced. (Helms. Aff. ¶18).   In May 2001, Hyatt implemented a number of cost-saving measures Company-wide.  (Horne Depo. 83).  In the Sales Department, Hyatt narrowed each office down by 3% to save money on travel and related expenses. (Horne Depo. 83; Helms Aff. ¶16).  In May 2001, based on the recommendations of his staff, Helms implemented numerous cost-savings measures in the Sales Department, which impacted the NSF, including cutbacks in sales administration travel and expenses by 2.5%; eliminating the Divisional Director of Sales meeting; reducing sales administration promotional expenses by 2%; reducing each NSF office budget by 3%; and hiring employees for lesser starting compensation, if possible. (Helms Aff. ¶¶16, 17).  Unlike its competitors, Hyatt was able to avoid layoffs during this time. (Helms Depo. 8-9).   Plaintiff acknowledged she was aware of the financial turmoil during this period.  (Pl. Depo. 89).

As evidence that the hotel industry was suffering from an economic downturn, in 2001, Hyatt realized a decline in its total income of over $400,000,000.00 from the previous year, and Hyatt's hotel owners realized profits almost $200,000,000.00 less than the previous year.  (Helms Aff. ¶20).  This data indicates that even prior to September 11, 2001, Hyatt was beginning to feel the effects of an economic downturn. (Helms Aff. ¶20). This downturn necessitated many workplace cutbacks, and, as a result, Helms began to examine numerous options for reducing the expenses in Hyatt's Sales Department, as detailed above. (Helms Aff. ¶17).

### G.    The 2001 Mid-Year Review.

In May 2001, Booth devised a new performance review and goal setting form that was intended to replace the previous evaluation forms used to evaluate salespersons in the NSF.  (Booth

Orlando 37921.1

Depo. 155). This new form was approved by all five Directors of National Sales as well as Horne. (Booth Depo. 155-56; Horne Depo. 174). It was Booth's intention to use the template informally during the non-binding mid-year reviews in July 2001, so he could introduce all of the Directors of National Accounts and National Account Managers who reported to him to the new evaluation procedure. (Booth Depo. 158). It was his hope they would become accustomed to the new format before their formal performance review at the end of the year. (Booth Depo. 158, 166). In addition, since Booth was the new Director of Sales for the Central Region, he wanted to introduce his direct reports to his expectations, hear their concerns, as well as identify areas he felt required improvement. (Booth Depo. 158). He made it clear to all of his subordinates that the mid-year review was not a formal action; that no documentation would be placed in their files; and that the mid-year procedure was a "trial run" to prepare for the formal evaluation procedure at year-end. (Booth Depo. 158). In short, nothing about the informal mid-year review constituted an adverse employment action. (Booth Depo. 167; Pl. Depo. 148). Booth gave the mid-year review to all of the Directors of National Accounts and National Account Managers in the Central Region, including Plaintiff. (Booth Depo. 167; Pl. Depo. 53-54).

On the "Production Achievement" section of the mid-year review, Booth rated Plaintiff as "needs improvement." (Booth Depo. 167). At that time, Plaintiff had achieved only 78.8% of her quota for the first six months of the year and was not on track to achieve her quota. (Booth Depo. 167; Pl. Depo. 153, 155). Booth indicated this was an area of concern for him because salespeople were not eligible for bonuses unless they reached 90% of their quota; Plaintiff, therefore, needed to improve in this area if she wanted to receive a bonus. (Booth Depo. 168). Overall, Plaintiff received a "Meets Expectations" rating on this informal evaluation, something that is not, from any viewpoint, negative. (Booth Aff. ¶8). Nonetheless, Plaintiff believed she was singled out on the

Orlando 37921.1

12

basis of her age and sex, because she received the "needs improvement" rating on the informal mid-year review. (Pl. Depo. 53). Plaintiff admitted in her deposition that the mid-year review did not constitute disciplinary action. In spite of her knowledge that co-workers of different genders and ages received similar reviews, she somehow felt "singled out." (Pl. Depo. 32-35, 148). In fact, all of her colleagues in the Central National Sales Office received informal mid-year reviews, and the reviews clearly were completed without regard to the employees' gender or age, as employees in each age and gender category received "Meets Expectations" and "Exceeds Expectations" ratings. (Booth Aff. ¶8).[12]

### H.     Booth's Alleged Gender And Age-Based Comments.

Plaintiff regarded two comments by Booth during the mid-year review as inappropriate. (Pl. Depo. 199-200). According to Plaintiff, Booth asked her if she planned on "staying home and enjoying marriage." (Pl. Depo. 27). Plaintiff also took issue with Booth asking her "if someone else could handle her accounts." (Pl. Depo. 27). Although Plaintiff believed the comments were "sexist and ageist," she did not regard them as harassment. (Pl. Depo. 57-58, 199-203). Consequently, Plaintiff did not report the comments to anyone in Hyatt's Human Resources Department. (Pl. Depo. 199-203). Plaintiff conceded in her deposition she had no idea why Booth asked her the two questions. (Pl. Depo. 27-28). When asked whether she believes her mid-year review had anything to do with her age or gender, Plaintiff stated, "I don't know." (Pl. Depo. 57).

Booth's account of the events differed slightly from that of Plaintiff. He noted that prior to the July 2001 mid-year reviews of Plaintiff and all of her colleagues who reported to him, he had

---

[12]  For example, Carol Buseman, female and age 49, received a "Meets Expectations" rating; Denise Cmiel, female and age 40, received an "Exceeds Expectations" rating; Molly Crompton, female and age 33, received a "Meets Expectations" rating; Melissa Daniels, female and age 35, received an "Exceeds Expectations" rating; Mark Henry, male and age 52, received an "Exceeds Expectations" rating; and Fred Reichelt, male and 45, received an "Exceeds Expectations" rating. (Booth Aff. ¶8; Patrick Aff. ¶5). The ages referenced are those at the time the reduction in force occurred in late September 2001. "Booth Aff." refers to the Affidavit of Brian Booth, attached hereto as Exhibit K.
Orlando 37921.1

received a call from a Hyatt executive at the Hyatt Regency Cincinnati, Scott Allen. (Booth Depo. 171). Allen reported a rumor Plaintiff might be leaving the NSF at the end of the year. (Booth Depo. 171). Booth testified without contradiction he was motivated to determine if Plaintiff was interested in a different job or work arrangements. (Booth Depo. 171). He therefore asked her if a home office was of interest; and in the event the report of her leaving Hyatt was true, who she would recommend to succeed her in handling her accounts. (Booth Depo. 172-173). He noted in particular the business necessity of obtaining her opinion whether her customers could be serviced by an NSF representative in Chicago versus Cincinnati. (Booth Depo. 174). At the time the mid-year reviews were conducted, there were no plans to close the Cincinnati NSF office where Plaintiff worked. (Booth Depo. 176). In fact, Booth reported back to Horne that Plaintiff had no intentions of leaving Hyatt and Horne was pleased. (Booth Depo. 178).

In any event, it is undisputed Booth was not the decisionmaker in any instance of adverse action of which Plaintiff complains. He did not select NSF staff for the post-September 11, 2001, reduction in force. (Booth Depo. 15-16; Horne Depo. 19, 23). He obviously was not the decisionmaker in the process whereby he was selected for Director of Sales for the Central National Sales Force; and he was not the decisionmaker with regard to the two other positions Plaintiff claims she was denied. (Horne Depo. 106, 108-110; Small Aff. ¶3; Helms Aff. ¶¶4-6). There is no record evidence that Booth participated in the decisions with regard to the promotional opportunities Plaintiff cites or with regard to the decision who would be affected by the reduction in force in September 2001.

## I.    The Tragedy Of September 11, 2001 And Its Effects On Hyatt's Workforce.

On September 11, 2001, America experienced what can only be described as one of the worst days in the nation's history. As terror hit American soil, several thousand lives were lost and

Orlando 37921.1

this country's already fragile economy weakened even more. Among the industries most affected by this tragedy were the airline and hotel industries. Hyatt did not escape this fate as its hotels experienced extremely low occupancy rates. (Helms Aff. ¶13). As previously discussed, Hyatt was experiencing difficult economic times even prior to September 11. (Helms Depo. 8-9).[13]

In the days following September 11, Hyatt hotels lost over $44,000,000.00 in business from immediate cancellations. (Helms Depo. 9). In fact, Hyatt's business had dropped by $415,000,000.00 from the previous year. (Helms Depo. 9). Not unlike other companies in the hospitality industry, Hyatt was forced to make difficult decisions to insure the continuing good health of the Company. (Helms Depo. 9-10). Hyatt's President, Scott Miller, informed his direct reports, including Helms, that they must immediately undertake more aggressive cost-cutting measures. (Helms Depo. 9-10).

### J.    The Reduction In Force In September 2001.

Armed with the mandate from the President of Hyatt, Helms held a meeting with his direct reports, Jack Horne, Fred Shea, the Vice President of Field Sales Operations, Rob Sarmiento, the Assistant Vice President of International and Individual Travel, and Steve Enselein, the Assistant Vice President of Catering and Convention Services, and requested that each examine the business environment from three perspectives: (1) costs savings opportunities; (2) minimizing lost production to the Company; and (3) impacting the fewest employees. (Helms Depo. 8-10; Horne Depo. 8, 14). Horne then evaluated the employees in the NSF and ranked them in three categories, A, B, and C, according to how essential their continued employment was to the Company's survival. (Horne Depo. 85-88). Specifically, Horne analyzed each NSF position from the standpoints of

---

[13] As stated previously, Hyatt narrowed each business unit down by 3% to save money on travel and expenses. (Horne Depo. 83; Helms Aff. ¶¶16, 17). Additionally, in May 2001, Helms recommended and Hyatt implemented numerous cost-savings measures impacting the NSF, including cutbacks in sales administration travel and expenses by 2.5%; eliminating the Divisional Director of Sales Meeting; reducing sales administration promotional expenses by 2%; reducing each NSF office budget by 3%; and lowering entry level compensation. (Helms Aff. ¶17).
Orlando 37921.1

impact on production and customer relationships. (Horne Depo. 8-9). He focused on maintaining excellent service for the customer, the geographic locations of all NSF salespeople, their respective mixes of business, and whether the customer base was individual versus group travel, or national versus international travel. (Horne Depo. 9-10).

Ultimately, Horne made the decision to eliminate 10 of the approximately 77 NSF sales positions, after consultation with Helms and other senior managers. (Horne Depo. 12-13; Patrick Aff. ¶¶4-5).[14] The ten persons affected by the reduction in force were: Mary Rocereto, Dawn Beagle, Jane Johnson, Barbara Loder Hildebrandt, Mary Patton, Dean D'Anna, Wendy Jensen Aylward, Cardella Gills, Herve Roussel, and Gayle Smith. (Defendants' Answers and Supplemental Answers to Plaintiff's First Set of Interrogatories to All Defendants, No. 4). [15] This group was composed of 8 females and 2 males, representing the approximate gender mix of the NSF as a whole. (Patrick Aff. ¶5). The group was similarly composed of 8 individuals age 40 or older and 2 under the age of 40. (Patrick Aff. ¶5). At all relevant times, the NSF was composed of approximately 77 persons, 45, or 58% of whom were over the age of 40. (Patrick Aff. ¶5).

Horne explained he selected Plaintiff for position elimination exclusively for business reasons, specifically his belief Hyatt would not lose any production or revenue from the customers Plaintiff handled. (Horne Depo. 8). Horne further explained that neither performance nor seniority was a consideration in any of the job eliminations. (Horne Depo. 52, 100; Helms Depo. 43, 47). Horne also noted that, although there were new hires in the year 2001, those individuals replaced other Directors of National Accounts or National Account Managers who had left their positions during that time. (Horne Depo. 104). Horne explained that the new hires were only recently

---

[14] "Horne Aff." refers to the Affidavit of John ("Jack") Horne, attached hereto as Exhibit L.

[15] Copies of Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories to All Defendants and Defendants' First Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories to All Defendants are attached hereto as Composite Exhibit M.
Orlando 37921.1

introduced to the customers of the departed Directors of National Accounts and the corporate directive of insulating customers from the negative impact of the reduction in force militated against a second change in NSF contact for these customers. (Horne Depo. 104-105).

Booth played no role in the decision to eliminate the 10 positions, including Plaintiff's position. (Booth Depo. 7-8). Horne did advise Booth of his decisions and asked his opinion about the impact of the proposed reduction in force. (Booth Depo. 8-9). However, Booth had no input regarding which individuals would be terminated and did not offer recommendations or participate in the reduction in force decision. (Booth Depo. 9). Once the decision to eliminate positions in the NSF became final, Booth was given the task of informing affected individuals in his region that Helms and Horne wanted to meet with them. (Booth Depo. 16-17). Thus, on September 28, 2001, Booth contacted the affected individuals, including Plaintiff. (Booth Depo. 17). During his telephone conversation with Plaintiff, Booth attempted to schedule a meeting between him and Plaintiff, and she declined. (Pl. Depo. 87-88). Booth then informed Plaintiff that her job was being eliminated. (Pl. Depo. 91). According to Plaintiff, Booth stated the reason her position was being eliminated was due to an "economic decision." (Pl. Depo. 97). To date, Plaintiff's position has not been replaced. (Horne Aff. ¶11).

### K.    The Reassignment Of Plaintiff's Accounts.

Following the elimination of Plaintiff's position, Booth made the decision to assign Plaintiff's accounts to several current Directors of National Accounts who were already performing related work. (Booth Depo. 37). Further, Booth testified, without contradiction, that he considered factors, such as matching up like industries to existing markets, geographical locations, and individual account levels, rather than age or gender, in assigning Plaintiff's accounts. (Booth Depo. 38). Although Plaintiff alleges in her Complaint and her Amended Complaint that her accounts

Orlando 37921.1

17

were given to less experienced younger individuals, in fact, Plaintiff's accounts were distributed to a diverse group of individuals for reassessment. (Booth Depo. 25, 37). The persons to whom Plaintiff's accounts were assigned consisted of persons both over and under the age of 40 and who were mostly female. (Defendants' Answers and Supplemental Answers to Plaintiff's First Set of Interrogatories to All Defendants, No. 3; Booth Depo. 25, 37). The ages of the individuals who were assigned Plaintiff's former accounts at the time of the reduction in force are as follows: Barbara Hale, 34; Molly Crompton, 33; Fred Reichelt, 45; Melissa Daniels, 35; Inga Spindola, 43; and Jennifer Roman, 32. (Patrick Aff ¶5). Four of this group were in their 30's, and two were in their 40's. All but one are female. Thus, any argument that such assignments were made based on gender or age are without factual support.

Further, whether Plaintiff perceives her experience and/or strengths to be superior to those of two younger females to whom her accounts were assigned, Molly Crompton and Barbara Hale, is irrelevant to her claims of age and gender discrimination. Simply because Plaintiff does not agree with the legitimate business decisions of Booth following the reduction in force does not logically lead to the conclusion that such decisions were made on the bases of age or gender.

**L.    Statistical Overview Of Hyatt's Workforce Before And After The Reduction In Force.**

A statistical analysis of the National Sales Force and the entire Company demonstrates no animus whatsoever towards female employees or employees age 40 and over. Interestingly, prior to the reduction in force, the sales personnel in Hyatt's NSF included 77 positions, 56 (73%) of whom were female and 21 (27%) of whom were male. (Patrick Aff. ¶5). After the reduction in force, which affected a total of 10 individuals in the NSF, the sales personnel in the NSF included 67 individuals, 48 (72%) of whom were female and 19 (28%) of whom were male. (Patrick Aff. ¶5). Thus, the gender mix fluctuated one percentage point after the reduction in force. Company-wide,

Orlando 37921.1

18

prior to the reduction in force, Hyatt's workforce consisted of approximately 36,069 employees, 18,508, or 51%, of whom were male, and 17,561, or 49% of whom were female. (Patrick Aff. ¶6). The reduction in force affected 228, or 44%, male employees and 294, or 56%, female employees. (Patrick Aff. ¶6). Following the reduction in force, as of December 31, 2001, the workforce was comprised of approximately 35,547 employees, 18,280, or 51%, of whom were male, and 17,267, or 49% of whom were female. (Patrick Aff. ¶6). Thus, the percentage of employees in each gender category, Company-wide, essentially remained the same prior to and after the reduction in force.

Similarly, prior to the reduction in force, the sales personnel in the NSF included only approximately six (9%) employees between the ages of 20 and 29; 28 (36%) employees between the ages of 30 and 39; 34 (44%) employees between the ages of 40 and 49; and 9 (12%) employees age 50 or over. (Patrick Aff. ¶5). A total of 56% (43 employees) in the NSF were 40 years of age or more at all relevant times. After the reduction in force, of the same group of employees, six (9%) employees were between the ages of 20 and 29; 26 (39%) were between the ages of 30 and 39; 26 (39%) were between the ages of 40 and 49; and 9 (13%) were age 50 or over. In other words, 52% of the NSF sales staff was still over the age of 40. Accordingly, before and after the reduction in force, the percentage of employees in each age category, as a percentage of the sales personnel in the NSF, essentially remained the same. In fact, the percentage of employees in the age 50 and over category **increased** after the reduction in force occurred. (Patrick Aff. ¶5). Not a single person 50 and older was adversely affected by the staff reduction. Also, in each of the five National Sales Offices in the National Sales Force, numerous employees older than the individuals affected by the reduction in force were retained. (Patrick Aff. ¶5).

Company-wide, prior to the reduction in force, Hyatt's workforce consisted of approximately 36,069 employees, 16,890 or 47%, of whom were age 40 or over and 19,179, or 53%

of whom were under 40. (Patrick Aff. ¶6). The reduction in force affected 130 employees (25%) who were 40 or over, and 392 employees (75%) under 40. (Patrick Aff. ¶6). Following the reduction in force, as of December 31, 2001, the workforce was comprised of approximately 35,547 employees, 16,760, or 47% of whom were 40 or over, and 18,787, or 53% of whom were under 40. (Patrick Aff. ¶6). Thus, the percentage of employees in each age category, Company-wide, remained the same prior to and after the reduction in force.

### M.    Summary Of Plaintiff's Claims.

On or about December 26, 2001, Plaintiff filed her Amended Complaint in the instant action in the Court of Common Pleas, Hamilton County, Ohio. Hyatt removed the action to this Court based on diversity jurisdiction. In her Amended Complaint, Plaintiff claimed she was discriminated against by Hyatt and individual Defendants Helms and Booth on the basis of her age and gender in violation of O.R.C. § 4112.01(A)(2) and asserted claims against Hyatt, Helms, and Booth for violation of Ohio Public Policy. On or about June 25, 2002, Plaintiff filed a second action in this Court. In that action, Plaintiff raised claims of gender discrimination against Hyatt under Title VII, age discrimination against Hyatt under the ADEA, and gender and age discrimination against Horne under O.R.C. § 4112.01(A)(2). Plaintiff also raised a claim for breach of Ohio Public Policy against Horne. On or about December 20, 2002, this Court consolidated the two actions, treating them as one lawsuit for all purposes. (Order on Plaintiff's Motion to Consolidate dated December 20, 2002). The parties have engaged in written discovery, including Defendants' production of over 23,000 documents to Plaintiff, and have taken numerous depositions. Discovery in this matter closed on or about January 6, 2003. As outlined in greater detail below, because Plaintiff can establish no genuine issues of material fact on any of her claims, summary judgment in favor of all Defendants on all issues is appropriate.

## II.    LEGAL ANALYSIS AND ARGUMENT

Plaintiff contends Defendants engaged in age and sex discrimination in violation of O.R.C. Chapter 4112, Title VII, and the ADEA, and that she was discharged in violation of Ohio Public Policy, but she has no direct evidence of either age or gender discrimination, and instead relies exclusively on speculation. Because no genuine issues of material fact exist as to her claims of age and gender discrimination and wrongful discharge in violation of Ohio Public Policy, summary judgment must be entered in favor of all Defendants as a matter of law.

### A.    Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party need not support its motion with affidavits or similar materials that negate the nonmoving party's claim but needs only to show an absence of evidence supporting the nonmoving party's case. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The existence of **some** alleged factual dispute between the parties cannot defeat an otherwise properly supported motion for summary judgment. *See Evans v. Jay Instrument & Specialty Co.*, 889 F. Supp. 302, 307 (S.D. Ohio 1995), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Instead, the nonmoving party must come forward with "specific facts showing that there is a **genuine issue for trial**." *Evans*, 889 F. Supp. at 307 (emphasis added, citations omitted). Mere allegations or speculation are not sufficient to defeat a motion for summary judgment. *See id.* Indeed, "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 932 (7th Cir. 1995)(emphasis in

Orlando 37921.1

original).[16] Thus, when a party cannot establish the existence of an element that is essential to the claim on which the party will have the burden of proof at trial, the court must enter summary judgment against that party. *See Evans*, 889 F. Supp. at 307. Thus, the non-moving party must go "beyond the pleadings and designate 'specific facts showing that there is a genuine issue for trial'" in order to defeat a motion for summary judgment. *Sublett v. Edgewood Universal Cabling Systems, Inc.*, 194 F. Supp. 2d 692, 696 (S.D. Ohio 2002), *citing Anderson*, 477 U.S. at 250.

Because Plaintiff has presented no more than speculative and conclusory evidence with regard to all of her claims, summary judgment in favor of all Defendants is appropriate with regard to all counts of her Complaints.

**B.    Plaintiff's Claims Of Age And Gender Discrimination Against Hyatt Fail As A Matter Of Law.**

Defendants are entitled to summary judgment as to Plaintiff's age and gender discrimination claims as there are no issues of material fact that would allow a fact-finder to conclude Defendants violated Title VII, the ADEA or O.R.C. § 4112(A)(2). The ADEA prohibits employers from discriminating against "any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's age." Title 29 U.S.C. § 623 (a)(1). Title VII declares that it shall be an unlawful employment practice to discriminate against any individual because of such individual's gender. 42 U.S.C. § 2000(e). Similarly, O.R.C. Chapter 4112 provides that employers may not discriminate against employees because of gender or age. O.R.C. § 4112.14(A). Ohio courts apply the same analysis used in federal anti-discrimination case law when evaluating claims brought under O.R.C. Chapter 4112, and, thus, Defendants' analysis under federal

---

[16] *See also, Ruth v. Allis-Chalmers Corp.*, 1986 U.S. Dist. LEXIS 26531 at *10-*11 (W.D. Ky. April 18, 1986) (summary judgment granted for defendant employer where there were no facts, only the plaintiff's speculation, to support claim that age was determining factor in termination); *Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226, 231 (Ky. 1984) (summary judgment affirmed for defendant employer where plaintiff's "claims regarding hidden motivations and conspiracy are totally unrelated to age discrimination"). A copy of *Ruth v. Allis Chalmers Corp.* is attached hereto as Exhibit N.
Orlando 37921.1

and state law will be treated together for the purposes of this Memorandum of Law. *See Irwin v. Marquette Medical Systems, Inc.*, 107 F. Supp. 2d 974, 981-982 (S.D. Ohio 2000), *citing Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131-132 (1981).[17]

### 1. Plaintiff Cannot Establish A *Prima Facie* Case Of Age Or Gender Discrimination Against Hyatt.

Plaintiff cannot establish a *prima facie* case of age or gender discrimination with regard to her claims that she was not promoted and her claims based on the termination of her employment during the reduction in force.

### a. *Applicable Burdens of Proof For Age And Gender Discrimination.*

A plaintiff may establish a *prima facie* case of employment discrimination through direct or circumstantial evidence. *See Sublett*, 194 F. Supp. 2d at 702, *citing Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). If such direct evidence is presented, the burden of persuasion shifts to the employer to show that it would have taken the same action even without the discriminatory motivation. *See id.* The Sixth Circuit has defined "direct evidence" to be proof that establishes discrimination on its own, without a need for the inference of discrimination arising from a *prima facie* case under the *McDonnell Douglas* burden shifting analysis. *See Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 114-115 (6th Cir. 1987), *abrogated on other grounds, Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Thus, direct evidence means that a plaintiff may establish a *prima facie* case of discrimination directly by presenting evidence to show an employer more likely than not was

---

[17] The only difference in the analysis of federal and Ohio anti-discrimination laws is that individual supervisors can be held jointly and severally liable under O.R.C. Chapter 4112, unlike under Title VII and the ADEA, and this issue will be addressed below. *See Genaro v. Central Transport, Inc.*, 84 Ohio St. 3d 293, 300, 703 N.E.2d 782, 787-788 (1999). Orlando 37921.1

motivated by discriminatory intent. *See Kittle v. Cynocom Corp.*, 232 F. Supp. 2d 867, 875 (S.D. Ohio 2002), *citing Mauzy v. Kelly Services, Inc.*, 75 Ohio St. 3d 578, 664 N.E.2d 1272, 1279 (1996).[18]

In the present case, there is no direct evidence of discrimination, as Plaintiff has pointed to no comments or actions by any of the Defendants that indicate an age or gender-based decision or animus. As will be discussed below, Brian Booth's comments could not be construed as direct evidence, as Booth played no part in the decision to eliminate Plaintiff's position, nor was he involved in the decisions with regard to the promotional opportunities Plaintiff claims she was denied. Thus, any comments by Booth, which were ambiguous and not directly related to her age or her gender, are not direct evidence of age or gender discrimination. *See Creech v. The Ohio Casualty Ins. Co.*, 944 F. Supp. 1347, 1358 (S.D. Ohio 1996)(noting that to support claims of discrimination, the comment must have been related to the discriminatory decision-making process and that isolated or ambiguous comments are too abstract to support a finding of discrimination).

Absent direct evidence of age or gender discrimination, courts analyze Title VII and ADEA claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Sublett*, 194 F. Supp. 2d at 702. Under *McDonnell Douglas Corp.*, although the burden of production may shift from the plaintiff to the defendant, the burden of persuasion remains with the plaintiff throughout the analysis. *See Irwin*, 107 F. Supp. 2d at 982. Using the McDonnell Douglas burden shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination. *See Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491, 497 (6th Cir. 2001).

Once a plaintiff has established a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.

---

[18] In *Kittle,* the court cited examples of what could be considered to be direct evidence. *See Kittle,* 232 F. Supp. 2d at 875. For example, if an employer states "I fired you because you are disabled" or tells an employee he or she is being demoted due to health problems, direct evidence of disability discrimination may be demonstrated, but when an employer expresses awareness of and concern for an employee's health, this is not direct evidence of discrimination. *See id.*

Orlando 37921.1

*Barnhart v. Pickrel, Schaeffer Ebeling Co., L.P.A*, 12 F.3d 1382, 1390 (6th Cir. 1993).  If the employer produces evidence of a legitimate, non-discriminatory reason, a determination of which can involve no credibility assessment, the burden of persuasion shifts back to the plaintiff to show that the employer's reason is a pretext for intentional age or gender discrimination.  *See Roh*, 241 F.3d at 498. Pretext may be demonstrated by showing (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; and (3) the stated reasons were insufficient to explain the discharge. *See Barnhart*, 12 F.3d at 1390; *Kline v. Tennessee Valley Auth.*, 128 F. 3d 337, 342-343 (6th Cir. 1997)(stating pretext may be demonstrated with a "direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible.")

In the instant case, Plaintiff cannot demonstrate a *prima facie* case of either age or gender discrimination.  Even if she could set forth sufficient evidence to establish a *prima facie* case, however, Plaintiff cannot show that Defendants' articulated legitimate, non-discriminatory reasons for hiring other individuals or eliminating her position pursuant to a legitimate workforce reduction were pretextual.

> **b.      *Plaintiff Cannot Establish A Prima Facie Case Of Age Or Gender Discrimination Based On Hyatt's Alleged Failure To Promote Her To Certain Positions.***

In the instant case, Plaintiff contends she was qualified for but overlooked for three promotions in the NSF, in part, based impermissibly on her age and/or gender, in violation of Title VII, the ADEA, and the OCRA.  As an initial matter, Plaintiff's claims with regard to alleged denied promotions fail under Title VII and the ADEA because she has failed properly and timely to exhaust her administrative remedies. *See AMTRAK v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 2070-2071 (2002)(finding that a party must file a charge of discrimination within 180 or 300 days of the

Orlando 37921.1