1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF OHIO

4                         WESTERN DIVISION

5

6      -------------------------------------------

                                          :

7   BARBARA LODER HILDEBRANDT,             :

                                          :

8              Plaintiff,                  :

                                          :

9         vs.                             :        CASE NO.

                                          :        C-1-02-0003

10  HYATT CORPORATION, et al,              :

                                          :

11             Defendants.                :

                                          :

12     -------------------------------------------

13

14

              DEPOSITION OF:     BARBARA LODER HILDEBRANDT

15

              TAKEN:            By the Defendants

16                              Pursuant to Agreement

17            DATE:             March 19, 2002

18            TIME:             Commencing at 9:00 a.m.

19            PLACE:            Waite, Schneider, Bayless &
                                  Chesley

20                              15th Floor Central Trust Tower
                                Cincinnati, Ohio   45202

21

              BEFORE:           Nancy A. Burns

22                                 and

                                Marlene L. Dori

23                              Notaries Public - State of Ohio

24

EXHIBIT
B

Page 25

1  A.  I felt that what happened to me was wrong.
2  Q.  Did you feel that maybe by bringing this
3  lawsuit that might give you some closure and help you deal
4  with your frustration or anger about the loss of your job?
5  A.  Yes.
6  Q.  Were you planning to sue Hyatt even before the
7  loss of your job?
8  A.  No, I wasn't.
9  Q.  Had you given any consideration to, prior to
10  your being informed that you were losing your job at Hyatt,
11  had you given any consideration to consulting an attorney or
12  another legal counselor about events at the workplace?
13  A.  No, I did not.
14  Q.  Were there any events at the workplace prior to
15  the loss of your job that you thought were wrongful or
16  unfair to you?
17  A.  Yes.
18  Q.  Can you tell me what those were?  And, again,
19  this is everything before the loss off your job.
20  A.  I felt that in the beginning of the year the
21  quota setting was unfair, I felt that initially I was given
22  a quota that was way out of range from anything I'd ever
23  received before, I felt that I was being set up to fail with
24  that type of quota, I protested it.

Page 26

1  Q.  Anything else?  And, again, well, we're going
2  to come back to all of this, but I'm just trying to get a
3  list of things that prior to the loss of your job you
4  thought was unfair but which you nonetheless did not consult
5  a lawyer about.
6  A.  I felt that there was potential for my job to
7  be eliminated.
8  Q.  Maybe I've not been clear.  I'm just trying to
9  ask what things happened, in other words comments, conduct,
10  what solid events happened that you believe constituted some
11  kind of unfairness prior to the loss of your job.
12  MR. STEINBERG:  Excuse me.  Are you relating
13  this question to her termination or to other
14  employment issues?
15  MS. GALLION:  I'm asking about everything
16  except her termination, because that will obviously
17  be a big topic for today.
18  Q.  So maybe I haven't made myself clear.  But
19  without talking about your termination at all, which we'll
20  certainly spend plenty of time doing as the day goes by,
21  what events prior to that, if any, did you think were
22  unfair?
23  A.  I thought I was given a very unfair mid-year
24  review, that the premise for the mid-year review was given

Page 27

1  to us five months into the review period.
2  Q.  Anything else that you can think of?
3  A.  Comments by Brian Booth at the review period.
4  Q.  How many comments?
5  A.  One comment in particular.
6  Q.  What comment was that?
7  A.  He made a comment about me staying home and
8  enjoying being married.
9  Q.  Anything else you can think of?  That was
10  unfair to you leading up to the loss, the eventual loss of
11  your job which we'll discuss later?
12  A.  Also that he asked if my accounts could be
13  handled by somebody else.
14  Q.  Is there any reason why that inquiry was unfair
15  that you could explain to me?
16  A.  Why would you ask that question of an employee
17  that's doing a great job?  Why would you want to take their
18  accounts away from that person?
19  Q.  Did he say that he wanted to take your accounts
20  away from you?
21  A.  He asked if somebody else could handle my
22  accounts.  Is that not same thing?
23  Q.  But he did not say that he wanted to take your
24  accounts away from you?

Page 28

1  A.  He asked if somebody else could handle them.
2  Q.  But my question is he did not actually say
3  words to the effect of I want to take your accounts away?
4  A.  No, he did not, however he did call, I believe
5  it was in June, and ask about a specific account that they
6  wanted to give to another salesperson.
7  Q.  Which account was that?
8  A.  Food Service Associates.
9  Q.  Was that a group account?
10  A.  It was a group account.
11  Q.  Was that account actually taken away from
12  you --
13  A.  No, it wasn't.
14  Q.  -- prior to your termination?  But he inquired
15  about taking it away?
16  A.  Yes, he did.
17  Q.  Did he say during that communication who he was
18  thinking of giving it to or what he was thinking of doing
19  with it?
20  A.  They were thinking about giving it to Jennifer
21  Rollman, an employee in Atlanta.
22  Q.  Did he give you any explanation of why he was
23  thinking this?
24  A.  That she needed accounts.

ESQUIRE DEPOSITION SERVICES
407.426.7676

Page 29

1    Q.   Anything else that you can think of leading up
2    to your termination that you thought was unfair, conduct,
3    comments, anything that you can point to?
4    A.   Nothing else.
5    Q.   But these events that you've just relayed to me
6    were not sufficient collectively or individually to compel
7    you to go consult a lawyer, is that correct?
8    A.   Yes.
9    Q.   And the quota setting, you are aware that
10   everyone who was similarly situated to yourself had their
11   quotas adjusted, are you not?
12   A.   No, I'm not aware.
13   Q.   You're not aware that every single one of your
14   co-workers had their quotas adjusted?
15        MR. STEINBERG:  Objection.
16   A.   No, I'm not.
17   Q.   Are you aware that every one of your co-workers
18   who was managed by Brian Booth also had a mid-year review?
19   A.   I'm aware of that, yes.
20   Q.   But you still feel that you were unfairly
21   singled out even though you were subjected to the same
22   treatment that other men and women of different ages were
23   subjected to in having to participate in a mid-year review?
24        MR. STEINBERG:  Excuse me.  Objection to the

Page 30

1    premise in that question.
2    Q.   You may answer if you understand it.
3    A.   I feel that the entire review was unfair.
4    Q.   So the whole process of a manager deciding to
5    undertake a mid-year review that affected you and others you
6    thought was unfair, correct?
7         MR. STEINBERG:  Excuse me.  Objection
8    misstating the testimony.
9    Q.   Is that your testimony, that just the whole
10   business --
11   A.   No.
12   Q.   -- of having a mid-year review --
13   A.   The actual premise of the review, the attitude,
14   the tone of his voice was unfair.
15   Q.   So it's not the review itself?  And, again,
16   don't let me bamboozle you, but I'm just trying to figure
17   out what the facts are.  It's not the fact of a mid-year
18   review in and of itself that's offensive but it was his
19   attitude and his tone, is that correct?
20   A.   Yes.
21   Q.   So just because --
22   A.   And his evaluation.
23   Q.   The content of the evaluation?
24   A.   Yes.

Page 31

1    Q.   If you learned that 80 percent of your
2    co-workers who were similarly situated got the same
3    evaluation even though they, too, were high performers would
4    you still feel that receiving the meets expectations
5    evaluation was offensive to you?
6         MR. STEINBERG:  Excuse me.  Objection to the
7    premise in that question.  We have requested
8    discovery and we have not received any such
9    information.
10        MS. GALLION:   If you'll just make your
11   objection, otherwise we just get derailed.  And I'm
12   going to get you that information but just long
13   objections just cause us to have to have --
14        MR. STEINBERG:  I'm objecting to your stating
15   evidence into the record that you haven't provided in
16   discovery and I don't have any way of testing whether
17   it's true or false.
18        MS. GALLION:   Okay.  Just make an objection
19   and we'll go forward.
20   Q.   The question stands.  My question is if you
21   learned that the vast majority, approximately 80, 90 percent
22   of your co-workers received the same rating as you in
23   connection with that mid-year review would you still feel
24   then, if this were so, that you had still somehow been

Page 32

1    singled out for unfair treatment?
2    A.   Yes.
3         MR. STEINBERG:  Excuse me.  Objection to
4    hypothetical question.
5    Q.   Would you still feel singled out?  Answer yes?
6    A.   Yes.
7    Q.   Why, if you were treated in the same way as the
8    vast majority of your co-workers?
9    A.   I was treated unfairly.  I don't care how they
10   were treated.  I was treated this way.  I thought it was
11   unfair.
12   Q.   Can you give me any more specific explanation
13   of why it would be unfair to you if similarly situated, high
14   performing co-workers got the same evaluation from a new
15   manager?
16        MR. STEINBERG:  Objection again to a
17   hypothetical question.
18   Q.   You may answer.  Can you give me any specific
19   explanation of why if similarly situated, high performing
20   co-workers such as yourself all received the same meets
21   expectations?
22   A.   I don't know why.  Why would high performing
23   receive mediocre reviews?
24   Q.   Would you agree that if they did --

8 (Pages 29 to 32)

Page 33

1    A.  That's silly.
2    Q.  If it did happen to other people of
3  different --
4    A.  You're saying it did.
5    Q.  If you'll just let me finish my question.
6    A.  Okay.
7    Q.  If it did happen to other people of different
8  genders and different sexes would you still feel singled
9  out?
10    MR. STEINBERG:  Excuse me.  I'm going to object
11    to questions that don't relate to any facts in the
12    case, that are purely hypothetical, and now it's
13    getting argumentative, and I'm going to ask you to go
14    to another subject.
15    MS. GALLION:  You cannot order the witness,
16    you cannot order me what questions to ask and not
17    ask.  To try to do so is disrespectful.  I've not
18    been argumentative in any way but I do think I'm
19    entitled to an answer to my question.
20    MR. STEINBERG:  If you harass the witness I
21    will take action.
22    MS. GALLION:  Well, I certainly haven't and
23    it's a great thing that we have a videotape.  There
24    are no raised voices.  I'm entitled, these are

Page 34

1  essential questions about the evidence in the case
2  and I'm entitled to answers and I'm going to continue
3  to go forward, and you cannot brow beat me or bully
4  me into not asking proper questions.  And I know you
5  wouldn't do that cause you're an honorable guy, so
6  let's not argue.
7    Q.  Is there anything that you can, to ask my
8  question better, to make it a little bit more
9  understandable, is there anything in particular that you can
10  point to to explain why or if you would still feel singled
11  out if it turns out that similarly situated, high performing
12  co-workers also got a meets expectations?
13    MR. STEINBERG:  Objection again to a
14    hypothetical question.
15    Q.  You may answer.
16    A.  I felt singled out.  I had a bad review.
17    Q.  You think a bad review is a meets expectations
18  review, is that correct?
19    A.  Every single review I ever had with Hyatt was
20  exceeds expectations.
21    Q.  Yes, ma'am, but my question was is a meets
22  expectations review a bad review in your, in your
23  evaluation, in your assessment?
24    MR. STEINBERG:  Objection.  The question has

Page 35

1  been asked and answered.
2    Q.  I didn't ask what you had gotten previously, I
3  asked you is a meets expectations review a negative one in
4  your assessment?
5    A.  Yes.
6    Q.  And it would not matter to you how many other
7  people who also might have gotten exceeds expectations or
8  role model or distinguished, also got a meets expectations,
9  is that right, it would not matter?
10    A.  It would not matter.
11    Q.  Okay.  Now, you also mentioned his attitude and
12  tone, that being Mr. Booth who is sitting to my left.  What
13  about his attitude and tone can you describe for me that was
14  offensive or unfair during the mid-year review?
15    A.  I thought he was demeaning, intimidating.
16    Q.  Can you describe anything in particular,
17  whether it was a physical conduct or a comment?
18    A.  Comments that he made that, which I stated
19  earlier.
20    Q.  The one comment about your being married and
21  did you want to stay at home and enjoy married life?
22    A.  I asked him why he would ask such a question
23  like that, I asked if he asked that question to men who were
24  recently married.

Page 36

1    Q.  Anything else that you can think of --
2    MR. STEINBERG:  Objection.  Would you let
3    her finish her answer?
4    Q.  I'm sorry.  Were you not finished?
5    A.  No, I was not finished.  I was very much upset
6  over the question, that he would even ask something like
7  that regarding my marital status concerning my job, that I
8  was just going to stay at home and retire.  I told him I had
9  no intention of quiting my job, that I was happily married,
10  that my husband enjoyed me working, that I liked my job and
11  I wanted to continue to do a good job for Hyatt.
12    Q.  Yes, ma'am.  Is there anything else about his
13  tone or his attitude that you can recall that you thought
14  was demeaning or offensive or unfair?
15    A.  The whole thing I thought was unfair and
16  demeaning, and offensive.
17    Q.  Is there anything else in particular that you
18  could identify to an outside third party that an ordinary
19  person of ordinary sensibilities would say I understand that
20  that's a comment or a question that's offensive?  I'm trying
21  to get to the specifics.
22    A.  I think that a lot of the review was not
23  accurate and I told him that.  He also expressed that no one
24  would see it.

ESQUIRE DEPOSITION SERVICES
407.426.7676

Page 45

1 a look at your complaint at some point. You say it was
2 increased by 40 percent and so I'm trying to analyze that
3 and trying to get your testimony on that subject.
4        What was increased by 40 percent?
5    A.  My group quota.
6    Q.  So that now, with an increase of 40 percent of
7 the group quota, that now meant that group was no longer
8 just 60 percent, your group was now 100 percent of your
9 quota --
10   A.  Yes.
11   Q.  -- is that correct? And that is the 40 percent
12 increase? Don't let me put words in your mouth.
13       MR. STEINBERG: Objection.
14   Q.  Is that the 40 percent increase, that your
15 group now became 100 percent of your quota?
16       MR. STEINBERG: Objection.
17   Q.  You may answer.
18   A.  Can we take a break?
19   Q.  Of course. We can take a break at any time.
20       MS. GALLION: Is that okay with you, Mr.
21 Steinberg? I'm happy to take a break.
22       MR. STEINBERG: That's fine.
23       (There was a brief recess.)
24   Q.  Let's go back to what we were talking about

Page 46

1 just to make sure that I understand, cause it can be
2 confusing. Is it fair to say that in 2001 you were informed
3 that your total quota would no longer have an IT or
4 transient component?
5    A.  Yes.
6    Q.  And we've already established that that was
7 something you had requested in years previous, correct?
8    A.  In the past year.
9    Q.  Yes. You had requested that number was too
10 small?
11   A.  Yes.
12   Q.  So now your quota was going to be composed of
13 100 percent group, correct?
14   A.  Correct.
15   Q.  And that was a potentially lucrative type of
16 opportunity if you could get your quota right, correct?
17   A.  Correct.
18   Q.  So the whole issue that then emerged, am I
19 correct, was what was your quota going to be?
20   A.  Yes.
21   Q.  And you had discussions with Mr. Booth about
22 that?
23   A.  Yes.
24   Q.  Were those in-person discussions?

Page 47

1    A.  No, they were not.
2    Q.  What did - They were by telephone?
3    A.  Yes, they were.
4    Q.  What did Mr. Booth say or recommend?
5    A.  He recommended a $5 million quota.
6    Q.  For the first six months?
7    A.  Yes, he did.
8    Q.  And what did you say?
9    A.  I said, I protested, I said it was bullshit.
10   Q.  And what did he say? ...
11   A.  He said, Okay, it's 4 million one.
12   Q.  So you had a brief conversation and when you
13 said it's bullshit and protested he dropped down to 4.1, is
14 that correct?
15   A.  Yes.
16   Q.  Now, was 4.1 million okay with you, within an
17 acceptable range?
18   A.  It was not.
19   Q.  What would have been acceptable?
20   A.  I had submitted 3 million or 3.2 million and
21 then we were asked to submit more, I submitted 3.5 million.
22   Q.  Wouldn't that have been less than what your
23 quota had been the year before, in the $3 million range,
24 since you had achieved 9 million in the year before?

Page 48

1        MR. STEINBERG: Objection, objection. You're
2 misstating the facts, you're mixing up quotas and
3 what she achieved.
4        MS. GALLION:  Do you have an objection?
5 Please just make it.
6    Q.  Hadn't your quota itself been more than just $3
7 million for each of the six-month periods in 2000?
8    A.  I don't recall it not being quotas for --
9    Q.  So you don't recall what those quotas were?
10   A.  I know what I achieved, obviously I can figure
11 out the math, but I don't have it in front of me.
12   Q.  And you achieved 125 percent and you had over 9
13 million, which was your achievement, correct?
14   A.  In group and transient IT.
15   Q.  But if you do the math doesn't that mean that
16 your quota was close to $8 million, right around 7.7 million
17 if 9.6 million is 100, if 125 percent of quota is 9.6
18 million?
19   A.  I don't recall what my group quotas were.
20   Q.  So you wanted 3.2 million?
21   A.  I had initially suggested 3.2 million.
22   Q.  And what did you think was a fair place after
23 negotiations to rest on for your quota?
24   A.  I, we were all asked to increase our quota so I

1 increased it to 3.5 million.
2     Q. And 3.5 you thought would have been fair and
3 appropriate if not a little bit challenging, is that
4 correct?
5     A. Given the business That I had on the books and
6 what I felt was going to close, yes, I felt that that was
7 fair.
8     Q. Are you aware if any of your colleagues who
9 were similarly situated also had their quotas increased?
10     A. I don't know.
11     Q. You didn't talk to any of your colleagues to
12 find out about their quotas?
13     A. I don't recall.
14     Q. Would that have been like a normal topic of
15 conversation between you and your colleagues to say, What's
16 your quota, here's my quota?
17     A. It could have been.
18     Q. Do you recall any of your colleagues indicating
19 to you that they similarly, men, women, different ages, all
20 had their quotas raised, too?
21     A. I assume we probably all had our quotas raised.
22     Q. Was 4.1 million fair to you?
23     A. It was not fair because I had indicated that I
24 felt I could do 3.5 million.

1     Q. Is it your view that if you can't achieve a
2 quota and so tell your boss that the boss should relent and
3 go with the quota that you can achieve?
4     A. Not necessarily so.
5     Q. You do understand that in a sales organization
6 it is the role of the supervisors and managers to push their
7 people toward higher and higher achievement, correct?
8     A. Yes.
9     Q. And you would agree with me, would you not,
10 that that's a proper role for managers and supervisors in a
11 sales organization, correct?
12     A. You're always trying to increase your sales.
13     Q. And that's what the managers are supposed to
14 implement and assist the salespeople toward doing, correct?
15     A. Yes.
16     Q. But somehow you had the view that that's not
17 what Brian Booth was trying to do with you, is that correct?
18     A. I felt that he was giving me a quota that was
19 unfair.
20     Q. Why?
21     A. Because it was a 40 percent initially over any
22 quota I'd ever been assessed.
23     Q. Do you have any idea what his opening
24 recommendation for increases of quotas were with any of your

1 colleagues?
2     A. No, I don't.
3     Q. So even without knowing what the experience of
4 your colleagues and similarly situated people were your view
5 was that even 4.1 million was unfair to you because of your
6 age or your gender, is that right?
7     A. I thought it was high for me personally for
8 what I had achieved previously.
9     Q. Where is the connection between the setting of
10 your quota for the first six months of 2001 at 4.1 million
11 and either your sex or your age?
12     MR. STEINBERG: Objection.
13     Q. You may answer. Where is the connection, if
14 there is any --
15     MR. STEINBERG: Objection.
16     Q. -- between the setting of this quota and your
17 age and your sex?
18     A. I thought that he was giving me an unreasonable
19 quota and I expressed that.
20     Q. I want to make sure you're finished. My
21 question is where is the connection, if you can say, if you
22 can identify anything, between a $4.1 million quota and your
23 age or your gender?
24     MR. STEINBERG: Excuse me. Objection. Again

1 calls for a legal conclusion.
2     Q. You're not a lawyer, are you?
3     A. No, I'm not.
4     Q. Okay. I'm not asking for a legal conclusion,
5 I'm asking you in your own mind, in your own view, if you
6 can say, where's the connection between your age or your
7 gender and the setting of the $4.1 million quota for the
8 first six months of 2001?
9     A. I don't, what do you mean by connection?
10     Q. How are they connected, where's the nexus, how
11 does one lead to the other is what I mean.
12     A. I still don't understand your question.
13     Q. Do you, yourself - here's a new question - did
14 you, yourself decide in your own mind that this $4.1 million
15 quota had something to do either with your gender, female,
16 or your age, 48 or 49 at the time?
17     A. I thought that it was an unreasonable quota for
18 me.
19     Q. My question, ma'am, is did you think that the
20 setting of this quota had anything to do with your age or
21 your sex?
22     A. No.
23     Q. That's my question.
24     A. No.

Page 53

1    Q.   Did you think that having a mid-year review
2    forget about rude or disrespectful comments, just having a
3    mid-year review, was there any connection between that and
4    your age or your sex in your mind?
5    A.   Yes.
6    Q.   What is the connection?
7    A.   I felt that I was being singled out to have an
8    unfair review.
9    Q.   And you can say this even without having any
10   idea of what the reviews might have involved or featured for
11   your co-workers, is that right?
12   A.   I don't know what they featured for my
13   co-workers.
14   Q.   But you are aware that everyone participated in
15   a midyear review, correct?
16   A.   I was not there at their reviews.
17   Q.   Did you talk to any of your co-workers to find
18   out if they were asked to participate in one?
19        MR. STEINBERG: Objection. I don't believe
20        that's an accurate statement of the facts.
21   Q.   I'm asking, it's a question. Did you ask any
22   of your co-workers to see if they had participated in one?
23   A.   I think they had reviews and some of them
24   talked about their reviews.

Page 54

1        MR. STEINBERG: Are you representing that all
2        directors of national sales had mid-year review? I
3        don't believe that's true.
4        MS. GALLION:   I don't, I'm not being
5        questioned. I'm simply asking if she asked if any of
6        her co-workers had a mid-year review, whoever they
7        may have reported to. And, again, I'm not being
8        examined. If you have an objection, Bob, just make
9        it, just make it. You're not a judge here today.
10       MR. STEINBERG: I don't believe it's
11       appropriate to represent facts that —
12       MS. GALLION:   I'm not misrepresenting
13       anything.
14   Q.   So let me just start all over with a new
15   question. Are you confused in any way about my questions?
16   A.   Somewhat.
17   Q.   Which one in particular are you confused by?
18   A.   You're asking me questions if everyone had a
19   review.
20   Q.   Who had a review to your knowledge, if you
21   know?
22   A.   I believe our office had a review, I don't
23   believe other offices had reviews.
24   Q.   I think you're right. And that means the

Page 55

1    people that worked for Brian Booth, correct?
2    A.   Correct.
3    Q.   Did you talk to any of them about whether they
4    had a mid-year review and, if so, how it went?
5    A.   I had some conversations with them.
6    Q.   So you certainly knew that among the people who
7    directly reported to Mr. Booth, that you weren't being
8    singled out just to have a mid-year review, correct? Just
9    to have one?
10   A.   I'm assuming, I don't know but everybody had
11   one, I don't know that for a fact.
12   Q.   Do you know of anyone, whether rumor,
13   conjecture or fact, who didn't have to participate in a
14   mid-year review?
15   A.   I don't know who had a review.
16   Q.   What is the connection between being asked to
17   participate in a mid-year review and your age, 48 or 49,
18   whatever it was?
19   A.   I wasn't asked to participate in it, I had to
20   participate it.
21   Q.   Then I'll rephrase my question. What is the
22   connection between your age at the time and being compelled
23   to participate in a mid-year review?
24        MR. STEINBERG: Objection. Calls for a legal

Page 56

1    conclusion.
2    Q.   You may answer.
3    A.   I don't understand the question.
4    Q.   How did you in your mind think to yourself
5    simultaneous with those events this is because of my age,
6    that I'm being made to participate in this mid-year review?
7    A.   I think the nature of the review made me feel
8    that I was being singled out.
9    Q.   That just to participate in one, let's not talk
10   about its content, just the fact of being told you needed to
11   participate in one, did you think to yourself this is
12   because of my age?
13   A.   That was before I had my review. If you're
14   told you're going to have a review you're reviewed.
15   Q.   Was it offensive to you to be told you're going
16   to have a mid-year review?
17   A.   It was offensive to be told in May that we were
18   going to be reviewed in June for six months and five months
19   had already lapsed with criteria that we had never seen
20   previously.
21   Q.   Those three things that you've just mentioned,
22   only being given a few weeks or a few months notice, five
23   months already passed, with criteria you've never seen, did
24   you think that those three, those three events or

Page 57

1  circumstances had any connection to your age or your sex?
2              MR. STEINBERG: Objection.
3       Q.  In your mind?
4       A.  Possibly.
5       Q.  Did you think so at the time?
6       A.  I thought the reviews were unfair. I've stated
7  that.
8       Q.  Yes, ma'am, but my question is not about
9  unfairness, my question is about your age or your gender.
10  I'll be happy to ask it again. Did you think at the time
11  this has something to do with my age or my gender?
12             MR. STEINBERG: Objection.
13      A.  I don't know.
14      Q.  So you have no recollection of having thought
15  that at the time, is that correct?
16      A.  I don't know.
17      Q.  As he made his comments to you did you think
18  that there was some reason that he was saying the things
19  that you thought were rude and disrespectful because of your
20  age?
21      A.  Yes.
22      Q.  What did he say that led you to think there was
23  a connection to your age?
24      A.  I think that when he asked me about my marriage

Page 58

1  and did I want to stay home it implied that I was old enough
2  to just simply give up my job and stay home.
3       Q.  So you thought that the question about being
4  married and staying at home --
5       A.  I thought it was sexist.
6       Q.  -- had something to do with age?
7       A.  And was demeaning.
8       Q.  But what did it have to do with your age?
9              MR. STEINBERG: Objection. Asked and
10  answered.
11      Q.  I don't understand. Maybe you can illuminate
12  it for me. How does this have anything to do with your age?
13  As opposed to your gender, which --
14      A.  I believe I answered your question that I felt
15  that he was implying that I should stay home.
16      Q.  Because you were older?
17      A.  Yes. Older and married.
18      Q.  And you think the comments about your marriage
19  were sexist, correct?
20      A.  Yes.
21      Q.  Has anyone else at Hyatt ever made any age
22  related remarks or any sex or gender related remarks or
23  sexist remarks to you?
24      A.  Not that I can recall.

Page 59

1       Q.  Let's just take Ty Helms, who you have sued as
2  an individual. Are you aware of that, that you've sued him
3  in his personal capacity?
4       A.  Yes.
5       Q.  Why? Why did you sue him in his personal
6  capacity, if you know?
7              MR. STEINBERG: Objection. Calls for a legal
8  conclusion.
9       Q.  Don't tell me anything about advice from your
10  attorneys, but if you, yourself know why you sued Ty Helms
11  individually, why did you do it?
12      A.  I believe he was involved in my termination of
13  my job.
14      Q.  Has he ever made any age related or gender
15  related comments to you?
16      A.  No, he hasn't.
17      Q.  Can you think of any conduct that he's ever
18  engaged in that seemed to have a connection to age or gender
19  in any way?
20      A.  Not that I'm aware of.
21      Q.  Other than the comment that you relayed about
22  now that you're married do you want to stay at home, and,
23  again, the record will have exactly what you said, I'm just
24  paraphrasing it, did Mr. Booth ever make any remarks that

Page 60

1  you thought had anything to do with age or gender?
2       A.  Not that I can recall.
3       Q.  Did Mr. Horne, Jack Horne with an E on the end,
4  did he ever make any such remarks, again, age or gender?
5       A.  I don't think I've ever really talked to Jack
6  Horne.
7       Q.  Are you contending that Mr. Horne made any
8  adverse employment decisions with respect to you?
9       A.  Yes, I believe he did.
10      Q.  What did he do?
11      A.  My job was eliminated.
12      Q.  What role did Mr. Horne play in your view,
13  based on what you know at this time?
14      A.  I don't know.
15      Q.  But you just said that you thought he did. Can
16  you tell me the foundation for thinking that?
17      A.  Well, he was my boss once removed. I assume
18  somebody made a decision to terminate my employment.
19      Q.  But you don't know what role, if any, he might
20  have actually played, is that correct?
21      A.  I don't know complete roles that everyone
22  played.
23      Q.  Okay. Have you been in touch with a number of
24  your current or former co-workers at Hyatt in the

15 (Pages 57 to 60)

Page 69

1    Q.   Does this appear to be one day after the first
2    FAX cover sheet, which is about six documents up the road,
3    BH 435? There you go. If you take a look at the top of 435
4    do you see a FAX date of October 8 across the very top of
5    the document?
6    A.   I do.
7    Q.   Does that appear that it was sent or received
8    on October 8, assuming the accuracy of that date?
9    A.   Yes.
10   Q.   And then if you take a look back at Number 455,
11   does that have a FAX date of October 9 from Hyatt National
12   Sales?
13   A.   Yes.
14   Q.   Did you have a conversation with Barb Hale in
15   between October 8 and October 9 asking for more data?
16   A.   I don't recall.
17   Q.   Do you recall having an interest in seeing
18   these documents?
19   A.   Yes, I do.
20   Q.   Is she the person that you would have asked,
21   because she continued to work there, to get you this
22   information?
23   A.   This is all the information she supplied to me.
24   Q.   But that's not my question. Let me just ask it

Page 70

1    again. My question for you is did you give her an
2    indication that you had an interest in receiving this
3    information?
4    A.   Yes, I did.
5    Q.   Did you ever discuss with her any of the
6    allegations that are contained in your amended complaint
7    that's on file with the Court?
8    A.   I did not.
9    Q.   Did you ever disclose to her that in your
10   charge of discrimination with the Equal Employment
11   Opportunity Commission as well as in your complaint that you
12   described her as a person who was less qualified than
13   yourself who had nonetheless been retained and had taken
14   some of your clients?
15   A.   Would you rephrase the question?
16   Q.   Did you ever disclose to her that in your
17   charge of discrimination with the Equal Employment
18   Opportunity Commission as well as in your amended complaint
19   that you described her as a person with less experience,
20   less qualifications, who nonetheless was retained by Hyatt
21   whereas you were not and that she also took some of your
22   accounts?
23   A.   I didn't discuss that with her.
24   Q.   Can you recall how many communications you've

Page 71

1    had with Miss Hale in the last seven months?
2    A.   Probably two or three.
3    Q.   And were they for the most part focused around
4    your request that she send you documents?
5    A.   I spoke with her obviously in early October,
6    but other than that, and I spoke with her when she resigned.
7    Q.   Did you speak with her within the last week or
8    two about her resignation?
9    A.   Yes, I did.
10   Q.   Did anything during that conversation come up
11   that you knew that these documents were going to be produced
12   to Hyatt and that Hyatt would then know that Barb Hale had
13   produced documents to you, did that come up in your
14   conversation with her?
15   A.   No, it did not.
16   Q.   You didn't feel you should alert her to that or
17   did you even know --
18   A.   I didn't talk to her about it.
19   Q.   Did she give you any indication why she
20   resigned?
21   A.   She said she was unhappy and that she had found
22   another job.
23   Q.   Did she mention any gender issues to you?
24   A.   No.

Page 72

1    Q.   Did she offer to be of any aid or assistance in
2    your lawsuit?
3    A.   Not that I recall.
4    Q.   Have you had any communications in the last
5    seven months with Bruce Small?
6    A.   No.
7    Q.   None at all?
8    A.   I don't believe I've spoken with Bruce Small.
9    Q.   Did Mr. Small even call you when he found out
10   that your job had been eliminated and that you were no
11   longer employed.
12   A.   I don't believe he called me.
13   Q.   Do you regard him as a friend?
14   A.   I do.
15   Q.   Have you asked him to produce documents to you?
16   A.   I haven't.
17   Q.   Have you e-mailed him at any time?
18   A.   No.
19   Q.   Or received an E mail?
20   A.   I don't know.
21   Q.   Is Mr. Small a person that you felt treated you
22   fairly while you reported to him?
23   A.   Yes, I do.
24   Q.   Do you know what his approximate age is?

18 (Pages 69 to 72)

Page 73

1    A.  I don't know his age.

2    Q.  Are you accusing him of any kind of age or

3  gender animus or bias?

4    A.  No, I'm not.

5    Q.  Do you know who Scott Allen is, the general

6  manager of the Hyatt Hotel here?

7    A.  Yes, I do.

8    Q.  How would you describe your relationship with

9  Mr. Allen?

10    A.  Our relationship was great, I thought it was

11  good.

12    Q.  Is he a friend?

13    A.  I would say he's a business friend.

14    Q.  Have you had any conversations with him leading

15  up to and after your marriage about your plans, your

16  business or professional plans?

17    A.  I don't recall.

18    Q.  Did you tell Mr. Allen that you may very well

19  leave Hyatt at the end of 2001 or change the nature of your

20  workplace commitment, did you make those comments to him in

21  2001?

22    A.  Workplace commitment, I don't understand.

23    Q.  The nature of your job, the number of hours,

24  the volume of work that you were doing.

Page 74

1    A.  I don't recall having a conversation with him.

2    Q.  So you're not saying that you didn't you

3  just --

4    A.  I just don't recall.

5    Q.  Were you indeed evaluating or re-evaluating

6  your work commitment in the year 2001?

7    A.  I was doing my job, I continued to do my job.

8    Q.  My question is were you in your own mind

9  re-evaluating or reconsidering your workplace commitment in

10  terms of how much longer you would work --

11    A.  No.

12    Q.  -- in your current position?  Did you discuss

13  with anybody at Hyatt Regency Cincinnati your plan to leave

14  your employment?

15    A.  I had no plans to leave.

16    Q.  Did you discuss with anybody, including Mr.

17  Allen, your plans to restructure your position or work less?

18    A.  No, not that I can recall.

19    Q.  Did you make any inquiry of him about other

20  opportunities for yourself?

21    A.  Of Scott Allen?

22    Q.  Yes.

23    A.  Not that I can recall.

24    Q.  Who was your assistant in your office here

Page 75

1  while you worked for Hyatt?

2    A.  Carla Gacasan.

3    Q.  And is it G-a-c-a-s-a-n?

4    A.  Yes, it is.

5    Q.  Where is Miss Gacasan?  Is she still here?

6    A.  She's in Cincinnati, yes.

7    Q.  Do you stay in touch with her?

8    A.  Occasionally, yes.

9    Q.  Did she also lose her job?

10    A.  She did.

11    Q.  At about the same time as yourself?

12    A.  I think shortly thereafter.

13    Q.  Isn't it true that the entire satellite office

14  in Cincinnati for the national sales force was closed and

15  that resulted in the loss of your job and her job?

16    A.  I don't know about her job.

17    Q.  Did you talk with her after you learned that

18  your job was being eliminated and you were being terminated?

19    A.  I told her that I was terminated.

20    Q.  Was she not terminated at exactly the same

21  time?

22    A.  No, she wasn't.

23    Q.  Do you know how much later she left or lost her

24  job?

Page 76

1    A.  I think it was shortly thereafter.

2    Q.  Do you know what she's doing now?

3    A.  I don't know what she's doing right at the

4  moment.

5    Q.  Is she a person that may have any knowledge of

6  any of the issues in this lawsuit?

7    A.  She may.

8    Q.  What issues might those be?

9    A.  I don't know what she is aware of.

10    Q.  Did you discuss any issues that you may be

11  having with Mr. Booth or with Hyatt with her?

12    A.  I discussed that I was upset over my mid-year

13  review with her and commented to her the remark that Mr.

14  Booth had made.

15    Q.  And what did she say or do, if anything?

16    A.  I don't recall what she said, if she did

17  anything, I don't know what she did.

18    Q.  Do you expect to call her or to involve her in

19  this lawsuit?  And, again, don't share with me any advice

20  from your attorney, but in your own mind is she a person who

21  may be a witness?

22        MR. STEINBERG:  Objection.  That calls for

23    legal decision and privileged information.

24    Q.  I'm asking you in your own mind is she a person

Page 85

1    A.  I might have spoken with Mary once or twice.
2    Q.  Have you spoken to her about her intention to
3  bring some type of a claim against the company?
4    A.  I don't know what her plans are.
5    Q.  Did you talk to her about getting together to
6  do some kind of legal action?
7    A.  I mentioned that I did have legal action.
8    Q.  What did she say?
9    A.  I don't, I don't recall.
10    Q.  She wasn't interested in joining in with you?
11    A.  She didn't say that.
12    Q.  Do you know if she's working anywhere else?
13    A.  I believe she is working.
14    Q.  Did either one of you in conversation express
15  the belief that there was an age or a gender bias at Hyatt
16  in connection with some of these recent decisions?
17    A.  I don't think we discussed that.
18    Q.  Fred Reichelt, R-e-i-c-h-e-l-t, have you been
19  in touch with Fred?
20    A.  No.
21    Q.  Have you been in touch with Inga, I-n-g-a,
22  Spindola, S-p-i-n-d-o-l-a?
23    A.  No.
24    Q.  Have you been in touch with Loretta?  And

Page 86

1  Loretta's last name is Venezia, V-e-n-e-z-i-a?
2    A.  I've spoken with Loretta.
3    Q.  How many times?
4    A.  Couple times, two or three times.
5    Q.  Are you aware that Loretta resigned in advance
6  of your, the loss of your job and the loss of others' jobs?
7    A.  Yes.
8    Q.  Do you know why she resigned?
9    A.  I think she was unhappy and had another
10  position.
11    Q.  What has been the substance of your
12  communications with her?
13    A.  She talked to me about her employment with
14  Westin, that she was enjoying a job.
15    Q.  Did you use her or attempt to use her as a
16  resource to attempt to find other hospitality industry work?
17    A.  No.  I'd already sent it to her boss or people
18  with Starwood.
19    Q.  Have you had any contact with Terri Williams?
20    A.  Terri Williams called me initially and then I
21  tried to call him back but we never connected.
22    Q.  Dawn Beagle, B-e-a-g-l-e?
23    A.  I haven't spoken with Dawn Beagle.
24    Q.  What about Trina?  Trina's last name is

Page 87

1  Cannacho dash London like the city.  Any contact with her?
2    A.  (Witness shook head.)
3    Q.  James Davis?
4    A.  Nope, no contact.
5    Q.  Karen Gray?
6    A.  No contact.
7    Q.  Any contact with Julie Green?
8    A.  Julie Green called me to express that she was
9  upset that I was terminated and also sent me a Christmas
10  card.
11    Q.  Did the two of you discuss any age or gender
12  aspect of your termination?
13    A.  I think she just simply said she was upset and
14  sorry that I was terminated.
15    Q.  Were you given any reason for being terminated
16  by anyone?
17    A.  I was terminated over the phone.
18    Q.  By whom?
19    A.  Brian Booth.
20    Q.  Did Brian Booth attempt to set up a meeting in
21  person with you?
22    A.  Yes, he did.
23    Q.  And did you decline to meet with him?
24    A.  Yes, I did.

Page 88

1    Q.  If you had sat down and met with him do you
2  realize that might have been an opportunity to find out
3  additional information or receive documents that might have
4  been of interest to you?
5    A.  He had expressed to me on the telephone that he
6  was simply coming in to deliver a packet of information to
7  me and that if I wanted further clarification why my job was
8  eliminated I could either call Jack Horne or Ty Helms.
9    Q.  Let's go back to the beginning.  Did he
10  telephone you and indicate that he wanted to meet with you,
11  is that the first thing that happened in this sequence of
12  events, Brian Booth called and said, I'd like to meet with
13  you?
14    A.  He said he was coming in to go to The Phantom
15  of the Opera with his family, said he was going to be here
16  anyhow.
17    Q.  He said, I'm coming to Cincinnati, my family
18  and I are going to go see Phantom and I'd like to see you,
19  is that correct?  Well, what did he say as best you can
20  recall?
21    A.  He asked if I had heard what was going on.
22    Q.  Had you?
23    A.  No.
24    Q.  So you did not have any idea that a number of

Page 89

1 people who worked in the corporate office were losing their
2 jobs?
3    A.   No.
4    Q.   Did you suspect that something might have to
5 happen in light of September 11 and the recession and just
6 the bad economic climate in the hospitality industry?
7    A.   I didn't really think about that.
8    Q.   Did you know there was a negative economic
9 climate in the hospitality industry by the third quarter of
10 2001?
11    A.   I was aware that it was beginning.
12    Q.   Did you know that the year itself, even before
13 September 11, had not been good due to recessionary and
14 other factors?
15    A.   Yes.
16    Q.   And you were certainly experiencing that with
17 your own quota, correct?
18    A.   Yes.
19    Q.   Because you were not on track to make your
20 quota due to recessionary and other factors, correct?
21    A.   Not the quota that was set for me.
22    Q.   Were you, were you -- Well, what other quota
23 would there be if not the one that was set for you?
24    A.   I had indicated, however, that I felt that I

Page 90

1 was still going to be on track to make my quota.
2    Q.   So you hadn't given up on the year --
3    A.   No, absolutely not.
4    Q.   -- even before September 11? Did you realize
5 by the time September 11 occurred that everybody nationwide
6 was going to have a lot of trouble making their forecasts,
7 their budgets, meeting their quotas?
8        MR. STEINBERG:  Objection.  Beyond the witness'
9 knowledge.
10    Q.   Did you have those thoughts, that for the
11 hospitality industry this was the harbinger of some even
12 tougher times?
13    A.   It was, I mean it started to be.
14    Q.   My question is did you have that thought, did
15 you recognize that even as it happened?
16    A.   Yes.
17    Q.   So did you have a good sense certainly by the
18 middle of September that it was very unlikely that you would
19 make your quota?
20    A.   I still felt that I had a chance to make my
21 quota.
22    Q.   Did it occur to you even before you heard
23 anything from Mr. Booth or others that in light of the
24 negative economic climate and the fact that many people were

Page 91

1 not traveling that there might have to be budget reductions,
2 cutbacks in staff, et cetera, at Hyatt?
3    A.   I perhaps knew that they were going to lay off
4 people in the field level.
5    Q.   But you didn't think that it would affect your
6 office?
7    A.   Yes.
8    Q.   So Mr. Booth early on in this conversation,
9 correct me if I'm wrong, after indicating that he and his
10 family are coming to Cincinnati and he'd like to see you
11 says, Have you heard what's going on or --
12    A.   Right.
13    Q.   -- words to that effect, correct?
14    A.   (Witness nodded.)
15    Q.   And was your answer, No, I don't know what
16 you're talking about?
17    A.   Yes.
18    Q.   And what did he then say?
19    A.   He said, Your job's being eliminated, we're
20 closing the Cincinnati office.
21    Q.   Were you aware or did you come to find out
22 later that the announcements were being made that others in
23 Chicago were losing their jobs that day and that the word
24 was then going to filter out through the grapevine and be

Page 92

1 all over the company by close of business Friday?
2    A.   I didn't know that.
3    Q.   Did you think that, sensing that word was going
4 to get out, that Mr. Booth should have been on a plane so he
5 would have been here that Friday to personally deliver that
6 word to you or have another person personally deliver the
7 word to you?
8    A.   I didn't think about it.
9    Q.   Do you think that it was unfair to you because
10 of your age or gender to communicate this sensitive
11 information, difficult information over the phone?
12    A.   Absolutely.
13    Q.   Did you think that it had a connection, though,
14 that he did so because of your age and because of your sex?
15    A.   Not necessarily.
16    Q.   Did you think he did just because he was
17 rude and didn't have sensitivity for others' feelings?
18    A.   He is rude and insensitive.
19    Q.   But not because of age or gender, is that your
20 testimony, he's just rude and insensitive?
21    A.   I said he's rude and insensitive.
22    Q.   But it's not your testimony that he's rude and
23 insensitive only to people who are female and only to people
24 who are older, is that correct?

23 (Pages 89 to 92)

Page 97

1  effect that your job was being eliminated, correct?
2      A.  (Witness nodded.)
3      Q.  Is that yes?
4      A.  Yes.
5      Q.  And you were shocked, correct?
6      A.  Yes.
7      Q.  And is the first comment that you made to him,
8  I'm going to sue, you'll be hearing from my lawyer?
9      A.  I said, Why me?
10     Q.  What did he say?
11     A.  He said, I said, Whose decision was it?  And he
12  said he had some input into it but it came from much higher
13  up.
14     Q.  Tell me about the rest of the conversation that
15  you can recall, after he said, after you said whose decision
16  and he said I had some input but it came from higher up.
17     A.  And he said much higher up.
18     Q.  And what happened then, who said what?
19     A.  He said, I said, What were the reasons?  He
20  said it was an economic decision and if I wanted to know
21  more I could either call Jack Horne or Ty Helms.
22     Q.  Did you elect to do that?
23     A.  Yes, I did.
24     Q.  Did you call both Ty and/or Jack?

Page 98

1      A.  I called Ty Helms.
2      Q.  Well, we'll go to that in a moment but just to
3  finish this conversation what happened after he said that?
4      A.  He said he was going to come in to meet with me
5  and I said I was going to have an attorney there.  And I said,
6  that's your prerogative and that he was simply coming in to
7  drop off a packet of information.
8      Q.  Did you tell him that there, don't bother?
9      A.  No, I didn't.
10     Q.  Or did you lead him to believe that you would
11  be there?
12     A.  I don't think I really said anything.  And then
13  he said, once again reiterated that he would be there at
14  9:00 o'clock.
15     Q.  And you said that you were going to have an
16  attorney there, that you would consult an attorney, and he
17  said that's your prerogative, correct?
18     A.  Yes.
19     Q.  Did you appear for the meeting as scheduled?
20     A.  No, I did not.
21     Q.  What did you do instead?
22     A.  I asked they send the packet of information to
23  my home.
24     Q.  How did you do that?

Page 99

1      A.  I wrote it in a note.
2      Q.  A note that was sent to whom and when?
3      A.  A note that I left on my assistant's desk to
4  give to him when he came in.
5      Q.  Did you know how to get in touch with him at
6  home?
7      A.  I knew he was staying in Cincinnati and one of
8  the assistant managers of the hotel called as a courtesy to
9  say that I was not going to come to the meeting at 9:00
10  o'clock on Monday.
11     Q.  Called who?
12     A.  Called to his in-laws.
13     Q.  So you --
14     A.  And left a message.
15     Q.  So you asked someone who was an assistant
16  manager at the hotel --
17     A.  Yes.
18     Q.  -- to call Brian at his in-laws' home as a
19  courtesy, correct?
20     A.  Yes.
21     Q.  But you didn't call him yourself?
22     A.  No, I did not.
23     Q.  Because you didn't want to talk to him?
24     A.  I didn't know how to reach him.  I assumed he

Page 100

1  would be there but I had her contact him.
2      Q.  Who was this?
3      A.  Tiffany Ross, Rossler.
4      Q.  Did she have his number to your knowledge, she
5  was therefore able to find him at his in-laws?
6      A.  I believe I might have looked it up.
7      Q.  So you had the number yourself, correct?
8      A.  I looked it up in the phone book.
9      Q.  You could have called him at the in-laws but
10  you elected not to, correct?
11     A.  Correct.
12     Q.  You didn't want to speak with him because you
13  were angry?
14         MR. STEINBERG:  Objection.
15     A.  I thought that there was no need to talk to him
16  because he said he was simply going to drop off a packet of
17  information.
18     Q.  Did you ask in your note or through Tiffany
19  that the packet just be sent to your home?
20     A.  Yes.
21     Q.  Did you have any further communications with
22  Mr. Booth at any time thereafter?
23     A.  None.
24     Q.  Did he say anything that was rude or

25 (Pages 97 to 100)

Page 105

1  insensitive, I thought that I had tried to reach him when it
2  appeared that he was available and he would not take my
3  phone call.
4      Q.  But you don't know what he was doing?
5      A.  I don't know what he was doing --
6      MR. STEINBERG:   Could she finish her answer?
7      Q.  If there's anything else, please say it.
8      A.  That's it.
9      Q.  But he didn't say anything or give any
10  indication that age or gender had anything to do with his
11  communications, did he?
12      A.  He said exactly what I said he said.
13      Q.  So my answer to my question, then, is no,
14  correct?
15      A.  I didn't ask him that question, I simply asked
16  him to call me.
17      Q.  He didn't say anything about or give any
18  indication that age or gender played any role in his
19  communication, did he?
20      A.  He said he was having a crazy day and assumed I
21  was having a crazy day.
22      Q.  If you would answer my questions it would be
23  the respectful thing.
24      A.  No, I will not.

Page 106

1      Q.  Thank you.
2      MR. STEINBERG:  Just a moment, just a moment.
3  I'm going to object because that question was asked
4  and answered three times and the answer she gave was
5  responsive.  She stated exactly what she said.
6      Q.  I would appreciate if you would just answer my
7  questions because then I won't ask them three times and if
8  there's anything unclear I'm delighted to rephrase anything.
9      Did you talk to anyone else in a position of
10  responsibility at Hyatt thereafter to try to find out why
11  your job was eliminated?
12      A.  No, I did not.
13      Q.  Do you know Chuck Floyd?
14      A.  Not really.
15      Q.  Is there a reason that you have listed Chuck
16  Floyd, if you know this even, in your answers to
17  interrogatories as a person who may have some knowledge in
18  this case?
19      A.  I believe from other people that he was
20  involved in the decision but I am not positive of that.
21      Q.  Who indicated that Chuck might have some
22  involvement?
23      A.  I believe it was Melissa Daniel.
24      Q.  Melissa?  What did she tell you?

Page 107

1      A.  She said that she felt that from what she had
2  heard it was a decision between Chuck, Ty and Jack.
3      Q.  And where is Melissa Daniel now?
4      A.  She's at her home office in Dallas, Texas.
5      Q.  She's still working for the company?
6      A.  Yes, she is.
7      Q.  What is her age, if you know?
8      A.  She's in her mid 30's I believe.
9      Q.  Did you think that her office should be closed
10  or her job should have been eliminated rather than yours?
11      A.  I felt that my accounts were given to people
12  that were substantially younger.  I didn't have any
13  thoughts --
14      Q.  Did you feel that, my question was did you feel
15  that the Dallas satellite office should have been closed
16  instead of yours?
17      A.  I believe I should have been able to keep my
18  job given my experience and my tenure with the company and
19  my contributions.
20      Q.  So Melissa Daniels should have been terminated
21  before you, is that correct?
22      A.  I didn't go through and determine who I
23  determined should have been terminated instead of me.
24      Q.  So it's true, is it not, that you filed a

Page 108

1  lawsuit without really even knowing why you were selected
2  for job reduction or job elimination, is that right?
3      MR. STEINBERG:  Objection.
4      A.  I believe I was terminated because of my age
5  and probably gender.
6      Q.  Can you give me all the reasons why you think
7  that is so?
8      MR. STEINBERG:  Objection.
9      Q.  You can start now.  Please give me each and
10  every reason why you think --
11      A.  My job was eliminated and my accounts were
12  given to women that were substantially younger than I am.  I
13  have far more experience than either of the two women who
14  acquired my accounts and I believe I was passed over for
15  promotional or asked.
16      Q.  Was this the promotional opportunity, is that
17  the one position that Brian Booth got in December of 2000,
18  is that the promotional opportunity you're referring to?
19      A.  Yes.  There were other opportunities, too, I
20  believe I was passed over.
21      Q.  Which ones are they?  They're not plead in your
22  complaint that I'm aware of so maybe you can enlighten me.
23      A.  I had talked to Mike Cheatham about the
24  position of AVP, AVP for individual travel.

27 (Pages 105 to 108)

Page 109

1    Q.   When did you have a discussion with him,
2  ballpark, about that?
3    A.   Probably the latter part of 1999.
4      MS. GALLION:   Is this an issue, counsel,
5    that's in the complaint?  Because it certainly would
6    appear to be time barred to me.  But if this is in
7    the complaint is this something you intend to rely
8    upon?  Cause if not I'll move on to another subject.
9      MR. STEINBERG:   Oh, her being passed over for
10    promotions is definitely part of a pattern that we're
11    going to rely on.
12    Q.   Did you talk to Mike Cheatham about the ABP of
13  individual travel?
14    A.   Yes, I did.
15    Q.   Tell me the other jobs and then we'll go over
16  each one, tell me everything you were passed over for that
17  you think has something to do, again, the nexus is that has
18  something to do with your age and something to do with your
19  gender or both.
20    A.   I expressed to Bruce Small that I was
21  interested in that position.
22    Q.   Which position?
23    A.   The AVP of individual travel.
24    Q.   You told Mike Cheatham and Bruce Small?

Page 110

1    A.   I told Bruce Small and he asked me to call Mike
2  Cheatham.
3    Q.   Before we talk about that tell me just each
4  opportunity.  We've got that AVP of individual travel in
5  '99.  Anything else that you were passed over for besides
6  Brian Booth's position in December of 2000?
7    A.   A lot of the opportunities weren't posted.
8    Q.   But what other opportunities are there, whether
9  they were posted or not?
10    A.   Associate director of sales.
11    Q.   Who got that job?
12    A.   Mark Henry.
13    Q.   When?
14    A.   I'm not exactly sure.  I believe in 1999.
15    Q.   Around '99?
16    A.   1998, I'm not sure.
17    Q.   Okay.  Who else, what other positions?  And
18  then we'll talk about each one.
19    A.   Those two come to mind.
20    Q.   Is there any other position?
21    A.   Brian Booth's position.
22    Q.   Just to make sure I've got the master list, the
23  associate director of sales that Mark Henry got in '98 or
24  '99, the Brian Booth position which is the director of

Page 111

1  marketing and sales December of 2000, and I also have the
2  AVP of individual travel, the one that involves Bruce Small
3  and Mike Cheatham in '99.
4    A.   Yes.
5    Q.   Any other positions that you were passed over
6  for?
7    A.   No, not that I'm aware of.
8    Q.   Let's take them in order.  The associate
9  director of sales, you think that was in '98 or '99?
10    A.   I believe it was in '99.
11    Q.   And that's a position that you were interested
12  in?
13    A.   Yes, it was.
14    Q.   Who did you communicate your interest to?
15    A.   Bruce Small and Mike Cheatham.
16    Q.   What did Bruce say when you told him of your
17  interest?
18    A.   I believe he felt that they already had
19  somebody earmarked for that position.
20    Q.   So you knew that the position was open,
21  correct?
22    A.   Yes, I did.
23    Q.   Whether it's posted or not really doesn't seem
24  to make any difference because you knew it was available,

Page 112

1  right?
2      MR. STEINBERG:   Objection.
3    A.   I —
4    Q.   Is that right?
5    A.   I knew it was available.
6    Q.   Okay.  So you are not in a position to claim
7  that whether it was posted or not you were deprived of
8  knowledge of its pendency?
9    A.   I —
10    Q.   You knew it was opened?
11    A.   I was interested in the position.
12    Q.   And you knew it was open, correct?
13    A.   Yes.
14    Q.   And you knew it was open in time to express
15  interest, correct?
16    A.   I don't know how timely it was considering the
17  fact that they had appeared to have earmarked someone
18  already for the position.
19    Q.   Who left that position so that it became open?
20    A.   Ty Helms.
21    Q.   And did word reach out to you in the field that
22  Ty was moving up and that this position was now available?
23    A.   Yes.
24    Q.   So you told Bruce Small and you were interested

28 (Pages 109 to 112)

Page 113

1 and Bruce said words to the effect of I think they've got
2 somebody earmarked for that?
3    A.  Yes.
4    Q.  And what did you say?
5    A.  I said I was still interested in pursuing it.
6    Q.  What did he say?
7    A.  He said to call Mike Cheatham.
8    Q.  Did you do that?
9    A.  Yes, I did.
10   Q.  Now, are you contending that Bruce Small made
11 decisions with respect to you that involved your age or your
12 gender?
13        MR. STEINBERG:  Objection.  Asked and answered.
14        MS. GALLION:   I'm not sure of the answer but
15 she's now making other allegations that he passed her
16 over so I think it's fair for me to ask again.
17   Q.  Are you contending that Bruce Small
18 discriminated against you or made decisions --
19   A.  No, I'm not.
20   Q.  Okay.  So the fact that Bruce said I think
21 they've got someone else earmarked, go ahead and call Mark
22 Cheatham, that was not unfair to you on the basis of your
23 age and sex, is that correct?
24   A.  No.

Page 114

1    Q.  All right.  When you called Mike Cheatham did
2 you reach Mr. Cheatham?
3    A.  Yes, I did.
4    Q.  Did you have a conversation with him?
5    A.  Yes, I talked to him.
6    Q.  What's his age, approximately, if you know?
7    A.  I don't know.
8    Q.  Did you know him very well?
9    A.  I knew him, not very well, I obviously knew
10 him.
11   Q.  Did he ever say or do anything that indicated
12 to you that maybe he was taking your age or gender into
13 account?
14   A.  No, he did not.
15   Q.  What did he say?
16   A.  He said the same thing Bruce Small said, in
17 essence, he thought they had already earmarked some of the
18 position.
19   Q.  And did that turn out, whether it was the right
20 purpose that they had earmarked, did it turn out that Mark
21 Henry ended up in that role?
22   A.  That wasn't Mark Henry, that was Rob Sirmiendo.
23   Q.  Was the Mark Henry position another one?
24   A.  Yes, it was.

Page 115

1    Q.  So there was actually four that were talking
2 about it?
3    A.  Three.
4    Q.  Three?  Well, I want to make sure that I have
5 everything straight.  We have the AVP of individual travel?
6    A.  Yes.
7    Q.  The Brian Booth position?
8    A.  Yes.
9    Q.  And then you told me the associate director --
10   A.  Yes.
11   Q.  -- of sales that Mark Henry got?
12   A.  Yes.
13   Q.  But is that not correct?
14   A.  That is correct.
15   Q.  What about Rob Sarmiento?
16   A.  They're two different things.  Associate
17 director sells the central national sales office and then
18 the AVP of individual travel.
19   Q.  Well, now, who got the AVP individual travel
20 job?
21   A.  Rob Sermiento.
22   Q.  I'm sorry.  You were talking about that other
23 opportunity and I'm still focused just on the Mark Henry.
24 How old is Mark?

Page 116

1    A.  Excuse me, I think that we're talking about two
2 different positions.
3    Q.  We are.  But I was, I'm still focused just on
4 the Mark Henry situation.
5    A.  We hadn't --
6    Q.  We hadn't discussed that at all.
7        MR. STEINBERG:  Excuse me.  The series of
8 questions you asked her was about the Rob Sarmiento
9 position.
10        MS. GALLION:   I'm sorry, I didn't even
11 realize that.
12   Q.  So I asked you - let me just back up - we've
13 been talking about the AVP of individual travel, correct?
14   A.  Yes.
15   Q.  And that's the one where Bruce said they've got
16 somebody earmarked?
17   A.  (Witness nodded.)
18   Q.  And Mike Cheatham said?
19   A.  Basically the same thing but he would talk to
20 Ty Helms.
21   Q.  Did you hear any more about it?
22   A.  At some point Ty Helms called me and said in
23 passing, Oh, by the way, Mike Cheatham just told me that you
24 were interested in this position.

29 (Pages 113 to 116)

ESQUIRE DEPOSITION SERVICES
407.426.7676

Page 117

1  Q.  And you said, Yes, I am?
2  A.  And I said, Yes, I am.
3  Q.  And what did he say?
4  A.  He said, It's good to know that you're
5  interested in advancement however we've selected Rob
6  Sarmiento.
7  Q.  Is there anything unfair or irresponsible or
8  disrespectful about this communication?
9  A.  He said the reason why they selected Rob
10  Sarmiento is because he spoke Spanish.
11  Q.  Did he speak Spanish?
12  A.  I don't know if he speaks Spanish or not.
13  Q.  Do you speak Spanish?
14  A.  No, I don't.
15  Q.  How old is Rob Sarmiento?
16  A.  I don't know how old he is.
17  Q.  Is he about your age?
18  A.  I'm not sure.
19  Q.  Did you believe that Rob Sarmiento got the AVP
20  of individual travel position over you because of your age
21  or gender, and, if so, why?
22  A.  Over my gender, yes.
23  Q.  So you think this was not an age decision but a
24  gender decision, is that right?

Page 118

1  A.  It was a gender decision.
2  Q.  Why?
3  A.  I think that women weren't considered for these
4  positions, that they had already selected who they wanted
5  before they were even announced, if they were announced.
6  Q.  What makes you think that has something to do
7  with being a woman?
8  MR. STEINBERG: Objection.
9  A.  A man got the job.
10  Q.  It's not illegal for a man to get the job, so
11  what makes you think that just because a man got the job
12  that a woman was unfairly excluded?
13  A.  I was qualified for the position but my
14  interest was never taken, I believe, seriously.
15  Q.  So then you are accusing Bruce Small and Mike
16  Cheatham of gender discrimination?
17  MR. STEINBERG: Objection.
18  Q.  Are you not?
19  MR. STEINBERG: That misstates the testimony.
20  Q.  You're not?
21  A.  No, I'm not.
22  Q.  Okay. Then who are you accusing of gender
23  discrimination in the selection of Rob Sarmiento? Who? It
24  has to be a person.

Page 119

1  A.  Ty Helms.
2  Q.  So Ty is, then, the person that you think
3  practiced gender discrimination, is that right?
4  A.  Yes.
5  Q.  And he's never said anything to you to reflect
6  a bias on the basis of gender, has he? I asked you about
7  this under oath earlier and you said no, did you not?
8  MR. STEINBERG: Well, then I object because
9  it's been asked and answered.
10  Q.  Didn't I ask you this earlier and you said no?
11  A.  I don't recall.
12  Q.  Then did he? Has he ever said anything to you
13  that explicitly focused on gender preoccupation or gender
14  bias?
15  A.  No.
16  Q.  How did you determine in your own mind that he
17  has such a gender bias?
18  A.  That I was not seriously considered for a
19  position that I was qualified for.
20  Q.  So you came to the conclusion in your own mind
21  that the only way that you, with your qualifications,
22  couldn't have been taken seriously was because you're a
23  woman, is that correct?
24  A.  I was not, I believe I was not taken seriously

Page 120

1  to be considered for the position.
2  Q.  But you don't have any hard evidence or proof
3  that that is so, do you?
4  MR. STEINBERG: Objection. That calls for a
5  legal conclusion. The proof will be coming later.
6  Q.  Do you have any evidence such as facts, words,
7  documents, anything that would support that?
8  A.  I don't have everything that's been given to
9  us.
10  Q.  Is it your, just your view that the only way
11  that you could have been passed over or not taken seriously
12  must be because you're a woman?
13  A.  I said I was not taken seriously when I
14  expressed my interest in the position.
15  Q.  Did you know if speaking Spanish was a
16  requirement for this job --
17  A.  No, I did not, no.
18  Q.  -- or not? Okay. Let's go, then, we just
19  finished talking about the AVP individual travel. Did you
20  ever affirmatively indicate in writing at any time anywhere
21  your interest in having that job?
22  MR. STEINBERG: Objection to the presumption in
23  that question.
24  Q.  Did you ever affirmatively indicate in writing

30 (Pages 117 to 120)

Page 121

1  on an evaluation, on a memo to your supervisors, did you
2  fill out a transfer or promotion form, did you ever do any
3  of that?
4      A.  No because a lot of those forms were not
5  required in order to express your interest.
6      Q.  At evaluation time did you talk to your various
7  managers about your interest in being promoted to that
8  position?
9      A.  That position wasn't available at the time when
10  I was being reviewed.
11      Q.  So you didn't apply for it and you never told
12  anyone of your interest --
13      A.  I told when the job became available --
14      Q.  -- until --
15          MR. STEINBERG:  Excuse me.
16          MS. GALLION:  I didn't finish my question.
17      Q.  So you never --
18          MS. GALLION:  You can't object cause there's
19  no question.
20          MR. STEINBERG:  I'm waiting for the question.
21      Q.  You never indicated your interested in that job
22  to anyone until you learned that it had been vacated at
23  which time you told Bruce Small and Mike Cheatham, correct?
24      A.  Yes.

Page 122

1      Q.  And you never filled out any documentation to
2  apply for that job, whatever that might have been?
3          MR. STEINBERG:  Well, excuse me.
4      Q.  Is that correct?
5          MR. STEINBERG:  I'm objecting to that question
6  because it assumes that there's some process the
7  company has to apply for these promotions.
8      Q.  Is that correct?
9      A.  There was no process, there were no forms to
10  fill out.
11      Q.  So the answer is no, correct?
12      A.  No.  There were no forms to fill out.
13      Q.  Let's talk about the next situation which is
14  the associate director of sales from '98 or '99.
15      A.  Yes.
16      Q.  And this is the position that Mark Henry got?
17      A.  Yes.
18      Q.  Are you saying that, in this lawsuit, that his
19  selection had something to do with age or gender?
20      A.  It had to do with gender.
21      Q.  Are you saying it did not have anything to do
22  with age in your view?
23      A.  I'm saying I believe it had to do with gender.
24      Q.  But my question is does that mean you're saying

Page 123

1  it doesn't have anything to do that you know of with age?
2          MR. STEINBERG:  I'm going to object because it
3      calls for a legal conclusion.
4      Q.  You're not a lawyer, are you?  We've been
5  through this.  I mean I'm only asking your own view, your
6  own personal views.  You didn't think to yourself, did you,
7  that this had something to do with age, correct?
8      A.  I don't know what I thought.
9      Q.  You thought it had something to do with gender,
10  is that right?
11      A.  Yes.
12      Q.  Okay.  Tell us about how the opportunity came
13  up and how you learned about it.
14      A.  All of a sudden Mark Henry was the associate
15  director of sales.
16      Q.  Who had had that position?
17      A.  No one had had it before.  Oh, well, I have to
18  go back.  I guess Christie Hicks had had it under Fred Shea
19  and then they didn't have an associate director of sales.
20      Q.  Christie Hicks had this job?
21      A.  How it was determined -- I don't know.
22      Q.  Christie Hicks had this job at one point?
23      A.  I believe so.
24      Q.  And then it wasn't filled, is that right?

Page 124

1          MR. STEINBERG:  Objection.
2      Q.  Is that what you just said?
3      A.  I don't know.
4      Q.  But Christie Hicks had this job, did she not?
5      A.  I believe so.
6      Q.  How, in light of the fact that a woman held
7  this job in recent years, did you conclude that there was a
8  gender bias for your not being considered?
9      A.  We were never told that they were going to
10  reinstitute the associate director of sales position.
11      Q.  How is just not telling you or others that the
12  position is to be reinstituted suggestive of the --
13      A.  They --
14          MR. STEINBERG:  Just a moment.
15      Q.  Let me finish - of a desire to keep woman out
16  of the job?
17          MR. STEINBERG:  I'm going to object because
18      these questions call for legal conclusions and
19      they're argumentative.
20      Q.  I'm not asking any of those, and I'm not being
21  argumentative, am I?  Am I being rude or disrespectful to
22  you in any way?  Please say so if I am.  We've got a nice
23  little record here, which is a great thing.
24      A.  I want to take my time to answer your questions

31 (Pages 121 to 124)

Page 125

1  correctly.
2    Q.  Okay.
3    A.  And I believe I'm doing --
4    Q.  Great. That's not my question. My question
5  is --
6       MR. STEINBERG:  Would you let her finish her
7  answer, please? You just interrupted her in the
8  middle of an answer.
9    A.  I'm trying to talk to you honestly.
10    Q.  I'm trying to ask you questions.
11       MR. STEINBERG:  Would you please let her finish
12  her answer?
13       MS. GALLION:  I don't even have a question
14  that's related to the deposition before her.
15    A.  Let's take a break, please.
16       MR. STEINBERG:  Take a break.
17       (There was a brief recess.)
18    Q.  Let's start over in our discussion about the
19  associate director of sales job that we think might have
20  become available in '98 or '99, is that correct?
21    A.  Correct.
22    Q.  Now, this is a position that Christie Hicks at
23  some point had held, correct?
24    A.  I believe so.

Page 126

1    Q.  And was it vacated and was not filled for some
2  period?
3    A.  I'm not positive.
4    Q.  In light of the fact that a woman was in that
5  position at one time, is that suggestive to you that women
6  were able to achieve and be considered for high level
7  positions in the national sales force at Hyatt?
8    A.  She had a position, yes, she was qualified for.
9    Q.  Now, is it true that this associate director of
10  sales position could not have been filled in '98 or '99
11  without the input of the decision-making Of Bruce Small?
12    A.  I don't know.
13    Q.  Are you aware that he exclusively made that
14  decision to place Mark Henry in that job?
15    A.  I'm not.
16    Q.  If that is so are you still of the opinion that
17  this was a gender-dictated decision?
18       MR. STEINBERG:  Objection to hypothetical
19  assumption.
20    A.  I don't know that Bruce Small made that
21  decision to have Mark Henry be the associate director of
22  sales.
23    Q.  If Bruce Small testifies under oath, as I
24  expect him to, that he alone made this decision to place

Page 127

1  Mark Henry in this job because he thought he was qualified,
2  do you feel that it was a gender-based decision?
3       MR. STEINBERG:  Same objection to a
4  hypothetical question.
5    A.  I don't know.
6    Q.  You may answer. You are aware that given his
7  position at the time Bruce Small would have been a person
8  with input into that decision-making, correct?
9    A.  Perhaps, yes.
10    Q.  Did you communicate to him your interest in and
11  availability for the associate director of sales job?
12    A.  It wasn't expressed that there was going to be
13  another associate director of sales.
14    Q.  So you really never had any opportunity to
15  express any interest in it because you didn't know it was
16  going to be filled, correct?
17    A.  Yes, correct.
18    Q.  And is it your testimony that there was no
19  notice given and all of a sudden Mark Henry was in the job?
20    A.  Yes.
21    Q.  So you didn't apply because you didn't know to
22  apply or express interest, correct?
23    A.  Yes.
24    Q.  Had you ever expressed to Bruce any other time

Page 128

1  your interest in a position such as the associate director
2  of sales position or another similar position in Chicago?
3    A.  Not in Chicago, no.
4    Q.  Where was Mark Henry resident?
5    A.  Chicago.
6    Q.  Isn't it correct that you actually had had
7  discussions with Bruce about your desire not to work in the
8  Chicago office and to remain in Cincinnati?
9    A.  I wanted to remain in Cincinnati but I was
10  never asked to move to Chicago.
11    Q.  Yes, ma'am, but my question is didn't you have
12  more than one conversation with Bruce Small, your friend,
13  wherein you reiterated to him that you did not want to work
14  in Chicago, number one, and that you wanted to remain in
15  Cincinnati, number two?
16    A.  I was never asked to work in Chicago.
17    Q.  That's not my question. And I'm, again, I'm
18  going to ask you to please focus on my questions and I'll be
19  delighted to focus --
20    A.  I am focusing on your questions.
21    Q.  Did you have such a conversation with Bruce
22  Small at any time where you told him I'm interested in
23  advancement but not if it means coming to Chicago?
24    A.  I told Bruce Small I believe I prefer to remain

32 (Pages 125 to 128)

Page 129

1    in Cincinnati. My dad was ill at the time and subsequently
2    passed away but after that I was available.
3         Q.    Did you get back to Bruce Small and say, Hey,
4    now I'm available to go to Chicago?
5         A.    I expressed an interest to Bruce Small about
6    the AVP position.
7         Q.    Which you knew was in Chicago, correct?
8         A.    Didn't have to be in Chicago.
9         Q.    That's a decision for management to make, is it
10   not?
11        A.    Ultimately.
12        Q.    You're not suggesting that there was a gender
13   or age animus involved simply because management wanted
14   management positions to be in the corporate office, are you?
15        A.    I said already that I expressed an interest in
16   the position and I was told to me that they had already
17   earmarked someone else for the position.
18        Q.    Ma'am, that's not my question. Please, my
19   question, we'll get out a lot faster, my question was are
20   you saying that because management wanted certain high level
21   positions to be in Chicago where the corporate office was
22   located that that decision in and of itself suggested age or
23   gender discrimination or unfairness?
24        MR. STEINBERG: Excuse me, I just object to the

Page 130

1    presumption in the question.
2         Q.    Is that what you're saying? Just because
3    management might want a senior position to be in Chicago
4    that alone suggests an age bias or a gender bias?
5         A.    I'm saying that I expressed my desire to remain
6    in Cincinnati with my father, and, but I was open to
7    promotions or anything that I was qualified and could be
8    offered to me.
9         Q.    Yes, ma'am, we have that on the record probably
10   three times, but none of that is responsive to my question.
11   My question is do you think that just the decision alone to
12   have certain positions resident in Chicago, a place that you
13   testified that at least at certain times in your career you
14   didn't want to be because it was not convenient, is that in
15   and of itself indicative of a gender or an age bias?
16        A.    I never said I particularly wanted to be in
17   Chicago.
18        MR. STEINBERG: I'm going to object. Just a
19   moment. You're referring to some alleged decision
20   that she knows nothing about.
21        MS. GALLION:   Put your objection on the
22   record.
23        MR. STEINBERG: It is, I've objected three
24   times to this question.

Page 131

1         Q.    But are you saying that if management just
2    wanted key decisions in Chicago that there's something wrong
3    with that?
4         A.    I don't know what their thoughts were that they
5    had to have key management, there were other people in the
6    company that operated out of other offices.
7         Q.    Didn't you just say under oath a few moments
8    ago that during your father's last illness it was best for
9    you to be here in Cincinnati?
10        A.    Yes, I did.
11        Q.    And you did communicate that, I believe you've
12   testified under oath you did communicate that to Mr. Small,
13   correct?
14        A.    Yes, I did.
15        MR. STEINBERG: Objection. Repetitious.
16        Q.    And I asked you did you at some point then go
17   back to him and say I'd now like to be considered for the
18   position in Chicago?
19        A.    I expressed my interest in the AVP of IT sales.
20   It never got to the point where anybody asked me would I
21   move to Chicago.
22        Q.    Did Bruce ever ask you if you would move to
23   Chicago if he was willing to give you consideration for an
24   opportunity there?

Page 132

1         A.    He never gave, there was no reason for me to
2    move to Chicago.
3         Q.    And on the associate director of sales
4    position, what is the basis on which you believe the
5    placement Of Mark Henry in that job had something to do with
6    gender?
7         A.    I don't know how Mark Henry got that job, he
8    just all of a sudden had the job.
9         Q.    But I'm asking you a different question. What
10   is the basis on which you've said under oath that it had
11   something to do with gender?
12        A.    I believe he got the job because he's a male.
13        Q.    And what do you base that on?
14        A.    Nobody else was informed of the decision to
15   have an associate director of sales.
16        Q.    Doesn't that mean other males weren't informed
17   of the decision, too?
18        A.    That I don't know. I know I was not —
19        Q.    You just know you weren't? —
20        A.    — informed.
21        Q.    And it's your view that if you weren't and
22   you're a woman it must be because you're a woman.
23        A.    I don't know that for a fact.
24        Q.    Let's talk about the third decision-making that

33 (Pages 129 to 132)

Page 133

1  you say you were excluded from and that's the Brian Booth
2  decision, in December of 2000. How did you learn that that
3  position was vacant?
4      A.  I'm not sure, I mean it wasn't, to my knowledge
5  it wasn't posted.
6      Q.  Isn't Bruce Small your good friend? Didn't he
7  tell you when he vacated that position in August of 2000?
8      A.  I don't know when exactly he vacated his
9  position.
10     Q.  Didn't you know that he was not your boss
11 anymore and that the position of your boss was vacant?
12     A.  I don't know the exact date when he vacated.
13     Q.  But my question was didn't you know at some
14 point in time that the position of your boss, the person you
15 reported to, was vacant?
16     A.  Yes, and Brian Booth was going to be the new —
17     Q.  Was there a point in time where you just knew
18 it was vacant but there was no announcement that someone new
19 was coming?
20     A.  I don't know the exact time line when Bruce was
21 told he was going to move over to another position.
22     Q.  Isn't it true that Bruce moved in late August
23 of —
24     A.  I don't —

Page 134

1      Q.  And that Brian Booth came in December and that
2  that job was vacant for five months?
3      A.  I don't know the exact time line on it.
4      Q.  Does that sound about right to you, that that
5  job was open for consideration to anybody who was interested
6  for about five months?
7          MR. STEINBERG:  Objection to that alleged
8  statement of facts.
9      Q.  Does that sound right to you?
10     A.  I don't recall how long the position was vacant
11 before.
12     Q.  Well, what did you do to express an interest in
13 it?
14     A.  I was not considered for the position.
15     Q.  My question is what did you do to express an
16 interest in it? Not what did someone else do, what did you
17 do?
18     A.  We were never asked if we were interested in
19 the position having been in national sales.
20     Q.  Did you send an E mail or a letter or make a
21 phone call upon finding out that it was vacant to
22 communicate to anyone, hey, I'm interested in that?
23     A.  No, I didn't.
24     Q.  Did you ask anyone to consider you for that

Page 135

1  position?
2      A.  No, I didn't.
3      Q.  I'd like it if you would take a look, please,
4  ma'am, under Tab 5. Tab 5 - I'll give you a moment to get
5  there. I believe that you'll see that it contains some of
6  your performance reviews and evaluations. Is the first one
7  that you have before you one with the Bates stamp number of
8  010332?
9      A.  Yes.
10     Q.  Let's start with that one. Why don't you take
11 a moment, it appears to be one with your signature on the
12 second page of it, April 16, '97, and it appears to involve
13 four pages.
14         Would you take just a moment and refresh your
15 memory with that and I'd like to ask a couple of questions.
16 And I'll just wait for you to tell me that you're ready.
17     A.  Okay.
18     Q.  Let's take a look at Page 2 which has the Bates
19 stamp number of 10333. It appears that you received an
20 exceeds expectations evaluation in or about April of 1997
21 signed by Mr. Small, is that correct?
22     A.  Yes.
23     Q.  Was this a fair and appropriate evaluation of
24 you?

Page 136

1      A.  Yes.
2      Q.  Is this consistent with your overall view of
3  him as a fair manager to you?
4      A.  I believe he was fair, yes.
5      Q.  And do you see right under, right before the
6  overall rating about the middle of the page it says Proposed
7  Goal Review, review the employee's proposed goals and draft
8  any amendments, additions or changes. Do you see that?
9      A.  Where is this?
10     Q.  Right in the middle of the page.
11     A.  Okay.
12     Q.  Right above Overall Rating. Do you see that?
13 Do you see where it says Proposed Goal Review?
14     A.  Yes.
15     Q.  Did you perceive that to be an opportunity to
16 indicate on a separate writing of your own what your goals
17 were for advancement of your career? My question is did you
18 know you could do that in other words?
19     A.  Yes.
20     Q.  Did you ever take the opportunity to talk about
21 career advancement and career goals during your evaluations
22 generally? And I'm not asking about this particular
23 document but did you generally use the yearly or every six
24 months —

34 (Pages 133 to 136)

Page 137

1  A.  I put it right in here, career advancement.
2  Q.  So you did take this opportunity, correct?
3  A.  Yes.
4  Q.  Show me exactly where you're talking about.
5  Which number are you referring to?
6  A.  010335.
7  Q.  And what in particular did you make a comment
8  about that related to career advancement?
9  A.  Just says Goals for your discipline for 1997,
10  it says Career advancement.
11  Q.  And what did you mean by career advancement?
12  A.  I obviously was talking to him about career
13  advancement.
14  Q.  Do you remember any discussions you had in
15  1997, what kind of career advancement you were interested
16  in?
17  A.  I think I probably had general conversations
18  with him about advancing my career. I don't recall off the
19  top of my head what they were from 1997.
20  Q.  So you would agree with me that these reviews
21  were great opportunities to talk about specific career
22  advancement, correct?
23  A.  If the opportunity presented itself to
24  advance. There were not always opportunities made known to

Page 138

1  us to advance in national sales, but obviously I was
2  interested in advancing my career with Hyatt.
3  Q.  Take a look at the next set of documents which
4  I believe you'll find to be your January 1998 review.
5  MR. STEINBERG: Excuse me. I think this is her
6  '97.
7  MS. GALLION:  Well, it's dated the review
8  date is January 30, 1998. It probably is for the
9  calendar year '97.
10  Q.  Take a moment just to take a look at the three
11  or four pages that involve that. I have a couple of
12  questions.
13  A.  Okay.
14  Q.  This, again, was from Mr. Small, is that
15  correct, even though it doesn't appear to be signed by him?
16  A.  I'm assuming that it was.
17  Q.  I think it says Mr. Small at the top of the
18  first page 10324, is the number I think, Reviewed by Bruce
19  Small is typed in?
20  A.  It does --
21  Q.  Does that sound correct to you?
22  A.  Yes.
23  Q.  And on Page 2 which is Bates stamped 010325 he
24  again gave you an exceeds expectations, correct?

Page 139

1  A.  Yes.
2  Q.  And did you think that was fair?
3  A.  Yes.
4  Q.  And deserved by you?
5  A.  Absolutely.
6  Q.  Let's go to the next page which is 010326. Is
7  this a document that was prepared by you or by him?
8  A.  By myself.
9  Q.  And was this for the purpose of reporting on
10  your own performance and having some input into your yearly
11  evaluation?
12  A.  Yes.
13  Q.  Take a look at the very next page. You list
14  your accomplishments, beginning at 010327, is that correct?
15  A.  Yes.
16  Q.  And take a look at Paragraph 8 of the
17  accomplishments which would be on the second page. You
18  reference entering your 19th year with the company and you
19  mention satisfied customers, excellent results and then you
20  -- Did you have good relationships with Fred, Christie and
21  Bruce?
22  A.  Yes.
23  Q.  Which Fred is this?
24  A.  Fred Shea.

Page 140

1  Q.  S-h-e-a?
2  A.  Yes.
3  Q.  Are you contending that Fred ever made any
4  gender or age based decisions with respect to you that you
5  know of?
6  A.  Not that I know of.
7  Q.  You're not alleging that Christie did, are you?
8  A.  No.
9  Q.  Well, who is Bruce? Bruce Small?
10  A.  Bruce Small was my boss who --
11  Q.  And you had a good relationship with him, too,
12  correct?
13  A.  Yes.
14  Q.  Okay. Take a look at the very next page. This
15  is your self assessment and goal setting, beginning at
16  010329. Do you see that?
17  A.  Yes.
18  Q.  Do you mention anything about going to Chicago
19  or any kind of particularized career advancement there?
20  A.  Not on this review I don't.
21  Q.  Take a look at the next page after that which
22  is a self assessment.
23  A.  Mm-hmm.
24  Q.  And goal setting, your proposed goals for '98.

35 (Pages 137 to 140)

Page 141

1    Do you see that document?
2        A.  Mm-hmm.
3        Q.  Do you see anything in there about advancing
4    your career or going to the corporate office or being
5    considered for any of these types of jobs that we've been
6    discussing?
7        A.  I did not put it in this particular self
8    assessment.
9        Q.  But you did put getting married as a goal?
10       A.  I wanted to get married eventually, yes.
11       Q.  Were you dating anyone in particular or
12   planning to get married?
13           MR. STEINBERG:  Objection, relevancy.
14       Q.  You may answer.  Were you planning to?
15       A.  It was probably just a stab of humor, that I
16   wanted to get married at some point.
17       Q.  Okay.  Take a look at the very next set of
18   documents which I think you'll see has a review date of
19   February 18, 1999.  Again, it's, the first page, 10319,
20   indicates that the reviewer is Bruce Small and it appears
21   you again got an exceeds expectations.  Is that a fair
22   assessment of your performance?
23       A.  Yes, it is.
24       Q.  Go to the fourth page under there which I think

Page 142

1    you'll see has a Bates stamp of 010322 and is that your own
2    prepared statement for goals and accomplishments?
3        A.  Yes.
4        Q.  And just tell us what your goals are as you
5    indicated for the calendar year 1999.  Do you see them
6    before?  Increase revenue?
7        A.  Mm-hmm.
8        Q.  Maintain Excellent client and peer and
9    corporate relations.  Do you see Number 3, increase your
10   customer base within your region?
11       A.  Yes.
12       Q.  Do you see anything else at all about
13   advancement or going to the corporate office or expressing
14   any kind of interest in these other jobs?
15       A.  You don't necessarily always have to put them
16   in the review.
17       Q.  But my question is --
18       A.  No, I did not.
19       Q.  -- do you see anything in this document?  Thank
20   you.  Let's go, then, skip two pages and now we're looking at
21   the review date of February 2000, 010313, and again it
22   appears that the reviewer is Mr. Small and again you've
23   received exceeds expectations.  Do you regard that as a fair
24   assessment of your performance --

Page 143

1        A.  Yes.
2        Q.  -- during '99?  And now if you'll skip two more
3    pages to 010315 there's a performance appraisal narrative.
4    Did you or he prepare that?
5            MR. STEINBERG:  Which page are you on?  Excuse
6    me.
7            MS. GALLION:   010315.  Says performance
8    appraisal.
9        Q.  That appears to be something that Bruce
10   prepared.  Is that what it looks like to you?
11       A.  Yes.
12       Q.  Is there anything on this particular document
13   as of February 2000 that references any kind of advancement
14   opportunities for you?
15       A.  From Bruce?
16       Q.  Yes, from Bruce.
17       A.  No.
18       Q.  Let's go to the next document which is 316.
19   Now, is this your self assessment and goal setting?
20       A.  Yes.
21       Q.  Is there anything that you see about expressing
22   an interest during this one time of year where you expressed
23   those things with your boss about going to the corporate
24   office or assuming a different area of responsibility?

Page 144

1        A.  As I said before, I expressed it verbally at
2    the end of 1999.
3        Q.  Can I take this as a no, that there's nothing
4    in this document that indicates your interest in some of
5    these jobs that you've been referencing, is that correct?
6        A.  No, but this was always not the place where you
7    identified that.
8        Q.  And let's go to page four of that document
9    which is 010318.  Do you see that, Proposed Goal for 2000?
10       A.  Mm-hmm.
11       Q.  Is that a yes, do you see that?
12       A.  Yes.
13       Q.  Good.  Do you see anything at all in that
14   proposed goal and your focus goals for 2000 that relates to
15   one of these Chicago opportunities or any desire for that
16   type of advancement?
17       A.  No, not on this page I do not.
18       Q.  Take a look at the next of your reviews which
19   is a review date of February 1, 2001 signed by Mr. Booth.
20   Do you see that?  It's Document 010310.
21       A.  Yes.
22       Q.  Take a look at the next page which is 010311,
23   and did you also receive from him an exceeds expectation?
24       A.  Yes.

36 (Pages 141 to 144)

Page 145

1    Q.   And this would have been for your performance
2  in 2000, correct?
3    A.   Yes.
4    Q.   And did you feel that that was a fair
5  assessment --
6    A.   Yes.
7    Q.   -- by Mr. Booth?  Although he had not been your
8  manager during that entire period, correct?
9    A.   Correct.
10    Q.   And take a look, if you will, to the third page
11  of that 2000 assessment, 010312.  There's a performance
12  appraisal narrative.  Do you see that?
13    A.   Yes.
14    Q.   Now, who prepared that, if you know?
15    A.   I don't know.
16    Q.   But you didn't, did you?
17    A.   I did not.
18    Q.   Is there anything, this is attached to Mr.
19  Booth's performance evaluation.  So just for right now let's
20  just assume he prepared it.  Is there anything in there
21  that's negative toward you or that suggests any kind of --
22    A.   I don't know who prepared it.
23    Q.   Well, just take a look.  Just for a moment
24  assume that maybe he did.

Page 146

1        MR. STEINBERG:  Objection to assuming something
2    she doesn't know.
3    Q.   That's okay, this is a discovery deposition.
4  Just for these purposes just assume that he did, but whoever
5  prepared this is there anything negative in it?
6    A.   Whoever wrote it was very positive about my
7  performance.
8    Q.   Okay.  Then go on to the next page, 010671.
9  Now, do you know what this document is?
10    A.   Yes, I do.
11    Q.   What is this?
12    A.   This is a mid-year review.
13    Q.   And this is the mid-year review that you're
14  complaining about in the lawsuit, correct?
15    A.   Yes, I am.
16    Q.   Before we begin with it, did you, in connection
17  with that previous evaluation did you submit any kind of a
18  document showing what your achievements and goals were?  I
19  didn't see one but I'm wondering if you have an independent
20  recollection whether there was one.
21        MR. STEINBERG:  Before she answers that
22    question I want to ask you are you representing this
23    is the complete document --
24        MS. GALLION:  Yes.

Page 147

1        MR. STEINBERG:  -- that you have?
2        MS. GALLION:  Yes.
3        MR. STEINBERG:  Okay.
4    A.   I don't know, I have to check my documents.
5    Q.   Well, I didn't find one in anything that you
6  produced, either.  So is there any reason you would not have
7  come up with something like that during your performance
8  review to maybe write down your own achievements and your
9  own goals?
10    A.   I don't recall.  As I said, I'll have to check
11  back through --
12    Q.   Okay.  Thank you.
13    A.   -- my reviews.
14    Q.   Now, let's do go to 010671 which is the
15  mid-year document.  Is this a copy, this three-page document
16  a copy of what Mr. Booth gave you?
17    A.   Yes.
18    Q.   And did he tell you that this was a document to
19  help you gauge where you were for the year?
20    A.   He told me no one else would see this and that
21  this was an assessment.
22    Q.   Did he tell you that this would not go in your
23  personnel file and that it was not an official action but
24  was just a sit-down at mid-year, figure-out-where-you-were

Page 148

1  kind of exercise?  Is that what he told you?
2    A.   He told us in May that we were going to be
3  reviewed and gave us the criteria and this was his
4  assessment which he laid on my desk before he left.
5    Q.   Yes, ma'am, but none of that was my question.
6  My question was didn't he indicate to you that this was a
7  gauge where you are at mid-year, not a formal action, will
8  not be in your personnel file kind of inquiry?
9    A.   Yes.
10    Q.   So you understood that this was not any kind of
11  official disciplinary action being taken against you, that
12  indeed it wouldn't even be in your file, correct, if what he
13  said was true, correct?
14    A.   Why bother to do it then?
15    Q.   But that's not my question.  My question is you
16  understood whether you liked it or approved that that's what
17  it was, correct?
18    A.   That's what he said.
19        MR. STEINBERG:  Can I ask what file this came
20    from?
21        MS. GALLION:  His files.
22        MR. STEINBERG:  Mr. Booth's files?
23        MS. GALLION:  Correct.  It's not in any
24  personnel files.  And in fact I'd like to make a

ESQUIRE DEPOSITION SERVICES
407.426.7676

## Page 153

1    A.  My quota ended up being 78 percent of an
2    artificially inflated quota.
3    Q.  So the answer is no, you were not, correct?
4    A.  No.
5        MR. STEINBERG:  Objection.
6    Q.  You were not on track, correct?
7    A.  It ended up that I did 78 percent of the quota
8    that was assigned to me for the first six months.
9    Q.  Which is less than 100 percent, correct?
10   A.  Yes.
11   Q.  So you were not on track to meet your quota,
12   whether the quota was fair or not is another subject, right?
13   A.  I did not make my quota for the first six
14   months.
15   Q.  So whether the quota was fair or not that would
16   ordinarily mean that someone needs improvement to try to
17   make their quota, correct?
18       MR. STEINBERG:  Objection.
19   Q.  Is that correct?  If you're not making your
20   quota don't you need to improve somehow so that you can do
21   your best to try to make your quota?
22   A.  I always try to do my best to make my quota.
23   Q.  But generally.
24   A.  I did make my quota.

## Page 154

1    Q.  But generally would you agree with me that if
2    one is in that boat whether it's due to the recession --
3    A.  Not necessarily so.
4    Q.  So you're saying this was an unfair mark,
5    correct, there was nothing more that you could do?
6    A.  I'm saying the quota was unfair.
7    Q.  So the IN, the improvement needed, was unfair
8    because the quota was unfair, correct?
9    A.  Yes, it was.
10   Q.  Now, account penetration, sales activity.  It
11   says you met your expectations.  Would you agree that you
12   did?  That you at least did what you were supposed to be
13   doing?
14   A.  Absolutely.
15   Q.  Okay.  The next is physical responsibility and
16   budgets.  And it says you exceeded expectations.  Would you
17   agree that that's a fair and accurate analysis?
18   A.  Yes.
19   Q.  And then the next thing is understanding and
20   knowledge of future group revenue targets.  And you're told
21   that you meet expectations in that regard.  Is that accurate
22   and fair, that you did meet expectations?
23   A.  Well, I could have exceeded expectations, but
24   it was really never discussed.

## Page 155

1    Q.  But did you feel that you at least met your
2    expectations?
3    A.  I felt I had a good understanding of what was
4    expected and that in my mind exceeds expectations.
5    Q.  And it says under the comment of financial
6    management that production for the first half of 2001 was at
7    78.8.  Was that accurate?
8    A.  Yes.
9    Q.  And then it says or 3.2 million in group
10   revenues.  Is that accurate?
11   A.  I believe so.
12   Q.  And then it says the second half of the year
13   you need to increase your sales activity with existing
14   accounts and develop new business.  Would that be a fair
15   statement that you'd expect a sales manager to say at any
16   time?  (No response)  Increase sales activities with existing
17   clients, develop new business.  Does that sound like a fair
18   thing to say on any day of the week in a sales organization?
19   A.  But the whole financial management aspect of it
20   was unfair.
21   Q.  Ma'am, just answer my question.  I'm not asking
22   you about the whole financial.  I'm just asking you isn't it
23   fair on any given day in a sales organization, and in
24   particular an evaluation time, to say please increase your

## Page 156

1    sales activity with existing accounts and try to develop new
2    business?
3    A.  That's fair.
4    Q.  And it says need to be creative in executing
5    sales plan as budget restrictions remain in place.  Isn't
6    that also a fair thing to say any day of the week in a
7    recession in a sales organization?
8    A.  I was always extremely careful with the budget
9    and the money that was allocated to me that I spent.
10   Q.  And isn't it a good thing for a manager to say
11   be creative in executing your sales plan?
12   A.  Yes.
13   Q.  Nothing unfair in and of themselves about those
14   comments, would you agree with me?
15   A.  But he's alluding to the fact --
16   Q.  Is the answer yes, there's nothing unfair, and
17   then you're going to answer more?
18   A.  I'm not finished answering your question, I'm
19   trying to answer it for you.
20   Q.  My question, though, if you just answer mine
21   first and then say anything else it's okay.  But would you
22   agree with me that nothing under those comments is either
23   untrue or unfair?
24       MR. STEINBERG:  Just a moment, just a moment.

**Page 157**

1    The witness is allowed to answer the question in the
2    form that she sees fit. If you're not satisfied with
3    her answer you can ask another question or repeat
4    your question.
5        Q.   I'll just repeat it.
6        MR. STEINBERG: I'm going to ask you to stop
7    interrupting her when she's trying to answer your
8    question.
9        Q.   I'm happy to give you all the time in the
10   world. I only ask that you answer my question first --
11       A.   I'm trying to answer your question.
12       Q.   -- and then say anything else.
13       A.   I think it's unfair.
14       Q.   What is unfair?
15       A.   It's unfair that he says the second half needs
16   to increase sales activities comparing it to the first half
17   that he felt that I fell short. That's my answer.
18       Q.   So is it that you fell short in the first half
19   that's unfair or that you just needed to pick it up in the
20   second half or both?
21       A.   It's unfair that I was given a quota that was
22   too high.
23       Q.   Where is there some indication that this was
24   done because of your gender or your age?

**Page 158**

1        MR. STEINBERG: Objection.
2        Q.   If anywhere?
3        THE WITNESS:   Can we take a break now?
4        Q.   I really don't want to take a break.
5        MR. STEINBERG:  We're ten minutes past our
6    agreed lunch break.
7        MS. GALLION:   Well, you know we are. I'll
8    tell you what, if you need to take a break, great, I
9    don't intend to go through this whole document, so if
10   you think that's going to take too much time I'm
11   happy to take a break.
12       MR. STEINBERG:  Well, I think it will, I mean
13   if you're asking her if Mr. Booth wrote down that he
14   did this because of her gender --
15       MS. GALLION:   It's a good thing you don't get
16   to testify. I'm happy to take a break, and we will
17   come back at your convenience at whatever time is
18   good for you. So just let me know.
19       (Luncheon recess)
20       Q.   I'd like to continue our discussion of this
21   mid-year review and in particular with the document numbered
22   671 which is the first page of the mid review. I'd like to
23   take a look at the business relationships column. You are
24   rated as exceeding expectations with your customer

**Page 159**

1    relationships. Would you agree that that's fair and
2    accurate?
3        A.   Yes, I would.
4        Q.   You are rated meets expectations with field
5    relationships all levels. Is that a fair and accurate
6    rating?
7        A.   I would say not.
8        Q.   Do you think it should have been exceeds?
9        A.   Yes.
10       Q.   And, again, I believe you testified previously
11   that you think meets is an unsatisfactory evaluation or
12   criteria?
13       A.   I thought I had excellent or I did have
14   excellent relationships with people in the field.
15       Q.   So you take this to mean that just saying that
16   you meet the criteria somehow means that they aren't
17   excellent, that they're just satisfactory, is that how you
18   interpret this?
19       A.   That it's meets expectations but I felt that I
20   exceeded expectations in that area.
21       Q.   And now in relationships, employee
22   relationships, you're rated as exceeds. Does that sound
23   appropriate and fair?
24       A.   Yes.

**Page 160**

1        Q.   And then in the next two, conflict resolution
2    and customer event participation you're given meets
3    expectations. Do you think those are fair?
4        A.   No.
5        Q.   You think they are too low?
6        A.   Too low.
7        Q.   Now, is there any, do you think you were rated
8    too low in those because of either your gender or your age?
9        A.   No.
10       Q.   Now, the overall rating for the business
11   relationships is exceeds expectations. Is that what it
12   should be in your view?
13       A.   Yes.
14       Q.   And then there was some comments and you are
15   told that you have solid relationships with your customer
16   base. Is that a fair and accurate statement?
17       A.   That's accurate.
18       Q.   There's a sentence that says, With new staff
19   coming to national sales force be receptive to them as they
20   look to the established players for guidance. Is that a
21   fair and accurate and appropriate comment?
22       A.   That was a comment I didn't make.
23       Q.   But to you, did you interpret it, it looks like
24   it's describing you as an established player. Does that

40 (Pages 157 to 160)

Page 197

```
 1        A.  I believe till December 1st.
 2        Q.  Did you exercise your Cobra rights under the
 3   Hyatt plan?
 4        A.  Yes, I did.
 5        Q.  So does that mean for the months of October and
 6   November --
 7        A.  Yes.
 8        Q.  -- you paid the Cobra rate in order to enjoy
 9   health and life insurance, is that correct?
10        A.  In order to have it.
11        Q.  And you did in fact have it and enjoy having
12   it, correct?
13        A.  I had it.
14        Q.  When I say enjoy it means the same thing.
15        A.  (Witness nodded.)
16        Q.  In other words it was a benefit that you had,
17   correct?
18            MR. STEINBERG:  Objection.  To the term enjoy.
19            MS. GALLION:   Look it up in the dictionary,
20        it's a great word.
21        Q.  But it means to have, basically.  You utilized
22   that type of insurance, correct?
23        A.  Yes, I did.
24        Q.  Okay.  How much did you pay for those two
```

Page 198

```
 1   months to try to --
 2        A.  I don't recall off the top of my head.
 3        Q.  Was it more than a thousand dollars?
 4        A.  I'm not sure, I'd have to look at my notes.
 5        Q.  Now, since that time have you been privileged
 6   to participate in your husband's programs for both health
 7   and life insurance?
 8        A.  I don't believe there's a life insurance
 9   program.
10        Q.  Is there any life insurance that you have on
11   your own life?
12        A.  I'm continuing the life insurance with
13   Hartford.
14        Q.  Do you know what you are paying for that either
15   on a monthly or quarterly interval?
16        A.  I'm not 100 percent sure.  I believe it's around
17   $150.
18        Q.  Per month?
19        A.  I'm not sure, I'd have to go check my records.
20            MS. GALLION:  I'll make a supplemental
21        request for that type of information.
22        Q.  And has there been any increase in your
23   husband's insurance due to the fact that you now
24   participate?
```

Page 199

```
 1        A.  I don't know.
 2        Q.  Is the health insurance that you have now about
 3   the same in terms of content and privileges as what you
 4   enjoyed at Hyatt?
 5        A.  I'm sure probably, I don't know for a fact.
 6        Q.  Have you lost your physicians or pharmacy or
 7   anything like that?
 8        A.  I don't know, I haven't --
 9        Q.  Has not been an issue or you've not had to --
10        A.  It has not been an issue and have not had the
11   need.
12        Q.  Take a look, if you will, we're going to move
13   ahead to Tab 4.  Have you seen any of Hyatt's policies on
14   the subjects of harassment and discrimination and equal
15   employment opportunity?
16        A.  I don't recall having this policy manual given
17   to me.
18        Q.  Are you aware that these policies are --
19        A.  I'm aware that there is a policy manual, we
20   just, I just didn't, was issued one.
21        Q.  10632 which is this policy against harassment,
22   I'd like to ask you a few questions about it, and I think
23   you have it before you.  This policy indicates that the
24   company prohibits, it does not tolerate harassment of any
```

Page 200

```
 1   type and it mentions gender harassment.  Did you perceive
 2   that you had been harassed on the basis of your gender by
 3   the comments that you've attributed to Mr. Booth?
 4        A.  I feel that it was an inappropriate comment.
 5   And I expressed that.  I didn't report it.
 6        Q.  Did you regard it as harassment based on your
 7   gender?
 8        A.  I regarded it as an inappropriate comment.
 9        Q.  I'll take that to mean no.  Did you know that
10   if you did regard it as harassment based on gender that you
11   would have had under this policy the privilege of reporting
12   this so that an investigation could be undertaken?
13        A.  Yes.
14        Q.  But you did not do that, correct?
15        A.  I did not do that.
16        Q.  Did you even consider doing that?
17        A.  No, I did not consider doing that.
18        Q.  Do you know any people in human resources?
19        A.  In Chicago?
20        Q.  Yes, ma'am.
21        A.  Not really.
22        Q.  Do you know Doug Patrick?
23        A.  No, I don't.
24        Q.  Do you know Linda Olsen.
```

50 (Pages 197 to 200)

1    A.  No, I don't. I know her name.

2    Q.  Do you know that Linda Olsen is a woman in your

3  age group, actually older than you, who is a senior

4  vice-president of HR, are you aware of that?

5    A.  I said I just know Linda Olsen's name, I really

6  don't know her, I've never spoken to her.

7    Q.  Did it occur to you maybe to reach out to

8  someone like that if you did think you had been the

9  recipient of inappropriate conduct that might be violative

10  of these policies?

11    A.  I didn't call anyone to report what he had said

12  to me.

13    Q.  Do you know anybody in HR here locally at the

14  property?

15    A.  Yes.

16    Q.  Who do you know?

17    A.  Well, I know everybody that works there.

18    Q.  Do you know Tracy?

19    A.  Tracy (nodding.)

20    Q.  Did it occur to you that maybe you could go to

21  someone like that if you thought that you had been the

22  recipient of an inappropriate comment?

23    A.  I could have gone to Tracy.

24    Q.  But elected not to?

1    A.  I elected not to.

2    Q.  Is she a person that you like and trust?

3    A.  I know her.

4    Q.  Would you rely upon her if you had to to do

5  things properly?

6    A.  Yes, I suppose if I needed to have her I would.

7    Q.  Take a look at the very next page, which is

8  10633. This is, again, Policy 112 and it says that if an

9  employee feels that they're being harassed they should tell

10  that individual how they feel and whether it was harassment

11  or whatever you regarded the remark as you did let Mr. Booth

12  know that you didn't appreciate the remark --

13    A.  Yes, I did.

14    Q.  -- he made about your marriage? And it also

15  says Under this policy that it can and should be reported to

16  managers and that human resources is to investigate. Were

17  you aware that that is company policy, that human resources

18  will investigate and senior management will look into these

19  things should someone bring them to their attention?

20    A.  I probably was aware but, as I said, I didn't

21  have this policy manual.

22    Q.  But you had an awareness --

23    A.  Yes.

24    Q.  -- that these were some opportunities available

1  to you if you wished to pursue them?

2    A.  Yes.

3    Q.  Is it best and most fair to say that the one

4  comment that Mr. Booth made just didn't rise to the level

5  that you felt it should be subjected to such an

6  investigation and reported to senior management?

7    A.  I felt it was a terribly inappropriate comment

8  to make and the whole review was inappropriate and I didn't

9  feel that I had to report him.

10    Q.  That being so is there any reason why you

11  didn't feel, since you've described it as terribly

12  inappropriate, that maybe it should go to senior management

13  or to HR so that it would never happen again?

14    A.  Well, maybe it should have.

15    Q.  Why didn't you do it?

16    A.  I didn't do it. I really can't answer why I

17  didn't do it. I probably should have done it.

18    Q.  Are you currently receiving any information

19  from any current employee of Hyatt?

20    A.  No, I'm not.

21    Q.  Such as any information from the company's data

22  bases, any type of information at all?

23    A.  No, I'm not.

24    Q.  Take a look, if you will, at 10640 which is a

1  different version of a policy against harassment. Have you

2  ever seen this version?

3        MR. STEINBERG:  Can I ask when this was in

4    effect? This has no date or --

5        MS. GALLION:  I don't remember, I don't

6    remember, but Doug Patrick can tell you all that

7    during his deposition. I myself don't remember.

8        MR. STEINBERG:  Are you contending this is

9    relevant to the time period of this case?

10        MS. GALLION:  Yeah, during the time period of

11    her employment, but I couldn't tell you when.

12        MR. STEINBERG:  She was there 22 years.

13        MS. GALLION:  Well, these are all within the

14    past five, six, seven years.

15        MR. STEINBERG:  Thank you.

16        MS. GALLION:  And in fact I think 10640 is

17    the current version, if I'm not mistaken, but, I

18    think it is.

19    Q.  Have you ever seen this before?

20    A.  No.

21    Q.  Take a look at the next page. Were you given a

22  copy of this to sign?

23    A.  I don't believe so.

24    Q.  So if one is in your file you don't have a

51 (Pages 201 to 204)

**Page 205**

1  recollection of having signed it?
2      A.  I don't, I don't believe so.
3      Q.  Take a look at the next page which is an older
4  version of the employee handbook, or, actually this is the
5  newest version, pardon me, of the employee handbook. Were
6  you ever given an employee handbook?
7      A.  Which number are you referring to?
8      Q.  We're on 1642. Have you ever seen an --
9      A.  I think at some point I've seen employee
10  handbooks.
11      Q.  You certainly would know how to have access to
12  one if you ever needed one, correct?
13      A.  Yes.
14      Q.  All you'd have to do is just walk down and see
15  Tracy and ask her for the current handbook, correct?
16      A.  Yes.
17      Q.  Have you ever had the need to do that or the
18  desire to do that?
19      A.  No.
20      Q.  Where did you work physically?
21      A.  I worked on the third floor.
22      Q.  Of the hotel?
23      A.  Of the Hyatt Regency Cincinnati.
24      Q.  And you know that Tracy in Human Resources

**Page 206**

1  worked --
2      A.  Yes, I know where she is.
3      Q.  -- down in the basement there? Well, let's
4  take a look at this particular handbook. It says up at the
5  top it's for the corporate office. Take a look, if you
6  will, at Page 10649. And up at the top it says Our Employee
7  Relations Policy. Do you see that portion?
8      A.  Mm-hmm.
9      Q.  The second named paragraph after the little
10  dots or bullets says that Hyatt is an equal employment
11  opportunity and affirmative action employer. We do not
12  discriminate, then it goes on to mention race, color,
13  gender, sexual orientation, marital status, pregnancy,
14  national origin, ancestry, age and other classes. Were you
15  aware that this is the stated policy of the company?
16      A.  I really hadn't seen this particular document
17  as it was dated, I don't believe.
18      Q.  But are you aware that this is the stated
19  policy --
20      A.  Yes.
21      Q.  -- of the company, whether you'd seen this --
22      A.  Right.
23      Q.  -- particular version or not which happened to
24  be dated 8/01 you know this is the company's policy,

**Page 207**

1  correct?
2      A.  Yes.
3      Q.  Okay. And are you aware that the company also
4  purports to have an open door policy which is discussed at
5  the bottom of that same page?
6      A.  Yes.
7      Q.  Did you feel comfortable raising any issues
8  that you might have had with Mr. Small when he was the
9  person to whom you reported?
10      A.  Could you restate the question?
11      Q.  When Mr. Small was your director did you feel
12  comfortable in addressing him and talking with him about any
13  problems or issues that you might have encountered during
14  your work?
15      A.  I really didn't have any.
16      Q.  So you really never had any occasion to sit
17  down and talk to him confidentially, is that correct?
18      A.  Yes.
19      Q.  Did you ever have the need to, during the year
20  2001, to talk to anybody about problems or issues in the
21  workplace?
22      A.  No.
23      Q.  Take a look, if you will, now switching a
24  number of pages to a document that's called BH 55. It's

**Page 208**

1  probably 20 or 30 pages.
2      MR. STEINBERG:  Can you find a convenient time
3  can we take a break?
4      MS. GALLION:   Sure, right after this page
5  would be a perfect time.
6      Q.  Do you happen to see that Acknowledgment of
7  Policy Against Harassment which is Number 55?
8      A.  Yes.
9      Q.  Is that your signature and your handwriting
10  with the date September 15, 1998?
11      A.  Yes.
12      Q.  Is this an indication that at least as of that
13  time you were aware of the company's policy against
14  harassment?
15      A.  Yes.
16      Q.  And does that mean you had an awareness that
17  the company doesn't tolerate harassment based, among other
18  things, on sex, gender or other protected categories
19  including age?
20      A.  Yes.
21      Q.  And did you see that in the first paragraph you
22  were agreeing to conduct yourself in accordance with the
23  company's policy?
24      A.  Yes.

52 (Pages 205 to 208)

Page 209

1    Q.  And also agreeing to report any act, allegation
2  or rumor of harassment?  Do you see that language?  It's in
3  that first big paragraph buried in there somewhere.
4    A.  I see it.
5    Q.  Okay.  Let's take a break and when we come back
6  we'll be under Tab 7.  Rocking and rolling.
7        (There was a brief recess.)
8    Q.  Okay.  I'd like to turn to the documents under
9  Tab 7, please, and you'll see a charge of discrimination.
10   A.  Yes.
11   Q.  Is everything on this document true and did you
12  confirm that before you signed it?
13   A.  Yes.
14   Q.  Let's take a look at that third paragraph where
15  you talk about the director of sales and marketing position
16  and you say, and I'm quoting, "The director of sales and
17  marketing position was never posted or advertised.  I was
18  not given an opportunity to apply for the position."
19       This is the position that we spoke about a few
20  moments ago where you acknowledged to me that you knew that
21  this position was open, correct?
22   A.  Correct.
23   Q.  And you did not do anything affirmatively to
24  indicate in writing or in any other way that you were

Page 210

1  interested in the job, is that correct?
2    A.  I was not given an opportunity to apply for it.
3    Q.  Ma'am, you knew it was open, did you not?
4    A.  Yes, I did.
5    Q.  But you did not do anything to affirmatively
6  reach out to the people who might have been the
7  decisionmakers to say please consider me, did you?
8    A.  No, I did not.
9    Q.  Let's take a look at that next paragraph.  You
10  reference Mr. Booth and you say that he increased your sales
11  quota by 40 percent to five million in six months.
12       He in fact did not do that, did he?
13   A.  He did, he lowered it.
14   Q.  He told you that it should be five million and
15  then when you protested by saying bullshit he lowered it to
16  the 4.1, is that not correct?
17   A.  Yes, he did.
18   Q.  So in fact there was no 40 percent increase
19  because it was actually 4.1 percent, 4.1 million, correct.
20       MR. STEINBERG:  Objection.  I have a question.
21       Read the entire paragraph which includes that
22       information about the 4 million.
23   Q.  Do you understand my question?  In fact it ended
24  up being 4.1 million for that six-month period, correct?

Page 211

1    A.  Yes, it was 4.1 million.
2    Q.  For the first six months of the year?
3    A.  For the first six months; yes.
4    Q.  And isn't it true that you were tracking over
5  80 percent of that by the time you looked back in July,
6  isn't that right?
7    A.  78 percent.
8    Q.  78 percent.  And you say that this was an
9  unreasonable goal, we've already talked about that, correct?
10   A.  Yes.
11   Q.  Now, you say your normal sales goal was $3
12  million, do you see that?
13   A.  Yes.
14   Q.  Are you sure about that?
15   A.  I believe it was normally around 3 million.
16   Q.  How was your quota according to the documents
17  that I have, $7.7 million for the year 2000 if your normal
18  six months was just 3 million?
19       MR. STEINBERG:  Just a minute, objection.  I
20       request that you show her the document you're
21       referring to if you want her to answer that question.
22       MS. GALLION:   I'm not referring to anything
23       in particular.
24   A.  I don't have those figures.

Page 212

1        MR. STEINBERG:  Just a minute, please.  That
2        was the basis for your question, you referred to
3        the document you had.  And if you want her to respond to
4        the document you should show it to her.
5    Q.  Ma'am, I asked you, again, that was your quota
6  for the year 2000, 7.7 million, and did you over achieve it,
7  over 9 million.  And I believe your answer was yes, was it
8  not?
9    A.  I don't know what my group quota was off the
10  top of my head --
11   Q.  Well, are you referring to just --
12   A.  2000.
13   Q.  Are you saying that your normal sales goal,
14  that that's just your group quota, is that what you're
15  referring to?
16   A.  My normal sales group quota was normally 3
17  million.
18   Q.  But that's not what you say in here.
19       MR. STEINBERG:  Objection.
20   Q.  You say your sales goal, correct?
21   A.  We're talking about only group sales in Number
22  4, not IT.
23   Q.  Do you say anywhere in here that you're only
24  talking about a portion of your quota?

53 (Pages 209 to 212)