1           UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4   - - - - - - - - - - - - -
    BARBARA LODER              :
5   HILDEBRANDT,               :
                               :
6           Plaintiff,         :
       vs.                     :   Case No. C-1-02-003
7                              :     (Judge Beckwith)
    HYATT CORPORATION,         :
8   et al.,                    :
                               :
9           Defendants.        :
    - - - - - - - - - - - - -

0

1

2           Videotaped deposition of BRIAN J. BOOTH, a

3   defendant herein, called by the plaintiff for cross-

4   examination, pursuant to the Federal Rules of Civil

5   Procedure, taken before me, Wendy L. Welsh, a

6   Registered Merit Reporter and Notary Public in and

7   for the State of Ohio, at the offices of Waite,

8   Schneider, Bayless & Chesley, 1513 Central Trust

9   Tower, Five West Fourth Street, Cincinnati, Ohio, on

0   Wednesday, March 20, 2002, at 9:00 AM.

1

2

3

4

**EXHIBIT**

**C**

Page 5

09:00:48 1    Q. Who is paying your attorney fees on your
09:00:52 2 behalf?
09:00:52 3    A. Hyatt Corporation.
09:00:55 4    Q. Okay. Have you been or are you
09:00:56 5 represented by any other attorneys in this matter?
09:01:02 6    A. No.
09:01:02 7    Q. I just want to review the basic procedure
09:01:06 8 in a deposition. Your testimony is sworn just like
09:01:09 9 it would be in court except the Judge isn't here.
09:01:12 10    It's important to answer audibly so the
09:01:15 11 court reporter can take down either a yes or no. If
09:01:18 12 you don't understand a question, just let me know
09:01:22 13 and I'll rephrase it; otherwise, I'm going to assume
09:01:26 14 you understand the question.
09:01:28 15    You have the right to read and correct
09:01:30 16 errors and sign the deposition before it's filed.
09:01:33 17    If your attorney makes an objection to one
09:01:34 18 of my questions during the deposition, you still
09:01:42 19 have to answer the question unless your attorney
09:01:45 20 instructs you not to answer it. In other words,
09:01:49 21 even though an objection is made, you're supposed to
09:01:51 22 still answer --
09:01:52 23    A. Okay.
09:01:52 24    Q. -- the question. Do you have any

Page 6

09:01:55 1 questions about deposition procedure?
09:01:57 2    A. No.
09:01:59 3    Q. Okay. Any time that you'd like to take a
09:02:01 4 break, let me know and we'll take a break.
09:02:03 5    A. Okay.
09:02:04 6    Q. Okay. I also should say that it's
09:02:15 7 informal. If you want to take off your jacket at
09:02:17 8 any time, you're welcome to do that.
09:02:20 9    A. Okay.
14:11:17
14:11:17 10    (Plaintiff's Exhibit 1
14:11:17 11            was marked for

            identification.)
09:02:20 12    Q: I'm going to start off with Exhibit
09:02:22 13 Number 1 and give a marked copy to the court
09:02:24 14 reporter, a copy for you and for counsel. Can you
09:02:40 15 identify Exhibit Number 1?
09:02:42 16    A. This was the letter that we were told was
09:02:44 17 going to be going out from human resources to the
09:02:50 18 individuals affected by the reduction in force.
09:02:53 19    Q. Okay. Now, this letter says that Barbara
09:02:58 20 Loder was employed by Hyatt Hotels Corporation in
09:03:04 21 the position of Director of National Accounts in the
09:03:08 22 Sales Department from February 1, 1996 until
09:03:12 23 October 1, 2001. To your knowledge, is that a
09:03:16 24 correct statement?

Page 7

09:03:17 1    A. Yes, it is.
09:03:19 2    Q. Okay. And you're aware that she was
09:03:21 3 employed with Hyatt previously in other capacities?
09:03:25 4    A. That's correct.
09:03:25 5    Q. She had been totally employed about 22
09:03:29 6 years?
09:03:29 7    A. That's correct.
09:03:30 8    Q. And then it says "Recently due to the
09:03:33 9 economy, Hyatt needed to eliminate a number of
09:03:36 10 positions including Barbara's position." To your
09:03:42 11 knowledge, is that true?
09:03:42 12    A. Yes, it is.
09:03:44 13    Q. And then it says "Barbara was separated
09:03:46 14 from the company through no fault of her own." To
09:03:50 15 your knowledge, is that a correct statement?
09:03:53 16    A. That's absolutely correct.
                    (Plaintiff's Exhibit 2
17                    was marked for

18                    identification.)
09:04:18 19    Q. Okay. Let me show you Exhibit Number 2.
09:04:18 20 Are you able to identify Exhibit Number 2?
09:04:21 21    A. This is the first time I've seen this
09:04:24 22 document.
09:04:25 23    Q. Okay. Then we'll pass over that.
09:04:35 24        Mr. Booth, did you participate in any way

Page 8

09:04:38 1 in the decision to fire Mrs. Hildebrandt?
09:04:44 2    A. No.
09:04:45 3    Q. Okay. Did you have any role in her
09:04:50 4 termination?
09:04:50 5    A. I was asked if the plan that was provided
09:04:54 6 to me by Jack Horne, if it was a workable plan if
09:04:58 7 this had to take place.
09:05:01 8    Q. Okay. And when did that occur?
09:05:03 9    A. It was around the third week of September.
09:05:09 10    Q. Okay. Can you be any more specific as to
09:05:09 11 the date?
09:05:12 12    A. I -- I would say somewhere between the
09:05:13 13 22nd and 24th.
09:05:17 14    Q. Okay. And was this a conference or a
09:05:20 15 conversation with Mr. Horne?
09:05:22 16    A. Yes, it was.
09:05:23 17    Q. Was anyone else present?
09:05:23 18    A. No.
09:05:25 19    Q. Okay. Where did this take place?
09:05:30 20    A. In Jack's office in Chicago.
09:05:31 21    Q. Were you both present in the office?
09:05:33 22    A. Yes, we were.
09:05:34 23    Q. Can you tell me as best you can remember
09:05:37 24 what he said and what you said.

## Page 9

09:05:40 1    A. Jack presented a plan to me that potential
09:05:43 2 reductions may be needed. He outlined the positions
09:05:48 3 that would affect my office and he asked me to look
09:05:51 4 at it and see, if it -- if it did take place, would
09:05:54 5 it be workable.
09:05:55 6    Q. And this was something that was on a piece
09:05:58 7 of paper?
09:05:59 8    A. It was a -- it was a verbal discussion we
09:06:00 9 had.
09:06:03 10    Q. Okay. When you said he presented a plan,
09:06:06 11 it was orally, there was no written plan?
09:06:08 12    A. No, it was an oral -- oral plan.
09:06:12 13    Q. Okay. And did you have any input in any
09:06:14 14 way as to which people would be terminated?
09:06:17 15    A. No, I did not.
09:06:18 16    Q. Okay. Had you heard or learned of these
09:06:24 17 terminations prior to September 22nd?
09:06:27 18    A. No, I had not.
09:06:27 19    Q. Was Mrs. Hildebrandt one of the people
09:06:39 20 that Mr. Horne intended to terminate?
09:06:43 21    A. The position of Cincinnati sales office
09:06:45 22 was on that list, yes.
09:06:47 23    Q. Okay. Did you make any objection at all
09:06:49 24 to her being terminated?

## Page 10

09:06:51 1    A. At that point I was asked to review the
09:06:54 2 plan, so no, I did not make -- make any objection to
09:06:57 3 anyone.
09:07:06 4    Q. Did you have any discussions with any
09:07:08 5 other Hyatt officials about terminating Mrs.
09:07:13 6 Hildebrandt?
09:07:15 7    A. No.
09:07:18 8    Q. Did Mr. Horne tell you why he had chosen
09:07:32 9 her to be terminated as opposed to someone else?
09:07:32 10    A. The -- the plan that he presented to me
09:07:32 11 was to lay out the ability to minimize impact of
09:07:34 12 production, at the same time achieving the cost
09:07:38 13 savings desired and still have good customer
09:07:41 14 relationships.
09:07:45 15    Q. All right. Tell me, how would firing Mrs.
09:08:00 16 Hildebrandt minimize the impact of production?
09:08:06 17    A. Jack's plan -- he did not get into that
09:08:09 18 aspect of the plan with me. He said, look at this
09:08:13 19 plan and, if this happened, would it be workable.
09:08:16 20 So I -- I don't know what Jack's thoughts were with
09:08:18 21 regard to that aspect.
09:08:20 22    Q. Wasn't Mrs. Hildebrandt one of the higher
09:08:23 23 producers in her region?
09:08:24 24    A. Yes, she was.

## Page 11

09:08:26 1    Q. Okay. Do you have any understanding as to
09:08:30 2 how firing her could possibly minimize the impact of
09:08:35 3 production?
09:08:35 4    MS. GALLION: I object to the use of the
09:08:36 5 term "firing her," as that is not what the
09:08:38 6 record indicates.
09:08:39 7    Subject to that objection, you may answer.
09:08:41 8    A. No, I do not.
09:08:41 9    Q. Okay. Is there -- is there any question
09:08:43 10 in your mind that Mrs. Hildebrandt's employment was
09:08:46 11 terminated?
09:08:52 12    A. I'm still not sure I understand that
09:08:52 13 question.
09:08:52 14    Q. Wasn't she -- wasn't her employment
09:08:53 15 terminated?
09:08:54 16    A. The position was eliminated in Cincinnati,
09:08:56 17 yes.
09:08:56 18    Q. Didn't she lose her job?
09:08:58 19    A. Yes, she did, sir.
09:08:59 20    Q. Involuntarily?
09:09:00 21    A. Yes, she did.
09:09:01 22    Q. Do you feel she wasn't fired?
09:09:04 23    A. The -- the position was closed in
09:09:06 24 Cincinnati. So it -- she did -- it did result in a

## Page 12

09:09:11 1 job loss.
09:09:13 2    Q. Okay. The second point you mentioned was
09:09:16 3 to achieve cost savings?
09:09:20 4    A. Yes.
09:09:22 5    Q. How would firing Mrs. Hildebrandt achieve
09:09:25 6 a cost savings?
09:09:27 7    MS. GALLION: Same objection. And I will
09:09:28 8 not continue to object. Every time he uses the
09:09:31 9 word "firing" Mrs. Hildebrandt I have the same
09:09:33 10 objection.
09:09:33 11    You may answer.
09:09:35 12    A. Jack did not share with me the specific
09:09:38 13 cost savings with his plan.
09:09:39 14    Q. Do you have any understanding of how there
09:09:42 15 could possibly be a cost savings to the company in
09:09:44 16 firing Mrs. Hildebrandt?
09:09:46 17    A. Again, Jack did not share that aspect of
09:09:49 18 the plan with me.
09:09:52 19    Q. And finally, you wanted to still have good
09:09:57 20 customer relations?
09:09:58 21    A. Correct.
09:09:59 22    Q. How could firing Mrs. Hildebrandt create
09:10:02 23 good customer relations?
09:10:04 24    MS. GALLION: Same objection.

(800) 578-1542 * MERIT * (513) 381-8228

Page 13

09:10:06 1      You may answer.

09:10:07 2      A. As we went through the process of -- of

09:10:09 3  calling customers, it -- it became very apparent

09:10:12 4  that Ms. Hildebrandt had a tremendous following, and

09:10:18 5  we made personal calls to everyone to let them know

09:10:21 6  that the close of the Cincinnati office had occurred

09:10:24 7  and it was through no fault of -- of Mrs.

09:10:26 8  Hildebrandt's.

09:10:28 9      Q. Isn't it a fact that her customers were

09:10:29 10  very upset that she was fired?

09:10:31 11      A. That's correct, they were. I -- I spoke

09:10:33 12  with the majority of them.

09:10:34 13      Q. And that certainly doesn't lead to good

09:10:37 14  customer relations, does it?

09:10:38 15      A. It did not on that -- on that particular

09:10:40 16  call, no.

09:10:43 17      Q. Did you or anyone else offer Mrs.

09:10:44 18  Hildebrandt another position in the company?

09:10:51 19      A. No.

09:10:52 20      Q. Why didn't you?

09:10:53 21      A. There was no other positions to be offered

09:10:56 22  at -- at the time we went through the downsizing.

09:11:00 23      Q. Have there been no other positions

09:11:05 24  available since the downsizing?

Page 14

09:11:08 1      A. Are you speaking in my office or with the

09:11:12 2  company?

09:11:12 3      Q. That you know of in Hyatt.

09:11:14 4      A. I do not know of any, no.

09:11:16 5      Q. You don't know of any sales positions in

09:11:19 6  Hyatt that have been available since Mrs.

09:11:21 7  Hildebrandt was terminated?

09:11:22 8      A. Well, I -- I -- in my office I have a

09:11:25 9  position open now, but that happened as of last

09:11:27 10  Friday.

09:11:34 11      Q. Okay. When did Mr. Horne first consider

09:11:37 12  ending her employment?

09:11:38 13      MS. GALLION: Objection, calls for

09:11:41 14  speculation.

09:11:41 15      If you know, you may answer.

09:11:42 16      A. I do not know.

09:11:50 17      Q. When did Mr. Horne or any Hyatt official

09:11:53 18  first consider terminating anybody in the national

09:11:56 19  sales force?

09:11:56 20      MS. GALLION: Objection. Calls for

09:11:59 21  speculation.

09:12:00 22      If you know, you may answer.

09:12:02 23      A. That's another question I don't know.

09:12:03 24      Q. Did anyone tell you that there was a

Page 15

09:12:13 1  reduction in force taking place?

09:12:16 2      A. Prior to Jack's conversation with me?

09:12:20 3      Q. At -- at any time.

09:12:20 4      A. No.

09:12:23 5      Q. Okay. Up until today has anyone ever told

09:12:30 6  you that Hyatt was engaged in a reduction in force?

09:12:35 7      A. Well, that took place in September of last

09:12:38 8  year, yes.

09:12:39 9      Q. Okay. Who told you that there was a

09:12:41 10  reduction in force?

09:12:43 11      A. Jack Horne.

09:12:45 12      Q. And when did he tell you that?

09:12:47 13      A. He told me September 27th.

09:12:53 14      Q. Okay. What specifically did he tell you

09:12:56 15  about the reduction in force?

09:12:58 16      A. He came into my office and said, the plan

09:13:03 17  that I had presented to you earlier is going to be

09:13:06 18  implemented and these are the positions that would

09:13:11 19  be eliminated from your office.

09:13:17 20      Q. Okay. So when he presented this plan to

09:13:20 21  you somewhere around September 22nd, you didn't

09:13:23 22  understand there was going to be a reduction in

09:13:25 23  force?

09:13:25 24      A. He presented it as -- as a -- as a

Page 16

09:13:28 1  possibility.

09:13:30 2      Q. Okay. Tell me what he told you about it

09:13:31 3  being a possibility.

09:13:33 4      A. He said that we were -- be looking to

09:13:37 5  reduce expenses, the figures from the -- the field

09:13:40 6  were severe with -- with the 9/11 incident and he

09:13:44 7  said this may come about. He said if this does

09:13:48 8  happen, you need to be prepared for this. But he

09:13:51 9  said, at this point it is strictly a possibility.

09:13:54 10  Nothing had been decided upon.

09:13:56 11      Q. Did he tell you when he began to implement

09:13:58 12  that plan?

09:13:58 13      A. No, he did not.

09:14:11 14      Q. Okay. Did you play any role in this

09:14:11 15  reduction in force?

09:14:11 16      A. No.

09:14:11 17      Q. Well, you did notify people they were

09:14:12 18  terminated?

09:14:13 19      A. Well, I did notify, but I didn't

09:14:16 20  participate prior to that.

09:14:20 21      Q. Okay.

09:14:20 22      A. So let me -- let me revise that -- that

09:14:21 23  answer. I did communicate to the players involved,

09:14:24 24  yes.

Page 17

09:14:26 1    Q. Can you tell me just specifically what you
09:14:28 2 did in connection with this reduction in force?
09:14:30 3    A. It was my responsibility to inform the
09:14:33 4 individuals, if they were in Chicago, to -- that Ty
09:14:38 5 Helms would like to meet with them, along with Jack
09:14:40 6 Horne, to discuss their career with Hyatt.
09:14:44 7    Q. Okay. And is this something you were told
09:14:45 8 to do or something you decided to do?
09:14:47 9    A. No, I was instructed to do it.
09:14:49 10    Q. And who instructed you to do that?
09:14:50 11    A. Jack Horne.
09:14:51 12    Q. Okay. When did he give you that
09:14:54 13 instruction?
09:14:54 14    A. On September 27th.
09:14:58 15    Q. And when were you supposed to take this
09:15:01 16 action?
09:15:01 17    A. The following day, on the 28th.
09:15:03 18    Q. All right. And were you to contact any
09:15:08 19 persons other than people in Chicago?
09:15:11 20    A. It would have been Ms. Hildebrandt in
09:15:15 21 Cincinnati.
09:15:16 22    Q. Anyone else?
09:15:17 23    A. No.
09:15:17 24    Q. Okay. Did you supervise people in other

Page 18

09:15:19 1 areas?
09:15:20 2    A. Yes. Michigan and Dallas and in Chicago
09:15:25 3 and then here in Cincinnati.
09:15:27 4    Q. Okay. Who was going to contact them?
09:15:30 5    A. It was only going to be the individuals
09:15:32 6 affected who were -- who were to be -- to get the
09:15:34 7 call.
09:15:36 8    Q. Okay. So individuals in these other
09:15:38 9 locations were not affected?
09:15:39 10    A. That's correct.
09:15:49 11    Q. All right.
09:15:49 12       All right. Let's just go back a little
09:15:50 13 bit to around the second part of the year 2000.
09:15:56 14    A. Okay.
09:15:59 15    Q. Okay? What were the indications that you
09:16:02 16 were aware of at that time that the year 2001 was
09:16:09 17 going to be a more difficult year for the hotel
09:16:12 18 industry?
09:16:13 19    A. We started to see some decline in our
09:16:16 20 production within the central national sales office
09:16:20 21 through monthly reports from the directors. They
09:16:23 22 were indicating it was becoming more difficult to
09:16:25 23 close on business.
09:16:27 24    Q. Okay. Were you able to tell at that point

Page 19

09:16:28 1 that you were heading into a recession?
09:16:51 2    A. Yes.
09:16:58 3    Q. Are you aware of people that were hired
09:17:01 4 into the national sales force during the year 2001?
09:17:09 5    A. Just the individuals in my office.
09:17:11 6    Q. Okay. Who is it that you're aware of?
09:17:14 7    A. Donna Bongiovanni.
09:17:17 8    Q. Can you -- can you spell her name?
09:17:18 9    A. Yes, B-O-N-G-I-O-V-A-N-N-I.
09:17:23 10    Q. All right.
09:17:24 11    A. Was -- was hired. Molly Crompton
09:17:29 12 transferred from our Washington national sales
09:17:30 13 office.
09:17:30 14    Q. All right.
09:17:35 15    A. And Inge, I-N-G-E, Spindola,
09:17:36 16 S-P-I-N-D-O-L-A, transferred from Carribean national
09:17:44 17 sales to the central national sales office.
09:17:49 18    Q. All right. And they didn't replace
09:17:50 19 anyone, did they?
09:17:52 20    A. Molly Crompton replaced Terri Williams.
09:17:58 21    Q. Where had Terri Williams been located?
09:18:01 22    A. Terri Williams was in Dallas.
09:18:02 23    Q. Okay. Did Molly go to Dallas?
09:18:04 24    A. No. Molly's in Chicago.

Page 20

09:18:06 1    Q. Okay. Why didn't she go to Dallas?
09:18:08 2    A. The Dallas national sales office had been
09:18:11 3 moved because of the tower teardown at DFW, our
09:18:17 4 hotel there. They went to home offices. When Terri
09:18:20 5 gave her notice, we moved the -- the office back to
09:18:25 6 Chicago and we made the appropriate changes in the
09:18:27 7 travel budget to allow Molly to go down and cover
09:18:31 8 accounts there.
09:18:32 9    Q. So you're saying you didn't have
09:18:34 10 salespeople in Dallas then?
09:18:36 11    A. We had -- national sales people, we only
09:18:38 12 have one in Dallas now: Melissa Daniels.
09:18:42 13    Q. Melissa Daniels?
09:18:43 14    A. Yes.
09:18:45 15    Q. And where does she work from?
09:18:45 16    A. She works out of her home.
09:18:53 17    Q. Okay. What is -- was the age of Donna
09:18:57 18 Bongiovanni when she was hired in 2001?
09:19:00 19    A. I -- I don't know.
09:19:01 20    Q. What was Molly Crompton's age when she
09:19:07 21 transferred in in 2001?
09:19:09 22    A. I don't know.
09:19:10 23    Q. Are you aware that they're in their 30s?
09:19:13 24    A. I -- I have an approximation of both ages

Page 25

```
09:23:43  1    A. No.
09:23:44  2    Q. Did you file your income tax returns for
09:23:47  3  2001 yet?
09:23:48  4    A. No.
09:23:48  5    Q. Okay. Are you able to name each of the
09:23:54  6  employees who received any of Mrs. Hildebrandt's
09:23:59  7  accounts after she was fired?
09:24:00  8    A. Yes.
09:24:02  9    Q. Okay. Can you tell me who they are?
09:24:04 10    A. Barbara Hale --
09:24:07 11    Q. All right.
09:24:07 12    A. -- Molly Crompton --
09:24:11 13    Q. Okay.
09:24:11 14    A. -- Fred Reichelt, Melissa Daniels --
09:24:18 15    Q. Okay.
09:24:18 16    A. -- Inge Spindola and, I believe, Jennifer
09:24:27 17  Roman.
09:24:29 18    Q. All right. Can you -- can you recall
09:24:31 19  which accounts Ms. Crompton obtained?
09:24:34 20    A. I -- I have a list but I don't have it in
09:24:37 21  front of me, so I -- I wouldn't know from memory.
09:24:40 22    Q. Okay. Do you have it here in the city?
09:24:41 23    A. If I don't have it, I believe I can get
09:24:44 24  it.
```

Page 26

```
09:24:46  1    Q. Okay. Do you think you might be able to
09:24:47  2  get it --
09:24:48  3    MS. GALLION: We produced --
09:24:48  4    Q. -- by this afternoon?
09:24:49  5    MS. GALLION: We produced it to you.
09:24:50  6    MR. STEINBERG: Oh.
09:24:51  7    MS. GALLION: And I don't know why you
09:24:51  8  don't have it, but it's Bates stamp numbered
09:24:54  9  and it was produced to you. Maybe you just
09:24:55 10  didn't recognize it.
09:24:58 11    MR. STEINBERG: Well, not all of these
09:25:00 12  individuals were identified as people --
09:25:03 13    MS. GALLION: Well, we --
09:25:01 14    MR. STEINBERG: -- who received her
09:25:03 15  accounts.
09:25:03 16    MS. GALLION: We gave you the list that we
09:25:05 17  had, the only list that we had.
09:25:09 18    MR. STEINBERG: All right.
09:25:09 19    Q. Is that the list you're referring to?
09:25:11 20    A. Yes, it is.
09:25:47 21    MS. GALLION: Okay?
09:25:47 22    MR. STEINBERG: Well, I'll look for that
09:25:51 23  list.
09:25:53 24  BY MR. STEINBERG:
```

Page 27

```
09:25:53  1    Q. Now, can you tell me what Molly Crompton's
09:26:01  2  sales production was in 2001?
09:26:02  3    A. I believe it was 165 percent.
09:26:05  4    Q. I'm not asking the percent of --
09:26:09  5    A. Oh, percent?
09:26:10  6    Q. -- her quota; I'm asking the dollar value
09:26:12  7  of the sales she produced.
09:26:13  8    A. Off the top of my head, I don't know.
09:26:17  9    Q. Okay. Do you have those records
09:26:19 10  available?
09:26:19 11    A. Yes.
09:26:21 12    Q. Is that something you could obtain?
09:26:23 13    A. Yes.
09:26:25 14    Q. Okay. Now, is your answer going to be the
09:26:27 15  same for the rest of these individuals?
09:26:28 16    A. I would like to have reference to the
09:26:30 17  sheet to be -- to be accurate with my answer, yes.
09:26:33 18    Q. Okay.
09:26:33 19    MS. GALLION: And let me put on the record
09:26:36 20  that -- and this -- this is not a document that
09:26:38 21  exists, but we are in the process and we'll
09:26:41 22  probably have within an hour or two a document
09:26:44 23  that we're especially preparing for you which
09:26:47 24  has all the affected persons and anybody else
```

Page 28

```
09:26:50  1  that was a comparator to them, their 2000, 2001
09:26:57  2  production and achievement as well as a
09:26:58  3  breakdown of what's group and what's IT,
09:27:01  4  because we -- it just doesn't exist in that
09:27:03  5  form. But we could see from yesterday that it
09:27:05  6  would be helpful to have it, so we're actually
09:27:07  7  preparing it, pulling it, and it should be here
09:27:12  8  within, I hope, about an hour.
09:27:13  9    MR. STEINBERG: Well, I appreciate that,
09:27:15 10  but I'm -- I am mostly interested in
09:27:17 11  contemporaneous records rather than records --
09:27:19 12    MS. GALLION: Well --
09:27:19 13    MR. STEINBERG: -- that were created --
09:27:19 14    MS. GALLION: -- there aren't any.
09:27:19 15    MR. STEINBERG: -- for litigation.
09:27:20 16    MS. GALLION: There aren't any. There --
09:27:22 17  there aren't any, so...
09:27:24 18    MR. STEINBERG: Well, that's what I want
09:27:26 19  to ask.
09:27:26 20  BY MR. STEINBERG:
09:27:26 21    Q. Mr. Booth, you -- are you saying that you
09:27:28 22  don't keep any record of what your salespeople
09:27:30 23  produce?
09:27:30 24    A. No, we keep a record, yes.
```

Page 33

1 computation that's used to determine bonuses?
2    A. It -- it -- it pulls data from there to
3 come out in the -- in the Pride summary data report
4 that comes at the end of each month, which is part
5 of the month end production reports.
6    Q. Is the computation that is used to
7 determine bonuses kept in writing somewhere?
8    A. Yes, it is.
9    Q. Okay. Does it have a title or name to it?
10    A. It's the -- the Pride program.
11    Q. Is there a document, and by document I
12 mean it could be more than one paper, but a document
13 that describes the Pride program?
14    A. Yes.
15    Q. Okay. Now, in order to have access to the
16 Hymark database do you have to input any code or
17 security?
18    A. You-- you have to enter your -- your
19 password and a login.
20    Q. Okay. Does anyone at a lower level than
21 yourself have access to the Hymark program?
22    A. Yes.
23    Q. Who would that be?
24    A. Anyone who's employed with Hyatt would

Page 34

1 have access to Hymark.
2    Q. Okay. Does that include clerical
3 individuals?
4    A. Yes, it would.
5    Q. Okay. Are you aware of any people in your
6 group -- is it called a group?
7    A. Our -- our national sales office.
8    Q. The people you're in charge of are
9 referred to as an office?
10    A. As an office, correct.
11    Q. Okay. Are you aware of anyone in your
12 national sales office in the year 2001 that produced
13 more revenue than Mrs. Hildebrandt?
14    A. Yes.
15    Q. Who would that be?
16    A. Mark Henry.
17    Q. Anyone else?
18    A. Denise Cmiel.
19    Q. Okay.
20    A. And Molly Crompton.
21    Q. How much revenue did Molly Crompton
22 produce?
23    A. I'd like -- off the top of my head I don't
24 know, but I -- I could find that out.

Page 35

1    Q. But you think that she produced more than
2 Mrs. Hildebrandt?
3    A. Yes.
4    Q. And do you know how much Mr. Henry
5 produced?
6    A. I would have the same answer to that.
7 I -- I can find that information.
8    Q. Okay.
9    A. And -- and there may -- there may be
10 others on there, but again, I want to look at the
11 year-end numbers. I don't -- I don't have them all
12 in my head.
13    Q. Okay. I'm not asking percentage of quota
14 here.
15    A. Correct. Correct. No, I would have
16 specific dollar figures.
17    Q. Okay. Did -- do you know what Molly
18 Crompton's quota was for the first six months of
19 2001?
20    A. For the first six months of 2001, off the
21 top of my head, I do not know.
22    Q. How about Barbara Hale, do you know hers?
23    A. No.
24    Q. Fred Reichelt?

Page 36

1    A. No.
2    Q. Do you know any of them?
3    A. Not off the top of my head, no.
4    Q. Okay. Is the quota figure contained in
5 the Hymark system?
6    A. Yes, it would be.
7    Q. All right. When did you first have any
8 discussions or consideration of assigning Mrs.
9 Hildebrandt's accounts to other people?
10    A. The first time I considered that was when
11 Jack proposed to me a potential reduction in force.
12    Q. So it would be around September 22nd?
13    A. That's correct.
14    Q. Okay. You don't recall discussing that
15 with Mrs. Hildebrandt during her midyear evaluation?
16    A. My discussion with Mrs. Hildebrandt was
17 geared more towards a career talk than a -- than a
18 reallocation of accounts.
19    Q. Do you recall discussing with her whether
20 it was possible to have her accounts handled by
21 people in Chicago?
22    A. I did -- I did ask that question, yes.
23    Q. Okay. And that would have been in July of
24 2001?

Page 37

1  A. It would have been July, yes.
2  Q. Do you know who participated in the
3  decision to assign her accounts to each of the
4  individuals that you've named?
5  A. That would have been myself.
6  Q. Anyone else?
7  A. No.
8  Q. Okay. Well, one of the people is -- that
9  you named, I think, was Jennifer Roman?
10  A. Jennifer is a director of national
11  accounts. She didn't participate in -- she was a --
12  she was a recipient.
13  Q. Right.
14  A. Right.
15  Q. But -- okay. So aren't you aware that
16  Jennifer Roman is someone that was hired in 2001,
17  since you've assigned accounts to her?
18  A. She was hired by Gus Vonderheide. She was
19  not hired in my office.
20  Q. So you don't know when she was hired?
21  A. I don't know the specific date when she
22  was hired, no.
23  Q. All right. So that -- I want to make sure
24  I understand this -- you and you alone and no one

Page 38

1  else decided who would get Mrs. Hildebrandt's
2  accounts?
3  A. After Jack presented the plan, that's
4  correct.
5  Q. Well, did the plan include any information
6  as to who would receive her accounts?
7  A. It did not.
8  Q. Okay. Now, tell me why you selected Molly
9  Crompton to receive her accounts.
10  A. What I looked at through the evaluation
11  process was, first off, trying to match up like
12  industries to existing markets. We then took into
13  consideration geographic --
14      And this -- and this goes for everyone
15  that I'm -- that we made assignments to.
16      -- and then we looked at existing account
17  levels to see where people could take on just more
18  accounts if need be. So we used a -- a three-stage
19  criteria, or I used a three-stage criteria to try to
20  make that work.
21  Q. Is there a "we" or just you?
22  A. It's me.
23  Q. Okay. Tell me why you assigned some of
24  her accounts to Molly Crompton.

Page 39

1  A. Molly Crompton had the ability to take on
2  some new accounts.
3  Q. What does that mean, she had the ability
4  to take on new accounts?
5  A. In -- in -- in talking with her, she felt
6  that she had the -- the appropriate amount of time
7  to devote to additional accounts if -- if they were
8  to be assigned to her.
9  Q. She needed some new accounts, didn't she?
10  A. By need, what do you mean by need?
11  Q. She needed new accounts to make more
12  money, didn't she?
13  A. No.
14  Q. Hadn't Molly Crompton been asking you
15  during the course of the year to get her more
16  accounts?
17  A. Yes.
18  Q. And you finally did it?
19  A. She was assigned accounts based on her
20  ability to take on additional business.
21  Q. Okay. Why did you assign new accounts to
22  Barbara Hale?
23  A. Barbara Hale had some geographic
24  advantages to the northern Ohio customers.

Page 40

1  Q. And what would that be?
2  A. Well, being located in Dearborn she could
3  get down to the Columbus area easier than flying
4  from Chicago.
5  Q. And how is that?
6  A. Just from a geographic standpoint.
7  Q. Explain to me how it's easier to get to
8  Columbus from Dearborn than from Chicago.
9  A. Well, just we looked at -- we looked at
10  air-- airfare pricing on averages and -- and wanted
11  to make sure that we could get people in front of
12  the customers as -- as -- as often as necessary.
13  Q. Can you fly to Columbus, Ohio, faster from
14  Dearborn than from Chicago?
15  A. Off the top of my head, timewise I don't
16  know, but there's many times that -- that Ms. Hale
17  drove down to Columbus.
18  Q. Can you drive there faster than you can
19  fly in from Chicago?
20  A. I've never done that. I don't know.
21  Q. Does Dearborn have an airport?
22  A. Detroit.
23  Q. You have to go to Detroit?
24  A. Yes.

Page 53

10:01:19 1  Hymark reports that Miss Hildebrandt's name had,

10:01:23 2  with the -- the assigned accounts.

10:01:25 3      Q. So she accessed the Hymark database to get

10:01:28 4  this information?

10:01:21 5      A. Correct.

10:01:30 6      Q. Okay. Do you know whose writing is on

10:01:32 7  here, the handwriting?

10:01:33 8      A. That would be mine.

10:01:45 9      Q. All right. Do you believe that this

10:01:50 10  Exhibit 39 accurately reflects which of Mrs.

10:01:55 11  Hildebrandt's accounts were assigned to each of the

10:01:56 12  salespeople named here?

10:01:57 13      A. I believe so, yes.

10:01:59 14      Q. Okay. Then I won't bother to go through

10:02:01 15  each one.

10:02:03 16      A. Okay.

10:02:03 17      Q. All right. Mr. Booth, when did you begin

10:02:18 18  your present job?

10:02:18 19      A. I began on December 4, 2000.

10:02:20 20      Q. And can you state what your duties are?

10:02:25 21      A. My responsibilities are to manage the

10:02:29 22  central national sales office for Hyatt Corporation.

10:02:33 23      Q. Okay. Can you be a little bit more

10:02:34 24  specific about what that involves?

Page 54

10:02:36 1      A. Certainly. An attainment of assigned

10:02:40 2  revenue goals, represent the Hyatt brand at industry

10:02:46 3  events, manage the P&L for that office.

10:02:54 4      Q. And P&L means what?

10:02:56 5      A. Profit and loss statement.

10:02:58 6      Q. Okay.

10:02:58 7      A. Those would be my primary duties.

10:03:01 8      Q. And who is your direct supervisor?

10:03:07 9      A. Jack Horne.

10:03:08 10      Q. And has that been so during your entire

10:03:10 11  employment in this position?

10:03:11 12      A. That's correct.

10:03:11 13      Q. Okay. Do you have goals yourself that you

10:03:13 14  have to meet?

10:03:15 15      A. I have an -- I -- my goal is the office

10:03:17 16  goal, the office quota if you will.

10:03:19 17      Q. Okay. And who sets the office quota?

10:03:22 18      A. Jack Horne.

10:03:22 19      Q. Does he consult you when he sets that

10:03:26 20  quota?

10:03:26 21      A. We have discussions.

10:03:31 22      Q. Okay. What is your salary?

10:03:33 23      A. My salary is $129,000 a year.

10:03:37 24      Q. Do you have the potential to receive a

Page 55

10:03:40 1  bonus?

10:03:40 2      A. I have that potential, yes.

10:03:43 3      Q. And what is -- how is your bonus

10:03:45 4  determined?

10:03:54 5      A. My bonus is a -- a 30 percent potential of

10:03:54 6  salary, 20 percent being financially related and

10:03:54 7  10 percent discretionary to Jack Horne.

10:03:57 8      Q. All right. The 10 percent, that means if

10:04:00 9  Jack Horne decides he wants to give you a bonus he

10:04:03 10  does, and --

10:04:04 11      A. He has discretionary ability for 10

10:04:04 12  points, yes, 10 percentage points.

10:04:09 13      Q. What is the financial part? Can you

10:04:11 14  explain that to me?

10:04:12 15      A. It's broken up into two areas. One is the

10:04:17 16  achievement of the office quota, and the -- and

10:04:18 17  that's a maximum of -- of 10 points and that's on a

10:04:22 18  sliding scale. The -- the higher the achievement,

10:04:24 19  the more potential. And then the second portion is

10:04:26 20  what we call future group revenue targets, where the

10:04:30 21  revenue figure is set for the company as a whole.

10:04:33 22  The -- those are achieved, then there's one point

10:04:35 23  for every year from -- it goes into a five -- or

10:04:39 24  goes out for five years.

Page 56

10:04:42 1      Q. Is there a revenue target for each client?

10:04:45 2      A. There's a revenue target for each year.

10:04:49 3      Q. For all clients?

10:04:50 4      A. For -- for -- as a whole. Anything from

10:04:54 5  national sales, field sales, that all -- that number

10:04:57 6  all feeds into the revenue target for the -- for the

10:04:59 7  company.

10:05:01 8      Q. What's -- what is the difference between a

10:05:02 9  revenue target and a quota?

10:05:04 10      A. A quota is a -- well, let me go back. A

10:05:08 11  revenue target is -- is a figure that we -- a

10:05:11 12  percentage that we want to have on the books by a

10:05:13 13  certain date and time. Whether -- and -- and we --

10:05:15 14  we match it up to the end of the year close of

10:05:18 15  books. A quota would be a -- a number that's

10:05:21 16  assigned to an office in order to help achieve to

10:05:25 17  get to that revenue target.

10:05:29 18      Q. Are the figures the same?

10:05:31 19      A. No, they're not the same.

10:05:32 20      Q. Can you -- can you give me an example with

10:05:33 21  hypothetical figures how this would work?

10:05:37 22      A. Well, for 2001 the revenue -- or the quota

10:05:42 23  for our office was $156 million for the whole year,

10:05:46 24  the central national sales. The revenue target for

**Page 57**

10:05:49 1 the year, 2001, would be in excess of probably
10:05:54 2 $800 million. The quota feeds into the achievement
10:06:02 3 of the future group revenue target.
10:06:13 4     Q. Does revenue target mean what you are
10:06:15 5 hoping to --
10:06:16 6     A. We are hoping to have on the books by a
10:06:17 7 specified date, and -- and those are set by Fred
10:06:21 8 Shea.
10:06:22 9     Q. What is the specified date?
10:06:25 10     A. End of the year.
10:06:27 11     Q. Okay. And so you're saying the revenue
10:06:29 12 target is much higher than the quota?
10:06:31 13     A. Yes, because it's -- it's a company total
10:06:33 14 versus my office component of that.
10:06:37 15     Q. Okay. Does your office have a share of
10:06:38 16 this revenue target assigned to you or --
10:06:41 17     A. No, we do not. We just have our quota.
10:06:44 18     Q. Okay. Now, what I'm having trouble
10:06:47 19 getting a handle on is --
10:06:50 20     A. Okay.
10:06:50 21     Q. -- how this revenue target that's
10:06:53 22 companywide is used to determine your bonus.
10:06:55 23     A. Well, if -- if the -- if -- if we exceed
10:06:57 24 that as a company, then that's when the bonus

**Page 58**

10:07:01 1 becomes -- you become eligible --
10:07:03 2     Q. Okay.
10:07:03 3     A. -- for a bonus.
10:07:04 4     Q. I understand it now.
10:07:06 5     A. Okay.
10:07:07 6     Q. Now, with regard to the quota that you
10:07:11 7 have, you then set quotas for your salespeople?
10:07:17 8     A. That's correct.
10:07:20 9     Q. And does the total of the quotas you set
10:07:24 10 for them exceed the quota that's set for you?
10:07:28 11     A. No, it has to -- it has to equal for the
10:07:31 12 office.
10:07:32 13     Q. It has to equal?
10:07:33 14     A. Yes.
10:07:36 15     Q. Okay. These directors of national sales
10:07:43 16 hold management positions in the company?
10:07:44 17     A. They are managers, yes.
10:07:45 18     Q. Okay. How did you come to be placed in
10:07:50 19 the position that you're in now?
10:07:52 20     MS. GALLION: Objection. Calls for
10:07:54 21 speculation.
10:07:54 22     If you know, you may answer.
10:07:56 23     A. I don't know.
10:07:58 24     Q. You don't have any idea how you got your

**Page 59**

10:08:01 1 job?
10:08:01 2     A. I know I was -- how I was hired, but I
10:08:03 3 don't know how Jack Horne came to show interest in
10:08:08 4 me, no.
10:08:15 5     Q. Do you know if your position was ever
10:08:17 6 advertised or posted?
10:08:21 7     A. I don't know that.
10:08:29 8     Q. Do you know if the company has any formal
10:08:33 9 procedure for advertising or posting positions such
10:08:37 10 as the one you hold?
10:08:37 11     A. Yes, we do.
10:08:39 12     Q. Is there a name for that?
10:08:40 13     A. It generally goes through Mike Cheatham's
10:08:45 14 office.
10:08:48 15     Q. Okay. Is there a name for this process
10:08:50 16 that the company uses?
10:08:52 17     A. It's -- it's done through -- it was
10:08:55 18 done -- it's done now through Hyatt.com under the
10:08:59 19 Career's cap.
10:09:00 20     Q. But back at the time you obtained the job
10:09:02 21 was there such a process that you were aware of?
10:09:05 22     A. There was a -- there was a -- a posting
10:09:07 23 report -- or a job report opening that Mike
10:09:10 24 Cheatham's office put together.

**Page 60**

10:09:13 1     Q. Okay. What -- what is a posting report?
10:09:17 2     A. It would be -- we -- Mike would be
10:09:19 3 notified that a particular position was open
10:09:21 4 somewhere in the company, in the sales division
10:09:24 5 only.
10:09:25 6     Q. Uh-huh.
10:09:25 7     A. And then that word would be sent out via
10:09:29 8 e-mail to the directors of sales and, I believe, the
10:09:34 9 general managers.
10:09:34 10     Q. Okay. And you don't know if that was done
10:09:36 11 in connection with your job?
10:09:39 12     A. I don't know that.
10:09:40 13     Q. Do you know if any other candidates were
10:09:45 14 considered?
10:09:54 15     A. I don't know that.
10:09:54 16     Q. Did you fill out any application for your
10:09:54 17 job?
10:09:54 18     A. I did not.
10:09:54 19     Q. How did you learn you were going to be
10:09:56 20 promoted?
10:09:54 21     A. I had -- had a -- a conversation with my
10:10:04 22 general manager at the time, Steve Trent.
10:10:04 23     Q. Okay. About when was this conversation?
10:10:11 24     A. It was, I'd say, around October.

Page 61

10:10:17 1    Q. Of 2000?
10:10:18 2    A. 2000.
10:10:20 3    Q. Was this a personal conversation?
10:10:22 4    A. It was a personal conversation.
10:10:23 5    Q. Okay. Can you tell me, the best you can
10:10:26 6 remember, what he said to you and what you said to
10:10:29 7 him.
10:10:31 8    A. He had asked that Jack Horne expressed
10:10:33 9 interest in -- in you as a candidate, would you be
10:10:36 10 interested in going up to interview for this
10:10:39 11 position. And I said yes.
10:10:42 12    Q. Okay. Did he tell you why Mr. Horne was
10:10:45 13 interested in you as a candidate?
10:10:48 14    A. He -- he thought with my large hotel
10:10:49 15 background and years of experience that -- that --
10:10:58 16 and -- and bringing a field perspective to the
10:11:00 17 national sales office were -- were issues that --
10:11:01 18 that I brought to the table and he was interested in
10:11:04 19 talking with me.
10:11:05 20    Q. What else did he tell you?
10:11:04 21    A. That was really the -- the content of --
10:11:12 22 of the discussion.
10:11:12 23    Q. Did he tell you whether Mr. Horne had
10:11:15 24 requested information about you?

Page 62

10:11:17 1    A. No, he had not.
10:11:19 2    Q. Did he tell you whether Mr. Horne had
10:11:21 3 looked at any of your records?
10:11:24 4    A. He had not.
10:11:25 5    Q. What was the next thing that happened in
10:11:31 6 connection with the promotion?
10:11:34 7    A. Jack called and asked to set up an
10:11:36 8 interview with himself and Fred Shea and Ty Helms.
10:11:46 9    Q. Okay. Do you remember when that call was?
10:11:49 10    A. It was a couple days after my discussion
10:11:52 11 with -- with Steve Trent.
10:11:53 12    Q. Still in October?
10:11:54 13    A. Still -- still in October.
10:11:57 14    Q. Okay. Do you recall where the interview
10:11:59 15 took place?
10:11:59 16    A. Yes.
10:12:00 17    Q. Where?
10:12:01 18    A. Hyatt Regency O'Hare.
10:12:04 19    Q. And do you recall when it was?
10:12:06 20    A. It was a -- during the lunch hour and in
10:12:09 21 early afternoon.
10:12:11 22    Q. What day or month was it?
10:12:13 23    A. It was a couple days after Jack called, so
10:12:16 24 it -- it happened fairly quickly.

Page 63

10:12:18 1    Q. Do you think it still was October?
10:12:20 2    A. I believe it to be -- that would be my
10:12:22 3 best guess.
10:12:26 4    Q. Okay. Were these three individuals
10:12:28 5 present?
10:12:29 6    A. I interviewed separately with Jack and
10:12:32 7 then jointly with Ty and Fred Shea.
10:12:37 8    Q. Okay.
10:12:37 9    A. Ty Helms --
10:12:38 10    Q. Which --
10:12:38 11    A. Ty Helms and Fred Shea.
10:12:39 12    Q. Which was first?
10:12:40 13    A. Jack.
10:12:41 14    Q. Okay. How long did that interview take?
10:12:43 15    A. An hour and a half.
10:12:50 16    Q. Can you tell me the substance of what was
10:12:51 17 discussed in that interview?
10:12:53 18    A. Jack, you know, asked me my interests. I
10:12:57 19 asked what his vision for national sales was, what
10:13:01 20 he was looking for to accomplish by this next hire.
10:13:05 21    Q. What did he tell you?
10:13:06 22    A. He said that he'd like to bring a field
10:13:09 23 perspective to national sales. He felt that there
10:13:15 24 was a -- that was lacking when we were dealing with

Page 64

10:13:18 1 the properties.
10:13:27 2    Q. Did you discuss the downturn in the
10:13:29 3 economy?
10:13:30 4    A. We did not have that discussion, no.
10:13:32 5    Q. Okay. Did you discuss your past
10:13:36 6 experience at Dallas/Fort Worth? Is that where you
10:13:41 7 were?
10:13:41 8    A. Dallas/Fort Worth. That did not come up
10:13:44 9 during the discussion.
10:13:46 10    Q. Okay. Is there any other subjects that
10:13:47 11 you discussed?
10:13:48 12    A. Not that I can recall.
10:13:49 13    Q. All right. And how long was your meeting
10:13:51 14 with Mr. Shea and Mr. Helms?
10:13:53 15    A. It was about an hour.
10:13:56 16    Q. Can you tell me the subjects that were
10:13:58 17 discussed with them?
10:13:59 18    A. Again, they expressed to me what their
10:14:03 19 desire was with national sales, and again, making
10:14:07 20 sure that -- that we understood that the field
10:14:10 21 hotels were your customers and -- and -- and not to
10:14:14 22 lose that, because the field pays for the salaries
10:14:17 23 of national sales and all the corporate office.
10:14:22 24 And -- and -- and just trying to reach out to all

Page 61 - Page 64

Page 65

10:14:23 1 levels of hotels, not just the big hotels who would
10:14:28 2 get the larger pieces of business.
10:14:30 3    Q. Did they discuss with you the downturn in
10:14:32 4 the economy?
10:14:34 5    A. They did not.
10:14:34 6    Q. Did either of the three indicate to you
10:14:37 7 why they had selected you?
10:14:39 8    A. They felt with -- with my experience
10:14:42 9 within the company and ability to work at a -- at a
10:14:45 10 very large hotel, at the time the second largest
10:14:48 11 hotel in the company, that I was used to handling a
10:14:51 12 large staff.
10:14:53 13    Q. So they had some familiarity with your
10:14:55 14 experience in the company?
10:14:56 15    A. Yes.
10:14:57 16    Q. And they knew about your interactions with
10:15:00 17 your staff?
10:15:00 18    A. Correct.
10:15:01 19    Q. Okay. Were you qualified for this
10:15:15 20 promotion?
10:15:16 21    A. Yes.
10:15:18 22    Q. What qualifications did you have for this
10:15:21 23 position?
10:15:21 24    A. Holding director's titles with two major

Page 66

10:15:26 1 hotel chains, Marriott and Hyatt, working in a
10:15:29 2 number of convention and -- and large hotel
10:15:32 3 facilities and dealing with national sales in -- in
10:15:35 4 many of those capacities and -- and managing a
10:15:39 5 fairly large P&L statement.
10:15:47 6    Q. Managing what?
10:15:48 7    A. A P&L statement, a profit and loss
10:15:50 8 statement.
10:15:53 9    Q. Oh. Thank you. You had never been in
10:15:55 10 national sales before, had you?
10:15:56 11    A. No, I had not.
10:15:57 12    Q. Did you have good interpersonal skills?
10:16:05 13    A. I believe so.
10:16:07 14    Q. Could you explain what those skills were.
10:16:10 15    A. Well, my skills in that area are -- are
10:16:16 16 getting to know my staff, getting involved in their
10:16:18 17 day-to-day activities, deploying resources where
10:16:22 18 it's necessary and making sure that we have the
10:16:27 19 ability to have open and -- and two-way discussions
10:16:31 20 on a variety of topics.
10:16:35 21    Q. Did you have a positive future attitude
10:16:39 22 about your job?
10:16:40 23    A. Yes.
10:16:45 24    Q. Do you think that you had the ability to

Page 67

10:16:47 1 lead a sales team?
10:16:48 2    A. Yes.
10:16:50 3    Q. Had you been able to retain your sales
10:16:53 4 staff?
10:16:56 5    A. Yes.
10:17:00 6    Q. Okay. Can you elaborate on that?
10:17:11 7    A. Is there a specific time frame in which
10:17:11 8 you're --
10:17:11 9    Q. Well, in the year or two prior --
10:17:11 10    A. Em-hmm?
10:17:11 11    Q. -- to when you were promoted did you --
10:17:11 12 did you have an ability to keep a loyal sales staff
10:17:13 13 working under you?
10:17:14 14    A. We at DFW had both good and -- and bad
10:17:19 15 turnover, but the core group of people that -- that
10:17:23 16 I brought in remained at the hotel.
17        (Plaintiff's Exhibit
          30a was marked for
18            identification.)
10:17:55 19    Q. Okay. Mr. Booth -- oh. I brought this
10:18:01 20 out a little bit too early. I'm going --
10:18:03 21    A. Oh.
10:18:03 22    Q. -- to get to this later.
10:18:04 23    A. Okay.
10:18:04 24    Q. This is -- well, while we're -- while we

Page 68

10:18:05 1 have it, let's go over it. Exhibit Number 30a, do
10:18:10 2 you recognize that?
10:18:10 3    A. Yes, I do.
10:18:12 4    Q. And what is that?
10:18:12 5    A. This is the review that Jack Horne gave to
10:18:16 6 me in the early part of 2001 to cover 2000.
10:18:22 7    Q. Okay. And what was your overall rating by
10:18:24 8 Mr. Horne?
10:18:25 9    A. Meets expectations.
10:18:28 10    Q. Okay. Thank you.
10:18:29 11        (Plaintiff's Exhibit
10:18:29         30b was marked for
10:18:29 12            identification.)
10:18:54 13    Q. I've handed you Exhibit Number 30b. Do
10:18:57 14 you recognize this document?
10:18:59 15    A. Yes, I do.
10:19:00 16    Q. And what is this?
10:19:01 17    A. This is a recap of a discussion Steve
10:19:05 18 Trent and I had while at DFW.
10:19:08 19    Q. And who is Steve Trent?
10:19:09 20    A. Steve Trent was a general manager.
10:19:12 21    Q. He was your boss?
10:19:13 22    A. That's correct.
10:19:14 23    Q. And this is dated February 13, 1999?
10:19:17 24    A. Yes.

Page 137

1    Q. Okay. And do you have any idea why this
2 was printed out on the 28th?
3    A. I do not.
4    Q. Do you see the net production for Barbara
5 Loder here?
6    A. Yes.
7    Q. And that is minus 358,000 approximately?
8    A. That's correct.
9    Q. The net production for, is it Jan
10 Bansfield --
11    A. That's correct.
12    Q. -- was minus 1,231,000; is that right?
13    A. That's correct.
14    Q. The net production for Barbara Hale is
15 minus 2-- 1,242,000?
16    A. That's correct.
17    Q. And for Molly Crompton it's minus 584,
18 almost 585,000, right?
19    A. That's correct.
20    Q. Now, of those figures I read that were in
21 the minus, it was only Barbara Loder who lost her
22 job, right?
23    A. No. In -- in the downsizing Mary Patton's
24 position was also eliminated.

Page 138

1    Q. Well, I didn't read hers.
2    A. Oh, I'm sorry.
3    Q. But Mary Patton was in a positive
4 figure --
5    A. Right.
6    Q. -- wasn't she?
7    A. Yes. Of -- of the names you read, you're
8 correct in your previous statement.
9    Q. Okay. So Mary Patton didn't even have a
10 minus on production, did she?
11    A. Not -- not through the 27th, no.
12         (Plaintiff's Exhibit 8
13         was referenced.)
14    Q. Show you Plaintiff's Exhibit Number 8. Do
15 you recall this document?
16    A. Yes, I do.
17    Q. What is this?
18    A. This would be the list of nominees for
19 sales manager of the year in the different size
20 categories, small, medium and large hotels.
21    Q. And this is for the year what?
22    A. For 2-- 2001.
23    Q. Okay. And these are the top performers?
24    A. These would be the top performers at the

Page 139

1 hotel level, yes.
2    Q. Okay. On the second page there is a
3 heading called NSF Nominees?
4    A. That's correct.
5    Q. What does that refer to?
6    A. National sales force nominees for sales
7 manager of the year.
8    Q. And there were two people in your region
9 who were nominated for sales manager of the year?
10    A. Yes.
11    Q. Who were they?
12    A. They were Melissa Daniels and Barb
13 Loder -- Miss Hildebrandt.
14    Q. Okay. Did you play any role in nominating
15 her?
16    A. I played a role in nominating both of
17 those ladies, yes.
18    Q. Can you tell me what your role was?
19    A. The role was I was asked to submit the --
20 the most deserving names out of my office, and those
21 are the two ladies that I -- I presented.
22    Q. Was that based on their performance?
23    A. Absolutely.
24    Q. So Melissa Daniels and Barb Loder, you

Page 140

1 felt, were your two best performers?
2    A. For that -- for that year, yes.
3         (Plaintiff's Exhibit 10
4         was referenced.)
5    Q. Okay. Showing you Plaintiff's Exhibit
6 Number 10. Do you recall this document?
7    A. Yes, I do.
8    Q. What is this?
9    A. This is an e-mail from Miss Hildebrandt,
10 asking for customers to be invited in -- in,
11 number 1, to Hytee, which is a -- an event that we
12 put on for our female customers along with the
13 female managers. It's a golf event.
14    Q. Okay. Can you spell Hytee?
15    A. Yes. H, capital H-Y-T-E-E.
16    Q. Where was this to take place?
17    A. At the Hyatt Regency Coconut Point, which
18 is just outside of Naples, Florida.
19    Q. Can you explain a little bit more about
20 what Hytee is.
21    A. Certainly. Hytee was developed, I
22 believe, three to four years ago to allow the female
23 managers to invite female customers. We do a number
24 of -- of golf events throughout the year and there

Page 149

1 three contracts, but the client's representative
2 hadn't routed them to the legal department to get
3 them closed?
4    A. Right.
5    Q. Were you aware of that?
6    A. Yes.
7    Q. And at the end of the summary she says
8 that she feels she's back on track to achieve her
9 quota.
10    A. Yes.
11    Q. Did you believe that she was back on track
12 to achieve her quota?
13    A. Yes, I did.
14    Q. Did you share these projections with
15 anyone?
16    A. No. These were -- these were working
17 documents just from the -- the directors to myself.
18             (Plaintiff's Exhibit 16
19             was referenced.)
20    MR. STEINBERG: Okay. Here you go.
21    MS. GALLION: Thank you.
22    Q. I'm showing you Plaintiff's Exhibit
23 Number 16. Do you recognize this?
24    A. Yes, I do.

Page 150

1    Q. What is this?
2    A. This is the annual review that I conducted
3 with Miss Hildebrandt in February of 2001 for her
4 performance in 2000.
5    Q. And did you sign this?
6    A. Yes, I did.
7    Q. On the second page?
8    A. Yes.
9    Q. Okay. There are four areas that you
10 reviewed here?
11    A. Yes.
12    Q. The first one is Task Management?
13    A. Correct.
14    Q. And there are five categories, right, of
15 task management?
16    A. There's four.
17    Q. Four.
18    A. And then --
19    Q. Okay. And then a total?
20    A. The total.
21    Q. Okay. The -- the total score you gave her
22 on task management was RM?
23    A. That's correct.
24    Q. What does RM mean?

Page 151

1    A. RM is role model.
2    Q. Okay. What is role model?
3    A. Role model is reserved for the very
4 highest performers with-- within the company.
5    Q. Okay. Someone who's done -- exceptional
6 in their accomplishments?
7    A. Yes.
8    Q. Okay. And then the second area is
9 Business Practices. You gave her a total score of
10 EE?
11    A. That's correct.
12    Q. What is EE?
13    A. Exceeds expectations.
14    Q. Okay. And one of the scores, though, was
15 a role model score in that group, right?
16    A. Correct.
17    Q. And then in the category of Business
18 Values what did you give her?
19    A. Exceeds expectations.
20    Q. And in the category of Leadership, what
21 did you give her?
22    A. Exceeds expectations.
23    Q. And the total rating was what?
24    A. Exceeds expectations.

Page 152

1    Q. Okay. Do you feel this is a true picture
2 of her work?
3    A. Absolutely.
4    Q. Then the last page, do you know who wrote
5 this page?
6    A. This would have been my -- my input.
7    Q. Okay. And you're saying here that she had
8 a solid year, achieving 136 percent of her group
9 quota, right?
10    A. Yes.
11    Q. And you mention her work at Coconut Point
12 Resort?
13    A. Yes.
14    Q. And you say she's very dedicated and
15 tireless in her efforts to gain business for Hyatt?
16    A. Yes.
17    Q. Is that a -- is that a true statement?
18    A. That's very true.
19             (Plaintiff's Exhibit
20             16a was referenced.)
21    Q. Okay. Next is Plaintiff's Exhibit 16a.
22 Do you recognize this?
23    A. Yes, I do.
24    Q. What is this document?

Page 153

```
13:38:49  1      A.  This was a self-assessment that
13:38:54  2  Ms. Hildebrandt provided to myself prior to her
13:38:59  3  final review for that year.
13:39:00  4      Q.  Is this something your managers are
13:39:03  5  required to do before their final review?
13:39:06  6      A.  We're -- we encourage it, but it's not --
13:39:10  7  it's not mandated.
13:39:11  8      Q.  Okay.  Up at the -- paragraph 1 she says
13:39:18  9  that she exceeded her quota for last year by
13:39:22 10  $2 million.  Do you think that's a true statement?
13:39:24 11      A.  Based on -- on my dealings with
13:39:28 12  Miss Hildebrandt, yes.
13:39:29 13      Q.  And in item number 4, she increased her
13:39:33 14  2000 net production by 12.7 percent over her 1999
13:39:39 15  net production.  Do you believe that's true?
13:39:42 16      A.  Yes, I do.
13:39:43 17      Q.  In item number 8 she mentions that
13:39:55 18  she's entering her 22nd year with Hyatt.  So you
13:39:58 19  were aware of that?
13:39:59 20      A.  Yes.
13:40:00 21      Q.  And she says:  I've continued to
13:40:07 22  demonstrate dedication, drive, and determination in
13:40:10 23  achieving the goals the company set forth.  Exceeded
13:40:14 24  quota for the past five years.
```

Page 154

```
13:40:17  1          Do you believe that's correct?
13:40:18  2      A.  Yes, I do.
13:40:19  3      Q.  Okay.  Now, on the next page there's a
13:40:26  4  section called Professional Goals.
13:40:28  5      A.  Yes.
13:40:29  6      Q.  And her first goal is to increase revenue
13:40:33  7  by 10 percent over the year 2000 revenue?
13:40:37  8      A.  That's correct.
13:40:38  9      Q.  And she says, quote, As this is the
13:40:42 10  increase the company will try to obtain, quote.  Do
13:40:49 11  you understand what she meant by that?
13:40:51 12      A.  Not completely, because I don't know at
13:40:53 13  that point if the quotas had been established for
13:40:58 14  the office yet.
13:40:59 15      Q.  Okay.  Rather than go through some of
13:41:26 16  these documents, let me just ask you:  Were you
13:41:27 17  aware that her previous performance reviews were all
13:41:32 18  Exceeds Expectations?
13:41:32 19      A.  Yes, I was.
13:41:34 20          (Plaintiff's Exhibit 26
13:41:34 21           was referenced.)
13:41:50 22      Q.  Okay.  I show you Plaintiff's Exhibit
13:41:57 23  Number 26, which consists of three pages.  Do you
13:42:00 24  recognize this document?
```

Page 155

```
13:42:01  1      A.  Yes, I do.
13:42:03  2      Q.  Do the three pages go together?
13:42:05  3      A.  Yes, they do.
13:42:07  4      Q.  Okay.  Can you tell me what this is?
13:42:12  5      A.  This is the new performance review and
13:42:15  6  goal setting form that was to be used starting last
13:42:20  7  year for the national sales force.
13:42:23  8      Q.  All right.  The first page, this is a
13:42:28  9  letter or memo dated May 18th, 2001?
13:42:31 10      A.  Correct.
13:42:32 11      Q.  And it's from you?
13:42:34 12      A.  Yes.
13:42:34 13      Q.  To all the directors of national accounts
13:42:34 14  in your region?
13:42:38 15      A.  Yes.
13:42:39 16      Q.  And are you telling them you're
13:42:43 17  instituting this new procedure?
13:42:46 18      A.  Yes.  This form was approved by the five
13:42:49 19  directors of the national sales offices, with Jack
13:42:54 20  Horne's approval, to better reflect the duties that
13:42:56 21  the national sales force used -- or conducted on a
13:43:01 22  day-to-day basis.  And this was -- this was, in
13:43:03 23  fact, the new form for everyone, yes.
13:43:06 24      Q.  Okay.  And the new form you're talking
```

Page 156

```
13:43:09  1  about, is that what is shown on the next two pages?
13:43:11  2      A.  That is correct.
13:43:12  3      Q.  Tell me, if you know, whose idea was this
13:43:14  4  new form?
13:43:15  5      A.  This was originally started with Gus
13:43:19  6  Vonderheide.  He brought it up with Jack Horne on a
13:43:24  7  conference call.  And then Gus, myself and the other
13:43:29  8  directors sat down to brainstorm what components we
13:43:34  9  felt were appropriate for the national sales force
13:43:38 10  to be reviewed upon.
13:43:39 11      Q.  So is this a compilation of all five
13:43:43 12  directors' ideas?
13:43:46 13      A.  Yes.
13:43:46 14      Q.  Okay.  Who put this together, do you know?
13:43:48 15      A.  The actual layout of the form?  This came
13:43:55 16  from Gus Vonderheide in -- in Omaha.
13:43:58 17      Q.  When did this project get started?
13:44:00 18      A.  It started shortly after the 2000 review
13:44:07 19  and concluded at the Hyatt masters' meeting at Lake
13:44:11 20  Las Vegas where the document was -- was finally
13:44:15 21  approved by Jack Horne.
13:44:16 22      Q.  When was that?
13:44:17 23      A.  It was in May.  I -- I don't know the
13:44:21 24  exact date of the -- of the meeting.
```

Page 157

```
1    Q. Okay. May 2001?
2    A. That's correct.
3    Q. Did anyone else besides Mr. Horne approve
4 it?
5    A. I believe a copy was sent to human
6 resources for approval.
7    Q. How was this form supposed to be used?
8    A. This form was supposed to be used similar
9 to the form that the national sales force had seen
10 in the past where they would have different
11 categories, but we broke it down into areas where
12 the business was -- was taking place that would
13 better reflect what their true activities were.
14 There -- there were many operational type issues in
15 the -- in the previous document that we didn't think
16 matched up well with what the -- the national sales
17 force was being asked to do.
18    Q. Can you look back at Exhibit 16? Do you
19 have that there?
20    A. Yes. Yes.
21    Q. Was this new form supposed to replace
22 Exhibit 16?
23    A. That's correct.
24    Q. As an annual performance review?
```

Page 158

```
1    A. As an annual performance review, correct.
2    Q. Okay. Now, whose idea was it to use this
3 for a midyear performance review?
4    A. That was my idea.
5    Q. Okay. Can you tell me how that came
6 about?
7    A. Yes. Because we had a new form and the
8 evaluation process had been changed for the
9 criteria, I felt it was important that we expose
10 this document to everybody early on in the year so
11 they could become accustomed to what the format
12 would be before we got to a merit increase
13 performance review at the end of the year.
14      I also wanted to let people know my
15 expectations as I went through the evaluation
16 process, which were different after having a
17 substantial amount of time with Bruce Small. We
18 think differently and I wanted to make sure that we
19 had some communication, and to the point where if
20 there was an area that we'd like to see improvement,
21 there's sufficient time to make that improvement
22 to -- to allow the person to have a -- a maximum
23 review, come the following year.
24    Q. Is this something that you discussed with
```

Page 159

```
1 Mr. Horne?
2    A. Yes, I did.
3    Q. Did he approve using this as a midyear
4 review?
5    A. He thought it was a good idea.
6    Q. Do you know if the other -- are you
7 referred to as a regional director?
8    A. The other directors of the -- director of
9 the national sales office in Chicago.
10    Q. Do you know if the other office directors
11 used the midyear review?
12    A. I don't know if they did that or not.
13    Q. Okay. Okay. Do you recall sometime in
14 January of 2001 Mrs. Hildebrandt submitting her
15 sales goal for the first six months?
16    A. Yes, I do.
17    Q. Something she's required to do, right?
18    A. I ask for feedback, yes.
19    Q. And do you recall she submitted a
20 $3 million goal?
21    A. Yes, I do.
22    Q. And at that point she was no longer
23 handling the IT accounts, right?
24    A. That is correct.
```

Page 160

```
1    Q. Just group accounts?
2    A. Correct.
3    Q. And did you ask her to submit a higher
4 number?
5    A. I did.
6    Q. Okay.
7    A. Yes, I did.
8    Q. Why was that?
9    A. The office quota, that assigned by Jack
10 Horne to myself, increased significantly and
11 required everybody to re-evaluate the number they
12 had provided.
13    Q. So you had to move quotas up because Mr.
14 Horne had increased the quota for the office?
15    A. That's correct.
16    Q. Okay. And then do you remember her
17 submitting a quota around the first part of February
18 of 3.5 million?
19    A. That was her second revision, correct.
20    Q. Okay. And do you recall being involved in
21 a call with her and Mark Henry?
22    A. Yes, I do.
23    Q. Okay. Can you tell me what you recall
24 about that phone call, what each of you said.
```

**Page 161**

1    A. The call -- I made the call with Mark, my
2  associate director of sales, in the room and we went
3  over where I thought the quota would be.  It was
4  significantly higher than what Miss Hildebrandt
5  thought it should be.
6         She said, this is bullshit.
7         I said, let's -- let's talk about this.
8  I'm looking at a tentative report that had activity
9  that's expected to close in the first six months.
10 Is there something I'm missing on here?
11        We had some brief discussion and she
12 pointed out some things that weren't going to close
13 that on paper looked like they were going to close,
14 and that's -- resulted in a revision downward of her
15 quota.
16    Q. Why was Mark Henry on this call?
17    A. Mark is associate director of sales whose
18 goal someday is to -- to be a director of an office.
19 And in talking with Mark, he had never been involved
20 in quota setting at all with Bruce Small.  And so I
21 felt it was a development tool for him to at least
22 walk through and -- and hear people's concerns,
23 because we did see a big jump in the quota, and I --
24 I know it was more than I expected and I know it was

**Page 162**

1  more -- more than most people expected based on the
2  quota that we were assigned.
3     Q. Do you remember telling Miss Hildebrandt
4  that Mark Henry was a witness on the call?
5     A. A witness?  No, I don't remember that
6  comment.
7     Q. Okay.  You anticipated a problem on this
8  quota, didn't you?
9     A. Yes.  Any time we get a raise of
10 $20 million, I -- I expect to have discussions with
11 everybody, yes.
12    Q. Did you talk to Jack Horne about that,
13 that this is going to cause problems?
14    A. I talked to Jack.  You -- you know, we --
15 we had some discussion, but the number stood.
16    Q. Okay.  And how were you able to reduce it
17 to -- from 5 million?
18    A. Well, what -- what I was able to do, after
19 talking with Jack, is he allowed me to put some
20 revenue in -- into my name, even though there
21 weren't necessarily accounts assigned to me, again,
22 to -- office had to make the number, but again to
23 allow some relief amongst people in the office
24 that -- that might already be at the maximum they

**Page 163**

1  could probably produce.
2     Q. So part of the quota then got assigned to
3  you?
4     A. That's correct.
5     Q. And do you remember who the various people
6  were who couldn't handle these higher quotas?
7     A. Well, one in particular was -- was Barbara
8  Hale in the automotive market.  We -- there -- there
9  was no life in that market for the most part, so her
10 quota could not be moved up without completely
11 demoralizing her and giving her no -- no even hope
12 of positive performance.
13    Q. Do you remember how much you had to lower
14 her quota by?
15    A. I don't know off the top of my head, but
16 it -- it was in excess of a million dollars.
17    Q. Okay.  Do you remember setting Mrs.
18 Hildebrandt's quota at 4.1 million?
19    A. I believe that is where we ended up, yes.
20    Q. Okay.  Did you talk to Mr. Horne about the
21 problem that you would have in raising these quotas
22 when there's a recession going on?
23    A. We talked about it.  Again, the number was
24 the number.  Jack received this -- his quota from Ty

**Page 164**

1  Helms, so that was -- the national sales number was
2  the national sales number.
3     Q. Okay.  So Mr. Horne had a number and he
4  had to pass that down to you?
5     A. Correct.
6     Q. Okay.  Did anyone explain to you why they
7  set such high quotas?
8     A. It was a -- it was a function of the
9  hotel's quota, the field, and we get a percentage of
10 that, anywhere between 38 and 41 percent.
11    Q. Who -- who was it that explained that to
12 you?
13    A. Well, Jack Horne explained it to me.
14    Q. Okay.  Could you explain it to me, because
15 I don't quite understand.
16    A. Certainly.  The -- and this goes back in
17 the future group revenue targets again, so I'm --
18 each hotel has a booking site.  The larger hotels
19 book further out, maybe upwards of five to seven
20 years.  The smaller hotels would maybe book within a
21 three-year period.
22    Q. Okay.
23    A. Those revenue figures are rolled up into
24 divisional numbers, and there are five divisions,

Page 165

1 which are rolled up into a company number.

2    So during a Pride period there is a total

3 revenue expected to be booked by the company, from

4 the field's perspective. We get a portion of that

5 based on our -- our contribution in previous years

6 and it's been running 38 to 42 percent. So the

7 higher the field quota is, our quota goes up as

8 well.

9    Q. The field quota is based on their

10 bookings?

11    A. Their bookings.

12    Q. Future --

13    A. Current year and future bookings, yes.

14    Q. Okay. Now, that doesn't take into account

15 a downturn in the economy, right?

16    A. Not completely.

17    Q. Okay. Did Hyatt ever adjust these quotas

18 because of the events in the year 2001?

19    A. No.

20    Q. Okay. They expected people to keep

21 performing as had been projected prior to that year?

22    A. Keep performing to the best of their

23 ability. Certainly the events of 9/11 was a very

24 challenging environment.

Page 166

1    Q. Right. Okay. Now, going to July of 2001,

2 do you recall a midyear review with

3 Mrs. Hildebrandt?

4    A. Yes, I do.

5    Q. Okay. Do you remember where this took

6 place?

7    A. At the Hyatt Regency Cincinnati, in her

8 office.

9    Q. And of course this was the first time she

10 ever had a midyear review?

11    A. That's correct.

12    Q. And is it -- did you give a midyear review

13 to all of your managers?

14    A. Yes, I did.

15    Q. Okay.

16        (Plaintiff's Exhibit 27

17        was referenced.)

18    Q. Okay. Do you recognize Plaintiff's

19 Exhibit Number 27?

20    A. Yes, I do.

21    Q. What is this?

22    A. This is the midyear review that I had with

23 Ms. Hildebrandt.

24    Q. Okay. Now, I think it was mentioned in --

Page 167

1 in her deposition that you kept a copy in your

2 files?

3    A. I kept a copy for my use only, yes.

4    Q. But you didn't turn this in to anyone?

5    A. I did not. I made it very clear from the

6 beginning that this was a working document. We had

7 never done midyear reviews and I wanted -- it was

8 a -- to introduce the document to the individual

9 directors and it was not going to be sent to

10 anyone's permanent file.

11    Q. Okay. Can we look at the area of

12 Financial Management.

13    A. Yes.

14    Q. The first item is "Production achievement

15 versus quota"?

16    A. Correct.

17    Q. What does that refer to?

18    A. That would be the net production through

19 the first half of the year compared to the quota

20 that was established.

21    Q. Now, is this where she was at about

22 79 percent?

23    A. Correct. 78.8, approximately, yes.

24    Q. Okay. What was wrong with that production

Page 168

1 achievement?

2    A. Well, it -- it was -- it was lower than we

3 had hoped for this particular marketplace. Our

4 Pride or bonus payout doesn't start until

5 90 percent, so anything -- anything below that would

6 be an area that we need to improve in.

7    Q. Okay. Well, I remember you mentioned a

8 couple minutes ago that 79 percent of quota in a

9 recession was pretty good performance.

10    A. It -- it was a pretty good performance,

11 yes.

12    Q. I'm not sure, what were you trying to tell

13 her by saying needs improvement here?

14    A. Well, just the -- the fact that -- that

15 the financial performance or production from the --

16 the directors was -- was very important, we needed

17 to continue to work towards that, we're judged on

18 our numbers and we needed her contribution to be

19 successful.

20    Q. Now, were you getting any input from Mr.

21 Horne about people meeting their quotas?

22    A. No.

23    Q. Okay. Now, there are three other

24 subcategories here.

Page 169

13:58:12 1    A. Em-hmm.

13:58:12 2    Q. Two of them are -- you rated her meets

13:58:17 3 expectation --

13:58:17 4    A. Em-hmm.

13:58:17 5    Q. -- and one exceeds?

13:58:19 6    A. Yes.

13:58:26 7    Q. Under my math that wouldn't equal out to a

13:58:31 8 total rating of needs improvement, but you --

13:58:33 9    MS. GALLION: I object. If that's a

13:58:36 10 question, I move to strike it.

13:58:38 11    Q. -- you gave her a total rating of

13:58:41 12 improvement needed, right?

13:58:42 13    A. That's correct.

13:58:43 14    Q. How did you compute that?

13:58:45 15    A. Well, I -- production drove the rating on

13:58:47 16 this particular area. The other areas in there, I

13:58:53 17 looked to give a -- a review that was accurate, but

13:58:59 18 production drives the financial management area for

13:59:02 19 the national sales managers.

13:59:06 20    Q. Can you look at the last page.

13:59:14 21    A. Yes.

13:59:14 22    Q. You see there's some bullet points there?

13:59:20 23    A. Yes.

13:59:20 24    Q. And the last one is "Get more of your

Page 170

13:59:23 1 customers to Hyatt Events."

13:59:24 2    A. Right.

13:59:28 3    Q. You understand that she doesn't choose who

13:59:32 4 goes to the Hyatt events, don't you?

13:59:33 5    A. She doesn't have the ultimate selection,

13:59:36 6 that's correct.

13:59:36 7    Q. All she can do is submit names?

13:59:38 8    A. Correct.

13:59:39 9    Q. And you're aware she did submit names,

13:59:41 10 aren't you?

13:59:41 11    A. Yes.

13:59:42 12    Q. Okay. Did you realize that this is the

13:59:45 13 lowest rating she's received in 22 years with the

13:59:49 14 company?

13:59:49 15    A. I did not know that.

13:59:49 16    Q. You didn't know that at the time?

13:59:51 17    A. I didn't know that at the time.

13:59:52 18    Q. Okay. Do you remember during the midyear

14:00:05 19 review discussing her recent marriage?

14:00:05 20    A. Yes, I do.

14:00:09 21    Q. And do you remember asking her whether she

14:00:11 22 might stop working and stay at home now that she was

14:00:14 23 married?

14:00:14 24    A. I don't remember saying that.

Page 171

14:00:16 1    Q. Okay. Do you deny that you said that?

14:00:19 2    A. I -- I -- I'm saying I don't remember

14:00:23 3 saying it that -- that way you just expressed it.

14:00:27 4    Q. What did you -- what do you remember

14:00:27 5 saying?

14:00:27 6    A. What I remember is before the midyear

14:00:31 7 review began, Jack Horne called me into his office

14:00:33 8 and said that he had received a call from Scott

14:00:36 9 Allen asking that he got the feeling that

14:00:40 10 Miss Hildebrandt might want to do something else at

14:00:43 11 the end of 2001. Jack said, can you go down when

14:00:46 12 you talk with her and find out if, in fact, that is

14:00:51 13 true.

14:00:51 14    In -- in my conversation with

14:00:54 15 Miss Hildebrandt I brought up the -- the fact, were

14:00:57 16 there other things that she wanted to do, were you

14:01:02 17 limited with regard to your -- your ability to move,

14:01:08 18 given that your husband is a -- an elected official?

14:01:11 19 I offered would a home office be of interest to her,

14:01:15 20 because many of our -- our remote locations had gone

14:01:19 21 to a home office, would that be more convenient for

14:01:22 22 her. She did a tremendous job for the company with

14:01:24 23 regard to Coconut Point in the presell; was there

14:01:25 24 something in that area.

Page 172

14:01:26 1    We were afraid that we were going to lose

14:01:29 2 her to someone else and we didn't want that to

14:01:32 3 happen. And so I had never had a chance to sit down

14:01:35 4 with her and talk about her career, in my mind, in

14:01:39 5 any great detail and I -- and I didn't want to miss

14:01:41 6 this opportunity to -- to see if she would be

14:01:45 7 forthcoming with it.

14:01:46 8    After our discussion she said, I'm very

14:01:48 9 happy with what I'm doing. And that was

14:01:50 10 satisfactory to me, that that's fine.

14:01:51 11    Q. Why were you afraid to lose her?

14:01:57 12    A. Because she -- she was a top performer.

14:02:01 13    Q. Is that particularly important in a

14:02:04 14 recession period?

14:02:04 15    A. Absolutely.

14:02:05 16    Q. Tell me everything you can remember about

14:02:10 17 the conversation you had with Mr. Horne before this

14:02:13 18 review.

14:02:13 19    A. It -- it was a -- it was a brief

14:02:16 20 conversation where he came in my office and said

14:02:19 21 Scott Allen called and felt that Miss Hildebrandt

14:02:25 22 wanted to do something else with her career. He

14:02:28 23 didn't elaborate.

14:02:30 24    Q. Did he say anything more about what Mr.

Page 173

14:02:34 1 Allen said?

14:02:34 2     A. He did not.

14:02:35 3     Q. Okay. What instructions did he give you?

14:02:37 4     A. He said when you -- he said you have a --

14:02:37 5 you're going down to Cincinnati for -- to go over

14:02:40 6 the midyear review. And I said, yes, I am. He

14:02:42 7 said, can you please find out if there's something

14:02:44 8 that she'd like to do, because we want her to stay

14:02:47 9 with the company.

14:02:48 10     Q. Okay. Do you remember her being upset

14:02:51 11 over your question about her marriage?

14:02:52 12     A. I -- I do remember that, yes.

14:02:54 13     Q. And asking you if you would have asked

14:02:56 14 that question to men?

14:02:57 15     A. And I remember her saying that, yes.

14:02:59 16     Q. Do you remember discussing with her the

14:03:06 17 fact that Brian Cassidy and Terri Williams had

14:03:10 18 recently resigned?

14:03:11 19     A. I don't remember that, no.

14:03:13 20     Q. Do you deny that was discussed?

14:03:16 21     A. I don't remember that part of the

14:03:18 22 discussion.

14:03:18 23     Q. Do you remember talking to her about

14:03:23 24 whether her accounts could be handled from Chicago?

Page 174

14:03:25 1     A. I did ask that question.

14:03:26 2     Q. Okay. Why were you wanting to know that?

14:03:28 3     A. Well, and again going back to if there was

14:03:31 4 something else she wanted to do, based on her

14:03:34 5 account relationships here, and she had been an

14:03:36 6 established player in this community for many years,

14:03:40 7 not only as on my staff presently but before that as

14:03:42 8 director of sales and marketing at the Hyatt Regency

14:03:46 9 Cincinnati, would it be important to have someone

14:03:49 10 down here, would the customers come to expect that,

14:03:52 11 if she were to go to do something else.

14:03:54 12         But when she said, no, I'm happy with what

14:03:57 13 I'm doing, that was very satisfactory to me and I

14:03:59 14 didn't -- didn't pursue it any further and -- and --

14:04:02 15 and, quite frankly, moved on to other issues because

14:04:04 16 I -- we didn't have one.

14:04:05 17     Q. What did she tell you about whether these

14:04:07 18 accounts could be handled from Chicago?

14:04:08 19     A. She felt it would be important to have

14:04:11 20 someone here.

14:04:11 21     Q. Did you agree?

14:04:12 22     A. I -- I respected her opinion, and

14:04:14 23 that's -- and I was looking for her opinion.

14:04:17 24     Q. What did she say when you asked her if she

Page 175

14:04:26 1 would -- I'm not sure if I'm phrasing this

14:04:26 2 correctly, so you can correct me -- if she would be

14:04:28 3 amenable to a home office?

14:04:29 4     A. She said that might be a possibility and

14:04:32 5 didn't commit one way or the other.

14:04:33 6     Q. Okay. Why were you opening up a

14:04:37 7 discussion of a home office?

14:04:38 8     A. Well, in many of our hotels we start to

14:04:41 9 see at some point in time, with the ownership setup,

14:04:44 10 that we may see rent being due to -- to occupy the

14:04:48 11 space. We didn't have that situation in this

14:04:51 12 particular case, but it's been our experience and

14:04:53 13 that's the reason why I said, you know, would a home

14:04:56 14 office be of interest to you, because then once we

14:04:59 15 have someone established in the office at home, then

14:05:03 16 once initial start-up is in there we just have to

14:05:06 17 pay the -- the -- the monthly connection charges.

14:05:09 18     Q. Okay. So there was no rent cost in her

14:05:14 19 office?

14:05:14 20     A. Not -- not at that time, no.

14:05:14 21     Q. Did you -- do you remember indicating to

14:05:21 22 her that the company was planning or considering

14:05:24 23 closing the Cincinnati office?

14:05:24 24     A. No. At that point I had no idea that

Page 176

14:05:30 1 we -- there was no discussions about any closures

14:05:33 2 whatsoever.

14:05:34 3     Q. Do you remember telling her that your wife

14:05:36 4 Peggy was politicking to have the office in

14:05:41 5 Cincinnati remain open so you could continue

14:05:45 6 visiting?

14:05:45 7     A. Oh. At a -- on a -- on a -- a jestful

14:05:50 8 nature, yes, she'd like to see it keep open,

14:05:53 9 because, again, her family's here.

14:05:55 10     Q. Well, why would you have to worry about

14:05:58 11 having it remain open if there was no consideration

14:06:01 12 of closing it?

14:06:01 13     A. There -- there was no consideration of

14:06:04 14 closing it. Peggy's comments were it was nice to

14:06:07 15 have an office where you could go visit and -- and

14:06:09 16 be with family if -- if the -- if the situation

14:06:12 17 allowed. It was -- it was nothing more than -- than

14:06:16 18 her desire to have me cover an area that she grew up

14:06:20 19 in. She -- once we -- once we were married and

14:06:22 20 moved away she's not been back in Cincinnati, and

14:06:26 21 her entire family's here. So this is probably as

14:06:29 22 close to Cincinnati that I was going to get from an

14:06:31 23 assignment standpoint.

14:06:32 24     Q. Well, I -- I understand why you want to be

14:06:34 1 close to Cincinnati. My question is why you're
14:06:37 2 raising the subject of politicking to have the
14:06:41 3 office remain open if --
14:06:42 4     A. I --
14:06:42 5     Q. -- no one's considering closing it.
14:06:44 6     A. Politicking is not an accurate
14:06:48 7 statement --
14:06:48 8     Q. Okay.
14:06:48 9     A. -- for my --
14:06:48 10    Q. What do you believe you said?
14:06:49 11    A. I -- I believe I said that Peggy likes the
14:06:51 12 fact that there's a Cincinnati office here that
14:06:53 13 allows me to come and conduct business in her
14:06:56 14 hometown.
14:06:56 15    Q. Okay. Do you remember Mrs. Hildebrandt
14:07:01 16 telling you that she planned to stay in her job for
14:07:04 17 many years to come?
14:07:04 18    A. Yes, she did.
14:07:06 19    Q. Okay. Did you convey this back to Jack
14:07:07 20 Horne?
14:07:07 21    A. Yes, I did.
14:07:08 22    Q. When?
14:07:10 23    A. The very next day when I went back to --
14:07:12 24 or the next time I was in the office, I should say.

Page 178

14:07:15 1 I don't know if that was a day or two later, but
14:07:18 2 left -- the next time I had an opportunity to see
14:07:20 3 Jack.
14:07:20 4     Q. Can you tell me what you can recall about
14:07:21 5 this conversation, what you said and what --
14:07:24 6     A. Certainly.
14:07:24 7     Q. -- he said.
14:07:24 8     A. Jack asked how it went. I said -- I said,
14:07:27 9 it went fine. I said, Ms. Hildebrandt is very happy
14:07:31 10 in her job. We talked about a home office.
14:07:35 11    And Jack said, that's fine. If that's
14:07:37 12 something down the road that she'd like to pursue,
14:07:40 13 we'd certainly support that. And -- and that was
14:07:41 14 it. He was -- he was satisfied with -- with the
14:07:44 15 answers that I gave him.
14:07:45 16    Q. He was -- was he satisfied that she had no
14:07:48 17 intention to leave the company?
14:07:49 18    A. Yes.
14:07:49 19    Q. All right. We've been going for more than
14:08:09 20 an hour. Would you like to have a break?
14:08:11 21    A. Yeah, that would be nice. Thank you.
10:31:45 22    (Recess taken: 2:08 p.m. - 2:29 p.m.)
14:29:36 23    VIDEOGRAPHER: You're on the record.
14:29:38 24 BY MR. STEINBERG:

Page 179

14:29:38 1     Q. Mr. Booth, after September 11th, the
14:29:45 2 events of September 11th, 2001, do you remember Mr.
14:29:52 3 Horne stating that you should be optimistic about
14:29:57 4 sales matters, because people have to meet?
14:30:04 5     A. Yes.
14:30:05 6     Q. And do you remember him saying that the
14:30:07 7 sales organization needs to be one with compassion?
14:30:09 8     A. Yes.
14:30:09 9     Q. Do you remember him saying that the Hyatt
14:30:16 10 sales organization has a chance to win relationships
14:30:20 11 for the long term by dealing with the short term
14:30:24 12 with sensitivity and common sense?
14:30:26 13    A. Yes, I do.
14:30:27 14    Q. Do you think that Hyatt dealt with Mrs.
14:30:35 15 Hildebrandt with compassion and sensitivity and
14:30:37 16 common sense?
14:30:40 17    MS. GALLION: I'm going to object to the
14:30:41 18 extent that calls for a question that he may
14:30:43 19 not be competent to give.
14:30:44 20    If you have an opinion, please express it.
14:30:47 21    A. I can't speak for the entire company, no.
14:30:49 22    Q. Did Mr. Horne tell you that Hyatt's
14:30:54 23 competitors were overleveraged and short on capital
14:30:57 24 and they were going to lose stock value because of

Page 180

14:31:00 1 the September 11th events?
14:31:01 2     A. I remember that statement, yes.
14:31:03 3     Q. And do you remember him saying that Hyatt
14:31:06 4 was in a position unlike any of its competitors and
14:31:10 5 that it had the resources to weather the storm and
14:31:14 6 come out ahead when the economy turned in its favor?
14:31:17 7     A. Yes, I remember that statement.
14:31:18 8     Q. And you're aware that after September 11th
14:31:28 9 but before these reductions Hyatt followed through
14:31:31 10 on a decision to open a new resort in Coconut Point?
14:31:35 11    A. Yes.
14:31:37 12    Q. That was around September 24th, wasn't it?
14:31:40 13    A. Approximately.
14:31:40 14    Q. Okay. Have you discussed this lawsuit
14:31:56 15 with anybody besides your attorneys?
14:31:57 16    A. The -- Ty Helms and Jack Horne.
14:32:04 17    Q. And have you discussed with Mr. Helms and
14:32:08 18 Mr. Horne what your testimony might be today?
14:32:11 19    A. No.
14:32:18 20    Q. Are you aware of any surveys or studies
14:32:19 21 over the last five years done by Hyatt that relate
14:32:24 22 to resignation or termination?
14:32:26 23    A. No.
14:32:29 24    Q. Are you aware of any surveys or studies