UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - -
BARBARA LODER          :
HILDEBRANDT,
                       :
                       :
        Plaintiff,     :
    vs.                :    Case No. C-1-02-003
                       :     (Judge Beckwith)
HYATT CORPORATION,     :
et al.,                :
                       :
        Defendants.    :
- - - - - - - - - - - - -


        Videotaped deposition of JOHN MICHAEL

HORNE, a witness herein, called by the plaintiff for

cross- examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy L. Welsh, a

Registered Merit Reporter and Notary Public in and

for the State of Ohio, at the offices of Waite,

Schneider, Bayless & Chesley, 1513 Central Trust

Tower, Five West Fourth Street, Cincinnati, Ohio, on

Thursday, March 21, 2002, at 9:06 AM.

EXHIBIT

D

## Page 6

09:08:49 1    (Plaintiff's Exhibit 1

09:08:49 2    was referenced.)

09:08:49 3    Q. I'd like to start off by showing you

09:09:02 4    Exhibit Number 1. Can you identify this exhibit?

09:09:10 5    A. Yes, I can.

09:09:11 6    Q. Okay. What is this?

09:09:13 7    A. This is basically a -- a letter from Cathy

09:09:17 8    Petz, our human resource director, basically saying

09:09:22 9    that -- in -- regards to the positions that were

09:09:23 10   being eliminated, and this is Barb's letter and the

09:09:29 11   fact that Hyatt needed to eliminate positions.

09:09:34 12   Q. Okay. Do you feel that all of the

09:09:36 13   statements in this letter are true? Take your time

09:09:40 14   and look it over.

09:09:44 15   A. Very much so.

09:09:47 16   Q. Okay. Is it true that due to the economy

09:09:51 17   Hyatt needed to eliminate Barbara's position?

09:09:54 18   A. That's correct.

09:09:56 19   Q. And is it true that she was separated from

09:09:59 20   the company through no fault of her own?

09:10:02 21   A. That's correct.

09:10:04 22   Q. And is it true that she was valuable to

09:10:06 23   the company?

09:10:07 24   A. Very much so.

## Page 7

09:10:12 1    Q. Okay. Thank you. Mr. Horne, did you

09:10:17 2    participate in the decision to fire Mrs.

09:10:20 3    Hildebrandt?

09:10:21 4    A. Well, with all due respect, I didn't fire

09:10:25 5    Ms. Hildebrandt. I terminated her position.

09:10:27 6    Q. Is there a difference between terminating

09:10:30 7    a person and firing them?

09:10:31 8    A. Yeah. We had a reduction in force that we

09:10:34 9    eliminated a number of positions, but certainly as a

09:10:38 10   person I did not fire Barb.

09:10:42 11   Q. Okay. Are you aware that in the reduction

09:10:44 12   in force a number of people were laid off?

09:10:47 13   A. Yes, I am.

09:10:49 14   Q. And what's a layoff?

09:10:54 15   A. A layoff? I'm not sure what the legal

09:10:58 16   definition is of a layoff but it's somebody without

09:11:01 17   employment.

09:11:03 18   Q. Well, a lay-- isn't a layoff where someone

09:11:05 19   is temporarily suspended from employment, with the

09:11:09 20   permission to return at a certain time?

09:11:12 21   MS. GALLION: I object. Asks for a legal

09:11:14 22   conclusion. If the witness has a layperson's

09:11:17 23   understanding and his own personal opinion of

09:11:19 24   what a layoff is, please answer.

## Page 8

09:11:22 1    A. I'll refrain from answering.

09:11:25 2    MS. GALLION: If you have an opinion about

09:11:27 3    what a layoff is, you may say.

09:11:31 4    Q. Mrs. Hildebrandt wasn't laid off, was she?

09:11:33 5    A. No. Her position was eliminated.

09:11:39 6    Q. Okay. Now, did you participate in the

09:11:41 7    decision to end her employment?

09:11:44 8    A. Yes, I did.

09:11:46 9    Q. Okay. What was your reason for ending

09:11:50 10   Mrs. Hildebrandt's employment?

09:11:53 11   A. Basically, unfortunately, the company's

09:11:58 12   demise last year financially that began in the

09:12:03 13   spring and then got worse after 9/11, we were put in

09:12:07 14   a position to reduce a number of positions and I

09:12:12 15   basically was in charge of recommending in my area.

09:12:15 16   Q. What was your reason for terminating Mrs.

09:12:19 17   Hildebrandt's employment?

09:12:20 18   A. Well, I looked at a -- a number of

09:12:23 19   positions in the national sales force where I felt

09:12:28 20   that Hyatt in the long run would not lose any

09:12:31 21   production or any revenue from customers. I tried

09:12:35 22   to analyze to the best of my ability all 67 national

09:12:41 23   sales positions and where I could reduce positions

09:12:44 24   and not impact production and customer

## Page 9

09:12:48 1    relationships. And I came to the conclusion or

09:12:53 2    recommendation of these ten individuals.

09:12:57 3    It should also be noted that besides

09:12:59 4    looking at the customer base, the geographic areas

09:13:03 5    that those people were in, I also looked at the mix

09:13:06 6    of business that that person handled, whether it was

09:13:12 7    individual travel or group travel. And knowing that

09:13:15 8    we were going to go to a separate strategy of group

09:13:19 9    and IT, that also came into my decisions.

09:13:23 10   So in other words, if somebody was going

09:13:25 11   to lose IT accounts to another person and could

09:13:27 12   possibly take on additional group accounts, that

09:13:31 13   went into my thinking as well when I was reducing

09:13:42 14   positions.

09:13:42 15   Q. Okay. Well, Mrs. Hildebrandt had lost her

09:13:42 16   IT accounts, hadn't she?

09:13:43 17   A. Yes, she had lost them earlier.

09:13:43 18   Q. And she could take on additional group

09:13:45 19   accounts, couldn't she?

09:13:47 20   A. She may have, yes.

09:13:49 21   Q. And was that a reason why you ended her

09:13:52 22   employment, because she could take on additional

09:13:55 23   group accounts?

09:13:55 24   A. Well, the specific reasons were I felt

## Page 10

1 that the accounts that she handled in Ohio could be
2 covered by the person we had in Michigan as well as
3 anybody back in Chicago.
4     Q. Who was the person in Michigan?
5     A. Barbara Hale.
6     Q. Okay. Now, Mrs. Hildebrandt had
7 tentatively booked a significant amount of
8 production through the end of 2001, hadn't she?
9     A. I'm not aware of that.
10     Q. So you didn't look at her booked
11 production when you made the decision to end her
12 employment?
13     A. No, I really did not.
14     Q. Well, then how did you determine whether
15 her employment would affect production?
16     A. I basically looked at the customers and
17 the geographic location of those customers that
18 Barbara handled and I made the determination that
19 those customers could be handled by other people in
20 the national sales force.
21     Q. That's true of virtually all of your
22 customers, isn't it?
23     A. Yes, it is.
24     Q. Anyone in your national sales force can

## Page 11

1 handle customers in any geographic location, can't
2 they?
3     A. Yes.
4     Q. Well, I don't understand what your reason
5 was for terminating Mrs. Hildebrandt.
6     MS. GALLION: Objection to argumentative
7 nature. If you have a question, please put it.
8 Stating that you don't understand the reason is
9 not a question.
10     You don't have to answer. There's no
11 question before you.
12     Q. Do you have any further reason for
13 terminating Mrs. Hildebrandt?
14     A. No.
15     Q. None at all?
16     A. No.
17     Q. Was maintaining a good relationship with
18 your customers a consideration you made in
19 terminating Mrs. Hildebrandt?
20     A. To the best of my ability, yes.
21     Q. Do you feel that ending her employment
22 helped to maintain a good relationship with her
23 customers?
24     A. Not initially, but in the long run, yes.

## Page 12

1     Q. Weren't her customers very upset about her
2 being terminated?
3     A. It was -- if they were, I've -- I've only
4 heard of -- of one or two. I've not heard myself.
5     Q. Aren't you aware they've contacted the
6 company and expressed their unhappiness at her
7 termination?
8     A. I'm not aware of that.
9     Q. Is there any other reason that you had for
10 terminating Mrs. Hildebrandt, other than what you've
11 already stated?
12     MS. GALLION: Objection. Asked and
13 answered three times. He's given you his
14 reasons.
15     If you have any other reasons, please say
16 so.
17     A. No, I don't.
18     Q. Did you have any further answer to that
19 question?
20     A. No.
21     MS. GALLION: He said no.
22     Q. Did anyone else participate in the
23 decision to fire Mrs. Hildebrandt?
24     A. Again, with all due respect, she was not

## Page 13

1 fired. Her position was eliminated, and I made the
2 recommendation and my boss approved the
3 recommendations.
4     Q. Who was your boss?
5     A. Ty Helms.
6     Q. Okay. Did you discuss any reason with
7 Mr. Helms why you wanted to end Mrs. Hildebrandt's
8 employment?
9     A. I discussed all the reasons of all the
10 reductions, yes.
11     Q. All the re-- I'm sorry?
12     A. With all ten people I discussed the
13 reasons, yes.
14     Q. Okay. With regard to Mrs. Hildebrandt did
15 you discuss with Mr. Helms any reasons that you
16 haven't stated here today?
17     A. No, sir.
18     Q. Did you have any other reasons for ending
19 the employment of the other nine?
20     A. No, sir.
21     Q. It was all the same reason?
22     A. That's correct, sir.
23     Q. Did you have discussions with any Hyatt
24 officials about terminating Mrs. Hildebrandt other

Page 14

09:18:24 1 than Mr. Helms?
09:18:26 2      A. No.
09:18:26 3      Q. Okay. Why did -- did you decide it was
09:18:42 4 necessary to terminate anyone?
09:18:48 5      A. Basically after -- after 9/11 the
09:18:55 6 financial situation for the company worsened
09:18:59 7 tremendously, and I had a meeting with Ty Helms, who
09:19:03 8 said unfortunately the cost-cutting measures that
09:19:07 9 have taken place all year long, due to the company's
09:19:10 10 performance, were possibly not enough and that we
09:19:15 11 might have to go into a position of reducing bodies.
09:19:19 12 And I was instructed to put together a plan to the
09:19:23 13 best of my ability to do that.
09:19:29 14      Q. When did you first give any consideration
09:19:31 15 to terminating your employees?
09:19:34 16      A. It was somewhere between 9/13 and 9/20.
09:19:43 17 I'm just sorry that I don't recall the date.
09:19:47 18      Q. Had you given any consideration to closing
09:19:50 19 the Cincinnati office prior to that time?
09:19:53 20      A. No, sir.
09:19:54 21      Q. Do you recall meeting with Mr. Booth to
09:20:13 22 inform him about these terminations?
09:20:16 23      A. Yes, I do.
09:20:18 24      Q. Okay. Do you recall when that was?

Page 15

09:20:20 1      A. I believe I met with Brian on the 22nd of
09:20:26 2 September to inform him there was a possibility this
09:20:29 3 would take place, and then again on the 27th I
09:20:34 4 informed him that these reductions were going to
09:20:36 5 take place.
09:20:39 6      Q. Okay. Now, was your statement to him on
09:20:42 7 the 22nd that the reductions might take place, was
09:20:46 8 that a truthful statement?
09:20:48 9      A. Yes, very much so.
09:20:50 10      Q. So Mr. Helms had not yet decided to make
09:20:54 11 these reductions?
09:20:55 12      A. At that point the decision had not been
09:20:57 13 decided, yes, that's a correct statement.
14                   (Plaintiff's Exhibit 37
15                    was referenced.)
09:21:48 16      Q. Let me show you Exhibit Number 37.
09:21:56 17      MS. GALLION: Thank you.
09:21:56 18      Q. Are you familiar with this document, Mr.
09:21:57 19 Horne?
09:21:57 20      A. No, I'm not.
09:22:01 21      Q. You see it's a document dated
09:22:01 22 September 20th, 2001?
09:22:06 23      A. I -- I can see that, yes.
09:22:08 24      Q. And it's from Mr. Helms to Mr. Miller and

Page 16

09:22:18 1 Mr. Rabin. This was provided to me by Hyatt. Do
09:22:18 2 you know who Mr. Miller is?
09:22:19 3      A. Yes, I do.
09:22:19 4      Q. Who is he?
09:22:21 5      A. He's the president of Hyatt Hotels.
09:22:24 6      Q. And who is Mr. Rabin?
09:22:25 7      A. He's the chief operating officer, the
09:22:30 8 number two in command of Hyatt Hotels.
09:22:36 9      Q. Okay. And I understand that you've
09:22:38 10 testified you haven't seen this document, but I just
09:22:42 11 want to ask you some questions about it. Do you see
09:22:44 12 the first sentence says "Attached is a department-
09:22:48 13 by-department labor cost reduction plan for
09:22:51 14 Corporate Sales"?
09:22:55 15      A. I do see that.
09:22:57 16      Q. Is corporate sales the area that you're
09:22:59 17 in?
09:22:59 18      A. I'm part of corporate sales, yes.
09:23:05 19      Q. Okay. And then the following paragraphs
09:23:07 20 talk about what types of cuts are to be made. And
09:23:13 21 if you look to the next to the last paragraph, does
09:23:22 22 it say "It goes without saying that these cuts will
09:23:24 23 be difficult for an already lean organization that
09:23:31 24 is trimmed substantially during the 'good times,'

Page 17

09:23:34 1 but they must be taken"?
09:23:36 2      A. I see that line.
09:23:38 3      Q. Okay. And this is dated before you met
09:23:40 4 with Mr. Booth, right?
09:23:41 5      A. Yes, it is.
09:23:47 6      Q. Did Mr. Helms tell you that they hadn't
09:23:45 7 yet decided whether to take these cuts?
09:23:54 8      A. When I submitted my -- my plan to him, it
09:23:58 9 had not been decided. And again, as I stated, on
09:24:01 10 the 26th or 27th I was told that cuts would be
09:24:06 11 needed to be taken. So yes, there was -- there was
09:24:09 12 no -- no direction given to me as far as cuts being
09:24:12 13 taken until the 26th or 27th.
09:24:17 14      Q. Do you recall what you told Mr. Booth was
09:24:18 15 the reason for these cuts?
09:24:20 16      A. The reason for them?
09:24:20 17      Q. Yes.
09:24:22 18      A. Yes. The -- the company's financial
09:24:29 19 performance had worsened severely as of 9/11 and we
09:24:30 20 were forced to take further cuts, not just at the
09:24:34 21 travel and expense level.
09:24:34 22      Q. Did you tell him that the reason for the
09:24:38 23 terminations was to minimize the impact on -- on
09:24:44 24 production?

Page 18

```
09:24:44  1        MS. GALLION: I object. That assumes
09:24:47  2    evidence that is not real evidence and, in
09:24:49  3    fact, there's no testimony to that effect.
09:24:52  4        But subject to my objection, you can
09:24:53  5    answer.
09:24:54  6        MR. STEINBERG: Well, there was testimony
09:24:55  7    to that effect yesterday and it's in the
09:24:56  8    record.
09:24:56  9        MS. GALLION: There was not testimony to
09:24:57 10    that effect. He didn't say that that's the
09:24:59 11    reason the cuts were made, but I don't want to
09:25:02 12    argue.
09:25:02 13        If you understand that question and have
09:25:05 14    an answer, please provide it.
09:25:06 15    A. That wasn't the answer that I gave to Mr.
09:25:08 16    Booth.
09:25:08 17    Q. So you didn't tell Mr. Booth that one of
09:25:10 18    the reasons for the terminations was to minimize
09:25:13 19    impact of production?
09:25:15 20    A. At the time of the 26th, no, I did not.
09:25:19 21    Q. Okay. Is that the reason you gave me
09:25:20 22    earlier this morning?
09:25:23 23    A. Repeat the question, please.
09:25:25 24    Q. Was minimizing the impact of production --
```

Page 19

```
09:25:29  1    A. That's -- that is the -- when I looked at
09:25:32  2    the national sales force and made the recommendation
09:25:34  3    to reduce ten positions, my goal was to minimize the
09:25:37  4    production from these customers for the company for
09:25:40  5    the better of the company long term, yes.
09:25:48  6    Q. Did you tell Mr. Booth that one of the
09:25:49  7    reasons for the people you chose to eliminate was to
09:25:54  8    still maintain good customer relations?
09:25:57  9    A. Yes.
09:26:00 10    Q. And did you tell him that one of the
09:26:02 11    reasons, a third reason for choosing the people to
09:26:07 12    eliminate was to achieve a cost savings?
09:26:12 13    A. I can't recall if I told him that at the
09:26:14 14    time that we made the decision.
09:26:20 15    Q. Was achieving a cost savings a reason why
09:26:23 16    you chose these individuals to terminate?
09:26:25 17    A. Yes, it was.
09:26:31 18    Q. Did you or anyone else offer Mrs.
09:26:33 19    Hildebrandt any other position at Hyatt?
09:26:37 20    A. No.
09:26:39 21    Q. Why not?
09:26:40 22    A. There was no positions available.
09:26:46 23    Q. Why didn't you lay her off instead of
09:26:48 24    firing her?
```

Page 20

```
09:26:50  1    A. Again --
09:26:51  2        MS. GALLION: I object. If you know what
09:26:52  3    the term -- I object to the use of the term
09:26:54  4    "layoff," which is a legal term.
09:26:56  5        But if you wish to define it as you
09:26:58  6    understand it and answer, I have no objection.
09:27:00  7        MR. STEINBERG: It is not a legal term.
09:27:02  8        MS. GALLION: My objection stands.
09:27:03  9        If you define it and then give your
09:27:05 10    answer, if you have one, I have no objection.
09:27:11 11    A. I -- I don't -- you know, I don't really
09:27:14 12    understand what you mean by layoffs, but I'd be
09:27:16 13    happy to describe why the -- why the --
09:27:18 14    Q. Well --
09:27:18 15    A. -- positions were reduced again.
09:27:20 16    Q. -- do you remember that the sales managers
09:27:23 17    in the field were laid off rather than terminated?
09:27:23 18    A. I had nothing to -- I have no knowledge of
09:27:28 19    that. I have nothing to do with those decisions.
09:27:31 20    Q. You didn't learn -- you've never learned
09:27:34 21    that the sales managers in the field were laid off?
09:27:36 22    A. No.
09:27:37 23        MS. GALLION: I object. There's no
09:27:39 24    evidence in the record to that effect and, in
```

Page 21

```
09:27:40  1    fact, that is not true.
09:27:41  2        But you may answer.
09:27:43  3    A. No.
09:27:44  4        MR. STEINBERG: Ms. Gallion, if you're
09:27:46  5    going to testify, I'm going to request that the
09:27:48  6    court reporter put you under oath so that
09:27:51  7    there's --
09:27:51  8        MS. GALLION: Please don't make surly,
09:27:55  9    rude --
09:27:51 10        MR. STEINBERG: -- a penalty of perjury.
09:27:53 11        MS. GALLION: Please don't make rude
09:27:55 12    comments to me. These are the same kinds of
09:27:57 13    objections that you made during the deposition
09:27:58 14    of your clients. You objected to evidence that
09:28:00 15    was not in the record or to presuppositions
09:28:03 16    that you didn't have access to, and I'm making
09:28:05 17    the same objection, but I can affirmatively
09:28:07 18    tell you that statement is not true. But this
09:28:10 19    witness can answer, subject to my objection.
09:28:18 20 BY MR. STEINBERG:
09:28:18 21    Q. Do you have any answer to make, Mr.
09:28:18 22    Booth -- excuse me, Mr. Horne?
09:28:18 23    A. The answer was no.
09:28:23 24    Q. Okay. Were you aware that by terminating
```

Page 18 - Page 21

1 Mrs. Hildebrandt that she was forced to cash in her
2 matched savings plan that she had invested in for
3 many years?

4    A. I was not aware of that.

5    Q. And she was forced to cash it in in a
6 declining stock market where the value of it was
7 very low; you aren't aware of it?

8    A. I think I was aware of the stock market
9 situation, but I wasn't aware of Ms. Hildebrandt's
10 situation.

11    Q. Were you aware that she had to pay income
12 tax on top of that, on all of that savings?

13    A. No, I was not aware of that.

14    Q. Do you have any idea how much that cost
15 her?

16    A. No, I have no idea.

17    Q. Did you make any effort to look into the
18 impact that these terminations would have on your
19 employees?

20    A. You know, this -- what happened on 9/11
21 had a significant impact on all of us and -- and all
22 the employees, and this is a situation that I have
23 never gone through in my career, would never, ever
24 choose to go through again. So I think I understand

1 the impact it's had on the employees, the impact
2 it's had on me personally. It's been nothing but
3 tragic.

4        I can't even imagine what Barbara's going
5 through. She was a very good performer, as were all
6 ten of these people.

7    Q. You were --

8    A. It was a situation I --

9        MS. GALLION: Please don't interrupt the
10 witness.

11    A. It was a situation that I could not avoid,
12 unfortunately, due to the economic climate of the
13 company. I'm very sorry it happened.

14    Q. You couldn't avoid terminating Mrs.
15 Hildebrandt?

16    A. I had to make a decision on a number of
17 reductions in the national sales force. I chose to
18 choose the position that she held. I am very sorry
19 it happened to her, but I had to make a decision and
20 I tried to make the best decision for the well-being
21 of the company.

22    Q. There were many national sales managers
23 that retained their jobs, weren't there?

24    A. Certainly.

1    Q. The only reason she lost hers is because
2 you chose her to be terminated; isn't that right?

3    A. I made the decision to eliminate the
4 Cincinnati position, that's correct.

5    Q. Now, as I understand it, by the second
6 half of 2000 there were indications that the economy
7 was worsening; is that correct?

8    A. That would be a fair statement, but to add
9 to that, we were -- we saw that -- the economy in
10 the hotel business declining as early as -- as
11 February of 2001.

12    Q. And by that point you can see there was a
13 recession; isn't that right?

14    A. We could see that we were coming into
15 that, yes.

16    Q. Okay. And you knew that a recession would
17 hurt the hotel business?

18    A. Yes, I did.

19    Q. Did you discuss this with Mr. Helms or any
20 of your superiors, the impact that a recession would
21 have on the hotel business?

22    A. Did -- did I have discussions with Ty
23 Helms? Is that the question?

24    Q. Yes.

1    A. Yes, we talked about it.

2    Q. In early 2001?

3    A. Sure. Yes.

4    Q. Did you discuss the fact that there might
5 have to be terminations during the year of 2001?

6    A. Not until after 9/11.

7    Q. You never discussed with any Hyatt
8 official the possibility of employees being
9 terminated prior to September 11th --

10    A. No, sir.

11    Q. -- 2001? Now, despite the fact that you
12 could see there was a recession coming that would
13 hurt the hotel business, didn't you increase the
14 quotas of all your sales managers?

15    A. Well, you'd have to understand the
16 methodology of setting quotas, I guess, to answer
17 that. Quotas are set twice a year, in January and
18 then again in July. And we had set the quotas in
19 January based really on -- on coming off of the best
20 year ever in the year 2000 and expecting 2001 again
21 to be a sensational year. The quotas were set
22 initially in January for the first half based on
23 that.

24    Q. You did raise the quotas, didn't you, for

Lindeerandt vs. Hyatt Corp., et al.                                    JOHN MICHAEL HORNE

---

Page 26

09:33:12 1  2001?
09:33:13 2      A. For which period?
09:33:14 3      Q. For both periods.
09:33:16 4      A. No, the actual --
09:33:18 5      Q. Didn't you --
09:33:18 6      A. The second -- the second half quota was
09:33:20 7  lower than the first half quota for the national
09:33:23 8  sales force.
09:33:43 9      Q. Do you recall that you hired sales
09:33:44 10 managers in 2001?
09:33:45 11     A. Yes, sir, I did.
09:33:47 12     Q. In fact, you hired a substantial number of
09:33:50 13 sales managers in 2001?
09:33:52 14         MS. GALLION: Object to use of the term
09:33:54 15 "substantial."
09:33:54 16         But if the witness understands, he may
09:33:57 17 answer.
09:33:58 18     A. Is there a question there?
09:34:00 19         MS. GALLION: You may answer. You may
09:34:20 20 answer that question if you understand the use
09:34:04 21 of the term "substantial."
09:34:06 22     A. I don't understand that.
09:34:06 23     Q. Didn't you hire as many sales managers as
09:34:09 24 you eventually terminated?

---

Page 27

09:34:11 1      A. No, I -- I don't -- I don't believe so.
09:34:14 2      Q. Do you deny that?
09:34:16 3         MS. GALLION: The witness has answered.
09:34:18 4  He said, "No, I don't believe so." Asked and
09:34:23 5  answered.
09:34:23 6      Q. Do you deny that?
09:34:25 7         MS. GALLION: Same objection. He said,
09:34:26 8  "No, I don't believe so."
09:34:38 9      A. I don't believe so.
09:34:38 10     Q. Have you discussed the subject matter of
09:34:41 11 your testimony with anybody?
09:34:42 12     A. No. With the -- with the -- excuse me.
09:34:44 13 With the -- regarding the reduction in force? Maybe
09:34:44 14 I didn't understand the question.
09:34:49 15     Q. Your subject matter of what you might
09:34:51 16 testify to today --
09:34:51 17     A. Oh, no.
09:34:51 18     Q. -- have you discussed that with anyone?
09:34:53 19     A. No. Only with -- meeting with my counsel.
09:34:56 20     Q. Has anyone informed you what Mr. Booth
09:34:59 21 testified to yesterday?
09:35:02 22     A. Not directly as far as specific answers,
09:35:05 23 no.
09:35:06 24     Q. Has anyone told you anything about what he

---

Page 28

09:35:08 1  testified to yesterday?
09:35:10 2      A. Yes.
09:35:11 3         MS. GALLION: Please don't reveal any
09:35:13 4  communications from your counsel. They are all
09:35:15 5  privileged. If you did have communications
09:35:17 6  with your counsel, say so, but don't discuss
09:35:18 7  the substance of any of them.
09:35:21 8      Q. I'm asking you specifically if your
09:35:24 9  attorneys told you what Mr. Booth's testimony was
09:35:24 10 yesterday.
09:35:25 11        MS. GALLION: Please do not answer that
09:35:26 12 question.
09:35:27 13        We're absolutely privileged to discuss
09:35:28 14 with him anything in -- in preparation of his
09:35:29 15 deposition. There's no confidentiality order
09:35:32 16 or anything else precluding us from discussing
09:35:34 17 any matter with representatives of the company
09:35:36 18 and witnesses in the case.
09:35:37 19        Do not discuss any-- anything that you
09:35:40 20 discussed with us.
09:35:42 21     Q. So then you are aware of Mr. Booth's
09:35:44 22 testimony --
09:35:44 23        MS. GALLION: Do not --
09:35:44 24     Q. -- that he gave yesterday?

---

Page 29

09:35:46 1         MS. GALLION: Do not answer anything that
09:35:47 2  would infringe the attorney-client privilege.
09:35:49 3         And please move on to another subject,
09:35:51 4  because I'm going to have the same objection
09:35:53 5  each and every time.
09:35:55 6      Q. Do you know the substance of Mr. Booth's
09:35:57 7  testimony yesterday?
09:35:59 8      A. Just -- I'm not prepared to answer that.
09:36:04 9      Q. Are you refusing to answer the question?
09:36:06 10        MS. GALLION: He is refusing to answer the
09:36:08 11 question to the extent that it invades the
09:36:11 12 attorney-client privilege. You may ask him if
09:36:12 13 he knows from Mr. Booth about Mr. Booth's
09:36:15 14 testimony.
09:36:17 15        MR. STEINBERG: So we're clear on this one
09:36:16 16 point, the attorney-client privilege cannot be
09:36:21 17 asserted to prevent disclosure of
09:36:24 18 attorney-client communications that are in
09:36:26 19 furtherance of misconduct.
09:36:28 20        MS. GALLION: There is no misconduct.
09:36:29 21        MR. STEINBERG: And I cite --
09:36:29 22        MS. GALLION: And how offensive for you to
09:36:31 23 suggest that.
09:36:32 24        MR. STEINBERG: Excuse me. I'd cite DR

---

Page 50

```
09:58:00  1      Q. Did you save some money by terminating
09:58:04  2   these people?
09:58:05  3      A. Yes, we did.
09:58:06  4      Q. What would you have saved?
09:58:09  5      A. Well, certainly we saved their -- their
09:58:12  6   salaries and we certainly saved PTEB. And then
09:58:17  7   secondary to all that, we saved some home office
09:58:20  8   cost.
09:58:20  9      Q. What is the acronym you used?
09:58:23 10      A. SOHOs?
09:58:24 11      Q. No.
09:58:24 12      MS. GALLION: PTEB.
09:58:28 13      A. PT and -- payroll, taxes, employee
09:58:29 14   benefits.
09:58:31 15      Q. Wasn't Reed Exhibition furious about your
09:58:35 16   firing D'Anna?
09:58:39 17      A. No.
09:58:39 18      Q. They didn't --
09:58:39 19      A. Furious would not be the right word, no.
09:58:42 20      Q. Didn't they tell you they were very upset
09:58:45 21   about that?
09:58:45 22      A. No, Tim McGuiness did not tell me that.
09:58:53 23      Q. Didn't you tell two of D'Anna's clients
09:58:55 24   that you did the wrong thing by terminating him?
```

Page 51

```
09:59:00  1      A. I -- I don't think I said those exact
09:59:01  2   words.
09:59:02  3      Q. I'm talking about Wes Harrington and Steve
09:59:06  4   Rugers. What did you tell them?
09:59:09  5      A. I said that this was -- this was the most
09:59:14  6   challenging and difficult thing that I've ever gone
09:59:17  7   through and I hope -- I hope that I didn't make a
09:59:20  8   mistake, based on what Dean's customers' feedback
09:59:24  9   was to me, and -- and that -- that will be
09:59:28 10   determined. And I apologized to them and I just
09:59:31 11   hoped that I didn't make a mistake.
09:59:32 12      But I -- I sit here and say to you, I'm
09:59:35 13   not perfect. I'm one person. I'm in charge of a
09:59:38 14   national sales force. I made the best decisions
09:59:40 15   that Jack Horne could make for the company.
09:59:44 16      And were they perfect? No. These are ten
09:59:49 17   top performers for Hyatt for many years, many years.
10:00:01 18   I'm keenly aware of that. And I -- it was a very
10:00:01 19   difficult decision and I'm not going to sit here and
10:00:06 20   say every decision I made was the perfect, right
10:00:02 21   decision.
10:00:02 22      Q. These two customers were pretty upset,
10:00:06 23   weren't they?
10:00:07 24      A. They are. I know -- yeah, I know Wes.
```

Page 52

```
10:00:10  1      Q. Did you improve any customer relations by
10:00:12  2   terminating this long-time employee D'Anna?
10:00:15  3      A. Not initially. Not initially.
10:00:20  4      Q. Why did you terminate Wendy Jensen?
10:00:20  5      A. Didn't I just -- I just answered that.
10:00:28  6      MS. GALLION: He just answered that.
10:00:30  7      Q. Just to save the money of her office?
10:00:36  8      MS. GALLION: Objection. That's not his
10:00:36  9   answer.
10:00:36 10      MR. STEINBERG: All right. I'll -- we'll
10:00:36 11   let --
10:00:36 12      MS. GALLION: It's asked and answered.
10:00:37 13      MR. STEINBERG: -- the answer stand.
10:00:37 14      MS. GALLION: And the record will say what
10:00:38 15   it says.
10:00:38 16   BY MR. STEINBERG:
10:00:38 17      Q. Is there any other reason you have for
10:00:41 18   terminating Wendy Jensen?
10:00:43 19      A. No.
10:00:44 20      Q. Was her production a reason?
10:00:45 21      A. I didn't really review the production of
10:00:47 22   these people.
10:00:47 23      Q. Didn't look at the production?
10:00:49 24      A. No.
```

Page 53

```
10:01:01  1      Q. Why wouldn't you look at their production?
10:01:04  2      A. If I had to review their production, then
10:01:12  3   regretfully -- and I made decisions purely on
10:01:19  4   production, I would have had to reduce the national
10:01:21  5   sales force in large amounts in 2001. Production
10:01:25  6   was horrible because of 9/11 and the recession. I
10:01:29  7   did not want to focus on production. I wanted to
10:01:32  8   focus on the customers in those geographic locations
10:01:34  9   and what those customers meant to Hyatt long term
10:01:40 10   and in the past.
10:01:41 11      Q. So production played no role in the
10:01:43 12   decision to terminate any of these people?
10:01:46 13      A. No, it really didn't.
10:01:50 14      Q. Were you aware that Mr. D'Anna had
10:01:54 15   exceeded his six-month quota by 140 percent?
10:01:58 16      A. I am aware of that, yes. He was a great
10:02:01 17   employee.
10:02:01 18      Q. And after he exceeded that quota, you
10:02:04 19   raised his quota, didn't you?
10:02:08 20      A. I didn't -- I didn't raise his quota. His
10:02:11 21   director might have raised his quota. I don't
10:02:13 22   assign individual quotas.
10:02:16 23      Q. Do you remember him objecting to his quota
10:02:18 24   being raised and your telling him that the Reed
```

Page 54

10:02:22 1  Exhibition business would be booked into the new
10:02:25 2  Hyatt Orlando Convention Center and he could handle
10:02:28 3  that quota?
10:02:30 4      A. I do remember that conversation, yes.
10:02:30 5      Q. So you did discuss his quota with him?
10:02:33 6      A. He -- he -- he brought it up to me, yes.
10:02:42 7      Q. Let's talk about Los Angeles. Is that the
10:02:46 8  correct --
10:02:46 9      A. Yeah, the western national sales office.
10:02:49 10     Q. And by the way, in New York we have two
10:02:52 11 people that were hired in 2001 and two people that
10:02:54 12 were terminated in 2001, right?
10:02:58 13         MS. GALLION: Is that an -- is that a
10:03:01 14 question?
10:03:02 15     Q. You can answer.
10:03:03 16     A. Was it a question?
10:03:04 17     Q. Yes.
10:03:05 18     A. Yes, that's correct.
10:03:07 19         MS. GALLION: Let's take a break before we
10:03:09 20 start a new thing.
10:03:10 21         MR. STEINBERG: That's fine.
10:03:10 22         MS. GALLION: We were taking a break about
10:03:13 23 every hour, so this is a perfect time.
10:03:17 24         (Recess taken: 10:03 a.m. - 10:19 a.m.)

Page 55

10:19:10 1          VIDEOGRAPHER: You may begin. You're on
10:19:12 2  the record.
10:19:13 3  BY MR. STEINBERG:
10:19:14 4      Q. Mr. Horne, we're back from the break and
10:19:16 5  we were going to talk about Los Angeles.
10:19:20 6      A. Uh-huh.
10:19:21 7      Q. Do you recall hiring Donna Palmer in 2001?
10:19:25 8      A. Yes, I do.
10:19:28 9      Q. Is she under 40?
10:19:30 10     A. I don't know.
10:19:31 11     Q. Do you know whose accounts Donna Palmer
10:19:33 12 took over?
10:19:34 13     A. Robin Wall.
10:19:35 14     Q. Robin --
10:19:37 15     A. Wall, W-A-L-L.
10:19:40 16     Q. And how would you describe your
10:19:42 17 relationship with Donna Palmer?
10:19:46 18     A. Business relationship.
10:19:47 19     Q. Have you visited her at her office?
10:19:51 20     A. Yes, I have.
10:19:52 21     Q. How many times?
10:19:55 22     A. Once.
10:20:03 23     Q. Now, as far as termination, you terminated
10:20:05 24 Dawn Beagle?

Page 56

10:20:06 1      A. Yes, that's correct.
10:20:12 2      Q. Do you know that Ms. Beagle is over 40?
10:20:12 3      A. Yes, I do.
10:20:13 4      Q. And she's been with the company a long
10:20:15 5  time, hasn't she?
10:20:16 6      A. I believe she has, yes.
10:20:19 7      Q. Who received her accounts?
10:20:19 8      A. I'm sorry?
10:20:30 9      Q. Who -- I'm sorry. Who received her
10:20:33 10 accounts?
10:20:41 11     A. They were redeployed to Karina Mirkin,
10:20:41 12 Trina London and, I believe, Jim Davis.
10:20:50 13     Q. Now, Ms. Mirkin is under 40, isn't she?
10:20:53 14     A. I'm not sure.
10:20:54 15     Q. You've seen her, haven't you?
10:20:56 16     A. I have seen her. Late 30s?
10:20:59 17     Q. And Ms. London, she's under 40, isn't she?
10:21:02 18     A. She is, yes.
10:21:02 19     Q. And Mr. Davis, is he under 40?
10:21:07 20     A. I don't know.
10:21:07 21     Q. How would you describe your relationship
10:21:10 22 with Ms. London?
10:21:11 23     A. Business relationship.
10:21:12 24     Q. Do you have any social relationship with

Page 57

10:21:14 1  her?
10:21:14 2      A. No.
10:21:16 3      Q. How would you describe your relationship
10:21:18 4  with Mr. Davis?
10:21:20 5      A. Business -- business relationship.
10:21:21 6      Q. And with Ms. Mirkin?
10:21:24 7      A. The same.
10:21:26 8      Q. How often have you visited Ms. London in
10:21:29 9  2001?
10:21:31 10     A. I don't have a number, but several times.
10:21:34 11     Q. How about Mr. Davis, how often have you
10:21:37 12 visited?
10:21:38 13     A. Several times.
10:21:38 14     Q. Okay. And Ms. Mirkin?
10:21:42 15     A. The same.
10:21:42 16     Q. Now, does Ms. London work out of a
10:21:46 17 separate office?
10:21:46 18     A. She works out of a home office.
10:21:48 19     Q. Home office.
10:21:49 20     A. (Nodding head.)
10:21:49 21     Q. And where is that located?
10:21:52 22     A. Palo Alto.
10:21:52 23     Q. Okay. Have you visited her in her home
10:21:56 24 office?

## Page 58

1  A. No, sir.

2  Q. Was Jane Johnson terminated from this

3  office as well?

4  A. Yes. Her position was reduced in Denver.

5  Q. And do you know who received her accounts?

6  A. Her accounts were split between Julie

7  Green out of Kansas City, Jane Johnson out of

8  Houston and Mark Henry out of Chicago.

9  Q. Okay.

10  A. Jane Jordan. Did I say Jane Johnson?

11  Jane Jordan.

12  Q. Okay.

13  A. Excuse me.

14  Q. Is Julie Green under 40?

15  A. No, she's not.

16  Q. How about Jane Jordan?

17  A. I don't know.

18  Q. Now, I'm not going to be able to say the

19  last name. Harumi?

20  A. Harumi Yoshiike, yes.

21  Q. Harumi Yoshiike. Okay. Has he

22  retained --

23  A. She.

24  Q. -- or has she retained her job?

## Page 59

1  A. Yes, she has.

2  Q. And she handles business from Asia,

3  doesn't she?

4  A. That's correct.

5  Q. Okay. Now, moving to the central office

6  in Chicago.

7  A. Yes.

8  Q. In the year 2001, do you recall hiring

9  Donna Bongiovanni?

10  A. Yes, we did.

11  Q. Molly Crompton, transferring her in from

12  Washington?

13  A. That's correct.

14  Q. Inge Spindola was hired in 2001?

15  A. Transferred from the Carribean office,

16  yes, that's correct.

17  Q. She was not national sales, was she, in

18  the Carribean?

19  A. She was in -- she was in the Carribean

20  sales office, which is a -- you can, for lack of a

21  better description, call it a miniature national

22  sales office. They sell the Carribean properties.

23  But it's not, the Carribean office is not part of

24  the national sales force.

## Page 60

1  Q. And Barbara Hale, was she also brought in

2  in 2001?

3  A. I don't believe so, no.

4  Q. Don't think so? How would you describe

5  your relationship with Ms. Bongiovanni?

6  A. Business relationship.

7  Q. Have you visited her?

8  A. She's -- sits about four doors away from

9  me, so yes.

10  Q. So you see -- you see all these people in

11  Chicago, don't you?

12  A. The Chicago office is on the same floor as

13  me, yes.

14  Q. Okay. How would you describe your

15  relationship with Molly Crompton?

16  A. Business relationship.

17  Q. Inge Spindola?

18  A. The same.

19  Q. And Barbara Hale?

20  A. The same.

21  Q. And out of this office who was terminated?

22  A. Besides Barb.

23  Q. I don't think anyone, right?

24  A. No, Mary Patton's position --

## Page 61

1  Q. Mary Patton?

2  A. -- was eliminated. Yes.

3  Q. Okay. Who else?

4  A. That would -- those were the only two

5  whose positions were eliminated.

6  Q. Do you know who received Mary Patton's

7  accounts?

8  A. They were divided up among several people

9  and I would have to defer to Mr. Booth to answer who

10  got those accounts.

11  Q. Now, who is Melissa Daniels?

12  A. Melissa Daniels is part of the Chicago

13  national sales office and she has a home office in

14  Dallas, Texas.

15  Q. Why did she have a home office in Dallas

16  if she's part of the Chicago national sales office?

17  A. Because she handles a -- well, same reason

18  that many of the people have -- have satellite home

19  offices. Melissa had that office and handles

20  incentive companies from all over the country.

21  Q. Did she start out in Dallas?

22  A. No, she started in -- she started in -- in

23  Michigan.

24  Q. In Michigan?

Hildebrandt vs. Hyatt Corp. et al
March 21, 2002
Case 2:02-cv-00063-SSB-TSB    Document 63-8    Filed 03/01/2004    Page 11 of 24
JOHN MICHAEL HORNE

Page 62

10:26:08 1   A. Yes.
10:26:08 2   Q. Why did she transfer to Dallas?
10:26:13 3   A. To -- to move back home to be near her
10:26:20 4 parents as she was, unfortunately, going through a
10:26:23 5 divorce.
10:26:23 6   Q. So it was for her convenience?
10:26:25 7   A. It was, yes.
10:26:27 8   Q. And is this a -- one of these SOHOs?
10:26:33 9   A. That's correct.
10:26:33 10   Q. And this costs Hyatt money to maintain
10:26:35 11 this office?
10:26:36 12   A. Yes, it does.
10:26:37 13   Q. Okay. How old is Melissa Daniels?
10:26:42 14   A. I don't know.
10:26:43 15   Q. Isn't she under 40?
10:26:46 16   A. Late 30s.
10:26:49 17   Q. Don't you know her?
10:26:51 18   A. Melissa?
10:26:52 19   Q. Yes.
10:26:53 20   A. Yeah, I do.
10:26:54 21   Q. Do you have a social relationship with
10:26:55 22 her?
10:26:56 23   A. No, I don't.
10:26:57 24   Q. Hasn't she been your baby-sitter?

Page 63

10:27:00 1   A. Prior to -- oh, when I lived in Dearborn,
10:27:03 2 Michigan?
10:27:03 3   Q. Yeah.
10:27:04 4   A. Prior to being in national sales? She did
10:27:08 5 baby-sit, actually. I stand corrected.
10:27:09 6   Q. Isn't she a close friend of your family?
10:27:11 7   A. Close friend, no.
10:27:13 8   Q. No?
10:27:13 9   A. No.
10:27:14 10   Q. Who's responsible for sending her to
10:27:16 11 Dallas for her convenience?
10:27:18 12   A. The -- the move had taken -- to my best
10:27:28 13 estimation, the move had taken place prior to me
10:27:30 14 taking my position. So I believe my predecessor.
10:27:35 15   Q. So you're saying you had no responsibility
10:27:37 16 for that, played no role in that?
10:27:41 17   A. I -- I -- I don't believe I did, no.
10:27:45 18   Q. How old is Molly Crompton?
10:27:50 19   A. Molly would be in her mid-30s.
10:27:52 20   Q. Do you know Inge's age?
10:27:55 21   A. I believe she's in her mid-40s.
10:27:57 22   Q. And Barbara Hale's age?
10:27:58 23   A. I would believe Barbara would be in her
10:28:03 24 mid-30s as well.

Page 64

10:28:05 1   Q. And Donna Bongiovanni, do you know her
10:28:07 2 age?
10:28:07 3   A. She would be in her 40s, I believe.
10:28:07 4   Q. Did -- well, let's go back here.
10:28:24 5      So in -- in the central office we have
10:28:28 6 three people being brought in in 2001 and two people
10:28:34 7 being terminated; is that right?
10:28:36 8   A. That's correct.
10:28:39 9   Q. Two people who were terminated had a
10:28:42 10 long-time history with the company, didn't they?
10:28:46 11   A. One of them did. Certainly Barbara. I
10:28:49 12 think that Mary was with the company for eight
10:29:01 13 years. So a little more junior.
10:29:01 14   Q. Now, two of these people that you brought
10:29:01 15 in had worked for Hyatt at one point and quit,
10:29:01 16 hadn't they?
10:29:02 17   A. That's correct.
10:29:04 18   Q. That's Inge and Donna; is that right?
10:29:07 19   A. That's -- that's correct.
10:29:07 20   Q. Excuse me.
10:29:10 21      Had Donna quit twice?
10:29:11 22   A. No, not to my recollection. I was only
10:29:14 23 aware of when she left the Hyatt Chicago, then came
10:29:17 24 back.

Page 65

10:29:21 1   Q. Okay. And hadn't Molly Crompton also
10:29:21 2 quit?
10:29:26 3   A. I think Molly did -- Molly did leave the
10:29:30 4 Hyatt employment place for a short while and came
10:29:32 5 back. You're right. Three people, actually.
10:29:41 6   Q. Okay. Now, did Molly Crompton, to your
10:29:44 7 knowledge, receive some of Mrs. Hildebrandt's
10:29:47 8 accounts?
10:29:47 9   A. Yes, she did.
10:29:49 10   Q. Do you know which ones she received?
10:29:50 11   A. The one I'm specific with is American
10:29:56 12 Contract Bridge.
10:29:58 13   Q. That's a lucrative account, isn't it?
10:30:03 14   A. Yes, it is.
10:30:03 15   Q. Did Barbara Hale receive any of Miss
10:30:05 16 Hildebrandt's accounts?
10:30:06 17   A. Yes, she did.
10:30:07 18   Q. Do you recall which ones she received?
10:30:09 19   A. I do not, no.
10:30:12 20   Q. Did Fred Reichelt receive some of Miss
10:30:15 21 Hildebrandt's accounts?
10:30:16 22   A. I believe he did.
10:30:17 23   Q. Do you know which ones?
10:30:18 24   A. No, sir.

Page 74

10:39:27 1 Terri's. I'm not knowledgeable on Mary's accounts.
10:39:32 2    Q. Okay. And then didn't Molly Crompton
10:39:36 3 exceed her quota last year by some astronomical
10:39:40 4 number?
10:39:40 5    A. She did pretty well as I recall, yes.
10:39:43 6    Q. Do you recall what that number was?
10:39:44 7    A. No, I don't.
10:39:45 8    Q. And that was due to the business that came
10:39:48 9 in on all these accounts she inherited, wasn't it?
10:39:51 10    A. Large amount of it was due to her business
10:39:53 11 that she cultivated and received from Terri's
10:39:57 12 accounts. And as we're talking about, the Contract
10:40:01 13 Bridge obviously brought her a million three and I'm
10:40:03 14 not sure about all the others. I'd have to defer to
10:40:06 15 Brian for exactly what she produced.
10:40:20 16    Q. Who helped you, if anyone, in making the
10:40:23 17 decisions on which people to terminate?
10:40:26 18    A. I made those decisions on my own accord.
10:40:34 19 Nobody -- nobody helped me.
10:40:35 20    Q. Did you consult anyone?
10:40:36 21    A. Well, I -- once I draw up my -- drew up my
10:40:38 22 plan, I basically gave it to my boss, Ty Helms, to
10:40:42 23 review. I will -- I will state for the record that
10:40:46 24 I did call Gus Vonderheide. He -- the Omaha office

Page 75

10:40:50 1 was the one office where I did receive input from
10:40:54 2 the director as to recommendations for the
10:40:59 3 reduction.
10:40:59 4    Q. Did you consult any attorneys?
10:41:01 5    A. No.
10:41:03 6    Q. So no attorneys reviewed these decisions
10:41:05 7 at all?
10:41:07 8    MS. GALLION: Objection.
10:41:08 9    A. Well, not --
10:41:09 10    MS. GALLION: The witness said he didn't
10:41:11 11 consult any attorneys.
10:41:11 12    THE WITNESS: Yeah.
10:41:13 13    MS. GALLION: Subject to my objection, you
10:41:14 14 can answer.
10:41:14 15    A. I don't know the answer to that question.
10:41:17 16    Q. Was it your decision to rate people in
10:41:21 17 categories A, B and C?
10:41:24 18    A. Yes, it was.
10:41:25 19    Q. How did you reach that decision?
10:41:29 20    A. Basically I reached that several different
10:41:34 21 ways. I looked at it from the base of the clients
10:41:39 22 that individual handled. I looked at it from that
10:41:42 23 person's reputation and respect from the hotels,
10:41:45 24 from customers that would call me, would talk to me.

Page 76

10:41:49 1 I would rate it from -- I would rate them based on
10:41:51 2 whether they were involved in training for the
10:41:54 3 company, whether they were involved in customer
10:41:57 4 events, initiating customer events, planning, a
10:42:02 5 number of different areas.
10:42:02 6    Q. But you --
10:42:02 7    A. But, you know, it's -- I -- I just want to
10:42:09 8 clarify. Although I rated A, B and C, to me I
10:42:22 9 didn't have a bad performer in national sales. They
10:42:22 10 were all very good performers. Given the choice and
10:42:22 11 given that 9/11 never happened, I'd have 66 people
10:42:24 12 with me today. So I just -- I -- the letters A, B
10:42:23 13 and C don't mean that a C was a bad performer. It
10:42:32 14 just means that it was a position I felt we could
10:42:35 15 still cover if that position didn't exist.
10:42:37 16    Q. But you did have quite a lot of people who
10:42:40 17 were recent hires in comparison to people who had
10:42:46 18 been with the company for many, many years; you did
10:42:48 19 have that, didn't you?
10:42:50 20    A. Yeah, but just again, most of the recent
10:42:53 21 hires were obviously before 9/11 and those positions
10:42:58 22 replaced people that were in those positions. You
10:43:02 23 know, just to clarify that. But you're -- you're --
10:43:05 24 yes, actually you're -- you are correct in making

Page 77

10:43:06 1 that statement.
10:43:12 2    Q. Okay.
10:43:50 3    MS. GALLION: While you're looking, let me
10:43:51 4 just take a very short break. I'll be right
10:43:55 5 back.
10:44:00 6    VIDEOGRAPHER: We're off the record.
10:44:02 7    (Discussion off the record.)
10:48:23 8    VIDEOGRAPHER: We're on the record.
10:48:25 9    MR. STEINBERG: All set?
10:48:25 10    (Plaintiff's Exhibit
10:48:25 11    38e was referenced.)
10:48:26 12 BY MR. STEINBERG:
10:48:26 13    Q. Okay. Mr. Horne, I'd like to show you
10:48:27 14 what we've marked as Exhibit 38e and ask you if you
10:48:40 15 recognize this document.
10:48:41 16    A. Yes, I do.
10:48:41 17    Q. Can you tell me what this is?
10:48:43 18    A. It is a -- basically a cover sheet for Ty
10:48:48 19 Helms, my boss, to review if we were to -- if we
10:48:51 20 were to make reductions in force.
10:48:55 21    Q. Is -- is this something you prepared?
10:48:57 22    A. That's correct.
10:48:58 23    Q. Okay. When did you prepare this?
10:48:59 24    A. I would have prepared this, again,

Hildebrandt vs. Hyatt Corp., et al.
March 21, 2002
Case 2:02-cv-00003-SSB-TSB    Document 63-8    Filed 03/01/2004    Page 13 of 24
JOHN MICHAEL HORNE

Page 82

1  Q. Okay.
2  A. There were many accounts that were
3 returned to the field to the property level, and as
4 we've mentioned before, Jennifer Roman and some
5 existing people did take on some additional group
6 accounts.
7  Q. Okay.
8  A. Most certainly.
9  Q. Now, the -- the second portion of this
10 document has the title Total National Sales Force
11 Savings?
12  A. That's right.
13  Q. What does that refer to?
14  A. That refers to the amount of money that I
15 have saved in national sales.
16  Q. Does that refer to money saved through the
17 terminations?
18  A. Through the ten reductions, yes.
19  Q. Okay. Now, there's a $50,000 savings in
20 SOHO costs?
21  A. Yeah, that was a -- basically me taking
22 $700 a month times 12 months and coming up with an
23 approximate figure.
24  Q. Was that important, to save SOHO costs?

Page 83

1  A. No, it's -- it's not -- it's not
2 important, but I think it's something as you're --
3 as you're attempting to save money for the company,
4 I -- it was important for me to highlight.
5  Q. So, okay, the SOHO was not really
6 important in this reduction?
7  A. No.
8  Q. And then the next one is travel and
9 entertainment expenses. Was that important?
10  A. Certainly it was. This was put into
11 place, you know, much earlier in the year, not as a
12 result of 9/11. When the company started to feel
13 the recession, we -- we narrowed each office down by
14 3 percent.
15  Q. So these savings were already in place
16 before the reduction?
17  A. The travel and expense savings?
18  Q. Yes.
19  A. Yes. They were ongoing since May.
20  Q. Okay. And how did you arrive at the total
21 annual expense reduction of 1,200,000-plus?
22  A. Well, that was -- that was basically the
23 cost of the SOHOs, the cost of the T&E and at the
24 time an approximate cost of what the salaries would

Page 84

1 be tied to those positions.
2  Q. So most of this is in salary?
3  A. That would be correct.
4  Q. Did you choose to terminate people because
5 of their salary?
6  A. No, I did not.
7        (Plaintiff's Exhibit
8        38g was referenced.)
9  Q. Okay. To -- I'd like to show you
10 Exhibit 38g.
11    MS. GALLION: Thank you.
12  Q. Do you recognize this document?
13  A. Yes, I do.
14  Q. Okay. First of all, what is this?
15  A. This is a list, an organizational chart of
16 the northeast national sales office. It has
17 rankings by A, B and C of the individual people.
18  And it's a -- some specific bullet points, thought
19 process if we were to -- to downsize this office and
20 reduce these positions.
21  Q. Do you know who prepared this document?
22  A. I did.
23  Q. When did you prepare this?
24  A. Somewhere between September 13th and

Page 85

1 September 20th.
2  Q. Did anyone ask you to prepare this
3 document?
4  A. Yes.
5  Q. Who?
6  A. Ty Helms.
7  Q. Did he -- tell me what he said to you
8 about preparing this document.
9  A. He just asked me to put down my
10 recommendations for reducing the national sales
11 force and the positions involved and to, in my mind,
12 although everybody's good, to categorize an A, B and
13 C person.
14  Q. So was that Mr. Helms' idea to use the A,
15 B, C categories?
16  A. Yes, it was.
17  Q. All right. And did he tell you what the
18 definition of an A was?
19  A. No. No, this is my opinion.
20  Q. Did he tell you what the criteria to
21 determine who was an A was?
22  A. No. This was my opinion.
23  Q. So there is no criteria for being
24 denominated an A?

Page 86

10:58:53 1    A. I --
10:58:53 2        MS. GALLION: Objection.
10:58:54 3    A. I went --
10:58:54 4        MS. GALLION: That is --
10:58:54 5    A. -- through that ear --
10:58:56 6        MS. GALLION: -- not the previous
10:58:58 7    question. Rude --
10:59:00 8    A. I --
10:59:00 9        MS. GALLION: -- and argumentative.
10:59:01 10       You may answer.
10:59:02 11   A. Well, I explained earlier today that I did
10:59:04 12   have some criteria in my mind as to what made a
10:59:08 13   person an A. Would --
10:59:09 14   Q. Yes. What is that criteria?
10:59:11 15   A. That would be --
10:59:12 16       MS. GALLION: Objection. Asked and
10:59:14 17   answered.
10:59:14 18       But you may certainly go ahead and expound
10:59:17 19   again.
10:59:18 20   A. An A player in my mind was a person that
10:59:21 21   handled the top customers in that marketplace, that
10:59:27 22   was -- was very well respected by the hotels in
10:59:33 23   addition to their customers, that I might have had
10:59:34 24   first-hand experience from customers of their -- of

Page 87

10:59:39 1    their performance and their meaning to Hyatt --
10:59:41 2    Q. Okay.
10:59:41 3    A. -- that they might have handled customer
10:59:43 4    events, initiated the organization of an event, if
10:59:47 5    they participated in training for the company and
10:59:49 6    helped to be a mentor to others and they were an
10:59:53 7    all-around top performer more so than just
10:59:56 8    production. That's -- that's how I defined my A.
11:00:03 9    Q. Okay. Well, let's look at C here, Dean
11:00:15 10   D'Anna.
11:00:15 11   A. Yes.
11:00:15 12   Q. Was he not respected by his customers?
11:00:15 13   A. Dean was respected by his customers, yes.
11:00:15 14   Q. Wasn't he well respected by his customers?
11:00:15 15   A. Yes, he was well respected by his
11:00:17 16   customers. Dean is a -- just to clarify again.
11:00:21 17   Wendy and Dean are top performers. All of my people
11:00:25 18   on my A, Bs, and Cs were top performers.
11:00:30 19   Q. And Wen--
11:00:30 20   A. Dean -- Dean and -- Dean and --
11:00:31 21   Q. I'm sorry.
11:00:31 22   A. Dean was -- Dean was ques-- you know, in
11:00:32 23   question, he could have been the second or first top
11:00:35 24   performer in the -- in the -- in the division, but

Page 88

11:00:38 1    unfortunately when I did my analyzation I -- I --
11:00:44 2    I -- I determined that I could cover his customers
11:00:46 3    with the existing people.
11:00:49 4    Q. Yeah.
11:00:49 5    A. So he's a -- he -- yes, he's a top
11:00:51 6    performer.
11:00:52 7    Q. Performance or production wasn't the
11:00:54 8    criteria, right?
11:00:55 9    A. That's -- that's correct.
11:00:57 10   Q. My question was whether Dean was well
11:01:00 11   respected by his customers.
11:01:01 12   A. Yes.
11:01:02 13   Q. He was. And wasn't Wendy well respected
11:01:05 14   by her customers?
11:01:05 15   A. Yes, she was.
11:01:07 16   Q. Okay. Now, Bonnie Weiss, is she located
11:01:11 17   in a SOHO?
11:01:14 18   A. She is.
11:01:15 19   Q. Okay. Is Diane Smith located in a SOHO?
11:01:17 20   A. She is, yes.
11:01:19 21   Q. Marilyn Brumbaugh?
11:01:20 22   A. Yes, she is.
11:01:22 23   Q. Kathy Murphy is located in a SOHO?
11:01:24 24   A. That's correct.

Page 89

11:01:29 1    Q. Wasn't -- was Kathy Murphy transferred to
11:01:33 2    Baltimore?
11:01:34 3    A. Just recently, yes.
11:01:35 4    Q. Was that for her convenience?
11:01:37 5    A. Yes. Her husband was promoted.
11:01:38 6    Q. And Michelle Nicoletti is in a SOHO?
11:01:43 7    A. That's correct.
11:01:43 8    Q. And then Jensen and D'Anna are also in
11:01:47 9    SOHOs?
11:01:48 10   A. That's correct.
11:01:48 11   Q. So being in a SOHO wasn't the reason for
11:01:51 12   terminating Jensen and D'Anna, was it?
11:01:56 13   A. No.
11:01:56 14   Q. Okay. Well, let's look at what you're
11:01:58 15   saying under the heading National Sales Office.
11:02:02 16   A. Uh-huh.
11:02:07 17   Q. Don't you say that Wendy Jensen's group
11:02:10 18   account production is the lowest in the office?
11:02:13 19   A. That's -- I do say that. That's a fact.
11:02:19 20   Q. Yes. But production wasn't a criteria in
11:02:22 21   your decision?
11:02:23 22   A. It's -- it's not to be confused with Wendy
11:02:23 23   handled a very small group of customers in
11:02:29 24   Connecticut and those customers were easily able to

Page 98

11:11:42 1  which is 38f.

11:12:03 2      MR. STEINBERG: Do you have them all here?

11:12:06 3      THE REPORTER: Should be.

11:12:06 4      MR. STEINBERG: And Counsel should have a

11:12:09 5  copy of it.

11:12:11 6      MS. GALLION: Which one is this?

11:12:13 7      MR. STEINBERG: It's the central sales

11:12:14 8  office.

11:12:15 9      MS. GALLION: Okay.

11:12:15 10      Q. Here it is, Mr. Horne.

11:12:20 11      A. Thank you.

11:12:20 12      Q. Just ask that you could give it back to

11:12:22 13  the court reporter when you're finished.

11:12:22 14          Is this also a document that you prepared?

11:12:26 15      A. Yes, sir, it is.

11:12:30 16      Q. Okay. And here again, information is

11:12:32 17  blacked out on this document. Do you know why?

11:12:35 18      A. No, I don't.

11:12:36 19      Q. Okay. And there is handwriting here.

11:12:43 20  Next to Barbara Loder it says "Cincinnati SOHO." Do

11:12:47 21  you know who wrote that?

11:12:49 22      A. No, I don't.

11:12:50 23      Q. Next to Mary Patton it says "Most jr. with

11:12:54 24  Hyatt." Do you know who wrote that?

Page 99

11:12:55 1      A. No, I don't.

11:12:57 2      Q. And next to Loretta Venezia it says "IT

11:13:04 3  Chicago." And do you know who wrote that?

11:13:06 4      A. No, I don't.

11:13:07 5      Q. Do you know what "most junior with Hyatt"

11:13:12 6  means with respect to Mary Patton?

11:13:14 7      A. It means in terms of experience the -- the

11:13:16 8  least amount of years with Hyatt.

11:13:19 9      Q. Compared to who?

11:13:21 10      A. Compared to everyone else in the Chicago

11:13:24 11  national sales office.

11:13:34 12      Q. Okay. So that would be compared to Donna

11:13:34 13  Bongiovanni?

11:13:34 14      A. That's correct.

11:13:36 15      Q. Molly Crompton?

11:13:37 16      A. That's correct.

11:13:39 17      Q. Barbara Hale?

11:13:40 18      A. That's correct.

11:13:41 19      Q. Melissa Daniels?

11:13:43 20      A. That's correct.

11:13:43 21      Q. And Inge Spindola?

11:13:45 22      A. That's correct.

11:13:47 23      Q. Was her lack of seniority with Hyatt a

11:13:51 24  reason why she was terminated?

Page 100

11:13:55 1      A. Yes. Yes, it was. It was a very

11:13:58 2  difficult process in trying to reduce positions in

11:14:03 3  the central office because most -- most of the

11:14:09 4  individuals there handled a -- a variety of accounts

11:14:14 5  that were all very, very productive for the company.

11:14:19 6  And therefore I went with that -- that criteria as

11:14:23 7  the recommendation. And I knew that her accounts

11:14:25 8  could be handled by a number of other people where a

11:14:28 9  lot of relationships already existed, especially

11:14:30 10  Mark and Donna.

11:14:31 11      Q. So seniority was an important

11:14:34 12  consideration in these terminations?

11:14:37 13      A. With the specific individual of Mary

11:14:39 14  Patton I did use that as criteria.

11:14:42 15      Q. Did you consider that criteria with

11:14:44 16  Barbara Loder?

11:14:46 17      A. No, I did not.

11:14:47 18      Q. Did you consider that criteria with

11:14:50 19  Loretta Venezia?

11:14:52 20      A. No, I did not.

11:14:54 21      Q. Is Mary Patton over 40?

11:14:57 22      A. No, she's not.

11:15:00 23      Q. Now, at the top of the page under the

11:15:06 24  heading Central Sales Office you've written that

Page 101

11:15:10 1  "Barbara Hale, out of Dearborn would pick up

11:15:13 2  accounts handled by Barbara Loder"?

11:15:15 3      A. I did write that, yes.

11:15:16 4      Q. And what was your reason for giving her

11:15:19 5  those accounts?

11:15:20 6      A. Well, I -- I felt that Barbara was

11:15:25 7  heavily, heavily weighted in the corporate arena.

11:15:28 8  And while the big three automotive companies are

11:15:31 9  certainly some of biggest -- of Hyatt's largest

11:15:37 10  companies year in and year out, I was trying to

11:15:41 11  diversify her account base and thought she could

11:15:44 12  pick up some association accounts in Ohio so -- so

11:15:50 13  that she would be more balanced during unfortunate

11:15:50 14  recession times.

11:15:50 15      Q. So this would help her out?

11:15:52 16      A. It would help her diversify her account

11:15:55 17  load when the automotive market was down.

11:15:57 18      Q. It would help increase her production,

11:15:59 19  wouldn't it?

11:16:02 20      A. It would maintain the company's production

11:16:02 21  from these accounts.

11:16:07 22      Q. It would maintain the company's production

11:16:10 23  on these accounts to retain Barbara Loder, wouldn't

11:16:13 24  it?

**Page 102**

1    A. If I had that option, I would have taken
2 it.
3    Q. You had -- who told you you had no option
4 but to terminate Barbara Loder?
5    A. Well, I guess I told myself that, but I
6 had to reduce positions and -- and again going back
7 to the -- the -- the main reason why I did it, I
8 found that we could redistribute Barb's accounts and
9 handle them just as effectively, in my opinion.
10    Q. Now, you also reference in the next bullet
11 point that Mark will be losing two accounts. Is
12 that Mark Henry?
13    A. That's right.
14    Q. So you're going to give him some of Mary
15 Patton's accounts?
16    A. I'm not sure what Brian ended up giving
17 Mark, because we did -- we did give Mark the
18 Conferon account out of Denver when we lost -- when
19 we -- when we didn't have Jane Johnson's position
20 anymore. So he did pick up -- he did pick up
21 accounts. I'm not sure which ones of Mary's he
22 picked up.
23    Q. But at the time you wrote this, that was
24 your intention, wasn't it?

**Page 103**

1    A. Yeah, it was. It was my recommendation.
2    Q. With respect to Barbara Loder, is she in a
3 Cincinnati SOHO?
4    A. Yeah, we consider the hotel offices as --
5 as SOHOs, satellite offices, even though there's a
6 distinct difference obviously between being in your
7 home and being in a hotel.
8    Q. Well, one difference between her being in
9 the hotel and being in her home is it wasn't costing
10 you any maintenance, was it?
11    A. It wasn't currently, no.
12    Q. So what did you save by terminating her?
13    A. I saved her salary plus PT&B. Again, I --
14 and I don't mean to keep on harping on this, but
15 if -- if 9/11 did not happen I would have -- have
16 hoped to have saved all these positions. I would
17 have hoped I never would have been in any of this
18 situation, so...
19    Q. Well, I'm having trouble with
20 understanding that. I mean, how does 9/11 prevent
21 you from eliminating people that you just hired in
22 2001 instead of somebody who's been with the company
23 for 23 years?
24    A. Well, I --

**Page 104**

1    MS. GALLION: Objection. There's no --
2    A. I --
3    MS. GALLION: -- record evidence that
4 she's been with the company 23 years.
5    Subject to that, you may testify.
6    A. I -- I think we have to be careful here to
7 talk about these positions that were hired in 2001
8 and connected to the reduction in force. Because in
9 my mind it would have made no sense for a -- for a
10 Molly Crompton or an Inge Spindola to introduce
11 themselves to a whole new set of customers that were
12 once known by Terri Williams and Brian Cassidy and
13 then three months later, four months later,
14 reintroduce those customers to a third person. I
15 just don't think that would have been smart at all.
16    Q. Well, weren't Miss Hildebrand's customers
17 all reintroduced to a third person?
18    A. No, they were introduced to a second
19 person. Her position was reduced and they were
20 either introduced to a Molly, a Barb Hale. But
21 we're talking about these other people that you're
22 referring to that I've hired in 2001. A customer
23 would have had a third contact in a matter of six
24 months and that would have not made any sense to me

**Page 105**

1 at all.
2    Q. With regard to the customers that Mrs.
3 Hildebrandt was assigned to, if you had retained
4 her, those customers wouldn't have to be
5 reintroduced to anyone, would they?
6    A. Again, if -- if I had more options, then I
7 certainly would have retained more people.
8 Regretfully I -- I -- I didn't have those options.
9    Q. Well, maybe there's one thing we could
10 agree on and that is that Mrs. Hildebrandt clearly
11 was capable of handling any of these other accounts,
12 wasn't she?
13    A. You know, she was. She's a top -- she's a
14 top -- she was a top performer.
15    Q. Did you look through her prior performance
16 reviews before you terminated her?
17    A. No, I did not.
18    Q. Did you find out later that she had
19 exceeded expectations virtually every year?
20    A. I did hear that later, yes.
21    Q. Did you look at any of these other
22 people's performance reviews before you decided to
23 keep them instead of terminating them?
24    A. Not specifically, no, but all ten of them

March 21, 2002

## Page 106

1 were very, very good performers. And all ten of
2 them were probably rated exceeds expectations more
3 often than not.
4   Q. Well, I'm also talking about the people
5 that were not terminated. Did you look through
6 their performance reviews before you made the
7 decision who to terminate?
8   A. Do you have a -- a specific person?
9   Q. Sure. Donna Bongiovanni, Molly Crompton,
10 Barbara Hale, Melissa Daniels, Inge Spindola. Did
11 you study their performance reviews before you
12 decided to terminate Barbara Hildebrandt?
13   A. No, I didn't -- I didn't study those
14 individuals.
15   Q. Okay. Well, I want to talk for a minute
16 about some people who have been promoted under your
17 jurisdiction. Brian Booth is one. You promoted
18 him, didn't you?
19   A. Yes, I did. I hired him.
20   Q. Or you hired him from a hotel property?
21   A. That's correct.
22   Q. Okay. Was he groomed in some way for the
23 job?
24   A. I'm not sure what you mean by the word

## Page 107

1 "groomed."
2   Q. Well, how about the word "positioned," was
3 Brian positioned for the job?
4   A. He was -- he was qualified for the job.
5 He was qualified for the job.
6   Q. Does Hyatt position or prepare people for
7 promotions?
8     MS. GALLION: Objection. Calls for
9   speculation.
10     If the witness knows or has personal
11   knowledge, please answer.
12   A. Yeah, I can't -- I can't comment on the
13 company's position. I try to prepare individuals
14 for certain jobs to the best that I can.
15   Q. And are you yourself being prepared or
16 positioned for a promotion?
17   A. Not that I know of.
18   Q. Okay.
19   A. I hope so, though.
20     MR. STEINBERG: The videographer tells me
21   we only have a few minutes left on the tape so
22   I'll have to take a break here.
23     THE WITNESS: Okay.
24     MR. STEINBERG: So we can take a break.

## Page 108

1     VIDEOGRAPHER: We're off.
2     (Recess taken: 11:23 a.m. - 11:27 a.m.)
3     VIDEOGRAPHER: Tape 2. You may begin.
4 BY MR. STEINBERG:
5   Q. Okay. Mr. Horne, we're back on the
6 record.
7     Earlier I had asked you some questions
8 about visiting your various account managers.
9 Remember that?
10   A. Yes, I do.
11   Q. How many times did you visit Mrs.
12 Hildebrandt?
13   A. I never visited Cincinnati.
14   Q. Did you ever call her?
15   A. I don't believe I did, no.
16   Q. Let's go back to Mr. Booth. Who made the
17 decision to hire Mr. Booth?
18   A. I made the decision with -- along with my
19 boss, Ty Helms.
20   Q. Mr. Helms?
21   A. Yes.
22   Q. Who made the decision to consider Mr.
23 Booth for employment in the national sales force?
24   A. That would have been myself.

## Page 109

1   Q. And how did you first learn about Mr.
2 Booth?
3   A. Through a phone conversation from his
4 general manager, Steve Trent.
5   Q. Okay. When was that, if you can recall?
6   A. It was sometime in October.
7   Q. Would that be 2000?
8   A. 2000 -- yeah, I'm sorry, 2000.
9   Q. October 2000?
10   A. Right.
11   Q. Okay.
12     MS. GALLION: You might want to move your
13   hand.
14   Q. Who made the call, you or Mr. Trent?
15   A. Steve called me.
16   Q. Okay. Can you tell me what you can
17 remember about what he said and what you said in
18 this call.
19   A. Not word for word, but Steve certainly
20 gave a -- a good endorsement for Brian to take the
21 job. We talked about Brian working at a large, at
22 the time, a very large convention hotel for us, the
23 fact that much national sales business went through
24 that hotel, he had a very good understanding of the

1 national accounts and the process in booking and
2 that he was a successful director of sales and that
3 he was very organized, administratively he was very,
4 very sound and he thought he would be a good
5 candidate for the position.
6   Q. Did you follow normal business practices
7 in checking him out before you made the decision to
8 hire him.
9   A. Well, I -- I talked to the divisional
10 director of sales that oversaw that hotel and Brian
11 and I talked to Brian's former general manager Paul
12 Versillio, who was his general manager in St. Louis.
13 Again, both, you know, gave me thumbs up on hiring
14 Brian.
15   Q. Did you ask Mr. Trent to see Mr. Booth's
16 file?
17   A. No, I did not.
18   Q. Did you ask for his evaluations?
19   A. No, I did not.
20   Q. Isn't a normal business practice when
21 you hire someone?
22   A. Not always --
23     MS. GALLION: Objection.
24   A. -- no.

Page 111

1     MS. GALLION: Argumentative.
2     But you can answer.
3   A. No, not always.
4   Q. Not always?
5   A. When somebody's within Hyatt for a long
6 time and you -- and you -- and you get the
7 recommendation from -- from two general managers and
8 divisional directors of sales and you go through an
9 interview process, sometimes you make those
10 determinations without looking at an evaluation.
11   Q. Well, when someone is within Hyatt, that's
12 really the only chance you would have to get their
13 file, isn't it?
14   A. Yeah, that's correct.
15   Q. If someone had come from outside, you
16 probably wouldn't be able to get that other
17 company's file, would you?
18   A. No, you probably wouldn't.
19   Q. But in any event, you didn't ask Mr. Trent
20 for Mr. Booth's files?
21   A. I did not, no.
22   Q. And did you ever learn what's in his file?
23     MS. GALLION: Objection. Vague.
24     If you understand, you may answer.

Page 112

1   A. Brian has told me there were some -- some
2 memos that were pretty hard-hitting to him about his
3 performance.
4   Q. Well, did you learn that his main problem
5 has been retaining staff?
6     MS. GALLION: Objection to the
7 characterization of "his main problem."
8     Subject to that, you may answer.
9   A. Yeah, I didn't -- I didn't learn that was
10 his main problem, no.
11   Q. You've not learned that even today?
12   A. No, I have not.
13   Q. Have you learned that he had very poor
14 relations with his staff and a very high turnover?
15   A. No, I have not.
16     MS. GALLION: I object. That's
17 inconsistent with the evidence in the record.
18     But subject to my objection, you may
19 always answer.
20     (Plaintiff's Exhibit
21     31a was referenced.)
22   Q. Show you Exhibit 31a. Do you recognize
23 this document?
24   A. Yes, I do.

Page 113

1   Q. What is this?
2   A. This is an evaluation of myself that Ty
3 has given to me.
4   Q. Okay. Do you remember when you received
5 this evaluation?
6   A. I would have received it sometime in the
7 spring of 2001.
8   Q. And was -- this was shared with you by Mr.
9 Helms?
10   A. Yes, it was.
11   Q. Okay. Would you look at the third
12 paragraph from the bottom, the one that begins with
13 the word "Throughout."
14   A. Uh-huh.
15   Q. Can you read that paragraph into the
16 record, please.
17   A. "Throughout 2001 we will be positioning
18 Jack for a promotion to Vice President. During that
19 time it will be critical to give Jack extra exposure
20 internally to allow him the opportunity to show what
21 he can bring to the company."
22   Q. Okay. You were aware of this at the time
23 you received this evaluation, weren't you?
24   A. Yes, I was.

Page 122

11:40:17 1 had a maintenance contract with Banctec, so yes,
11:40:18 2 there were -- there were funds that were dedicated
11:40:20 3 to support the home offices, that's correct.
11:40:23 4    Q. And are you still supporting them?
11:40:25 5    A. Yes, sir.
11:40:26 6    Q. Okay. Could you look at the fourth line
11:40:32 7 from the bottom.
11:40:32 8    A. Em-hmm.
11:40:33 9    Q. It says "Create one system within the
11:40:42 10 NSF: securing contacts only within national
11:40:42 11 accounts." Can you tell me what you were referring
11:40:44 12 to by that?
11:40:45 13    A. Sure. When I took over national sales,
11:40:49 14 the way -- the way the -- the system worked is you
11:40:52 15 would secure the organization as a national customer
11:40:57 16 account. And then you would secure different
11:44:00 17 contacts within that organization. That would be
11:44:05 18 national contacts.
11:44:05 19       However, we also went a step further. We
11:44:07 20 secured contacts in nonnational accounts. So the
11:44:12 21 NSF kind of had the best of both worlds, if you
11:44:15 22 will. We had our national cus-- national orgs.,
11:44:18 23 which at the time a hotel could not call on in any
11:44:24 24 of those secure contacts. And then we would go into

Page 123

11:44:27 1 what I would call the field accounts and secure
11:44:29 2 contacts in there as well, prohibiting the field to
11:44:32 3 call on those customers.
11:44:34 4       And I didn't think that was a -- a fair
11:44:35 5 system. I -- I felt that the original system of --
11:44:37 6 of securing organizations and securing contacts
11:44:40 7 underneath those secured organizations was the only
11:44:43 8 way we should go and we should not secure contacts
11:44:47 9 in nonnational accounts. So I released all those --
11:44:51 10 those secured nonnational customers.
11:44:54 11       It doesn't mean that the national sales
11:44:56 12 force could not work those people. I just didn't
11:45:03 13 want them secured. Because to a hotel salesperson,
11:45:01 14 when they would go into the sales system and see
11:45:03 15 that X on that person, they would never call on them
11:45:06 16 because it was a national account person working it.
11:45:09 17 And I just didn't think it was fair for us to try to
11:45:12 18 control both sides of the equation.
11:45:14 19    Q. Is the idea to have one sales manager
11:45:17 20 matched up with an account? Is that what you're
11:45:20 21 going for here?
11:45:21 22    A. No, not necessarily, because as I told you
11:45:23 23 earlier, we're -- we're going -- we could have a --
11:45:26 24 a salesperson within an -- an account like IBM and

Page 124

11:45:29 1 she might work eight or nine contacts, but I also
11:45:32 2 could have an IT salesperson working the IT contacts
11:45:36 3 within the -- within that account. So I could have
11:45:40 4 multiple national salespeople on an account.
11:45:47 5    Q. So you're -- you're -- you're saying that
11:45:49 6 your purpose here was to limit the national sales
11:45:54 7 people from contacting the nonnational accounts?
11:46:00 8    A. No.
11:46:01 9    Q. No?
11:46:04 10    A. It was -- it was to -- it was --
11:46:04 11    Q. Hmm.
11:46:04 12    A. -- to not let -- that's okay. I don't
11:46:05 13 expect you to understand this. It took me a while,
11:46:08 14 too.
11:46:09 15       It -- it was -- the -- the purpose was to
11:46:11 16 not let them secure contacts in nonnational
11:46:14 17 accounts, but certainly if -- if Barb was at a trade
11:46:19 18 show and met a customer who was not one of her
11:46:21 19 secured contacts, she can certainly go into the
11:46:24 20 system and put a referral in and -- and -- and get
11:46:32 21 credit for the bookings. She could book the -- the
11:46:32 22 contact. I was just -- from a technology standpoint
11:46:35 23 I did not want to lock those customers off.
11:46:37 24    Q. What does -- what does the word secure

Page 125

11:46:38 1 mean in --
11:46:38 2    A. Secure means --
11:46:38 3    Q. -- this context?
11:46:40 4    A. -- putting an X next to them in the
11:46:43 5 system, for lack of a -- securing them means to put
11:46:46 6 an X next to them and secure them to your name.
11:46:46 7       See, I just wanted -- I wanted the
11:46:52 8 opportunity for -- for the lady working at the Hyatt
11:46:54 9 O'Hare to work that same contact as maybe a national
11:46:57 10 salesperson worked.
11:46:59 11    Q. Okay.
11:46:59 12    A. And by securing that, you limited it to
11:47:02 13 one person.
11:47:02 14    Q. I think I understand.
11:47:02 15    A. I'm sorry if I wasn't clear.
11:47:04 16    Q. No, I understand. When you brought in
11:47:14 17 Brian Booth did you advertise that position?
11:47:20 18    A. You know, to the best of my ability I
11:47:22 19 believe that I did post the position, but as I sit
11:47:22 20 here in front of you I have nothing to produce to
11:47:27 21 you that shows on record that I did.
11:47:31 22    Q. Well, what is it you think you did to post
11:47:33 23 it?
11:47:34 24    A. Well, we -- we normally post it in several

March 21, 2002

## Page 150

13:18:52 1    A. Not in the New York office.
13:18:52 2    Q. Where is she located?
13:18:54 3    A. She was in the Chicago office.
13:18:55 4    Q. Chicago office?
13:18:56 5    A. Yes.
13:18:57 6    Q. Okay. Was she physically located there?
13:19:01 7    A. Yes, she was.
13:19:02 8    Q. Do you recall, was she a long-time
13:19:08 9 employee that had a good record?
13:19:10 10    A. Yes, I believe she was.
13:19:11 11    Q. And she was on your list to terminate,
13:19:14 12 too, wasn't she?
13:19:14 13    A. She was.
13:19:15 14    Q. Okay. But did she surprise you by
13:19:18 15 quitting?
13:19:18 16    A. She resigned the morning of the notices,
13:19:22 17 yes.
13:19:22 18    Q. Do you know why she resigned?
13:19:23 19    A. To take a job in New York as director of
13:19:27 20 sales at the Westin Times Square I believe it's
13:19:32 21 named.
13:19:32 22    Q. Did she tell you why she wanted to leave
13:19:39 23 Hyatt?
13:19:39 24    A. No, she didn't.

## Page 151

13:19:40 1    Q. Were you the area supervisor, I forget the
13:19:51 2 title, that covered the -- the hotel at McCormick
13:19:53 3 Place?
13:19:54 4    A. I was.
13:19:56 5    Q. And do you know what the circumstances
13:19:58 6 were when Molly Crompton first left McCormick Place?
13:20:02 7    A. She resigned to go to a catering company
13:20:08 8 in Chicago. As I recall, the hotel hours were too
13:20:17 9 restrictive. She was working all the time and she
13:20:19 10 wanted to go somewhere where she could work more or
13:20:23 11 less 8:00 to 5:00 and have a -- life outside of
13:20:26 12 her job.
13:20:26 13    Q. And then she came back to McCormick Place?
13:20:28 14    A. She did.
13:20:30 15    Q. Did you play any role in her coming back
13:20:33 16 to McCormick Place?
13:20:33 17    A. No, I did not.
13:20:35 18    Q. Okay. And then at some point she left
13:20:39 19 McCormick Place and went to the Washington national
13:20:42 20 sales office?
13:20:43 21    A. That's correct.
13:20:43 22    Q. Did you have any role in her moving to the
13:20:47 23 Washington national sales office?
13:20:47 24    A. No, only than -- other than telling my

## Page 152

13:20:52 1 director there that she was a candidate, that she
13:20:55 2 had put her name in the hat based on the open
13:20:58 3 positions report. And he had called me and asked
13:21:00 4 me, when she would work for me at the Hyatt O'Hare,
13:21:04 5 was she a good employee.
13:21:05 6    Q. Okay. And then she went from Washington
13:21:09 7 to the central office?
13:21:10 8    A. Right.
13:21:11 9    Q. Did you have any role in her going to the
13:21:10 10 central office?
13:21:11 11    A. Yes, I did. I -- I knew that she was
13:21:24 12 unhappy personally in Washington and she wanted --
13:21:24 13 she made a statement that she wanted to come back.
13:21:27 14 And when Terri resigned, I made the recommendation
13:21:30 15 that she should come back.
13:21:32 16    Q. Okay. How did you know she was unhappy in
13:21:36 17 Washington?
13:21:36 18    A. Because her director had told me that.
13:21:36 19    Q. Okay. Now, it wasn't clear. Did you
13:21:44 20 mention earlier that you -- you think you adjusted
13:21:48 21 her quota upwards to account for additional accounts
13:21:54 22 she received?
13:21:55 23    A. I -- well, if she -- if she received an
13:21:59 24 account that had a tentative piece of business that

## Page 153

13:22:01 1 was going to turn definite before the year end 2001,
13:22:06 2 then she would get a quota adjustment upwards. If
13:22:09 3 she received several pieces of tentative business
13:22:12 4 that were not going to close before the end of 2001,
13:22:15 5 she would have had no reflection of her quota
13:22:19 6 changing.
13:22:19 7    Q. So you're talking hypothetically here?
13:22:21 8    A. Yes.
13:22:21 9    Q. Okay. I understand that there's a quota
13:22:26 10 set for the first six months?
13:22:27 11    A. That's right.
13:22:28 12    Q. And then a quota for the next six months?
13:22:30 13    A. That's right.
13:22:32 14    Q. And is it correct that you dictate those
13:22:35 15 quotas to, is it divisional director? No,
13:22:41 16 the --
13:22:41 17    A. No -- I'm sorry.
13:22:43 18    Q. People like Brian Booth, what are they
13:22:49 19 called?
13:22:49 20    A. Yeah, my -- my national sales office
13:22:49 21 director. I -- I -- what I do is, yes, I -- I -- I
13:22:52 22 dictate an office quota, an overall office quota,
13:22:57 23 and then how the director breaks it down
13:22:59 24 individually I have -- I have nothing to do with

Page 154

13:23:01 1 that.

13:23:01 2 Q. Okay. Are you suggesting that other than

13:23:04 3 the -- these two quotas, these two 6-month quotas --

13:23:09 4 A. Yes.

13:23:09 5 Q. -- that there might have been some other

13:23:11 6 quota adjustment for Molly Crompton?

13:23:12 7 A. There could have been. If she -- the --

13:23:15 8 normally we would not ever make any adjustments to

13:23:18 9 quota during the six-month period, but obviously

13:23:21 10 this was a once-in-a-lifetime, hopefully, you know,

13:23:27 11 reduction that took place, and therefore based on

13:23:30 12 people getting accounts and possibly getting

13:23:33 13 tentative business, as I earlier said, the windfall,

13:23:38 14 I wanted to make sure we adjusted the quotas to

13:23:42 15 reflect those tentatives that are coming their way.

13:23:44 16 So I believe -- I believe that there was an

13:23:46 17 adjustment made.

13:23:47 18 Q. Isn't it correct that after

13:23:59 19 September 11th, 2001 there were no quota adjustments

13:23:55 20 made?

13:23:55 21 A. There were no quota adjustments made

13:23:58 22 because of the disaster that occurred. However,

13:24:02 23 going back to my statement, if -- if somebody

13:24:06 24 received a tentative piece of business from one of

Page 155

13:24:08 1 the positions that was reduced and that piece of

13:24:11 2 business had an opportunity to turn before the 31st,

13:24:15 3 there were quota adjustments.

13:24:16 4 Q. So after the events of September 11th

13:24:26 5 there were no adjustments to anyone's quota

13:24:31 6 downward?

13:24:31 7 A. No, there weren't.

13:24:32 8 Q. The only thing you did was adjust quotas

13:24:36 9 upward?

13:24:36 10 A. Well, I didn't, but possibly the directors

13:24:39 11 did, yes.

13:24:41 12 Q. Okay. Okay. Can you tell me how long

13:25:10 13 you've lived at your current address.

13:25:11 14 A. I've lived there since 1995.

13:25:15 15 Q. And who else resides there?

13:25:17 16 A. My wife and my two daughters.

13:25:19 17 Q. Okay. What is your date of birth?

13:25:22 18 A. 9/23/61.

13:25:24 19 Q. And what's your Social Security number?

13:25:29 20 A. 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.

13:25:30 21 Q. And you're a U.S. citizen, right?

13:25:38 22 A. That's correct.

13:25:38 23 Q. What year did you graduate high school?

13:25:41 24 A. 1979.

Page 156

13:25:42 1 Q. Did you attend college?

13:25:45 2 A. Yes, I did.

13:25:45 3 Q. And did you graduate?

13:25:48 4 A. I did. 1983.

13:25:51 5 Q. What college did you attend?

13:25:53 6 A. Lynchburg College in Lynchburg, Virginia.

13:25:58 7 Q. Okay. What was your major?

13:25:59 8 A. Business.

13:25:59 9 Q. Did you receive a BS degree?

13:26:05 10 A. That's correct.

13:26:06 11 Q. Okay. Have you had any other degrees

13:26:12 12 besides that?

13:26:12 13 A. No, I have not.

13:26:13 14 Q. Do you have any postcollege education?

13:26:15 15 A. No, I do not.

13:26:17 16 Q. Did you receive any specialized training

13:26:23 17 that you can recall?

13:26:23 18 A. No.

13:26:24 19 Q. Okay.

13:26:24 20 MS. GALLION: I want to object to the

13:26:30 21 vagueness of that question and the vagueness of

13:26:30 22 the term "specialized training," but apparently

13:26:33 23 the witness understood and he's answered.

13:26:34 24 Q. Do you hold any licenses?

Page 157

13:26:36 1 A. Like can you explain further?

13:26:41 2 Q. Well, insurance licenses, sales type of

13:26:45 3 license or any kind of a license issued by the

13:26:45 4 government.

13:26:47 5 A. No.

13:26:48 6 Q. Have you had any seminars or courses in

13:26:53 7 your field?

13:26:53 8 A. Yes. Yes.

13:26:57 9 Q. Can you tell me what those were?

13:26:59 10 A. Seminars like sales training classes?

13:27:01 11 Q. Yes.

13:27:01 12 A. Yeah. I've gone through a number of PSS,

13:27:06 13 PSN classes, leadership classes, Upward Bound

13:27:10 14 classes, all sales development courses that I took

13:27:14 15 either in Sheraton or in Hyatt.

13:27:18 16 Q. Okay.

13:27:18 17 A. I've certainly gone to human resource-held

13:27:22 18 seminars for further education within the company.

13:27:24 19 Q. All right. Have you ever been arrested?

13:27:28 20 A. No, I have not.

13:27:29 21 Q. Have you ever been involved in a lawsuit?

13:27:32 22 A. No, I have not.

13:27:33 23 Q. Have you ever been disciplined by any

13:27:37 24 governmental authority?

Page 162

1 else.

2    Q. Okay. You feel that you perform your job

3 competently, don't you?

4    A. My current job?

5    Q. Yeah.

6    A. Yes, I do.

7    Q. Are you careful to make a record of your

8 meetings that you attend?

9    A. No, I'm not.

10    Q. You never make a record of meetings you go

11 to?

12       MS. GALLION: Objection. That's contrary

13 to the witness's testimony.

14       You may answer.

15    Q. Do you ever make a record of meetings you

16 attend?

17    A. I -- the way -- the way I work is that --

18 is that I work via electronic Palm. And my Palm

19 pretty much sits on my assistant's desk. And so I

20 travel 150 to 200 days a year. And so if I have a

21 meeting, it's -- it's entered into the Palm via her.

22    Q. Is it downloaded into your computer then?

23    A. No, it's not.

24    Q. Do you keep any written diary or -- or

Page 163

1 calendar?

2    A. No, I don't.

3    Q. Do you try to record the substance of

4 meetings and conversations you have with your

5 superiors?

6    A. No, I don't.

7    Q. Is national sales manager the correct

8 description for people who held jobs like Mrs.

9 Hildebrandt's?

10    A. Well, she would be considered a director

11 of national accounts.

12    Q. Director of national accounts?

13    A. That's right.

14    Q. Okay. That's a management position, isn't

15 it?

16    A. Yes, it is.

17    Q. Are there different types of directors of

18 national accounts or are they all the same?

19    A. They're -- they're all the same. There's

20 an additional position called national account

21 manager.

22    Q. What is that?

23    A. It really -- it really is the same

24 position, but we give a director's title.

Page 164

1    There's -- there's -- there's an additional benefit

2 with being a director.

3    Q. Director is a more prestigious position,

4 is that right, or --

5    A. I -- I think it's a more prestigious

6 title. I don't know about position. I think what

7 the national account manager does and what a

8 director of national accounts does is very similar,

9 but there's an additional benefit that comes with

10 the director's title.

11    Q. What is that?

12    A. That's participating in the matched

13 savings program.

14    Q. Okay. Are all of the people that we've

15 discussed today, the people that you graded A, B and

16 C, are they all directors of national accounts?

17    A. No, they're not.

18    Q. Some of them are national account

19 managers?

20    A. That's right.

21    Q. Can you recall which ones are, without

22 reviewing the exhibits, or would you like me to get

23 the exhibit out?

24    A. I think I -- don't I have them right here?

Page 165

1    Q. They're marked 38 with a subletter. Can

2 you just tell me the ones who are national account

3 managers?

4    A. Faye Memoli. I would -- I don't have the

5 Omaha exhibit in front of me. Because that would --

6 that would help. I also don't have Chicago in front

7 of me.

8       MS. GALLION: Does this help?

9       MR. STEINBERG: I don't know. You -- the

10 witness could tell you if it would help.

11       But I'll get you Omaha.

12       THE WITNESS: Oh, here. You know, that --

13 that -- that makes a difference.

14    A. In Omaha we have Tina Nebuloni is a

15 national account manager. Erin Moriarty is a

16 national account manager. Rose Castin (phonetic) is

17 a national account manager. Jennifer Uhlig is a

18 national account manager. I believe that covers it.

19    Q. What about in the central region? Is

20 there --

21    A. There -- there is nobody that's a --

22 there's no one that's national account manager.

23    Q. Okay. Did you consider the western

24 office?

Page 166

1  A. I believe I did.
2  Q. Here's the document, if this will help
3  you.
4  A. No, Donner -- Donna Palmer was until
5  March 15th, three days ago. She was just promoted
6  to director of national accounts. So everybody else
7  is a director on that page.
8  Q. Who decides whether a person is a director
9  of national accounts or a national accounts manager?
10  A. The process would be that the -- come
11  budget time every fall, the director of the office
12  would put in a recommendation for somebody to get a
13  title change. And it would be reviewed by myself,
14  it's reviewed by Ty, and then it would be reviewed
15  by the accounting folks in our -- Frank Borg or --
16  or Rhonda Saleh and -- and human resources as well,
17  and they would make a determination whether we could
18  get it through the budget.
19  Q. Well, some people start out, though, as
20  director of national accounts, don't they?
21  A. Yes, they do.
22  Q. Who decides whether a person would start
23  in that title or a national account manager title?
24  A. The person that's hiring them.

Page 167

1  Q. Okay. Is there a different pay rate for
2  the two positions we talked about?
3  A. There is.
4  Q. Can you tell me what the difference is?
5  A. I can't. I -- I just -- I don't know.
6  Q. Is there a pay --
7  A. I'd have to --
8  Q. I'm sorry.
9  A. I'd have to defer to human resources for
10  that information.
11  Q. Is there a pay range within each of these
12  positions?
13  A. There is.
14  Q. And do you know what that is?
15  A. No, I don't.
16  Q. Okay. Who determines what a director of
17  national accounts is paid?
18  A. Who determines?
19  Q. Em-hmm.
20  A. The person hiring that person.
21  Q. In -- in some cases is that yourself?
22  A. Sure. Absolutely.
23  Q. Okay.
24  A. I would -- I would -- I would always have

Page 168

1  input.
2  Q. Okay.
3  A. Because I have to sign the status change
4  that eventually gets this person hired, so I have to
5  approve it.
6  Q. So the people we talked about that were
7  hired in 2001 you had input as to what each of them
8  was paid?
9  A. Either I had input or I just approved what
10  that director recommended.
11  Q. Okay. You -- was your first year '99; is
12  that right?
13  A. That's right.
14  Q. Do you know how many directors of national
15  accounts and national account managers there were
16  total?
17  A. I have no idea.
18  Q. How about for 2000?
19  A. I have no idea.
20  Q. 2001?
21  A. I have no idea. I've never done that
22  analysis.
23  Q. Do you know if there are any less now than
24  there were at the beginning of 2001?

Page 169

1  A. Less directors?
2  Q. Directors and national account managers
3  taken together.
4  A. Yeah, there's -- unfortunately there's ten
5  less.
6  Q. Are you -- you hired some and some were
7  terminated. You do think there are ten less than
8  there were at the beginning of the year?
9  A. Yes, that's -- that's -- that's an
10  accurate answer.
11  Q. Okay. What is the next step up the ladder
12  for a director of national accounts?
13  A. That's -- that's a very good question.
14  They can -- they could go back on property as a
15  director of sales. Conceivably they could -- they
16  could take my job, my position. Conceivably they
17  could be considered for a divisional director of
18  sales.
19  Q. Aren't there positions between yours and
20  theirs?
21  A. Between a director of a -- a national
22  accounts?
23  Q. Director of national accounts. That's --
24  A. Oh, I --

Page 174

1    Q. Okay. Do you know how Mr. Booth arrived
2  at reducing it?
3    A. No, I don't.
4    Q. Were you aware that Mrs. Hildebrandt was
5  given a midyear review?
6    A. Yes, I was.
7    Q. Can you tell me what you know about the
8  midyear reviews?
9    A. Yes. Brian came to me and -- let me --
10  let me back up for one moment here. We -- we
11  decided among the directors and myself that we were
12  going to create a new review for the managers and --
13  and the directors, a review that I felt was more
14  well balanced in all areas and not just based on
15  quota achievement.
16        And Brian and -- and Gus Vonderheide
17  worked on creating that review, which we put into
18  place this year, or this year for the review for
19  last year.
20        And then Brian told me that, as being new
21  to the office, one of the -- one of the ways he
22  could reach out and get in touch with his managers
23  since he was a new director was he felt that he
24  should do a midyear review.

Page 175

1        And I said, that's fine. That's a great
2  idea. What better way to -- for you to know their
3  expectations and for them to know your expectations.
4  So I -- I endorsed that.
5    Q. Do you know for whom he did a midyear
6  review?
7    A. My understanding was that he did it for
8  his complete office, all his managers.
9    Q. Did you receive the results of it?
10    A. No, I did not.
11    Q. We talked earlier about the term "SOHO."
12    A. Yes.
13    Q. I just wanted to review with you who the
14  people are that operate from a SOHO after
15  October 1st, 2001. I think I have these names, and
16  you can check whatever document you need, but is
17  Trina London such a person?
18    A. She is.
19    Q. Melissa Daniels?
20    A. She is.
21    Q. Barb Hale?
22    A. She was.
23    Q. Okay. Jan Bansfield?
24    A. She is.

Page 176

1    Q. Michelle Bondanelli?
2    A. She is.
3    Q. Marilyn Brumbaugh?
4    A. She is.
5    Q. Kathy Murphy?
6    A. She is.
7    Q. Michelle Nicoletti?
8    A. She is.
9    Q. Diane Smith?
10    A. She is.
11    Q. Bonnie Weiss?
12    A. She is.
13    Q. Harumi Yoshiike?
14    A. No, she's based out of the Hyatt -- oh,
15  I'm sorry, she's a hotel. Sometimes I get confused
16  with the home office. She is a -- she is a
17  satellite office, yes.
18    Q. Okay. Well, I'm not --
19        MS. GALLION: Let me just clarify one
20  thing, because I think we're confused. Is this
21  about people with SOHO -- with home offices or
22  people working out of hotels?
23    A. Because, yeah, they're -- they're two
24  different things, but...

Page 177

1    Q. I understand.
2    A. Okay.
3    Q. I -- I'm only asking you about the SOHO.
4        MS. GALLION: But a SOHO is both.
5    A. But a SOHO is -- is -- can be a
6  satellite -- well, technically not. We have satel--
7    Q. I'm not -- I'm not including hotels.
8    A. Okay. Harumi is in a hotel.
9    Q. Is there anyone else that you know of that
10  was in a SOHO after October 1, 2001?
11        MS. GALLION: I'm going to object to that
12  nomenclature, because a SOHO is a satellite
13  office which could be a hotel/home office.
14        MR. STEINBERG: I'm going to request, if
15  you're going to testify, that you be sworn in.
16        MS. GALLION: I'm not testifying; I'm
17  objecting to the question.
18        MR. STEINBERG: I'm objecting to your
19  inserting alleged evidence into the record.
20  Mr. Horne is perfectly capable of knowing what
21  a SOHO is.
22        MS. GALLION: Mr. Horne is doing a
23  wonderful job of testifying and doesn't need my
24  assistance, but -- I don't want a record that