## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BARBARA LODER HILDEBRANDT,   )
                                        )
     Plaintiff,               )
                                          )
vs.                           )     Case No.  C-1-02-0003
                                          )
HYATT CORPORATION, et al.    )     Judge Beckwith
                                        )     Magistrate Judge Sherman
     Defendants.          )
                                        )

### AFFIDAVIT OF TYSON HELMS

STATE OF ILLINOIS      }
                         } ss:
COUNTY OF LAKE      }

     BEFORE ME, the undersigned authority, personally appeared, TYSON HELMS, who, after first being duly sworn, deposes and states that he is an adult person, over 18 years of age, competent to testify as to the following matters as to which he has personal knowledge or which he believes to be true:

     1.  I have been employed with Hyatt since March 1992.  I am currently the Vice President of Sales for Hyatt and have held this position since February 2000.

     2.  In this position, I work as a resource to all of Hyatt's hotels to assist them in generating as much revenue as possible, and I am responsible for numerous departments at Hyatt including Field Sales, National Sales, Catering and Convention Services, International and Individual Sales.  As I have the responsibility for National Sales, I am familiar with the employment of Barbara Loder Hildebrandt.

-1-



3. As Vice President of Sales, it is my responsibility to hire persons who report directly to me.

4. In or about April 2000, I hired Rob Sarmiento to fill the position of Assistant Vice President for International and Individual Travel. Mr. Sarmiento had 16 years of experience with Hyatt, which included approximately four years of experience as a Divisional Director of Sales, with responsibility over approximately 24 hotels, and approximately seven years of experience as a Director of Sales for two large hotels. Mr. Sarmiento also speaks fluent Spanish.

5. My decision to hire Mr. Sarmiento was based strictly on his qualifications and was in no way based on gender or his age, or the gender or age of any other individual.

6. I attempted to hire Terri Benich for this position, but, for personal reasons, she declined the opportunity.

7. In comparing the qualifications of Mr. Sarmiento and Barbara Loder Hildebrandt, I belive Mr. Sarmiento is more qualified for the position of Assistant Vice President for International and Individual Travel.

8. As Vice President of Sales for Hyatt, I am also familiar with the financial issues at Hyatt that affect the departments for which I have responsibility.

9. In my position, I serve on the Managing Committee for Hyatt, which consists of approximately 14 individuals from each major department of the company.

10. As a part of the Managing Committee, I attend regular meetings regarding the Company as a whole, including the Company's financial well-being.

-2-

11. In my position as Vice President of Sales for Hyatt, I also have access to information regarding hotel occupancy and room rates.

12. I am aware that prior to September 11, 2001, Hyatt was beginning to experience the effects of a downturn in the economy.

13. Specifically, beginning in or before the middle of 2001, Hyatt began experiencing a decrease in occupancy percentages and average rates per room.

14. As a result of these lost revenues, Hyatt began to implement cost-cutting measures to assist the hotels and the hotel owners in maintaining profitability.

15. Because the economy began to decline and the hotels were beginning to experience a loss in revenue, I was asked to recommend and implement cost-savings measures, which would, in turn, save hotels operating costs and improve return for our owners.

16. In or about May 2001, I prepared a memorandum to the individuals who reported to me, summarizing their recommendations regarding various proposed cost-savings measures for Hyatt's Sales department and approving their implementation of these measures. A copy of this memorandum is attached as Exhibit 1 to this Affidavit.

17. These measures included narrowing each sales office by 3% to save on travel expenses; decreasing in Sales and Administration Travel and Expenses by 2.5%; eliminating the Divisional Director of Sales Meeting; reducing sales administration promotional expenses by 2%; reducing each National Sales Force Office budget by 3%; and hiring employees for less, if possible.

18. Many, if not all of these recommendations were implemented.

19. I am aware that all departments and hotels within Hyatt were asked to examine and implement various methods by which costs could be reduced Company-wide.

20. The events of September 11, 2001, in combination with already-declining economy caused Hyatt, its hotels, and the hotel owners to suffer significant losses when compared to the prior year. Specifically, Hyatt realized a decline in its total income of over $400,000,000.00, and Hyatt's hotel owners realized profits almost $200,000,000.00 less than the previous year. Exhibit 2 to this Affidavit details Hyatt's profits and losses in 2000, as compared to 2001.

FURTHER AFFIANT SAYETH NAUGHT.

_____
TYSON HELMS


       SWORN TO and SUBSCRIBED before me this 27 day of February 2003
by TYSON HELMS, Vice President of Sales for HYATT _____, who is
personally known to me or has produced _____ as
identification.

_____
NOTARY PUBLIC, STATE OF ~~ILLINOIS~~ Indiana

OFFICIAL SEAL
Teresa C. Castellanos
Notary Public, State of Indiana
My Commission Expires 3/4/08

-5-

Memorandum



Hyatt Hotels Corporation
200 West Madison Street
Chicago, IL 60606 USA

Telephone : 312.750.1234
Fax :        312.920.2396

**Date:**     May 17, 2001                    **cc:**    Ed Rabin
                                                          Frank Borg

**To:**       Steve Enselein
              Jack Horne
              Rob Sarmiento
              Fred Shea

**From:**     Ty Helms                        **Encl:**

**Subject:**  Sales Chain Expense Savings

# CONFIDENTIAL

Thank you for submitting your ideas for expense reductions this year. As you know, I am going to focus our department on keeping revenue generation and training expenses in place, but review all other areas in detail.

As a first blush, I would like each of you to analyze all your departments, all existing contracts and future events for "basic" savings...this includes chain and billback expenses.

1. Cut our Sales Administration T&E by 2.5%, approximately $35,000, this does not mean don't travel or entertain...it means watch the dollars.

2. Cut the DDOS meeting and save $10,000.

3. Review MPI Annual and save $20,000.

4. Reduce Sales Administration promotional expenses by 2% and save $25,000.

5. Reduce IT and International miscellaneous promotions by $35,000.

6. Reduce each NSF office budget by 3% and save about $350,000.

7. Watch payroll and relocation expenses...hire for less, if possible, and keep positions open as long as possible.

With these initial cost savings, we can save over $500,000 to our chain expenses...and still maintain our training/revenue generation tactics.

All it will take is a little extra effort and paying more attention to everything we spend.

Thank you in advance for your cooperation with this important issue.

32326

**EXHIBIT**

**H-1**

### TOTAL COMPANY - COMPARABLE LOCATIONS

Year Ended: DECEMBER 31, 2001

| | LAST YEAR $(000)$ | | FORECAST $(000)$ | | PRELIMINARY $(000)$ | | MONTH END $(000)$ | | VARIANCE FROM LAST YEAR $(000)$ | | VARIANCE FROM FORECAST $(000)$ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES & INCOME:** | | | | | | | | | | | | |
| ROOMS: | 2,235,242 | 59.5% | 2,326,023 | 60.1% | 2,006,917 | 60.0% | 1,947,710 | 58.7% | -287,533 | -12.9% | -378,314 | -16.3% |
| FOOD: | 807,811 | 65.7% | 829,621 | 66.1% | 714,792 | 66.2% | 716,124 | 65.5% | -91,687 | -11.4% | -113,497 | -13.7% |
| BEVERAGE: | 203,747 | 16.6% | 208,341 | 16.6% | 181,546 | 16.8% | 184,530 | 16.9% | -19,217 | -9.4% | -23,811 | -11.4% |
| F&B OTHER & SUNDRY: | 217,866 | 17.7% | 216,927 | 17.3% | 183,038 | 17.0% | 192,836 | 17.6% | -25,000 | -11.5% | -24,091 | -11.1% |
| TOTAL F&B: | 1,229,423 | 32.7% | 1,254,889 | 32.4% | 1,079,376 | 32.3% | 1,093,490 | 32.9% | -135,934 | -11.1% | -161,399 | -12.9% |
| TELEPHONE: | 99,070 | 2.6% | 100,174 | 2.6% | 85,337 | 2.6% | 76,432 | 2.3% | -22,638 | -22.9% | -23,742 | -23.7% |
| OTH. DEPT & RENTALS: | 194,104 | 5.2% | 190,959 | 4.9% | 174,248 | 5.2% | 202,555 | 6.1% | 8,451 | 4.4% | 11,596 | 6.1% |
| **TTL SALES & INCOME:** | 3,757,839 | 100.0% | 3,872,045 | 100.0% | 3,345,878 | 100.0% | 3,320,186 | 100.0% | -437,653 | -11.6% | -551,858 | -14.3% |
| **DEPARTMENTAL PROFIT:** | | | | | | | | | | | | |
| ROOMS: | 1,730,947 | 77.4% | 1,807,741 | 77.7% | 1,546,077 | 77.0% | 1,496,337 | 76.8% | -234,610 | 18.4% | -311,404 | 17.7% |
| FOOD & BEVERAGE: | 267,881 | 21.8% | 277,031 | 22.1% | 199,906 | 18.5% | 221,095 | 20.2% | -46,787 | 65.6% | -55,937 | 65.3% |
| TELEPHONE: | 51,796 | 52.3% | 51,695 | 51.6% | 40,633 | 47.6% | 34,906 | 45.7% | -16,891 | 25.4% | -16,789 | 29.3% |
| OTH DEPT & RENTALS: | 115,635 | 59.6% | 110,031 | 57.6% | 100,275 | 57.5% | 125,775 | 62.1% | 10,139 | 120.0% | 15,744 | 135.8% |
| **GROSS OPER. INCOME:** | 2,166,260 | 57.6% | 2,246,498 | 58.0% | 1,886,890 | 56.4% | 1,878,112 | 56.6% | -288,148 | 34.2% | -368,386 | 33.2% |
| **DEDUCTIONS FROM INC:** | | | | | | | | | | | | |
| ADMIN. & GEN.: | 214,862 | 5.7% | 222,323 | 5.7% | 209,104 | 6.2% | 210,262 | 6.3% | -4,600 | -2.1% | -12,061 | -5.4% |
| MARKETING: | 243,857 | 6.5% | 252,328 | 6.5% | 236,960 | 7.1% | 226,544 | 6.8% | -17,312 | -7.1% | -25,784 | -10.2% |
| HEAT, LIGHT & PWR.: | 104,812 | 2.8% | 110,222 | 2.8% | 114,928 | 3.4% | 110,098 | 3.3% | 5,285 | 5.0% | -124 | -0.1% |
| REPAIRS & MAINT.: | 162,792 | 4.3% | 167,448 | 4.3% | 158,615 | 4.7% | 150,952 | 4.5% | -11,840 | -7.3% | -16,495 | -9.9% |
| **TOTAL DEDUCTIONS:** | 726,323 | 19.3% | 752,320 | 19.4% | 719,608 | 21.5% | 697,856 | 21.0% | -28,467 | -3.9% | -54,464 | -7.2% |
| **GROSS OPER. PROFIT:** | 1,439,937 | 38.3% | 1,494,178 | 38.6% | 1,167,283 | 34.9% | 1,180,256 | 35.5% | -259,681 | 40.7% | -313,922 | 43.1% |
| Percent of Change: | | | | | | | | | | -18.0% | | -21.0% |
| OTHER INCOME: | 20,580 | 0.5% | 11,622 | 0.3% | 11,563 | 0.3% | 12,551 | 0.4% | -8,029 | -39.0% | 929 | 8.0% |
| **OTHER EXPENSES:** | | | | | | | | | | | | |
| DATA PROCESSING | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | -96.4% | 0 | 0.0% |
| INSURANCE | 26,969 | 0.7% | 29,990 | 0.8% | 29,448 | 0.9% | 31,589 | 1.0% | 4,620 | 17.1% | 1,599 | 5.3% |
| RETIREMENT | 102 | 0.0% | 0 | 0.0% | 4 | 0.0% | 0 | 0.0% | -102 | -100.0% | 0 | 0.0% |
| R.E.& P.P. TAXES | 94,294 | 2.5% | 101,052 | 2.6% | 100,406 | 3.0% | 97,151 | 2.9% | 2,857 | 3.0% | -3,901 | -3.9% |
| BUSINESS TAXES | 210 | 0.0% | 165 | 0.0% | 165 | 0.0% | 178 | 0.0% | -32 | -15.1% | 13 | 7.9% |
| LEASES | 3,834 | 0.1% | 4,545 | 0.1% | 4,136 | 0.1% | 5,589 | 0.2% | 1,754 | 45.7% | 1,044 | 23.0% |
| REPL. OF FF&E | 122,178 | 3.3% | 128,478 | 3.3% | 115,744 | 3.5% | 111,776 | 3.4% | -10,402 | -8.5% | -16,702 | -13.0% |
| MISCELLANE | 25,053 | 0.7% | 27,815 | 0.7% | 29,111 | 0.9% | 29,197 | 0.9% | 4,145 | 16.5% | 1,383 | 5.0% |
| TTL OTHER EXPENSES: | 272,640 | 7.3% | 292,045 | 7.5% | 279,014 | 8.3% | 275,481 | 8.3% | 2,841 | 1.0% | -16,564 | -5.7% |
| **A.G.O.P.:** | 1,187,877 | 31.6% | 1,213,755 | 31.3% | 899,832 | 26.9% | 917,326 | 27.6% | -270,551 | 38.2% | -296,429 | 46.3% |
| MGMT FEE/HYATT RETENT | 135,555 | 3.6% | 141,046 | 3.6% | 114,373 | 3.4% | 111,900 | 3.4% | -23,655 | -17.5% | -29,146 | -20.7% |
| ADD'L MGMT FEE: | 79,477 | 2.1% | 76,975 | 2.0% | 46,152 | 1.4% | 44,197 | 1.3% | -35,280 | -44.4% | -32,778 | -42.6% |
| RENT: | 155,823 | 4.1% | 165,648 | 4.3% | 128,592 | 3.8% | 129,488 | 3.9% | -26,135 | -16.8% | -36,160 | -21.8% |
| PROFIT BEF. CAP. EXP: | 817,221 | 21.7% | 830,087 | 21.4% | 610,715 | 18.3% | 631,742 | 19.0% | -185,480 | 57.6% | -198,345 | 64.1% |
| CAPITAL EXPENSES: | 32,032 | 0.9% | 37,232 | 1.0% | 33,877 | 1.0% | 35,304 | 1.1% | 3,272 | 10.2% | -1,928 | -5.2% |
| PROFIT: | 785,190 | 20.9% | 792,855 | 20.5% | 576,838 | 17.2% | 596,437 | 18.0% | -188,752 | 56.9% | -196,418 | 64.4% |

NOTE: This forecast is based upon reasonable assumptions, given current economic conditions; however, it reflects only our best judgement at the present time and constitutes no representation or warranty of what the operating results will, in fact, be.

Excludes: Alicante, Calgary, Coconut Pt., Cleveland, DFW Air., Lodge, Hilton Head, Newport, PK Chicago, Penn's Landing, Pitts. Air., Richmond, Seattle (G), St



CONFIDENTIAL

EXHIBIT
H-2

32490

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| BARBARA LODER HILDEBRANDT, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>HYATT CORPORATION )<br>)<br>and )<br>)<br>TY HELMS )<br>)<br>and )<br>)<br>BRIAN J. BOOTH, )<br>)<br>Defendants. )<br>) | Case No.  C-1-02-0003<br><br>Judge Beckwith<br>Magistrate Judge Sherman |

### AFFIDAVIT OF TERRI BENICH

STATE OF ARIZONA        }
                        } ss:
COUNTY OF MARICOPA  }

   BEFORE ME, the undersigned authority, personally appeared, TERRI

BENICH, who, after first being duly sworn, deposes and states that she is an adult person,

over 18 years of age, competent to testify as to the following matters as to which she has

personal knowledge or which she believes to be true:

   1. I am currently the Director of Marketing for the Hyatt Regency Scottsdale, in

Scottsdale, Arizona.

   2. I have been employed by Hyatt since May 1993.

-1-



3. My date of birth is June 24, 1959.

4. I have been the Director of Marketing for the Hyatt Regency Scottsdale since approximately December 1997.

5. During my employment as Director of Marketing at the Hyatt Regency Scottsdale, in or around December 1999, I was approached by Chuck Floyd and Ty Helms and notified that I was being considered for the position of an Assistant Vice President of Sales in the Corporate Office.

6. I turned down the opportunity to be considered further for this position due to personal circumstances at the time.

7. Following the offer for the Assistant Vice President of Sales, I also was considered for another opportunity for advancement, again to the Corporate Office. Although I do not recall the specifics of that position, or the exact timing of that communication, my personal circumstances did not allow me to move to Chicago, which was a requirement of the position.

8. I do not now, nor have I ever, felt that I have been treated poorly or unlawfully by Hyatt based on my age, gender, or any other reason. To the contrary, I believe I have been offered numerous opportunities for advancement throughout my approximately nine-year career with Hyatt.

FURTHER AFFIANT SAYETH NAUGHT.

TERRI BENICH

SWORN TO and SUBSCRIBED before me this _2__ day of August 2002 by TERRI BENICH, Director of Marketing for HYATT REGENCY SCOTTSDALE, who is personally known to me or has produced _____ as identification.



NOTARY PUBLIC, STATE OF ARIZONA

-3-

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - -

BARBARA LODER                   :
HILDEBRANDT,                    :
                                :
            Plaintiff,          :
    vs.                         :    Case No. C-1-02-003
                                :       (Judge Beckwith)
HYATT CORPORATION,              :
et al.,                         :
                                :
            Defendants.         :

- - - - - - - - - - - - - -


            Deposition of BRUCE W. SMALL, a witness

herein, called by the plaintiff for cross-

examination, pursuant to the Federal Rules of Civil

Procedure, taken before me, Wendy L. Welsh, a

Registered Merit Reporter and Notary Public in and

for the State of Ohio, at the offices of Fisher &

Phillips LLP, 420 Marquette Building, 140 South

Dearborn Street, Chicago, Illinois, on Tuesday,

April 16, 2002, at 1:58 p.m.


EXHIBIT
J

1 the users, for sales and catering people, throughout
2 the company, enhancing the computer functionality
3 for them. I am responsible for a B to B Internet
4 application called E-mmediate Meetings, the
5 development of it and the ongoing enhancement and
6 maintenance of it. And I'm responsible for the
7 account information services team in Omaha.
8    Q. Can you tell me what that is?
9    A. That group produces customized reporting
10 for the national sales force for their organizations
11 so that the organization can look at the business
12 they've produced for our company as an on-request
13 type service. They produce direct mail lists for
14 hotel campaigns. They maintain certain of our mail
15 lists for our corporate marketing efforts. Things
16 like that.
17    Q. The E-mmediate, would you call that a
18 system?
19    A. It's a Web application.
20    Q. That is a large project, isn't it?
21    A. Yes.
22    Q. Do you recall when that started?
23    A. We pitched it September of 2000 and it
24 went live October 1, I think it was, 2001 in beta,

1 live beta. Full production was late October.
2    Q. So it is in full production?
3    A. Oh, yes.
4    Q. Do you know what the investment is that
5 Hyatt has in that system?
6    A. I don't recall the final numbers on that.
7    MR. STEINBERG: I think that's all the
8 questions I have. Let me just check.
9    Okay. That's all I have. Thank you.
10    MS. GALLION: We'll take a short break and
11 we'll come back. I'll have five or ten minutes
12 and we'll be done.
13    (Recess taken: 2:43 p.m. - 2:56 p.m.)
14    REDIRECT EXAMINATION
15 BY MS. GALLION:
16    Q. I had noticed your deposition, sir, just
17 because I wanted to ask you a handful of questions.
18    Do you know the plaintiff in this case:
19 Mrs. Hildebrandt?
20    A. Yes.
21    Q. Do you know her from having worked with
22 her?
23    A. Yes.
24    Q. Was there ever a period of time when you

1 were in a position to evaluate her performance as an
2 employee of the national sales force?
3    A. Yes.
4    Q. Over what period of time did you have some
5 opportunity to form an opinion?
6    A. From late '95 to fall -- well, pretty much
7 through 2000, December of 2000.
8    Q. So is this an approximately five-year
9 period of time?
10    A. Thereabouts, yeah.
11    Q. What was the opinion that you formed of
12 Mrs. Hildebrandt's abilities and efforts in the
13 national sales force?
14    A. She was excellent.
15    Q. And did she report directly to you?
16    A. Yes.
17    Q. At any time during this period of time,
18 this approximately five-year period, did she ever
19 express any interest to you in any promotional
20 opportunities that were outside of the Cincinnati
21 area?
22    A. Not that I recall, no.
23    Q. Do you recall you yourself vacating the
24 position that you were in in the national sales

1 force in or about the fall of the year 2000?
2    A. Yes.
3    Q. What job were you in at that time and what
4 job did you move to?
5    A. I was director of the Chicago national
6 sales office and I moved to the director of sales
7 information systems.
8    Q. Does that mean that the director of
9 national sales office in Chicago job came open in
10 the fall of 2000?
11    A. Yes.
12    Q. Did you or someone else make that known to
13 Mrs. Hildebrandt?
14    A. We had a sales meeting and a conference
15 call at the point we agreed to tell everybody, which
16 was roughly September -- late September, early
17 October.
18    I remember it because it was hard to tell
19 everybody, but I knew I was going to be sharing the
20 jobs for a while, so it meant I was going to be
21 spending a couple days in the national sales office
22 and two or three days at the Oakbrook office,
23 totally separate locations, and it was going to mean
24 some communications challenges. But I couldn't just

**Page 46**

1 do that without telling people.

2    Q. Was she one of the people that you

3 communicated the news to?

4    A. Oh, yeah.

5    Q. Is there any doubt in your mind that she

6 knew you were going to be vacating the director of

7 national sales job?

8    A. Oh, no.

9    Q. Did she, even upon learning that you were

10 vacating the job in the fall of 2000, make known to

11 you in any way that she was interested in applying

12 for that job?

13    A. No.

14    Q. If she had, what would you have done, if

15 anything?

16    MR. STEINBERG: Objection to a

17 hypothetical question.

18    Q. You may answer.

19    A. I wasn't involved in the search for my

20 replacement, so it wouldn't have been germane.

21 There would have been another place to go to to make

22 that known.

23    Q. If someone had indicated an interest to

24 you, would you --

**Page 48**

1 grew to know her customer base, I had concerns about

2 the long-term viability of that limited geographical

3 territory.

4    And we undertook some searches, we had the

5 team in Omaha pull a number of records for us, we

6 had some binders we went through and I don't

7 remember all of them, but over time I spent a number

8 of hours going through those.

9    We passed them on to Barb. We made some

10 calls that I can remember. It was very difficult to

11 find customers that fit the national sales force

12 criteria in that geographical area.

13    Q. Did you work with her as you've just been

14 describing --

15    A. Yes.

16    Q. -- to try to locate additional

17 opportunities?

18    A. Oh, yes.

19    Q. Even at the time that you no longer

20 supervised her, let's just go to, say, the fall of

21 2000 at the time you were exiting that position to

22 your current position, did you continue to have some

23 concerns about the viability of a national sales

24 force presence in the person of Mrs. Hildebrandt in

**Page 47**

1    A. I would have passed it on, sure.

2    Q. But she did not?

3    A. No.

4    Q. What is your current age, sir?

5    A. 51.

6    Q. Have you ever observed, in your own view,

7 any kind of conduct in the national sales force and

8 anything pertaining to Mrs. Hildebrandt that

9 suggested to you unfairness either because of age or

10 gender?

11    A. No.

12    Q. Anything involving yourself that you ever

13 thought was unfair because of age or gender?

14    A. No.

15    Q. During the period of time, that

16 approximately five-year period that you described

17 when you managed her, did the two of you ever

18 discuss the dearth or lack of national sales quality

19 clients in her geographic area?

20    A. Yes.

21    Q. Just tell us very briefly what you

22 discussed and what plan of action that you had.

23    A. I don't remember the timing of it. It

24 wasn't right at the beginning, but over time as I

**Page 49**

1 that geographic area?

2    A. Yeah. The challenge of the number of

3 accounts hadn't changed at that point.

4    MS. GALLION: I don't have anything else.

5    Thank you, sir. Counsel may have a few.

6    MR. STEINBERG: Oh, I have a few.

7    (Recess taken: 3:01 p.m. - 3:04 p.m.)

8    RECROSS-EXAMINATION

9 BY MR. STEINBERG:

10    Q. Mr. Small, how long did Barb Loder

11 Hildebrandt work for you?

12    A. I think we said from roughly the late

13 summer, early fall of '95 through the end of 2000.

14    Q. And every year that she worked for you you

15 rated her, and when you weren't involved in this

16 litigation, you rated her as exceeding her

17 expectations?

18    A. Yes.

19    Q. And you knew she was an excellent person

20 in the national sales force?

21    A. Yes.

22    Q. Just as good as anyone; isn't that right?

23    A. Yes.

24    Q. And better than many in the central