LEXSEE 2002 U.S. Dist. LEXIS 23613

MAURICE A DONAHOO, Plaintiff, v. OHIO DEPARTMENT OF YOUTH SERVICES, Defendant.

CASE NO. 5:01CV1137

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

2002 U.S. Dist. LEXIS 23613

August 26, 2002, Decided

**DISPOSITION:**
[*1] Defendant's motion for summary judgment GRANTED, and Plaintiff's Title VII failure to promote and retaliation claims dismissed with prejudice, and Plaintiff's state law claims dismissed without prejudice. JUDGMENT granted in favor of Defendant.

**COUNSEL:**
For Maurice A. Donahoo, Plaintiff: F. Benjamin Riek, III, Riek & Associates, Cleveland, OH.

For Ohio Dept. of Youth Services, Defendant: Michael C. McPhillips, Robert L. Griffin, Office of the Attorney General, Columbus, OH.

**JUDGES:**
GEORGE J. LIMBERT n1, United States Magistrate Judge.

n1 On June 20, 2001, the parties consented to the jurisdiction of the undersigned in their joint report of parties planning meeting, and the following day the instant case was transferred to the docket of the undersigned. See ECF Dkt. # 7,8.

**OPINIONBY:**
GEORGE J. LIMBERT

**OPINION:**

MEMORANDUM OPINION AND ORDER

The instant case came before this Court on Defendant Ohio Department of Youth Services' (ODYS) Motion for Summary Judgment. See Electronic Court Filing (hereinafter "ECF") Dkt. # 33. Plaintiff Maurice Donahoo (Plaintiff) filed an opposition memorandum and Defendant replied. See ECF Dkt. # # 39, 56. For the following reasons, the Court [*2] GRANTS Defendant ODYS' Motion for Summary Judgment on all of the claims contained in Plaintiff's amended complaint. See ECF Dkt. # 33.

I. FACTUAL BACKGROUND

Defendant ODYS, an agency of the State of Ohio, operates the Indian River Juvenile Correctional Facility, formerly Indian River School (IRS), a facility in Massillon, Ohio for the rehabilitation of youth. See ECF Dkt. # # 17, 19 at P 2. Plaintiff, an African American, has been employed for more than twenty years at IRS, and continues to work at IRS. See ECF Dkt. # 31, Donahoo Deposition at 11-12.

A. **Plaintiff's Experience and Reviews as a Unit Administrator**

In May 1994, Plaintiff received his most recent promotion to Unit Administrator (UA), and he served a six month probationary period. See ECF Dkt. # 31, Donahoo Deposition at 81-85. Until IRS reorganized in the Spring of 2000, Plaintiff reported directly to the Deputy Superintendent for Direct Services (Deputy Direct) at IRS. See id. at 20. Besides Deputy Direct, IRS had two other Deputy Superintendent positions: Deputy Superintendent of Indirect Services (Deputy Indirect) and Deputy Superintendent of Programs (Deputy Programs). See [*3] ECF Dkt. # 33 at n.2.

Subsequent to Plaintiff's promotion to a UA position at IRS in July 1994, all of his supervisors rated his work performance as average to below average. See ECF Dkt. # 31, exhibits H-M. ODYS evaluated Plaintiff on a State



of Ohio form which listed eight categories, followed by a supervisor's determination whether Plaintiff "far exceeds," "exceeds," "meets," "partially meets," or "does not meet" expectations. *See id.* When Plaintiff first became a UA, his supervisor was Deputy Direct Robert Maier. *See id.* Deputy Direct Maier reported to Linda Bess, IRS's Superintendent and an African-American. *See* ECF Dkt. # 31, Donahoo Deposition at 80-81. Deputy Direct Maier prepared Plaintiff's final probationary evaluation in March 1995, finding that Plaintiff met job expectations in seven of eight categories, and partially met expectations in "Job Knowledge." *See id.,* and exhibit M. Deputy Direct Maier noted that Plaintiff had a lot to learn in his duties as an investigator. *See id.*

In May 1995, ODYS transferred Deputy Direct Maier to a position outside IRS. *See* ECF Dkt. # 33 at 2. For 12 months, the Deputy Direct position at IRS stood vacant, [*4] and Plaintiff reported directly to Superintendent Bess. *See* ECF Dkt. # 31, Donahoo Deposition at 23-24. Superintendent Bess completed Plaintiff's first annual evaluation as a UA. *See id.* at 80-81, *and* exhibit L. Superintendent Bess rated Plaintiff worse than Deputy Direct Maier had, stating Plaintiff only "partially" met expectations in five of the eight categories, and met expectations in three of eight categories. See id. n2

> n2 In the Fall of 1994, Plaintiff stated that he applied for a posted Deputy Direct position at IRS. Plaintiff does not have a copy of the application and IRS's personnel office had no record of it. *See* ECF Dkt. # 31, Donahoo Deposition at 35-38, 127-128, Watt Deposition at 68-69, *and* exhibit A at 7, *and* exhibit B at 3. Given that Plaintiff began his employment as a UA at IRS in May 1994, and that he does not recall the month he allegedly applied for the Deputy Direct vacancy at IRS in the Fall of 1994, it is unclear whether Plaintiff had completed his six-month probationary period as a UA prior to his alleged application for the Deputy Direct vacancy. *See id.* Plaintiff's alleged application for the Deputy Direct vacancy in the Fall of 1994 would have taken place prior to him receiving his final probationary evaluation for his UA position in March 1995. *See id.,* Donahoo Deposition 81-85, exhibit M.

[*5]

Carol Trowbridge filled the Deputy Direct position at IRS in May 1996, and served in that capacity until the Fall of 1997. *See* ECF Dkt. # 31, Trowbridge Deposition at 21, *and* Donahoo Deposition at 24-26. Deputy Direct Trowbridge evaluated Plaintiff twice. *See id.,* exhibits K and J. Deputy Direct Trowbridge stated that her management style drove her to "always try to find something of an employee that exceeds" expectations. *See* ECF Dkt. # 31, Trowbridge Deposition at 50. However, in a September 1996 evaluation, Deputy Direct Trowbridge found that Plaintiff only "partially" met expectations in "Planning, Scheduling, and Prioritizing," and that she needed to address some problems with Plaintiff. *See id.* Specifically, Deputy Direct Trowbridge noted that Plaintiff overly accommodated other people's schedules, which caused investigations to drag out. *See id.,* Trowbridge Deposition at 47-48, Donahoo Deposition at 77-78, *and* exhibit K. In October 1997, Deputy Direct Trowbridge found Plaintiff met expectations for all categories, meaning he "basically performed [his] job but didn't do anything particularly outstanding or anything unusual." *See id.,* Trowbridge [*6] Deposition at 49, Donahoo Deposition at 76-77, *and* exhibit J.

Deputy Direct Trowbridge received a promotion to a superintendent position at another ODYS facility. *See* ECF Dkt. # 31, Trowbridge Deposition at 21. Lee Williams then filled the Deputy Direct position at IRS upon Trowbridge's departure. *See id.,* Donahoo Deposition at 26. ODYS has no record of Plaintiff applying for the vacant Deputy Direct position created by Trowbridge's promotion. *See* ECF Dkt. # 31, exhibit B. Deputy Direct Lee Williams formally evaluated Plaintiff twice, in February 1999 and August 1999. *See* ECF Dkt. # 31, Donahoo Deposition, *and* exhibits H, I. In both instances, Deputy Direct Lee Williams concluded that Donahoo met job expectations in all categories, but did not exceed them. *See id.* For the 1998-99 year, Deputy Direct Lee Williams noted that Plaintiff was not viewed as proactive, waited to be told what to do, needed to act on issues precisely and efficiently, and needed to remain open minded on the job and think "outside the box." *See* ECF Dkt. # 31, Donahoo Deposition at 63-71, Ames Deposition at 22-23, *and* exhibit H.

In 1998, IRS Superintendent Bess was transferred [*7] to ODYS Central Office in Columbus (Central Office) and Conrad Ames was appointed to replace her. *See* ECF Dkt. # 33 at 4. Superintendent Ames was promoted from his prior position as Deputy Indirect at IRS, where he served for five years. *See infra.* While Superintendent Ames was Deputy Indirect at IRS, then Superintendent Bess twice recommended that Ames apply for Deputy Direct vacancies, but Ames declined. *See* ECF Dkt. # 31, Ames Deposition at 11-12, 35, 39-40. Superintendent Ames strongly recommended that Johnetta Williams, an African-American female, replace him as Deputy Indirect at IRS. *See id.* at 42-44.

Superintendent Ames remembered the excellent job Johnetta Williams had done years earlier in IRS's business office. *See id.* Johnetta Williams was the only candidate interviewed and was selected. *See id.* ODYS has no record of Plaintiff applying for the Deputy Indirect vacancy upon Ames' promotion to Superintendent at IRS. *See* ECF Dkt. # 31, exhibit B.

### B. The February 2000 Deputy Direct Vacancy at IRS

Deputy Direct Lee Williams was demoted from Deputy Direct at IRS to a position outside IRS in early 2000. *See* ECF Dkt. # 31, exhibit C, *and* [*8] ECF Dkt. # 1. A couple of days after Lee Williams' departure, Superintendent Ames informed Plaintiff about it. *See* ECF Dkt. # 31, Donahoo Deposition at 89-95. Plaintiff admitted he was aware of the Deputy Direct vacancy following Lee Williams departure, even though it was not formally posted. *See id.* Plaintiff knew that in the past some IRS Deputy Superintendent positions had been filled without being formally posted, while another Deputy position was posted and then filled. *See id., and infra.* Plaintiff acknowledged that ODYS policy requiring classified civil service positions to be posted was not applicable to Deputy Superintendent positions because those positions were unclassified and served at the discretion of the Director of ODYS. *See* ECF Dkt. # 31, Donahoo Deposition at 113-117, exhibit S.

Plaintiff explained that he failed to ask anyone about the procedure to express interest in a Deputy Superintendent position that was not posted. *See* ECF Dkt. # 31, Donahoo Deposition at 247-48. Plaintiff also did not inform Superintendent Ames that he was interested in the 2000 Deputy Direct vacancy or any other Deputy Superintendent position. *See id.,* Ames Deposition [*9] at 79. Plaintiff further did not inform anyone in ODYS's Central Office that he wanted to be considered. *See id.,* Donahoo Deposition at 95-96. Prior to February 2000, only one UA at IRS, Sue Schaad, a Caucasian female, informed Superintendent Ames that she was interested in being a Deputy Superintendent. *See id.,* Ames Deposition at 81. Per Superintendent Ames' instructions, Schaad gave him an application and resume and he forwarded it to ODYS's Central Office.

### C. Characteristics of Unclassified Deputy Superintendent Positions

ODYS employees who have received promotions have commented that if an employee is interested in an unclassified position that is not posted, such as a Deputy Superintendent position at an ODYS' youth facility, they should, "Let somebody know that you're interested in the position." ECF Dkt. # 31, Barnett Deposition at 59. Additionally, "... everybody who works in the facility and outside the facility are very aware of when a deputy has left a position or when a position is vacant." *Id.* Former Deputy Direct Trowbridge at IRS stated, "Most deputy superintendent positions and superintendent positions are fairly common knowledge throughout the [*10] institutions .... I think most people would know they would apply for a Deputy Superintendent position through the Superintendent and a Superintendent through Central Office. It's not too hard to figure out." *Id.,* Trowbridge Deposition at 39-40. ODYS also emphasized that its unclassified positions in general, and Deputy Superintendent positions in particular, were short-term and transient. n3

---

n3 ODYS cited the following examples. Dion Norman left IRS to become a Deputy Superintendent at Buckeye Youth Center, and later became Superintendent at Scioto/ Riverview JCF. *See* ECF Dkt. # 31, Donahoo Deposition at 145-46, *and* ECF Dkt. # 33, exhibit A P2(y). Jim Greek's career advancement took him through seven ODYS' locations: from IRS to the ODYS Staff Training Academy to Buckeye Youth Center; then on to Circleville Juvenile Correctional Facility (JCF), followed by the Training Institute of Central Ohio (TICO), before being reassigned to Marion JCF, then Central Office, and eventually Maumee JCF. *See* ECF Dkt. # 31, Greek Deposition at 9-13. Carol Trowbridge was promoted from IRS to Freedom Center. *See id.,* Trowbridge Deposition at 22-23. Norm Hills was reassigned from Superintendent at IRS to Marion JCF after eleven months. *See id.,* Hills Deposition at 7-8. Ralph Coyle was moved from Ohio River Valley JCF to temporary duty as IRS Superintendent. *See id.,* Ames Deposition at 69. James Hieneman transferred from Superintendent at Ohio River JCF to Central Office. *See id.,* Hieneman Deposition at 24-25. Clifton Fouty was transferred from Scioto JCF to Circleville JCF; and later terminated. *See id.,* Hieneman Deposition at 63-64, 71-72. James Buccigross was removed from IRS Deputy Superintendent Program and transferred. *See id.,* Watt Deposition at 35-40. Paul Warye was transferred from Cuyahoga Hills JCF to IRS to become Superintendent. *See id.,* Watt Deposition at 64. Lee Williams was relocated from Cuyahoga Hills JCF to IRS to become deputy superintendent, then moved to Mohican JCF. *See id.,* Watt Deposition at 47-49. Ames was transferred from IRS to Mohican JCF to replace Mohican's Superintendent who was transferred to TICO. *See id.,* Ames Deposition at 68-69.

[*11]

Plaintiff's current supervisor, E.C. Bradley, explained that a classified civil service employee in middle management might not necessarily be interested in the risks inherent in unclassified positions:

I wasn't quite sure if I wanted one of those positions then or even now .... Today I'm working in Massillon. Tomorrow they can tell me to go work in Toledo. I'm not real happy about that. I own a home, and I'm not ready to just pick up and just move.

ECF Dkt. # 31, Bradley Deposition 54-56. ODYS explained that appointments to unclassified positions, such as Deputy Superintendent positions at IRS, are made at the discretion of the appointing authority, the director of ODYS, and serve at the director's pleasure and are non-tenured. *See* ECF Dkt. # 33 at 7(citing Ohio Adm. Code § 123:1-47-01(87), and Ohio Rev. Code § 5139.02 (A), (B)). Due to the transitory nature of the unclassified positions at ODYS, Rick Watt, the IRS personnel officer, explained that ODYS customarily did not post openings for unclassified positions. *See* ECF Dkt. # 31, Watt Deposition at 45-56. In his six years in the personnel department, Watt could only recall a couple instances when a Deputy [*12] Superintendent position at any of the eleven ODYS facilities has been posted at IRS. *See id.* Watt also stated that ODYS did not post the vacancy created by Deputy Direct Lee Williams' departure at IRS. *See id.*

D. ODYS' Management Structure, Hiring Practices, Mission, and Needs

Deputy superintendents at ODYS institutions report to the institution Superintendent. *See* ECF Dkt. # 31, Hieneman Deposition at 34-37. Institution Superintendents report to Bureau Chief of Institutions. *See id.* The Bureau Chief of Institutions reports to the Deputy Director of Corrections, and the Deputy Director of Corrections reports to the ODYS Director, who was appointed by the Governor. *See id.* Jim Hieneman was the Deputy Director of Corrections during the first part of 2000, and Geno Natalucci-Persichetti has been ODYS Director since 1988. *See id.*

When filling unclassified positions at institutions, the ODYS Director considers the overall mission of the Department and the perceived needs of the institution in question. *See* ECF Dkt. # 33, exhibit B at No. 14. ODYS Director Geno Natalucci-Persichetti has appointed over thirty African American men and women to unclassified [*13] positions within ODYS during the past 14 years, including 21 deputy superintendents and 9 superintendents. *See id.*, exhibit A at P2 (a)-(ff).

Shortly after he became ODYS Deputy Director of Corrections in 1999, Deputy Director Hieneman, who served most of his career with the Ohio Department of Rehabilitation and Correction (ODRC), asked Norm Hills, then an ODRC regional director, to refer potential candidates from the adult prison system for ODYS Deputy Superintendent positions. *See* ECF Dkt. # 31, Hills Deposition at 15-20, *and* Hieneman Deposition at 39-41. Norm Hills understood Deputy Director Hieneman to be looking for "strong leadership candidates with solid correctional backgrounds, experienced folks ... Someone who knew policies, procedures, could manage a correctional setting, provide sound security, good programming, fundamentally knew the principles of how to manage a correctional facility." *Id.*, Hills Deposition at 15-20. Accordingly, Norm Hills gave Deputy Director Hieneman several names. *See id.* Deputy Director Hieneman and Don Feldkamp, ODYS's Bureau Chief for Institutions, also sought referrals from other experienced professionals they knew from their [*14] experiences at ODYS and ODRC. *See id.*, Hieneman Deposition at 39-41.

ODYS Director Natalucci-Persichetti had made institutional security a top priority at IRS, in part because of a recent escape. *See* ECF Dkt. # 31, Hieneman Deposition at 45-47. He determined that Superintendents or Deputy Superintendents at each ODYS institution should have training in Incident Command System (ICS). *See id.* ICS is a command structure used to manage critical incidents such as escapes, riots, serious fights, and natural disasters. *See id.*, Ames Deposition at 56. In the late 1990s, ODYS was beginning to train its management staff in ICS, and had piloted ICS at Ohio River Valley JCF when Deputy Director Hieneman was Ohio River Valley JCF superintendent. *See id.*, Hieneman Deposition at 67-69. At Ohio River Valley JCF, Deputy Director Hieneman had his deputy superintendents, duty officers, and unit administrators trained in ICS. *See id.*, Hieneman Deposition at 71.

The ICS system was firmly in place in Ohio's adult prison system, but only elementary levels of training had been offered by ODYS's other institutions. *See* ECF Dkt. # 31, Hieneman Deposition at 67-69. Deputy Director [*15] Hieneman initially sought applicants for Deputy Superintendent positions with strong security backgrounds and ICS experience from ODRC. *See id.*, Hills Deposition at 15-20. The Deputy Direct was in charge of security for IRS, including security in the incarcerated youths' living units. *See id.*, Donahoo Deposition at 86-87.

E. Jerry McCall Promotion to the February 2000 Deputy Direct IRS Vacancy

During late 1999 and early 2000, vacancies for Deputy Direct positions arose at three ODYS facilities: IRS, Marion JCF, and Riverview JCF. *See* ECF Dkt. # 33 at 9. Bureau Chief Feldkamp asked IRS Superintendent Ames if he could recommend any internal candidate at IRS and IRS Superintendent Ames said he could not. *See* ECF Dkt. # 31, Hieneman Deposition at 47-48. IRS Superintendent Ames learned that Bureau Chief Feldkamp had a list of prospective candidates. *See id.,* Ames Deposition at 46-47. An interviewing committee was established, comprised of Bureau Chief Feldkamp and the superintendents of each facility -- Conrad Ames (IRS), James Greek (Marion), and Melinda Posey (Riverview). The interviewers were provided with a list of candidates and their resumes and/or applications. [*16] Five candidates, all of whom were then employed by ODRC, were interviewed: Allen Mason (African American), Todd Ishee (Caucasian), Cliff Fouty (Caucasian), Larry Newman (Caucasian), and William Gilliland (Caucasian). *See id.,* Ames Deposition at 49-50, and Greek Deposition at 20-23, 26-29.

After the interviews, Riverview Superintendent Posey, who is African-American, recommended Fouty for the Riverview Deputy Direct post. *See* ECF Dkt. # 33 at 9. Superintendent Ames initially recommended Ishee for the IRS Deputy Direct vacancy, but Ishee declined. *See* ECF Dkt. # 31, Ames Deposition at 52. Superintendent Ames subsequently told Bureau Chief Feldkamp that he was not interested in any other interviewee. *See id.*

Marion Superintendent Greek initially recommended Mason. However, Mason's background check determined that he had falsified his educational credentials while employed by ODRC. *See* ECF Dkt. # 31, Hieneman Deposition at 61-63, and Greek Deposition at 28-30. Marion Superintendent Greek then chose Keith Saunders, with whom he had worked at TICO, for Deputy Direct at Marion. Saunders, an African-American, received the appointment at Marion. *See id.,* Greek Deposition [*17] at 38.

Jerry McCall found out about Deputy Direct openings at ODYS from Ralph Coyle, who was then superintendent of ODYS's Ohio River JCF. Superintendent Coyle had transferred to ODYS after a long career at ODRC, where he had been warden of two different adult prisons, and also started the adult correctional boot camp at Southeastern Correctional Institution in Lancaster. *See* ECF Dkt. # 31, Hieneman Deposition at 78-79.

McCall sent a resume to Ohio River Superintendent Coyle who forwarded it to ODYS Central Office. *See* ECF Dkt. # 31, McCall Deposition at 12-17. Bureau Chief Feldkamp met informally with McCall for about 45 minutes, found him to be a "really viable candidate," and set up a meeting between McCall and Ames. *See id.,* Hieneman Deposition at 57, and McCall Deposition at 14-16. Thereafter, IRS Superintendent Ames gave McCall a four-hour tour of IRS, wherein they discussed McCall's security and ICS experience. *See id.,* McCall Deposition at 16-17. IRS Superintendent Ames told Bureau Chief Feldkamp that he believed McCall would be a "good fit" for IRS. *See id.,* Ames Deposition at 53, *and* Hieneman Deposition at 57.

McCall, who is Caucasian, had been [*18] employed at ODRC for more than 18 years. In his last position McCall had been the assistant shift commander at a correctional boot camp at Southeastern Correctional Institution in Lancaster. *See* ECF Dkt. # 31, Hieneman Deposition at 58-59, exhibit 12. McCall had several levels of ICS training offered by ODRC, including a basic course, an advanced scenario, a writing course, and section chief training. *See id.,* McCall Deposition at 18-20. At Southeastern Correctional Institution in Lancaster, McCall had been involved in three actual situations in which he used ICS, and four or five full-scale mock scenarios using ICS. *See id.* IRS Superintendent Ames was interested in McCall's ICS background because ODYS was planning to implement the ICS system. *See id.,* McCall Deposition at 17-19. At IRS only an elementary training course in ICS had been given, though the plan at the time was to develop ICS training that mirrored ODRC. *See id.,* Hills Deposition at 45-47. As of February 2000, only one IRS employee, Judy Fry, had extensive ICS training. *See id.,* Ames Deposition at 47. McCall was offered the Deputy Direct position at IRS in February 2000. *See* ECF Dkt. # 31, [*19] McCall Deposition at 6-7, 21. At the time McCall was appointed Deputy Direct at IRS, he supervised the following UAs: Plaintiff Maurice Donahoo, Emmanuel "E.C." Bradley and Kirk Braithwaite, all African-American; and Sue Schaad and Judy Fry, both Caucasian. *See id.,* Donahoo Deposition at 128-29, *and* McCall Deposition at 22.

After McCall's appointment, Plaintiff believed he was denied the Deputy Direct position at IRS on the basis of his race. *See* ECF Dkt. # 31, Donahoo Tr. 53-56. Plaintiff believed his experience and performance as a Unit Manager and UA qualified him for the Deputy Direct position at IRS. *See id.* at 56-63. On March 20, 2000, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that IRS discriminated against him on the basis of his race when McCall was selected for Deputy Direct. *See* ECF Dkt. # 31, Donahoo Deposition at 31-32, exhibit C. Plaintiff did not notify the EEOC that he considered McCall's hiring as a Deputy Direct to be a continuing violation. *See id.*

On the EEOC form for designating the date the discrimination took place, Plaintiff put down 2/15/00 as the earliest and latest dates of discrimination, [*20] and did not check the continuing action box. See id. n4

> n4 Other than the promotion at issue in this lawsuit, Plaintiff points to one other instance in which he believes he was mistreated on the basis of his race. Plaintiff maintains this other instance occurred around 1995 or 1996, when UA Fry, whom Donahoo viewed as not competent, was reassigned to better job duties and a better schedule. See ECF Dkt. # 31, Donahoo Tr. 49-53. Plaintiff, however, did not make any formal complaint of race discrimination in this other instance.

**F. Reorganization and the Promotion of E.C. Bradley**

In April 2000, there were several administrative changes at IRS. Superintendent Ames was demoted to Superintendent at another ODYS facility. See ECF Dkt. # 31, Ames Deposition at 21. Following Ames' move, Ohio River JCF Superintendent Coyle and Deputy Direct McCall briefly served temporary assignments as acting IRS Superintendent. Norm Hills was appointed permanent Superintendent of IRS in June 2000. See id., Hieneman [*21] Deposition at 79-80, 104, and Hills Deposition at 8.

In an unrelated move, UAs were reclassified as Operations Managers ("OMs"). See ECF Dkt. # 31, Donahoo Deposition at 21-22, and Watts Deposition at 103, Ex. 10. Plaintiff's rate of pay or benefits did not change as a result of his job reclassification. See id., Donahoo Deposition at 137-41. Upon the recommendations of Superintendent Ames and Deputy Direct McCall, E.C. Bradley, an African-American who held a comparable OM position to Plaintiff at IRS, was promoted to a new position, Operations Administrator ("OA"). See id., Bradley at 97-101, and Donahoo at 15-16, 137-41. Plaintiff and other OMs at IRS began reporting directly to OA Bradley, who in turn reported to Deputy Direct McCall. From the date of his lateral transfer in April 2000, Plaintiff was not been demoted, suspended, fined, or experienced a reduction in pay or duties. See id., Donahoo Deposition 214.

Three Caucasians, Judy Fry, Susan Schaad, and Ed Glennon, and two other African-Americans, Asie Singleton and Ray Gray interviewed for the OA position at IRS. See ECF Dkt. # 31, McCall Deposition at 40, Ex. 28. Deputy Direct McCall chose [*22] Bradley because of his dedication to IRS, work ethic, and good interview. Employees, though, objected to Bradley's appointment because of his past disciplinary history and his low score on a qualification test. Nothwithstanding, at the urging of Superintendent Ames and Deputy Direct McCall, Bradley was promoted from a OM to an OA at IRS. See id., McCall Deposition at 22-25. IRS restructured from a "unit" to an "operations" structure in order to streamline the chain of command. Under unit management, there was "no clear-cut line of authority as to who was going to manage a critical incident or take charge ...." Id., Hieneman Deposition at 51. The newly developed operations system at IRS was similar to the command structure Deputy Director Hieneman had worked under at ODRC. See id., Hieneman Deposition at 47-51.

**G. Plaintiff's Return from Leave**

**1. Double Shifts**

From September 2000 through mid-December 2000, Plaintiff went on short-term disability leave for stress. See ECF Dkt. # 31, Watt Deposition at 90, and Hills Deposition at 47-48. Plaintiff returned to work on December 15, 2000. See id., Donahoo Deposition at 17-18, 174-78. On or after December 28, 2000, Plaintiff [*23] submitted a note from his therapist, Barbara McHenry, which stated:

> This memo is to inform you that the above mentioned Maurice Donahoo will be returning to work ... at full capacity. Mr. Donahoo is still in therapy for stress related issues and it is recommended at this time that he not be required to work double shifts. If this is a problem and you must talk with me please feel free to call me. My number can be found at the top of this page. Our goal is to keep Mr. Donahoo working & in good health and I believe he is incapable of doing that now if he is required to work double shifts. Thank you.

Id., Donahoo Deposition at 154-59, and exhibit V. While the note does recommend that Plaintiff not be required to work double or 16 hour shifts, it does not state that Plaintiff had any substantially limiting disability. IRS Superintendent Hills interpreted the note as meaning that Plaintiff could work his regularly scheduled times. See id., Hills Deposition at 52. Plaintiff's therapist also did not state that Plaintiff work any particular shift. See id., Donahoo Deposition at 154-59, and exhibit V. After this letter, Plaintiff's therapist provided no additional [*24] material to ODYS or IRS regarding Plaintiff. See id., Donahoo Deposition at 167-168. ODYS or IRS did not communicate with Plaintiff's therapist because Plaintiff never gave ODYS a release authorizing them to discuss Plaintiff's condition with the therapist. See id., Barnett Deposition at 73-74.

On January 23, 2001, Plaintiff filed a second charge with EEOC. *See* ECF Dkt. # 31, exhibit D. Plaintiff stated that between December 28, 2000 and January 14, 2001, IRS retaliated against him for filing the previous March 2000 EEOC charge. *See id.* Plaintiff maintained that the alleged retaliation took the form of having to work double shifts contrary to his therapist's recommendation and having his shift changed. *See id.* Specifically, Plaintiff stated under oath that his therapist's request that he not be assigned double shifts was "ignored," and he added that "I have been assigned to work 16 hours on several occasions." *Id.* Plaintiff also complained that on January 14, 2001, he had been switched to the 2:00 PM to 10:00 PM shift, from the 10 PM to 6 AM shift, and he had been "under the assumption that I would have been placed on the night shift upon my return from medical [*25] leave." *Id.* Like his first EEOC charge of discrimination, Plaintiff did not allege a continuing violation, but he did assert that the retaliation took place between December 28, 2000 and January 14, 2001. *See id.* Plaintiff's time sheet, a punch detail report, revealed that Plaintiff only worked one day in excess of eight and one half hours in the alleged retaliatory time period of December 28, 2000 and January 14, 2000. *See* ECF Dkt. # 31, exhibit W at 1-2.

After the Plaintiff's second EEOC charge was filed, Plaintiff's immediate supervisor, OA Bradley took the therapist's letter to his superiors, Deputy Direct McCall and Superintendent Hills. *See* ECF Dkt. # 31, McCall Deposition at 32. Superintendent Hills understood the therapist's request to mean that Plaintiff could not work 16 consecutive hours. *See id.*, Hills Deposition at 49. Given that the new operations structure instituted at IRS with the promotion of OA Bradley required that an OM be on duty 24 hours per day, seven days per week, Superintendent Hills told OA Bradley that he could not guarantee that Plaintiff would not be given double shifts. *See id.*, Bradley Deposition 67-71. Nonetheless, OA Bradley [*26] tried to limit Plaintiff's work schedule, noting that, "I would do what I could do to make sure to try to get [him] out of there as quick as I could, which was the same thing I was doing for everybody." *Id.* at 73-74.

ODYS' EEO office was without a permanent manager from the resignation of Jacquilla Bass in September 2000, until the appointment of Jason Barnett in March 2001. When Barnett assumed the position, he inherited a backlog of active cases, including Plaintiff's second EEOC charge. *See* ECF Dkt. # 31, exhibit C at P 2. Barnett promptly contacted IRS in an attempt to locate the therapist's note referred to in Plaintiff's retaliation charge. *See id.* Barnett inquired whether Plaintiff had completed an ADA accommodation form, and learned that he had not. *See id.* Barnett urged IRS officials to have Plaintiff complete an accommodation form. *See id.*, Barnett Deposition at 48-51. Accordingly, OA Bradley asked Plaintiff to complete an accommodation form, but Plaintiff refused. *See id.*, Bradley Deposition at 73-74, *and* Donahoo Deposition at 181-82. n5

> n5 OM Bradley and Deputy Direct McCall were not aware of any ODYS policy regarding reasonable accommodations under the Americans with Disabilities Act. *See* ECF Dkt. # 31, McCall Deposition at 34. OM Bradley admitted he was also unaware that IRS could apply for a 90 day transitional back to work program for non-disabling impairments, until another OM at IRS participated in such program in 2001. *See id.*, Bradley Deposition at 71-72.

[*27]

Barnett stated that his recommendation that an accommodation form be provided to Plaintiff was based upon Plaintiff's recent EEOC retaliation charge which requested an accommodation, rather than Plaintiff's therapist note regarding double shifts. *See* ECF Dkt. # 31, Barnett Deposition at 60-63. Barnett explained that Plaintiff's note from his therapist regarding double shifts "would not initially tell somebody that they should do reasonable accommodation." *Id.* Barnett further opined that not every employee's doctor note suggests that he or she is seeking an ADA accommodation, and that pursuant to ODYS process and policy it is an employee's responsibility to let ODYS know that he or she is disabled and in need of an accommodation. *See id.*

Personnel Officer Watt stated that an IRS employee who wants to seek a reasonable accommodation form will generally "come to me and ask for one." ECF Dkt. # 31, Watt Deposition at 94. In the end, Donahoo did not seek a reasonable accommodation directly with IRS's personnel office. *See id.*, Donahoo Deposition at 26-28. Officials at ODYS did not realize that Plaintiff was requesting an accommodation regarding double shifts until he filed [*28] his retaliation charge with EEOC on January 23, 2001. *See id.*, Barnett Deposition at 60-63.

During April 2001, Plaintiff testified in Columbus, Ohio, in a coworker's discrimination proceeding. Barnett approached Plaintiff after the hearing and tried to convince Plaintiff to complete an accommodation form. *See* ECF Dkt. # 31, Barnett Deposition at 51-54. Plaintiff declined, telling Barnett he was "about four months too late." *See id.*, Donahoo Deposition at 180. Plaintiff looked back on the discussion he had with Barnett during the EEOC investigation, and stated, "I responded telling Mr. Barnett that the request was made four months ago,

and now the issue of me filing retaliation charges, now my request is being given consideration. I stated to Mr. Barnett that I will not sign the accommodation document because it could aid in voiding my retaliation charges." *Id.* at 208-209. Barnett stated, "We made immediate attempts to get him in to address his doctor's note .... He didn't give us a chance to work with his doctor because he didn't fill out the release form which would give us an idea if he was a candidate for the program." *Id.*, Barnett Deposition at 73-74.

ODYS [*29] pointed out, that in spite of Plaintiff's failure to request a formal accommodation with IRS, Plaintiff nevertheless did not work a double shift until June 1, 2001 -- more than five months after the therapist's letter was issued. *See* ECF Dkt. # 31, Donahoo Deposition at 159-161, and exhibit W at 1-11. This was the only double shift Donahoo worked during the first six months of 2001. *See id.* In contrast, during the same six month time period, OM Braithwaite worked 17 double shifts, OM Vernon Bedell worked 12 double shifts, and OMs Ralph Coyle and Diane Barboza each worked three 16-hour shifts. *See id.*, exhibit D at P 6.

Also, during the six month time period following his therapist's note, Plaintiff worked significantly fewer hours on average than the other OMs at IRS, and infrequently worked more than nine hours a day. *See* ECF Dkt. # 31, exhibit D, and exhibit W. Plaintiff averaged fewer hours of work per pay period than any OM except for OM Schaad, who took nearly eight weeks approved leave during that period. *See id.*

### 2. Shift Assignments.

ODYS' Central Office required that IRS always have at least one OM on duty throughout the day and night. *See* ECF [*30] Dkt. # 31, Donahoo Deposition at 185-86, *and* Ex. DD. IRS nepotism rules also prohibited certain OMs from working shifts on which relatives worked. *See id.* OA Bradley, recognizing these constrictions, stated that he tried to grant Plaintiff's specific shift requests when feasible. *See id.*, Bradley Deposition at 62-67, 88-91, exhibit 17 at P 2. When the operations structure started in the spring of 2000, OA Bradley granted Plaintiff's request, for family reasons, to be placed on first shift. *See id.* Shortly thereafter another OM's promotion created a vacancy on third shift, 10:00 PM to 6:00 AM. *See id.* Third shift was temporarily filled while IRS awaited Central Office approval to permanently staff it. *See id.* Around the same time approval was received for permanent staffing in December 2000, Ralph Coyle was hired as an OM, and Plaintiff returned from his three month stress leave. *See id.* ODYS standard practice at IRS was to place the newest OM on third shift, and OA Bradley did not deviate from this policy, and thus assigned Coyle to third shift rather than Plaintiff. *See id.*

### 3. Overtime Pay for Roll Call.

In April 2001, second shift for IRS OMs [*31] began at 2:00 PM and ended at 10:00 PM. OMs, however, were required to be at roll call, which began at approximately 1:45 PM. OMs at IRS, including Plaintiff, had not been paid overtime for roll call. ODYS viewed this as part of an OM's management responsibilities. *See* ECF Dkt. # 33, exhibits E and F.

From mid-January 2001 through mid-April 2001, Plaintiff clocked in to work within a few minutes before or after 1:45 PM. *See* ECF Dkt. # 31, exhibit W at 2-7. Nothing indicated that Plaintiff requested overtime for roll call during this period. However, after he filed his retaliation charge, Plaintiff did request overtime for roll call for April 12, 13, 14, 17, and 18 of 2001. *See id.*, Donahoo Deposition at 200-04, *and* exhibit Y. All of the requests were denied. *See id.*, Bradley Deposition at 77-78.

Prior to this denial, Plaintiff had worked overtime for roll call pay without receiving overtime pay and without requesting it. *See* ECF Dkt. # 33, exhibits E and F. Plaintiff stated he was unaware of any OM, temporary or permanent, who received overtime pay for roll call prior to their shift during any period from March 2000 (when the Operations series began) through [*32] April 2001. *See id.*

### 4. Operations Managers' Performance Evaluations.

OA Bradley stated that he did not have time to complete Plaintiff's performance evaluation which was due in September 2000. *See* ECF Dkt. # 31, Bradley Deposition at 15. In fact, McCall frequently reminded Bradley of his need to complete evaluations. *See id.* at 27. The IRS Superintendent received a list of tardy evaluations on a monthly basis. He reviewed the list and notified the deputy superintendents whose area they fell under. *See id.*, Hills Deposition at 13-14. The list for September 26, 2001 indicates that all of Bradley's evaluations of OMs were overdue. *See* ECF Dkt. # 33, exhibit D at P 7.

## II. PLEADINGS AND PROCEDURE

On August 28, 2001, Plaintiff, an African-American, filed an amended complaint against a sole Defendant, ODYS. *See* ECF Dkt. # 17. In his amended complaint, Plaintiff averred that he has been employed by ODYS in various positions at IRS for over twenty-three years. *See* ECF Dkt. # 17 at 2. Plaintiff stated that he worked as a Unit Administrator at IRS when the events giving rise to

his claims occurred. *See id.* Plaintiff explained that a Deputy Superintendent [*33] position at Indian River School became available in early 2000, and this position is the next position in a normal line of upward progression within ODYS. *See id.* at 3. Plaintiff further stated that a white male, Jerry McCall, received the open Deputy Superintendent position at IRS in February 2000. *See id.*

Plaintiff alleged that over his career, he had applied for numerous Deputy Superintendent openings at IRS, with the most recent opening coming in early 2000. *See* ECF Dkt. # 17 at 3. Plaintiff averred that all of the successful applicants for the Deputy Superintendent openings at IRS were Caucasian, including the most recent applicant, Jerry McCall. *See id.* Plaintiff contended that he was qualified for the Deputy Superintendent position each time that it became available at IRS, and he was denied a Deputy Superintendent promotion on the basis of his race. *See id.*

After becoming aware of the hiring of Jerry McCall for the vacant Deputy Superintendent position at IRS in February 2000, Plaintiff filed an internal discrimination charge with the Ohio Department of Administrative Services' Equal Opportunity Division (EOD) on February 25, 2000. *See* ECF Dkt # 17 [*34] at 3. On March 22, 2000, Plaintiff filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC). *See id.* On December 28, 2000, EEOC issued a right-to-sue letter and determination. *See id.*

In September 2000, Plaintiff went on medical leave for stress and returned to work on December 15, 2000. *See* ECF Dkt. # 17 at 4. Upon his return to work, Plaintiff stated that his health care provider advised ODYS on December 28, 2000 that he should not be assigned double shifts. *See id.* Plaintiff alleged that after receiving his request ODYS nevertheless assigned him double shifts. *See id.* In contravention to his wishes, Plaintiff also averred that ODYS changed his shift from the third shift, 10 PM-6 AM, to the second shift, 2 PM to 10 PM, on January 14, 2001. *See id.* at 5. Plaintiff asserted that ODYS placed a white male in the vacant third shift slot. *See id.*

Plaintiff believed that ODYS retaliated against him by doubling and/ or changing his shifts for filing his earlier racial discrimination claim with EEOC. *See* ECF Dkt. # 17 at 5. While Plaintiff failed to file a complaint with the EOD alleging that he was the victim of retaliation, [*35] he proceeded directly to file a retaliation claim with EEOC on January 23, 2001. *See id.* On June 13, 2001, EEOC issued a right-to-sue letter and determination. *See id.* On August 28, 2001, Plaintiff, in his amended complaint, brought five claims against ODYS based upon the allegations, *supra*, including, race discrimination and retaliation, under both Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, and Ohio Revised Code Chapter 4112, and wrongful denial of a promotion claim in violation of Ohio's public policy. *See id.*

On September 10, 2001, ODYS filed an answer to the amended complaint, denying most of the amended complaint's allegations and asserting that legitimate, nondiscriminatory reasons accounted for its employment decisions concerning Plaintiff. *See* ECF Dkt. # 19 at 5. In particular, ODYS averred that Plaintiff neither applied for nor was qualified for the deputy superintendent position at the Indian River School. *See id.* at 6. Defendant further asserted that a portion of Plaintiff's allegations were barred by the statute of limitations, and that this Court lacked jurisdiction over Plaintiff's state [*36] law claims. *See id.*

On April 30, 2002, ODYS filed the instant motion for summary judgment requesting dismissal of all of Plaintiff's claims contained within his amended complaint. *See* ECF Dkt. # 33. On May 21, 2002, Plaintiff filed a response in opposition to Defendant's motion for summary judgment. *See* ECF Dkt. # 39. ODYS replied to Plaintiff's opposition memorandum on June 4, 2002. *See* ECF Dkt. # 56.

### III. STANDARD OF REVIEW

The function of summary judgment is to dispose of cases without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact. *See   Schultz v. Newsweek, Inc., 668 F.2d 911, 918 (6th Cir. 1982)*. Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[*37] FED. R. CIV. P. 56(c). Under Rule 56, a party is entitled to summary judgment *where the documentary evidence produced by the parties permits only one conclusion. See   Allen v. Wood, 970 F. Supp. 824, 828 (E.D. Wash. 1997)*(citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (emphasis added).

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and must identify the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*(quoting FED. R. CIV. P. 56(c)). This initial burden can be discharged by the moving party by showing that the nonmoving party has failed to establish an essential element of the nonmoving party's case for which he or she bears the ultimate burden of proof at trial. *See Celotex, 477 U.S. at 323; Morales v. American Honda Motor Co., Inc., 71 F.3d 531, 535 (6th Cir. 1995).* [*38] The evidence submitted must be viewed in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).*

If the moving party meets this burden, then the nonmoving party must take affirmative steps to avoid the entry of a summary judgment. *See* FED. R. CIV. P. 56(e). "Although the nonmoving party's evidence in opposition to summary judgment need not be of the sort admissible at trial, he must employ proof other than his pleadings and own affidavits to establish the existence of specific triable facts." *Ashbrook v. Block, 917 F.2d 918, 921 (6th Cir. 1990)* The nonmoving party must do this by presenting more than a scintilla of evidence in support of his or her position. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

Summary judgment must be granted unless sufficient evidence exists that favors the nonmoving party such that a judge or jury could reasonably return a verdict for that party. *See Anderson, 477 U.S. at 249.* The Court is not [*39] "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* If a party fails to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the Court is required to enter summary judgment. *See Celotex, 477 U.S. at 322.* A movant is entitled to summary judgment if the non-movant, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *See Spells v. Cuyahoga Community College, 889 F. Supp. 1023, 1026 (N.D. Ohio 1994).*

## IV. LAW AND ANALYSIS

### A. Title VII Failure to Promote Claim

#### 1. Continuing Violation

In his amended complaint, Plaintiff averred that over his career he had applied for numerous Deputy Superintendent openings at IRS, with the most recent opening occurring in early 2000. *See* ECF Dkt. # 17 at 3. Plaintiff asserted that all the successful applicants for the deputy superintendent openings at IRS were Caucasian, including *inter alia,* Carol Trowbridge, Katie Needham, and Lee Williams, [*40] and the most recent being Jerry McCall in February, 2000. *See id.* Plaintiff contended that he was qualified each time the Deputy Superintendent position became available at IRS, and that he was continually denied a Deputy Superintendent promotion on the basis of his race. *See id.*

The Court finds, however, that the continuing violation theory is not available to Plaintiff in this instant failure to promote case, and he therefore is only entitled to challenge the hiring of Jerry McCall to the most recent Deputy Superintendent vacancy at IRS in February 2000. *See* ECF Dkt. # 17. The Court finds more specifically that Plaintiff is barred from challenging the promotions of, *inter alia,* Carol Trowbridge, Katie Needham, and Lee Williams because 1) he failed to satisfy the administrative prerequisites, and 2) notwithstanding this failure, he does not have a viable continuing violation claim. *See id.*

Title VII requires an employee to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *See 42 U.S.C. § 2000e-5(e)(1).* Additionally, an individual can file a private lawsuit if the EEOC has not filed a suit or [*41] when the individual has received notice that there will be no such suit. *42 U.S.C. § 2000e-5(f)(1).* The filing of a charge of discrimination is a mandatory prerequisite to the filing of a lawsuit under Title VII. *See Love v. Pullman Co., 404 U.S. 522, 523, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972); Vinson v. Ford Motor Co., 806 F.2d 686, 688 (6th Cir. 1986); Rivers v. Barberton Bd. Of Educ., 143 F.3d 1029, 1032 (6th Cir. 1998)*(holding that right to sue letter is a condition precedent to filing claim). A plaintiff may not bring suit on any claim of discrimination until such time as they have received a right to sue letter from the EEOC or Ohio Civil Rights Commission (OCRC). *See Parsons v. Yellow Freight System, 741 F.2d 871, 873 (6th Cir. 1984).* A Title VII plaintiff is also confined to those matters which were made in the charge of discrimination or those charges which are reasonably expected to grow out of the charge of discrimination. *See Duggins v. Steak ' N Shake, Inc., 195 F.3d 828, 832 (6th Cir. 1999).* n6

---

n6 Reasons for the EEOC filing requirement were discussed by the Sixth Circuit Court of

Appeals in *Jones v. Sumser Retirement Village, 209 F.3d 851, 853 (6th Cir.2000):* First, the requirement provides the basis for the EEOC's "attempt to obtain voluntary compliance with the law." Second, these attempts "notify potential defendants of the nature of plaintiff's claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them." *Id.* (quoting *Abeita v. Transamerica Mailings, Inc., 159 F.3d 246, 254 (6th Cir.1998).*

[*42]

Plaintiff did not file a charge with the EEOC or Ohio Civil Rights Commission within 300 days of either the promotion of Trowbridge, Needham, or Lee Williams. *See* ECF Dkt. # 17, 39. Therefore, Plaintiff never received a right-to-sue letter with respect to the earlier promotions. *See id.* The EEOC charge for which Plaintiff did receive a right-to-sue letter states that both the "earliest" and "latest" dates of discrimination were February 15, 2000, referring to the promotion of Jerry McCall to Deputy Direct Superintendent at IRS. See ECF Dkt. # 31, exhibit C. The box marked "Continuing Violation" is not checked. *See id.* Therefore, excluding the promotion of Jerry McCall in early 2000, the Court finds that Plaintiff never satisfied the mandatory administrative prerequisites to challenge the earlier promotions of deputy superintendents at IRS including, *inter alia,* Carol Trowbridge, Katie Needham, and Lee Williams, and thus he cannot assert the earlier promotions for the first time in this lawsuit. *See* ECF Dkt. # 17.

Assuming *arguendo* that Plaintiff did satisfy administrative prerequisites for the earlier promotions, the Court finds that Plaintiff does not have [*43] a viable continuing violation theory. *See* ECF Dkt. # 17. The Sixth Circuit has held that this theory applies to "narrowly limited exceptions" to the general rules that statutes of limitations are triggered when a discriminatory act occurs. *See Haithcock v. Frank, 958 F.2d 671, 677-678 (6th Cir. 1992).*

Plaintiff stated that ODYS' appointment of Jerry McCall without posting the opening constituted "present discriminatory activity giving rise to a claim of continuing violation." Plaintiff argued that under the continuing violation theory, he can sue over the promotions of Carol Trowbridge and Lee Williams to Deputy Direct and Katie Needham to Deputy Programs. *See* ECF Dkt. # 39 at 30.

Plaintiff, however, acknowledged that the vacancy that led to the Carol Trowbridge appointment to Deputy Direct was posted. *See* ECF Dkt. # 39, exhibit B at P 6. With regard to the promotions of Katie Needham and Lee Williams, Plaintiff offered no evidence regarding the individuals whom ODYS considered for these positions, their respective races, their qualifications, or which ODYS officials made the hiring decisions. *See id.* Plaintiff also failed to point to any evidence [*44] of a discriminatory animus linking the McCall promotion to the earlier promotions. *See id.* As the Sixth Circuit noted in *Burzynski v. Cohen, 264 F.3d 611, 618 (6th Cir. 2001),*

Simply alleging discrete acts of non-selection is not sufficient to establish a continuing violation .... The record is devoid of any evidence which would support the application of the continuing violation theory.

*Id.* Plaintiff neglected to mention that the same non-posting policy resulted in not only the appointment of Johnetta Williams, who is African American, to Deputy Superintendent at IRS in 1998, but in the promotions of scores of qualified African Americans to Superintendent and Deputy Superintendent positions at ODYS facilities. *See* ECF Dkt. # 33, exhibit A. Based upon the foregoing, the Court finds no continuing violation theory is available to Plaintiff in his failure to promote claim in the instant case. *See* ECF Dkt. # 17. Accordingly, only the promotion of Jerry McCall to vacate the Deputy Direct Superintendent position at IRS in early 2000 will be at issue in the following analysis of Plaintiff's failure to promote claim. *See infra.*

2. Elements [*45] of a Failure to Promote Claim

To establish a prima facie claim of racial discrimination based on a failure to promote under Title VII of the Civil Rights Act of 1964, a plaintiff generally must demonstrate that:

(1) he is a member of a protected class;

(2) he applied and was qualified for a promotion;

(3) he was considered for and denied the promotion; and

(4) other employees of similar qualifications who were not members of the protected class received promotions.

*See Dews v. A.B. Dick Co., 231 F.3d 1016, 1020-1021 (6th Cir. 2000)*(citations omitted). After a plaintiff creates a presumption of discrimination by establishing a prima facie case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision. *See id.* The plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual. *See id.* (citations omitted)

A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *See Dews, 231 F.3d at 1021* [*46] (citation omitted). If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *See id.* (citation omitted). Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times. *See id.* (citation omitted).

While ODYS acknowledges that Plaintiff satisfies the first element of his prima facie case for Title VII failure to promote, the Court agrees with ODYS and finds that Plaintiff cannot prove the other elements necessary to establish his Title VII failure to promote claim regarding the promotion of Jerry McCall to Deputy Direct Superintendent at IRS in early 2000. See ECF Dkt. # 17.

a. The Application and Consideration Requirements

To establish a failure to promote claim, Plaintiff must be able to show that he "applied for" and was "considered for" the promotion at issue, *i.e.* the early 2000 Deputy Direct vacancy at IRS. *See Dews, 231 F.3d at 1020-1021*. The Court finds that the undisputed evidence shows that Plaintiff did not apply for the early 2000 Deputy Direct vacancy at IRS. See ECF Dkt. # 33, 54.

Nevertheless, the Sixth [*47] Circuit currently recognizes an exception to the "applied for" and "considered for" requisites of a Title VII failure to promote claim. In *Dews*, the Sixth Circuit Court of Appeals held that a plaintiff need not satisfy the "applied for" or "was considered" (second and third) elements of a *prima facie* case when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion. *See Dews, 231 F.3d at 1022*. In *Dews*, the plaintiff was in charge of national governmental sales for A.B. Dick, a seller of office equipment. In 1996, Dick's sales force was broken down into six regions, each with a regional manager. The plaintiff learned of a vacancy for a Western Regional Manager, and expressed his interest to his supervisor. The supervisor, however, dissuaded Dews from applying, stating that the position would be filled by someone who lived in the western part of the country. Dews, who lived in Cincinnati, did not apply for the position and Dick filled the position with someone who did not live in the west. The Sixth Circuit announced that ".. in failure to promote cases a plaintiff [*48] does not have to establish that he applied for and was considered for the promotion *when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion.*" *Id.* (emphasis added).

Read in its entirety, it is clear that the Sixth Circuit in *Dews* was addressing unfairness associated with the failure to notify potential candidates of a position through a formal posting *or some other means*. The primary case relied upon in *Dews* held that the plaintiff did not have to satisfy the "applied for" or "was considered" elements of a *prima facie* case "when he did not know about it [the vacancy]." *Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1132-1133 (11th Cir. 1984); see also Bernard v. Gulf Oil Corp., 841 F.2d 547 (5th Cir. 1988)* (same). Another case cited by *Dews, Paldano v. Althin Medical, 974 F. Supp. 1441 (S.D. Fla. 1996)*, discussed how the lack of a notice procedure could result in vacancy information being available to only one segment of a work force. Because Plaintiff was verbally informed of the Deputy Direct vacancy within [*49] a few days after Lee Williams left it, the concerns at issue in these cases did not apply to him. Plaintiff was among the segment of the workforce to whom the vacancy information was made available.

In the instant case, Plaintiff cannot rely upon the *Dews* exception to the "applied for" and "was considered" requirements of a *prima facie* case because Plaintiff's supervisor did notify him of the available Deputy Direct position a few days after Lee Williams' departure. See ECF Dkt. # 31, Donahoo Deposition at 89-95. When such notification is provided, the employer does not have to provide a "formal mechanism for expressing interest in the promotion." *Dews, 231 F.3d at 1021-1022*. n7 By Plaintiff's own admission, Superintendent Ames notified him that the position of Lee Williams, Plaintiff's immediate supervisor, was vacant. See ECF Dkt. # 31, Donahoo Deposition at 89-95. By his own admission, Plaintiff also did not ask anyone how he could express his interest in the position. *See id.* Neither *Dews* nor the other cases relied upon by Plaintiff require anything more than notification that the position is available.

n7 While Plaintiff attempts to created an issue of fact as to whether ODYS had to post the Deputy Direct opening, the lack of a posting requirement is a matter of law. "Unclassified service," defined in Ohio Adm. Code § 123:1-47-01 (A)(87), provides that "appointment to a position in the unclassified service may be made at the discretion of the appointing authority ...." Ohio law neither requires the director of ODYS to post unclassified positions, nor does it forbid him from doing so. The fact that the director

chose on one occasion in the past 10 years to post a Deputy Superintendent position does not create an issue of fact as to whether it was required for the McCall promotion.

[*50]

Plaintiff desires the Court to ignore the plethora of evidence that ODYS Director Natalucci-Persichetti has promoted African Americans to top-ranking positions at IRS and other institutions. See ECF Dkt. # 33, exhibit A. However, as Plaintiff states, the *Dews* exception was created to address instances in which the failure to post a position results in a segment of the workforce (*e.g.* African Americans) being excluded from promotions. *See* ECF Dkt. # 39 at 11-12. The Court finds that, where there is no evidence that such exclusion or segregation has taken place, as in the instant case, the *Dews* exception to a *prima facie* case is not applicable. This is especially true when the would-be applicant, Plaintiff, was aware of the vacancy.

The Court recognizes a recent case within the Sixth Circuit, *Frazier v. Ford Motor Co., 176 F. Supp. 2d 719 (W.D. Ky. 2001)* n8, which distinguishes *Dews*. In *Frazier*, the two African-American plaintiffs were representatives of a union local who alleged they were denied international representative positions on the basis of their race. As in the instant case, the positions were filled based upon recommendations [*51] from central headquarters or the local level. One plaintiff, Jefferson, told a regional director he was interested in the position a year before it was filled, but made no follow up notifications. The other plaintiff, Roberts, had only expressed his interest three years earlier.

    n8 The claims were brought under the Kentucky Civil Rights Act which requires that a plaintiff prove the same elements as a Title VII action. *See* *Frazier, 176 F. Supp. 2d at 720-721*.

The *Frazier* court concluded that the *Dews* exception did not apply, focusing on all of the obvious steps that the would-be applicants could have taken to express their interest, but did not:

They could have submitted letters to [the Regional Vice President] notifying him of their interest, but they failed to do so. Moreover, Plaintiff Roberts failed even to express interest to anyone at any time in the four years prior to the position's availability.

*Frazier, 176 F. Supp. 2d at 722*. Similarly, in the [*52] instant case, Plaintiff was aware that unclassified positions were not always posted. Plaintiff knew the 2000 Deputy Direct position was vacant and the position served at the pleasure of the Director of ODYS. Plaintiff had been through two recent instances in which a deputy superintendent position was filled without a posting, including one filled by an African-American Johnetta Williams. Yet, even after Superintendent Ames personally notified Plaintiff that the position was vacant, Plaintiff did not tell Superintendent Ames or Central Office that he was interested. Plaintiff admitted he did nothing in more than five years to let anyone know that he wanted to be a Deputy Direct, since he last allegedly applied for a Deputy Superintendent position in 1994.

*Frazier* also recognized that the *Dews* exception does not apply when the vacant position is not "one for which anyone who met certain objective criteria (*e.g.*, experience in managing sales) might be expected to apply." *Id. at 722*. The court noted:

The position of union representative is a more political one, subject to subjective criteria, which not everyone who may be objectively qualified would [*53] necessarily want. *Those who do want such a job should be expected to make their wishes known.* Without such evidence of an expression of interest, it is problematic to say that Defendant considered and rejected Plaintiffs on the basis of race.

*Frazier, 176 F. Supp. 2d at 722-73* (emphasis added). In the present case, as explained, *supra*, the Deputy Superintendent positions are not ones which everyone with objective qualifications wanted. Unlike Plaintiff's classified position, a Deputy Direct Superintendent position is unclassified and the incumbent has no recourse to challenge an adverse employment action through a union grievance process or civil service appeal. *See* Ohio Rev. Code §§ 5139.02, 124.01 *et seq., and Schatzman v. County of Clermont, No. 99-4066, 234 F.3d 1269, 2000 U.S. App. LEXIS 35119, 2000 WL 1562819, **7 (6th Cir. Oct. 11, 2000), unpublished* (citing *State ex rel Hunter v. Summit Cty. Human Resource Commn., 81 Ohio St. 3d 450, 453, 692 N.E.2d 185, 188 (1998)*. n9

    n9 Moreover, the evidence shows that unclassified Superintendent and Deputy Superintendent positions at IRS and throughout ODYS were short-tenured and subject to frequent long-distance transfers. *See supra.* OA Bradley, even after he advanced to a supervisory position above Plaintiff, testified he was not interested in unclassified employment because of its risks.

[*54]

The instant case is similar to *Frazier* in a third way. The plaintiffs in *Frazier* implied that their superiors at the local level would disqualify them on the basis of their race. On summary judgment, the District Court said that did not matter:

Even if ... officials had discriminated on the basis of race in not recommending African-Americans for promotion to this particular position, Plaintiffs had the opportunity to contact [central headquarters] directly for appointment as International Representatives. Any disagreement with Local 862 officials or policies, then, was not a disqualifier from appointment.

*Frazier, supra* Applied to the instant case, if Plaintiff believed Superintendent Ames would not give him fair consideration for the Deputy Direct Superintendent vacancy, nothing but his own inaction prevented Plaintiff from contacting the ODYS Director's office to express his interest in the Deputy Superintendent position. Director Natalucci-Persichetti had a long record of appointing qualified African-Americans to unclassified positions. *See* ECF Dkt. # 33, exhibit A at P 2 (a) -- (ff).

Plaintiff acknowledged that a person who holds [*55] an OM position at an ODYS institution should be familiar with Department policies, or at least have the resourcefulness to find out about a policy with which he is unfamiliar. The Court agrees with ODYS that, rather than doing anything to find out about how he could make his interest in the position known, Plaintiff sat back and did nothing until a Caucasian was appointed to the position and then brought a discrimination claim.

Based upon the similarities between the instant case and *Frazier,* and the fact that Superintendent Ames notified Plaintiff of the Deputy Direct Superintendent vacancy at IRS in early 2000, just a few days after its opening, the Court finds that Plaintiff does not qualify for the *Dews* exception delineated by the Sixth Circuit. The Court agrees with ODYS that no reasonable jury could find that a twenty plus year employee who wants a promotion, realizes the position he wants is vacant, and then does nothing to inform his superiors that he is interested in it can establish that he "applied for" the position. Accordingly, for purposes of defeating summary judgment, the Court finds that Plaintiff has failed to establish that he "applied for" or was "considered [*56] for" the promotion at issue, and for this reason Plaintiff's Title VII failure to promote claim must fail. *See* ECF Dkt. # 17.

**b. The Qualification Requirement**

Even assuming that Plaintiff established that he "applied for" and was "considered for" the promotion at issue to defeat summary judgment, the Court finds that Plaintiff was not qualified for the Deputy Direct Superintendent position as a matter of law. Plaintiff testified that his purported qualifications for Deputy Direct arose out of his experience as a UA and Unit Manager at IRS. *See* ECF Dkt. # 31, Donahoo Deposition at 62-63. Plaintiff has not pointed to any admissible evidence that he was qualified to be promoted to Deputy Direct. *See* ECF Dkt. # 39. Plaintiff merely 1) gives his own opinion that he was qualified; 2) offers evidence that his performance was satisfactory in his current position; and 3) offers the opinion of Superintendent Hills that Plaintiff was qualified for Deputy Direct under certain conditions. *See id.*

Plaintiff bears the burden of proving that he was qualified for the promotion, not that he was qualified for his current position. The cases upon which Plaintiff relies upon were [*57] disciplinary, not failure-to-promote cases that only addressed the plaintiffs' qualifications for their existing positions. *See* ECF Dkt. # 39 at 15. Plaintiff's qualifications for Unit Administrator (and later Operations Manager) are not at issue in this case. A plaintiff's own arguments that he was qualified for a position cannot give rise to a material fact dispute. *See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999).* Therefore, Plaintiff's own opinion of his qualifications is irrelevant.

The Court acknowledges that Superintendent Hills did not even know Plaintiff when the Jerry McCall promotion occurred early in 2000, and therefore his opinion in 2002 that Plaintiff would be qualified for a Deputy Superintendent position under certain conditions is not probative. Most significantly, Plaintiff has no evidence of anyone who supervised him prior to the Jerry McCall promotion in early 2000 -- Caucasian or African American -- who believed he was qualified for the Deputy Direct vacancy. *See* ECF Dkt. # 39.

In spite of Plaintiff's contentions, the undisputed evidence shows that Plaintiff never exceeded expectations as a UA, often did [*58] not meet expectations, and lacked leadership skills. *See* section I, A, *supra.* Obviously, the mere fact that Plaintiff occupied a position that reported to the Deputy Direct did not qualify him for advancement to upper management. Moreover, in filling this unclassified Deputy Direct position, the ODYS director determined that the Deputy Direct Superintendent at ICS should have Incident Command System training given the recent escape at the institution. *See* section I, D, *supra.*

The Court finds that the combination of Plaintiff's reviews ranging from unsatisfactory to unremarkable,

and his lack of ICS training or experience, rendered him unqualified as a matter of law for the Deputy Direct Superintendent position at IRS in early 2000. Accordingly, for purposes of defeating summary judgment, the Court finds that Plaintiff has failed to establish that he was "qualified" for the promotion at issue, and for this reason Plaintiff's failure to promote claim also must fail. *See* ECF Dkt. # 17.

### c. The Similarly Situated Requirement

Even assuming that Plaintiff established that he "applied for", was "considered for", and was "qualified for" the promotion at issue for [*59] purposes of defeating summary judgment, the Court finds that Plaintiff has not established sufficiently for surpassing the summary judgment hurdle that the promotion at issue went to a similarly situated Caucasian employee. Put another way, the Court finds as a matter of law that the promotion at issue did not go to Caucasian employee of similar qualifications. The fourth element of a failure to promote claim requires the Plaintiff to show that another employee of similar qualifications who was not a member of the protected class received the promotion. *See   Dews, 231 F.3d 1016, 1020-1021.*

Plaintiff has no evidence that he was treated less favorably than any similarly situated non-minority. *See* ECF Dkt. # 39. An individual is "similarly situated" in a Title VII failure to promote claim when he or she is in "all relevant respects" similarly situated. *See   Evans v. Toys R Us Ohio, Inc., 221 F.3d 1334, 2000 U.S. App. LEXIS 24141, 2000 WL 761803, \*\*9 (6th Cir. 2000),* affirming *32 F. Supp. 2d 974 (N.D. Ohio 1999); see also Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644 (7th Cir. 2001).* In *Evans,* the plaintiff [*60] was an African-American manager at several toy stores in northern Ohio. Evans claimed the employer failed to promote him to Assistant Store Director on the basis of his race. The court stated:

The case law in this circuit is clear: if a plaintiff cannot show that he was passed over for promotion in favor of a non-minority employee who was similarly situated in all relevant respects, he cannot meet his burden of proof....

*Evans, 221 F.3d 1334,* [WL], \*\*9. Because Evans was comparing himself to individuals who had worked in different geographic regions, were not subject to the same standards of performance and were not reviewed by the same supervisors, the court affirmed the summary judgment grant of the *U.S. District Court for the Northern District of Ohio. 221 F.3d 1334,* at * 31.

Plaintiff was clearly not similarly situated to Jerry McCall. Prior to his appointment as Deputy Direct Superintendent at IRS, McCall had worked at an entirely different department of the state of Ohio, ODRC. *See* section I, E, *supra.* McCall never worked under any supervisor that Plaintiff had over his career. *See id.* McCall had extensive ICS training. *See* [*61]   *id.* McCall had been named Officer of the Year at his prison and later the officer of the year for the entire ODRC system. *See id.* He had been commander of an experimental adult "boot camp" prison. *See id.* McCall was the compliance officer that oversaw that the Southeastern Correction Institution received national accreditation. *See* ECF Dkt. # 31, Hieneman Deposition, 58-59, ex. 12. Additionally, McCall had a security background that was essential to the ODYS' upper management due to the recent escape from IRS. *See id.* at 45-47.

Compared to McCall, Plaintiff had no similar experience. *See* ECF Dkt. # 31, Donahoo Deposition at 85-86, 123-24. Plaintiff has not attempted to introduce evidence that he was denied a promotion in favor of a Caucasian individual with similar background and qualifications. *See* ECF Dkt. # 39. Therefore, Plaintiff cannot satisfy the fourth prong of a *prima facie* case and cannot survive summary judgment.

Overall, the Court finds that Plaintiff has failed to establish a prima facie case of failure to promote based upon racial discrimination under Title VII. *See* ECF Dkt. # 17, 39. For purposes of defeating summary judgment, Plaintiff [*62] has not established that he either applied for or was qualified for the Deputy Direct Superintendent position in early 2000, or that he was similarly situated to the person who eventually obtained the promotion at issue. *See id.* For these reasons, either individually or in combination, the Court finds that Plaintiff's failure to promote claim under Title VII is without merit. *See id.*

### 3. Affirmative Defense to Failure to Promote Claim

Assuming Plaintiff established a *prima facie* case of failure to promote, ODYS may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision. *See   Dews, 231 F.3d at 1020-1021.* Assuming Plaintiff did establish a *prima facie* case, the Court finds as a matter of law, that ODYS had a legitimate, non-discriminatory reason to promote Jerry McCall to the Deputy Direct Superintendent vacancy at IRS in early 2000.

The undisputed evidence indicates that ODYS was in the process of reconfiguring its command structure to make it more similar to ODRC. *See* section I, D, *supra.* Accordingly, ODYS' Central Office wanted a superintendent or deputy superintendent at each of its institutions [*63] who was well versed in ICS. *See id.* Superintendent Ames, then IRS superintendent, had minimal training in ICS. Accordingly, Central Office

sought applicants from ODRC, where ICS was firmly in place. *See id.* McCall had extensive experience not only in ICS training but multiple occasions where he put it to use in an adult prison. *See id.* The Court finds that ODYS' emphasis on security training and/ or experience is clearly a legitimate, non-discriminatory reason to promote Jerry McCall to the Deputy Direct Superintendent position at IRS in early 2000, particularly given that institution's recent escape.

### 4. Pretext

Assuming that Plaintiff established a *prima facie* case for failure to promote, and ODYS articulated a legitimate, non-discriminatory reason to promote Jerry McCall to the Deputy Direct Superintendent position at IRS in early 2000, the Court finds that ODYS's reason for hiring Jerry McCall as opposed to Plaintiff is not pretext as a matter of law. A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged [*64] conduct. *See Dews, 231 F.3d at 1021.*

Even assuming that a jury could disbelieve ODYS's explanation of why it chose to hire Jerry McCall as its Deputy Direct Superintendent at IRS in early 2000, the Court concludes that no reasonable jury could find that this reason was a pretext for race discrimination. The ODYS Director has a history of appointing some thirty African-American Superintendents and Deputy Superintendents at ODYS institutions over the past twelve years. *See* ECF Dkt. # 33, exhibit A. Plaintiff, in fact, worked most of his years as a UA under an African-American Superintendent at IRS, Ms. Bess. The Court notes that an appointing authority's previous appointments of African-Americans suggests that racial bias was not a factor in the appointment at issue. *See Frazier, 176 F. Supp. 2d at 724.*

Superintendent Ames, too, did not hesitate to voice his strong support for African-American candidates he wanted promoted, as evidenced by the promotion of Johnetta Williams to Deputy Indirect in 1998 at IRS. *See* section I, A, *supra*. Additionally, one month after the Jerry McCall promotion, Superintendent Ames pushed for the appointment of [*65] an African-American, Bradley, to OA, from a field of three Caucasians and three African-Americans. *See* section I, F, *supra*. However, for the Deputy Direct position in 2000, Superintendent Ames did not view any of his internal candidates, Caucasian or African-American, as suitable.

Moreover, Plaintiff's performance as a UA was viewed as unremarkable by both his African American supervisor and his Caucasian supervisors. Superintendent Bess, an African American Superintendent at IRS had found that Plaintiff failed to meet expectations in several categories in which she rated him. *See Hardy v. Marriott Corp., 670 F. Supp. 385, 391 (D.D.C. 1987)* (African-American evaluators' negative evaluations of African-American plaintiff "negate any inference of racial discrimination").

Even ignoring the ODYS' extensive history of filling unclassified positions with African-Americans, the Court additionally finds that Plaintiff lacks any evidence that ODYS' stated reason for hiring Jerry McCall as the Deputy Direct Superintendent at IRS is pretextual for racial discrimination. In *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000),* [*66] the U.S. Supreme Court exclaimed that "when a plaintiff alleges disparate treatment, liability depends on whether the protected trait actually motivated the employer's decision." *Reeves, 530 U.S. at 141.* The Supreme Court also emphasized that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," and that a plaintiff cannot prevail merely by proving that an employer's reasons are pretextual, he must prove they are a "pretext for discrimination." *Id. at 143* (citing *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1994)).* In *Reeves,* the Supreme Court stated that, "it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *530 U.S. at 147* (quoting *Hicks, 509 U.S. at 519).*

Plaintiff asserts that, "proof of pretext yields a question of fact that is always for the jury's consideration." ECF Dkt. # 39 at 19. However, in *Reeves,* the Supreme Court acknowledged and implicitly rejected this notion when [*67] the court stated that,

Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and *there was abundant and uncontroverted independent evidence that no discrimination had occurred.*

*Reeves, 530 U.S. at 148*(emphasis added). The present case is an instance where no rational finder of fact could conclude that discrimination occurred because abundant and uncontroverted independent evidence existed that no discrimination had occurred. *See id.* On the one hand, as

noted *supra*, ODYS has presented voluminous, uncontroverted evidence that there was nothing racially discriminatory about the Jerry McCall promotion. And on the other hand, Plaintiff has failed to introduce any evidence to refute [*68] ODYS' assertion that the ICS requirement motivated its decision to appoint Jerry McCall to the Deputy Direct Superintendent position at IRS.

In arguing the ICS requirement was a pretext for race discrimination, Plaintiff decries the fact that resumes and applications were solicited from what he terms the "favored few" within the state's correctional system. *See* ECF Dkt. # 39 at 22. Plaintiff, however, fails to point out that this "favored few" included candidates of both races during the recruitment and interview process for the 1999/2000 Deputy Superintendent vacancies at IRS, Marion JCF, and Riverview JCF. *See* section I, E, *supra*. Their resumes were also reviewed by a committee composed of African American and Caucasian administrators, and an African American candidate was selected as the most qualified for the position at Marion JCF. *See id.*

The Court finds that Plaintiff's argument that the ICS system had not yet been put into place at IRS is irrelevant. The relevant inquiry is whether ODYS honestly believed these reasons and acted upon these beliefs in good faith. *See    Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001).* The Sixth Circuit [*69] has stated that with respect to the requirement that a plaintiff prove pretext for discrimination, an employer may make employment decisions "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Evans, 221 F.3d 1334,* [WL], **11, n.7.

Plaintiff has no evidence n10 to rebut that ODYS' decision makers honestly believed that an ICS-trained individual was the best choice for the Deputy Direct Superintendent position at IRS, particularly after a recent escape at the institution. *See    Jacklyn v. Schering Plough Healthcare Products Sales Corp., 176 F.3d 921, 929 (6th Cir. 1999)* (courts should not second guess employer's business judgment that changes and new methods of operation are needed). n11

---

n10 Plaintiff's complaints contained in a letter to Jason Barnett of never being asked to apply for a deputy superintendent position did not contradict ODYS' emphasis on promoting people with ICS training. Additionally, the Sam Stanford affidavit is only riddled with hearsay, and does not address or support Plaintiff's claims. *See* ECF Dkt. # 39, exhibits C, O. [*70]

n11 Plaintiff's reliance upon *Farber v. Massillon Bd. Of Educ., 917 F.2d 1391 (6th Cir. 1990)* is misplaced because there is no evidence that McCall lacked the minimum qualifications for the Deputy Direct Superintendent position at IRS.

---

For the foregoing reasons, Plaintiff has failed to establish for purposes of defeating summary judgment, that ODYS' proffered, nondiscriminatory reason for hiring Jerry McCall is a pretext for race discrimination. Overall, for all the reasons stated, the Court finds that Plaintiff's Title VII failure to promote claim is without merit and cannot survive summary judgment; therefore the Court dismisses Plaintiff's Title VII failure to promote claim *with prejudice. See* ECF Dkt. # 17.

### B. Title VII Retaliation Claim

### 1. Elements of Retaliation Claim

In order to make out a *prima facie* case of retaliation, Plaintiff must show (1) he engaged in activity protected by Title VII; (2) the defendant knew of his protected activity; (3) the defendant thereafter took an adverse employment action against him or he was subjected to severe or pervasive [*71] retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. *See    Morris v. Oldham County, 201 F.3d 784, 792 (6th Cir. 2000).* ODYS does not dispute that Plaintiff engaged in protected activity when he filed his charges with the EOD and EEOC in February 2000 and March 2000, respectively, but argues that he cannot prove the remaining elements. *See* ECF Dkt. # 33 at 18. The Court finds that Plaintiff has failed to prove the third and fourth elements of his alleged Title VII retaliation claim. *See* ECF Dkt. # 17.

### a. Adverse Employment Action

In the third prong of the Title VII retaliation claim, a plaintiff must prove that the defendant took an adverse employment action against him or that Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor. *See    Morris, 201 F.3d 784 at 792.* After he engaged in protected activity, it is clear to the Court that Plaintiff did not experience an adverse employment action. None of the matters of which he complained culminated in a "firing, failure to promote, reassignment with significantly different [*72] responsibilities, or a decision causing a significant change in benefits." *See    Morris, 201 F.3d at 789,* and ECF Dkt. # 31, Donahoo Deposition at 214.

Also, it is manifest to the Court that Plaintiff was not subjected to retaliatory harassment. The standard for

proving severe and pervasive harassment is high. In *Morris*, after the plaintiff complained about her supervisor's implicit sexual remarks, the plaintiff was relocated to a new office outside the supervisor's vicinity. However, the supervisor persisted to stalk the plaintiff's new work site at least 15 times and telephoned her 30 times to harass her. He made faces at her through her office window; followed her home from work and gave her "the finger" outside her house; and threw roofing nails on her driveway. The court held that a jury could find such misconduct severe and pervasive enough to create a hostile work environment. Analyzing the case in the framework of a sexual harassment case, the court found a cause of action when "the workplace is permeated with [retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment [*73] and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). The existence of a hostile work environment is based upon "the frequency of the [retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

However, "not everything that makes an employee unhappy" qualifies as retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee' did not like would form the basis of a discrimination suit." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996)(quoting (*Williams v. Bristol-Myers-Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). Conduct that a reasonable person would find neither hostile nor abusive is beyond Title VII's purview. *See Harris*, 510 U.S. at 21. The Supreme Court established these standards "to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). [*74]

In the instant case nothing that Plaintiff complains about comes close to a hostile working environment. To the contrary, Plaintiff was treated the same way as every other OM who had not engaged in protected activity. Plaintiff complains that he was scheduled to work double shifts against the suggestion of his therapist during the alleged retaliation period from late December 2000 to mid January 2001. However, the evidence shows Plaintiff's therapist returned him to work at "full capacity" into a position in which he knew he might be on 24-hour call including weekends and holidays, and might be assigned to work rotating shifts. *See* section I, G, 1, *supra*. Notwithstanding these job requirements, Plaintiff's supervisor, OA Bradley did what he could to limit Plaintiff's hours, as he did for all employees. Most importantly, documentation shows that Plaintiff did not work one double shift during the alleged retaliation period. And, even more telling, Plaintiff only worked a double shift once during the six month period following when Plaintiff's therapist sent the note, while other OMs worked as many as 17 double shifts. *See* section I, G, 1, *supra*. With the exception of [*75] OM Schaad, who took long-term leave, Plaintiff also worked less hours overall than the five other OMs during the same six month period. The Court finds that Plaintiff's complaints regarding double shifts are devoid of merit.

Plaintiff also complained that he was assigned to second shift instead of third. *See* section I, G, 2, *supra*. However, Plaintiff's therapist had not mandated, or even suggested, that Plaintiff be assigned to a certain shift. His job description called for rotating shifts and it was the standard practice at IRS to assign the newest OM to third shift. IRS merely followed its practice when it assigned Ralph Coyle to third shift instead of Plaintiff. *See* section I, G, 1, *supra*. The Court also notes that Plaintiff has no evidence that he was assigned to second shift to exacerbate his stress or on account of his prior charge. The fact that IRS did not disrupt its shift assignment policies did not constitute "harassment" of Plaintiff.

Similarly, Plaintiff's lack of a performance evaluation had nothing to do with his EEOC charge. Performance evaluations were long overdue for all OMs. *See* section I, G, 4, *supra*. Lastly, IRS's denial of overtime [*76] for roll call was standard practice. *See* section I, G, 3, *supra*. Plaintiff has no evidence that his treatment was any different from individuals who did not engage in protected activity.

In summary, no jury could find that IRS's adherence to its established policies in all these regards rose to the level of "severe" and "pervasive" harassment that created a hostile work environment and permanently altered the terms and conditions of his employment. Overall, the Court finds that Plaintiff's Title VII retaliation claim must fail because Plaintiff has failed to establish for purposes of defeating summary judgment that ODYS took an adverse employment action against him or that he was subjected to severe or pervasive retaliatory harassment by a supervisor. *See* ECF Dkt. # 17.

### b. Causal Connection

As part of his *prima facie* case of Title VII retaliation, Plaintiff must produce evidence "sufficient to raise the inference that his protected activity was the likely reason" for the alleged harassment. *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990). Closeness in time must be coupled with knowledge of protected activity to [*77] raise any inference of causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir.2000). Recently, in *Clark County*

*School Dist. v. Breeden, 532 U.S. 268, 149 L. Ed. 2d 509, 121 S. Ct. 1508 (2001),* the Supreme Court noted:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). See, e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209* (10 th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski, 967 F.2d 1168, 1174-75* (7 th Cir. 1992) (4-month period insufficient).

Moreover, "employers need not suspend previously planned [actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality." *Id.*

Superintendent Hills knew about the EEOC charge shortly after he became [*78] IRS superintendent in June 2000; however, the conduct complained of did not begin until January 2001, seven months later. Coupled with the lack of temporal proximity, Plaintiff has no evidence that any of the actions of which he complains were done with reference to his earlier charges.

In his own eyes, Plaintiff was mistreated at IRS long before his engagement in protected activity. He told one of his doctors in September 1999 that work had become "a chore." See ECF Dkt. # 31, Donahoo Deposition at 225-26. In November 2000, Plaintiff told a doctor that work had been "hell for years," referring to "lots of procedure changes, unfairness, seeing certain people given perks, being promoted" in the prior ten years. *See id.* at 240. Plaintiff also had formally complained about having to work a "robotic" schedule prior to his engagement in protected activity. *See id.* at 33.

These complaints are exactly the same type of actions -- schedule changes, being denied a shift -- that Plaintiff alleged were retaliatory in 2001. Moreover, Plaintiff has no evidence that any OM who did not engage in protected activity was exempted from IRS's practice of rotating shifts and assigning the newest [*79] OM to third shift. The undisputed evidence is that all OMs were paid straight time, not overtime for roll call; and that performance evaluations were overdue for all OMs. n12

---

n12 The Courts finds that ODYS also had legitimate, non-retaliatory reasons for its actions in enforcing its workplace policies.

---

Based upon the foregoing, for purposes of defeating summary judgment, the Court finds that Plaintiff has failed to establish that there was a causal connection between Plaintiff's protected activity and any alleged harassment or retaliation. See ECF Dkt. # 17. For this reason, Plaintiff's Title VII retaliation claim also must fail. *See id.*

### c. Affirmative Defense

In *Morris, supra,* the Sixth Circuit adopted the same affirmative defense for employers in retaliatory harassment cases as that available when a supervisor subjects an employee to a hostile work environment based on sex, but no tangible job action takes place. The affirmative defense is comprised of two elements:

(a) that the employer [*80] exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.

*Morris, 201 F.3d at 788-89.* ODYS clearly satisfies both elements. First, ODYS employees are protected by a state policy that prohibits them from being subjected to "restraint, interference, coercion, discrimination, or reprisal" for participation in a discrimination complaint. *See* ECF Dkt. # 33, exhibit C, *and* Ohio Adm. Code § 123:1-49-16). Plaintiff was aware of the policy and took advantage of it when he filed his EOD complaint over the Jerry McCall promotion in February 2000.

But then after he was allegedly subjected to retaliation, Plaintiff unreasonably failed to take advantage of all opportunities ODYS afforded him to avoid harm. *See supra.* Plaintiff did not file an EOD complaint. When OA Bradley suggested that Plaintiff complete an ADA accommodation form, he refused. Again, when EEO Manager Jason Barnett tried to persuade Plaintiff to complete an ADA form, Plaintiff again said no, because [*81] he believed that keeping his retaliation claim alive was more important.

Because Donahoo cannot prove the third or fourth elements of a *prima facie* case and ODYS had a full affirmative defense to Plaintiff's allegations, the Court finds that Plaintiff's Title VII retaliation claim must be dismissed *with prejudice.*

### C. Plaintiff's State Law Claims

The Court dismisses *without prejudice* Plaintiff's state law claims of failure to promote and retaliation pursuant to Chapter 4112 of the Ohio Revised Code and violation of public policy. *See* ECF Dkt. # 17. The Eleventh Amendment to the federal Constitution bars an

action for retrospective relief against a state in federal court. *See Stein v. Kent State University Bd. of Trustees, 994 F. Supp. 898, 902-903 (N.D. Ohio 1998).* This amendment also applies to litigation brought by citizens of the state being sued and by citizens of another state. *See id.* Absent a state waiver or congressional override, a federal court is without jurisdiction to hear a claim against a state. *See id.*

This Court, however, may hear a Title VII claim against a state in a federal court. *See Stein, 994 F. Supp. at 902-903* [*82] (citing *Fitzpatrick v. Bitzer, 427 U.S. 445, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976)*)(Eleventh Amendment does not bar an award of back pay since limited by enforcement provisions of § 5 of the Fourteenth Amendment); *see also Seminole Tribe of Florida v. Florida, 517 U.S. 44, 58-60, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996)* (§ 5 of the Fourteenth Amendment allows Congress to abrogate immunity from suit guaranteed by Eleventh Amendment).

The Court finds that the State of Ohio has not waived its Eleventh Amendment immunity as to the state law claims in the instant case. A waiver is only found "where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Stein, 994 F. Supp. at 902-903* (quotations omitted). A state maintains Eleventh Amendment immunity from suit in federal court though it has waived its immunity from liability and consented to be sued in its own courts. *See id.* The State of Ohio has waived its immunity from suit and consented to having its liability determined by the state Court of Claims. *See id.* (citing R.C. § 2743.02(A)(1)) [*83] . However, § 2743.02(A)(1) is not a waiver of immunity from suit in federal court. *See id.* (citations omitted). Enactment by the Ohio legislature of § 4112.01 *et seq.*, the anti-discrimination statute, did not explicitly abrogate the state's Eleventh Amendment immunity from suit in federal court. *See id.* It simply authorized suit of the state as employer in a court of competent jurisdiction, which in Ohio is limited to the Court of Claims. Based upon the forgoing, the Court finds that Plaintiff's state law claims are not properly brought before this Court, and should be dismissed *without prejudice. See* ECF Dkt. # 17.

## V. CONCLUSION

For the foregoing reasons, the Court concludes there are no genuine issues of material fact and ODYS is entitled to judgment as a matter of law on all of Plaintiff's claims contained in his amended complaint. *See* ECF Dkt. # 17. Accordingly, the Court GRANTS Defendant ODYS' motion for summary judgment, and dismisses Plaintiff's Title VII failure to promote and retaliation claims *with prejudice,* and dismisses Plaintiff's state law claims *without prejudice.*

IT IS SO ORDERED.

SIGNED and ENTERED on this [*84] 26th day of August, 2002.

/s/George J. Limbert

United States Magistrate Judge

JUDGMENT ENTRY

This matter is before the Court upon Defendant's Motion for Summary Judgment. *See* ECF Dkt. # 33. For the reasons set forth in the Memorandum Opinion and Order issued in connection with the Defendant's Motion for Summary Judgment, which is incorporated herein by reference, the Court finds that there exists no genuine issues of material fact and that Defendant is entitled to judgment as a matter of law. Plaintiff's Title VII failure to promote and retaliation claims are dismissed *with prejudice,* and Plaintiff's state law claims are dismissed *without prejudice.* Costs are assessed to Plaintiff. Therefore, JUDGMENT is granted in favor of Defendant.

IT IS SO ORDERED.

SIGNED and ENTERED on this 26th day of August, 2002.

/s/George J. Limbert

United States Magistrate Judge