LEXSEE 1999 U.S. App. LEXIS 17969

GARY L. HOOPER, Plaintiff-Appellant, v. CARGILL, INCORPORATED, Defendant-Appellee.

No. 98-5870

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*1999 U.S. App. LEXIS 17969*

July 23, 1999, Filed

**NOTICE:**
[*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 206 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 206 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1999 U.S. App. LEXIS 27679*.

Certiorari Denied February 22, 2000, Reported at: *2000 U.S. LEXIS 1097*.

**PRIOR HISTORY:**
On Appeal from the United States District Court for the Middle District of Tennessee. 97-00650. Nixon. 6-16-98.

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
For GARY L. HOOPER, Plaintiff - Appellant: Frank Steiner, Ann Buntin Steiner, Steiner & Steiner, Nashville, TN.

For CARGILL, INCORPORATED, Defendant - Appellee: Paul E. Prather, J. Edward Wise, Steven W. Likens, Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Memphis, TN.

**JUDGES:**
Before: BOGGS, NORRIS, and BATCHELDER, Circuit Judges.

**OPINION:**

PER CURIAM. After Cargill, Inc. discharged Gary Hooper in a reduction in force, Hooper alleged age discrimination in violation of Tennessee and federal law. Hooper appeals from the district court's grant of summary judgment to Cargill, Inc. We affirm.

I

Born on November 1, 1949, Gary Lee Hooper began working for Mitchell Steel, Inc. in Nashville in 1972. In 1983, Cargill, Inc. ("Cargill") acquired [*2] Mitchell Steel's Nashville plant. Beginning (at the latest) in 1986, Hooper worked as a "Production Supervisor" for one of the three production shifts. Hooper consistently received performance evaluations of "good" and "very good." The Nashville plant's March 1996 loss of its largest customer forced the plant's General Manager to restructure and restaff the plant. As a result, in June 1996 Cargill fired Hooper (along with seven other employees) in a reduction in force.

On August 26, 1996, Hooper filed a complaint with the Tennessee Human Rights Commission and with the EEOC, alleging age discrimination. On June 17, 1997, Hooper filed a complaint in federal court alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Tennessee Human Rights Act, TENN. CODE ANN. §§ 4-21-101 & 4-21-401 & 4-21-407 (1998). On June 12, 1998, the court granted Cargill's motion for summary judgment, and dismissed the case. It found that Hooper did not state a prima facie case of age discrimination and that "there is absolutely no evidence linking the termination to Plaintiff's age."



II

Hooper argues on appeal that the [*3] district court erred by finding that he failed to satisfy the prima facie burdens of an ADEA age discrimination claim. First, he believes that "a reasonable juror could easily conclude that Hooper was replaced by [Robert] Tigg," a younger employee. Second, Hooper contends that, even if Tigg did not replace him, the record supports an inference that Cargill fired Hooper because of his age. Courts analyze claims under the Tennessee Human Rights Act under the same standards as federal discrimination law, *see, e.g., Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984), so we refer only to the ADEA claim.

A. Whether Cargill Replaced Hooper

A plaintiff may state a prima facie case of age discrimination by showing that (1) he belongs to the protected class; (2) he had the qualifications to perform the job; (3) he suffered an adverse employment action; and (4) his employer replaced him with a younger employee. *See, e.g., Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). In a workforce reduction, however, a plaintiff faces a more significant burden. If his employer did not replace him, the plaintiff cannot state [*4] a prima facie case without presenting "evidence sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir.), cert. denied, 498 U.S. 878, 112 L. Ed. 2d 171, 111 S. Ct. 211 (1990). "The mere termination of a competent employee when an employer is making cutbacks due to economic insufficiency is insufficient to establish a prima facie case of age discrimination." *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984). "The plaintiff in such reorganization cases must come forward with additional direct, circumstantial, or statistical evidence that age was a factor in his termination in order to establish a prima facie case." *Id.* at 1091. Cargill concedes that Hooper satisfied the first three elements of the prima facie test, but it contends (and the district court agreed) that it did not replace Hooper with a younger employee.

Hooper argues that Robert Tigg, then 34 years old, replaced him, and that he thus stated a prima facie case even if he did not present evidence [*5] suggesting that Cargill intentionally discriminated. In our opinion in *Barnes*, we discussed the meaning of "replaced":

[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.2d at 1465. The evidence shows that there is no dispute as to the material fact that Tigg did not replace Hooper; rather, Bob Pittard, the Plant Manager, placed Tigg in a new position that combined Tigg's old duties and many of Hooper's old duties. The "Statement of Undisputed Facts in Support of Cargill's Motion for Summary Judgment" contains four undisputed paragraphs that prove that Tigg did not replace Hooper:

56. Following the plant realignment and reduction in force, Tigg did not replace Hooper. Tigg continues to perform his former duties supervising the shipping and scheduling departments and also supervised [sic] the first shift production employees formerly supervised by Hooper. [*6]

RESPONSE. Admitted only for purposes of this motion.

....59. After the reduction in force, Tigg began performing Hooper's former supervisory duties **in addition to his own and that Hooper's remaining duties** were distributed among other existing employees who remained after the reduction in force.

RESPONSE: Admitted only for purpose of this motion. However, Plaintiff would state that it was his understanding that Robert Tigg assumed the majority of his job duties.

60. Tigg did not receive a pay raise at the time he took over these additional duties.

RESPONSE: Admitted only for purposes of this motion.

61. Hooper also formerly performed certain administrative duties (purchasing of plant supplies, handling employee records and time cards) that Tigg did not pick up and that are now being performed by other employees who were employed prior to the reduction in force. These employees perform these duties in addition to their own duties.

RESPONSE: Admitted only for purposes of this motion.

(emphasis in original) (citations to record omitted).

Hooper argues on appeal that Tigg replaced him, but he does not address the admissions reprinted above. He seems to use "replacement" [*7] in its informal sense, rather than conforming his usage to the definition in the *Barnes* opinion. For example, he argues that, "In this case plaintiff agrees there was no replacement in the

sense of new employees being hired, however there was a direct replacement of older employees by substantially younger, less qualified employees in the production supervisor position." True, where Gary Hooper (46) and Carl Allen (54) once supervised production shifts, now Robert Tigg (34) and John Patterson (30) supervise production shifts. Applying the *Barnes* interpretation of "replace," however, shows that Tigg did not replace Hooper: Tigg shouldered some of Hooper's duties (production supervisor) in addition to Tigg's duties (shipping and scheduling supervisor); Cargill distributed Hooper's remaining duties among existing employees performing related work. As for Hooper's assertion that "the same job title was retained with only a minor change in duties," Hooper produces no evidence to support his statement, and the evidence in the record belies his claim. n1

> n1 Suggesting the existence of a prima facie burden more lax than the one we describe above, Hooper cites many cases from other circuits. For example, he filed as supplemental authority the opinion in *Miller v. Borden, Inc.*, 168 F.3d 308 (7th Cir. 1999), and he claimed that the *Miller* opinion established burdens less onerous than those required of Hooper by the district court. Even if this court's opinion in *Barnes* did not control, we would not apply the reasoning in *Miller* to this appeal: *Miller* considers the burdens attending a case of a single discharge, not a reduction in force, and the opinion distinguishes reduction-in-force from single-discharge cases. See *Miller, 168 F.3d at 313 & n.1.*

[*8]

B. Whether the Evidence Permits an Inference of Age Discrimination

"The plaintiff in [cases of corporate reorganization or of a reduction in force] must come forward with ... direct, circumstantial, or statistical evidence that age was a factor in his termination in order to establish a prima facie case." *LaGrant, 748 F.2d at 1091.* Hooper contends that the record supports the inference that Cargill fired him because of his age. Although Hooper offers some evidence to substantiate his claim, he fails to "eliminate[] the most common non-discriminatory explanations" for his firing. *Allen v. Diebold, Inc., 33 F.3d 674, 678 (6th Cir. 1994).* Little evidence suggests that Cargill considered Hooper's age, and Hooper certainly did not "present evidence of actions taken by the employer which, if unexplained, are more likely than not based on consideration of impermissible factors." *Ibid.* Hooper admits that Cargill suffered economic problems and had to fire someone, he just wishes that Cargill had not fired him:

Question: Who do you think should have gone -- or do you think somebody else should have gone rather than you?
Hooper: I think somebody [*9] else should have gone rather than me.
Question: Anybody in specific, or just somebody other than you?
Hooper: Just somebody other than me, sir.
Question: Okay. But not anybody in particular?
Hooper: No, sir.

(J.A. 100-01).

Hooper presents a variety of arguments to contend that he stated a prima facie case of age discrimination. Hooper's reasons fall loosely into several categories:

1. Termination of a Qualified Employee, and the Relative Qualifications of Hooper & Tigg

Hooper emphasizes his annual performance evaluations, contending that the reviews portray him as exceptionally qualified. As this court noted in *Brocklehurst v. PPG Industries, Inc., 123 F.3d 890 (6th Cir. 1997)*, however, "the decision to discharge [in a reduction in force] a qualified, older employee is not inherently suspicious. ... In a RIF, qualified employees are going to be discharged." *Id. at 896.* Further, Hooper cannot deny that his May 1996 evaluation suggested that his "overall current performance" "needs improvement," nor can he deny that, in May 1995, the new General Manager, Frank Gettys, asked managers to raise their expectations, and that Cargill's national [*10] Human Resources director agreed with Gettys. Instead, Hooper argues that Gettys did not provide managers with explicit standards. He also correctly observes that Tigg's July 1994 and October 1995 evaluations (both by Pittard) are almost identical to each other (implying that the performance standards were not raised for Tigg).

Tigg's high 1995 rankings, assigned six months before Gettys asked Pittard to prepare for a reduction in force, suggest that Tigg performed well, not that Pittard intended to sabotage Hooper's career, and Hooper offers no evidence to the contrary. After Gettys's arrival, other employees (in addition to Hooper) received ratings lower than those they had previously received. Hooper makes the remarkable, unevidenced claim that "all of the objective records, including evaluations and past performance history, show that Hooper was an exceptional employee who clearly was more qualified than the younger employee who replaced him." Hooper's "subjective determination that he was better qualified," *LaGrant, 748 F.2d at 1091,* does not satisfy the burdens

of a prima facie case of age discrimination. Pittard believed that Tigg would perform better in the [*11] consolidated position than would Hooper; although the evidence could support a contrary conclusion (e.g., Hooper had far more supervisory experience than did Tigg), the record shows that Pittard could reasonably consider Tigg more qualified. n2

n2 An internal memo sent within Cargill's national Human Resources Department states that Hooper's many previous laudatory performance reviews represented a "potential problem," although the memo explains that increased performance expectations resulted in Hooper's lower 1996 evaluation. The memo does not permit the inference of age discrimination, however: merely because the company realized that an enterprising attorney might attempt to use the performance reviews as evidence does not, without more, render either the reviews or the evaluation of potential legal problems probative of discriminatory intent.

2. Hooper's Seniority, Drake's Comment About Hooper's Salary, & "Statistics"

The documents in the joint appendix contain no direct evidence of age discrimination. [*12] Hooper believes that an inference of discrimination arises from his seniority, his relatively high salary, and from Russell Drake's alleged comment that Cargill fired Hooper because he "earned too much." n3 Hooper admits that Cargill does not have a seniority system regarding salaried employees that required it first to fire the least-senior employees. He also agrees that he did not receive raises merely because of his age. Thus, even if Cargill targeted Hooper because of his seniority and salary, it did not violate the ADEA: "Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993); see also Allen v. Diebold, Inc., 33 F.3d 674, 677 (6th Cir. 1994)* ("Plaintiffs must allege that Diebold discriminated against them because they were old, not because they were expensive.").

n3 Drake, the Production Manager, served as Hooper's immediate supervisor. Cargill observes that Drake testified that Gettys and Pittard did not discuss Hooper's salary with Drake--strong evidence that, if Drake made the comment to Hooper, Drake relied on his subjective judgment, and not on the expressed judgment of Cargill's decisionmakers.

[*13]

Hooper also refers to "statistics" to prove his case: "Here the average age of defendant's two production supervisors [Hooper and Allen] before the reorganization was 50 and after the reorganization was 32 [Tigg and Patterson]. When the comparison is to all salaried employees, before the reorganization the average age was 39.8 and the average age for the four salaried employees terminated was 45."

Hooper's first statement misleads. Cargill reconfigured the jobs, so Tigg and Patterson do not hold the same jobs--they merely assumed some of the duties. Hooper cannot prove age discrimination merely by showing that Cargill retained younger employees in jobs that Hooper could have performed. *See, e.g., Barnes, 896 F.2d at 1465.* Further, Cargill did not fire Allen (then 54). Instead, it permitted him to stay on salary until he reached age 55 and qualified for early retirement; even after reaching 55, he continued to work as an hourly employee (and, as of December 1997, he still worked at Cargill). Additionally, if Pittard could reasonably find Tigg superior to Hooper, Cargill's alleged discrimination against Allen would not bolster Hooper's age discrimination claim. [*14] *See, e.g., Barnes, 896 F.2d at 1475.*

As for Hooper's second statement (concerning average age), the extremely small sample size reduces the probativeness of the averages. *See, e.g., Brocklehurst, 123 F.3d at 897* (questioning the strength of discrimination claims based on small samples of employees); *Black v. City of Akron, 831 F.2d 131, 134 (6th Cir. 1987).* Cargill fired eight employees in the reduction in force, and appears to have fired only three salaried employees, as it permitted Allen to stay: Maria Burkett (then 36), Durenda Hood (then 45) and Hooper (then 46)--resulting in an average age of 42.33, not 45, for the terminated salaried employees. Further, Burkett, Hood, Hooper, and Allen appear to have held low-ranking salaried positions, which suggests that Cargill released them because they did not hold vital positions, and not because of their age.

3. Cargill's Approach to the RIF: Pittard's Rankings and Refusal to Permit Transfer

Pittard bore responsibility for much of the planning of the reduction in force: he wrote a May 13, 1996 draft proposal reorganizing the plant's management structure and suggesting that Cargill [*15] fire six salaried employees, including Hooper; he prepared the May 30 or

31, 1996 evaluations of five employees to decide who would fill the position eventually assigned to Tigg; he presided over Drake's May 31, 1996 performance review of Hooper; and he spoke with Hooper when he fired him. Hooper complains about the chronology of the first three events, pointing out that, as of May 13, Pittard found him dispensable. Although Pittard could not remember many of the factors that influenced him when he compared the five employees in late May, Hooper has not shown that Pittard sought to justify his May 13 recommendation by doctoring the comparisons or by pressuring Drake to give a negative review. As Gettys commented, "You don't go in the day of a RIF and throw something to the wall and see if it sticks. You have to start planning ...." Even if we infer that Pittard made a decision in May 13 and later acted to justify the decision, the inference does not suggest that Pittard targeted Hooper because of his age.

A dispute persists regarding Pittard's failure to offer Hooper the ability to transfer to another plant. In his deposition, Hooper testified that, "When I went to Mr. Pittard's [*16] office on June 27th to get terminated, I asked him at that point was there any option for transfer, and he told me no." In his affidavit, Hooper declares that Pittard did not offer a transfer and that, had Pittard offered, Hooper would have accepted. On appeal, Hooper states without citation that Cargill "had a *policy* of transferring employees if they were caught in a reduction in force" (emphasis added).

Cargill does not appear to have a policy of transferring employees, however, Pittard testified that, in 1986, the Nashville plant implemented a reduction in force and that, to his knowledge, Cargill did not offer transfers. When questioned about the 1996 reduction in force, Pittard testified that Dave Lewis, Cargill's national Human Resources manager, told him that transfers "would not be an option." Although the joint appendix contains only portions of Lewis's deposition, the joint appendix reprints segments in which he suggests that Cargill "would try to accommodate" employees if they wished to transfer, "an opening was available and also the employee possessed the technical skills and competencies to in essence fill the vacancy, yes, that would be considered." He testified [*17] that he did not remember if anyone in the Nashville plant asked him about transferring the fired employees, and that he did not remember if he "approached the issue of transferring."

Hooper presents no evidence that Cargill gave any fired Nashville employee the option to transfer. Lewis's comments suggest that Cargill permits transfers only when convenient, and not as policy, and Pittard testified that Lewis told him that transfers "would not be an option." Especially in the absence of a company policy permitting or encouraging transfers in case of a reduction in force, Cargill's behavior does not support an inference of discrimination. "This Circuit has clearly established that an employer has no duty under ADEA to permit an employee to transfer to another position or to displace workers with less seniority when the employee's position is eliminated as part of a work force reduction." *Barnes, 896 F.2d at 1469.*

III

Hooper presents no substantial arguments that the district court did not address in its opinion. Faced with pressing financial difficulties, Cargill had to fire someone; although Hooper understandably wishes that Cargill had fired someone else, he does [*18] not show that Cargill chose to fire him because of his age. For the reasons given above, the judgment of the district court is AFFIRMED.

4 of 28 DOCUMENTS

DIANE TREPKA, Plaintiff-Appellant, v. THE BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT, Defendant-Appellee.

No. 00-4063

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

28 Fed. Appx. 455; 2002 U.S. App. LEXIS 1357

January 24, 2002, Filed

**NOTICE:**
[**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:**
On Appeal from the United States District Court for the Northern District of Ohio. 96-01955. Wells. 08-07-00.

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
For DIANE TREPKA, Plaintiff - Appellant: John B. Gibbons, Shawn P. Martin, Cleveland, OH.

For THE BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT, Defendant - Appellee: Kenneth B. Stark, Michael T. Pearson, Richard C. Hubbard, III, Duvin, Cahn & Hutton, Cleveland, OH.

**JUDGES:**
Before: BOGGS and GILMAN, Circuit Judges; and QUIST, District Judge. *

* Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

**OPINION:**

[*458]

PER CURIAM.

Diane Trepka appeals the district court's summary judgment for the Board of Education of the Cleveland City School District ("the Board"), dismissing all her claims arising [**2] under the Americans with Disabilities Act ("ADA"). *42 U.S.C. § 12101 et seq.* Because of injuries from a 1991 car accident, Trepka had difficulty climbing stairs and carrying loads. Trepka alleges that she has a qualifying disability under the ADA and that the Board failed to meet the ADA's requirements in dealing with her disability. In short, Trepka claims that the Board and its employees failed reasonably to accommodate her disability, harassed her on the basis of her disability, retaliated against her for filing complaints regarding the Board's lack of accommodation, and discharged her constructively because of her disability. The district court, assuming that Trepka had a qualifying disability, held that the Board's treatment of her did not violate the ADA. For the following reasons, we affirm the district court's grant of summary judgment.

I

In March 1991, Trepka was involved in an automobile accident, resulting in "myofacial pain syndrome." The syndrome causes continuing pain in Trepka's back and neck, and her physicians state that the condition is permanent. According to her physicians, Trepka's condition prevents her from climbing stairs [**3] "quickly" and carrying "oversized" loads.

Trepka, at the time of the accident and until her resignation in January 1997, was a special education teacher for the Cleveland City Schools. After a leave of absence due to her injuries, Trepka was assigned to teach

EXHIBIT R

an "adaptive management class" for behaviorally disabled students at Adlai Stevenson Elementary School. After telling the Board that her injuries would make it difficult to control disobedient children physically, she was transferred to Marion Seltzer Elementary School and a class of developmentally disabled students.

At Marion Seltzer, the allegedly unaccommodating and abusive conduct that is the basis of this action began. On her very first day, Marion Seltzer's principal, Bonnie Terrell, asked her whether her transfer was "voluntary or involuntary." Trepka was evaluated "more often than usual" by the administration, although each time receiving good to excellent reviews. In March 1996, she took a second medical leave because of her condition. When she returned, the Board reassigned her to another school in the district, but rescinded the reassignment before Trepka started teaching there because the school had no first floor [**4] room available for Trepka's class, and a second floor room would challenge her ability to climb stairs.

Before Trepka went on her second medical leave and was temporarily transferred from Marion Seltzer, she was assigned to Room 108 at Marion Seltzer. When Trepka returned to Marion Seltzer, Terrell placed her in Room 104, claiming that Room 108, the largest in the school, was already assigned to an overcrowded kindergarten class. Although Room 104 was also on the first floor, Room 108 was closer to Trepka's car and did not necessitate carrying materials for longer distances. Trepka demanded to be reassigned to Room 108 and rejected Terrell's alternative offers of the assistance of custodial staff or the availability of a cart to carry materials from her car to Room 104.

Terrell and Trepka had several tense verbal interactions during her time at Marion Seltzer. On one occasion, Terrell made several comments about Trepka's [*459] ability to walk. Terrell also reprimanded Trepka and another teacher for having a verbal altercation in the presence of students. On yet another occasion, Terrell asked Trepka to sit on the floor with her students at a school assembly.

In January 1997, Trepka resigned, [**5] claiming that her disability made it impossible to work under the conditions set by Terrell and the Board. After filing two complaints with the Ohio Civil Rights Commission, Trepka filed the complaint in this action in January 1996, before she had resigned her teaching position. After several amendments to her complaint, the Board moved for summary judgment in January 1998. The district court granted the Board's motion for summary judgment. According to the district court, there was a genuine issue of material fact at least as to whether Trepka had a "disability" as defined by the ADA. Nevertheless, the district court held that Trepka had demonstrated no genuine issue of material fact as to whether the Board had failed reasonably to accommodate her disability, whether she had been harassed or retaliated against because of her disability or her requests for accommodation, or whether she had been constructively discharged.

Trepka now appeals the district court's summary judgment dismissing her causes of action.

II

Trepka argues that the district court erred in granting summary judgment with regard to four categories of claims. First, Trepka contends that she demonstrated a genuine [**6] issue of material fact that the Board failed reasonably to accommodate her disability. Second, Trepka argues that Terrell's various comments to and treatment of Trepka establishes a genuine issue of material fact that Trepka was the victim of discriminatory harassment. Third, Trepka claims that there is a genuine issue of material fact as to whether the Board retaliated against Trepka for filing complaints regarding the accommodation of her disability during her tenure with the school district. Finally, Trepka insists that the Board's lack of accommodation and hostile treatment forced her to resign and creates at least a genuine issue of material fact as to whether she was constructively discharged. We consider each of these arguments separately.

A. Trepka's Accommodation Claim

Trepka argues that the district court erred in granting summary judgment on her accommodation claims. From her brief, it is difficult to determine the manner in which Trepka thinks the district court erred. We can discern two possible assertions of error. On the first theory, the Board could have reasonably accommodated her disability by placing her in Room 108, which is closer to the parking lot, [**7] rather than Room 104. Here, the Board offered two alternative accommodations: a cart or the assistance of custodians to help move materials from her car.

If an employee has a qualifying disability, the employer is required to provide such reasonable accommodations as will enable her to perform the essential functions of her job. *See* 42 U.S.C. § 12112(b)(5)(A); *Gaines v. Runyon, 107 F.3d 1171, 1178 (6th Cir. 1997)*. A request for accommodation by an employee or her physician triggers the employer's statutory duty reasonably to accommodate the employee's condition. The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the "ultimate discretion" to

choose another effective accommodation, even if less expensive or easier to provide. *Hankins v. The Gap, 84 F.3d 797, 800-01* [*460] *(6th Cir. 1996).* Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided. *Ibid.*; 29 C.F.R. § 1630.9(d) (2001). To prevail, Trepka must demonstrate a genuine issue of material fact with regard [**8] not only to her entitlement to her requested accommodation, but also to the inadequacy of the offered alternatives. *See Gaines v. Runyon, 107 F.3d 1171, 1178 (6th Cir. 1997).*

Trepka does not appear to offer any evidence regarding the adequacy of the alternatives offered by the Board. Trepka's requested accommodation, her reassignment to Room 108, establishes a baseline of her view of a reasonable accommodation. The only relevant difference between the requested Room 108 and her assigned Room 104 is the distance that Trepka would be required to navigate inside the building from her car. Apparently, Trepka regularly carried teaching materials from her car to her classroom. Her placement in Room 104 increased the distance that those materials would need to be carried.

Her physician had previously indicated that Trepka's condition limited her ability to carry loads and to climb stairs. Trepka, however, presented no evidence that her condition limited her ability to walk. Although placement in Room 104 increased the distance that she would need to walk, each of the two offered alternative accommodations, the use of a cart and the assistance of custodial staff, would obviate [**9] the need for her to carry loads any further from her car. Indeed, her own physician, in his letter to the school requesting a room reassignment, suggested assistance in carrying her materials as an alternative. Trepka claims that she asked the custodian for assistance once and that he was late in helping her, but we hold that such evidence falls well short of demonstrating that the accommodation was unavailable. Moreover, such a claim indicates very little about the availability or adequacy of the cart. We hold that there is no genuine issue of material fact that these alternatives were offered and available, and were adequate accommodations. Because the ADA does not entitle a disabled employee to insist on one among several reasonable accommodations, we hold that the district court's summary judgment was appropriate on this theory of Trepka's accommodation claim.

The second and only other theory of the Board's failure to accommodate is that she was not provided with adequate handicapped parking. According to Trepka, the parking facilities at Marion Seltzer Elementary School did not meet Department of Justice standards for handicapped parking. Insofar as Trepka's cause of action is [**10] under only the ADA, she must demonstrate that she required better parking as a reasonable accommodation to *her* physical limitations. One feature of the parking lot to which Trepka was assigned was the need to climb five steps to the door. Although there is evidence that Trepka's condition limited her ability to climb steps, Trepka's physician indicated that it was his recommendation that she climb steps no more than two to three times a day. The parking provided only required Trepka to climb less than a flight of stairs once a day. Absent any evidence of more profound physical limitations arising from her condition, we hold that Trepka has not demonstrated a genuine issue of material fact as to whether her parking needs were reasonably accommodated.

B. Trepka's Hostile Work Environment Claim

Trepka argues that the Board and its employees engaged in discriminatory harassment and created a hostile work [*461] environment for her because of her disability. In order to maintain an action for a hostile work environment under the ADA, the employee must demonstrate that: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; [**11] (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures. *See Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 872 (6th Cir. 1997)* (establishing the framework of proof under Title VII for sexual harassment); *Crawford v. Medina General Hosp., 96 F.3d 830, 834 (6th Cir. 1996)* (holding that the elements of a hostile work environment claim are the same across discrimination contexts and applying those elements specifically to the Age Discrimination in Employment Act). The Supreme Court has elaborated on what type of conduct can constitute harassment and form the basis for a hostile work environment claim. *See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* To prevail, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment." *See ibid.; Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).* [**12] Conduct that is "merely offensive" will not suffice to support a hostile work environment action. *See Harris, 510 U.S. at 21.*

This court is able to find only a few instances of conduct alleged here that could even approach harassment. Trepka claims that she was accosted on several occasions by the principal at the Marion Seltzer school, Bonnie Terrell. On September 28, 1995, Terrell had a relatively contentious oral confrontation with Trepka, yelling: "Answer me, Mrs. Trepka. Answer me.

You can walk. We all see you walk. You walk these steps every day." In the Winter of 1995, Terrell asked Trepka to knock the snow off her boots before entering the building while "other people were entering with snow on their boots." At an assembly, Terrell asked Trepka and another allegedly "disabled" teacher to sit on the floor with their classes while other teachers were not so asked. When Trepka arrived at Marion Seltzer, Terrell asked her whether her transfer was "voluntary or involuntary." Towards the end of her employment, Trepka says that she pressed a panic buzzer to the principal's office and Terrell failed expeditiously to respond.

The alleged conduct falls well short of [**13] even presenting a genuine issue of material fact regarding whether Trepka was subjected to a hostile work environment. Perhaps the strongest instance of conduct is Terrell's stern words about Trepka's ability to walk. At most, however, those words express skepticism regarding Trepka's condition. This single incident of explicit reference to Trepka's disability is not sufficiently severe to constitute harassment under our precedents.

With regard to Terrell's other conduct, there is no evidence that it was undertaken "because" of Trepka's disability. Our harassment jurisprudence requires that we distinguish between harassment and discriminatory harassment. See Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000). Thus, an employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class. See Faragher v. City of Boca Raton, 524 U.S. 775, 778, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). There is no evidence on the basis of which a reasonable jury could begin to determine that Terrell acted because [*462] of Trepka's disability rather than, for example, that Terrell asked Trepka to sit on [**14] the floor once because her developmentally disabled students needed extra attention, or that Terrell asked Trepka to knock the snow off her boots because Terrell did not notice anyone else, or that Terrell did not answer the panic button because she was not in her office, or that Terrell did all of these things because she just did not personally like Trepka. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) (holding that harassment motivated by personal dislike for an employee is not actionable under the discrimination laws). To avoid summary judgment, Trepka need not prove Terrell's motivation, but she should at least provide some evidence of discrimination -- and we can find none.

Accordingly, we affirm the district court's summary judgment with regard to Trepka's hostile work environment claim.

### C. Trepka's Retaliation Claim

Trepka next contends that she was the victim of prohibited retaliation for filing complaints with the Ohio Civil Rights Commission. See 42 U.S.C. § 12203(a) (prohibiting discrimination against any individual for engaging in conduct protected by the ADA, including [**15] filing a grievance). To establish an action for retaliation under the ADA, the employee must at least show that she suffered an "adverse employment action." See Penny v. United Parcel Serv., 128 F.3d 408, 417 (6th Cir. 1997). While there are, of course, other elements to a retaliation claim under the ADA, we need not elaborate upon them here as Trepka has not demonstrated a genuine issue of material fact that she suffered an "adverse employment action."

Not every action that the employee dislikes is an "**adverse employment action.**" See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996). Instead, the employer's conduct must effect a "materially adverse change in the terms and conditions of employment." Ibid. For **example**, reassignments do not constitute **adverse employment actions** without disadvantageous changes in hours or salary. See Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987). More generally, courts look for at least a termination of employment, a demotion in wage, salary or job title, a loss of benefits, or a decrease in responsibilities. See, e.g., Crady v. Liberty National Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). [**16]

Trepka has suffered none of these. Her salary, promotion track, and responsibilities were not diminished by any Board action. Indeed, her job evaluations throughout were either "good" or "excellent." At most, Trepka perceives an attitude of dislike among certain administrators. But such an atmosphere is not even close to the adverse *action* required to constitute retaliation. We therefore affirm the district court's summary judgment on her retaliation claim.

### D. Trepka's Constructive Discharge Claim

Finally, Trepka claims that, although she resigned and was not terminated from her position, she was "constructively discharged" and therefore is entitled to relief. Trepka's incantation of the words "constructive discharge," of course, is not sufficient to establish a cause of action because, absent explicit contractual provisions to the contrary, an employer may explicitly discharge any employee at will. See, e.g., Wright v. Honda of Am. Mfg., Inc., 73 Ohio St. 3d 571, 653 N.E.2d 381, 384 (Ohio 1995) ("In general, under the employment-at-will doctrine, the employment relationship between employer and employee is terminable at the will of either, [*463] thus, an [**17]

employee is subject to discharge by an employer at any time, even without cause."). Rather, conduct that forces an employee to quit, constituting "constructive discharge," is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic. The discriminatory conduct must then make working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996).*

Indeed, simple proof of discrimination is not enough to convert an employee's resignation into an actionable constructive discharge. Instead, there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment. *See Yates v. Avco Corp., 819 F.2d 630, 637 (6th Cir. 1987).*

Consequently, because we have held as to all of her other claims that Trepka has not demonstrated one genuine issue of material fact as to whether she was discriminated against because of her disability, she is far from establishing the "aggravating factors" necessary for a "constructive [**18] discharge" action. We therefore affirm the summary judgment of the district court on Trepka's constructive discharge claim.

III

Having also held that Trepka demonstrated no genuine issue of material fact with regard to her accommodation, hostile work environment and retaliation claims, we AFFIRM the district court's summary judgment in favor of the defendant.

LEXSEE 2003 OHIO APP. LEXIS 5097

SUSAN BARLOWE, et al., Plaintiffs-Appellants vs. AAAA INTERNATIONAL DRIVING, Defendant-Appellee

C.A. CASE NO. 19794

COURT OF APPEALS OF OHIO, SECOND APPELLATE DISTRICT, MONTGOMERY COUNTY

*2003 Ohio 5748; 2003 Ohio App. LEXIS 5097*

**October 24, 2003, Decided**

**PRIOR HISTORY:** [**1] (Civil Appeal from SCHOOL, INC. Common Pleas Court). T.C. NO. 99 CV 05112.

**DISPOSITION:** Judgment affirmed in part and reversed in part; cause remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee and her husband appealed from a judgment of the Montgomery County Court of Common Pleas (Ohio) which granted summary judgment in favor of the worker's employer on her claims of retaliation, disability discrimination, negligent and intentional infliction of emotional distress, and violation of public policy.

**OVERVIEW:** The employee was employed as a driving instructor for the employer. She was involved in an automobile accident. She filed a workers' compensation claim stemming from the accident. She returned to work as a part-time classroom instructor. The employer then placed advertisements for a driving instructor. The employee claimed this was in retaliation for filing a workers' compensation claim. The appellate court held the disability discrimination claim, pursuant to *Ohio Rev. Code Ann. § 4112.99*, was filed within the six-year time period. Since the trial court ruled on the disability discrimination claim based solely on statute of limitations grounds, it erred in granting summary judgment. The employee had a statutory remedy that adequately protected society's interests. The public policy expressed by § 4112.99 would not be jeopardized by the lack of a common law tort remedy. The employee had to pursue her claim under § 4112.99 in order to vindicate her rights under that statute and the policy interests expressed therein. Thus, the trial court's grant of summary judgment on the ground that she failed to meet the jeopardy element of her claim was not erroneous.

**OUTCOME:** The judgment of the trial court was affirmed in part, reversed in part, and remanded for further proceedings, including consideration of the non-statute of limitations aspects of the employer's motion for summary judgment.

**CORE TERMS:** disability, summary judgment, public policy, wrongful discharge, discrimination claim, jeopardy, common-law, violation of public policy, retaliatory discharge, workers' compensation, retaliation, statute of limitations, notice requirement, statutory claim, jeopardized, common law tort, clarity, granting summary judgment, wrongful discharge claim, statutory remedies, statutory scheme, statutory remedy, oral argument, matter of law, tort action, tort claim, aggrieved, vindicate, public policy claim, instructor

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Summary Judgment > Summary Judgment StandardCivil Procedure > Summary Judgment > Standards of Review*
[HN1] The appellate court's review of a trial court's decision to grant summary judgment is de novo. Ohio R. Civ. P. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party

Orlando 60333.1


EXHIBIT S

against whom the motion for summary judgment is made.

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN2] The law of the case doctrine provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN3] The law of the case doctrine functions to compel trial courts to follow the mandates of reviewing courts. Thus, where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law.

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN4] The law of the case doctrine has been extended to encompass a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same case. However, the doctrine should not be taken to imply that a trial court can never, under any circumstances, reconsider its prior ruling. Specifically, it does not preclude a court from reconsidering its prior rulings in order to correct its own errors.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & DefinitionsGovernments > Legislation > Statutes of Limitations > Time Limitations*
[HN5] The statute of limitations for claims of disability discrimination, pursuant to Ohio Rev. Code Ann. ch. 4112, is six years. A claim based solely upon Ohio Rev. Code Ann. § ch. 4112 is not subject to the statute of limitations for *Ohio Rev. Code Ann. § 4123.90.*

*Labor & Employment Law > Employment Relationships > At-Will EmploymentLabor & Employment Law > Wrongful Termination > Public Policy*
[HN6] Ohio adheres to the doctrine of employment at will, which refers to the traditional rule that a general or indefinite hiring is terminable at the will of either party, for any cause, no cause or even in gross or reckless disregard of any employee's rights. However, there are several exceptions to the doctrine of employment at will. The courts have recognized the exceptions of implied contract and promissory estoppel. The Supreme Court of Ohio has recognized a cause of action for wrongful discharge in violation of public policy. Clear public policy sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the general assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law.

*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN7] The elements of a claim of wrongful discharge in violation of public policy are well-established: (1) that clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). The first two elements, the clarity and jeopardy elements, both of which involve relatively pure law and policy questions, are questions of law to be determined by the court. The third and fourth elements are questions of fact to be determined by the jury.

*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN8] In regard to wrongful discharge based upon public policy, an analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim. Where the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, the issue of adequacy of remedies becomes a particularly important component of the jeopardy analysis. If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy. Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests. In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct.

*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN9] In regard to wrongful discharge based on public policy, the jeopardy element involves an inquiry into whether the statute provides an adequate remedy to the plaintiff. Adequacy of remedies issue arises where the right and remedy are part of the same statute which is the sole source of the public policy opposing the discharge.

*Labor & Employment Law > Wrongful Termination > Remedies*
[HN10] See *Ohio Rev. Code Ann. § 4112.99*.

*Labor & Employment Law > Wrongful Termination > Remedies*
[HN11] *Ohio Rev. Code Ann. § 4112.99* has been interpreted to allow for the recovery of compensatory damages and, when actual malice is shown, punitive damages. "'Damages,' absent a restrictive modifier like "compensatory," "actual," "consequential" or "punitive," is an inclusive term embracing the panoply of legally recognized pecuniary relief. Thus, the remedies provided by *Ohio Rev. Code Ann. § 4112.99* provide broad relief which is sufficiently comprehensive to vindicate the policy goals set forth in that statute.

**COUNSEL:** DEBORAH J. ADLER, Dayton, Ohio, Attorney for Plaintiffs-Appellants.

ERIN B. MOORE, Dayton, Ohio, Attorney for Defendant-Appellee.

**JUDGES:** WOLFF, J. YOUNG, J. and BRYANT, J., concur. (Hon. Thomas F. Bryant sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

**OPINIONBY:** WOLFF

**OPINION:** WOLFF, J.

[*P1] Susan and Clarence Barlowe appeal from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of Susan Barlowe's employer, AAAA International Driving School, Inc. ("AAAA"), on her claims of retaliation, disability discrimination, negligent and intentional infliction of emotional distress, and violation of public policy.

[*P2] On October 15, 1998, Susan Barlowe ("Barlowe") was employed as a behind the wheel driving instructor for AAAA. On that date, she was involved in an automobile accident, causing her to be unable to work. Barlowe filed a workers' compensation claim stemming from the accident. On May 3, 1999, she was released by her physician to return to work, at which time she was scheduled [**2] as a part-time classroom instructor. Barlowe returned to work for AAAA from May, 1999, through October, 1999, and from December, 1999, through September, 2000. She has not worked for AAAA since that time.

[*P3] In June of 1999, Defendant placed newspaper advertisements for driving instructors. According to Barlowe, these advertisements were placed in retaliation for her filing a workers' compensation claim. Consequently, on November 18, 1999, Barlowe filed a complaint, asserting claims of disability discrimination, in violation of *R.C. Ch. 4112*; negligent and intentional infliction of emotional distress; and retaliatory discharge due to her filing of a workers' compensation claim. Barlowe's husband asserted a claim for loss of consortium. On October 3, 2000, AAAA filed a Motion to Dismiss Barlowe's claims of disability discrimination and retaliatory discharge under *R.C. 4123.90*, on the ground that she had failed to comply with the ninety day notice requirement in that statute. The trial court granted the Motion. On February 16, 2001, the Barlowes filed a First Amended Complaint, reasserting claims of the disability discrimination under *R.C. Ch. 4112*, [**3] emotional distress, retaliatory discharge, and loss of consortium. Therein, they indicated that the trial court had dismissed her workers' compensation retaliation claim for failing to meet the notice requirement of *R.C. 4123.90*. Barlowe also alleged an additional claim of disability discrimination in violation of public policy, in accordance with *Greeley v. Miami Valley Contractors, Inc.(1990), 49 Ohio. St.3d 228, 551 N.E.2d 981*.

[*P4] On February 26, 2002, AAAA filed a Motion for Summary Judgment on all of the Barlowes' remaining claims. Prior to ruling on AAAA's Motion, the trial judge retired, and the action was reassigned to another common pleas judge. On January 31, 2003, the trial court sustained AAAA's Motion. Specifically, the court noted that the claims of retaliatory discharge and disability discrimination had been dismissed by that court on November 22, 2000. It granted summary judgment on the public policy claim, indicating that the jeopardy element of her claim had not been met. The trial court also granted summary judgment on Barlowe's emotional distress claims and her husband's derivative loss of consortium claim.

[*P5] [**4] Barlowe raises two assignments of error on appeal.

[*P6] "I. THE TRIAL COURT COMMITTED AN ERROR OF LAW IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANT ON PLAINTIFF'S CLAIMS FOR DISABILITY

DISCRIMINATION PURSUANT TO *R.C. 4112* AND FOR WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY BECAUSE IT IMPROPERLY APPLIED THE PROCEDURAL REQUIREMENTS OF *REVISED CODE SECTION 4123.90* CONCERNING PLAINTIFF'S SEPARATE CLAIM FOR WORKER'S COMPENSATION RETALIATION."

[*P7] Barlowe challenges the trial court's decision which granted summary judgment on her disability discrimination claim under *R.C. Ch. 4112*. She asserts that the trial court failed to recognize that she had alleged disability discrimination, in violation of *R.C. Ch. 4112*, as a separate and alternative claim to her retaliatory discharge claim, based on her filing and pursuing a workers' compensation claim. She further argues that she was not required to elect between *R.C. Ch. 4112* and *R.C. 4123.90*, and that the notice requirement of *R.C. 4123.90* is inapplicable to her claim under *R.C. Ch. 4112*. In addition, Barlowe argues that, in granting summary judgment, [**5] the trial court incorrectly interpreted its prior ruling on the motion to dismiss by stating that the ruling had dismissed both her workers' compensation retaliatory discharge claim and her disability discrimination claim. In response, AAAA asserts that the trial court's November 22, 2000, decision dismissed both the disability discrimination claim and the retaliatory discharge claim. It further asserts that the trial court did not err in granting summary judgment on those claims, because it "simply followed the doctrine of *the law of the case* when it adhered to the prior dismissal of the two claims."

[*P8]   [HN1] Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Comm'rs. (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841*. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against [**6] whom the motion for summary judgment is made. See *State ex rel. Grady v. State Emp. Rels. Bd., 78 Ohio St.3d 181, 183, 677 N.E.2d 343, 1997 Ohio 221*; *Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 65-66, 8 O.O.3d 73, 375 N.E.2d 46*.

[*P9] In *Nolan v. Nolan (1984), 11 Ohio St.3d 1, 11 Ohio B. 1, 462 N.E.2d 410*, the Supreme Court of Ohio explained the law of the case doctrine:

[*P10]   [HN2] "The doctrine provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. * * *

[*P11]   [HN3] "The doctrine functions to compel trial courts to follow the mandates of reviewing courts. Thus, where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law."

[*P12]   *11 Ohio St.3d at 3* (citations omitted). [HN4] This doctrine has been extended "to encompass a lower court's adherence to its own prior rulings or to [**7] the rulings of another judge or court in the same case." *Poluse v. Youngstown (1999), 135 Ohio App. 3d 720, 725, 735 N.E.2d 505, 508*. However, the doctrine "should not be taken to imply that a trial court can never, under any circumstances, reconsider its prior ruling." *Id.* (quoting *Clymer v. Clymer, (Sept. 26, 1995), Franklin App. No. 95APF02-239, 1995 Ohio App. LEXIS 4303*. Specifically, it does not preclude a court from reconsidering its prior rulings in order to correct its own errors. See *id.*; *State ex rel. Dannaher v. Crawford, 78 Ohio St.3d 391, 678 N.E.2d 549, 1997 Ohio 72* (law of the case doctrine, as expressed in *Clymer*, does not preclude a common pleas judge from reconsidering an interlocutory order entered in the same case by a different judge); see also *Weaver v. Motorists Mut. Ins. Co. (1990), 68 Ohio App. 3d 547, 548, 589 N.E.2d 101, 102*.

[*P13]   Turning to the circumstances herein, although the trial court did not cite the law of the case doctrine, it granted summary judgment on the retaliation and disability discrimination claims, stating "these two claims were dismissed by this Court on November 22, 2000." Whether that [**8] doctrine could have been applied as a basis for summary judgment ruling depends on whether the *Chapter 4112* disability discrimination claim was, in fact, dismissed by prior Order. The November 22, 2000, Order dismissed the "actions of handicap discrimination and retaliation brought under *R.C. 4123.90*." (Doc. # 19 at 4). If the *Chapter 4112* claim was dismissed, as AAAA argues, then the trial court relied upon the law of the case doctrine when granting summary judgment on those claims. On the other hand, if the disability discrimination under *Chapter 4112* was not dismissed by in the November 22, 2000, Order, as Barlowe argues, then the trial court misconstrued the prior order. n1

---

n1 1 The Court notes that in its briefing on the Motion to Dismiss, AAAA indicated that Barlowe's disability discrimination claim was arguably brought under *R.C. 4123.90*, as well as

R.C.. Ch. 4112. It expressly stated that it had not moved to dismiss the disability discrimination claim under R.C. 4112. The Court further notes that R.C. Ch. 4112 was not mentioned in the November 22, 2000, Order.

[**9]

[*P14] Ultimately, this Court need not decide whether November 22, 2000, decision, in fact, dismissed both claims or, alternatively, whether the trial court misinterpreted the prior decision when it concluded that the disability discrimination under R.C. 4112 had been dismissed. [HN5] The statute of limitations for claims of disability discrimination, pursuant to R.C. Ch. 4112, is six years. See *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc., (1994) 70 Ohio St. 3d 281, 1994 Ohio 295, 638 N.E.2d 991*, syllabus ("R.C. 4112.99 is a remedial statute, and is thus subject to R.C. 2305.07's six-year statute of limitations."). A claim based solely upon R.C. Ch. 4112 is not subject to the statute of limitations for R.C. 4123.90. Barlowe's disability discrimination claim, pursuant to R.C. Ch. 4112, was unquestionably filed within the six-year time period, a fact which AAAA conceded during oral argument. Accordingly, we conclude that Barlowe's disability discrimination claim under R.C. Ch. 4112 was timely filed, and the trial court's grant of summary judgment on that claim, whether by applying the law of the [**10] case doctrine or by misinterpreting the prior dismissal decision as having dismissed that claim, was erroneous.

[*P15] During oral argument, AAAA asserted, as an alternate basis for affirming the trial court's grant of summary judgment, that Barlowe cannot create a genuine issue of material fact as to her disability discrimination claim and that it is entitled to judgment as a matter of law. Citing the de novo standard of review, AAAA invited this Court to review the summary judgment briefing and the evidence before the trial court and to rule that summary judgment in its favor was proper. We decline to do so. Because the trial court addressed Barlowe's disability discrimination claim solely on statute of limitations grounds, it did not reach the substantive elements of her claim. Under these circumstances, it is preferable that the trial court address these elements in the first instance by addressing the non-statute of limitations aspects of AAAA's motion for summary judgment.

[*P16] The first assignment of error is sustained.

[*P17] "II. THE TRIAL COURT COMMITTED AN ERROR OF LAW IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANT ON PLAINTIFF'S CLAIM FOR WRONGFUL DISCHARGE [**11] IN VIOLATION OF PUBLIC POLICY BECAUSE PLAINTIFF WAS ENTITLED TO MAINTAIN A SEPARATE CAUSE OF ACTION FOR COMMON LAW TORT AGAINST DEFENDANT NOTWITHSTANDING PLAINTIFF'S CLAIMS PURSUANT TO STATUTE."

[*P18] Barlowe claims that the trial court improperly granted summary judgment on her claim of wrongful discharge in violation of the public policy against disability discrimination, arguing that it incorrectly concluded that she could not satisfy the jeopardy element of that *Greeley* claim.

[*P19] [HN6] Ohio adheres to the doctrine of employment at will, which refers to the traditional rule that "a general or indefinite hiring is terminable at the will of either party, for any cause, no cause or even in gross or reckless disregard of any employee's rights." *Collins v. Rizkana, 73 Ohio St.3d 65, 67, 652 N.E.2d 653, 1995 Ohio 135*. However, the Supreme Court has recognized several exceptions to the doctrine of employment at will. See, e.g., *Mers v. Dispatch Printing Co. (1985), 19 Ohio St.3d 100, 19 Ohio B. 261, 483 N.E.2d 150* (recognizing two exceptions to the doctrine: implied contract and promissory estoppel). In *Greeley, supra*, the Supreme Court [**12] of Ohio first recognized a cause of action for wrongful discharge in violation of public policy. In *Painter v. Graley, 70 Ohio St.3d 377, 639 N.E.2d 51, 1994 Ohio 334*, paragraph three of the syllabus, the Court stated:

[*P20] "'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law."

[*P21] [HN7] The elements of a claim of wrongful discharge in violation of public policy are well-established:

[*P22] "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

[*P23] "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

[*P24] "3. The plaintiff's dismissal was motivated by conduct related to the public [**13] policy (the *causation* element).

[*P25] "4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)."

[*P26] *Collins, 73 Ohio St.3d at 69-70*; *Hundley v. Dayton Power & Light Co., 148 Ohio App.3d 556, 774 N.E.2d 330, 2002 Ohio 3566*. The first two elements, the clarity and jeopardy elements, "'both of which involve relatively pure law and policy questions,' are questions of law to be determined by the court." *Collins, 73 Ohio St. 3d at 70*. The third and fourth elements are questions of fact to be determined by the jury. See *id*.

[*P27] Herein, the trial court ruled that the clarity element had been satisfied, but that the jeopardy element had not been met. Citing to *Wiles v. Medina Auto Parts, 96 Ohio St.3d 240, 773 N.E.2d 526, 2002 Ohio 3994*, the trial court reasoned that "there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interest." The court held that the jeopardy element was not satisfied in Barlowe's circumstances, [**14] stating that "the public policy expressed, in this case handicap discrimination, would not be jeopardized by the absence of a common-law wrongful discharge action in tort because the aggrieved employee had an alternate means of vindicating her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct."

[*P28] Barlowe appeals the trial court's determination that the jeopardy element was not met. Specifically, she claims that she may maintain both a statutory claim under *R.C. Ch. 4112* and a common-law tort claim based on the public policy expressed by that statute, pursuant to *Greeley* and its progeny. AAAA responds that *Greeley* claims are unavailable when the statutory scheme parallels the damage remedies available in a common-law tort action.

[*P29] In *Kulch v Structural Fibers, Inc., 78 Ohio St.3d 134, 677 N.E.2d 308, 1997 Ohio 219*, the Supreme Court considered whether the jeopardy element had been met when an employee brought a statutory cause of action against his employer, pursuant to the Ohio Whistleblower Statute, *R.C. 4113.52*, and a corresponding wrongful discharge in violation [**15] of public policy claim, pursuant to *Greeley*. *Id. at 136-378*. In analyzing that element, the *Kulch* court stated that "the mere existence of statutory remedies in *R.C. 4113.52* [the Whistleblower Statute] does not, without more, operate to bar recognition of appellant's *Greeley* claim for tortious wrongful discharge in violation of *R.C. 4113.52*." *Id. at 156*. The Court specifically recognized that the statutory remedies "are not adequate to fully compensate an aggrieved employee who is discharged, disciplined, or otherwise retaliated against in violation of the statute." Thus, it concluded that a common-law claim for violation of public policy would further encourage, not hinder, the legislative objectives. The Court held that an at-will employee who is discharged in violation of the Whistleblower Statute may maintain a statutory claim for the violation, a common-law cause of action in tort, or both, but the employee is not entitled to double recovery. *Id. at 162*.

[*P30] The *Kulch* decision was immediately applied in *Livingston v. Hillside Rehabilitation Hosp., 79 Ohio St.3d 249, 680 N.E.2d 1220, 1997 Ohio 155* [**16] . In that case, the plaintiff brought a claim of age discrimination in violation of *R.C. § 4112.02* and a corresponding *Greeley* claim based solely on that statute. The lower courts had held that the plaintiff could not maintain her public policy claim in conjunction with her statutory claim, on the ground that the statutory discrimination claim afforded her adequate relief. The Supreme Court, without opinion, reversed and remanded on the authority of *Kulch*.

[*P31] Thereafter, various courts applying Ohio law have ruled that a *Greeley* claim based on the public policy expressed in *R.C. 4112* could be pursued alongside a statutory discrimination claim. E.g., *White v. Honda of America Mfg., Inc., 191 F. Supp. 2d 933 (S.D. Ohio 2002)* (Sargus, J.). Indeed, this Court reversed a grant of summary judgment on a claim of wrongful discharge in violation of public policy, based on Ohio's age discrimination statute, on the ground that the grant of summary judgment on the statutory age discrimination claim was likewise reversed. *Cruz v. South Dayton Urological Assoc., Inc. (1997), 121 Ohio App. 3d 655, 700 N.E.2d 675* (Grady, [**17] J.). However, many Ohio courts of appeals have held that a *Greeley* claim premised solely on *Ch. 4112* cannot be maintained. See *Berge v. Columbus Community Cable Access (1999), 136 Ohio App.3d 281, 736 N.E.2d 517, 534-35* (affirming dismissal of *Greeley* claim premised on *Ch. 4112*, because the remedies under *R.C. 4112.99* are sufficient to provide complete relief); *Shugars v. Allied Machine & Engineering Corp. (Aug. 28, 2003), Tuscarawas App. No. 2002-CA-10-0085, 2003 Ohio 4672*; *Wiles v. Medina Auto Parts (June 6, 2001), Medina App. C.A. NO. 3131-M, 2001 Ohio App. LEXIS 2499, 2001 WL 615938, aff'd, 96 Ohio St.3d 240, 773 N.E.2d 526, 2002 Ohio 3994*.

[*P32] Last year in *Wiles v. Medina Auto Parts, supra*, the Supreme Court distinguished *Kulch* and applied its holdings narrowly. Therein, the plaintiff alleged that he had been wrongfully discharged for exercising his rights under the Family and Medical Leave Act ("FMLA"), *19 U.S.C. § 2601 et seq*. Applying the analytical framework in *Collins*, the Court agreed that the FMLA expressed a clear public policy in favor of a [**18] qualified employee being allowed to

take medical leave to care for a parent with a serious health problem, thus satisfying the clarity element. Turning to the jeopardy element, the Court explained:

[*P33]    [HN8] "An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim. Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right *and* remedies for its breach, 'the issue of adequacy of remedies' becomes a particularly important component of the jeopardy analysis. 'If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy.' Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests. In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge [**19] action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct." *96 Ohio St.3d at 244* (citations omitted). Upon review of the FMLA statutory scheme, the Court noted that it provided substantive rights for employees, prohibitions applicable to employers, and a comprehensive remedial scheme designed to compensate an employee for his or her employer's violation of the Act. *Id.* It thus concluded that "this combination of compensatory damages and equitable remedies is sufficiently comprehensive to ensure that the public policy embodied in the FMLA will not be jeopardized by the absence of a tort claim for wrongful discharge in violation of public policy." *96 Ohio St. 3d at 245.*

[*P34]    In reaching this conclusion, the Supreme Court rejected the appellant's assertion that *Kulch* directed it to recognize a common law tort claim for wrongful discharge in violation of the FMLA, on the ground that the FMLA did not provide a complete remedy. It reasoned:

[*P35]    "*Kulch* does not, as Wiles argues, stand for the proposition that [**20] statutory remedies are inadequate--therefore warranting a *Greeley* claim--when those remedies provide something less than the full panoply of relief that would be available in a tort cause of action for wrongful discharge. Importantly, the analysis upon which Wiles relies garnered the votes of only three justices. Thus, *Kulch* is not controlling authority on the question of whether the remedies provided in a statute are sufficiently comprehensive to render unnecessary the recognition of a separate common-law *Greeley* claim based solely on the same statute--much less a *Greeley* claim based on a *federal* statute that was the product of a Congressional balancing of right and remedy that we ought not disturb." *96 Ohio St.3d at 247* (citations omitted).

[*P36]    Turning to the case before us, the trial court relied upon the Supreme Court's reasoning in *Wiles* in determining that Barlowe could not avail herself of a common law tort action for wrongful discharge in violation of public policy, based solely on Ohio's statute against disability discrimination. Barlowe claims that this reliance on *Wiles* was inappropriate, arguing that she did not bring claims [**21] under the FMLA. She further asserts that, in *Pytlinski v. Brocar Prod., Inc., 94 Ohio St.3d 77, 760 N.E.2d 385, 2002 Ohio 66*, the Supreme Court of Ohio reaffirmed its holdings in *Kulch* and *Greeley*, and that under *Greeley* and its progeny she is entitled to bring both a statutory claim under *R.C. 4112* and a wrongful discharge in violation of public policy tort claim, based on violations of that statute. AAAA responds that the principles and reasoning in *Wiles* are applicable beyond FMLA-based claims, and thus support the trial court's ruling. Barlowe replies that *Wiles* is not a clear majority opinion, in light of Justice Pfeifer's concurrence in judgment only, and that this court should not decide at this time whether *Wiles* applies to *R.C. Ch. 4112*.

[*P37]    Although the Supreme Court has not yet applied its reasoning in *Wiles* to wrongful discharge claims based on *R.C. Ch. 4112*, there is no indication that the principles expressed therein are limited to FMLA-based claims. Rather, the Supreme Court has repeatedly stated that [HN9] the jeopardy element involves an inquiry into whether the statute provides an adequate remedy to the plaintiff. [**22] See *Collins, supra* (adequacy of remedies issue arises where "the right and remedy are part of the same statute which is the sole source of the public policy opposing the discharge."); *Helmick v. Cincinnati Word Processing, Inc. (1989), 45 Ohio St. 3d 131, 543 N.E.2d 1212* (allowing concurrent tort action for sex discrimination when relief available under the statutory scheme did not parallel the damages available in a common-law tort action); *Kulch, supra* (permitting wrongful discharge claim based on Whistleblower statute where the remedies available under *R.C. 4113.52* would not provide complete relief).

[*P38]    The Supreme Court's ruling in *Pylinski* does not alter this conclusion. In that case, the Court held that the plaintiff's claim for wrongful discharge in violation of public policy was governed by the four-year statute of limitations for tort actions not specifically covered by other statutory sections and not the limitations period set forth in the Whistleblower Statute, *R.C. 4113.52*. At the heart of this ruling was the fact that the plaintiff had

relied upon Ohio's public [**23] policy in favor of workplace safety, not the public policy set forth in the Whistleblower Statute. The *Pylinski* court did not address *Greeley* claims based solely upon a violation of a statute. Unlike the plaintiff in *Pylinski*, Barlowe relies exclusively upon the public policy set forth in Ohio and federal anti-discrimination statutes. Accordingly, *Pylinski* is inapposite.

[*P39] Barlowe has relied upon *R.C. Ch. 4112*, including *R.C. 4112.99*, as the statutory basis for her wrongful discharge claim. n2 *R.C. 4112.99* provides that [HN10] "whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." [HN11] This statute has been interpreted to allow for the recovery of compensatory damages and, when actual malice is shown, punitive damages. *Rice v. CertainTeed Corp., 84 Ohio St. 3d 417, 704 N.E.2d 1217, 1999 Ohio 361*. "'Damages,' absent a restrictive modifier like 'compensatory,' 'actual,' 'consequential' or 'punitive,' is an inclusive term embracing the panoply of legally recognized pecuniary relief." *84 Ohio St. 3d at 419*. Thus, the [**24] remedies provided by *R.C. 4112.99* provide broad relief which is sufficiently comprehensive to vindicate the policy goals set forth in that statute. See *Berge, supra*. Following the reasoning of *Wiles*, Barlowe has a statutory remedy that adequately protects society's interests. Compare *Collins, supra*. We therefore conclude that the public policy expressed by *R.C. 4112.99* will not be jeopardized by the lack of a common law tort remedy. Plaintiff must pursue her claim under *Chapter 4112* in order to vindicate her rights under that statute and the policy interests expressed therein. n3 See also *Dolan v. St. Mary's Mem. Home, 153 Ohio App.3d 441, 794 N.E.2d 716, 2003 Ohio 3383* (rejecting, in accordance with *Wiles*, a wrongful-discharge action based on the reporting of abuse in a nursing home when the plaintiff has a remedy by means of a retaliatory discharge claim, pursuant to *R.C. 3721.24*.). Accordingly, the trial court's grant of summary judgment to AAAA on Barlowe's *Greeley* wrongful discharge claim, on the ground that she failed to meet [**25] the jeopardy element of her claim, was not erroneous.

n2 2 By referencing the dismissal of the disability discrimination and retaliation claims in its discussion of Barlowe's public policy claim, the trial court arguably recognized a *Greeley* claim based on *R.C. 4123.90*. Barlowe, however, conceded during oral argument that a *Greeley* claim based on *R.C. 4123.90* is foreclosed by her failure to comply with the ninety-day notice requirement of that statute.

n3 3 Barlowe has not argued, nor is there any indication, that she cannot pursue a remedy under *R.C. Ch. 4112* and that she needs a common law remedy in order to vindicate the policy goals therein.

[*P40] Barlowe's second assignment of error is overruled.

[*P41] The judgment of the trial court will be AFFIRMED in PART, REVERSED in PART, and REMANDED for further proceedings, including consideration of the non-statute of limitations aspects of AAAA's motion for summary judgment.

YOUNG, [**26] J. and BRYANT, J., concur.

(Hon. Thomas F. Bryant sitting by assignment of the Chief Justice of the Supreme Court of Ohio).