UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


BARBARA LODER HILDEBRANDT,    :
                             :
            Plaintiff         :
                             :        CASE NO.  C-1-02-0003
        vs.                   :
                             :        Judge Beckwith
HYATT CORPORATION, *et al*.,   :        Magistrate Judge Black
                             :
            Defendants        :
                             :


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR  SUMMARY JUDGMENT**


Respectfully submitted,


s/Robert A. Steinberg
Stanley M. Chesley (0000852)
Robert A. Steinberg (0032932) (Trial Attorney)
**WAITE, SCHNEIDER, BAYLESS
 & CHESLEY CO., L.P.A.**
1513 Fourth and Vine Tower
Cincinnati, OH  45202
513-621-0267
bobsteinberg@wsbclaw.cc


            and


Michael J. O'Hara (0014966)
**O'HARA, RUBERG, TAYLOR, SLOAN
 & SERGENT**
209 Thomas More Park, Suite C
P.O. Box 17411
Covington, Kentucky 41017-0411
(606) 331-2000
mohara@ortlaw.com

## TABLE OF CONTENTS

PAGE

INTRODUCTION…………………………………………………......  4

I.    FACTUAL BACKGROUND …………………………………….…  5

      A.  THE PARTIES………………………………………….……  5

      B.  BARBARA HILDEBRANDT'S DUTIES AND
          PERFORMANCE WITHIN HYATT'S
          NATIONAL SALES FORCE ………………………………  6

      C.  THE IMPORTANCE OF LONG-TERM
          RELATIONSHIPS WITH NATIONAL ACCOUNTS …………  8

      D.  DESPITE THE FACT THAT THE ECONOMY WAS
          MOVING TOWARD A RECESSION IN LATE 2000
          AND HYATT HAD TO RESTRICT HIRING IN 2001,
          HORNE AND HELMS HIRED YOUNG PEOPLE
          INTO THE NSF DURING 2001 ………………………………  10

      E.  HYATT'S DISCRIMINATORY PRACTICE OF
          PRESELECTING YOUNG MEN FOR PROMOTIONS ……..  12

      F.  BRIAN BOOTH ATTEMPTS TO POSITION BARBARA
          HILDEBRANDT FOR TERMINATION FROM THE NSF …..  16

      G.  IN MAY 2001, HYATT BEGAN TO PLAN A
          REDUCTION IN FORCE ……………………………………  18

      H.  IN SEPTEMBER 2001, HYATT CARRIED OUT A
          COMPANY-WIDE REDUCTION IN FORCE – HELMS
          AND HORNE, WITH BOOTH'S ASSISTANCE, USED
          THE TRAGIC EVENTS OF SEPTEMBER 11 AS AN
          EXCUSE TO REMOVE A NUMBER OF "DINOSAURS"
          FROM THE NSF ……………………………………………  19

      I.   DEFENDANTS FLAGRANTLY VIOLATED COMPANY
           POLICY IN THE PROCEDURE THEY FOLLOWED TO
           TERMINATE BARBARA HILDEBRANDT AND OTHER
           MEMBERS OF THE NSF …………………………………..  21

J.  HORNE, WITH HELMS' APPROVAL, FIRED
    "DINOSAURS" WITH VALUABLE NATIONAL
    ACCOUNTS AND GAVE THEIR ACCOUNTS TO
    YOUNGER, RECENTLY HIRED EMPLOYEES ………….   23

II.    PLAINTIFF'S CLAIMS …………….…………………………………   35

III    LAW AND ARGUMENT …………………..………………………   35

A.    PLAINTIFF HAS SUBMITTED OVERWHELMING
      EVIDENCE OF A PRIMA FACIE CASE THAT AGE
      DISCRIMINATION WAS A FACTOR IN HER
      TERMINATION ………………………………………………..   37

B.    PLAINTIFF HAS SUBMITTED SUBSTANTIAL
      EVIDENCE OF A PRIMA FACIE CASE OF FAILURE
      TO PROMOTE HER …………………………………………   51

C.    DEFENDANT FAILED TO ARTICULATE A
      LEGITIMATE REASON FOR FIRING BARBARA
      HILDEBRANDT ……………..………………………………   54

D.    THERE IS OVERWHELMING EVIDENCE THAT THE
      REASON ARTICULATED FOR TERMINATING
      PLAINTIFF ARE PRETEXT …………………………………   55

E.    PLAINTIFF IS NOT PURUSING A FEDERAL AGE
      OR GENDER DISCRIMINATION CLAIM
      BASED ON DEFENDANTS' FAILURE TO
      PROMOTE HER ………………..…………………………   61

F.    PLAINTIFF DOES NOT CLAIM DEFENDANTS
      DISCRIMINATED AGAINST HER DUE TO HER
      GENDER WHEN THEY TERMINATED
      HER EMPLOYMENT…………..………………………………   61

G.    OHIO LAW DOES RECOGNIZE A WRONGFUL
      DISCHARGE PUBLIC POLICY CLAIM
      BASED ON AGE DISCRIMINATION…………………………   61

**INTRODUCTION**

Defendants' motion for summary judgment alleges that there are no material factual disputes.  Their memorandum in support of their motion, however, omits numerous facts that demonstrate that Plaintiff Barbara Hildebrandt can establish a prima facie case; that Defendants have failed to articulate a legitimate reason for her termination; and that she has strong evidence of discrimination in both her termination and denial of promotion opportunities.  At the very least, material facts are in dispute in this case.[1] [2]

This case is about the discriminatory treatment by three substantially younger male supervisors of Barbara Loder Hildebrandt, a long time (twenty-two years) loyal Hyatt employee in its National Sales Force who maintained an outstanding performance record and earned many millions of dollars for Hyatt.  A young male Assistant Vice President in charge of Hyatt's National Sales Force, Jack Horne, and his supervisor, Vice President Ty Helms, have favored younger workers and males in their employment actions.  In 2001, Horne was on a mission to remove the "dinosaurs in the national sales force" who "had just been around too long," referring to older workers with excellent sales records.[3]  Despite the facts that national economy was in an economic recession in early 2001 and that Hyatt's Chief Operating Officer had instructed his officials to try to eliminate layoffs and save jobs for loyal workers, Helms and Horne nevertheless hired and

---

[1]    Plaintiff's counsel verified with the Clerk of Courts that Defendants did not file any of their "confidential" exhibits under seal.  Therefore, Plaintiff will not do so either.

[2]    For the sake of consistency, the exhibit numbers referred to in this memorandum are the same as the deposition exhibit numbers.  Therefore, there will be gaps in exhibit numbers used in this brief.

[3]    Dawn Beagle deposition, pp. 106-07.

transferred younger individuals into National Sales Force positions during 2001. Helms and Horne planned to remove many of the "dinosaurs" and give these more recent and less experienced employees the valuable accounts older workers had spent years developing. Using the tragic events of September 11, 2001 as an excuse, Horne and Helms retained recently-hired younger individuals and planned to terminate ten long-term loyal employees whose only failing was their age, and in one case, a disability. Horne and Helms also discriminated against Barbara Hildebrandt in denying her promotions, which were given to young men who were "positioned" to be promoted in violation of Hyatt policies.

## I.    FACTUAL BACKGROUND

### A.    THE PARTIES

Plaintiff, Barbara Loder Hildebrandt, a female, was 49 years of age, having been born on September 23, 1952, when Defendants notified her of her termination effective October 1, 2001.[4] She was then and currently is a resident and citizen of the State of Ohio.[5] At the time of her termination, Ms. Hildebrandt had been a loyal Hyatt sales employee with an excellent record for 22 years.[6] During her career, she moved many times at Hyatt's request.[7] She held the position of Director of National Accounts for Central National Sales for Hyatt in Hyatt's National Sales Force (NSF), to which she was appointed on or about February 1996.[8] From 1995 to 2001, her headquarters was the Hyatt Regency

---

[4]    Defendants' summary judgment memorandum, p. 3.
[5]    Barbara Hildebrandt Deposition, p. 4.
[6]    Defendants' summary judgment memorandum, p. 3; Ex. 15; Exs. 16, 17, 19, 21, 23, 25.
[7]    Ex.15; Defendants' summary judgment memorandum, p. 3.
[8]    Id., p. 3.

Hotel in Cincinnati, Hamilton County, Ohio.[9]

Defendant Hyatt is a corporation that manages hotel chains nationally and internationally, with its corporate headquarters in Chicago, Illinois.[10]  Defendant Ty Helms, a male born June 13, 1957, was Vice President of Sales in September 2001.[11]  Helms is substantially younger than Barbara Hildebrandt.  Helms approved Jack Horne's decision to fire Barbara Hildebrandt and other similarly situated older workers.[12]  Defendant Jack Horne, a male who turned 40 years of age one week before Plaintiff's employment was terminated, was at that time Hyatt's Assistant Vice President of National Sales.[13]  Horne made the decision to terminate Plaintiff's employment and the employment of other similarly situated older workers.[14]  Defendant Brian Booth, a male who was about 38 years of age in September 2001, was at that time the Director of Sales and Marketing for Hyatt's Central National Sales Office in Chicago, to which Mrs. Hildebrandt was assigned.[15]  Booth made gender-discriminatory remarks to Barbara Hildebrandt and participated in the decision to fire her.[16]

### B.    BARBARA HILDEBRANDT'S DUTIES AND PERFORMANCE WITHIN HYATT'S NATIONAL SALES FORCE

Hyatt operates a National Sales Force (NSF) and a Divisional Sales Force (DSF).   The DSF members are employed in Hyatt hotels and arrange

---

[9]    Barbara Hildebrandt Deposition, p. 205.
[10]    Defendants' memorandum, p. 2.
[11]    Ty Helms Deposition, p. 5, Defendants' memorandum, p. 7; Ex. 203.
[12]    Helms Dep., p. 7; Defendants' memorandum, p. 15-16.
[13]    Jack Horne Deposition, pp. 4, 155.
[14]    Horne Dep. p. 8
[15]    Brian Booth Deposition, pp. 4, 87; Defendants' memorandum, p. 9
[16]    Horne Dep., pp. 14-15; Hildebrandt Dep. pp. 57-58.

accommodations in their respective hotels.[17]   The NSF members handle large national accounts, which book business such as conventions in various Hyatt hotels, usually on a periodic basis.[18]   DSF personnel aspire to join the NSF; it is considered a move upward, and it is very rare that people voluntarily leave the NSF.[19]   Barbara Hildebrandt's duties as a Director of National Accounts included arranging group and individual hotel accommodations for her clients at Hyatt hotels throughout the country, recruiting new clients, and maintaining approximately 40 accounts in Ohio, Kentucky, and Tennessee through personal services.[20]

Barbara Hildebrandt was not merely a satisfactory employee; she was an exceptional employee.  Her accounts produced approximately 10 million dollars in sales for Defendants during calendar year 2000, the year before she was fired.[21]   She received excellent annual performance evaluations ("Exceeds Expectations" or "Role Model") each year she was Director of National Accounts, including her most recent annual evaluation of February 1, 2001.[22]   She received annual Outstanding Production Achievement Awards in 1994, 1996, 1997, 1998, 1999, and 2000; and met or exceeded all her annual sales goals, with one exception in 1995 when she achieved 92.3% of her goal and received an "Exceeds Expectations" rating.[23]   In 2000, she was nominated for the prestigious

---

[17]   Defendants' memorandum, p. 4.
[18]   Id., p. 3; Molly Crompton Deposition, pp. 21-25; Barbara Hildebrandt Affidavit, ¶. 1.
[19]   Crompton Dep., pp. 39, 41; Hildebrandt Affidavit, ¶. 1.
[20]   Hildebrandt Affidavit, ¶. 1
[21]   Id., ¶. 4.
[22]   Exs. 16, 17, 19, 21, 23, 25; Hildebrandt Deposition, pp. 135, 138-39, 141-42, 144; Booth Dep., p. 154.
[23]   Exs. 16a, 18, 20, 22, 24, 26, 200; Hildebrandt Affidavit, ¶. 5.

Annual Director of National Accounts award.[24]   She was ranked among the highest performers in the company for the year prior to her termination (2000).[25] She achieved 136% of her group quota for that year.[26]  She exceeded her quota by two million dollars.[27]   In fact, she exceeded her quota for the previous five years.[28]    In a contemporaneous document, her supervisor, Brian Booth, characterized her as "very dedicated and tireless in her efforts to gain business for Hyatt."[29]  Her only failing was her age.  In the eyes of Jack Horne, she was a "dinosaur," and thus he wanted to remove her and give her valuable accounts to much younger workers, Molly Crompton and Barbara Hale.

## C.   THE IMPORTANCE OF LONG-TERM RELATIONSHIPS WITH NATIONAL ACCOUNTS

Barbara Hildebrandt describes the importance of long-term account relationships as follows:

> I spent many years developing and maintaining my accounts.  I devoted a great deal of my time each day to maintaining and developing my relationships with my clients.  It takes at least a year or two just to get to know a client.  Long-term personal relationships are the key to a successful national sales career.  Long-term relationships are important because a client develops loyalty to the brand through a long-term association with its national account representative.  The more you book a client's business, the better you understand its needs.  Eventually, the client calls you first with opportunities to book their meetings.  It comes to value you as a partner in its meeting planning process.  For example, I developed an excellent relationship with Foodservice Associates of Louisville, Kentucky.  In order to show their appreciation for my dedication to their account, their representatives invited me to a day at the races at Churchill Downs and billed it as Barb Loder Appreciation Day.  Having a new sales representative handle an account requires the client to educate

---

[24]     Ex. 8, p. BH 000034, Ex. 9, 200; Horne Dep., p. 172; Hildebrandt Affidavit, ¶. 6.
[25]     Booth Dep., pp. 150-51, Ex. 16.
[26]     Id., p. 152; Ex. 16.
[27]     Id., p. 153; Ex. 16a.
[28]     Id., p. 153-54; Ex. 16a.
[29]     Id., p. 152; Ex. 16.

the salesperson as to its needs and essentially who it is.  Initially, the trust factor is not there.  In essence, a new salesperson has to earn a client's respect and business friendship.  It takes years to develop these relationships.  A client likes consistency with their National Sales person as well as the consistency in service and products in the hotels they book.[30]

Molly Crompton describes the importance of these relationships in a similar manner:

Well, in our position we maintain relationships, and the relationship doesn't stop with the contract just because they have a definite booking.  Oftentimes if I'm booking something for '06, maybe they have an annual meeting coming up.  Maybe their annual meeting is at the Marriott in Wardman Park.  I would go to that meeting depending on the client and the needs of the client so that I could have a better understanding of what their needs are, so that when it is in my hotel, I'm very familiar with their program and I can share that information.

Q   Are these relationships important to your business?

A   Vital.

Q   Can you tell me about that?

A   You work with who you trust.  I think that in order to have that trust in me as a client, if I were a client, I would want to work with somebody that I know is going to go to bat for me, that understands my needs.

* * *

Q   So in between these bookings, you still have to make an effort to maintain your relationship?

A   Absolutely.

Q   What are some of the things you do to do that?

A   I'm on the road a lot.  I have many, many, many client dinners.  In the definite stages of existing business, I keep tabs on that.  There is so many intricacies with, you know, suites or hospitalities that we want to address those details just so that we are taking care of the client, making sure that they are in a good position and they want to continue to work with us.

---

[30]    Hildebrandt Affidavit, ¶. 2.

* * *

A.    Sales is relationally driven.  I think the entire nature of the sales position is relational.[31]

**D.    DESPITE THE FACT THAT THE ECONOMY WAS MOVING TOWARD A RECESSION IN LATE 2000 AND HYATT HAD TO RESTRICT HIRING IN 2001, HORNE AND HELMS HIRED YOUNG PEOPLE INTO THE NSF DURING 2001**

During late 2000, it became apparent to Hyatt officials that the economy was in a downturn and heading for a recession.[32]  Hyatt understood that an economic recession existed in the United States since "late 2000/early 2001."[33]  During the first half of 2001, Hyatt's Chief Operating Officer, Ed Rabin, and other top executives initiated alerts to take steps to cut costs, which "clearly included [eliminating] positions."[34]  Hyatt eliminated some positions prior to September 11, 2001.[35]  Hyatt's official policy in economically tough times was to try to retain the jobs of loyal, long-term employees.[36]  Insofar as COO Rabin knew, "we were doing everything to protect, I believe, our employees, both long term and loyal and hard working [employees] and all of the above."[37]  In April 2001, initial cost savings steps attempted to avoid eliminating employees.[38]  One of the methods of cutting costs was "certainly" to restrict new hiring.  Hyatt's top executives had "any number of communications, both verbal and written, that said, no new hiring during this period or new hiring should be kept to a minimum."[39]  During the

---

[31]    Crompton Dep., pp. 67-70.
[32]    Judicial admission of Defendants in Document 20, Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery, p. 4; Helms Dep., p. 14.
[33]    Id.
[34]    Ed Rabin, Hyatt President, Deposition, p. 16.
[35]    Id.
[36]    Id., pp. 16-17.
[37]    Id., pp. 17.
[38]    Id., p. 18.
[39]    Id., p. 20.

second half of 2001, prior to September 11, 2001, economic results were "not living up to the expectations of the company, they were not getting better at all."[40]

Jack Horne and Ty Helms, however, ignored these cost saving restrictions in order to move younger workers into the National Sales Force to eventually replace older workers.  Horne, with Helms' approval, hired ten sales managers, all substantially younger than Barbara Hildebrandt, into the National Sales Force during 2001 or early 2002, during Hyatt's alleged economic emergency: Jennifer Roman (DOB: 9/30/68), Faye Memoli (DOB: 6/20/71), Donna Bongiovanni (DOB: 9/11/60); Richard Wood (DOB: 1/7/60), JoAnn Rumsey (DOB: 6/5/68), Erin Moriarity (DOB 4/21/77), Carolyn Montrose (DOB: 5/5/64), Judy Lee-Kirchman (DOB: 12/10/58), Gracie Anzaldo-Moore (DOB: 6/26/59) (hired in 2002), Karen Kelly[41] (hired in late 2001 or early 2002).[42]  In addition, in March 2001, Horne transferred and promoted Molly Crompton, a 33-year-old National Accounts Manager with less than one year's experience in the NSF, into the position of Director of National Accounts in the Central Region, the same region where Barbara Hildebrandt was located.[43]

The evidence clearly shows Horne did this with the intent to eventually fire older workers and allow the more recently hired younger workers to benefit by inheriting their accounts.  Horne's only reason for firing Barbara Hildebrandt is that he believed her accounts could be handled by other sales managers:  "I

---

[40]    Id., pp. 28.
[41]    On information and belief, under age 40.
[42]    Horne Dep., pp. 34-41, 46, 59; Ex. 41 (Exhibit 41 is a summary spreadsheet prepared by Hyatt and produced by Hyatt's attorney during the deposition of Brian Booth - *see* Booth Dep, pp. 107-112; Horne Dep., pp. 32-33).
[43]    Id., pp. 72, Crompton pp. 5, 51

basically looked at the customers and the geographic location of those customers that Barbara handled and I made the determination that those customers could be handled by other people in the national sales force."[44]  This is no reason at all because, as Horne admitted, anyone in the NSF could handle customers in any geographic location.[45]

### E.    HYATT'S DISCRIMINATORY PRACTICE OF PRESELECTING YOUNG MEN FOR PROMOTIONS

During the relevant time period, Hyatt sales officials operated an informal promotion system whereby young males were "positioned" for future promotions.[46]  Helms referred to this practice as "succession planning,"[47] but denied that he "positioned" people for promotion:

A. (Ty Helms):       No.  I've recommended some people, but ***I wouldn't say that I positioned people***.  I don't think that's an appropriate word.  I don't know what --

Q: (Plaintiff's Attorney):     Is that a word that you use or don't use?

A.   No, I don't use it, no.[48]

Helms was then asked to read from his evaluation of Jack Horne's 2000 performance.  He read from Exhibit 31a as follows:

A.     . . . Throughout 2001 ***we will be positioning Jack Horne for a promotion as vice president***.

Q.     And the rest of it, please.

A.     "During that time it will be critical to give Jack extra exposure internally to allow him the opportunity to show what he can bring to the company."

---

[44]       Horne Dep., p. 10.
[45]       Id., pp. 10-11.
[46]       Helms Dep., pp. 76-81.
[47]       Helms Dep., pp. 76-77.
[48]       Helms Dep., p. 79-80 (emphasis added).

12

Q.      Okay.  And then did you make an effort to give Mr. Horne extra exposure so that he would be in the best position to get this promotion?

A.   When opportunities existed.  He has not gotten that promotion, by the way.

Q.   But you've given him the exposure to get it, haven't you?

A.   I -- I -- certainly.[49]

Sometime after Helms' deposition, during 2002 or 2003, Horne received the Vice President job that Helms positioned him for.[50]

Promotion opportunities in Hyatt's National Sales Force were not posted, and employees were not given an opportunity to apply for promotions.[51]   As former Director of National Accounts Dawn Beagle testified, "these positions were not posted.  There was not a structure or a system that you could, you could express your interest, put your resume in, allow yourself to be interviewed and then make a decision.  As I explained before it was almost as if the announcement would be made that so and so is leaving and so and so would be replacing them."[52]  Hyatt officials had a practice of "reaching out" to younger male employees they favored, such as Jack Horne, Rob Sarmiento, and Brian Booth, rather than permitting other qualified employees to apply for promotion opportunities.[53]  This conduct violated Hyatt's policy requiring the posting of job openings.[54]

During the fall of 1999, Barbara Hildebrandt and Loretta Venezia, another

---

49       Id., pp. 80-81 (emphasis added); Ex. 31a.
50       Rabin Dep., p. 82-83.
51       Hildebrandt Dep., pp. 110 - 118; Hildebrandt Affidavit, ¶. 7.
52       Dawn Beagle Deposition, p. 70.
53       Rabin Dep., pp. 80-83; Helms Dep., pp 76-78; Horne Dep., pp. 106-07, 110-112.

Director of National Accounts for the Central Region who was over 40 years of age, each independently informed Vice President Ty Helms that they were interested in promotion. They each specifically asked to be considered for promotion to the open position of Assistant Vice President of International Sales.[55] Helms had already positioned a male under 40 years of age, Rob Sarmiento, for this promotion. Helms refused to consider Mrs. Hildebrandt and Ms. Venezia for this promotion or for other promotions.[56] When Ms. Venezia met with Helms, he sat back in his chair and laughed at her. He said, "we already know who we want and it has nothing to do with experience. We're looking at Rob Sarmiento."[57] Ms. Venezia understood at that time that she would never receive a promotion at Hyatt because she was female and too old.[58] After she was overlooked for the promotion Brian Booth received, Ms. Venezia met with Helms and Horne to complain about the lack of promotion opportunities.[59] This conversation convinced her she had no future with the company.[60] On September 28, 2001, she resigned due to lack of promotion opportunities at Hyatt to pursue a new opportunity with another company.[61] Unbeknownst to Venezia, a Director of National Accounts with an excellent performance record, Horne had earmarked her for termination.[62]

Barbara Hildebrandt was also overlooked for promotion to the position of

---

[54]    Ex. 190.
[55]    Helms Dep., pp. 240-41; Hildebrandt Affidavit, ¶ 8, Venezia Affidavit, ¶. 4.
[56]    Helms Dep., pp. 239-40; Hildebrandt Affidavit, ¶ 8; Venezia Affidavit, ¶. 4.
[57]    Venezia Affidavit, ¶. 4.
[58]    Id.
[59]    Id., ¶. 6.
[60]    Id.
[61]    Id.
[62]    Horne Dep., p. 98-99, 149-50; Exhibit 38f.

Associate Director of Sales, which was given to a male, Mark Henry, in 1999, and she was overlooked for the position of Director of Sales and Marketing for the Central Region, which was given to Brian Booth in December 2000.[63]   In 2000, Helms and Horne caused Bruce Small, a male employee who was then about 50 years of age, to be transferred out of his position as Director of Sales and Marketing for the Central Region, a supervisory sales position, to a job known as Director of Sales Information Systems, a non-sales position, in charge of computer records relating to sales.[64]   On December 4, 2000, Helms and Defendant Horne "reached out" to promote Brian Booth, a male who was then about 38 years of age, to that position.   The position was neither posted nor advertised, and no other employees were given a chance to compete for it.[65]

Plaintiff and Venezia, as well as other Directors of National Accounts, were qualified for this position.[66]   Booth was not qualified for the position because he had never before worked in the NSF.[67]   Booth had been a Director of Sales for the Hyatt Regency Hotel at the Dallas-Fort Worth, Texas Airport.   He had never held Barbara Hildebrandt's position of Director of National Accounts, and he had no national account sales experience with Hyatt.[68]   In 1999 and in 2000, Booth had received written reprimands from his supervisor for inappropriate behavior, negative attitude, lack of ability to supervise staff, and lack of belief in Hyatt's product.[69]   Booth was known for high turnover of his sales staff.[70]   Jack Horne

---

[63]     Hildebrandt Dep., pp. 110-11.
[64]     Helms Dep., p. 114; Small Dep., p. 8.
[65]     Hildebrandt Dep., p. 133; Venezia Affidavit, ¶ 5.
[66]     Horne Dep., pp. 108-112.
[67]     Ex. 197.
[68]     Exs. 30a-30e
[69]     Exs. 30b, 30c.

overlooked many qualified females over the age of 40, including Barbara Hildebrandt, and chose the substantially younger and less qualified Booth to become her supervisor.[71]

### F. BRIAN BOOTH ATTEMPTS TO POSITION BARBARA HILDEBRANDT FOR TERMINATION FROM THE NSF

Shortly thereafter, in February 2001, in the midst of a severe economic decline, Booth instructed Ms. Hildebrandt to submit a higher sales goal for the first half of 2001.  She increased her six-month goal from 3 million dollars to 3.5 million dollars.[72]  Booth did not accept her increased sales goal and instead arbitrarily increased her six-month quota to 5 million dollars.[73]  Ms. Hildebrandt was shocked at this unreasonably high figure, and expressed her dismay and disbelief.  Booth then lowered the quota to 4 million dollars for a six-month period, still an unreasonable amount, far higher than any previous year.[74]  The much younger Molly Crompton, who was promoted to Director of National Accounts in the Central Region in March 2001, was given a sales goal of only 5.5 million dollars for the remaining 9 months of 2001.[75]  Because incentive or bonus pay is determined based on the percentage amount by which a sales manager exceeds her sales goal,[76] this gave Crompton an advantage over Barbara Hildebrandt in obtaining a higher bonus payment for 2001.

On or about May 14, 2001, at a meeting of sales managers for the Central National Sales Office that took place in Pittsburgh, Pennsylvania, Booth told Ms.

---

[70]    Id.
[71]    Horne Dep., pp. 108-112.
[72]    Hildebrandt Dep., pp. 47-49.
[73]    Id., pp. 38, 47.
[74]    Id. p. 47

Hildebrandt she would receive a "mid-year review."  She had never before been given a mid-year review, and five months of the year had already elapsed.[77] Horne had approved Booth's plan to use a mid-year review.[78]  Booth also stated during the May 14, 2001 meeting that Mrs. Hildebrandt and the other Directors of National Accounts were fortunate they still had their jobs.[79]  As a result, Ms. Hildebrandt understood that her job was now in jeopardy.[80]

On or about July 10, 2001, Booth gave Barbara Hildebrandt her first-ever mid-year review.  In this review, Booth's February 2001 high opinion of her performance[81] suddenly changed dramatically for the worst.  He rated her as "meeting expectations," the lowest review she had received in 22 years.[82]  His basis for this rating was that she had achieved only 78% of her sales goal, which he had artificially inflated in February 2001 over her objection.[83]  In fact, Mrs. Hildebrandt had exceeded her normal six-month sales goal of 3 million dollars. She booked $3,227,000 in sales for the first six months of 2001.[84]

During the July 10, 2001 meeting, Booth, who was directly supervised by Horne, commented on Barbara Hildebrandt's recent marriage and asked her if she was going to stay home and enjoy being married.[85]  Mrs. Hildebrandt was offended by this sexist remark and queried Booth whether he asked this question

---

[75]    Crompton Dep., p. 57-58.
[76]    Hildebrandt Affidavit, ¶. 9; Ex. 198.
[77]    Hildebrandt Dep., pp. 26, 27, 56, 150.
[78]    Booth Dep., p. 156.
[79]    Hildebrandt Dep., p. 225.
[80]    Id.
[81]    See Ex. 16.
[82]    Hildebrandt Dep., p. 34.
[83]    Id., p. 153.
[84]    Ex. 27A; Hildebrandt Affidavit, ¶. 10.
[85]    Hildebrandt Dep., pp. 57-58.

to male employees who were recently married.[86]   Booth also asked if someone would be needed to replace her [in Cincinnati, Ohio] if she left her job or whether her accounts could be handled from the Chicago office.[87]   From this conversation, Mrs. Hildebrandt was concerned that Booth and his supervisors were planning to terminate her employment.   She told Booth she had no intention of giving up her 22-year career; she liked her job, and her husband also approved of her job.[88]   She said she intended to remain in her job for many years to come.[89]   She told Booth she disagreed with his mid-year review, but would strive to meet her quota by years' end.[90]

During Horne's tenure as Assistant Vice President of National Sales, he had a practice of visiting the National Sales offices and meeting with Directors of National Accounts.[91]   During that tenure, he never visited Plaintiff.[92]   During that same time, he never even telephoned her.[93]   Defendant Horne spent an inordinate amount of time visiting young Directors of National Accounts under 40 years of age.[94]

### G.    IN MAY 2001, HYATT BEGAN TO PLAN A REDUCTION IN FORCE

In mid-May 2001, at about the same time that Booth told his sales managers they were fortunate to retain their jobs,[95] Hyatt officials hired 38-year-

---

[86]    Id., p. 35.
[87]    Id., p. 27.
[88]    Id., pp. 36-37.
[89]    Id.
[90]    Id.
[91]    Horne Dep., pp. 38, 47, 55, 57.
[92]    Id., p. 108
[93]    Id.
[94]    See footnote 88
[95]    Hildebrandt Dep. 225.

old attorney Rob Schnitz of the Fisher & Phillips LLP law firm, who specialized in employment law and reductions in force, as Vice President and Associate General Counsel to help plan the termination of employees.[96]   Schnitz was represented to C.O.O. Ed Rabin as having expertise in the area of law dealing with elimination of jobs.[97]   He had no previous experience with Hyatt.[98]   Despite his initial denials in response to leading questions by his counsel,[99] Schnitz ultimately admitted during his deposition that he was "hired for a position that encompassed legal supervision of any reduction in force that might occur in the future."[100]

> **H.    IN SEPTEMBER 2001, HYATT CARRIED OUT A COMPANY-WIDE REDUCTION IN FORCE - HELMS AND HORNE, WITH BOOTH'S ASSISTANCE, USED THE TRAGIC EVENTS OF SEPTEMBER 11 AS AN EXCUSE TO REMOVE A NUMBER OF "DINOSAURS" FROM THE NSF**

When the tragic events of September 11, 2001 occurred, Defendants used these events as an excuse to terminate long-time Directors of National Accounts who were over 40 years of age and other qualified employees who were out of favor and assign their valuable accounts to more recently hired sales managers, most of whom were under age 40.[101]   Hyatt's top executives met to discuss cost savings measures after September 11, 2001, but **they did not determine it was necessary to terminate any individual in the NSF**, which made up a small portion of Hyatt's workforce.[102]   **The managing committee did not determine**

---

[96]    Rabin Dep., pp. 21-22; Schnitz Dep., pp. 5, 9-10, 33-34, 49.
[97]    Rabin Dep., p. 22.
[98]    Schnitz Dep. p. 7.
[99]    *See* Schnitz Dep., pp. 45-46.
[100]   Schnitz Dep. p. 53.
[101]   *See* Ex. 199.
[102]   Rabin Dep., p. 37; Helms Dep., p. 24.

***that a specific number of individuals in the NSF had to be terminated, nor did they determine that any specific cost savings in the NSF had to be made***.[103]  Because Hyatt did not fund any of the expenses of the NSF, there were no cost savings to be realized by terminating NSF employees.   The entire expense of the NSF was funded by third-party hotel owners as a "chain allocation."[104]

Helms, a member of the managing committee, was well aware that it was not necessary to terminate the employment of anyone in the NSF.[105]  ***Helms did not instruct Horne that he was required to terminate anyone in the NSF; Helms did instruct Horne that he had to identify any person to be terminated; Helms did not instruct Horne that any specific number of people had to be terminated; and Helms did not instruct Horne that any particular cost savings had to be achieved.***[106]  Helms did not even require Horne to complete a cost-benefit analysis or provide specific information about people he wished to discharge.[107]   No specific criteria were developed to determine how many NSF employees were to be discharged, and no specific criteria were developed to determine the selection of employees to be discharged.[108]   Helms simply gave Horne unbridled discretion to terminate employees and then approved Horne's recommendations, except one.   Helms reversed one of Horne's termination recommendations to save the job of a male

---

[103]     Helms Dep., p. 33.
[104]     Id., pp. 159, 163.
[105]     Id., pp. 33.
[106]     Id., pp. 31-32, 37; Horne Dep., p. 14.
[107]     Helms Dep., p. 37.
[108]     Id., p. 42; Horne Dep., p. 85.

employee, Joe Koch, who was 37 years of age.[109]

**I.    DEFENDANTS FLAGRANTLY VIOLATED COMPANY POLICY IN THE PROCEDURE THEY FOLLOWED TO TERMINATE BARBARA HILDEBRANDT AND OTHER MEMBERS OF THE NSF**

Hyatt has had a corporate policy in effect at least since December 1999 entitled "Reduction in Staff: The Business Process Review."[110]  When there is a permanent elimination of a position or positions, Hyatt officials are required to complete a form called the Business Process Review.[111]   This consists of a two-step process "designed as a pre-analysis to ensure a well thought out reorganizational strategy."[112]  The first step is to complete a form called Business Process Review Redesign Pre-Analysis, which includes an Overview and Objectives, the Organizational Changes, a Costs/Benefit Analysis, Training Needs and Plans, Communication Approach, and Approval.[113]  The second step is to complete a form called Business Process Review Employee Data Sheet, which includes information about employment history, current pay and benefit information, and skills assessment.[114]   "The Business Process Review is a mandatory first step in the event of a permanent elimination of any position or positions and must be approved by the Divisional Director of Human Resources, Divisional Vice President, Corporate Human Resources, and Corporate Legal <u>prior</u> to implementation."[115]

---

[109]    Helms Dep., p. 35; Horne Dep., pp. 13, 74, 97; Ex. 199, p. 5.
[110]    Ex. 144.
[111]    Id.
[112]    Id.
[113]    Id.
[114]    Id.
[115]    Id., Item IV. (Emphasis in original).

Hyatt does not mention its Reduction in Staff: Business Process Review policy in its memorandum in support of summary judgment. That is because it not only failed to follow any aspect of its RIF policy, but it also violated the spirit of the policy, which is to require management to develop and apply legitimate criteria for a RIF. The only forms Horne prepared were five informal notations relating to NSF employees in each region and a cover page.[116] Instead of following Hyatt's carefully prepared Business Process Review policy, Helms told Horne to put down his recommendations for reducing the NSF and to divide employees into A, B, and C groups.[117] Helms, however, set forth no criteria for selection for these groups.[118] Those in the A group were protected from termination, while those in the C group were chosen to be fired.[119] Horne simply invented completely arbitrary subjective criteria for these groups.[120] He made no record of the alleged criteria. He testified that an "A player" was someone who handled top customers in the marketplace and who Horne "might have had first-hand experience from customers of their performance . ."[121] However, Horne admitted that employees he did not rate as an "A player" were also top performers and respected by their customers.[122] Using this non-criterion, he subjectively divided his employees into three groups that forecast their future.

Horne failed to consider any legitimate criteria regarding the discharged employees in the protected age group. He did not consider their seniority; their

---

[116]    Horne Dep., p. 182; Exs. 38e, 38f, 38g, 38h, 38i, 38j.
[117]    Horne Dep., p. 85
[118]    Id.
[119]    Ex. 38.
[120]    Id., p. 86.
[121]    Id. p. 86-87.
[122]    Id., pp. 87-88.

history with the company; their current pay and benefits; their production; their skills compared to those not discharged; their long-term performance; their short-term performance; the amount Hyatt had spent on schooling and training them; their awards and achievements; their annual performance reviews; whether they operated from a satellite office; whether they could be accommodated with transfers to other positions; or the disastrous financial effect termination would have on a long-time employee's savings plan and income tax liability. Horne did not even look at their performance reviews or their sales achievements. [123]

### J. HORNE, WITH HELMS' APPROVAL, FIRED "DINOSAURS" WITH VALUABLE NATIONAL ACCOUNTS AND GAVE THEIR ACCOUNTS TO YOUNGER, RECENTLY HIRED EMPLOYEES

In the Central Sales Office, Horne placed Barbara Loder Hildebrandt, Loretta Venezia, and Mary Patton in the C category, marked for termination.[124] For Mary Patton, the one terminated employee who was under age 40 (age 39), Horne applied an objective, legitimate termination criterion: seniority; i.e., length of service with Hyatt.[125] However, when it came to 50-year old Barbara Hildebrandt and 42-year old Loretta Venezia, Horne did not consider seniority to be a factor for these long-term employees;[126] instead his subjectivity prevailed. The written reason Horne set forth for eliminating Barbara Hildebrandt was that 34-year-old Barbara Hale, operating out of a satellite office in Michigan, would be given Barbara Hildebrandt's accounts.[127] Horne admitted he did this so that Hale, who was assigned to non-productive automotive accounts, could take over

---

[123]    Helms Dep., pp. 43-46, 60-63, 208; Horne Dep., pp. 52-53, 83-84, 88-89, 100, 106.
[124]    Ex. 38f; Horne Dep., pp. 97-106.
[125]    Ex. 38f; Horne Dep., pp.99-100.
[126]    Horne Dep., p. 100.

Barbara Hildebrandt's productive association accounts "so that she [Hale] would be more balanced during unfortunate recession times."[128]  This would help Hale "diversify her account load when the automotive market was down," and increase her production.[129]  This is a blatant admission of Horne's favoritism toward this younger worker.  Fifty-year-old Barbara Hildebrandt, whose long-term accounts were productive for the company, was fired so that 34-year-old Barbara Hale, whose accounts were not productive, could take over Mrs. Hildebrandt's accounts and improve her situation.  Hale was relatively new to the NSF, having joined it in September 1998.[130]  She had only become a Director of National Accounts the previous year, in March 2000.[131]  Barbara Hildebrandt, on the other hand, had worked for the company since 1979.

Another Horne favorite, 33-year-old Molly Crompton, was also assigned Barbara Hildebrant's productive accounts.  An examination of Crompton's employment history with Hyatt demonstrates Horne's bias toward this younger employee to the disadvantage of Barbara Hildebrandt.  Crompton became interested in hotel work after viewing a "glamorous" television program called "Hotel" starring actress Connie Selleca.[132]  Her history in hotel work at Hyatt was in the field of food service.[133]  Starting in 1993 and ending in 1996, Crompton held at least four different food service jobs.[134]  It was not until September 1995 that

---

[127]    Ex. 38f; Horne Dep., pp. 100-101
[128]    Id., p. 101.
[129]    Id.
[130]    Ex. 155
[131]    Id.
[132]    Crompton Dep., p. 8.
[133]    Id., pp. 9-21; Ex. 86.
[134]    Crompton Dep., pp. 9-21; Ex. 86.

Crompton secured an entry-level sales job.[135]  In October 1996, she obtained a similar job, Meeting Connection Manager, at the Hyatt Regency Hotel at O'Hare Airport, where the Director of Sales was Jack Horne.[136]  Within nine months, in July 1997, she moved to a convention center in Chicago called McCormick Place, where a Hyatt hotel was being built.  Her job was to obtain bookings for the hotel.[137]  Crompton wanted to be assigned the association market (professional associations, such as the American Medical Association), where the big clients were, and she was not able to obtain them.[138]  As a result, in February 1998, she left Hyatt and accepted a food service job, Director of Catering, at Biggs Mansion in Chicago, a restaurant that handles elaborate social events.[139]

In March 1999, Crompton returned to Hyatt employment as a Sales Manger at McCormick Place.[140]  By this time, Jack Horne, Crompton's superior at McCormick Place, had obtained a position as Assistant Vice President of Sales in Hyatt's National Sales Force.[141]  Crompton desired a position with the NSF, because it was more prestigious, and Horne recommended her to fill an opening in the Eastern National Sales Office in Washington, D.C.[142]  During the following year, Horne and Helms approved $20,500 in raises for Crompton as well as over $12,000 in relocation expenses.[143]  In addition, Crompton received substantial

---

[135]    Ex. 86.
[136]    Ex. 86; Crompton Dep., pp. 25-27
[137]    Ex. 86; Crompton Dep., pp. 30-37.
[138]    Id., pp. 35-37
[139]    Ex. 86; Id., pp. 37-39
[140]    Ex. 86; Crompton Dep., pp. 34, 39-40.
[141]    Ex. 202
[142]    Crompton Dep., pp. 41-44, 54.
[143]    Ex. 86;

bonuses from accounts she inherited from National Sales Force sales managers, including Barbara Hildebrandt.

In early 2000, Horne and Helms authorized Crompton's promotion to the Eastern National Sales Office and a 21.5% raise of $8,500.[144]  Her relocation expenses from Chicago to Washington, D.C. of over $6,200 were paid by Hyatt.[145]  In September 2000, Horne and Helms authorized a $3,000 raise for Crompton.[146]  In less than one year, however, Crompton asked Horne and Brian Booth to move her back to Chicago because "I was terribly homesick for Chicago . . . I just didn't have a personal life."[147]  Booth and Horne accommodated her, despite the fact that this move would destroy any account relationships she had built.[148]

Crompton was assigned to the Central National Sales Office in Chicago on March 1, 2001,[149] less than a year after she had been promoted to the Eastern National Sales Office in Washington.  Despite the severe economic decline Hyatt was experiencing at this time, Hyatt paid her substantial relocation expenses back to Chicago.[150]  Also on March 1, 2001, although Crompton had less than one year's experience in the NSF, Horne and Helms promoted her to the position of Director of National Accounts and gave her another raise of $9,000.[151]

On September 28, 2001, Barbara Hildebrandt received a telephone call

---

[144]    Exs. 86; 88; 89; 92.
[145]    Exs. 93 (erroneously stating a move *to* Chicago instead of from Chicago); 96, 97; 98; 102.
[146]    Exs. 86, 88.
[147]    Crompton Dep., pp. 51-52.
[148]    Id., p. 53.
[149]    Ex. 86.
[150]    Id., p. 55.
[151]    Ex. 86, 87,

from Booth.  Without any warning, Booth informed her that her employment was terminated effective October 1, 2001.  This decision was made by Horne and approved by Helms.[152]  Booth provided no explanation as to the reason that she was fired, and Mrs. Hildebrandt knows of none.[153]  She telephoned Ty Helms to find out the reason she lost her job, which required that she cash in her Matched Savings Plan when the stock market was at its lowest ebb and pay thousands of dollars in taxes on the proceeds.[154]  Helms would not even accept her call, and he refused to return it.[155]  The individuals who participated in the decision to terminate Ms. Hildebrandt's employment, Booth, Horne, and Helms, are all males who are substantially younger than Plaintiff.[156]

After terminating her employment, Horne divided the spoils among his favored younger workers.  Barbara Hildebrandt's most productive accounts were given to three substantially younger workers outside the protected age group: Barbara Hale of Dearborn, Michigan, who was 34 years old and had been appointed Director of National Accounts the preceding year; Molly Crompton of Chicago, Illinois, who was 33 years old and had been appointed Director of National Accounts in 2001; and Jennifer Roman, who had just turned 33 years of age and had been hired into the company as a Director of National Accounts only four months before Mrs. Hildebrandt's termination.[157]

---

[152]    Horne Dep., p. 13; Helms Dep., p. 19.
[153]    Hildebrandt Dep., pp. 87-88, 91
[154]    Hildebrandt Dep. pp. 193-194
[155]    Id., pp. 230-31.
[156]    Ex. 199, Helms Dep., p. 19.
[157]    Ex. 39; *See* summary chart, Ex. 199; Helms Dep., p. 189; Horne Dep., pp. 63, 65, 68-69;

Hale had worked in the NSF for three years when she inherited Mrs. Hildebrandt's accounts. Crompton had worked in the NSF for less than two years when she inherited Mrs. Hildebrandt's accounts. Roman had worked in the NSF for four months when she inherited Ms. Hildebrandt's account. These three substantially younger employees received Ms. Hildebrandt's accounts in order to accommodate them because they did not have sufficient productive accounts of their own.

Barbara Hildebrandt was and remains equally or more qualified than Hale, Crompton and Roman for the Director of National Accounts position. Mrs. Hildebrandt has far more experience than either of the three. She worked for many years at the "property level" as a director of sales, both in the Hyatt Regency Hotel in Savannah, Georgia and the Hyatt Regency Hotel in Cincinnati, Ohio.[158] Neither Hale nor Crompton nor Roman worked at the property level as a Hyatt Director of Sales. Hale and Crompton received the benefit of additional millions of dollars of annual sales from accounts Ms. Hildebrandt worked many years to develop and maintain.[159] Roman received the benefit of additional millions of dollars of annual sales from a combination of Barbara Hildebrandt's accounts and the accounts of Mary Rocereto, another discharged employee in the protected age group.[160] Horne has given no legitimate reason why Barbara Hildebrandt could not have remained employed and taken over the accounts of Crompton, Hale, or Roman, or all three. He admitted that anyone in the NSF could handle the accounts of anyone else in the NSF in any geographic location,

---

[158]    Hildebrandt Dep., p. 232.
[159]    Ex. 156.

and he acknowledged that Barbara Hildebrandt was clearly capable of handling any of those accounts.[161]

Horne's attempt to justify his failure to terminate Molly Crompton instead of Barbara Hildebrandt because it would have made no sense for Molly Crompton to introduce herself to a whole new set of customers in March 2001 and then reintroduce those customers to a third person in September 2001,[162] demonstrates the fallacy of Hyatt's defense. Based on this thinking, Horne had no legitimate basis to move Molly Crompton to Chicago less than a year after she had begun to develop relationships with accounts in the Washington, D.C. NSF office. If Horne's statement is to be believed, his favoritism to this young worker outweighed the impact of destroying her account relationships in D.C. Horne apparently did not consider the long-term development and maintenance of account relationships that Barbara Hildebrandt had developed when he destroyed her career and gave many of her productive accounts to Crompton.

Crompton received the following accounts of Barbara Hildebrandt after she was fired: National Cotton Council, American Contract Bridge League, Universal Tech Corp, Smith & Nephew Healthcare, Longaberger, Brown-Forman, Self Storage Association, United Commercial Travelers of America, Remember Data Services, Society of Food Service Management, Spectra Precision Incorporated, Thomas Associates, Travel Link, and Western-Southern Life Insurance Corporation.[163] Crompton received over one million dollars in credit for

---

[160]    Ex. 183, p. 32349.
[161]    Horne Dep., pp. 10, 105.
[162]    Horne Dep., p. 104.
[163]    Ex. 39; Crompton Dep., pp. 79-84

2001 from just one of these accounts, American Contract Bridge League.[164] Based in large part on inheriting Barbara Hildebrandt's accounts, Crompton exceeded her sales goal for 2001 by 165% and thus received a bonus of about $15,000 in addition to the raises and the relocation expenses she had received previously.[165]

Hale received the following accounts of Barbara Hildebrandt after she was fired: AEC Management Resources, Inc., American Association of Lab Animal Science, American Board of Family Practice, American Board of Veterinary Practitioners, American Ceramic Society, Association Management Resources, Bank One Corporation, Chief Officers State Library Association, Council of State Government, F&W Publishing Corp., GE Aircraft Engines, International Anesthesia Research Society, Lenscrafters, National Association of Government Deferred, National Association of State Information Resource Executives, National Association of State Purchasing Offices, National Middle School Association, Procter & Gamble Headquarters, Procter & Gamble Corporate Sales, Procter & Gamble Group Travel, U.S. Cutting Tool Institute, and Wendy's International.[166]

Roman received the following accounts of Barbara Hildebrandt after she was fired, in addition to the large insurance accounts she received from Mary Rocereto: International Association of Culinary Professionals, Foodservice Associates, Foodservice Consultants International, and Inflight Foodservice Association.

---

[164]    Crompton Dep., p. 97.
[165]    Id., p. 75.

The employees in the NSF Central Region whose jobs Horne completely protected from termination were all substantially younger than Barbara Hildebrandt.[167]    Hale, Crompton, and Melissa Daniels, Horne's former baby-sitter,[168] were in their early 30's, while Donna Bongiovanni and Inga Spindola were 41 and 43 years old, respectively.  Barbara Hildebrandt was 49 years old when she was fired.  Horne and Booth continued an accommodation made to Melissa Daniels during better economic times by allowing her to work in a home office in Texas for her personal convenience, at significant expense to Hyatt although Daniels was assigned to the Central Region's Dearborn, Michigan office.[169]  Barbara Hildebrandt was capable of handling the accounts of Daniels, Compton, and Hale.  In 1998, Mrs. Hildebrandt achieved 130% of her sales quota; in 1999, she achieved 109% of her sales quota; and in 2000, she achieved 136% of her sales quota.[170]  She has received numerous sales achievement awards, including nomination for the prestigious Director of National Accounts award for the year before she was fired.[171]

A few of the many additional examples of the discriminatory pattern of firing older workers in the September 2001 RIF and redistributing their accounts to more recently hired younger workers, most of whom are not in the protected age group, include the following.

---

[166]    Ex. 39.
[167]    Exs. 38f, 199.
[168]    Horne Dep., pp. 62-63.
[169]    Id., p. 62.
[170]    Exs. 20, 18, 16.
[171]    Ex. 200.

Horne fired Mary Rocereto, a 45-year-old single mother who had worked with Hyatt for 23 years, while she was on maternity leave.[172]  Ms. Rocereto, who was assigned to the Eastern National Sales Office in Washington, D.C., was the only person terminated there.[173]   In 1995, Mary Rocereto was named head of Hyatt's first National Sales Office in Florida.[174]   She has also received many letters of commendation.[175]   Her largest account was given to newly-hired 33-year-old Jennifer Roman.[176]   Roman, having been hired in May 2001, needed accounts to work on.   Numerous young workers in the Eastern National Sales Office who were far less experienced than Rocereto were retained, including Joe Koch, age 37;[177]   Rich Morrow, age 37[178]; Andy Karpowitz, age 36[179]; Carolyn Montrose, age 37[180]; and **Faye Memoli, age 30, who was hired in July 2001**.[181] The only reason Horne gave for firing Mary Rocereto was that her accounts could be redistributed to others.[182]

Horne fired Dawn Beagle, a 42-year-old excellent performer who had worked for Hyatt for 13 years.  Ms. Beagle's performance ratings were always either Exceeds Expectations or the even higher Role Model rating.[183]  She was one of the largest bookers of the association market in the Western National Sales Office.  At the time of her termination, she was also the Vice President of

---

172    Mary Rocereto Deposition, pp. 34, 37, 70, 99, 154.
173    Ex. 38j.
174    Ex. 209.
175    Ex. 210.
176    Rocereto Dep., pp. 161; Horne Dep., pp. 40, 43, 95
177    Helms Dep., pp. 209-10.
178    Exs. 38j, 199, p. 5
179    Id.
180    Id.
181    Id.
182    Ex. 38j.

the Pacific/Southwest Chapter of the PCMA, the leading professional organization for the association/meeting planning market.[184]  The association market remained productive during the 2001 recession because large associations still needed to conduct annual meetings and conventions.  Hyatt paid $12,500 for her to attend the UCLA School of Business Anderson Graduate School's Executive Management Program during 1999 and 2000, from which she graduated about one year before being fired.[185]  In order to receive this benefit, Ms. Beagle had to sign a commitment to remain with Hyatt for five years after graduation.[186]  Horne ignored Hyatt's long-term planning policy and Beagle's seniority to favor two younger workers.  Dawn Beagle's valuable accounts, which she had spent many years developing, were redistributed to Karina Mirkin, age 33, who had only worked for Hyatt for two years, and Trina Camacho-London, age 36.[187]  Horne rated both of these younger workers as "A players."[188]  Jim Davis, a male, also received some of her accounts.[189]  The written reason Horne gave for firing Ms. Beagle was the "volatility of the high tech market in California," which Mirkin and Camacho-London served, and the fact that "Jim Davis will need additional group accounts under the proposed I.T. restructure."[190]  Thus, Horne fired a very productive older worker in order to give her valuable accounts to two young workers whose accounts were volatile and a male who needed more accounts.  Nothing could be more discriminatory.

---

[183]    Exs. 211, 212, 213, 214, 215.
[184]    Beagle Dep., p. 59
[185]    Beagle Dep., pp. 68-71
[186]    Id., p. 70
[187]    Exs. 38i, 199, p. 4.
[188]    Id.
[189]    Id.

Wendy Jensen Aylward began her employment with Hyatt 13 years before she was fired at age 42.[191]  Wendy Aylward entered the NSF in 1993.[192]  She received excellent performance reviews until she was hospitalized and diagnosed with multiple sclerosis in 1999.[193]  She requested accommodations to her travel schedule, which Hyatt initially provided.  However, in March of 2000 and March of 2001, she received the lower performance rating of Meets Expectations.  The criticisms on her performance reviews were based on her limitations due to her disease.[194]  Ms. Aylward formally objected to her March 2001 performance review.[195]  On September 19, 2001, Wendy Aylward's doctor sent Hyatt a letter that set out factors that have an adverse effect on her working condition and set forth the needed accommodations.[196]  Less than ten days later, on September 28, 2001, she was fired.[197]  According to the chart Hyatt produced in discovery,[198] most of Ms. Aylward's accounts were redistributed to the following younger workers outside the protected age group: Jim Vandevender, a 36-year-old who had been employed in the NSF only two years received most of her accounts;[199] Joann Rumsey, a 33-year-old who had not yet been promoted to Director of National Accounts, the position Ms. Aylward held; Barbara Hale, the 34-year-old who needed more accounts;[200] and Trina Camacho-London, the 36-

---

[190]    Ex. 38i.
[191]    Ex. 38g, Ex. 221.
[192]    Ex. 38g, 221
[193]    Exs. 216, 217, 218, 219, 220
[194]    Ex. 207
[195]    Aylward Dep., p. 140, Ex. 207
[196]    Ex. 208
[197]    Exs. 38g, 199, p. 2.
[198]    Exhibit 183, p. 32343
[199]    Exs. 38g, 199, p. 2.
[200]    Ex. 38f.

year old whose high tech accounts were too volatile.[201]   Thus, these examples demonstrate a clear pattern of discrimination.

Ms. Hildebrandt filed a timely discrimination charge with the Equal Employment Opportunity Commission (EEOC) on or about February 15, 2002.[202] Because the EEOC could not resolve her charge within 180 days, it provided her a right-to-sue notice on or about March 28, 2002.[203]

## II.    PLAINTIFF'S CLAIMS

Plaintiff has raised claims under Ohio and Federal law.  Plaintiff's Ohio age discrimination claims are brought against Defendants Hyatt, Helms, Horne, and Booth.   Plaintiff's federal age discrimination claims are brought against Defendant Hyatt.   Plaintiff's Ohio gender discrimination claims are brought against Defendants Hyatt, Helms, Horne, and Booth.   Plaintiff's federal age discrimination claims are brought against Defendant Hyatt.   Plaintiff's Ohio breach of public policy claim is brought against Defendants Hyatt, Helms, Horne, and Booth.

## III.    LAW AND ARGUMENT

This Court has ample experience with summary judgment motion practice and needs no guidance about the general standards for reviewing motions under Fed. R. Civ. P. 56.  As the Court knows, the controlling authority for the summary judgment standards in age discrimination cases is *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (*en banc*), a case not cited by Defendants, although it was decided prior to the filing of their brief.  The Supreme

---

[201]    Ex. 38i.
[202]    Ex. 204

Court of the United States has also issued precedent on the burden of proving discrimination cases, including its decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), and its most recent contribution in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

The *Wexler en banc* Sixth Circuit decision summarized the general standards succinctly: "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  317 F.3d at 570 (quoting *Anderson v. Liberty Lobby, In*c., 477 U.S. 242, 251-52 (1986)).  *Wexler* recounted the *Anderson* requirement for resolving credibility disputes: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  317 F.3d at 573 (quoting *Anderson*, 477 U.S. at 255).

Throughout its memorandum, Hyatt not only ignores recognized alternative methods for proving discriminatory intent and relies on the familiar *McDonnell Douglas* presumption,[204] but also ignores the different standard of proof provided for age discrimination cases involving a reduction in force.  To begin with, Barbara Hildebrandt can show that the decision-maker, Jack Horne, could articulate no actual legitimate reason that explained why she was chosen for termination over more recently-hired employees.  Even if Hyatt is deemed to

---

[203]    Ex. 205.
[204]    *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

have articulated some legitimate reason for its decision, Mrs. Hildebrandt has substantial evidence of pretext. Furthermore, applying the governing legal standards to the factual record, Hyatt has failed to satisfy its Rule 56 burden to demonstrate the absence of material issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986) (the moving party has the initial burden to show absence of genuine issue of material fact as to an essential element of opponent's case). *Accord, Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992). Mrs. Hildebrandt has submitted more than sufficient evidence under federal and Ohio law to reach a jury either with the assistance of the *McDonnell Douglas* presumption or without it.

### A. PLAINTIFF HAS SUBMITTED OVERWHELMING EVIDENCE OF A PRIMA FACIE CASE THAT AGE DISCRIMINATION WAS A FACTOR IN HER TERMINATION

Plaintiff asserts that age was a factor in her termination. She relies on her federal and state statutory age discrimination claims as well as her public policy tort claim for recovery.

The ADEA renders it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prove such discrimination, the plaintiff in an ADEA case must submit facts "that, if believed, indicate that age was ***at least a factor*** in [the] decision" denying an employment opportunity. *Wexler*, 317 F.3d at 572 (emphasis added). See also *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1182 (6th Cir. 1983) ("there may be more

than one reason for the employer's decision, the jury must decide whether at least one of the reasons was the plaintiff's age"). Thus, the ultimate question is whether Ms. Hildebrand's age was *at least a factor* that motivated Hyatt to terminate her. *See Reeves*, 530 U.S. at 153.

Where an employee is terminated due to an alleged reduction in force (RIF), the employee is generally not replaced. Therefore, the employee is permitted to prove the fourth prong of the *McDonald Douglas* test, if such test is used, by presenting "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 350 (quoting *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir.1990)). A plaintiff in a RIF case can also satisfy the fourth prong by demonstrating that a "comparable non-protected person was treated better." *Ercegovich*, 154 F.3d at 350 (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582-83 (6th Cir.1992)).

The United States Supreme Court, in a gender discrimination case, has recently elaborated on how discriminatory intent is proven. *See Desert Place, Inc. v. Costa*, 539 U.S. 90 (2003). The plaintiff may use either direct or circumstantial evidence or both to establish a prima facie case. "This Court has have often acknowledged the utility of circumstantial evidence in discrimination cases and has never questioned its adequacy in criminal cases, even though proof beyond a reasonable doubt is required." 539 U.S. at 91. The Court cited *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000), for the proposition that evidence that a defendant's explanation for an employment

practice is 'unworthy of credence' is 'one form of circumstantial evidence.  539 U.S. at 91.  Costa rejected any requirement of direct evidence and upheld a mixed-motive jury instruction based on the above evidence.

One method to meet the burden of proof on the employer's discriminatory motivation is use of a presumption.  *See* Fed. R. Evid. 301.  The *McDonnell Douglas* presumption operates the same way as other presumptions under the Federal Rules of Evidence: it shifts the production burden, narrows the critical issues, and gives plaintiffs the benefit of a recognized package of circumstantial evidence.  *See Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003)(citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Although many plaintiffs in employment discrimination cases seek the benefit of the *McDonnell Douglas* presumption, its use was originally intended to be neither mandatory nor preemptive.  Thus, whether the circumstantial evidence adduced by Ms. Hildebrandt satisfies an element of the *McDonnell Douglas* presumption is not the ultimate question.

> We interpret those opinions as allowing the use of the *McDonnell Douglas* guidelines, but not making them the exclusive criteria for establishing a prima facie case.  .  .  The plaintiff can establish a prima facie case of age discrimination by using the *McDonnell Douglas* criteria.  ***The plaintiff can also establish a prima facie case using statistical information, direct evidence of discrimination, and circumstantial evidence other than that which is used in the McDonnell Douglas criteria.***

*Blackwell*, 696 F.2d at 1179.  (Emphasis added).  *See also Brown v. Packaging Corp. of America,* 338 F.3d 586, 590 n. 1 (6th Cir. 2003).  As the Court also knows, in determining whether the evidence can establish a prima facie case,

this Court must construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party.  *See Smith v. Hudson*, 600 F.2d 60, 66 (6th Cir.1979).

The basic *McDonnell Douglas/Burdine* package of evidence does not include such potent evidence of discrimination as dissimilar treatment of employees similarly situated in all but age or sex.  See *Hedrick v. Western Reserve Sys.*, 355 F.3d 444, 459-60 (6th Cir. 2004); *Grossjean v. First Energy Corp.,* 349 F.3d 332, 335 (6th Cir. 2003); *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 603 (6th Cir. 2002); *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001); *Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491 (6th Cir. 2001).  As *Wexler* clarifies, the *McDonnell Douglas/Burdine* presumption was intended to negate the most common reasons for an adverse employment decision and progressively narrow the issues to a target erected by the employer meeting its easily satisfied articulation burden.  To inflate *McDonnell Douglas/Burdine* into a barrier the way Hyatt does misapprehends completely this function and provides no convincing basis for summary judgment.

Another method of proving a prima facie individual case of disparate treatment discrimination is to show that a plaintiff was treated less favorably than similarly situated employees outside the protected group.  *U.S. Postal Service Bd. of Governors v. Aiken*, 460 U.S. 711 (1983); *Furnco Const. Corp. v. Waters,* 438 U.S. 567 (1978); *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241 (6th Cir. 1995).  Showing that similarly situated non-protected employees were treated more favorably than plaintiff is not a requirement, but rather an alternative

method of establishing a prima facie individual disparate treatment case.  61 F.3d at 1246-1247.    In the instant case, Plaintiff has clearly demonstrated that she was treated less favorably with respect to termination than Molly Crompton, Barbara Hale, and Jennifer Roman, all outside the protected age group.  She has also shown she was treated less favorably with respect to promotion than Rob Sarmiento, Mark Henry, and Brian Booth, all males.

With regard to comparable persons, both the federal and Ohio courts have held that it is not necessary to compare the plaintiff to someone under 40 years of age, so long as the comparator person is similarly situated and substantially younger than the plaintiff. *O'Connor v. Consolidated Coin Caterers Corp*., 517 U.S. 308, 312-13 (1996); *Coryell v. Bank One Trust Co. N.A*., 101 Ohio St. 3d. 175 (2004).  "The term 'substantially younger' as applied to age discrimination in employment cases defies an absolute definition and is best determined after considering the particular circumstances of each case."  *Coryell*, 101 Ohio St. 3d 175, syllabus 2.   "[T]fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."  *O'Connor*, 517 U.S. at 313.

Any combination of circumstantial evidence sufficient for a reasonable juror to infer that age or gender made a difference in an adverse employment decision may be used.  A prima facie case is made out by "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion."  *Teamsters v. United States*, 431 U.S. 324, 358 (1977).

When considering circumstantial evidence, the court must consider the totality of the circumstances rather than examine the evidence piecemeal. The combination of individual pieces of evidentiary presentation may well be greater than the constituent parts. *Boujaily v. United States*, 483 U.S. 171, 179-180 (1987). In *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the Court reaffirmed the *Bourjaily* equation for measuring circumstantial evidence under the reasonable suspicion standard of the Fourth Amendment: "The [appellate] court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the totality of circumstances' as our cases have understood that phrase [which] precludes this sort of divide-and-conquer analysis."

Another type of evidence sufficient to prove either a *prima facie* case or shift the persuasion burden is age or gender stereotyping. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989). In *Hopkins*, the female candidate was rejected in part because she did not act in a sufficiently feminine way, starting with clothes and demeanor and proceeding to words and attitude. In this case, Jack Horne stated he would remove the "dinosaurs" in the National Sales force. Even though age and gender stereotyping does not fit within the *McDonnell Douglas/Burdine* framework, it still suffices, especially after *Costa*, to make out a trial-worthy case.

The evidence set forth in Part I above constitutes overwhelming proof of a prima facie case of age discrimination in the termination of Barbara Hildebrandt through direct and circumstantial evidence. It is not necessary to repeat all of the

evidence in this portion of the brief.  Suffice it to say there is direct evidence - Jack Horne's stated intention to remove the "dinosaurs" from the NSF.  There is also a tremendous amount of circumstantial evidence.

One item of strong circumstantial evidence is the failure of Horne and Helms to follow Hyatt's mandatory Reduction in Staff: Business Process Review policy.

> An employer's conscious, unexplained departure from its usual polices and procedures when conducting a RIF may in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiff's age.

*Tyler v. Union Oil Co. of California*, 304 F. 3d. 379, 396 (5th Cir. 2002), citing *EEOC v. Texas Instruments*, 100 F.3d 1173, 1182 (5th Cir.1996); *Moore v. Eli Lilly Co.*, 990 F.2d 812, 819 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).   In the instant case, such a nexus was established by direct and circumstantial evidence, including statistical evidence set forth below.

The failure of Helms and Horne to use the Business Process Review and its attendant inquiry into comparative skills and seniority is an indicator of discrimination.  This is particularly true when no legitimate criteria, such as performance, seniority, salary, company history, home office expense, skills, production, etc., were applied.  Plaintiff expects Hyatt, in its reply brief, to make a desperate attempt to convince the Court that its own corporate RIF policy does not apply to the 2001 RIF.  The more Hyatt argues this point, the clearer it is how damaging this circumstantial evidence is.  Regardless of the argument Hyatt might make, the fact that this policy exists creates a material issue of fact on this point.

Of course, there is much more circumstantial evidence. As explained in more detail in part I, Horne created three groups of sales managers in the NSF. Group A was fully protected from termination in the RIF. Group B was protected from all but the most aggressive cuts, which did not occur. Group C, in which Barbara Hildebrandt was placed, was designated for discharge.[205] There is a 7.5-year difference between the average age of the employees in Group A (35.5 years) and the average age of the employees in Group C (43.0 years). The Hyatt data shows that the impact of the terminations fell primarily on those 40 or over.

Average age of those in Group A (protected):                     35.5

Average age of those in "Groups A and B (not terminated):    38.0

Average age of those not protected from RIF - Group C:       42.8

Average age of those actually separated[206]:                     43.0

While employees 40 and over comprised 56% of the sales managers, *81% of the separated sales managers  (9 of the 11) were in the protected age group.*[207]   Other comparisons further confirm the disparate treatment of sales managers 40 and over.

---

[205]    Exs. 38f through j; 199.

[206]    This figure is comprised of 11 of the 13 that Horne placed in Group C who were actually separated. It excludes Neubauer and Koch, who were not actually separated, but includes Venezia, who was earmarked for termination but resigned on the day the terminations were announced.

[207]    Ex. 199

|  |  |
|---|---|
| Sales managers 40 & over before September 28, 2001:<br>(43 of 66) | 56% |
| Sales managers 40 & over protected from RIF (Group A):<br>(4 of 17) | 23% |
| Sales managers 40 & over designated for termination (Group "C"):<br>(10 of 13) | 77% |
| Sales managers 40 & over unprotected and separated:<br>(9 of 11)[208] | 81% |

This analysis demonstrates that the major impact of terminations in the NSF fell on those in the protected age group (81%).   In view of Horne's admissions that those terminated were excellent performers and that anyone in the NSF could handle any accounts, the ages of those that Horne designated for protection from termination (group A) vividly demonstrates Defendants' discriminatory intent.  *While 56% of the sales managers are in the protected age group, only a small percentage of those, 23%, were protected from termination.  By the same token, an unusually high percentage of those in the protected age group, 77%, were designated to be separated from the company.*  The younger and less experienced a sales manager was, the more likely it was that Hyatt protected them from the RIF.  *None of the youngest, least experienced sales managers was terminated.*[209]  In the 20 to 29 year-old group, no terminations occurred.[210]

The statistical "analysis" presented by Hyatt official Douglas Patrick, an interested witness who was a deposition witness in this case, is not admissible evidence for a number of reasons.  It contains a summary of alleged statistics in

---

[208]    Id.
[209]    Id.

Hyatt's complete workforce.  Hyatt refused to produce the underlying documents during discovery,[211] thus preventing Plaintiff's counsel from having a sufficiently large statistical sample for an expert statistical analysis of the RIF performed.[212] Plaintiff's counsel specifically requested "all documents relating to any statistical analyses performed relating to the alleged reduction in force."[213]  To the best of our knowledge, Hyatt did not produce the total workforce information contained in Patrick's affidavit, claiming that it was not relevant and it was burdensome to produce.  Furthermore, Hyatt's summary of statistical results is not admissible because the underlying original documents have not been made available for examination or copying, as required by Fed. R. Evid. 2006.  It is fundamentally unfair to permit Defendants to use this statistical calculation under these circumstances.

In addition, the Patrick affidavit contains statistical information about the NSF that is inconsistent with the information furnished by Hyatt in discovery and is also incorrect.  Patrick lists 77 sales managers that he claims were in the NSF at the time of the RIF.  This is inconsistent with the documents written by Jack Horne and submitted in discovery.  The Horne documents list only 66 sales

---

[210]      Id.

[211]      Ex. 206, Defendants' Responses and Objections To Plaintiff's First Set of Document Requests to All Defendants.  *See* Responses to 9, 10, 12(c), 13, 18, 19.

[212]      As the Court knows, the small sample size of about 70 persons in the NSF, which Hyatt did produce, is insufficient for an expert determination of statistical significance under the court-recognized Chi Square test, the Binomial test, the Fischer Exact test, or the Mantel-Haenszel test.  *see Vogel V. City of Cincinnati,* 959 F.2d 594, 600 (citing *Castaneda v. Partida,* 430 U.S. 482, 496-97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977) and *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308-309 n. 14, 97; N.A.A.C.P. v. City of Mansfield, Ohio  866 F.2d 162, *167 -168 (6th Cir. 1989); Love v. Alamance County Bd. of Educ.  757 F.2d 1504, *1510 (4th Cir.1985); *DeLuca by DeLuca v. Merrell Dow Pharmaceuticals, Inc.*  791 F.Supp. 1042, 1052 (D.N.J.,1992); *Johnson v. Garrett*  1991 WL 96434, *43 (M.D.Fla.) (M.D.Fla.,1991).

[213]      Ex. 206, Response to Request 12(c).

managers in the NSF, plus one person, Kelly Blice, identified as "ADOS" in the Omaha National Sales Office.[214]    Patrick has included each of the five office supervisors (John Hyland, Karen Gray, Brian Booth, Debbie Rodriguez, and Gus Vonderheide) in his calculation.[215]    Since these individuals were not even considered in the RIF A, B, and C groups, they are irrelevant.  Because four of the five supervisors were in the protected age group in 2001, this skews the statistical "analysis" Defendants have submitted.  Patrick has also included the following administrative assistants, but improperly characterized them as sales managers: Ellen Gerchick and Cathi Draper.[216]    He has included the following individuals who are unknown to Plaintiff's counsel, because they do not appear on the RIF lists Horne prepared: Denise Cmeil, Rose Castan, and Sally Farhart.[217]    The correct employees to consider are those Horne listed in the A, B, and C groups on Exs. 38f through j - those are the employees who potentially were affected by the RIF.  During discovery, Horne and Hyatt represented that these were the total NSF sales managers.  Thus, Hyatt's statistical presentation should be ignored.

Finally, the argument that Hyatt retained the oldest people in the NSF is irrelevant.  Plaintiff is not required to prove that the very oldest people were fired during a RIF in order to show age discrimination.  What is pertinent is that 81% of those fired were in the protected age group, while only 56% of the total sales managers were in the protected age group.

---

[214]    Exs. 38f through j.
[215]    Compare Patrick Affidavit to Exs. 38f through j.
[216]    Id.  Horne's documents, 38f through j list these individuals as administrative assistants.
[217]    Id.

Also very pertinent is the fact that Hyatt, having possession of company-wide data, failed to use a statistical expert to determine whether there was a disparate impact on the protected age group. Robert Schnitz, the RIF legal expert assigned to the RIF, claimed that a disparate impact analysis was performed.[218] However, no such analysis has been produced in discovery. Schnitz admitted that Hyatt did not have a statistical expert perform a disparate impact analysis, and that appropriate statistical tests (Chi Square, Binomial, Fisher's Exact, and Mantel-Haentzsel) were not performed.[219] The number of standard deviations was not determined. Schnitz could not state whether the uniform guidelines in the Code of Federal Regulations were followed.[220] He did not even examine Hyatt's EEO-1 employee data reports.[221] He did not make a comparison to the community labor pool.[222] He made no analysis of the disparate impact of termination criteria,[223] undoubtedly because there were no objective criteria used. He made no disparate impact analysis of promotions.[224]

Plaintiff's statistical information above lends further support for the conclusion that age was a determining factor in the selection process and also provides compelling evidence of pretext. In *Scott v. Goodyear Tire & Rubber Co.* 160 F.3d 1121 (6th Cir. 1998), the employee in a RIF case presented statistical evidence showing a variance of fewer than 7 years between eliminated and retained employees as tending to undercut the employers' purported

---

[218]    Schnitz Dep., pp. 28-31.
[219]    Id., pp. 32-38.
[220]    Id.
[221]    Id.
[222]    Id.
[223]    Id.
[224]    Id.

nondiscriminatory justification for the selection of plaintiff. In the instant case, there is a 7.5 year gap. The Sixth Circuit reversed the district court's grant of summary judgment to the employer. Regarding the statistical evidence the Court found that "they do reveal some startling age comparisons between persons occupying positions that were eliminated and those unaffected by the reorganization." 160 F.3d at 1129. The Sixth Circuit recognizes that even information from small statistical samples can increase the likelihood that the "decisions to eliminate certain positions were based on age." *Kulling v. Grinders for Indus., Inc.*, 115 F. Supp. 2d 828, 839 (E.D. Mich. 2000) (internal quotation marks and citations omitted).

Statistical information is also relevant to the pretext issue. The Sixth Circuit reaffirmed the importance of such statistical evidence.

> Cicero's statistics offer some proof that the defendants had a pattern of hiring and firing that adversely affected older employees. This evidence coupled with the other circumstantial evidence that Cicero offers raises a triable issue of fact that the defendants' proffered reason for dismissing Cicero was a pretext for discrimination. Therefore, the district court erred when granting the defendants' summary judgment motion.

> *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 593 (6th Cir. 2002).

Hyatt's use of a totally subjective selection process for RIF terminations, especially in the face of its Business Process Review policy for RIFs, is also a strong circumstantial indicator of discrimination. Subjectively made decisions, such as the termination decisions made by Helms and Horne, are a fertile ground for manipulating results to achieve a discriminatory end. An example is Helms' decision not to fire the young male sales manager Joe Koch for a purely

subjective reason.[225]   Another example is the subjective decisions that resulted in transferring and promoting Molly Crompton in order to improve her social life.

This Court has recognized that "[a]n employee selection procedure which is largely subjective must be closely scrutinized because of its capacity for unlawful bias."   *Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 436 (S.D. Ohio 1985) (Duncan, J.).   Subjective criteria provide a "ready mechanism for discrimination".   Id. *See also Senter v. General Motors Corp.*, 532 F.2d 511,529 (6th Cir. 1976).   Subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized.   *Jauregui v. City of Glendale*, 852 F.2d 1128, 1136 (9th Cir.1988); *Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 319-20 (N.D. Cal 1992).   Where the potential for manipulation inherent in the use of subjective evaluations is high, courts can infer the intent necessary to establish a claim for disparate treatment.   Id.

The statistical information confirms the evidence that Hyatt's completely subjective decision to fire Barbara Hildebrand so that three favored substantially younger workers outside the protected age group could benefit by receiving her productive accounts was discriminatory.   Thus, her age was a factor in her discharge.

B.    **PLAINTIFF HAS SUBMITTED SUBSTANTIAL EVIDENCE OF A PRIMA FACIE CASE OF FAILURE TO PROMOTE HER**

Plaintiff claims that age and gender discrimination under state law played a role in her inability to obtain promotions.   She also claims a public policy tort violation.    As with age and sex discrimination generally, a discriminatory

---

[225]    Helms Dep., pp. 209-11.

promotion claim can be proven in one of three ways: the *McDonnell Douglas/Burdine* presumption; circumstantial evidence setting forth a prima facie case; and direct and circumstantial evidence sufficient to shift the persuasion burden. In *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002), the Court rejected summary judgment because the plaintiff had "presented evidence on the basis of which a reasonable juror could find that DaimlerChrysler's proffered reasons did not actually motivate its employment decisions." That situation parallels the evidence adduced by Ms. Hildebrandt.

Once the plaintiff establishes her prima facie case through the *McDonnell Douglas* presumption or by other circumstantial or direct evidence, the production burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Rob v. Lakeshore Estates, Inc.*, 241 F.3d 491, 498 (6th Cir. 2001).

In the instant case, there is strong evidence that Hyatt's corporate sales division operated an informal policy of pre-selecting or "positioning" people for promotion. Vice President Helms set forth an example of this policy in writing by explaining how he positioned Horne for a promotion. Here also Hyatt violated its formal policy mandating posting job openings.[226] Those being promoted to supervisory positions within the sales division were all men. Booth, Horne, and Sarmiento were young men outside the protected age group when promoted. Barbara Hildebrandt was qualified for the promotions received by Sarmiento, Henry, and Booth. While we do not believe Horne was qualified to become

Assistant Vice President of Sales, as he demonstrated by his inappropriate conduct during the RIF, Mrs. Hildebrandt was not yet qualified for that position.

Booth provides the best example of a promotion improperly denied by Mrs. Hildebrandt.  This promotion opportunity was not posted or advertised, and Booth was pre-selected by Horne.  Mrs. Hildebrandt already knew about Hyatt's pre-selection policy from her experience with Ty Helms, who pre-selected Sarmiento for a promotion for which she asked to be considered.  Because of what happened to her and Loretta Venezia when they requested promotion, she thus knew she would not even be considered.[227]  Helms has admitted he was aware Mrs. Hildebrandt was interested in promotion.  No application process was available to her.   Hyatt's policy of favoring young males for promotion discouraged her from seeking further promotions.

The federal courts have recognized that a victim of discrimination can bring a claim based on the company's discouragement of applying for promotion or the futility of applying for promotion.  *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324 (1977).  An application is not required when it would simply constitute a "futile gesture" or a "vain gesture in light of employer discrimination." 431 U.S. at 366.  Employees facing an "entrenched discriminatory system" are "not required to keep beating their heads against the wall by reapplying."  *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1017 (2d Cir.1980), cert. denied, 452 U.S. 940 (1981); see *Berkman v. City of New York*, 705 F.2d 584, 594 (2d Cir.1983) ("Those who have been deterred by a

---

[226]    Ex. 190.
[227]    Hildebrandt Affidavit, ¶ 8.

52

discriminatory practice from applying for employment are as much victims of discrimination as are actual applicants whom the practice has caused to be rejected.").

Subjective practices with respect to promotion have the effect of significantly limiting employment opportunities. The Sixth Circuit has determined that such employment practices are particularly susceptible to discriminatory application.

> The [subjective] methods for promotion . . . would enable an individual foreman, if he were so inclined, to exercise racial discrimination in his selection of candidates for promotion . . . and that, under the social structure of the times and place, Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion . . . procedures which depend almost entirely upon the subjective evaluation and the favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management.

*Senter*, 532 F.2d at 528, quoting *Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir. 1972). (Emphasis added). Nothing could be more subjective than the manner in which young Brian Booth, a hotel sales manager with demonstrated inability and lack of desire to perform the job and no NSF experience, was elevated by Horne and Helms to become Barbara Hildebrandt's superior. She was denied this promotion opportunity due to her age and her gender.

**C.    DEFENDANT FAILED TO ARTICULATE A LEGITIMATE REASON FOR FIRING BARBARA HILDEBRANDT**

As the Court knows, once the plaintiff produces evidence sufficient to support a prima facie case, the defendant has the burden to go forward with evidence of a legitimate, non-discriminatory reason for its adverse employment actions.    *Cicero v. Borg-Warner Automotive, Inc.* 280 F.3d 579, 588 (C.A.6 2002).    If evidence of a legitimate reason is presented, the burden of going forward shifts back to the plaintiff.    Id.    This case, however, is the unusual case where Defendants have been unable even to articulate a legitimate reason for firing Barbara Hildebrandt.

The reason set forth in writing on Ex. 38f for firing Barbara Hildebrandt is that her accounts can be given to Barbara Hale, who "is weighted too heavily in the corporate market so the diversity into the association market would be helpful and strategic."  In view of Horne's admission that any account in the NSF can be handled by any sales manager, this statement is not a legitimate, non-discriminatory reason for firing Mrs. Hildebrandt.  To be sure, it is a reason, but not a legitimate one.  If anything, it is a reason why Ms. Hale should have been selected to be terminated.  Deciding to fire someone because she possesses productive accounts that a substantially younger employee can benefit from is not a legitimate reason.  It is an admission of a discriminatory intent.  The Court should determine as a matter of law that Hyatt has failed to articulate a legitimate reason for firing Barbara Hildebrandt.

As regards the promotion claim, although the reasons articulated by Hyatt are weak, Plaintiff will concede that Hyatt articulated apparently legitimate

reasons for its promotion decisions.  However, as demonstrated below, these reasons are not credible and are pretext for discrimination.

### D.    THERE IS OVERWHELMING EVIDENCE THAT THE REASONS ARTICULATED FOR TERMINATING PLAINTIFF ARE PRETEXT

Where the defendant is able to articulate a legitimate reason for its adverse employment actions, the persuasion burden remains on the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  "If . . . the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework – with its presumptions and burdens – is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

The plaintiff may carry her burden of persuasion by proving that the stated reason for her termination was pretext.  Pretext may be demonstrated by showing that either a discriminatory reason more likely motivated the employer or by showing that the employer's explanation is not credible.  *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 342-43 (6th Cir. 1997).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000).

A plaintiff may show that a proffered reason is a mere pretext for discrimination by showing that: (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; or (3) the stated reason was insufficient to explain the Defendant's action.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 574 (6th Cir. 2001) .

Because of the strength of the evidence offered above to support Plaintiff's *prima facie* case, she is not obligated to offer additional or different evidence to support her contention that Hyatt's articulated nondiscriminatory reasons for its actions against Plaintiff are pretextual.

> For purposes of this case, we need not--and could not--resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law. It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.

*Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 149, (2000). Rejecting the appellate court's piecemeal approach to the evidence, the Supreme Court stressed that it is the record as a whole, the totality of the circumstances, that must be evaluated in deciding whether an employee meets her burden of offering sufficient evidence of pretext. *Id.* "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990).

"[T]he district court should not carve the environment into a series of discrete incidents and then measure the harm occurring in each episode. Instead, the trier of fact must keep in mind that 'each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment [thereby] [sic] created may exceed the sum of the

individual episodes.'" *EEOC v. Mitsubishi Motor Manufacturing of America*, 990 F. Supp. 1059, 1074 (C.D. III. 1998).

Where, as here, the Plaintiff offers evidence challenging each of Defendant's suggested nondiscriminatory reasons for their actions, she has met her burden of coming forward with evidence of pretext rendering summary judgment inappropriate. No additional evidence of discrimination is required.

> As the district court noted, [plaintiff] successfully challenged the believability of the defendants' stated reasons for transferring her. But the court erred in requiring [plaintiff] to show not only pretext but also additional evidence that the Board discriminated against her based on her sex.

*Hinson v. Clinch County, Georgia Bd. of Educ.* 231 F.3d 821, 831 (11th Cir. 2000).

In this case, Plaintiff offers ample evidence that Hyatt's articulated justification for its actions against Plaintiff are simply untrue. It is the rare case where a plaintiff will not meet her pretext burden by showing that the employer's proffered reason is not worthy of credence.

> But let us be realistic. The most reasonable inference for jurors to draw, once they disbelieve the defendant's proffered explanation for its actions, will ordinarily be that the real reason the defendant acted as it did was illegal discrimination. See *Sanderson*, 530 U.S. at ---- - ----, 120 S.Ct. at 2108-09; see also *Fisher*, 114 F.3d at 1373.

*Kovacevich v. Kent State University* 224 F.3d 806, 839 -840 (6th Cir., 2000) (Gilman, J., concurring).

Defendants argue that Barbara Hildebrandt was "eliminated" as part of a work force reduction that was "due to well-known and understandable economic factors. " (Defendant's Memorandum, p. 45). While Plaintiff does not contest

that an economic recession existed in this country during 2001 and that the September 11, 2001 events added to it, the evidence shows that Hyatt's top executives made no determination that it was necessary to fire sales managers, its primary source of new business.  In view of Hyatt's claimed termination of over 500 employees, it is clear that its executives did not believe it was necessary to terminate ten more employees in the NSF.  They simply provided Helms and Horne with unbridled discretion to exercise their prejudices against the "dinosaurs" in the NSF, remove them and give their valuable accounts to favored younger workers.  Thus, the evidence does not establish that economic conditions required that Barbara Hildebrandt be fired.

Even if economic conditions are believed to justify eleven job terminations in the NSF, they do not provide any reason at all for selecting Barbara Hildebrandt over substantially younger and newly hired employees as one of the ten to be terminated.  She was much better qualified to handle the accounts given to Molly Crompton in March 2001, especially if Hyatt is alleging that a portion of her account base should have been returned to the field.  Moving a neophyte in the NSF to accommodate her social desires would not, in a legitimate business setting, take precedence over avoiding the termination of a long term, loyal, respected, excellent employee and the attendant destruction of her long term relationships with many very productive accounts.  No legitimate reason has been given for retaining Molly Crompton, Barbara Hale, or Jennifer Roman and ending the career of Barbara Hildebrandt.

In short, Plaintiff has offered evidence supporting her contention that the RIF, at least as it applied to Barbara Hildebrandt, was not legitimate.  The Sixth Circuit reversed a district court's grant of summary judgment for an employer where the employee produced summary judgment evidence raising a genuine issue of fact as to whether his termination during a RIF was legitimate. The court held that the employee produced sufficient evidence from which a reasonable juror could conclude that the employer used the RIF as a means to discharge him and retain a substantially younger worker. *Pelphrey v. Sears, Roebuck & Co.* 1999 WL 825096 **4 (6th Cir. 1999).

Pretext is shown once "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup.' [The employee] therefore merits a trial on his § 4112.14 claim."  *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  In the instant case, the tremendous amount of circumstantial and direct evidence of age discrimination in the discharge of Barbara Hildebrandt certainly creates a jury question on pretext and on the ultimate question of age discrimination.

The facts in this case easily distinguish it from *Herbst v. System One Information Management, LLC,* 31 F.Supp.2d 1025, (N.D. Ohio 1998) with respect to the RIF.  It is interesting to note that the court in Herbst refused to grant summary judgment as to the plaintiff's claim of age discrimination with respect to her employer's decision not rehire her in another position.  As is the

case here, the court found that the employee had presented evidence of inconsistent justifications offered by the employer.

> An employer's stated reasons for a challenged action which are inconsistent or unsupportable may be considered to mask discriminatory motive. *Perfetti v. First National Bank of Chicago*, 950 F.2d 449, 456 (7th Cir.1991), cert. denied, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992). Thus, a showing of inconsistencies may be found to constitute evidence of pretext.

*Herbst* 31 F.Supp.2d at 1036.

The employer's response in *Hopson*, 306 F.3d at 436, was similarly inadequate: "In each of the foregoing instances, the alleged legitimate, non-discriminatory reason was vague, failed to specify the manner in which the white employees were better qualified, or the degrees of difference in the annual evaluations. Moreover, it is virtually unfathomable, given Hopson's education and management experience, that he was not even interviewed for any of these positions. Indeed, a reasonable juror could find that these circumstances bespeak a pattern or practice of discrimination which resulted in the Plaintiff's not being promoted."

As the facts detailed above in part I reflect, Ms. Hildebrandt has adduced sufficient evidence to reach a jury under all three approaches: (1) a *McDonnell Douglas/Burdine* presumption under Fed. R. Ev. 201; (2) circumstantial evidence from which a reasonable inference arises of discrimination; and (3) direct and circumstantial evidence sufficient to convince a reasonable juror that discrimination exists. Summary judgment may not, therefore, be granted.

### E.    PLAINTIFF IS NOT PURSUING A FEDERAL AGE OR GENDER DISCRIMINATION CLAIM BASED ON DEFENDANTS' FAILURE TO PROMOTE HER

Defendants argue that Plaintiff cannot assert a federal age or gender discrimination claim based on their failure to promote her because she did not file an EEOC charge within the requisite time period.  Plaintiff agrees that she did not timely file an EEOC charge on her denial of promotion claim, and she does not assert a federal claim on this issue.

Plaintiff relies upon her state statutory and common law claims of age and gender discrimination in the denial of promotions.  Defendants do not challenge these claims on statute of limitations grounds.

### F.    PLAINTIFF DOES NOT CLAIM DEFENDANTS DISCRIMINATED AGAINST HER DUE TO HER GENDER WHEN THEY TERMINATED HER EMPLOYMENT

Plaintiff alleges federal and state statutory and state common law age discrimination claims in connection with her discharge.  She does not allege her discharge was due to her gender.

### G.    OHIO LAW DOES RECOGNIZE A WRONGFUL DISCHARGE PUBLIC POLICY CLAIM BASED ON AGE DISCRIMINATION

Defendants argue in their memorandum that Ohio law no longer recognizes a cause of action for wrongful discharge in violation of public policy based upon age discrimination under O.R.C. Chapter 4112, citing *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240 (2002).

In *Greeley v. Miami Valley Maintenance Contrs., Inc.* 49 Ohio St.3d 228 (1990), the Ohio Supreme Court recognized an exception to the employment-at-will doctrine where the employee presents evidence that she has been

discharged for a reason that contravenes clear public policy. *Id.,* syllabus ¶¶ 1,2

and 3.  In order to establish such a claim four elements must be satisfied:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis sic.)

*Ferraro v. B.F. Goodrich Co.*  149 Ohio App.3d 301, 316, 777 N.E.2d 282,

294 (Ohio App. 9 Dist.2002), quoting, *Painter v. Graley* (1994), 70 Ohio St.3d

377, 384, 639 N.E.2d 51, fn. 8 (internal quotes omitted)  and citing  *Kulch v.*

*Structural Fibers, Inc.* [1997], 78 Ohio St.3d 134, 150-151, 677 N.E.2d 308). The

clarity and jeopardy elements are questions of law to be determined by the court,

while the causation and overriding-justification elements are questions for the

trier  of  fact.  *Kulch,*  78  Ohio  St.3d  at  151,  677  N.E.2d  308.

   *Wiles v. Medina Auto Parts,* 96 Ohio St. 3d 240 (2002), the case relied

upon by Defendants, addressed claims brought under the Family Medical Leave

Act.  It did not involve a claim of age discrimination.  Indeed, Defendants cite no

case that prohibits application of the public policy wrongful discharge claim as it

applies to an age discrimination claim.

   In *Ferraro v. B.F. Goodrich Co.*  149 Ohio App.3d 301, 316, 777 N.E.2d

282, 294 (Ohio App. 9 Dist.2002), the Court of Appeals held as a matter of law

that Ohio does recognize a public policy wrongful discharge tort claim where age

is the alleged basis for the termination of employment.  It based its conclusion on

the decision by the Ohio Supreme Court to reverse a contrary ruling without

opinion.

> The Ohio Supreme Court has evidently expanded *Kulch* to apply to cases
> such as the one *sub judice*, in which a more expansive panoply of
> statutory remedies is available. In *Livingston v. Hillside Rehab. Hosp.*
> (1997), 79 Ohio St.3d 249, 680 N.E.2d 1220, plaintiff employee brought an
> age- discrimination claim pursuant to R.C. 4101.17 (since recodified at
> R.C. 4112.14) as well as a claim for tortious wrongful discharge in
> violation of public policy. The Eleventh District Court of Appeals found that
> effective and adequate statutory remedies were available to the employee
> and affirmed the trial court's dismissal of the employee's claim for wrongful
> discharge. *Livingston v. Hillside Rehab. Hosp.* (Jan. 24, 1997), 11th Dist.
> No. 95-T- 5360, 1997 WL 51413, 1997 Ohio App. LEXIS 244. Without
> opinion, the Ohio Supreme Court reversed "on the authority of" *Kulch.*
> *Livingston,* 79 Ohio St.3d 249, 680 N.E.2d 1220.
>
> In the aftermath of *Livingston,* both state and federal courts have
> concluded that Ohio law recognizes a claim for tortious wrongful
> termination in violation of public policy based on age discrimination.
> *Leonardi v. Lawrence Industries, Inc.* (Sept. 4, 1997), 8th Dist. No. 72313,
> 1997 Ohio App. LEXIS 4014, at * 13; *Ziegler v. IBP Hog Market, Inc.*
> (C.A.6, 2001), 249 F.3d 509, 519; *White v. Honda of Am. Mfg., Inc.*
> (S.D.Ohio 2002), 191 F.Supp.2d 933, 954; *Smith v. Glaxo Wellcome, Inc.*
> (June 11, 1998), S.D.Ohio No. C-1-96-540, 1998 WL 34024762, 1998
> U.S. Dist. LEXIS 22455, at * 2-3; *Rogers,* 1998 U.S. Dist. Lexis 22450 at *
> 17. Goodrich's argument that such a claim is precluded by the availability
> of coexistent statutory remedies is without merit.

As the *Ferraro* Court mentioned, the Sixth Circuit has specifically held that

an employee may proceed with a state tort claim of wrongful discharge in

violation of public policy where age is the basis of the discriminatory termination

of employment.  "The Ohio Supreme Court has recognized a public policy cause

of action [for] an age discrimination claim. *See Livingston v. Hillside Rehab.*

*Hosp.,* 79 Ohio St.3d 249, 680 N.E.2d 1220, 1220 (1997) (reversing without

opinion the appellate court, which had held that no wrongful discharge claim based on § 4101.17 existed)." *Ziegler v. IBP Hog Market, Inc.* 249 F.3d 509, 519, fn. 10 (6th Cir. 2001). The same rationale has been followed in this Court:

> Thus, the implication of Ohio Supreme Court's action in *Livingston* is that a public policy claim for wrongful discharge based on age discrimination can be brought even though the discrimination statutes provide complete relief.

*Rogers v. AK Steel Corp.* 1998 WL 1753590, *3 (S.D.Ohio,1998) (Beckwith,J.);

*and see Mercurio v. Honeywell* 2003 WL 966287, *3 (S.D.Ohio,2003) (Hogan, M.J.).

The balance of Defendants' argument for summary judgment with respect to Plaintiff's public policy tort claim simply repeats the factual arguments that Plaintiff has responded to above. Thus Hyatt's motion for summary in this regard is without merit.

Respectfully submitted,

s/Robert A. Steinberg
Stanley M. Chesley (0000852)
Robert A. Steinberg (0032932) (Trial Attorney)
**WAITE, SCHNEIDER, BAYLESS**
 **& CHESLEY CO., L.P.A.**
1513 Fourth and Vine Tower
Cincinnati, OH  45202
513-621-0267
bobsteinberg@wsbclaw.com

and

Michael J. O'Hara (0014966)
**O'HARA, RUBERG, TAYLOR, SLOAN**
  **& SERGENT**
209 Thomas More Park, Suite C
P.O. Box 17411
Covington, Kentucky 41017-0411
(606) 331-2000
mohara@ortlaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing Memorandum was served by electronic filing via the CM/ECF System to Theresa M. Gallion, Esq. and Natalie J. Storch, Esq. this 12th day of May, 2004.

s/Robert A. Steinberg
Robert A. Steinberg