George E. Parsons

GPA

guidance process associates

Re: Loss of Employment Opportunity
Of Barbara Hildebrandt

Date of Report: March 1, 2003
Date of Exam: January 23, 2003
Report prepared by George E. Parsons, Ph.D.
Report prepared for Robert Steinberg

The following report was prepared after extensive review of current research and professional peer reviewed publications. This report was prepared using knowledge and findings most closely associated with vocational and career changes of women. Its content and findings are provided within reasonable vocational certainty and are based not only on review of professional publications, but also on an extensive interview with Ms. Hildebrandt, and over thirty years of experience as an occupational specialist, vocational expert, and professor.

Prior to this report, an extensive examination of labor and employment characteristics for women in the stabilization and crystallization periods of employment was carried out. According to the U.S. Bureau of Labor Statistics (BLS), mid-life and older women are increasingly found in the labor force, with additional reported incidences of loss of employment by nature of their sex or age, sex and age separately, or by the combination of sex and age. The majority of women, 79% as found in private industry, report some form of employment difficulties (AARP, Vol. II, Employment Discrimination Against Mid-life and Older Women 1997).

Loss of employment, particularly for women in the stabilization and crystallization age group, for whatever reason, has a profound effect on cutting short the productive years, especially the participation rate and work life expectancy (Brookshire and Smith, 1990; U.S. Department of Commerce, Statistical Abstract, 1989, p. 73). Loss of employment opportunity in the work place, therefore, reduces the participation probability and in all cases when compared females to males, and white to black, females will be lower (Brookshire and Smith, 1990, p. 118). This lower rate is maintained throughout all age groups. The fact that both males and females are equally interested in employment (trying to find a job), and rates of employment between genders are similar, seems to

2728 Madison Road
Cincinnati, Ohio 45209
(513) 351-3334
Fax (513) 351-0309

*Coaching For Transition*

EXHIBIT
A

have no effect on the gender participation rate with males greater than females. Statistically, this phenomenon reduces the yearly income by one third for blue-collar semi-skilled and unskilled workers and by two thirds for those in professional or skilled work. This reduced income creates a ripple effect in other areas of women's income, both in fringe benefits and retirement (Blau and Ferber, Occupations and Earnings of Women Workers, 1987).

Statistically, half of the women between the ages of fifty and sixty-one years of age, and one quarter of the women between sixty-two and sixty-four years of age having stopped work, find new employment (BLS, Women's Section, 2002). Women and men over the age of fifty years old differ on the length of time between jobs after loss of employment; men averaging six to eight months between jobs and women averaging sixteen to eighteen months between jobs (U.S. Department of Health and Human Services, 2001). Additional losses also occur in monies spent for training with a reported fifty per cent reduction for women over age fifty, versus women thirty-five to forty years old (New Policy Institute, Third Age Employment, 2002), and in the areas of self-confidence, emotional stability and security.

A two and one half-hour interview was conducted with Ms. Hildebrandt on January 23, 2003. On that date, Ms. Hildebrandt appeared as an attractive, middle-aged, white female, who had driven herself to the appointment. She is currently fifty years of age and is the youngest of three children in her family. She was born in Pittsburgh, Pennsylvania, but spent the majority of her life in Cincinnati, Ohio. Her mother is still alive at age eighty-nine, but in fair health. Her mother has a college education, having graduated from Rhode Island University and worked both in Washington, D.C. at the Pentagon and later at the University of Cincinnati in the Development Office. Ms. Hildebrandt's father passed away in 1998, at age ninety. He completed two years at the University of Pittsburgh and continued to work until the age of seventy-five, for the Cincinnati Air Conditioning Company.

Ms. Hildebrandt has a college degree, a Bachelor of Arts degree from the University of Cincinnati with a major in art history. Ms. Hildebrandt has been continuously employed since her graduation in 1974, other than a period between September 2001, and June 2002. Her initial employment after graduation was with A.B. Clossen Company, as an interior designer from 1974 until 1977. She then took a position as an interior designer at Rice House in Charleston, South Carolina for one year. From 1977 until 1979, she was again employed as an interior designer at Paul Dorsett, in Charleston, South Carolina.

Following this employment she began her career with the Hyatt Corporation in 1979 until 2001, when she was terminated, as a director of national accounts. Her initial position was as a sales manager at the Hyatt Regency Phoenix. She subsequently was transferred or promoted to Tampa, Savannah, Cincinnati and the national office. She moved from a sales manager position, making approximately $12,000 in 1979, to a

director of national accounts making $112,000 in base salary and commissions. Her work, as she describes it, has been skilled and sedentary.

Ms. Hildebrandt's current position is development director for Cincinnati Horticultural Society, making approximately $30,000 per year. Her work is skilled and light in nature, involving sales organization, communication skills and follow-up. Ms. Hildebrandt provided no history of medical restrictions or disability and viewed her current health as good.

In regard to her termination from the Hyatt Corporation, it is my professional opinion within reasonable vocational certainty that Ms. Hildebrandt has and will suffer wage and fringe benefit losses between her current and past employment in a negative direction. Further, it is my professional opinion that her participation and employment prior to her termination was one hundred per cent and will now be reflective of the average P&E of 79% (BLS, Statistical Report, Nov. 2001).

The work history of Ms. Hildebrandt prior to her termination was continuous without interruption for child rearing, injury or retraining. Her participation rate was therefore 100% and would have been expected to remain at this level until the age of sixty and perhaps beyond due to her life expectancy of eighty years and also due to a family history of her father working into his 70s. Unfortunately, her termination has resulted in a forced break that makes her statistically more likely to revert to the average participation rate of 79%. Additionally, it is my opinion that her work life has been reduced from eleven to eight years (Work Life Expectancy Table, U.S. Department of Labor).

Certainly, a number of intangible-losses were reported by Ms. Hildebrandt including loss of contribution, pride of independence in work, and possible advancement and promotion. Although these factors come without an economic number, they strongly impact a person's job satisfaction and feelings of worth, ultimately leading to a reduced quality of life.

Sincerely,

*George E. Parsons Ph.D*

George E. Parsons, Ph.D.
Occupational Specialist

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4

 5    -----------------------------------
                                              :
 6    BARBARA LODER HILDEBRANDT,
                                              :
 7           Plaintiff,
                                              :
 8        vs.                                 :   CASE NO.
                                              :   C-1-02 003
 9    HYATT HOTELS CORPORATION, et al.,       :
                                              :
10           Defendants.                      :
                                              :
11    -----------------------------------

12

13

14        Deposition of:   GEORGE E. PARSONS, Ph.D.

15        Taken:           By the Defendants
                           Pursuant to Notice
16
          Date:            March 22, 2004
17
          Time:            Commencing at 1:17 p.m.
18
          Place:           Waite, Schneider, Bayless &
19                         Chesley Co., L.P.A.
                           1513 Fourth & Vine Tower
20                         Cincinnati, Ohio  45202

21        Before:          Susan M. Gee, RMR, CRR
                           Notary Public - State of Ohio
22

23

24

25                                            ORIGINAL
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**



1        A.    No.

2        Q.    How many times have you met with or been

3   in the presence of the plaintiff, Mrs. Hildebrandt?

4        A.    Once.

5        Q.    Was that also on the January date that's

6   indicated in your report?

7        A.    Yes.

8        Q.    And I understand that that lasted

9   approximately two and one half hours; is that

10  correct?

11       A.    Yes.

12       Q.    Have you spoken with her or visited with

13  her or discussed this matter with her on any other

14  occasion other than January 23 of last year?

15       A.    No.

16       Q.    Have you received, in the past 13 and a

17  half months, any update on her status?

18       A.    I did meet with Mr. Steinberg last week,

19  and I did ask at that time if she was still employed,

20  working for the Cincinnati Flower Horticultural, and

21  I was told she was, and that's the only update I

22  have.

23       Q.    But you have not spoken with her?

24       A.    No.

25       Q.    Is that correct?  Have you had any

1    conversations with her at all to discuss her efforts

2    to obtain employment?

3         A.    Other than my contact with her on January

4    23rd, 2003, no.

5         Q.    Do you recall what she told you generally

6    at that time about any job searches that she had

7    undertaken since approximately October 1 of 2002

8    through that date in January of 2003?

9         A.    Yes.

10        Q.    What do you recall?

11        A.    She had attempted five to six interviews

12   primarily looking at positions parallel to what she

13   had in the hotel industry and, also, in banking.  She

14   actually possessed a log of her applications, kind of

15   a chronological history.  She had --

16        Q.    I'm sorry.  Did she share that log with

17   you?

18        A.    You know, I can't recall.  I think she

19   did, but it was kind of parallel to what she was

20   telling me, and so I really didn't make a copy of it.

21   But I do recall, I think, seeing it.

22              She had indicated that she had some

23   interviews with Fifth Third Bank here and US Bank as

24   a branch manager, and then, of course, she had

25   secured the position that she's currently in.

1        Q.   Did she give you any indication if she had

2   looked at parallel employment in the hospitality

3   industry?

4        A.   Yes, she did, but I don't recall which

5   industries or which specific hotels.  She did

6   indicate, though, that she had looked for parallel

7   positions, particularly as they related to sales.

8        Q.   And do you recall what she told you with

9   respect to her findings?

10        A.   No.  She didn't indicate that she had been

11   able to secure any position, but that was -- I don't

12   recall any further information.

13        Q.   And do you have any information, perhaps

14   personal to yourself or through your business

15   practices in the Cincinnati area, do you have any

16   information whatsoever about available positions in

17   the hospitality industry in southern Ohio?

18        A.   I'm sorry.  Would you repeat that?

19        Q.   Sure.  I'd be happy to.  Do you, based on

20   either your own personal observations or business

21   dealings, know anything about hospitality industry

22   job availability in southern Ohio?

23        A.   Well, other than because I work as a coach

24   with various individuals who are seeking employment

25   and sometimes just for the transfer, transition from

1    one job to another, I keep a fairly close tab on the

2    marketplace, and I do know, you know, obviously, some

3    of those people are seeking employment in the hotel

4    industry, so I have some feel for it.  I don't know

5    that it's my field of expertise, but I certainly know

6    of some positions.

7        Q.    What would you say is the sum total of

8    your knowledge about job availability over the past

9    24 months in the hospitality industry in southern

10    Ohio?

11        A.    Well, again, because I'm reviewing

12    statistics all the time, you know, I'm -- obviously,

13    you know, the hotel industry, like every other

14    industry, has changes from time to time, so it

15    reflects whatever the economy or whatever's going on

16    within the area, so my familiarity comes from

17    reviewing documents produced by the U.S. Department

18    of Labor.

19        Q.    And what do you recall reviewing about the

20    hospitality industry since approximately September of

21    2001?

22        A.    Well, in Cincinnati specifically, we had

23    an up and down.  Last year was one of our better

24    years only because we opened a stadium and provided,

25    therefore, a higher increase in use of our hotel and

1     recreational facilities.  The year before that was a

2     down year because of the fact that we were making

3     transitions, so there was not the same degree of

4     usage of the hotels in the Cincinnati area.  In fact,

5     I think there was a decline of approximately 50

6     percent in hotel usage.  So it has been an up and

7     down, one year being lower than the average and last

8     year being higher than the average.

9         Q.   You are not suggesting that you are an

10     expert in the hospitality industry, are you?

11         A.   No.  I'm not putting myself forward as an

12     expert in the hospitality industry at all.

13         Q.   So you would not have any knowledge to

14     rebut or comment upon any opinions that a hospitality

15     expert hired by Hyatt might render in this case; is

16     that correct?

17         A.   It depends on what the characteristics of

18     what you were hiring the hospitality person to

19     report.  I suspect that would depend on the type of

20     question you asked.

21         Q.   Do you have any statistical data you could

22     share with us during our deposition today about jobs

23     nationwide from September 11 forward in the

24     hospitality industry?

25         A.   Well, I certainly don't have it here in

1    front of me.  I wasn't prepared to discuss that, but

2    I certainly have those types of statistics and could

3    certainly bring them forward.

4        Q.    Would you agree with me that, generally,

5    the hospitality industry has been very hard hit since

6    September 11th, which might describe why you

7    characterize 2002 as a down year, to use your words?

8            MR. STEINBERG:  Just a moment.  Objection,

9        because the witness has not reviewed his

10       materials in responding to your question.

11       Q.    Thank you.  But you can still answer, sir.

12       A.    Well, I think I've already explained it in

13   the Cincinnati geographic region, at least I think

14   that was what your original question, I think using

15   southern Ohio as the characteristic.  I think we did

16   have it down here, and as I pointed it out, as much

17   as it might be due to some things that are happening

18   nationally, it was also certainly due to our

19   riverfront development, particularly as it related to

20   our stadium development.

21           And I think that this year, and I'm

22   referring perhaps to the 2003 part of 2004 year, was

23   increased because of the fact that our stadiums were

24   completed, and that brought in more tourist trade

25   into the Cincinnati area.

1          I could not report, though, on the actual

2    numbers or statistics, because I don't have them here

3    sitting in front of me, but if we used the national

4    trend, it would be different perhaps, maybe, than

5    what we saw here in Cincinnati.

6          Q.    And which stadium are you talking about?

7    The NFL stadium?

8          A.    No.  We opened that the year prior, and

9    then, of course, we opened the Reds stadium this last

10   year.

11         Q.    And it's your testimony that just the

12   building and opening of these stadiums would have

13   caused an increase in tourism; is that correct?

14         A.    Well, I think that's a fairly well known

15   fact, yes.

16         Q.    Do these stadiums hold more people than

17   the previous stadiums that were their predecessors?

18         A.    You're talking about attendance-wise?

19         Q.    Yes.  I'm trying to figure out, or do they

20   sponsor more events?

21         A.    Well, I think the characteristic of the

22   number of events was exactly the same.  The size of

23   the stadiums combined would indicate that there's a

24   higher number of seats, but, of course, they're used

25   for different purposes, so the actual number of seats

BY MS. GALLION:

Q.   Sir, would you agree with me that to the extent that you've expressed some opinions about the hospitality industry and tourism generally, that these are not your area of expertise and not things that you should be testifying about in this matter?

A.   I agree.

Q.   All right.   Good.   Then we'll move on.   I have taken a look at your vitae, and the resume that I have appears to be approximately four pages in length, and I trust if there's a more recent version, I have not seen it.   And it also has trial and deposition statistics that cover the years '97 through 2000.   Now, is there a more updated version of your vitae or its attachment?

A.   I believe you -- well, it would be hard for me to say.   I don't think anything has really changed on it, so I've got to believe that it's probably the same.   Obviously, the statistics only go to 2000, and I would suspect, you know, that we do probably have some statistics that go after that, I'm sure.

Q.   And you mean trial and deposition statistics?

A.   Right.

1      Q.    When you say "statistics," at least at

2   this phase of our discussion, you're referring to

3   your participation in depositions --

4      A.    Yes.

5      Q.    -- or at trial; is that correct?

6      A.    Yes, yes.

7      Q.    Could you please update with any 2001,

8   2002 and 2003 statistics or have you offered

9   deposition testimony or trial testimony during those

10  periods?

11     A.    Yes, I have.  I suspect it's just not in

12  typed form.

13     Q.    Okay.  How many times have you testified

14  as an expert -- let's just go with the last three

15  years -- either at deposition or at trial?

16     A.    Are we -- I'm hesitating, because I do a

17  lot of work with the Office of Hearings and Appeals,

18  which is Social Security, and I testify in a number

19  of those hearings.

20     Q.    What is the nature of your service with

21  the Social Security Administration?

22     A.    I'm a vocational expert.

23     Q.    And in those cases, do you represent and

24  work on behalf of the administration or on behalf of

25  individuals?

1    A.    No.    I'm independent.    My role is to

2    respond to various hypothetical questions that are

3    brought forward by an administrative law judge.

4    Q.    And in whose service are you in connection

5    with the Social Security Administration cases, the

6    administration or the claimant?

7    A.    Well, I'm appointed by the Office of

8    Hearings and Appeals, which is the adjudication arm

9    for the Social Security division of the federal

10   government, and I'm under contract to provide

11   vocational services.

12   Q.    And what is the nature of that contract?

13   By that, I mean, in other words, how are you paid?

14   How much are you paid?    What's the nature of it?

15   A.    Well, payment is based upon the type of

16   service rendered by nature of the fact that I'm

17   required to review materials that are provided by

18   applicants for Social Security disability.    I'm paid

19   for that review.    I'm paid for my appearance at a

20   hearing, and I may be paid for additional evidence

21   being reviewed after the case.

22   Q.    And who pays you?

23   A.    The payment comes from the Office of

24   Hearings and Appeals.

25   Q.    Taking a look at the trial and deposition

```
 1    statistics that I do have in front of me from 1997
 2    through 2000, I see that a number of them list the
 3    Special Fund as a party.  Are those Social Security
 4    Administration cases?
 5         A.   Probably not.
 6         Q.   Probably not.
 7         A.   I don't have those in front of me, but my
 8    guess would be if it says Special Fund, then they're
 9    probably worker compensation.
10         Q.   Do you also work with the State of Ohio to
11    render opinions in connection with worker
12    compensation cases?
13         A.   I have.  The State of Ohio works a little
14    bit different.  Most of those special funds are
15    probably from Kentucky.
16         Q.   So is it the state of Kentucky that you
17    have a contract or business relationship with for the
18    workers' compensation matters?
19         A.   No.  I have no contract with either, any
20    state agency in regards to workers' compensation.
21         Q.   One of the things that I'm trying to find
22    out is the number of times that you've participated
23    as an expert in a case such as this one, and since I
24    can only work on the materials that I have before me,
25    let me start with the 1997 participation.  I see that
```

23

```
 1    resume, just to make sure that I understand
 2    everything that's contained on there.
 3           Now, on the first page of your resume,
 4    right below personal information, your home and
 5    office and information about your wife and child is
 6    an indication of your employment, and it says 2002 to
 7    the present, consultant and transitional coach, and
 8    then it also says, president of Guidance Processes
 9    Associates.  Do you see that?
10    A.    Yes, ma'am.
11    Q.    May I refer to that as GPA?
12    A.    Yes.
13    Q.    What is GPA, what type of a business?
14    A.    It's a Chapter S corporation.
15    Q.    And what is its core business?
16    A.    I consult with persons ready to retire.  I
17    do workshops.  I go to retirement businesses, people
18    who engage in retirement funds, such as the State
19    Teachers Retirement Fund or state public employment,
20    and I counsel by coaching with individuals making
21    transition either from the standpoint of their job to
22    another job.  I provide them with techniques to help
23    them make the adjustment, do workshops in that
24    regard.  I see individuals who are interested in
25    making transition from one occupation to another.
```

1    the extent that she didn't know her abilities, her

2    aptitudes, then I might have said something to her,

3    but she seems to know quite well what she can do and

4    does well.  I mean, I think she's a pretty

5    knowledgeable and insightful individual, but I did

6    not discuss with her my businesses, at least as far

7    as coaching or transitional.

8        Q.    Do you know if over the past 18 months she

9    has done anything to try to obtain employment in the

10   hospitality industry in the Cincinnati area?

11       A.    No, I don't know other than what I've

12   already testified to, and that is that when she first

13   began her search, she was looking at the hospitality

14   industry, she was looking at the banking industry.

15       Q.    You said she made a concerted effort.  Can

16   you describe for me what you've been told constituted

17   this concerted effort?

18       A.    Well, I think, when I say that, I think

19   she contacted persons that she had known in the

20   industry when her work -- I mean, anybody who has

21   been in the business for 30, 20-plus years, as she

22   was in the business, does make contacts with various

23   people, and I think she did do that, and I think that

24   was her inroad to try to find, see if she could find

25   a position.

1     Q.    Do you know how many people she contacted

2   or who they are?

3     A.    No.  No, I do not.

4     Q.    So you simply took her word for it that

5   she had made had a concerted effort; is that correct?

6     A.    I did.

7     Q.    I'm sorry?

8     A.    I did.

9     Q.    So you really don't have any -- you know,

10  as most experts, I'm not trying to be unduly

11  critical, but as most experts, you really would not

12  have any idea whether the things that she's indicated

13  to you are, in fact, true and correct?

14     A.    That's correct.

15     Q.    You are relying upon the good faith

16  assertions of her and her counsel; is that correct?

17     A.    I believe, in large part, that is correct.

18     Q.    And you're being paid to take those

19  assertions which you accept as true but which you've

20  done no personal investigation into, and then you

21  apply your scientific approach to those; is that

22  correct?

23     A.    Well, I'm being paid for my time.  However

24  I get the information, I certainly am going to review

25  it.  If there's other information that I don't have,

1    A.    I believe that's probably true.

2    Q.    Now, let's go back to your resume and

3    again to my promise to get us out of here by 2:30.

4    Is the work by GPA the only business that you're

5    involved with other than your service with the Social

6    Security Administration and your service in several

7    states in connection with workers' comp cases?

8    A.    Well, I'm an adjunct professor at

9    Cincinnati State College.

10    Q.    And I could not tell from your resume if

11    that was current.  Is that a current undertaking?

12    A.    Yes.

13    Q.    And what type of adjunct professor are

14    you?

15    A.    Well, I'm teaching courses in human

16    relations.  I'm teaching courses in job selection.

17    You know, I teach, perhaps, two courses per term.

18    Q.    Are you teaching right now, this spring

19    semester of 2004?

20    A.    Yes.

21    Q.    And what are you teaching?

22    A.    I'm teaching an introductory psych and a

23    human relations course.

24    Q.    Would those have anything at all to do in

25    any material way with the substance of your testimony

1  in this case?

2      A.   I don't believe so.

3      Q.   And what other activities are you engaged

4  in as of the current time?  Not that this is not

5  enough, but I'm just wondering, have I covered all of

6  your current business activities?

7      A.   I think in large part.  I mean, I do

8  consultative work for various businesses and

9  industries such as Toyota, and that's based upon

10  their demand and time, so I may not do anything for

11  three months and then I may work for them for two

12  weeks.  Here again, I do some workshops for them.  I

13  consult with them on employee relations.  I have been

14  consulting with them about hiring practices at times,

15  so it just depends on what their needs are, but I do

16  that for various corporations and companies.  So

17  that's something I engage in, but I can't say I've

18  done any of that for the last three months.

19      Q.   You do not expect and are not being held

20  out as an expert in this case on hiring practices or

21  employee relations concerns, are you?

22      A.   No, no.  And I don't put myself forward as

23  that other than in regards to some specific areas of

24  expertise, such as testing for aptitudes or skills or

25  things of this nature.

1    Q.    What is APR?  I noticed that, for a number

2    of years, you were president of APR.

3    A.    That was a private corporation.  APR was a

4    private business which dealt with much of the same

5    things in the nature of the fact that it did some

6    counseling, certainly did a lot of testing of

7    individuals in regards to their aptitudes or

8    vocational interest, intelligence testing, all sorts

9    of things of that nature.

10    Q.    Was that a company that you were the

11    primary owner of as well?

12    A.    I ended up being the primary owner.

13    Originally, I was one of four, and the beginning of

14    that business was in 1978.

15    Q.    And that business concluded in 2002; is

16    that correct?

17    A.    Was sold.

18    Q.    To go back for just a moment to GPA, who

19    are the other principals in that business, if any?

20    A.    None.  It's a Chapter S corporation.  I am

21    it, and that's the way it operates.

22    Q.    Who else works with you at GPA, any

23    administrative people or no one?

24    A.    No, no.

25    Q.    Just yourself?

1          A.    Just myself.

2          Q.    I note that you have a Ph.D. in counseling

3     psychology from Ohio State; is that correct?

4          A.    Yes.

5          Q.    What is the business of counseling

6     psychology?  Could you give me a definition?

7          A.    Sure.  Psychology is the study of human

8     behavior.  Counseling psychology and counseling

9     education, which is my major, basically deal with the

10    service of providing counseling to individuals who

11    are basically fairly normal by nature of the fact

12    that they may have some adjustment disorder or they

13    may be seeking vocational career information.  They

14    may be seeking educational information, so the

15    primary goal is to assist individuals who are

16    basically probably suffering from some type of

17    temporary adjustment disorder.

18         Q.    Is there necessarily a vocational

19    component?

20         A.    Not always.  Certainly, the training would

21    consist of some knowledge of vocational testing.  You

22    know, some people might follow through and make that

23    more their expertise, as I did, and some may follow

24    through and make more of a clinical type of practice

25    the object.

1      Q.   Now, you are not serving as a treating

2   psychologist in this case; is that correct?

3      A.   That's correct.

4      Q.   You've only spent two and a half hours

5   with the plaintiff, and you're certainly not in a

6   position to give any definitive analysis of her

7   psychological state; is that correct?

8      A.   Correct.  And I wasn't asked to do that

9   and didn't feel that that would be necessary.  I was

10   asked to look at her from a vocational standpoint and

11   only a vocational standpoint.

12      Q.   Now, I'm taking a look at Page 2 of your

13   vitae, which has some employment highlights.  Which

14   corporations are you a consultant to?  I think GE is

15   mentioned and I think Toyota.

16      A.   That's correct.

17      Q.   Any there any others?

18      A.   Well, I have worked with Procter & Gamble

19   here locally.  I have worked with the Cincinnati

20   realtors.  I've worked with the banking industry here

21   in Cincinnati.  Originally, it was Star Bank, now US

22   Bank, so those are the primary ones that I've worked

23   with over the years.

24      Q.   And what would the nature of your

25   consultation be?

34

1      A.    Well, again, I've been called in to do a

2   number of things.  I do workshops on a regular basis,

3   but I have also consulted with them about various

4   hiring practices or perhaps placement.  Certainly,

5   since the advent of the act dealing with disability,

6   I've consulted with a number of companies about the

7   possibilities of altering or changing a job, so that

8   it meets the qualifications of the person's

9   disability.  So I've done that for various companies,

10  maybe on a singular basis, sometimes on a more

11  long-term basis.  Certainly, for Toyota, I've done

12  that a number of times.

13     Q.    Were you involved in the case that went to

14  the United States Supreme Court from that Toyota

15  plant in northern Kentucky?

16     A.    No, but I'm very familiar with it.  I was

17  not personally involved with that specific case, no.

18     Q.    You're not an expert in the Americans With

19  Disabilities Act, or are you?

20     A.    I don't put myself forward as an expert.

21  I'm knowledgeable of it, and obviously, I consult

22  with companies in regards to it, but I don't consider

23  myself an expert in that area.

24     Q.    I note that you also have some significant

25  experience in the assessment and treatment of pain

1    patients and counseling of their needs; is that

2    correct?

3        A.    Yes.

4        Q.    Would you agree with me that that's also

5    unrelated to the service that you're rendering in

6    this case?

7        A.    Oh, absolutely.

8        Q.    I want to look at some of the publications

9    that you've been involved in.  I'm assuming that

10   pursuant to stock scientific practice, that the lead

11   contributor is the first or sometimes the only author

12   that's listed; is that correct?

13       A.    Generally, that is the case, yes, except

14   sometimes they are forced to put it in alphabetical

15   order.

16       Q.    Sometimes that happens, too, but I think

17   they usually do it on the basis of the degree of

18   contribution.  But just taking a look at the

19   publications from 1968 to the present and again from

20   1974 to the present, is there anything that would be

21   related, that you see would be related to examining

22   or understanding persons who claim that they've been

23   dislocated from their jobs because of sex or age

24   discrimination?

25       A.    No.

1    individuals, but, obviously, they're putting the

2    statistics out.  I'm reading them.

3         Q.   And where will I find these BLS statistics

4    that you refer to in the second paragraph of your

5    opinions?

6         A.   You'll get them from the Bureau of Labor

7    Statistics, Washington.

8         Q.   Is there a report that you're referring to

9    that I don't see?  I mean, you just say the BLS.  I

10   mean, where will I find these statistics to test your

11   opinions?

12        A.   Well, I think I have identified some of

13   the BLS reports in that.  As you go through the

14   report, I think I've identified those.

15        Q.   Could you point that out to me, since I

16   seem to not have noticed it?

17        A.   Okay.  There's one of the statistical

18   reports of November of 2001.  Certainly, that's one

19   that's listed.

20        Q.   And where do you refer to that?

21        A.   On Page 3.

22        Q.   So on Page 3 in which paragraph?

23        A.   It would be the third full paragraph.  I'm

24   sorry.  Strike that.  It's the second full paragraph.

25        Q.   The BLS statistical report, November of

 1    percent, what is the basis of your saying that she'll

 2    now be at 79 percent?

 3.        A.    Well, it's already characteristic of what

 4    has happened.  By terminating her, she was unable to

 5    be in the labor force initially, so her employment

 6    characteristic dropped, but her P would also drop,

 7    because she was not participating at that time.  Now,

 8    she was able to re-engage herself, but she had a loss

 9    of X number of months, so her characteristic now and

10    the type of employment that she's in would be

11    characteristic of the normal P and E, .79.

12        Q.    And that's the normal; is that correct?

13        A.    Yeah, that's the norm.

14        Q.    How do you know, sir, that she hasn't

15    chosen voluntarily to work for less money with less

16    stress and enjoy her life more?

17        A.    Well, first of all, I find that kind of an

18    absurd statement.  If you had the choice of going and

19    working for more than $30,000 and you turned it down

20    just to work for 30, it would be questionable, but

21    this isn't the characteristic.  I think what we're

22    looking at here is that's not what the statistic

23    says.  What she makes is what she makes.  I don't

24    have any control over that.  The question is --

25        Q.    It has nothing to do with her compensation

1    level?

2            MR. STEINBERG:  Excuse me.  Could you let

3        the witness finish his answer?

4        Q.   Oh, sure.  I'm sorry.  I thought you were.

5        A.   I think that she say -- she's making what

6    she's making, which is probably right for the

7    position that she has.  I think the P and E deals

8    with employment and participation, and I believe her

9    P and E has been affected.

10           Now, there's another way of looking at

11   this, and it's seen in the same paragraph or the next

12   paragraph, which basically deals with the fact that

13   if you just look at the worklife expectancy tables

14   from the U.S. Department of Labor, by the fact that

15   she's not in the labor force, she initially has a

16   loss of employment years.

17       Q.   I'm not following you.  I'm not sure what

18   you're saying.  Perhaps you could explain it to me.

19       A.   The P and E, I believe, has dropped from

20   100 percent to 79.

21       Q.   Right.  And I'm trying to determine what

22   you base that on.

23       A.   She was 100 percent prior to --

24       Q.   I understand that part.

25       A.   -- her termination, and she was out of the

1  labor force for a period of, I believe maybe eight

2  months, which automatically means that her P and E

3  has now been affected.  It's not 100 percent.  It's

4  less.  I believe now she's gonna reflect the P and E

5  of the average person in the employment world.

6      Q.   That's why I'm struggling, how you make

7  that rather facile leap to making her an average

8  person when her entire career, she has not been one

9  and she's out of work for seven or eight months.  If

10  you take a look at the quantum of seven or eight

11  months across the entire history of her career, how

12  could that create a 21 percent, percentage point

13  drop?

14      A.   Well --

15      Q.   Mathematically, it just does not seem to

16  make sense, and that's why, but maybe it's me, who

17  just is not sophisticated enough to understand.

18          MR. STEINBERG:  Can you let us know when

19          the question is over, so he can start

20          answering?

21          MS. GALLION:  Sure, he can answer.

22      Q.   I'm trying to explain to you the part that

23  I don't understand.  I understand the 100 percent.

24  It's the 79 percent and how you got there and how

25  much is raw data and how much is your opinion that I

1      Q.    Sure.

2      A.    I don't know how I would come to the

3   conclusion of above average.  I mean, I would have to

4   -- I mean, above average being above the .79

5   characteristic?

6      Q.    Yes.

7      A.    I don't have any records to why it would

8   be above.  I had reference to why it was 100 percent.

9      Q.    I understand that.  Again, I do not have

10  an answer to my question.  How did you choose the 79

11  percent as opposed to 85 percent, 88 percent, 92

12  percent, something else that's below 100 percent?

13     A.    Because --

14         MR. STEINBERG:  Excuse me.  Objection to

15         the statement that you did not have an answer,

16         but you can go ahead and answer it again.

17     Q.    Do you understand my question?

18     A.    Yes.

19     Q.    I'm not focused on the 100 percent.  I

20  certainly understand that.  I do not have an answer

21  to how you came up with 79 percent as opposed to some

22  other value that would be higher but yet below 100

23  percent.

24     A.    Well, I think I support it on the basis of

25  the statistics from the Department of Labor.  They're

56

```
 1    the ones who support the characteristic of .79 being
 2    the average P and the E for the American worker.  I
 3    think that the characteristics of the worklife
 4    expectancy table strongly supports the same
 5    contention.  I mean, it's reflective.  I mean,
 6    they're both coming in a different way to the same
 7    conclusion.
 8             When a person is out of the labor force
 9    for whatever reason, their characteristics of their
10    employment in the future are affected.  That's what
11    the basis of those reports are, and that's what the
12    basis of those statistics are.  Now, you wish me to
13    make her a .90.
14        Q.   Or a .85.  Correct me if I'm wrong.
15    There's nothing in these reports that you reference
16    that says someone in her situation has to be .79, is
17    there?
18        A.   Has to be?
19        Q.   Yes, has to be, based on the experiences
20    that she's had.
21        A.   I don't think there's a has to be
22    anywhere.  But, I mean, I think the characteristics
23    of that, are you willing to accept, therefore, that
24    her salary that she's currently making is the salary
25    that she should be making?  Are you willing to accept
```

1      that?

2          Q.    Is that what I would be required to do in

3      your analysis?

4          A.    Well, if you wanted me to accept one, I

5      could accept the other.  I mean, I'm just supporting

6      what is reality, what is the basis of these reports

7      and the basis of the information provided.  I didn't

8      see any characteristics that showed me that she'd be

9      better than the .79.  I think she's demonstrated to

10     me a willingness to go back to the labor force, which

11     certainly is positive.

12         Q.    But you didn't test her credibility in

13     that regard, did you?

14         A.    I'm not even sure I could answer that

15     question.  How would I test anybody's credibility?

16         Q.    In other words, you just assumed that she

17     had undertaken a good faith job search; is that

18     correct?

19         A.    Oh, I think you're assassinating and

20     characterizing her as not trying.  I don't think that

21     that's the case.  I think she's demonstrated -- you

22     know, she's beaten the statistics, at least as far as

23     the number of months between the termination and

24     re-employment.  She beat that statistic that's

25     usually 16 months for women.  She beat that

1    statistic, so she's demonstrating, from my

2    perspective, certainly, an attempt to try to return

3    to the labor force.

4        Q.    Do you have any idea, Dr. Parsons, of your

5    own personal knowledge, what she did to try to get a

6    job in the industry that she had worked in almost 30

7    years?

8        A.    Only to what I testified earlier, which is

9    her comment to me that she did contact people that

10   she had worked with over the years.   She had a number

11   of good industrial contacts with Procter & Gamble and

12   other companies, and she made some concerted effort

13   to try to return to those types of businesses, but I

14   don't know specifically what she did do other than

15   just her statement.

16       Q.    I'd like to ask about the next opinion

17   that you express on Page 3, where you say that it is

18   your opinion that her worklife has been reduced from

19   11 to eight years.   Do you see that?

20       A.    Yeah.

21       Q.    What do you base that on, and where can I

22   find the empirical data supporting that?

23       A.    Again, it's a worklife expectancy table.

24   I'll certainly make it available to Mr. Steinberg and

25   make it available to you.   If you're in the labor

1    Q.    And what did she say?

2    A.    She certainly felt that she would continue

3  working, had no reason to come out of the labor force

4  as she perceived it, and she certainly saw herself

5  working well beyond 65.  She gave no indication she

6  was ready to stop.  I know that she was married.  I

7  know that her husband was certainly supportive of

8  those kinds of characteristics, so there was no

9  reason that she gave me, at the time that I

10 interviewed her, that she wouldn't have continued on.

11   Q.    How do you know her husband was supportive

12 of these plans?

13   A.    Well, that was her statement to me.

14   Q.    And, again, you have no way to test this.

15 This is just simply what she told you; is that

16 correct?

17   A.    That's correct.

18   Q.    Did you know that she had married just a

19 matter of months before her employment at Hyatt

20 ended?

21   A.    I knew she had married recently.  I didn't

22 have any connection between her termination and her

23 marriage.  I mean, I wasn't looking at that.  She did

24 indicate that she was recently married, though.

25   Q.    Did you discuss with her whether her