RECEIVED MAR 7 2003

# BURKE, ROSEN & ASSOCIATES

2800 Euclid Avenue, Suite 300, Cleveland, OH 44115

John F. Burke, Jr., Ph.D.

Harvey S. Rosen, Ph.D.

March 4, 2003

Robert Steinberg, Esq.
**WAITE, SCHNEIDER, BAYLESS & CHESLEY**
1513 Central Trust Tower
Fourth & Vine Streets
Cincinnati, Ohio 45202

Re:    Barbara Loder Hildebrandt

Dear Attorney Steinberg:

You have asked for my opinion as to the economic loss created by the termination of Barbara Loder Hildebrandt. Mrs. Hildebrandt was terminated from her Director of National Accounts position by the Hyatt Hotel Corporation on October 1, 2001, at which time she was approximately 49 years of age. Calculated from the present, she is 50.5 years of age, has a statistical work life expectancy to approximately the age of 60, and a life expectancy under normal circumstances to the age of 82 years.

I have calculated expected losses under two scenarios assuming she: (1) continued in her position with Hyatt Hotel Corporation, and (2) had received the position and earnings structure of a peer, Brian Booth.

Mrs. Hildebrandt had earnings at Hyatt ranging between $94,152 in 1997 and $111,101 in 2000, her last full year of employment. After an extended period of unemployment, Mrs. Hildebrandt gained employment at lower wages and with fewer fringe benefits than she received prior to her termination from Hyatt.

My findings indicate that had Mrs. Hildebrandt's remained in her position, her termination created an economic loss of between $1,400,347 and $973,712. The loss was determined by computing the difference in the reasonable amounts of earnings Mrs. Hildebrandt would have been expected to earn over the remainder of her work life expectancy between her pre-and-post termination jobs. The high end of the range reflects the assumption that she would have worked to age 66, when she will be eligible for full Social Security retirement benefits under current legislation, whereas, the low end of the range assumes she would have retired at her statistical work life expectancy at the approximate age of 60 years. Please note that my findings also include compensation for the loss of vacation time at Mrs. Hildebrandt's new position, and the loss of hotel accommodation benefits.

My findings indicate that had Mrs. Hildebrandt received a pay increase to the level of Brian Booth from his date of promotion, her termination created an economic loss of between $2,232,796 and $1,535,079, calculated to the same points in time as above.

You have also asked me to review the economic impact of the premature tax liability created by the involuntary early retirement savings account distribution for Mrs. Hildebrandt. I have calculated the present value of a tax deferral to be $8,153.

The impact of future inflation on all computations was not taken into account. To be consistent, a real discount rate was utilized when the figures were reduced to present value.

My findings are detailed in this report.

Sincerely yours,

Harvey S. Rosen /rh

Harvey S. Rosen, Ph.D.
John Burke Jr., Ph.D.
Economists

HSR:JFB:rh
Enclosure



EXHIBIT
A

Telephone: (216) 566-9300            Facsimile (216) 566-0927            e-mail: h.rosen@burkerosen.com

# Preliminary Report

*concerning the*

## Loss of Earning Capacity

### of

### Barbara Loder Hildebrandt

Prepared for:

**Robert Steinberg, Esq. of
WAITE, SCHNEIDER, BAYLESS & CHESLEY**
*Attorneys at Law*

Prepared by:

**Harvey S. Rosen, Ph.D.
John F. Burke, Jr., Ph.D.**
*Economists*

*March 4, 2003*

REDACTED

2

Personal Data Sheet

Name:                        Barbara Loder Hildebrandt
Date of Birth:                    1952
Date of Termination: 10/01/2001                      (24.93% of 2001 Remains)

Age on:                      10/01/2001          49.0  Years
Work Life Expectancy from:   10/01/2001          10.3  Years ( 4.93% of 2012)*
Age at Expiration of Work Life Expectancy:        59.3  Years Old
Life Expectancy from:   10/01/2001               32.9  Years ( 65.21% of 2034)**
Age at Expiration of Life Expectancy:             81.9  Years Old

Age on: 04/01/2003                                50.5  Years
Work Life Expectancy from: 04/01/2003             9.5  Years ( 74.79% of 2012)*
Age at Expiration of Work Life Expectancy:        60.0  Years Old
Life Expectancy from: 04/01/2003                 31.5  Years ( 74.79% of 2034)**
Age at Expiration of Life Expectancy:             82.0  Years Old

Occupation:    Director of National Accounts
Employer:      Hyatt Hotel Corp.
Date of Hire:  10/1/1979

|  |  |  |  | As of 04/01/2003 | |
| Name | Relationship | Date of Birth | Age | Life Expectancy | |
| Lee | Husband | 1947 | 56.1 | 22.8 | Years |

Note: As of 04/01/2003 75.07% of 2003 Remains

*Length of Working Life for Men and Women, 1979–80, Worklife Estimates,
February 1986, Bureau of Labor Statistics, U.S. Department of Labor.

**Expectation of Life at Single Years of Age, by Race, and Sex: U.S., 1997, Anderson
RN. United States life tables,1997. National Vital Statistics Reports;Vol 47 No. 28,
Maryland: National Center for Health Statistics, December 13, 1999, pgs. 14-23.    FW

REDACTED

3a

Summary Sheet

**IA. Loss of Future Earning Income Attributable to Termination * / ***

| | Remain in Position Pre-Termination Present Value | | Expected Post-Termination Present Value | | Difference | |
|---|---|---|---|---|---|---|
| **A. Age 66 - Social Security** | | | | | | |
| Total Wages * | $ | 1,782,003 | $ | 563,741 | $ | 1,218,262 |
| Fringe Benefits * | $ | 184,028 | $ | 45,638 | $ | 138,390 |
| Vacation Loss * | $ | - | $ | (15,220) | $ | 15,220 |
| Hotel Accommodation Benefit ** | $ | 28,475 | $ | - | $ | 28,475 |
| Total | $ | 1,994,506 | $ | 594,159 | $ | 1,400,347 |
| **B. Age 65** | | | | | | |
| Total Wages * | $ | 1,694,594 | $ | 536,969 | $ | 1,157,625 |
| Fringe Benefits * | $ | 175,001 | $ | 43,590 | $ | 131,411 |
| Vacation Loss * | $ | - | $ | (14,807) | $ | 14,807 |
| Hotel Accommodation Benefit ** | $ | 26,728 | $ | - | $ | 26,728 |
| Total | $ | 1,896,323 | $ | 565,752 | $ | 1,330,571 |
| **C. Work Life from the present** | | | | | | |
| Total Wages * | $ | 1,246,230 | $ | 399,640 | $ | 846,590 |
| Fringe Benefits * | $ | 128,698 | $ | 33,084 | $ | 95,614 |
| Vacation Loss * | $ | - | $ | (12,166) | $ | 12,166 |
| Hotel Accommodation Benefit ** | $ | 19,343 | $ | - | $ | 19,343 |
| Total | $ | 1,394,271 | $ | 420,558 | $ | 973,712 |
| **D. Past** | | | | | | |
| Total Wages * | $ | 403,859 | $ | 141,631 | $ | 262,228 |
| Fringe Benefits * | $ | 41,707 | $ | 13,347 | $ | 28,360 |
| Vacation Loss * | $ | - | $ | (2,650) | $ | 2,650 |
| Hotel Accommodation Benefit ** | $ | 3,960 | | | $ | 3,960 |
| Total | $ | 449,526 | $ | 152,328 | $ | 297,198 |

| | | | |
|---|---|---|---|
| II.    Federal Tax Deferral Loss ** | | $ | 8,153 |

* Future year figures are grown at 1.5% real and discounted at -2.5% real per annum.

** Future year figures are grown at 0% real and discounted at -2.5% real per annum.

3b

Summary Sheet

**IB. Loss of Future Earning Income Attributable to Denial of Promotion * / ***

|  | Year 2000 Promotion Pre-Termination Present Value | | Expected Post-Termination Present Value | | Difference | |
|---|---|---|---|---|---|---|
| **A. Age 66 - Social Security** | | | | | | |
| Total Wages * | $ | 2,560,226 | $ | 583,741 | $ | 1,996,485 |
| Fringe Benefits * | $ | 238,254 | $ | 45,638 | $ | 192,616 |
| Vacation Loss * | $ | - | $ | (15,220) | $ | 15,220 |
| Hotel Accommodation Benefit ** | $ | 28,475 | $ | | $ | 28,475 |
| Total | $ | 2,826,956 | $ | 594,159 | $ | 2,232,796 |
| **B. Age 65** | | | | | | |
| Total Wages * | $ | 2,432,119 | $ | 536,969 | $ | 1,895,150 |
| Fringe Benefits * | $ | 225,700 | $ | 43,590 | $ | 182,110 |
| Vacation Loss * | $ | - | $ | (14,807) | $ | 14,807 |
| Hotel Accommodation Benefit ** | $ | 26,728 | $ | - | $ | 26,728 |
| Total | $ | 2,684,547 | $ | 565,752 | $ | 2,118,795 |
| **C. Work Life from the present** | | | | | | |
| Total Wages * | $ | 1,774,993 | $ | 399,640 | $ | 1,375,353 |
| Fringe Benefits * | $ | 161,301 | $ | 33,084 | $ | 128,217 |
| Vacation Loss * | $ | - | $ | (12,166) | $ | 12,166 |
| Hotel Accommodation Benefit ** | $ | 19,343 | $ | - | $ | 19,343 |
| Total | $ | 1,955,637 | $ | 420,558 | $ | 1,535,079 |
| **D. Past** | | | | | | |
| Total Wages * | $ | 540,409 | $ | 141,831 | $ | 398,778 |
| Fringe Benefits * | $ | 40,312 | $ | 13,347 | $ | 26,965 |
| Vacation Loss * | $ | - | $ | (2,650) | $ | 2,650 |
| Hotel Accommodation Benefit ** | $ | 3,960 | $ | - | $ | 3,960 |
| Total | $ | 584,681 | $ | 152,328 | $ | 432,353 |

II.     Federal Tax Deferral Loss **                                      $      8,153

* Future year figures are grown at 1.5% real and discounted at -2.5% real per annum.
** Future year figures are grown at 0% real and discounted at -2.5% real per annum.

4

Table 1:    Schedule Showing the Actual and Projected "But-for Termination" Earnings and
            Offset Wages for the years 1997 through 2003 for Barbara Loder Hildebrandt.

| Year | Earnings | Source / Comments |
|------|----------|-------------------|
| 1997 | $ 94,151.81 | Pay-stub / year-end earnings statement |
| 1998 | $ 105,192.27 | Pay-stub / year-end earnings statement |
| 1999 | $ 87,174.07 | Pay-stub / year-end earnings statement |
| 2000 | $ 111,100.69 | W-2 Statement |
| 2001 | $ 93,825.26 | W-2 Statement, termination on October 1st |
| 2002 | $ 16,875.00 | W-2 Statement, re-employed June 10th |

1997-2001 Actual Avg.:  $    98,289

Projected "But-for Termination Injury" and Actual/Projected Offsetting Wages:

| | Previous year change in CPI-U | Projected Pre-Termination Wages (a) | Offsetting Wages (b) |
|------|------|------|------|
| 2000 | | $ 111,101 | $ 111,101 |
| 2001 | | $ 93,825 | $ 93,825 (Act.) |
| 2002 | 2.85% | $ 97,947 | $ 16,875 (Act.) |
| 2003 | 1.58% | $ 100,987 | $ 30,931 (Proj.) |

Notes:
(a) Year 2001 Pre-Termination Wage calculated as Actual even though severance payments carried
    through mid-November. Years 2002 and 2003 are grown at the previous year change in CPI-U
    plus 1.5% real growth.
(b) Years 2000 to 2002 are Actual Earnings. Year 2003 is $30,000 Contractual Base Salary grown
    by the previous year change in CPI-U, plus 1.5% real to allow for commission income growth
    ($30,000 * 1.0158 * 1.015).

5

Table 2:    Schedule Showing the Present Value of Pre-Termination Earning and Fringe
Benefits for Barbara Loder Hildebrandt through Age 66.

| Year | | Present Value of Pre-Termination Wage Stream (a) | Present Value of Fringe Benefits (b) | Total |
|---|---|---|---|---|
| 2000 | (c) | $ 111,101 | $ 11,473 | $ 122,574 |
| 2001 | (c) | $ 93,825 | $ 9,690 | $ 103,515 |
| 2002 | | $ 97,947 | $ 10,115 | $ 108,062 |
| 2003 | | $ 100,987 | $ 10,429 | $ 111,416 |
| | | | | |
| Past | | $ 403,859 | $ 41,707 | $ 445,566 |
| | | | | |
| 2004 | | $ 100,002 | $ 10,327 | $ 110,329 |
| 2005 | | $ 99,026 | $ 10,226 | $ 109,252 |
| 2006 | | $ 98,060 | $ 10,127 | $ 108,186 |
| 2007 | | $ 97,103 | $ 10,028 | $ 107,131 |
| 2008 | | $ 96,156 | $ 9,930 | $ 106,086 |
| 2009 | | $ 95,218 | $ 9,833 | $ 105,051 |
| 2010 | | $ 94,289 | $ 9,737 | $ 104,026 |
| 2011 | | $ 93,369 | $ 9,642 | $ 103,011 |
| 2012 | (d) | $ 69,149 | $ 7,141 | $ 76,290 |
| | | | | |
| Work Life from present | | $ 1,246,230 | $ 128,698 | $ 1,374,928 |
| | | | | |
| 2012 | | $ 23,309 | $ 2,407 | $ 25,716 |
| 2013 | | $ 91,556 | $ 9,455 | $ 101,011 |
| 2014 | | $ 90,663 | $ 9,363 | $ 100,025 |
| 2015 | | $ 89,778 | $ 9,271 | $ 99,050 |
| 2016 | | $ 88,902 | $ 9,181 | $ 98,083 |
| 2017 | (e) | $ 64,157 | $ 6,625 | $ 70,782 |
| | | | | |
| Age 65 | | $ 1,694,594 | $ 175,001 | $ 1,869,595 |
| | | | | |
| 2017 | | $ 23,873 | $ 2,466 | $ 26,344 |
| 2018 | (f) | $ 63,531 | $ 6,561 | $ 70,092 |
| | | | | |
| Age 66 | | $ 1,782,003 | $ 184,028 | $ 1,966,031 |

Notes:
(a) Year 2000 is Actual. Year 2001 Pre-Termination Wage calculated as Actual even though severance through mid-November. Years 2002 and 2003 are grown at the previous year change in CPI-U plus 1.5% real growth. Years after 2003 are grown at 1.5% real and discounted at -2.5% real per annum.
(b) Fringe Benefits calculated for the year 2001 are calculated at $6,150.60 Social Security maximum from Table 9 plus 1.45% on the excess wage plus $3,000 maximum Retirement Savings Plan contribution. Total is 10.327% of Projected Earnings for 2001. All other years are calculated at 10.327%.
(c) Full-year calculated for 2002 and 2001 (the year of termination).
(d) 74.79% of 2012, Statistical Work Life Expectancy from the present.
(e) Age 65, 266/365.
(f) Age 66, 266/365.

6

Table 3:    Schedule Showing the Present Value of Post-Termination Earning and Fringe Benefits for Barbara Loder Hildebrandt through Age 66.

| Year | | Present Value of Post-Termination Wage Stream (a) | Present Value of Fringe Benefits (b) | Total |
|---|---|---|---|---|
| 2000 | (c) | $ 111,101 | $ 11,473 | $ 122,574 |
| 2001 | (c) | $ 93,825 | $ 9,690 | $ 103,515 |
| 2002 | (c) | $ 16,875 | $ 1,291 | $ 18,166 |
| 2003 | | $ 30,931 | $ 2,366 | $ 33,297 |
| Past | | $ 141,631 | $ 13,347 | $ 154,978 |
| 2004 | | $ 30,629 | $ 2,343 | $ 32,972 |
| 2005 | | $ 30,331 | $ 2,320 | $ 32,651 |
| 2006 | | $ 30,035 | $ 2,298 | $ 32,332 |
| 2007 | | $ 29,742 | $ 2,275 | $ 32,017 |
| 2008 | | $ 29,451 | $ 2,253 | $ 31,704 |
| 2009 | | $ 29,164 | $ 2,231 | $ 31,395 |
| 2010 | | $ 28,880 | $ 2,209 | $ 31,089 |
| 2011 | | $ 28,598 | $ 2,188 | $ 30,786 |
| 2012 | (d) | $ 21,180 | $ 1,620 | $ 22,800 |
| Work Life from present | | $ 399,640 | $ 33,084 | $ 432,724 |
| 2012 | | $ 7,139 | $ 546 | $ 7,685 |
| 2013 | | $ 28,043 | $ 2,145 | $ 30,188 |
| 2014 | | $ 27,769 | $ 2,124 | $ 29,893 |
| 2015 | | $ 27,498 | $ 2,104 | $ 29,602 |
| 2016 | | $ 27,230 | $ 2,083 | $ 29,313 |
| 2017 | (e) | $ 19,651 | $ 1,503 | $ 21,154 |
| Age 65 | | $ 536,969 | $ 43,590 | $ 580,559 |
| 2017 | | $ 7,314 | $ 559 | $ 7,873 |
| 2018 | (f) | $ 19,459 | $ 1,489 | $ 20,947 |
| Age 66 | | $ 563,741 | $ 45,638 | $ 609,379 |

Notes:
(a) Years 2001 and 2002 are Actual Earnings. Year 2003 is $30,000 Contractual Base Salary grown by the previous year change in CPI-U plus 1.5% real to allow for commission income growth. Years after 2003 are grown at 1.5% real and discounted at -2.5% real per annum.
(b) Year 2001 fringe benefits are calculated at 10.327% while still at Hyatt per previous table. Years 2002 and after are calculated for new employment beginning 6-10-2002 at Employer's 7.65% Social Security contribution.
(c) Full-years calculated, 2000, 2001 and 2002 are Actual.
(d) 74.79% of 2012, Statistical Work Life Expectancy from the present.
(e) Age 65, 266/365.
(f) Age 66, 266/365.

7

Table 4:    Schedule Showing the Annual Base Salary for years 1992 (year of hire) through year 2001 for Brian Booth.

| Year | Base Salary (a) | Effective Day (a) | Day of Year (b) |
|------|-----------------|-------------------|-----------------|
| 1992 | $    56,000 | 3/30 | 89 |
| 1993 | $    62,000 | 2/15 | 46 |
| 1994 | $    64,300 | 3/1 | 60 |
| 1994 | $    70,800 | 9/18 | 261 |
| 1994 | $    73,600 | 9/18 | 261 |
| 1996 | $    78,000 | 3/1 | 60 |
| 2000 | $   106,400 | 3/1 | 60 |
| 2000 | $   119,000 | 12/4 | 338 |
| 2001 | $   124,500 | 3/1 | 60 |

Notes:
(a) Source is Employment Data Sheet for Brian Booth, Bates# 000197.
(b) Calculated by Author.

8

Table 5:    Schedule Showing the Weighted Average Annual Base Salary for the years 1993
through 2001 for Brian Booth.

| Calendar Year | Base Salary (a) | | Days Effective | Weighted Value (b) | | Weighted Annual Base Salary (c) | |
|---|---|---|---|---|---|---|---|
| 1993 | $ | 56,000 | 45 | $ | 6,904 | $ | 61,260 |
|  | $ | 62,000 | 320 | $ | 54,356 |  |  |
| 1994 | $ | 62,000 | 59 | $ | 10,022 | $ | 66,604 |
|  | $ | 64,300 | 201 | $ | 35,409 |  |  |
|  | $ | 73,600 | 105 | $ | 21,173 |  |  |
| 1995 | $ | 73,600 | 365 | $ | 73,600 | $ | 73,600 |
| 1996 | $ | 73,600 | 59 | $ | 11,897 | $ | 77,289 |
|  | $ | 78,000 | 306 | $ | 65,392 |  |  |
| 1997 | $ | 78,000 | 365 | $ | 78,000 | $ | 78,000 |
| 1998 | $ | 78,000 | 365 | $ | 78,000 | $ | 78,000 |
| 1999 | $ | 78,000 | 365 | $ | 78,000 | $ | 78,000 |
| 2000 | $ | 78,000 | 59 | $ | 12,608 | $ | 102,776 |
|  | $ | 106,400 | 278 | $ | 81,039 |  |  |
|  | $ | 119,000 | 28 | $ | 9,129 |  |  |
| 2001 | $ | 119,000 | 59 | $ | 19,236 | $ | 123,611 |
|  | $ | 124,500 | 306 | $ | 104,375 |  |  |

| | | |
|---|---|---|
| 2001 Bonus Income per correspondence from Hyatt's Counsel: | $ | 13,900 |
| Author calculated % of Base Salary | | 11.24% |

1993 through 2001 Compound Rate of Base Wage Growth:    9.17%

| | |
|---|---|
| 1993 Annual Average CPI-U | 144.5 |
| 2001 Annual Average CPI-U | 177.1 |
| Compound Annual Rate of Growth in CPI-U: | 2.58% |

| | |
|---|---|
| Spread Over Inflation | 6.43% |

Note:
(a) Calculated by Author in Table 1.

9

Table 6:        Schedule Showing the Actual and Projected Base Salary for the
                years 1993 through 2003 for Brian Booth.

| Year | Weighted Base Salary (a) | Estimated Bonus Income (b) | Total |
|------|--------------------------|----------------------------|-------|
| 1993 | $    61,260 | | |
| 1994 | $    66,604 | | |
| 1995 | $    73,600 | | |
| 1996 | $    77,289 | | |
| 1997 | $    78,000 | | |
| 1998 | $    78,000 | | |
| 1999 | $    78,000 | | |
| 2000 | $   102,776 | $    11,557 | $    114,333 |
| 2001 | $   123,611 | $    13,900 | $    137,511 |
| 2002 | $   129,041 | $    14,511 | $    143,551 |
| 2003 | $   133,046 | $    14,961 | $    148,007 |

Notes:
(a) Year 1993 through 2001 Values are calculated by Author from company data in Tables 4 and 5.
    Years 2002 and 2003 are grown from the 2001 Value at the previous year change in CPI-U of 2.85%
    and 1.58% plus 1.5% real
(b) Year 2001 Bonus Income per correspondence from Counsel and Author calculates Bonus as 11.24%.
    of 2001 Base. Author calculates all 2000 to 2003 Bonus Values at 11.24% of Base.

10

Table 7:        Schedule Showing the Present Value of Pre-Termination Earning and Fringe
                Benefits for Barbara Loder Hildebrandt through Age 66, at Brian Booth's Wage.

| Year | | Present Value of Pre-Termination Wage Stream (a) | Present Value of Fringe Benefits (b) | Total |
|---|---|---|---|---|
| 2000 | (c) | $ 111,340 | $ 8,305 | $ 119,645 |
| 2001 | | $ 137,511 | $ 10,258 | $ 147,769 |
| 2002 | | $ 143,551 | $ 10,708 | $ 154,260 |
| 2003 | | $ 148,007 | $ 11,041 | $ 159,048 |
| Past | | $ 540,409 | $ 40,312 | $ 580,721 |
| 2004 | | $ 146,563 | $ 14,383 | $ 160,926 |
| 2005 | | $ 145,133 | $ 14,223 | $ 159,356 |
| 2006 | | $ 143,717 | $ 14,084 | $ 157,801 |
| 2007 | | $ 142,315 | $ 13,947 | $ 156,262 |
| 2008 | | $ 140,927 | $ 13,811 | $ 154,737 |
| 2009 | | $ 139,552 | $ 13,676 | $ 153,228 |
| 2010 | | $ 138,190 | $ 13,543 | $ 151,733 |
| 2011 | | $ 136,842 | $ 13,411 | $ 150,252 |
| 2012 | (d) | $ 101,346 | $ 9,932 | $ 111,278 |
| Work Life from present | | $ 1,774,993 | $ 161,301 | $ 1,936,294 |
| 2012 | | $ 34,161 | $ 3,348 | $ 37,509 |
| 2013 | | $ 134,185 | $ 13,150 | $ 147,335 |
| 2014 | | $ 132,876 | $ 13,022 | $ 145,898 |
| 2015 | | $ 131,579 | $ 12,895 | $ 144,474 |
| 2016 | | $ 130,296 | $ 12,769 | $ 143,065 |
| 2017 | (e) | $ 94,029 | $ 9,215 | $ 103,244 |
| Age 65 | | $ 2,432,119 | $ 225,700 | $ 2,657,819 |
| 2017 | | $ 34,996 | $ 3,430 | $ 38,425 |
| 2018 | (f) | $ 93,112 | $ 9,125 | $ 102,236 |
| Age 66 | | $ 2,560,226 | $ 238,254 | $ 2,798,480 |

Notes:
(a) Assumes that Barbara Loder Hildebrandt receives Brian Booth's promotion and Wage on 12-4-2000,
    and his Wage Total from that point on into the future. Years 2001 to 2003 are from Table 6.
    Years after 2003 are grown at 1.5% real and discounted at -2.5% real per annum.
(b) Fringe Benefits calculated for the year 2001 are calculated at $6,495 Social Security maximum
    from Table 6 plus 1.45% on the excess wage plus $3,000 maximum Retirement Savings Plan contribution.
    Total is 7.460% of Projected Earnings for 2001. All other years are calculated at 7.460%.
(c) Calculated as Pre-termination Wage of $111,101 on Table 1 for 338 days plus Brian Booth's Wage of
    $114,333 from Table 6 for (1-338/365).
(d) 74.79% of 2012, Statistical Work Life Expectancy from the present.
(e) Age 65, 266/365.
(f) Age 66, 266/365.

11

Table 8:            Schedule Showing the Present Value of Compensation for Pre-Post
                    Termination Vacation Loss for Barbara Loder Hildebrandt through Age 66.

| Year | Pre-Termination Vacation Weeks (a) | Post-Termination Vacation Weeks (b) | Vacation Difference (weeks) | Present Value of Compensation for Additional Time (c) |
|---|---|---|---|---|
| 2002 (d) | 2.0 | 0.5 | 1.5 | $      865 |
| 2003 | 4.0 | 1.0 | 3.0 | $    1,784 |
| Past | 6.0 | 1.5 | 4.5 | $    2,650 |
| 2004 | 4.0 | 2.0 | 2.0 | $    1,178 |
| 2005 | 4.0 | 2.0 | 2.0 | $    1,167 |
| 2006 | 4.0 | 2.0 | 2.0 | $    1,155 |
| 2007 | 4.0 | 2.0 | 2.0 | $    1,144 |
| 2008 | 4.0 | 2.0 | 2.0 | $    1,133 |
| 2009 | 4.0 | 2.0 | 2.0 | $    1,122 |
| 2010 | 4.0 | 2.0 | 2.0 | $    1,111 |
| 2011 | 4.0 | 2.0 | 2.0 | $    1,100 |
| 2012 | 4.0 | 3.0 | 1.0 | $      407 |
| Work Life from present | 42.0 | 20.5 | 21.5 | $   12,166 |
| 2012 | 4.0 | 3.0 | 1.0 | $      137 |
| 2013 | 4.0 | 3.0 | 1.0 | $      539 |
| 2014 | 4.0 | 3.0 | 1.0 | $      534 |
| 2015 | 4.0 | 3.0 | 1.0 | $      529 |
| 2016 | 4.0 | 3.0 | 1.0 | $      524 |
| 2017 | 4.0 | 3.0 | 1.0 | $      378 |
| Age 65 | 66.0 | 38.5 | 27.5 | $   14,807 |
| 2017 | 4.0 | 3.0 | 1.0 | $      141 |
| 2018 (e) | 2.9 | 2.2 | 0.7 | $      273 |
| Age 66 | 72.9 | 43.7 | 29.2 | $   15,220 |

Notes:
(a) Vacation per Hyatt Benefits brochure. 2002 calculated at only half year value to match
    post-termination employment as in (b).
(b) Vacation per Cincinnati Horticultural Society Personnel Manual. Year 2002 only half year
    employment so Author calculates as half week vacation.
(c) Compensation for year 2002 is calculated at 1.5 Weeks times $30,000 Annual Salary.
    For other years, compensation for additional required work time calculated as Vacation
    Difference divided by 52 weeks times the present value of the respective year post-termination
    earnings.
(d) See treatment of year 2002 in (a), (b) and (c).
(e) Calculated to 266/365, consistent with pre-post earning capacities.

Table 9:          Schedule Showing the Present Value of Compensation for Loss of
                  Hotel Accommodation Benefit for Barbara Loder Hildebrandt through Age 66.

| Year | | Present Value of Complementary Hotel Accommodations (a) |
|---|---|---|
| 2002 | (b) | $ 1,980 |
| 2003 | | $ 1,980 |
| Past | | $ 3,960 |
| 2004 | | $ 1,932 |
| 2005 | | $ 1,885 |
| 2006 | | $ 1,839 |
| 2007 | | $ 1,794 |
| 2008 | | $ 1,750 |
| 2009 | | $ 1,707 |
| 2010 | | $ 1,666 |
| 2011 | | $ 1,625 |
| 2012 | (c) | $ 1,186 |
| Work Life from present | | $ 19,343 |
| 2012 | | $ 400 |
| 2013 | | $ 1,547 |
| 2014 | | $ 1,509 |
| 2015 | | $ 1,472 |
| 2016 | | $ 1,436 |
| 2017 | (d) | $ 1,021 |
| Age 65 | | $ 26,728 |
| 2017 | | $ 380 |
| 2018 (e) | (e) | $ 1,367 |
| Age 66 | | $ 28,475 |

Notes:
(a) Vacation benefits per Counsel include 12 free room-nights per year at company facilities.
    Per Barbara Loder Hildebrandt, rooms range from $165-$185 per night. Author calculates
    as $165 per night times 12 nights. Years after 2003 are grown at 0% real and discounted
    at -2.5% real per annum.
(b) Full-year calculated for 2002.
(c) 74.79% of 2012, Statistical Work Life Expectancy from the present.
(d) Age 65, 266/365.
(e) Age 66, 266/365.

13

Table 10:    Social Security Contribution Rate for Employers

| Year | For Retirement Survivors, and Disability Insurance | For Hospital Insurance | Total | Maximum Amount of Covered Earnings | Maximum Contribution |
|---|---|---|---|---|---|
| 1937 – 1949 | 1.00% | *** | 1.00% | $3,000 | $30.00 |
| 1950 | 1.50% | *** | 1.50% | $3,000 | $45.00 |
| 1951 – 1953 | 1.50% | *** | 1.50% | $3,600 | $54.00 |
| 1954 | 2.00% | *** | 2.00% | $3,600 | $72.00 |
| 1955 – 1956 | 2.00% | *** | 2.00% | $4,200 | $84.00 |
| 1957 – 1958 | 2.25% | *** | 2.25% | $4,200 | $94.50 |
| 1959 | 5.00% | *** | 5.00% | $4,800 | $120.00 |
| 1960 – 1961 | 3.00% | *** | 3.00% | $4,800 | $144.00 |
| 1962 | 3.13% | *** | 3.13% | $4,800 | $150.00 |
| 1963 – 1965 | 3.63% | *** | 3.63% | $4,800 | $174.00 |
| 1966 | 3.85% | 0.35% | 4.20% | $6,600 | $277.20 |
| 1967 | 3.80% | 0.60% | 4.40% | $6,600 | $290.40 |
| 1968 | 3.80% | 0.60% | 4.40% | $7,800 | $343.20 |
| 1969 – 1970 | 4.20% | 0.60% | 4.80% | $7,800 | $374.40 |
| 1971 | 4.60% | 0.60% | 5.20% | $7,800 | $405.60 |
| 1972 | 4.60% | 0.60% | 5.20% | $9,000 | $468.00 |
| 1973 | 4.95% | 0.90% | 5.85% | $10,800 | $631.80 |
| 1974 | 4.95% | 0.90% | 5.85% | $13,200 | $772.20 |
| 1975 | 4.95% | 0.90% | 5.85% | $14,100 | $824.85 |
| 1976 | 4.95% | 0.90% | 5.85% | $15,300 | $895.05 |
| 1977 | 4.95% | 0.90% | 5.85% | $16,500 | $965.25 |
| 1978 | 5.05% | 1.00% | 6.05% | $17,700 | $1,070.85 |
| 1979 | 5.08% | 1.05% | 6.13% | $22,900 | $1,403.77 |
| 1980 | 5.08% | 1.05% | 6.13% | $25,900 | $1,587.67 |
| 1981 | 5.35% | 1.30% | 6.65% | $29,700 | $1,975.05 |
| 1982 | 5.40% | 1.30% | 6.70% | $32,400 | $2,170.80 |
| 1983 | 5.40% | 1.30% | 6.70% | $35,700 | $2,391.90 |
| 1984 | 5.70% | 1.30% | 7.00% | $37,800 | $2,646.00 |
| 1985 | 5.70% | 1.35% | 7.05% | $39,600 | $2,791.80 |
| 1986 | 5.70% | 1.45% | 7.15% | $42,000 | $3,003.00 |
| 1987 | 5.70% | 1.45% | 7.15% | $43,800 | $3,131.70 |
| 1988 | 6.06% | 1.45% | 7.51% | $45,000 | $3,379.50 |
| 1989 | 6.06% | 1.45% | 7.51% | $48,000 | $3,604.80 |
| 1990 | 6.20% | 1.45% | 7.65% | $51,300 | $3,924.45 |
| 1991 | 6.20% | 1.45% | 7.65% | $53,400 | $4,085.10 |
| 1992 | 6.20% | 1.45% | 7.65% | $55,500 | $4,245.75 |
| 1993 | 6.20% | 1.45% | 7.65% | $57,600 | $4,406.40 |
| 1994 | 6.20% | 1.45% | 7.65% | $60,600 | $4,635.90 |
| 1995 | 6.20% | 1.45% | 7.65% | $61,200 | $4,681.80 |
| 1996 | 6.20% | 1.45% | 7.65% | $62,700 | $4,796.55 |
| 1997 | 6.20% | 1.45% | 7.65% | $65,400 | $5,003.10 |
| 1998 | 6.20% | 1.45% | 7.65% | $68,400 | $5,232.60 |
| 1999 | 6.20% | 1.45% | 7.65% | $72,600 | $5,553.90 |
| 2000 | 6.20% | 1.45% | 7.65% | $72,600 | $5,553.90 |
| 2001 | 6.20% | 1.45% | 7.65% | $80,400 | $6,150.60 |
| 2002 & up | 6.20% | 1.45% | 7.65% | $84,900 | $6,494.85 |

Source:    U.S. Department of Health, Education and Welfare, Social Security Administration, the Associate Commissioner for External Affairs

Note:    Automatically adjusted after 1999; assumed constant 1/02

14

Table 11:     Schedule Showing the Projected Tax Implications of Early Cash-out
              of Retirement Savings for Barbara Loden Hildebrandt.

| Tax Year | | 2001 |
|---|---|---|
| Total Income (a) | $ | 171,478 |
| Distribution Amount (b) | $ | 89,915 |
| Total Federal Taxes Paid (a) | $ | 47,640 |
| Average Federal Tax Rate (c) | | 27.782% |
| | | |
| Federal Taxes Pain on Distribution | $ | 24,980 |
| Deferral Years (2019-2003) | | 16 |
| Future Value of Federal Taxes Paid (d) | $ | 16,827 |
| | | |
| Present Value of Federal Tax Deferral to Year 2019: | $ | 8,153 |

Notes:
(a) Source is 2001 1040 Federal Tax Return.
(b) Source is 1099-R from T. Rowe Price.
(c) Calculated by Author.
(d) Future year figures are grown at 0% real and discounted at -2.5% real per annum,
    with 2019 as distribution year as 2018 is final year of employment to age 66.



Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF OHIO
 4                 WESTERN DIVISION
 5
 6   ------------------------
 7   BARBARA LODER HILDEBRANDT,        :
 8         Plaintiff,                  :
 9   vs.                              : CASE NO.
                                       : C-1-02-0003
10   HYATT CORPORATION, et al,         :
11         Defendants.                 :
12   ------------------------
13
14
15   DEPOSITION OF:   BARBARA LODER HILDEBRANDT
        TAKEN:        By the Defendants
16                    Pursuant to Agreement
17      DATE:         March 19, 2002
18      TIME:         Commencing at 9:00 a.m.
19      PLACE:        Waite, Schneider, Bayless &
                      Chesley
20                    15th Floor Central Trust Tower
                      Cincinnati, Ohio  45202
21
        BEFORE:       Nancy A. Burns
22                    and
                      Marlene L. Dori
23                    Notaries Public - State of Ohio
24
```

Page 2

APPEARANCES:

On behalf of the plaintiff:

Robert A. Steinberg, Esq.
of
Waite, Schneider, Bayless & Chesley
1513 Central Trust Tower
Cincinnati, Ohio  45202

On behalf of the defendants:

Theresa M. Gallion, Esq.
Natalie Jones Storch, Esq.
of
Fisher & Phillips LLP
1250 Lincoln Plaza
300 South Orange Avenue
Orlando, Florida 32801

Also present:

Brian Booth

- - -

Page 3

BARBARA LODER HILDEBRANDT
of lawful age, a plaintiff herein, being first duly sworn as
hereinafter certified, was examined and deposed as follows:

CROSS-EXAMINATION

BY MS. GALLION:

Q.  Good morning, Miss Hildebrandt. How are you?

A.  I'm good, thank you.

Q.  Good. I'm Theresa Gallion, I represent the
defendants in this lawsuit that you have filed that's now
pending in the United States District Court. And I have a
few questions for you this morning. Have you ever had your
deposition taken before?

A.  No, I haven't.

Q.  I'm sure your attorney has mentioned some
housekeeping matters to you, but from my standpoint this is
a very informal process. Certainly if you need to take a
break, do so, if there's anything about my questions that's
unclear I hope you'll let me know, I'm happy to rephrase
anything. I think you'll find I'm very lowkey and whatever
I can do to accommodate you and make the day go better I
hope you'll let me know.

Is there anything about your physical or
emotional condition this morning that might in any way
prohibit you from giving truthful, accurate and thorough

Page 4

```
 1   testimony?
 2        A.  No.
 3        Q.  Nothing, prescription medication, lack of
 4   sleep, nothing of the sort?
 5        A.  Nothing.
 6        Q.  Then I'll assume unless you place me on notice
 7   to the contrary that your answers this morning will be
 8   pursuant to questions that you understand --
 9        A.  Yes.
10        Q.  -- from me and are the truthful response,
11   correct?
12        A.  Correct.
13        Q.  Would you give me just a little bit of
14   background information about yourself? Where are you
15   residing now?
16        A.  In Cincinnati.
17        Q.  And can you give me the physical location?
18        A.  688 Totten Way.
19        Q.  And that's T-o-t-t-e-n?
20        A.  Right.
21        Q.  And what's the ZIP there?
22        A.  45226.
23        Q.  And how long have you resided there?
24        A.  Since May 19th.
```

EXHIBIT
B

Page 5

1    Q.    And are you married?
2    A.    Yes, I am.
3    Q.    Did you also get married in May of this past
4    year?
5    A.    Yes, I did.
6    Q.    And your husband is?
7    A.    Lee Hildebrandt.
8    Q.    Have you worked anywhere since the time that
9    you left the employment of Hyatt last September?
10    A.    No, I have not.
11    Q.    We're going to talk at some point this morning
12    about your job search. Have you had any sorts of income
13    whatsoever, whether from your own efforts or otherwise?
14    A.    No, I haven't.
15    Q.    How have you been spending your time since late
16    September of 2001 on balance?
17    A.    I've been looking for a job, I've been
18    attending outplacement services at Lee Hecht Harrison.
19    Q.    Is there an office of Lee Hecht Harrison here
20    in town?
21    A.    Yes, there is.
22    Q.    Have you been working with any other search
23    agencies or other agencies that might help with out
24    placement?

Page 6

1    A.    Not really, no.
2    Q.    Just give me a sense of how you've been
3    spending your time. Could you possibly approximate how much
4    time you spend engaged in your job search?
5    A.    Almost every day that I'm talking to people,
6    I'm answering ads in the newspaper, I was at Lee Hecht
7    Harrison every day for three months and continued on with
8    luncheon networking.
9    Q.    Did you start with Lee Hecht probably in early
10    October?
11    A.    I don't remember the exact date that I started.
12    It might have been mid October.
13    Q.    Sometime probably in October, no later than
14    November?
15    A.    Yes.
16    Q.    Does that sound like the best approximation?
17    A.    (Witness nodded.)
18    Q.    And you had services that were paid for in
19    advance by Hyatt for about 90 days, is that correct?
20    A.    Yes.
21    Q.    And did you go there just about every day --
22    A.    Yes, I did.
23    Q.    -- to take advantage of those services? Is
24    that yes?

Page 7

1    A.    Yes.
2    Q.    Have you since that time continued to work with
3    the people at Lee Hecht Harrison?
4    A.    The services are over.
5    Q.    Did you decide on your own to continue to work
6    with them?
7    A.    No, I did not.
8    Q.    At your own expense for example?
9    A.    No, I did not.
10    Q.    Did you feel any need to do so?
11    A.    No, I did not.
12    Q.    Are you working with any other search firm or
13    outplacement firm?
14    A.    I have my resume with several head hunters if
15    you would.
16    Q.    Are they local head hunters?
17    A.    Yes.
18    Q.    Can you tell me who they are?
19    A.    I don't have my notes exactly in front of me to
20    refer to that.
21    Q.    Do you recall the names of any of them off the
22    top of your head or a contact person?
23    A.    The Angus Group.
24    Q.    Are they a local concern?

Page 8

1    A.    Yes, they are.
2    Q.    And who was your contact there?
3    A.    Ted Plattenburg I believe.
4    Q.    Do you have any --
5    A.    I sent my resume to him.
6    Q.    Do you have any idea how his name is spelled?
7    A.    I think it's P-l-a-t-t-e-n-b-u-r-g.
8    Q.    Any other firms that you can recall without
9    taking a look at your notes?
10    A.    I sent it to Ann Badane.
11    Q.    Do you know how that's spelled?
12    A.    B-a-d-a-n-e. And Rick Satterfeld.
13    Q.    Satterfeld?
14    A.    Satterfeld.
15    Q.    Satterfeld?
16    A.    Mm-hmm.
17    Q.    Are they with a group or are they together?
18    A.    I think they're together.
19    Q.    Anyone else that you can recall, again, just --
20    A.    I'd have to refer to my notes.
21    Q.    Have you had any interviews at all?
22    A.    Yes, I have.
23    Q.    Can you recall which ones those are? Again,
24    without access to your notes which you can look at at any

2 (Pages 5 to 8)

Page 253

1    Q.  BH 1551. This is December 2000, 9:00 a.m.,
2  Brian Booth lunch. Is this the first time that you met with
3  Brian Booth when, since he had become your director?
4    A.  I believe so.
5    Q.  How did that meeting go?
6    A.  I believe it went fine.
7    Q.  He didn't say or do anything inappropriate at
8  that time, did he?
9    A.  No, he didn't at that time.
10    Q.  And he didn't give you any indication that he
11  might have some bias against you, did he?
12    A.  He was coming in to see his in-laws for the
13  holidays.
14    Q.  Is there anything wrong that?
15    A.  No.
16    Q.  So he took the opportunity to see you, correct?
17    A.  Yes.
18    Q.  Now, is that the occasion where you had some
19  discussion with him about what your quota would be for the
20  first half of the year?
21    A.  No.
22    Q.  When was that?
23    A.  That was probably in February.
24    Q.  Take a look at this next document which is BH

Page 254

1  1666. Is this an indication that on July 9 of 2001 is the
2  day that you had the mid-year review with Brian Booth?
3    A.  I believe I might have had the next day or on
4  Wednesday perhaps.
5    Q.  Was he in town?
6    A.  He was.
7    Q.  Is that what that is indicating, Review slash
8  Brian Booth?
9    A.  Right. Yes.
10    MR. STEINBERG: She's asking about this entry.
11    A.  Right, yes. He came in to make sales calls
12  with me in Louisville and then we were going to do a review.
13    Q.  Okay. Take a look, what documents do you have
14  beneath that?
15    MR. STEINBERG: There's nothing underneath
16  that.
17    Q.  There's not? Okay.
18    MS. GALLION: Let me do this. Let me take a
19  break, see what else I wish to cover. Let's take a
20  short break. We don't even have to leave the room
21  unless you guys want to. I just want to make sure
22  I've covered everything.
23    (There was a brief recess.)
24    Q.  Have you ever been involved in any kind of

Page 255

1  litigation before?
2    A.  I, there was somebody that ran into my car.
3    Q.  I saw a copy of a complaint involving
4  Cincinnati Insurance Company.
5    A.  Right.
6    Q.  Barbara Loder, Christopher Barell, I have a
7  copy here. Have you ever been involved in any other than
8  that?
9    A.  No.
10    Q.  Did you obtain a settlement or a resolution of
11  that claim?
12    A.  No, not yet.
13    Q.  Is that something that's still ongoing?
14    A.  I believe so.
15    Q.  And who is representing you in that matter?
16    A.  I think it says on there. It was an uninsured
17  motorist.
18    Q.  That's not something that this current law firm
19  is handling on your behalf, is it?
20    A.  No.
21    Q.  Is this the only time that you've ever been
22  deposed?
23    A.  Yes.
24    Q.  I'm going to place before your attorney first,

Page 256

1  and a set for you, some documents that we will give to the
2  court reporter because they're not a set of our master
3  documents. These appear to be some documents that, I'm sure
4  you'll instruct us, but they appear to be part of your job
5  search. At the very top one has a Bates stamp number of
6  707.
7    A.  Yes.
8    Q.  And I'd like to bring your attention to the
9  third paragraph where you say, I'm ready for a new challenge
10  within the Cincinnati business community.
11    A.  Yes.
12    Q.  Do you see that language?
13    A.  Yes.
14    Q.  That appears to be in a number of these
15  letters. Was that consistent with your desire to stay here
16  and not go anywhere else?
17    A.  These firms that I was applying to called for
18  positions in Cincinnati.
19    Q.  But you didn't look at opportunities any other
20  place, did you?
21    A.  I haven't. But I would be open to that.
22    Q.  Take a look at the next document, 630, which is
23  a letter that you sent to BSA, confidential reply. You
24  close that letter with, I'm ready for a new challenge within

Page 257

1 the Cincinnati business slash medical community, correct?
2    A.   It's just terminology.
3    Q.   But it certainly is indicative of your desire
4 to work only here?
5    A.   The position that was advertised was for a rep
6 in Cincinnati.
7    Q.   But, ma'am, you don't know anything about
8 positions that are anywhere else because you're not looking
9 anywhere else, correct?
10    A.   I was applying to a position in Cincinnati.
11    Q.   But you haven't applied for any positions that
12 are anywhere other than Cincinnati?
13    A.   I'm trying to find a position in Cincinnati
14 first.
15    Q.   Okay. Take a look at the next document, which
16 is 625. It says, I'm actively seeking employment in the
17 Cincinnati area. That's correct, is it not?
18    A.   Yes, it is.
19    Q.   Take a look at the next one, 619. I'm seeking
20 a new challenge within the Cincinnati business community.
21 The same language, correct?
22    A.   It's just language. They are Cincinnati based
23 companies. Cincinnati Reds --
24    Q.   I understand, but in other words it's not as if

Page 258

1 you have some different letter that you use for out-of-town
2 interests?
3    A.   I haven't written to an out-of-town, for an
4 out-of-town interest.
5    Q.   Okay. All the others are the same thing. I
6 won't bore you with them. I did want to follow up on some
7 other matters, including persons that you have stayed in
8 touch with. Have you been in touch with Jane Johnson?
9    A.   I spoke to Jane Johnson earlier on.
10    Q.   How many times would you say?
11    A.   I believe I spoke to her once.
12    Q.   Just one time?
13    A.   (Witness nodded.)
14    Q.   Is that yes?
15    A.   Yes.
16    Q.   Is Jane moving on and finding other employment
17 and forgetting about her experience with Hyatt?
18    A.   I don't know.
19    Q.   Did you discuss with her bringing some kind of
20 an action based on age or based on sex?
21    A.   I don't recall the conversation with her.
22    Q.   Did you have, have you had that kind of
23 discussion with anybody?
24    A.   I discussed with some people that I was going

Page 259

1 to consult with an attorney.
2    Q.   Did you invite others to do the same thing and
3 perhaps join forces with you?
4    A.   No, I did not.
5    Q.   Do you know which other of these people may be
6 consulting an attorney as well?
7    A.   I don't know what you're looking at.
8    Q.   The other ten people, the other nine, other ten
9 people.
10    MR. STEINBERG:  Are you referring to the
11 people who were terminated?
12    MS. GALLION:   Yes.
13    Q.   Jane is one of those, is she not?
14    A.   Yes, she is.
15    Q.   Okay. Have you talked to any of those other
16 persons about joining forces with them?
17    A.   I've talked to a few, I haven't talked to
18 everyone.
19    Q.   Have you talked to Dean D'anna recently about
20 that?
21    A.   No, I haven't.
22    Q.   Have you talked to Wendy Jensen about that?
23    A.   I've talked to Wendy early on.
24    Q.   Did you also talk to Wendy about perhaps her

Page 260

1 belief that maybe she had health issues that might have been
2 the reason for the loss of her job?
3    A.   I knew Wendy had health issues.
4    Q.   Do you know what she's doing now?
5    A.   I don't know exactly what she's doing now.
6    Q.   When is the last time you'd say you talked to
7 her?
8    A.   Probably a month ago.
9    Q.   Have you talked to Diane Smith at all about
10 these matters?
11    A.   No.
12    Q.   Have you talked to Bonnie Weis?
13    A.   No.
14    Q.   Have you had any communications with Michelle
15 Bondenelli about these matters?
16    A.   No.
17    Q.   Marilyn Brumbaugh?
18    A.   Marilyn Brumbaugh called me to say howupset
19 she was that my job was eliminated.
20    Q.   Have you talked to her since then?
21    A.   No.
22    Q.   Any communication at all with James Davis?
23    A.   No.
24    Q.   Any communication at all with Karen Gray?

65 (Pages 257 to 260)

Page 285

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4              EASTERN DISTRICT OF KENTUCKY
 5

 6   ------------------------------------
                                        :
 7   BARBARA LODER HILDEBRANDT,          :
                                        :
 8         Plaintiff,                    :
                                        :
 9         vs.                           :        CASE NO.
                                        :        C-1-02-003
10   HYATT HOTELS CORPORATION, et al,    :
                                        :
11         Defendants.                   :
                                        :
12   ------------------------------------
13
14
```

|  | | |
|---|---|---|
| 15 | DEPOSITION OF: | BARBARA LODER HILDEBRANDT |
| 16 | | Vol. II |
| | TAKEN: | By the Defendants |
| 17 | | Pursuant to Agreement |
| 18 | DATE: | December 18, 2003 |
| 19 | TIME: | Commencing at 8:30 a.m. |
| 20 | PLACE: | Waite, Schneider, Bayless & Chesley |
| 21 | | 1513 Central Trust Tower |
| 22 | | Cincinnati, Ohio  45202 |
| | BEFORE: | Nancy A. Burns |
| 23 | | Notary Public - State of Ohio |
| 24 | | |
| 25 | | |

COPY

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

Page 286

```
1    APPEARANCES:
2       On behalf of the plaintiff:
3          Robert A. Steinberg, Esq.
              of
4       Waite, Schneider, Bayless & Chesley
          1513 Central Trust Tower
5          Cincinnati, Ohio 45202
6       On behalf of the defendants:
7          Theresa M. Gallion, Esq.
              of
8       Fisher & Phillips
          1250 Lincoln Plaza
9          300 South Orange Avenue
          Orlando, Florida 32801
10
11                 - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 287

```
1              BARBARA HILDEBRANDT
2    of lawful age, a plaintiff herein, being first duly sworn as
3    hereinafter certified, was examined and deposed as follows:
4                  CROSS-EXAMINATION
5    BY MS. GALLION:
6        Q.  Good morning, Miss Hildebrandt. How are you?
7        A.  I'm great. How are you?
8        Q.  Happy holidays.
9        A.  Same to you.
10       Q.  Thank you. We are really here for these
11   purposes, and I appreciate Mr. Steinberg setting this up
12   really as a follow-up on certain damages items that pertain
13   to your lawsuit, and all I really intend to do this morning
14   is just to get an update on your personal status and your
15   employment status and the status of your damages and so
16   we're going to try to be very brief. May I start by just
17   simply asking your current employment? Can you tell
18   me where you're currently employed?
19       A.  I'm currently employed by the Cincinnati
20   Horticultural Society in the office at 3731 Eastern Hills
21   Lane, Cincinnati.
22       Q.  Could you give me that one more time? 3731 --
23       A.  3731 Eastern Hills Lane, and that's Cincinnati,
24   Ohio 45209.
25       Q.  What is your current title?
```

Page 288

```
1        A.  I'm the development director.
2        Q.  Is that the job that you've held since the
3    inception of your employment with the Horticultural Society?
4        A.  Yes, it is.
5        Q.  On what day did you begin your employment?
6        A.  I believe it was June 10th, 2002.
7        Q.  And what is your current rate of pay or
8    compensation package?
9        A.  I'm currently making $30,000 a year and I also
10   have an incentive program if I meet certain goals.
11       Q.  Can you describe how the incentive program
12   works?
13       A.  It would work, if I were able to achieve X
14   amount of revenue over a set goal for sponsorships and
15   friends' campaigns or grants.
16       Q.  And if you do meet the incentive program
17   whatever its provisions may be what is the range of the
18   incentive that you would receive?
19       A.  It's broken out between different entities,
20   when it's friends' campaign, I believe it's five percent up
21   to, up to $5,000 over $40,000.
22       Q.  What is the maximum amount that you could
23   achieve under the incentive program, if you've ever done the
24   math?
25       A.  I'm not 100 percent sure but I think it would
```

Page 289

```
1    probably be, be up to $50,000, not exactly positive.
2        Q.  Have you enjoyed any incentive participation in
3    past years, perhaps in 2002?
4        A.  I was incented a $1,250.
5        Q.  So you received --
6        A.  I received a bonus, yes.
7        Q.  So you had a bonus or an incentive payment of
8    $1250 in the calendar year of '02?
9        A.  It came in '03. Right.
10       Q.  Okay.
11       A.  It was a bonus, yes.
12       Q.  Have you been able to track your incentive
13   participation to date to determine if you're on track to
14   receive any kind of incentive compensation for calendar year
15   2002? And I'll rephrase that. Have you been able to
16   ascertain that you've already achieved some incentive or
17   that you're on track for some incentive under the incentive
18   program?
19           MR. STEINBERG: Excuse me. Do you mean for
20   2003?
21           MS. GALLION: Yes, yes.
22       A.  Okay. It's still an ongoing process to
23   determine whether the money's going to come in from
24   different sponsorships or from the friends' campaign.
25       Q.  I probably jumped to the conclusion that it was
```

2 (Pages 286 to 289)

05/21/2004 09:26 FAX

Page 290

1  a calendar year. Is that the way that the incentive program
2  is judged or based?
3      A.  Well, it's really based I believe on when I
4  signed my contract, so that really isn't a calendar year.
5      Q.  When did you sign a contract?
6      A.  I signed a contract in June of '02.
7      Q.  And what are its relevant provisions in terms
8  of the length of your employment and the duties that you're
9  assigned?
10     A.  It's a year agreement.
11     Q.  Did it expire in or about June of '03?
12     A.  Yes, it did.
13     Q.  Did you sign another?
14     A.  Yes, I did.
15     Q.  So is it fair to say that you have a similar
16 agreement from June of '03 to approximately June of '04?
17     A.  Yes. It's similar.
18     Q.  May we obtain a copy of that?
19         MR. STEINBERG: Yes.
20         MS. GALLION:  Bob, what I'll do is I'll send
21  you a letter, because, correct me if I'm wrong, but
22  I'm recalling that you preferred, you and Miss
23  Hildebrandt preferred that we not have any subpoena
24  communication with the Horticultural Society, is that
25  correct?

Page 291

1          MR. STEINBERG: Well, yeah. We'll be glad to
2  provide you any documents you want from her work.
3          MS. GALLION:  Okay.
4          MR. STEINBERG: I mean you don't have to send
5  me a letter, it's in the transcript here.
6          MS. GALLION:  Okay, great.
7          MR. STEINBERG: I'll certainly provide you this
8  contract.
9          MS. GALLION:  Okay. If you could send me the
10 '03 to '04 contract that would be great. There may
11 also be a similar request, and if they need to be
12 redacted for some purpose I certainly understand but
13 I would like her tax returns, again, showing her
14 income, not anybody else's income, for '01. I think
15 we have '01, for '02. That is something that I
16 reviewed the records this morning and I did not see
17 it, I don't believe that we have it.
18         MR. STEINBERG: Sure.
19         MS. GALLION:  And, again, if there are
20 redactions, I don't know how she and her husband may
21 file but we certainly would understand, it's her
22 income that we would be focused on.
23     Q.  Miss Hildebrandt, do I understand that if I
24 obtain a copy of the agreement that you signed with the
25 Horticultural Society for the one-year period of June '03 to

Page 292

1  June '04 will it explain the incentive program?
2      A.  Yes, it will.
3      Q.  Okay. And then when do you think you will know
4  what your incentive payment, if any, will be?
5      A.  Possibly by the end of, end of April, beginning
6  of May.
7      Q.  Is that when you found out about your $1250
8  bonus last year?
9      A.  No. That was a bonus after the flower show was
10 completed.
11     Q.  Okay. Is this full-time employment with the
12 Horticultural Society?
13     A.  Yes, it is.
14     Q.  Okay. What are your usual work hours?
15     A.  The office hours are 8:30 to 4:30.
16     Q.  Since you began your employment with this
17 entity in the summer of '02 have you looked for or sought
18 any other employment?
19     A.  I had made an agreement with them that I would
20 stay there for a year basically. They were great to hire me
21 and I wanted to do a good job, and so the answer to that is
22 no, I did not look for anything else during that time.
23     Q.  Is it fair for me to understand that as you
24 have executed another one-year agreement with the
25 Horticultural society that you have the intention of being

Page 293

1  there through that period next summer?
2      A.  Yes, I hope to be.
3      Q.  Do you have any current changes in mind from an
4  employment standpoint?
5      A.  I don't know if my contract would be renewed
6  after '04.
7      Q.  Are there economic or financial conditions at
8  the Horticultural Society that might preclude that?
9          MR. STEINBERG: Do you understand that
10 question?
11     A.  Might preclude?
12     Q.  Might preclude another, your contract being
13 renewed?
14     A.  I don't believe so.
15     Q.  Is there, has someone communicated to you that
16 there's some doubt whether your contract will be renewed
17 after June of '04?
18     A.  It hasn't been discussed.
19     Q.  Okay. And who have you had that discussion
20 with?
21     A.  I haven't had the discussion with anyone.
22     Q.  Oh. So is this just maybe conjecture on your
23 part that perhaps you will not receive the offer of a new
24 contract after June of '04 or, I'm trying determine, do you
25 have some facts?

3 (Pages 290 to 293)

Page 294

1     A.  No, I don't have any fact.

2     Q.  Okay.  So as we sit here today you don't have

3  any fact to present a present belief that you won't be

4  employed after June of '04?

5     A.  Yes.

6     Q.  Is that correct?

7     A.  Yes.

8     Q.  Okay,

9        MS. GALLION:  And, Bob, just as part of our

10  ongoing responsibilities under the Federal Rules I'm

11  assuming that if her employment status changes in

12  some significant way that you'll advise us and update

13  us in that regard?

14       MR. STEINBERG:  Yes.

15       MS. GALLION:  Okay.

16       MR. STEINBERG:  I'm not sure she had a chance

17  to fully answer your question about whether she

18  looked for other jobs after the first contract was

19  over.

20     Q.  Okay, great.  Let's go back to that.  Would you

21  like to supplement your answer?  Maybe I was moving ahead

22  too quickly.  After or about the time that your first

23  contract expired in June of '03 did you consider other

24  employment opportunities?

25     A.  I did consider a few things, yes.

Page 295

1     Q.  Could you tell us what those were and what

2  steps you took?

3     A.  I considered a position with Pro Kids.

4     Q.  What type of business is Pro Kids?

5     A.  It's a nonprofit.

6     Q.  And what type of job was available there?

7     A.  It was a development director's position.

8     Q.  Were you offered a position with Pro Kids?

9     A.  They decided not to make any decision in

10  regards to the development director's position.

11     Q.  Did you consider any other opportunities or

12  perhaps interview for another opportunity?

13     A.  I looked at the Cincinnati Art Museum for

14  director of development position.

15     Q.  Did you interview there?

16     A.  No, I did not.

17     Q.  Is it something where you made private

18  inquiries with people that you knew to see if there was an

19  opportunity?

20     A.  There was a job that was posted that was

21  advertised.

22     Q.  All right.  Were you interested in it?

23     A.  I was interested but somebody else was

24  ultimately selected for it.

25     Q.  Okay.  Any other job opportunities that you've

Page 296

1  been interested in or been considered for?

2     A.  I was considered for a position with the

3  University of Cincinnati.

4     Q.  What position was that?

5     A.  That was the assistant development director for

6  the College of Business.

7     Q.  Did you interview for that job?

8     A.  I did interview for that.

9     Q.  And were you selected?

10     A.  No, I was not.

11     Q.  Have you been considered for or expressed an

12  interest in any other position?

13     A.  I sent a resume to the Ritz Carlton Company.

14     Q.  What position was available there, if you know?

15     A.  I don't know if any position was available.

16     Q.  Were you seeking a position with the hotel

17  that's in Cincinnati?

18     A.  I don't believe that there's a Ritz Carlton

19  hotel in Cincinnati.

20     Q.  Were you expressing an interest in working with

21  Ritz Carlton at other locations?

22     A.  Yes.

23     Q.  Have you or are you prepared to leave the

24  Cincinnati area if there's a good job that's suitable to you

25  that's offered to you?

Page 297

1     A.  I would consider any position that's offered to

2  me.

3     Q.  Did you hear back from the Ritz Carlton folks

4  or have any type of an interview?

5     A.  No, I have not.

6     Q.  Any other jobs or positions that you've

7  expressed an interest in?

8     A.  No.

9        MR. STEINBERG:  Hyatt.

10     A.  Oh, Hyatt, yes, I did, I sent a note to Doug

11  Patrick.

12     Q.  At Hyatt?

13     A.  Yes.

14     Q.  Advising Mr. Patrick of what?

15     A.  That I saw a position posted on the Web site

16  for a director of national accounts with Hyatt.

17     Q.  Okay.  Did you hear from him?

18     A.  No, I have not.

19     Q.  When was this?

20     A.  This was last week.

21     Q.  Oh, okay.

22     A.  Or this week I believe I sent it.

23     Q.  Are you interested in returning to Hyatt?

24     A.  I would explore the opportunity if it came up.

25     Q.  I'm not familiar with this director of national

4 (Pages 294 to 297)

Page 298

1  accounts position. What did you notice on line about it, in
2  other words where is it, what are the details about it?
3      A.  It was posted on the Web, It was director of
4  national accounts.
5      Q.  Do you know where one would need to be resident
6  to do this job or what region it covers?
7      A.  I believe it was from the Chicago region, same
8  region that I was part of.
9      Q.  Would you need to be in Chicago to perform this
10 job or did the Web site information indicate that?
11     A.  It did not indicate that, it just said director
12 of national accounts Chicago.
13     Q.  Okay. And you sent an e-mail or a personal
14 written note to Mr. Patrick expressing an interest in it?
15     A.  I expressed that I saw it on the Web and when I
16 went to apply for the position the Web site was down.
17     Q.  Okay. Are you going to follow up?
18     A.  I have asked him if the position is still
19 available and I've not yet heard from him.
20     Q.  Okay. Well, I'll do my best to make sure you
21 get a response.
22     A.  Thank you.
23     Q.  Are there any other hotel companies that you
24 sought employment opportunities with over the past 18
25 months?

Page 299

1      A.  I had earlier on sent my resume to Starwood.
2      Q.  Have you received any overtures from anyone at
3  Starwood?
4      A.  No, I have not. I also applied for a position
5  as the director of sales at the Cincinnatian Hotel.
6      Q.  Were you interviewed?
7      A.  Yes, I was interviewed by someone in human
8  resources.
9      Q.  Were you offered a job?
10     A.  No, I was not, it was offered to someone who
11 was the director of sales from a preferred hotel within
12 their chain.
13     Q.  I see. Is it your hope or expectation to
14 return to the hospitality industry?
15     A.  If a position presented itself that I was
16 qualified for and I enjoyed I certainly would consider it.
17     Q.  Are you currently enjoying your development
18 work at the Horticultural Society?
19     A.  It's very rewarding, it's a wonderful nonprofit
20 that provides a beautiful flower show for the region, the
21 region of Cincinnati in the United States.
22     Q.  How does the compensation that you have been
23 receiving compare to the compensation that you enjoyed right
24 at the time that you left Hyatt?
25     A.  Significantly less.

Page 300

1      Q.  What was your final compensation at Hyatt? I
2  know I have it, I frankly just don't recall.
3      A.  I believe my salary was, my base salary was
4  84.8, it could have been 88.4, I'm not —
5      Q.  Okay?
6      A.  — 100 percent sure. It was in that range.
7      Q.  Okay. If you were offered an additional
8  one-year contract with the Horticultural Society with
9  incentives will you execute that sometime in the coming
10 summer if you don't have other opportunities?
11     A.  Yes, I probably would.
12     Q.  You know, one of the last times I spoke with
13 you in a deposition setting I think was in mid March of '02
14 and you were married to Judge Hildebrandt and had been
15 married to him for I believe approximately a year. Is that
16 correct?
17     A.  Yes.
18     Q.  Okay. Are you still married to Judge
19 Hildebrandt?
20     A.  Yes, I am.
21     Q.  Do either of you have any present plans to
22 leave the Cincinnati area?
23     A.  Well, my husband doesn't.
24     Q.  Okay. Do you?
25     A.  I expressed if an opportunity came up that I

Page 301

1  was qualified for I could consider it.
2      Q.  Would that create a situation where you would
3  be commuting with your husband and commuting to another,
4  commuting away from your home?
5      A.  In all likelihood.
6      Q.  But you would be open to that if possible?
7      A.  Yes, if possible.
8      Q.  Do you continue to be happily married? And I
9  don't want to pry but there's, I'm trying to find out is
10 there any present intention on your part to end your
11 marriage.
12     A.  Oh, absolutely not.
13     Q.  Okay. Can you give me a brief description or
14 overview of the benefits that are available to you at the
15 Horticultural Society?
16     A.  I have a 401-K, I'm not on any insurance policy
17 except a long, long-term disability, I have vacation
18 afforded to me.
19     Q.  Is the vacation similar to the vacation that
20 you enjoyed at Hyatt?
21     A.  No, it's not.
22     Q.  Okay. Can you describe the differences?
23     A.  I believe when I left Hyatt I had four weeks
24 vacation. Currently I have two weeks.
25     Q.  Two weeks of paid vacation?

5 (Pages 298 to 301)

Page 306

1    A.   I believe it was ten weeks.
2    Q.   Okay. So, again, we'll both be corrected by
3 the record if need be, but if we assume for purposes of my
4 question that it was a ten-week package is it fair to say
5 that that would have roughly covered you for October,
6 November and very early December?
7    A.   Yes, that's correct.
8    Q.   Is it fair to say, then, that you did not
9 receive any income from an employment source for the balance
10 of December until you started working about June 10 of 2002?
11    A.   That is correct.
12    Q.   And then is it also fair for me to understand
13 that since June 10 of '02 through the present date have you
14 been receiving $30,000 annually that entire time?
15    A.   Yes.
16    Q.   So the shortfall would be the difference
17 between what your compensation was and likely would have
18 grown to be over the years at Hyatt and the $30,000, is that
19 correct, just in terms of salary?
20    A.   Yes, I would assume that is correct.
21    Q.   And then I'm assuming there are some other
22 benefits that you would attach a financial value to that you
23 have not enjoyed since you left Hyatt, is that correct?
24    A.   That would be correct.
25    Q.   Can you tell me what those benefits are, the

Page 307

1 ones that you've not been able to replace beginning in June
2 of '02?(No response) I know you've already told me for
3 example that the 401-K situation is less desirable than what
4 you enjoyed while you were at Hyatt, is that correct?
5    A.   Yes. Also I believe I enjoyed a holiday bonus
6 with Hyatt, I also, like any Hyatt employee, was able to
7 utilize complimentary room nights for vacation, those types
8 of benefits that were extended.
9    Q.   Did you actually use the comp room nights while
10 you were at Hyatt?
11    A.   Yes, I did.
12    Q.   How many did you receive per year if you can
13 recall?
14    A.   Every Hyatt employee I believe at that point
15 when I was employed was entitled to 12 complimentary room
16 nights per year.
17    Q.   And what was the approximate range of your
18 holiday bonus, if you recall?
19    A.   I think since I had worked there for 22 years
20 that I received the maximum bonus for my position which I
21 believe was $500.
22    Q.   During the holiday season each year?
23    A.   Yes.
24    Q.   Any other benefits? Because I know we've
25 already talked about your health insurance and how the plan

Page 308

1 that you have with your husband has been adequate, I think
2 that's the word you used for all your purposes. Is there
3 any other benefit, detriment, that you can describe?
4    A.   I'm not sure if the dental program is, is on
5 equal with Hyatt's dental plan.
6    Q.   Can you think of any dental treatment or
7 hygiene situation that you've not been able to get coverage
8 for?
9    A.   No.
10    Q.   Do you participate in some type of dental
11 program for your husband's insurance?
12    A.   Yes.
13    Q.   Has it been adequate for your purposes?
14    A.   Yes.
15    Q.   Can you think of any other what I'm going to
16 call benefit program detriment that you can describe between
17 your situation after you lost your employment with Hyatt and
18 what you previously enjoyed at Hyatt?
19    A.   Well, I believe the bonus program with Hyatt,
20 the incentive program based upon my base salary and the
21 numbers that I was able to achieve were significantly
22 greater than the current position that I'm in from an
23 incentive standpoint.
24    Q.   Great. And of course I have a record of the
25 incentive you received.

Page 309

1    A.   Right.
2    Q.   Anything else that you can think of that would
3 be a benefit detriment or a loss that you suffered?
4    A.   Not that I can think of at this moment.
5    Q.   Do you regard yourself as being under employed
6 in terms of your overall compensation?
7    A.   I feel that my compensation certainly isn't
8 where it used to be.
9    Q.   Do you have any current plans to try to do
10 something about that?
11    A.   I have an agreement with the Horticultural
12 Society through '04.
13    Q.   So that means that through that period you will
14 not look for anything else until you get close to the
15 expiration of that, is that right?
16    A.   Perhaps. I haven't really made any firm plans.
17    Q.   I didn't understand that, I'm sorry. Could you
18 repeat that last answer?
19    A.   I haven't made any, any plans or –
20    Q.   Okay. Are you currently doing anything on a
21 regular basis to try to stay in the main stream with respect
22 to hospitality industry jobs?
23    A.   As I indicated, I have applied, or, haven't
24 applied, I've inquired with Hyatt and also with with Ritz
25 Carlton.

7 (Pages 306 to 309)

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF OHIO
 3              WESTERN DIVISION
 4                 - - -
 5   BARBARA LODER HILDEBRANDT, )
 6        Plaintiff,    ) Case No.
 7        -vs-          ) C-1-02 003
 8   HYATT HOTELS CORPORATION,  ) Judge Sandra
 9   et al.,            ) Beckwith
10        Defendants.   )
11         - - - o0o - - -
12      Deposition of HARVEY S. ROSEN, Ph.D., a
13   witness herein, being called by the
14   Defendants as if upon cross-examination
15   under the statute, and taken before Angelika
16   P. Shane, a Notary Public within and for the
17   State of Ohio, pursuant to agreement of
18   counsel, on Wednesday, the 7th day of April,
19   2004, at 1:04 p.m., at the offices of Burke,
20   Rosen & Associates, 2800 Euclid Avenue, City
21   of Cleveland, County of Cuyahoga and State
22   of Ohio.
23          - - - o0o - - -
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3      VIA TELEPHONE:
 4
 5      On behalf of the Plaintiff:
 6
 7      Waite, Schneider, Bayless & Chesley
 8      Co., LPA, by
 9         Mr. Robert A. Steinberg
10      1513 Fourth & Vine Tower
11      One West Fourth Street
12      Cincinnati, Ohio  45202
13      (513) 621-0267
14
15
16
17      On behalf of the Defendants:
18
19      Fisher & Phillips, LLP, by
20         Ms. Theresa Gallion
21      1250 Lincoln Plaza
22      300 South Orange Avenue
23      Orlando, Florida  32801
24      (407) 541-0888
25
```

Page 3

```
 1        P-R-O-C-E-E-D-I-N-G-S
 2              - - -
 3        HARVEY S. ROSEN, Ph.D., of
 4   lawful age, a witness herein, having been
 5   first duly sworn, as hereinafter certified,
 6   deposes and says as follows:
 7              - - -
 8   CROSS-EXAMINATION OF HARVEY S. ROSEN, Ph.D.
 9   BY MS. GALLION:
10   Q   Hello, Dr. Rosen.  How are you?
11   A   I'm fine.  And you?
12   Q   Great.  Thank you for making yourself
13   available telephonically.  We appreciate
14   your cooperation.
15       I just want to make sure that you do
16   have before you the report in this matter,
17   dated March 7, 2003, and the report that I
18   have is 39 pages in length and also has
19   several graphs attached.
20       Is that correct and do you have that
21   with you?
22   A   Well, I don't have the graphs.  If you
23   look at where the body of the report ends,
24   I'm showing 14 pages.
25   Q   Okay.  Now, the others are appended
```

Page 4

```
 1   pages?
 2   A   Correct.
 3   Q   Do you have any of those with you?
 4   A   I do not, but I can get that.
 5   Q   Okay.  Great.  But in terms of what you
 6   have before you, you do not have any
 7   appendices, but you have 14 pages of the
 8   report; is that correct?
 9   A   Yes.
10   Q   And it is dated March 4, 2003?
11   A   March 4th, 2003, correct.
12   Q   Okay.  Great.  And do you also have a
13   copy of the list of your testimony and
14   depositions and your vitae?
15   A   I have a CV and I can get the other
16   list quickly as well.
17   Q   If you wish.  I don't know that — I'm
18   sure you'll be familiar with it, but those
19   will be the only documents that I'll be
20   referring to that you would need to have,
21   and I just wanted to make sure we were set
22   with that so we would not have any delay or
23   waste any time or if you didn't have it, I
24   could fax it to you.
25   A   Okay.  Not a problem, and if you do
```

EXHIBIT

Page 21

1  report, Table 1, it outlines the procedure
2  that we used, and if you'll turn to that
3  page, Table 1, you'll see that the data that
4  you just mentioned is all reproduced and in
5  fact, it shows what her income was from 1997
6  through 2002. It also shows an average for
7  the period '97 through 2001.
8  Q    That's the 98,289 figure that you're
9  referring to; is that correct?
10  A    Yes, that's correct.
11  Q    And how did you employ — it sounds
12  like you had more to say. Please go ahead.
13  A    Yeah. Basically the going forward
14  wage, which would appear on page 5, Table 2
15  of the report, is simply the actual 2001
16  earnings of $93,825, adjusted as indicated
17  in Footnote A on page 5.
18  Q    And how did you select that figure?
19  A    Which figure?
20  Q    The 2001 figure of 93,825?
21  A    Essentially that was the income that
22  she actually earned through her termination,
23  plus the severance through I believe it was
24  roughly the middle of November, and it was
25  close enough to the average, but maybe I'm

Page 22

1  conservative in these matters, so I took
2  what she had actually done in that last
3  year.
4  Q    Okay. And you've provided us two
5  scenarios earnings but for her termination;
6  is that right?
7  A    Correct.
8  Q    And the first scenario, correct me if
9  I'm wrong, assumes that she would have
10  remained as Director of National Accounts at
11  Hyatt, the same capacity she had previously
12  been employed in, correct?
13  A    Correct.
14  Q    And what base did you use in that
15  scenario; is that the 2001 figure, the
16  93,825?
17  A    Yes.
18  Q    Do you know anything about the
19  plaintiff's responsibilities as a Director
20  of National Accounts; in other words, what
21  her job was and how she did it?
22          - - -
23      (Discussion had off the record.)
24          - - -
25  Q    I think my question was; again, we were

Page 23

1  talking about your first scenario, which is
2  she would have remained a Director of
3  National Accounts and you've told me that
4  you used that 2001 figure of 93,825.
5      My question was, do you know anything
6  of your own personal knowledge about what
7  her responsibilities were as a Director of
8  National Accounts?
9  A    Just in a very general sense. I mean,
10  I made no investigation into the specific
11  job responsibilities and duties that she
12  held.
13  Q    Did you ever meet with her or speak
14  with her personally?
15  A    Yes.
16  Q    When?
17  A    It was actually by telephone, not in
18  person, and I don't believe that I have
19  written down -- let me check through the
20  file, but there were at least a couple
21  different conversations over a period of
22  time.
23      I'm afraid I do not have any
24  information with respect to when we may have
25  spoken to her.

Page 24

1  Q    Do you have any notes whatsoever that
2  you had made of your conversations with
3  her?
4  A    No.
5  Q    How did you recall the information
6  sufficient, then, to prepare this report if
7  you had no notes in any form?
8  A    Essentially it would have been either a
9  confirmation or an explanation of documents
10  that we did have in our possession.
11  Q    And who provided those documents to
12  you?
13  A    I believe most of them were provided
14  through her attorney to us. I'm not sure if
15  any of these came directly. I don't believe
16  they did.
17  Q    Do you recall any discussions with the
18  plaintiff about her job as Director of
19  National Accounts and what her
20  responsibilities were?
21  A    I don't recall.
22  Q    For example, do you know if she
23  supervised anyone?
24  A    I don't know.
25  Q    Do you know who she reported to or the

496c4940-9d44-11d8-a51b-0050fcb520b6

Page 29

1   A   Incidentally, there was also a third
2   correspondence, or maybe it was attached,
3   I'm not positive, but it has the employment
4   history of Mr. Booth from 1992 through March
5   1st of 2001.
6   Q   Did you undertake any analysis of Mr.
7   Booth's background versus the background of
8   the plaintiff?
9   A   I did not.
10   Q   Did you undertake any analysis, given
11   the documents that you've just mentioned are
12   in your possession, of whether plaintiff
13   would have been able to perform the position
14   that Mr. Booth was awarded?
15   A   I have no opinion with respect to that.
16   Q   You have never undertaken any
17   investigation and you would have no way of
18   knowing; is that correct?
19   A   That would be probably outside of my
20   area of expertise.
21   Q   Do you know how long Mr. Booth has been
22   an employee of Hyatt?
23   A   Yes.
24   Q   How long?
25   A   He was first hired on March 30th of

Page 30

1   1992.
2   Q   Do you know anything about his resume
3   or qualifications?
4   A   I do not.
5   Q   Do you know anything about his
6   educational attainment?
7   A   As I've already indicated, you asked if
8   I made any analysis with respect to Mr.
9   Booth's background and my answer was I did
10   not.
11   Q   Did you make any similar analysis of
12   the plaintiff's background, perhaps in an
13   effort to determine if she was qualified for
14   this job that is the underpinning of your
15   second scenario?
16   A   That would be outside my area of
17   expertise to determine whether she would be
18   qualified or not.
19   Q   Again, so we can move on to another
20   subject, you are taking it as a given from
21   the plaintiff and Mr. Steinberg that she was
22   qualified for Mr. Booth's job and should
23   have been awarded it; is that correct?
24   A   No, I'm not making any such
25   assumption. What I have here is merely a

Page 31

1   calculation which reflects what these
2   numbers would look like had she received
3   that promotion in December of 2000.
4   Q   Okay. Now, let's talk for a moment
5   about her earnings at alternate employment.
6   Do you have that portion of your report in
7   front of you?
8   A   I do.
9   Q   I have a few questions. You provided
10   one estimate of the plaintiff's earnings in
11   alternate employment; is that correct?
12   A   Yes, based upon her actual employment
13   at this time.
14   Q   And that's with the Cincinnati
15   Horticultural Society; is that correct?
16   A   Yes, that's correct.
17   Q   Have you undertaken any investigation
18   to determine whether the plaintiff is
19   willfully and intentionally underemployed?
20   A   I have not undertaken any type of
21   investigation. I do know that this is the
22   job she currently holds and this is what her
23   earning capacity is, given that she's now
24   been employed there for basically a couple
25   of years.

Page 32

1   Q   Do you have any idea what other good
2   faith job search she may have undertaken
3   since October of 2001?
4   A   I don't have any such information, nor
5   would I be in a position to evaluate whether
6   that's good faith or not. I guess that's
7   something the jury would probably wrestle
8   with.
9   Q   In other words, it's not your job or
10   your place and it's indeed beyond your
11   expertise to say whether she should
12   reasonably be employed in another capacity
13   and had the capability of becoming so
14   employed; is that right?
15   A   I have no opinion with respect to that,
16   that's correct.
17   Q   Now, what is the base of earnings that
18   you've used to project earnings in alternate
19   employment? Is that the 30,000 per year?
20   A   Well, that's her actual earnings that
21   she's had while she's there, but it is based
22   upon a contract rate of $30,000 a year, plus
23   some other incentives.
24   Q   Do your estimates assume that the
25   plaintiff will remain in the same position,

496c4940-9d44-11d8-a51b-0050fcb520b6

Page 33

```
 1   making $30,000 a year, for the remainder of
 2   her work life for approximately ten years?
 3   A   No.
 4   Q   Is there – can you show me a place in
 5   your report where you have a different
 6   assumption?
 7   A   Well, part of your question was did I
 8   assume she would continue to make $30,000 a
 9   year for the rest of her working life and
10   the answer is I did not assume that.
11   Q   Did you assume that she would remain in
12   this same position for the remainder of her
13   work life?
14   A   Yes.
15   Q   Do you think that's a reasonable
16   assumption if indeed she -- we are not in a
17   recession and she is willfully
18   underemployed?
19           MR. STEINBERG: Excuse me.
20           Object to the hypothetical
21           assumption regarding willfully
22           underemployed.
23   Q   You can answer the question, sir, if
24   you recall it.
25   A   Okay.
```

Page 35

```
 1   willfully underemployed or not?
 2   A   Well, I'm not sure I understand what
 3   you mean by willfully underemployed.  I
 4   don't know if that's a legal term or --
 5   Q   It's not.
 6   A   But it definitely, you know, it's based
 7   on what is, what she has.  I mean, one of
 8   the problems, especially that women have,
 9   especially older women, is reemployment.  I
10   mean, that's something that's well-known by
11   all labor economists.
12   Q   Are you telling me that you're an
13   expert for employment opportunities for
14   older women?
15   A   I'm saying that I can't sit down and
16   tell you like a vocational expert can,
17   because they can test specific individuals,
18   but with respect to the overall labor force
19   and participation rates in the labor force,
20   that would be an area that is under my
21   umbrella of expertise, yes.
22   Q   So, you are an expert in employment
23   opportunities for older women; is that
24   correct?
25           MR. STEINBERG: Objection.
```

Page 34

```
 1   Q   Do you think that's reasonable, if she
 2   is indeed willfully underemployed and if
 3   indeed as Mr. Greenspan suggests, the
 4   recession is over?
 5   A   Well, the recession has been over since
 6   November of 2001.  So, this is what she has
 7   and this is what I based it on.  Anything
 8   else would be speculation.
 9   Q   So, I guess you're telling me that you
10   made this assumption that she will remain in
11   this same position and has not made any
12   effort whatsoever taking into account that
13   she can or should be more substantially
14   employed in the industry of her original
15   choosing, the hospitality industry, at a
16   higher rate of pay?
17           MR. STEINBERG: Excuse me.
18           Object to the assumption in the
19           question. You can answer.
20   A   Right. I basically have made a
21   calculation which shows the difference
22   between this pre-employment situation and
23   her status compared to what she's been able
24   to do post.
25   Q   And you have no idea whether she's
```

Page 36

```
 1   Q   It's a yes or no, you are or you are
 2   not.
 3   A   Well, I can't answer that a yes or no.
 4   I can only say what I just said, that I can
 5   not and I do not test individuals.
 6           However, labor economists such as
 7   myself are quite familiar with problems of
 8   many different groups, including women, but
 9   not necessarily only older women.
10   Q   Do you know if this plaintiff has
11   encountered any of those troubles or
12   problems?
13   A   Well, there was a period of -- it took
14   her awhile to get reemployed, but I can't
15   specifically say other than, again, that
16   these are the types of typical problems that
17   women face, especially older women, not only
18   older women, but all older workers in
19   general, including men.
20   Q   So, are you telling me that you have
21   some evidence or reason to believe based on
22   any studies or tables that this particular
23   plaintiff has over the past two years been
24   the victim of age or gender discrimination
25   by someone other than Hyatt?  Is that what
```

Page 41

1   A   You have to bear with me. I have to
2   take a look at the contract. I don't recall
3   that it mentioned that; in which case, I
4   couldn't tell you, but let me take a quick
5   look at it, if you will.  I don't know if
6   she does or not.
7   Q   Do you know who she reports to or what
8   position that person holds?
9   A   No.
10  Q   Do you know what the minimum
11  qualifications are for the position that she
12  holds?
13  A   I do not, but given that she holds that
14  employment, I assume that she fulfilled
15  that.
16  Q   That's an assumption on your part and
17  not part of your expertise; is that
18  correct?
19  A   That's not an evaluation that I have
20  made, so I would have no opinion with
21  respect to that.
22  Q   Is the Horticultural Society a
23  not-for-profit organization, or do you
24  know?
25  A   I don't know, but I'm assuming that

Page 42

1   it's a nonprofit. I mean, it really has no
2   bearing on my opinion, but just as an answer
3   to your question.
4   Q   That's another assumption that you've
5   made?
6   A   What is another assumption I've made?
7   Q   You said that you assumed, I'm not sure
8   exactly the words that you used, but you
9   said you assumed that they were a
10  not-for-profit; is that correct?
11  A   No, I made no assumption when making my
12  report as to whether it was profit or
13  nonprofit.
14      What I meant by that, you asked me
15  whether I knew, and I'm just saying as I sit
16  here, I'm assuming that it's a nonprofit.
17  Q   I asked you if it was an assumption, so
18  I think we're --
19  A   It's an assumption I'm making right
20  now, but it's not an assumption that entered
21  into my opinion in my report.
22  Q   Excellent. I appreciate your
23  clarification.
24      Would you agree that based on her
25  previous employment, the plaintiff may

Page 43

1   qualify for other positions with
2   compensation that's higher than her current
3   job?
4   A   That she may be qualified, yes, but she
5   doesn't have those other jobs and I don't
6   know what those other jobs are.
7       I mean, you asked me earlier if I
8   looked at her work search or what she did,
9   and again, that's not something that I've
10  done here. That was not my assignment.
11  Q   My question was would you just simply
12  agree that based on her previous employment,
13  she may qualify for other positions with
14  higher compensation?
15          MR. STEINBERG:  Excuse me.
16      Object. That is beyond his area of
17      expertise.
18  Q   You may answer.
19  A   Again, I don't know what -- I can't
20  evaluate an individual. That's the work of
21  someone like Parsons, for example.
22      But as far as me taking and sitting for
23  a particular individual, that would be
24  outside my area of expertise.
25  Q   And again, you don't know what type of

Page 44

1   good faith job search she may have
2   undertaken, if any, correct?
3   A   Again, that would be outside of my area
4   of expertise.
5   Q   Do you know how long it took her to
6   procure the position at the Horticultural
7   Society?
8   A   I do. I'm sorry, was there another
9   question?
10  Q   What was the length of time?
11  A   Oh, okay. She started there June 10th
12  of 2002.
13  Q   Was it approximately eight months from
14  approximately October 1 of '01 to early June
15  of '02?
16  A   Yes.
17  Q   Can you tell me what the Department of
18  Labor data indicate was the average duration
19  of unemployment in October of '01?
20  A   Not as I sit here. It's something I
21  would have to look up.
22  Q   Did you take that into account in any
23  of your reports or your assessments?
24  A   I took into account the period of time
25  that she was out of work, period. In other

Page 45

1   words, I reflected the reality of what
2   actually happened.
3   Q   As we sit here today, can you tell me
4   anything about what the Department of Labor
5   data indicated was the average duration of
6   unemployment in October, November or
7   December of '01?
8   A   I'd have to look that data up. It's
9   readily available, but I can only tell you
10  that her period of unemployment was
11  approximately eight months.
12  Q   During that eight month period, do you
13  have any idea what types of jobs that she
14  was applying for?
15  A   You've asked me that several times
16  already and I've indicated I do not.
17  Q   And you don't know whether she was
18  offered other jobs and turned them down; is
19  that correct?
20  A   I do not know, that is correct.
21  Q   Did you perform any analysis of the job
22  market for 2001?
23  A   No.
24  Q   What about for 2002?
25  A   No.

Page 46

1   Q   What about for 2003?
2   A   No.
3   Q   What efforts, if any, did you make to
4   determine the availability of national
5   account management positions in the
6   plaintiff's immediate metropolitan area?
7   A   I made no attempt to make such an
8   analysis.
9   Q   Dr. Rosen, are you familiar with the
10  Displaced Worker Survey, the DWS?
11  A   I haven't looked at it for sometime.
12  When you say familiar, I'm not sure exactly
13  --
14  Q   Do you know what it is?
15  A   Well, there is a -- basically, it's an
16  unemployment study, yes.
17  Q   Did you take it into account in your
18  analysis of Ms. Hildebrandt's situation?
19  A   I took into account exactly what's in
20  my report, which is that she was unemployed
21  for a period of eight months and found new
22  employment at a base salary of approximately
23  $30,000 plus some incentives.
24  Q   Did you review the DWS or any similar
25  data prior to preparing your report?

Page 47

1   A   I did not. That would have been a
2   hypothetical exercise when, in fact, I had
3   actual data that pertained to this specific
4   individual.
5   Q   Does your analysis and your report, do
6   they proceed from the assumption that as a
7   result of the loss of plaintiff's job at
8   Hyatt, that she has lost the ability to
9   perform work as the Director of National
10  Accounts?
11  A   I have no opinion with respect to that.
12  Q   So, in other words, that assumption is
13  not built into your report; is that correct?
14  A   That is correct.
15  Q   Have you reviewed any medical or
16  vocational reports indicating that this
17  plaintiff is unable to perform the type of
18  work that she used to perform at Hyatt?
19  A   I have not reviewed any such study, no.
20  Q   Do you have any facts and are any facts
21  in your report based on a belief that the
22  plaintiff's earning capacity is limited to
23  $30,000 a year?
24  A   I don't believe my report says that
25  it's limited to $30,000 a year.

Page 48

1   Q   So, that is not part of your analysis;
2   is that correct?
3   A   I'm sorry, maybe I don't understand the
4   question. Could you repeat it or rephrase
5   it?
6   Q   I'd be happy to and I may have been cut
7   off.
8       Is there any aspect of your report that
9   is contingent upon or incorporates the
10  assumption that this plaintiff's earning
11  capacity is limited to $30,000 per year?
12  A   No, there's no such assumption in my
13  report.
14  Q   In other words, this plaintiff could
15  become employed making $200,000 a year
16  tomorrow and your analysis would be
17  inapplicable; isn't that correct?
18  A   Well, lots of things are possible. Is
19  the probability of that likely to happen?
20  Likely not, but I -- again, anything is
21  possible, but I would say the probability of
22  that happening is probably close to zero.
23  Q   Are you an expert on the probability of
24  jobs coming open in particular fields?
25      MR. STEINBERG: I'm going to

496c4940-9d44-11d8-a51b-0050fcb520b6

Page 49

1  object to that question because the
2  questioner asked him about the
3  subject, that's why he answered it.
4      MS. GALLION:  The right
5      answer probably would be, Bob: I'm
6      not an expert in that area, and
7      that's why I'm asking my follow-up
8      question.
9  Q   Is this another area of your expertise,
10 are you now a vocational expert with
11 knowledge of what jobs might be open in a
12 hospitality industry in a city where you
13 don't live?
14 A   Well, I'm not a vocational expert.
15 I've already said that several times with
16 respect to analyzing individual and
17 individual aptitudes and/or capabilities.
18 That requires a different type of expertise
19 than I have.
20     On the other hand, if you're asking me
21 as an economist, would I have some opinion
22 in general whether someone -- whether
23 $200,000 jobs come available out of the blue
24 like that, I mean, those jobs just don't
25 come out of the blue like that.  That I do

Page 50

1  have an opinion on, but that's not the focus
2  of what my analysis in this case is.
3  Q   Have you undertaken any analysis of the
4  availability of jobs in the hospitality
5  industry in Cincinnati over the last two and
6  a half years?
7  A   No.
8  Q   I would like to ask you a few questions
9  about your March 4, 2003 cover letter to Mr.
10 Steinberg.  Do you happen to have that
11 handy?
12 A   I have it right in front of me.
13 Q   If you will take a look in the fourth
14 paragraph, it's the largest paragraph on
15 that page, the one that begins, "My
16 findings," I just have a few questions for
17 you with respect to that.
18 A   Okay.
19 Q   Are you taking into account any offset
20 for anticipated future earnings from the
21 numbers that you are giving for her economic
22 loss?
23 A   Yes.
24 Q   Can you show me in your report where
25 you do that?  It was not evident to me.

Page 51

1  A   On page 3A.
2  Q   Just point me to the right place, if
3  you will, so that I can find it.
4  A   Okay.  Well, do you see on that page,
5  it's a summary of all the tables that
6  follow, and there's the first column which
7  shows the estimate of the pre-termination
8  earning capacity.
9  Q   I see it.
10 A   And then right next to it is the
11 offsetting earning capacity based upon her
12 current employment.
13 Q   And what value are you attributing to
14 that?
15 A   Well, depending upon the age, it looks
16 -- the ranges are from $420,558, and that's
17 working to approximately age 60 to a deduct
18 of $594,159, which is staying until the
19 earliest age she would qualify for her
20 social security benefits.
21 Q   Is the offset $30,000 a year for each
22 year?
23 A   No.
24 Q   Did you give her some raise or some
25 future earnings capacity in connection with

Page 52

1  the offset over and above what she's earning
2  now?
3  A   Yes.  If you'll refer to page 6, Table
4  3, the detail for page 3A is laid out with
5  all the assumptions made for that
6  calculation.
7  Q   I'm looking at footnote one on page 6.
8      MR. STEINBERG:  Footnote
9      one?
10 Q   A. I'm sorry.  Is it true that years
11 after 2003 are grown at 1.5 percent real and
12 then discounted?  Am I reading the right
13 footnote?
14 A   Yes, you are.
15 Q   And you also note in that same footnote
16 A; that this is to permit or to allow for
17 commission income growth?
18 A   Well --
19 Q   I don't see that incorporated anywhere.
20 A   Yes, it's incorporated, and let me
21 first say that it's actually all income
22 growth, not just commission income growth,
23 although the two contracts I've seen, she's
24 had no base raise on -- her base is still
25 30, but I have built in -- that one and a