LEXSEE 1997 US APP LEXIS 2331

JAMES RICHARD WILSON, Plaintiff-Appellant, v. WELLS ALUMINUM CORP., Defendant-Appellee.

No. 95-2003

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*1997 U.S. App. LEXIS 2331*

**February 7, 1997, FILED**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *107 F.3d 12, 1997 U.S. App. LEXIS 6848.*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN. 94-00560. McKeague. 1-23-95.

**DISPOSITION:** AFFIRMED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JAMES RICHARD WILSON, Plaintiff - Appellant: Terrence J. Lilly, James M. Giffels, Lilly & Lilly, Kalamazoo, MI.

For WELLS ALUMINUM CORPORATION, Defendant - Appellee: Francyne Stacey, Mel Muskovitz, Pear, Sperling, Eggan & Muskovitz, Ann Arbor, MI. Stephen M. Silvestri, Deborah L. Zimic, Miles & Stockbridge, Baltimore, MD.

**JUDGES:** BEFORE: KRUPANSKY, BOGGS, and SILER, Circuit Judges.

**OPINIONBY:** BOGGS

**OPINION:**

BOGGS, Circuit Judge. James Richard ("J.R." or "Dick") Wilson, a human resources administrator, worked from 1974 to 1985 at a Rome, New York, facility of Revere Copper & Brass, parent of defendant Wells Aluminum Corporation ("WAC"). In July 1985, WAC recruited Wilson for a job at its plant in Kalamazoo, where he worked until WAC terminated [*2] him, along with six other employees, in February 1994. Wilson was 58 when WAC fired him, and was an insulin-dependent diabetic. He brought this action in Michigan state court, alleging wrongful discharge, employment discrimination (on account of his age) in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), and disability discrimination in violation of the Michigan Handicappers' Civil Rights Act ("HCRA"). WAC removed to federal district court. The district court granted WAC's motion for summary judgment on all counts, and Wilson now appeals. We affirm.

I

Conversations that occurred at the time of Wilson's hiring by WAC and periodically over the course of his employment there underpin his wrongful discharge claim.

Wilson alleges that during negotiations leading to his transfer to WAC, the company's vice-president and general manager, Larry Nyberg; made representations as to the job security Wilson would enjoy at the WAC

EXHIBIT A

plant. Wilson's deposition testimony included the following passages:

> [Nyberg] assured me that he needed me. He referred to me, his nickname was "Big Guy." I need you. You have done a good job for me. You come out and I'll take care of [*3] you.
>
> . . .
>
> [Nyberg and his wife] continued to urge me to come to Kalamazoo. It was serious for me because my wife would have to give up her job. I had a home. He assured me that ... I would not lose anything if I came out, that I had a job and I would have a job for a long time. That the only way I would lose it was if I did something major wrong.
>
> . . .
>
> Q. Did you and [Nyberg] discuss what was meant by a long time?
> A. In terms of years?
> Q. Yeah.
> A. I took it to mean until I retired.

Wilson offered no notes or documentation to support his recollections. Nyberg confirmed the general circumstances surrounding his negotiations with Wilson, but denied offering him a job for life, permanently, or for any particular length of time, or from which he could be discharged only for just cause. No written employment contract accompanied Wilson's acceptance of WAC's offer. Wilson stated that no company documentation existed to reflect those representations, because at WAC "most of that ... would have been done by word. Larry's word was his bond."

Wilson also testified that in ensuing years he heard representations made by WAC managers to their managerial subordinates that [*4] they "would have a job forever pretty much as long as [they] kept [their] nose[s] clean." Wilson submitted affidavits from Bob Roberts and Thomas Fulton, respectively the operations manager and production/plant manager at the Kalamazoo plant for periods between 1987 and 1994. n1 Roberts stated:

> The termination policy for the non-hourly employees was to discharge for cause only. Mr. Wilson was aware of this policy and ... relied on this policy and administered it. I administered it as well and all of the supervisors who reported to me were aware of this policy and were told to implement it.

Fulton stated:

> WAC Aluminum had a policy and practice of not terminating individuals except for cause. n2 This policy was implemented by me in my function as a production/plant manager.

- - - - - - - - - - - - - - - - - -

n1 Wilson originally submitted these affidavits on the Friday before the hearing on WAC's motion for summary judgment scheduled for Monday, June 26, 1995. Judge McKeague refused to consider them at the time. After that hearing, Wilson submitted a motion to submit a supplemental brief and affidavits, which Judge McKeague granted by order on August 4, 1995. Judge McKeague's memorandum accompanying his order of summary judgment makes no mention of these affidavits or their contents.

WAC expends a good deal of effort in its brief arguing that Judge McKeague could have denied Wilson's motion to submit the supplemental affidavits, and argues that their untimeliness made any refusal by the court to consider them not an abuse of discretion. This court reviews an order of summary judgment de novo, not for abuse of discretion, and, like the district court, bases its judgment on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . ." *FED. R. CIV. P. 56(c)*. Whether the district court paid attention to the affidavits or not, they were properly submitted below, see ibid ("The adverse party prior to the day of hearing may serve opposing affidavits."), accepted by the court in its order of August 4, 1995, and constitute part of the record on appeal for this court to consider. See *FED. R. APP. P. 10(a)*. [*5]

n2 Context suggests that this policy and practice pertained to managerial employees; in the affidavit, Fulton has just claimed familiarity with "the hiring practices and procedures of middle management people," including himself and Wilson.

Nyberg's testimony on the issue of a just-cause policy was self-contradictory. His answers to questions posed by Wilson's counsel tended to confirm the existence of such a policy, but in answering questions from WAC's counsel, he denied it.

No employment handbook for management employees or other written statement of these alleged policies and practices appears in the record; the source of any such policy was not so definite as that. Wilson stated in his deposition that "I don't know of any written [just-cause] policy that I had in my possession. Any feelings have always been by the statements and practices as shown by upper management within the Wells hierarchy and generally would be verbalized by the people within the company."

II

The district court correctly identified two possible theories by which Wilson could sustain a claim of wrongful discharge [*6] under Michigan law: contract and legitimate expectations. See *Rood v. General Dynamics Corp.*, 444 Mich. 107, 507 N.W.2d 591, 597-98 (Mich. 1993).

A. Contract.

The district court easily and correctly disposed of the claim in contract. The court noted that employment contracts in Michigan are presumptively at will, but that the presumption can be overcome by presenting sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause. See *Rood, 507 N.W.2d at 597*. Because of the difficulty of verifying oral promises, "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." Id. at 598, quoting *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 473 N.W.2d 268, 275 (1991).

Nyberg's statements to Wilson as Wilson described them ("You come out and I'll take care of you;" Wilson would have a job for "a long time;" would lose it only if he did "something major wrong") were far from "clear and unequivocal" statements. (Exactly what does it mean to "take care" of someone? How much time is a "long time?" What is a "major wrong?")

The district court [*7] therefore correctly concluded that if the wrongful discharge claim turned on the existence of an oral contract, WAC would be entitled to summary judgment on that count.

B. Legitimate Expectations.

First announced by the Michigan Supreme Court in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (Mich. 1980), the principle that "employer policies and practices may also become a legally enforceable part of an employment relationship if [they] instill 'legitimate expectations' of job security in employees" is not a contractual doctrine, but one "grounded solely on public policy considerations." *Rood, 507 N.W.2d at 598*. The doctrine is based on "the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an 'orderly, cooperative and loyal work force' for the ultimate benefit of the employer." Id. at 606 (internal citation omitted).

The district court rejected Wilson's claim that he had a legitimate expectation not to be discharged without just cause. We do not find it necessary either to affirm or reject the court's analysis on that score, because even if we were to reverse the [*8] district court on this point, WAC would still have a dispositive defense.

WAC asserts that it terminated Wilson and his six colleagues for economic reasons. "Bona fide economic reasons for discharge constitute 'just cause' under Toussaint." *McCart v. J. Walter Thompson USA Inc.*, 437 Mich. 109, 469 N.W.2d 284, 287 (Mich. 1991). Robert Cecil, manager of the Kalamazoo plant, provided the chief evidence to support this assertion. In a deposition, he stated that when he was hired by WAC in October 1993, "there was no question in my mind that I was expected to improve profitability at the Kalamazoo plant. . . . They were looking for more profitability. They said the plant is capable of producing a larger profit than it's currently doing." Cecil testified that he drew up a reorganization plan under which he terminated seven managerial employees. Cecil Aff., JA at 158. Cecil testified that the terminations resulted in savings to WAC of $ 200,000 to $ 250,000 in salary costs, plus employer share of federal taxes and benefits. A list of six laid-off employees and the employees who assumed their duties shows that all duties were absorbed by existing WAC employees. However, Wilson's successor, [*9] John Smail, also left WAC within a matter of months, and was replaced by a fresh hire, Belden.

To counter WAC's economic-reason defense, Wilson submits an affidavit from Kathy Yarian, who at the time of Wilson's termination worked at an employment agency that helped recruit employees for WAC. Yarian stated that in the period from December 1993 to March 1994 "and thereafter" WAC utilized her agency for hiring both production workers "as well as workers in administrative or skilled positions, intending that such become permanent workers."

Yarian's affidavit fails to counter Cecil's testimony as to the existence of good economic reasons for the lay-offs, including Wilson's. She does not provide information as to whether any of the "administrative or

skilled" employees hired through her agency were intended to replace Wilson or the others who were fired at the same time. Nor did the hiring of production workers undermine the validity of measures to reduce managerial overhead. Even if the company's business were booming, that would not make simultaneous cost-control measures any less legitimate. A company need not be on the ropes in order to justify personnel cost savings; it is the essence [*10] of management both to boost revenues and to control costs. Cf. *McDonald v. Stroh Brewery Co., 191 Mich. App. 601, 478 N.W.2d 669, 674 (Mich. Ct. App. 1991)* ("although the economic reasons must be bona fide, there is no requirement that they rise to the level of a 'necessity'").

Thus, regardless of whether WAC created policies and practices giving rise to legitimate expectations of termination only for cause, WAC has stated, and Wilson has failed to rebut, a bona fide economic reason for Wilson's dismissal. True, that conclusion is vulnerable to one further line of attack: Wilson also alleged that he was fired in violation of anti-discrimination laws, and under Michigan law an economic benefit to the employer that is incidental to illegal discrimination will not constitute a bona fide economic reason. "Although there may be justification for economic layoffs, an employer may not decide which employees to lay off on the basis of considerations that are prohibited by law, such as race, gender, or age." *Featherly v. Teledyne Industries, Inc., 194 Mich. App. 352, 486 N.W.2d 361, 363 (Mich. Ct. App. 1992)*. In the remainder of this opinion, we conclude that WAC did not discriminate [*11] against Wilson on the basis of age or disability. Therefore, WAC stated an economic justification that constituted just cause for terminating Wilson regardless of whatever legitimate expectations he might have held under Toussaint, and was thus entitled to summary judgment.

### III

We turn, then, to Wilson's claim of age discrimination in violation of Michigan law. In a case brought under ELCRA, as in those brought under the federal Age Discrimination in Employment Act, a plaintiff who lacks direct evidence of discrimination may establish a prima facie case by means of the framework developed in federal discrimination jurisprudence beginning with *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. "To establish a prima facie case of age discrimination . . . plaintiff must show that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position, and (4) he was replaced by a younger person." *Barnell v. Taubman Co. Inc., 203 Mich. App. 110, 512 N.W.2d 13, 19 (Mich. Ct. App. 1994)*. Wilson indisputably demonstrated the first three elements. As for the fourth element, Wilson was initially replaced by Smail, [*12] who, like Wilson, was 58. According to Smail's deposition testimony, WAC soon pressured him to resign, and replaced him with a fresh hire who was "in his forties". The district court assumed that this indirect replacement of Wilson by a younger person satisfied the fourth element of the prima facie case. We shall assume the same. By making out a prima facie case of age discrimination, Wilson created the rebuttable presumption that WAC had discriminated against him. It fell to WAC to articulate a legitimate, nondiscriminatory reason for his termination. This it did with the economic reasons discussed above. To avoid summary judgment, Wilson, in turn, was then required to surrebut WAC's proffered, permissible explanation by "producing sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Company, 29 F.3d 1078, 1083 (6th Cir. 1994)*.

At this point, analysis breaks free of the McDonnell Douglas framework, and the case is subjected to the ordinary standards for considering a motion for summary judgment, viz., "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, [*13] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). It is well established in federal discrimination jurisprudence that the plaintiff has the ultimate burden of persuading a trier of fact that the defendant illegally discriminated. See, e.g., *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. The court's responsibility at this stage is to determine whether the evidence, taken in the light most favorable to Wilson, would be sufficient for him to sustain that burden before a reasonable jury. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. "The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence [*14] on which the jury could reasonably find for the plaintiff." *Id. at 252*.

We now consider whether Wilson furnished sufficient evidence to avoid summary judgment. We have already considered the evidence contained in the Yarian affidavit regarding hiring by WAC during the period in which Wilson was terminated, and found it legally insufficient to invalidate the economic reason WAC offered for Wilson's dismissal. Wilson offers three other evidentiary bases that he says create a genuine

issue of fact: statistical evidence, evidence of ageist comments, and testimony that WAC selected older employees for discharge in order to save on pension costs.

Wilson claimed that a pattern of age discrimination was apparent in the fact that six of the seven WAC employees fired at the same time as Wilson had ages of 63, 58, 55, 54, 46, and 39, and that all were older or had more years of service than their replacements. (As earlier noted, the replacements were already WAC employees. Three of the replacements, not counting Smail, were also over forty. One replacement was older than the man he replaced, but had fewer years of service.) The district court rejected this evidence as "not statistically [*15] relevant because they represent only a small pool of seven employees." A small base can undermine the significance of proffered statistical evidence. See *Black v. City of Akron*, 831 F.2d 131, 134 (6th Cir. 1987); *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 657-59 (1st Cir. 1985). A more fundamental problem is that Wilson fails to compare the number of employees terminated and their ages against the number of employees in the pool of managerial employees from which dischargees were to be selected, and their ages. Only if the percentage of employees over forty in the discharged group convincingly exceeded the percentage of employees over forty among the survivors could any inference of discrimination be drawn. And then the required degree of variance would depend on the size of the base. Cf. *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1011 (6th Cir. 1992) (discussing statistical proof of discrimination). Although we know that four of the seven discharged employees (57%) were over age fifty, and that (according to Cecil's affidavit) six employees over age fifty retained their jobs, if a clear statement of the total number of remaining managerial [*16] employees is given in the record on appeal it has eluded us. In any event, it is up to Wilson to present persuasive statistical evidence to support his claim of discrimination, and this he has not done. Cf. *Fudge*, 766 F.2d at 658 ("We think that in cases involving a narrow data base, the better approach is for the courts to require a showing that the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof.").

As for the allegedly ageist remarks, Wilson offered evidence that on one occasion, WAC's chief operating officer referred to Wilson as a "dinosaur." On another occasion, WAC's president said that Wells was a "stodgy" company. Wilson is correct in asserting that derogatory remarks related to age, gender, race or other protected characteristics may serve as direct evidence of discriminatory intent. See, e.g., *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994); *Sischo-Nownejad v. Merced Community College District*, 934 F.2d 1104 (9th Cir. 1991). However, this circuit has required workplace remarks furnished as evidence of discrimination to be clear, pertinent, and directly [*17] related to decision-making personnel or processes in order to prove discriminatory intent. In *Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1025-26 (6th Cir.), cert. denied, 510 U.S. 861, 126 L. Ed. 2d 135, 114 S. Ct. 175 (1993), we held that where an employer, eight months before laying off the plaintiff, told her that she had been transferred from a more responsible position because she was too old for it, and a month later told her that her fifty-fifth birthday was cause for concern, such comments were too abstract, isolated, and ambiguous to allow a jury verdict for the plaintiff to stand. Similarly, in *Gagne v. Northwestern Nat'l Life Ins. Co.*, 881 F.2d 309, 315-16 (6th Cir. 1989), we upheld an order of summary judgment on behalf of a defendant where the defendant employer made an isolated comment that he "needed younger blood." See *Cooley*, 25 F.3d at 1331. We believe that two remarks made by two different managers at a time not proximate to Wilson's termination are properly characterized as "isolated." And the remarks were ambiguous. Smail, who heard the "dinosaur" remark second-hand (we pass over the problem with hearsay), believed it meant "out of date," or [*18] "old-fashioned." Smail believed (contrary to the definitions of the word in Webster's Third New International Dictionary) that the term "stodgy" meant "old." But the company president apparently applied the adjective not to Wilson but to the company as a whole. We conclude that these remarks are not sufficient evidence of discrimination to have defeated WAC's motion for summary judgment. n3

    n3 We acknowledge that Michigan courts, interpreting Michigan's nondiscrimination laws, have sometimes shown themselves more likely to find that stray or ambiguous remarks created grounds on which a reasonable fact-finder could infer that discrimination was a "determining factor" in an adverse employment decision. For example, in *Featherly*, 486 N.W.2d at 365, a supervisor asked a certain employee, a month or two before laying him off as part of a large reduction in force, how long he planned to keep working. After announcing the lay-offs, the supervisor asked the employee how old he was and later remarked that the lay-off wouldn't hurt the employee much because he could retire. The Michigan Court of Appeals held that these remarks supported the employee's claim that age was a determining factor in his inclusion in the workforce reduction. And in *Wilson v. General*

*Motors Corp.*, 183 Mich. App. 21, 454 N.W.2d 405, 412-13 (Mich. Ct. App. 1990), the court refused to set aside a jury verdict where the evidence of discriminatory animus consisted of two remarks by supervisors (that plaintiffs "should be satisfied with what they had and be grateful that they had a job," and "that they had a lack of skills and that they weren't going anywhere no matter what type of degree they attained") that witnesses believed had "racial overtones," along with evidence indicating that black women were transferred or promoted less frequently. However, we find strong authority for relying on our Sixth Circuit cases. See, e.g., *Sumner v. Goodyear Tire & Rubber Co.*, 427 Mich. 505, 398 N.W.2d 368, 388 (Mich. 1986) ("Federal cases under Title VII . . . are regarded by Michigan courts as highly persuasive guidance in the application of civil rights statutes); *Michigan Dep't of Civil Rights v. Horizon Tube Fabricating, Inc.*, 148 Mich. App. 633, 385 N.W.2d 685, 687 (Mich. Ct. App. 1986) ("Michigan courts have frequently relied on federal decisions under Title VII when deciding state employment discrimination claims.").

[*19]

Finally, Wilson offers Smail's testimony that he believed WAC had a policy of terminating employees in the last few years before their retirement in order to save costs of financing their pensions. If this were true, and if it were shown that this was a significant reason for Wilson's selection for termination, we believe that WAC would be guilty of age discrimination under Michigan law. n4 However, Smail's testimony on the pension issue is conclusory. Presumably discovery could have been used to turn up more persuasive evidence, if it existed, on the correlation between age and pension costs. This might have permitted inferences about the importance of pensions in the decision to select Wilson and the other terminated employees. n5 As it is, Smail's unsupported assertions are no more than a scintilla of evidence, and cannot defeat summary judgment.

n4 In *Adama v. Doehler-Jarvis, Division of NL Industries, Inc.*, 115 Mich. App. 82, 320 N.W.2d 298, 302 (Mich. Ct. App. 1982), rev'd on other grounds, 419 Mich. 905, 353 N.W.2d 438 (Mich. 1984), the court held that it was not a violation of ELCRA for "costs involved in employing older workers, including pension costs, [to be] considered [by employers] where the business decision involves the possible closing out of all operations," so long as the age-related reason was not "a major determinative factor." Here, WAC was not threatened with having to "close out" its operations, so the Adama holding does not pertain. (This circuit has ruled similarly with respect to the ADEA. See *EEOC v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (forced early retirements are not in violation of ADEA only where there is a necessity for drastic cost reduction, such as "the prospect of imminent bankruptcy," and where forced retirements are the least detrimental alternative means available to reduce costs).)

[*20]

n5 Conceivably, discovery along these lines could have supported a suit under § 510 of ERISA, 29 U.S.C. § 1140, which prohibits employer action against an employee who participates in a pension benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

In short, the district court correctly ordered summary judgment for the defendant on the age discrimination count.

IV

Wilson has diabetes and must take insulin; that condition has been recognized as a handicap under HRCA. *Hines v. Grand Trunk Western R. Co.*, 151 Mich. App. 585, 596, 391 N.W.2d 750 (1985). Wilson submits an affidavit from his physician stating, among other things, that "it was recommended that Mr. Wilson see a psychologist or psychiatrist in order to deal with increasing job stress relating from [sic] an increasing work load at his work. This job stress also exacerbated his diabetic condition."

Two distinct theories are available to Wilson under HRCA. Wilson could claim that WAC, by firing him, committed a discriminatory employment practice [*21] prohibited by M.C.L. § 37.1202. He could also claim that WAC failed to accommodate him as a handicapper as required by M.C.L. § 37.1102.

A. Disability Discrimination

To recover under HRCA, a plaintiff must allege and prove that (1) the plaintiff is "handicapped" as defined by HRCA, (2) the handicap is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute. *Hall v. Hackley Hospital,*

*210 Mich. App. 48, 532 N.W.2d 893 (Mich. Ct. App. 1995).*

The district court disposes of Wilson's discrimination claim by interpreting a phrase taken from his deposition ("I believe they took no consideration to the fact that I identified myself as a handicapped person") as a concession that WAC did not discriminate against him on the basis of his handicap. Wilson objects to this interpretation, explaining that when he said WAC "took no consideration," Wilson meant not that WAC was indifferent to his handicap, but that WAC failed to accommodate it. On review of an order of summary judgment, Wilson's interpretation should be credited, especially because what was at best a vague [*22] and syntactically inexact statement was made, as surrounding testimony shows, late in the day when Wilson was tired.

We think there is a more fundamental reason for affirming the district court's order of summary judgment on this count. Wilson's complaint alleges that he "was discriminated against by the Defendant in the terms and conditions of his employment by virtue of a physical handicap which he had in connection with performing the functions of his job," and that "although accommodation was requested in such conditions, the Defendant fully refused and deliberately refused to accommodate the Plaintiff." The complaint does not specifically allege that WAC fired him because of his handicap. The Statement of Issues section of his brief states that "in Count III, Plaintiff argues that the discharge was discriminatory in that Plaintiff was discharged by virtue of a physical handicap which had no connection with performing the essential functions of his job...." However, in the briefs "Argument" section for that count, as well as in the parallel section in his brief below opposing the motion for summary judgment, Wilson discusses only the difficulties he experienced with his workload [*23] in the period preceding his termination.

> At the time of Wilson's discharge, he functioned as corporate safety director. He continually complained that the stress of the job, coupled with the other duties in plant relations were too much. n6 He requested continuously, clarification of his status and assistance in his job duties. ... It is undisputed that the Plaintiff advised his employer that he was an insulin-dependent diabetic. It is also undisputed that the Plaintiff requested assistance from the employer concerning stress-related activities and the fact that he was being asked to work literally around the clock in performing [his various functions].

Pl. Opp. Brief at 13-15. Wilson never directly avers that either the handicap itself or his requests for less stressful work motivated WAC in its decision to fire him. It is only in the Statement of Issues of his brief on appeal, then, that Wilson makes any reference to the theory that WAC terminated him because of his handicap status. Nor does Wilson ever allege that he was *assigned* to his duties because of his handicap.

> n6 At some point around 1993, Wilson was assigned "corporate" (multi-plant) duties as safety director in addition to his human resources duties in Kalamazoo.

[*24]

In the absence of a direct allegation that WAC discriminated against Wilson on the basis of his handicap, Wilson's claim of disability discrimination could not have withstood a motion to dismiss, much less a motion for summary judgment.

B. Accommodation of Handicap

HRCA § 37.1102 provides that "a person shall accommodate a handicapper for purposes of employment ... unless the person demonstrates that the accommodation would impose an undue hardship."

The district court based its order of summary judgment for WAC on this count on the observation that "interestingly, plaintiff never argues that he requested a change in employment status because of his insulin condition. Rather, plaintiff simply requested to be permitted a less stressful work load because he was under too much stress in his current position. . . . The Court's position on the accommodation of the request for a less stressful position is immaterial as the Court is aware of no case law construing 'stress sensitivity' as a handicap."

We withhold judgment on the district court's conclusion that "stress sensitivity" is not a handicap under HRCA, and its assumption that stress was not so linked to Wilson's diabetes, [*25] as a factor that according to Wilson's physician exacerbated the disease, that it was really diabetes, and not "stress sensitivity" that needed to be accommodated. Still, Wilson cannot escape summary judgment on the disability count by claiming a failure to accommodate.

Ordinarily, we think of "accommodation" in terms of adjustments an employer makes that allow a handicapped or disabled employee to continue to perform and progress in her job; accommodation is

carried out instead of an adverse employment action, such as termination or failure to promote. M.C.L. § 37.1202(f) and (g) pertains to this sort of accommodation. If Wilson had simply stopped doing some of his duties because of diabetes-related stress, and WAC then fired him for nonperformance, accommodation would clearly be an issue. However, we do not think there can be an actionable failure to accommodate under § 37.1102, where, as we concluded above, there was no adverse employment action related to the underlying disability.

V

For the reasons discussed above, the district court's order of summary judgment is AFFIRMED.

LEXSEE 1993 U.S. APP. LEXIS 8682

HARRY BOYLE, Plaintiff-Appellee, v. MANNESMANN DEMAG CORPORATION, Defendant-Appellant.

No. 91-3909

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

1993 U.S. App. LEXIS 8682

April 13, 1993, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** *Reported as Table Case at 991 F.2d 794, 1993 U.S. App. LEXIS 15037.*

**PRIOR HISTORY:** United States District Court for the Southern District of Ohio. District No. 89-00306. Rice, District Judge.

**LexisNexis(R) Headnotes**

**JUDGES:** BEFORE: BOGGS and SUHRHEINRICH, Circuit Judges, and GILMORE, Senior District Court Judge. *

* The Honorable Horace W. Gilmore, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

**OPINIONBY:** PER CURIAM

**OPINION:**

PER CURIAM. Defendant Mannesmann Demag Corporation appeals from the jury verdict for plaintiff Harry Boyle in this suit brought under the Age Discrimination in Employment Act (ADEA), *29 U.S.C. § 621*-34. Finding error in the admission of irrelevant evidence, we REVERSE.

I.

Plaintiff's case was tried before a jury, which returned a verdict for plaintiff. Prior to trial, defendant filed motions in limine objecting to plaintiff's evidence concerning the terminations of [*2] other district managers, certain age-related statements, and the German-American exchange rate; all of which were denied. Further, at the close of all the evidence, defendant brought a motion for directed verdict, which the district court also denied. On appeal, defendant challenges the admission of this evidence and the denial of its directed verdict motion.

II.

We review evidentiary rulings of the district court for an abuse of discretion, which "exists when the reviewing court is firmly convinced that a mistake has been made." *Schrand v. Federal Pacific Electric Co., 851 F.2d 152, 157 (6th Cir. 1988).* If evidentiary errors affected the substantial rights of appellant, they are prejudicial and warrant a new trial. Id. The errors in this case were prejudicial; therefore, we reverse for new trial.

A. Preservation of Evidentiary Issues

As a preliminary matter, we must address plaintiff's argument that defendant failed to preserve its evidentiary arguments by not renewing its objections at trial. Generally, evidentiary arguments are waived when a motion in limine is denied prior to trial and no further objection to that denial is [*3] made. *Polk v. Yellow Freight System, Inc., 876 F.2d 527, 532 (6th Cir. 1989); Petty v. Ideco, 761 F.2d 1146, 1150 (5th Cir. 1985); Northwestern Flyers, Inc. v. Olson Bros. Mfg. Co., 679*

EXHIBIT B

*F.2d 1264, 1275 n.27 (8th Cir. 1982)*. However, a review of the record reveals that at the pre-trial hearing on the motions in limine, the district court led defendant to believe that the motions in limine were sufficient to preserve the record and that it need not restate them at trial. J.A. at 189. We conclude that, in this limited circumstance, defendant's objections are properly before this court despite the failure to object at trial.

B. Testimony Relating to Prior Terminations

On direct examination, plaintiff introduced testimony by Lawrence Dickman and Robert Fetick concerning their prior employment with defendant, their ages at the time of termination, and their work performance. Trial Transcript Vol. 2 at 71-78, 112-14. Additionally, on cross-examination of John Kurowski, General Sales Manager at the time of the termination, plaintiff explored the terminations of Dickman, Fetick, and William [*4] Petrucelli. J.A. at 275-79. Defendant objects to the testimony as irrelevant and unduly prejudicial.

Plaintiff responds that defendant has waived any objection because defendant initially raised the issue of whether the terminations were based on age and also stipulated to Plaintiff's Exhibit 41-A which contained information relating to their testimony. We disagree.

First, it was plaintiff who initially raised the issue of past instances of age discrimination, not defendant. By asking Dickman and Fetick on direct how old they were at the time of their terminations, plaintiff created the inference that age was the true reason for their terminations. Defendant's inquiry of Fetick whether he believed that age was a factor in his termination came on cross-examination. Trial Transcript Vol. 2 at 127-28. Inferences raised on direct examination are clearly proper subjects for cross-examination. See *United States v. Moore, 917 F.2d 215, 222 (6th Cir. 1990)*, cert. denied, *113 L. Ed. 2d 654, 111 S. Ct. 1590 (1991)*; *United States v. Arnott, 704 F.2d 322, 324 (6th Cir.)*, cert. [*5] denied, *464 U.S. 948 (1983)*. See also Charles T. McCormick, McCormick on Evidence 143 (Edward W. Cleary ed., 3d ed. 1984). Defendant did not ask similar questions of Dickman. Further, it was plaintiff who explored the termination of Petrucelli on cross-examination of Kurowski, not defendant. J.A. at 275-79. Defendant is not precluded from objecting to this testimony.

Second, the stipulation to Exhibit 41-A does not preclude defendant's objections. This exhibit lists the names, addresses, sales territory, dates of employment, ages at termination, and the reasons for termination of ten managers including Dickman and Petrucelli, but not Fetick. J.A. at 1279-80. It does not address whether age was a secret factor in the terminations listed. Thus, we are free to reach the admissibility of the testimony.

Such testimony is irrelevant under *Federal Rule of Evidence 401* n1 where there is "no evidence from which the alleged statements of the witnesses could logically or reasonably be tied to the decision to terminate [the plaintiff]." *Schrand v. Federal Pacific Electric Co., 851 F.2d 152, 156 (6th Cir. 1988)*. Additionally, [*6] such evidence is unduly prejudicial under *Federal Rule of Evidence 403* n2 because it confuses the jury as to the actual issue in the case. Id. Fetick, Dickman, and Petrucelli were terminated in 1983 during defendant's reorganization, making their terminations remote in time and circumstances from plaintiff's termination. Thus, the testimony was irrelevant and inadmissible.

---

n1 Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

n2 Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."

---

C. Testimony Concerning Age-Related Statements

Defendant also objects to testimony by Fetick that, in 1981, William Persch, a general manager for defendant, directed him to hire another job applicant [*7] because he was "younger and hungrier." Fetick also testified that in 1983 Kurowski said that the company had "too many old farts."

Such comments are inadmissible because they "are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Chappell v. GTE Products Corp., 803 F.2d 261, 268 n.2 (6th Cir. 1986)*, cert. denied, *480 U.S. 919 (1987)*. See *McLaurin v. Fischer, 768 F.2d 98, 104 (6th Cir. 1985)* (age-related statement excluded as irrelevant). In the present case, Persch was not involved in plaintiff's termination; thus, his statement was irrelevant. Furthermore, although Kurowski did approve plaintiff's termination, his statement was made four years prior to plaintiff's discharge. Thus, both statements were irrelevant. n3

---

n3 The dissent posits that "those cases indicating stray remarks are insufficient to prove discrimination do not indicate that such remarks

are inadmissible. . . ." However, we have held repeatedly that such remarks are irrelevant and unduly prejudicial. As such, they must be excluded. See *Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir. 1989)* (solitary remark by supervisor that he "needed younger blood" was irrelevant and prejudicial, as well as simply insufficient to prove age discrimination) (quoting *Chappell, 803 F.2d at 268 n.2* (statements regarding young people taking over in management and indicating a negative view of "old-timers" held irrelevant and unduly prejudicial)); *Schrand v. Federal Pacific Electric Co., 851 F.2d 152, 155-56 (6th Cir. 1988)* (comments that employees were "too old" held irrelevant and unduly prejudicial); *McLaurin, 768 F.2d at 104* (isolated statement regarding the "young men whom we would like to attract" held irrelevant to issue of age discrimination). See also *Haskell v. Kaman Corp., 743 F.2d 113, 120 (2d Cir. 1984)* (references to "old ladies" and to "young turks" held irrelevant and unduly prejudicial).

[*8]

D. Testimony Regarding the Exchange Rate

Plaintiff also introduced evidence about the effect of the exchange rate between the United States dollar and the German deutsche mark on sales of defendant's products. Plaintiff argued that an exchange rate favorable to the German deutsche mark resulted in reduced sales in the United States, which led to his poor sales results. Defendant challenges the evidence as irrelevant and prejudicial. We agree.

Even if we assume that the exchange rate did affect sales, the evidence was still irrelevant because it could not have had a greater negative impact on plaintiff than any other Demag employee in the United States. Thus, it does not show that plaintiff's situation was different from any other Demag employee at the time nor does it show any difference between sales territories.

Furthermore, repeated references to a party's citizenship or nationality can be unduly prejudicial to that party. See *Gearhart v. Uniden Corp. of America, 781 F.2d 147 (8th Cir. 1986)* (on retrial, remarks relating to Far Eastern parent corporations should not be permitted because of xenophobia and because wealth of parent corporations [*9] is irrelevant to issues of case); *Hong v. St. Louis, 698 F. Supp. 180 (E.D. Mo. 1988)* (new trial granted because repeated references to the plaintiff's Marxist and communist interests and involvement in the Chinese government prejudiced the jury). Any relevance of the exchange rate evidence was outweighed by similar jury prejudice and confusion based on the repeated references to defendant's Germanic origins.

E. Denial of Directed Verdict

Defendant also argues that the district court improperly denied its motion for a directed verdict. We are without authority to grant the motion, however, because defendant failed to move for judgment notwithstanding the verdict. "The failure to move for a judgment n.o.v. precludes the appellate court from considering the sufficiency of the evidence and ordering the district court to enter a directed verdict." *Howard v. Kerr Glass Mfg. Co., 699 F.2d 330, 332 (6th Cir. 1983)*. See also *Aquionics Acceptance Corp. v. Kollar, 536 F.2d 712, 713 (6th Cir. 1976); Union News Co. v. Hildreth, 295 F.2d 658, 667 (6th Cir. 1961)*. [*10] Thus, we do not address defendant's request for directed verdict.

For all the foregoing reasons, we REMAND for new trial.

**CONCURBY:** GILMORE (In Part)

**DISSENTBY:** GILMORE (In Part)

**DISSENT:**

**GILMORE**, J., concurring in part and dissenting in part:

I concur with sections II A and II E of the majority opinion, but respectfully dissent from sections II B, II C, and II D.

With reference to section II B, the Defendant is correct that testimony regarding discrimination in the circumstances of other employees' terminations, where those terminations are remote in time and circumstance to Plaintiff's termination, are not properly admitted into evidence. *Schrand v. Federal Pacific Electric Co., 851 F.2d 152 (6th Cir. 1988)*, so holds. However, Schrand is distinguishable from this case. The witnesses did not claim they were terminated because of age, and although Dickman, Fetick and Petrucelli all stated their age and the circumstances surrounding their termination, Defendant admits that none of them offered testimony that they were discriminated against because of age. I think this simple fact defeats Defendant's claim of error.

Defendant argues that the testimony of these three [*11] people nonetheless created the presumption they were discriminated against based upon age. Although I do not believe such an inference can form a legitimate basis for exclusion, and even were the court to accept Defendant's argument, there are other factors that

distinguish this case from Schrand so that the testimony is properly admissible.

The Court in Schrand based its decision partly on the fact that the person who made the decision to terminate the other employees was not the same person who made the decision to terminate the Plaintiff. Here, the same person, Kurowski, was responsible for all of the terminations. In addition, the Court found it important that the plaintiff in Schrand expressly stated he was not attempting to establish a pattern or practice of discrimination, but only disparate treatment.

The trial court here considered Schrand and distinguished the case and made a specific finding of relevancy based upon the fact that Kurowski, the same person who fired Dickman, Petruceli and Fetick, also terminated Plaintiff. The trial court distinguished the present situation from Schrand because Plaintiff proffered evidence of a pattern and practice [*12] of discrimination. This evidence was clearly probative of Plaintiff's theory that Defendant's reorganization in 1983 was an attempt to eventually eliminate all older workers, including Plaintiff, who was given an underdeveloped territory at that time and was later replaced by Kurowski's protege. I therefore think the finding of the trial court that the probative evidence of prior terminations was not outweighed by the danger of unfair prejudice was correct.

With reference to Section II C and the testimony concerning age-related statements, I feel that is no basis for reversal. I do not agree with the characteristic of Kurowski's comment as a "stray remark. "The remark contains a clear age bias that I believe is highly probative of the decision-maker's motivation in making firing decisions. Moreover, those cases indicating stray remarks are insufficient to prove discrimination do not indicate that such remarks are inadmissible, nor do they indicate that such remarks in conjunction with other evidence would necessarily fail to support a finding of discrimination. Clearly, in my opinion, there is no error in admitting these statements.

With reference to Section II D and the testimony [*13] regarding the dollar and deutschmark exchange rate, I see nothing to Defendant's argument that reference to the exchange rate between the deutschmark and the dollar is irrelevant. Defendant's own documents constitute admissions that the exchange rate impacted upon costs, and it would be hard to argue that costs did not then impact upon sales.

Plaintiff attempted to prove that his 1987 termination for "poor performance" was pretextual by showing his low Orders Received Objective percentage was a result of the change in the exchange rate and not the result of his own incompetence. This exchange rate and not the result of his own incompetence. This evidence, I think, was clearly admissible.

The claim that the evidence of the difference in the exchange rate was unfairly prejudicial because it inflamed the passion of the jury against foreign corporations and our World War II foe is without merit. I don't think it even deserves consideration. Even so, the trial court screened out any potential prejudice on voir dire when the judge carefully explained Defendant's German ownership and asked the jurors whether they could not give Defendant a fair trial because of these foreign roots. [*14] Not one juror raised his hand. In sum, I think there is no merit in Defendant's claim of error in the admission of the exchange rate evidence. It was clearly not an abuse of discretion for the trial court to admit this relevant evidence.

For these reasons, I respectfully dissent from Sections II B, II C and II D, and would vote to affirm the District Court.

LEXSEE 93 FED. APPX. 837

CAROLYN COVINGTON, Plaintiff-Appellee, v. MCI WORLDCOM NETWORK SERVICES. INC., Defendant-Appellant.

No. 01-6139

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

93 Fed. Appx. 837; 2004 U.S. App. LEXIS 6031

March 26, 2004, Filed

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Western District of Tennessee. 98-02969. Donald. 08-10-01.

**DISPOSITION:** Denial of Defendant's motion for judgment as a matter of law affirmed. Denial of Defendant's motion for a new trial as to liability reversed, and matter remanded for further proceedings.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CAROLYN COVINGTON, Plaintiff - Appellee: Claire D. Reno, Dowden, Songstad & Worley, Memphis, TN.

For CAROLYN COVINGTON, Plaintiff - Appellee: Sandra C. Isom, Germantown, TN.

For MCI WORLDCOM NETWORK SERVICES, INC., Defendant - Appellant: Matthew C. Lonergan, J. Craig Oliver, Boult, Cummings, Conners & Berry, Nashville, TN.

**JUDGES:** Before: BOGGS, Chief Judge; GUY, Circuit Judge; and HOOD, District Judge. * HOOD, District Judge, concurring in part and dissenting in part.

* The Honorable Denise Page Hood. United States District Judge for the Eastern District of Michigan, sitting by designation. [**2]

**OPINION:**

[*839] **PER CURIAM.** Carolyn Covington brought this action against her former employer. MCI Worldcom Network Services ("MCI"), claiming race, sex, and age discrimination in refusing her a promotion. The jury found in her favor as to sex discrimination only. Defendant MCI WorldCom Network, Inc. ("MCI") appeals from the district court's denial of its motion for judgment as a matter of law or for a new trial, on the grounds that the verdict was based on insufficient and/or inadmissible evidence, and in the alternative seeks remittitur and alteration of the awards granted by the jury and trial judge. For the following reasons, we remand for a new trial as to liability.

I

Covington entered MCI's employ as a manager at the Memphis. Tennessee Call Center (the "Memphis Center") in 1991. In 1992, she transferred to the Memphis Center's Customer Calling Department, where she reported to David Watson, the manager in charge of that department. When Watson was promoted to Regional Manager, Covington applied for his vacated former position. Four other employees, all male, also applied for that position. After interviews in November 1993. the promotion went to a junior manager named Mark [**3] Shelby. MCI's lead witness, former Center Manager Mark Anderson, testified that he had promoted

EXHIBIT C

Shelby rather than Covington because Shelby displayed terrific leadership potential in his interview, setting forth a big-picture vision for the department's future under his management, and Covington did not. Covington sued because she did not get the promotion.

We review the denial of MCI's motion for judgment as a matter of law *de novo,* using the same standard as did the district court. *Williams v. Nashville Network. 132 F.3d 1123, 1130-31 (6th Cir. 1997).* That is, we affirm if there is a "legally sufficient basis for a reasonable jury to find for" Covington. *Fed. R. Civ. P. 50(a)(1).* We do not weigh the evidence, nor make credibility determinations; rather, we view the evidence in the light most favorable to Covington, giving her the benefit of all reasonable inferences, and we reverse only if reasonable minds could find only for MCI. *Williams, 132 F.3d at 1130.*

As usual at this stage, we do not review plaintiff's prima facie case, but only whether Covington proved discrimination. *Roh* [*840] *v. Lakeshore Estates, Inc., 241 F.3d 491, 498 (6th Cir. 2001).* [**4] Once MCI proffered an explanation for promoting Shelby rather than Covington, Covington had to prove that MCI's proffered justification was a mere pretext for intentional sexual discrimination. *Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 142-43, 147 L. Ed. 2d 105, 120 S. Ct. 2097* (2000). Covington could meet her burden by showing that MCI's justification (1) was not based in fact, (2) did not actually motivate MCI, or (3) would not suffice by itself to motivate MCI's action. *Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994).*

If the jury disbelieved MCI, it could justly infer that the true motive was discriminatory even without positive evidence of discriminatory motive. *Ibid; Furnco Constr. Corp. v. Waters. 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943(1978)* ("when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions it is more likely than not the employer, who we generally assume acts only with some reason based his decision on an impermissible consideration"). But because plaintiff bears the burden of proof, a jury's mere credibility determination [**5] unsupported, by any evidence of falsity cannot support a verdict for plaintiff. *Reeves, 530 U.S. at 147-48.* Covington had to present some evidence going squarely to falsity.

## II

MCI posted the position vacated by Watson as "Senior Manager. Customer Calling." Covington and Karl Amelang. the Memphis Center's then-Human Resources Manager testified as to the meaning of the title "Senior Manager." Managers at MCI progressed in compensation level from Manager I to Manager II, Manager III. and finally Senior Manager. At each promotion a manager's performance was reviewed and his or her compensation was increased accordingly. Covington testified that promotions came with seniority and satisfactory performance. Amelang testified more precisely that, as of 1993. MCI's Generic Job Summary for Senior Manager rank required nine to ten years related experience, including five years of supervisory experience.

Significantly, Amelang testified that Covington, a Manager III who had over five years of supervisory experience with various employers was qualified to apply for the post vacated by Watson. Amelang also testified that Shelby did not have the years of experience required [**6] by the Generic Job Summary for even Manager III rank. n1 In fact, Covington had been an MCI manager longer than any other candidate for the post. Shelby, in contrast, was a Manager I, and had been a manager for only nine months.

---

n1 The Generic Job Summary apparently allows an employee's educational degrees to substitute for experience, but as the record does not show how this apparent rule might apply to Shelby, we decline to read a caveat into Amelang's clear testimony.

---

MCI urges that Title VII does not demand that a company promote by seniority. It is true that a trial court does not "sit as a super-personnel department" in Title VII cases to second-guess the wisdom of an employer's standards. *Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 462 (6th Cir. 2004)* (quoting *Krenik v. County of Le Sueur. 47 F.3d 953, 960 (8th Cir. 1995)).* But Covington is not saying that the jury could impose standards upon MCI. Rather, she offered evidence that in MCI's own opinion, Shelby did [**7] not have the requisite experience for the post, so [*841] that MCI's proffered explanation was likely to be false.

MCI insists, however, that Shelby's ineligibility for Senior Manager status was irrelevant. Anderson testified on cross-examination that he had posted the job as "Senior Manager. Customer Calling." merely because Watson had been a Senior Manager, and to discourage applicants from outside the Memphis Center. But he never considered being a Senior Manager to be a requirement for the job. Senior Manager, MCI asserts is a compensation description, not a job requirement.

There is considerable evidence that "Senior Manager" designated an experience requirement in this instance. Covington's and Amelang's testimony points that way, Anderson's own testimony. that he used the

phrase to discourage some prospective applicants also necessarily implies that he expected the phrase to look like a requirement. Moreover, Anderson identified the position as "Senior Manager" in MCI's official log of the promotion process, and in a trial affidavit and yet he did not give Shelby what he now says is only a compensation title. Instead he gave Shelby the title of "Segment Manager," a title unfamiliar [**8] to Covington and to Anderson's successor. The jury could readily infer that Anderson made up the title "Segment Manager" because Shelby did not have the seniority to be a Senior Manager but needed a similar-sounding title to lend him the authority associated with his new responsibilities.

MCI contends that the jury could not infer that Anderson considered substantial experience to be a job requirement if Anderson testified that he did not. We disagree. A decision-maker's self-interested testimony about his own thoughts is not unassailable; direct evidence of discriminatory intent is hardly ever available so a plaintiff generally resorts to circumstantial evidence to show what the decision-maker had in mind. *Kline v. TVA, 128 F.3d 337, 348 (6th Cir. 1997)*. Covington produced evidence reasonably implying that Senior Manager eligibility was a prerequisite for the post, and evidence that Shelby was not eligible to be a Senior Manager. These points reasonably imply that Shelby was disqualified for the post, and thus that MCI's explanation was false.

We do not say that an employer can avoid trial only by blindly adhering to the terms of a job posting he [**9] created before the applicant field was known. Businesses do not and cannot work that way. An employer who claims he re-prioritized his original standards because no applicant perfectly fit the bill cannot be assumed to be lying. Such a claim would be an integral part of his required explanation of his decision, which the plaintiff must then prove false using independent evidence. But if an employer at trial describes his standards and his decision-making process in a way that is flatly inconsistent with his own prior statements, he may be impeached thereby. Covington satisfied her slight burden of proof.

### III

In the alternative, MCI urges that much of Covington's evidence was so prejudicial as to require a new trial. In particular, MCI challenges Covington's testimony as to an incident in September 2003. She testified that Shelby (then her co-worker) made misogynist remarks to her. including: "women should be at home raising babies, they have no place in the workforce "women can't compete with young men in the workplace;" and "women are too emotional." Covington complained to her then-supervisor Watson, who brushed these comments off as "a guy thing."

[*842] By this testimony, Covington [**10] sought to prove that MCI's promotion decision was tainted by sexual stereotyping. Shelby and Watson's comments, she contends, lend context to interview notes taken by Anderson during the promotion process. According to these notes. Anderson was very impressed by Shelby's focus and lack of distractions. Although the notes do not mention it. Anderson knew that Shelby was childless, and knew Covington's son had recently been diagnosed with severe kidney disease and received a transplant. Covington concludes that Anderson improperly stereotyped her as a primary care-giver, whose workplace commitment could not be relied upon. *See Nev. Dep't of Human Resources v. Hibbs, 538 U.S. 721, 123 S. Ct. 1972, 1979 n.5, 155 L. Ed. 2d 953 (2003)* (noting prevalent stereotype that "women's family duties trump those of the workplace"): *see also Los Angeles Dep't of Power and Water v. Manhart, 435 U.S. 702, 707, 55 L. Ed. 2d 657, 98 S. Ct. 1370 (1978)* ("employment decisions cannot be made on the basis of mere 'stereotyped' impressions about the characteristics of males or females").

We review the denial of MCI's motion for a new trial for abuse of discretion, reversing only if we are [**11] firmly convinced that the district court made a clear error of judgment. *Barnes v. Owens-Corning Fiberglas Corp., 201 F.3d 815, 820-21 (6th Cir. 2000)*. The district court could have granted a new trial because the verdict was so against the weight of the evidence as to be unreasonable, the damages award was excessive, or the verdict was influenced by bias or prejudice or was otherwise unfair. *Conte v. General Housewares Corp., 215 F.3d 628, 637 (6th Cir. 2000)*. We ask whether the challenged evidence was clearly admitted improperly, and if so, whether its introduction was harmless error, that is. whether we can say with "fair assurance," that it did not substantially affect the verdict, considering the weight of all the evidence on that issue and the centrality of the issue to the verdict. *Schrand v. Federal Pacific Elec. Co., 851 F.2d 152, 157 (6th Cir. 1988)* (quoting *Kotteakos v. United States, 328 U.S. 750, 765, 90 L. Ed. 1557, 66 S. Ct. 1239(1946))*.

Testimony as to Shelby and Watson's alleged comments should have been excluded. Evidence shall be excluded if irrelevant; and may be excluded if it is if much more prejudicial than [**12] relevant. *Fed. R. Evid. 402, 403*. There was no probative value to the comments, because they could not support an inference of discriminatory intent by MCI. Derogatory remarks by an immediate supervisor with meaningful influence on an employment decision may sometimes imply discrimination in the decision process. *Wells v. New*

*Cherokee Corp., 58 F.3d 233, 238 (6th Cir. 1995).* But Shelby was not Covington's supervisor and had no influence on the decision. Watson could be considered a contributor to the promotion process, because he helped Anderson interview Covington and Shelby and discussed the decision with Anderson, and because Shelby's promotion was announced in a memo sent under Watson and Anderson's names. But Watson did not somehow adopt Shelby's remarks by saying "it's a guy thing," *See Chappell v. GTE Products Corp., 803 F.2d 261, 268 n.2 (6th Cir. 1986)* (evidence that age-discrimination plaintiffs supervisor once said "don't categorize me in that with you," in response to third-party's remark that "we old timers know the procedure," properly excluded as irrelevant and prejudicial). [**13] A single "isolated and ambiguous" remark unrelated to a suspect decision cannot establish discrimination. *Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025* [*843] *(6th Cir. 1993).* n2 Moreover, there is no apparent nexus between Watson's alleged misogyny and Anderson's private notes, so the one cannot explain the other.

> n2 In *Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325 (6th Cir. 1994).* cited by the dissent, we upheld the admission of derogatory remarks, unrelated to the decision-making process, made by a person other than the decision-maker. But those remarks were made by the CEO of the company, a person who unquestionably set the tone for all lesser managers. That CEO consistently repeated his derogatory remarks over a period of years, strongly suggesting the creation of an unspoken corporate policy. *Cooley, 25 F.3d at 1331-32.* Moreover, we did not positively hold that even such strong indicia of bigotry at a high level proved discrimination by the decision-maker, we merely refused to find that admission was an abuse of discretion in the context of an otherwise-strong plaintiff's case. *25 F.3d at 1332-33.*

[**14]

The evidence was highly prejudicial, because this sort of irrelevant, apparent "smoking gun" can win a discrimination case. Thus, in *Smith v. Leggett Wire Co., 220 F.3d 752, 759-60 (6th Cir. 2000)*, we reversed because the district court had admitted testimony as to graphic racial insults by co-workers of plaintiff's own rank. Similarly, in *Schrand, 851 F.2d at 156-57.* we remanded for a new trial because plaintiff's most powerful evidence was that two co-workers had been told by their supervisors that they had been fired because of age; because those supervisors did not influence plaintiff's own termination, this evidence was unfairly prejudicial.

That the material was not merely potentially, but actually, prejudicial is strongly suggested by the fact that the jury found discrimination only on the basis of sex (rather than race or age). These inflammatory comments were nearly the only evidence going to sexual discrimination in particular -- nothing else even purported to connect Anderson's notes to his supposed concerns about Covington's home life, nor was there evidence that MCI would not have had such concerns about the commitment of a male employee [**15] with a gravely ill child. *See Bickerstaff v. Vassar College, 196 F.3d 435, 448, 452 (2d Cir. 1999)* (jury may not infer that extremely negative assessment of black tenure candidate was *ipso facto* based upon racial animus). Therefore, we are firmly convinced that the verdict was substantially swayed by this material.

We review the remaining challenged evidence only to the extent necessary to provide guidance on remand. Covington's counsel recited, from an email that Covington wrote when laid off in a June 1994 reduction in force, that Covington's discharge was a violation of her "civil rights" which she, "as a black female over 40," would not stand for, and that she had documentation of things that "weren't right" over the "last few months" preceding June 1994. Counsel cursorily questioned Amelang about these statements, purportedly in order to impeach Amelang's testimony that Covington had not previously complained about discrimination in the November 1993 promotion process. But Amelang's testimony did not open the door to vague accusations about later events; the email, or his acknowledgment that it existed, could not conceivably refute his prior testimony. The [**16] effect of counsel's recitation of plaintiff's own later, unrelated opinions must have been to make Amelang look like a liar, and to make Covington look persecuted. The relevance was nil, and the material was prejudicial.

IV

For the reasons stated, we affirm the denial of MCI's motion for judgment as a matter of law. reverse the denial of MCI's [*844] motion for a new trial as to liability, and remand for further proceedings in accordance with this opinion.

**CONCURBY:** HOOD (In Part)

**DISSENTBY:** HOOD (In Part)

**DISSENT:**

HOOD, District Judge, concurring in part and dissenting in part. I concur in the majority's finding that Covington satisfied her burden of proof that MCI's proffered explanation for promoting Shelby rather than Covington was a mere pretext for intentional sexual discrimination. I disagree with the majority's finding that the testimony as to Shelby and Watson's alleged comments should have been excluded as irrelevant and highly prejudicial.

As noted by the majority, Covington testified that Shelby. prior to his promotion to Segment Manager, made discriminatory comments to her, including: "women should be at home raising babies, they have no place in the workforce;" "women can't compete with [**17] young men in the workplace;" and "women are too emotional." Covington testified she and other employees complained to Watson about Shelby's comments who responded with, "it's a guy thing."

The majority cites *Phelps v. Yale Sec., Inc., 986 F.2d 1020. 1025 (6th Cir. 1993)* for the proposition that a single isolated and ambiguous remark unrelated to a suspect's decision cannot establish discrimination. Since the *Phelps* case, this Court has taken a closer look at discriminatory remarks and has set out a more comprehensive analysis than that made in the *Phelps* case to determine if such remarks should be admitted into evidence. In *Cooley v. Carmike Cinemas. Inc., 25 F.3d 1325 (6th Cir. 1994)*, an age-discrimination case, this Court acknowledged the *Phelps* case but went on to engage in a further analysis of the statement made in that case. This Court noted that although comments were made not in the context of the plaintiff's termination and that the comments were made years prior to the termination, "the accumulated testimony is going beyond the vague, ambiguous, and isolated comments that have been held insufficient to support an age-discrimination [**18] claim." *Cooley, 25 F.3d at 1333*. The comments were attributed to decision makers. related to the decision-making process, and quoted by co-workers who had discussions with Cooley's superiors during the course of their employment. *Id.*

In *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir. 1998).* this Court set forth a two-step process to analyze whether a remark should be admitted into evidence. The first step is to look at the identity of the speaker and whether a reasonable jury could conclude that the speaker was in a position to influence the decision to terminate an employee. *Id. at 355 (citing Kelley v. Airborne Freight Corp., 140 F.3d 335, 347-48 (1st Cir. 1998)*(statement by head of human resources who "participated closely" in plaintiff's termination was admissible to show a discriminatory atmosphere.). Although, as the majority writes, the original comments were spoken by Shelby, a non-decision maker in the promotion. Covington testified she complained to Watson, the Senior Manager, about Shelby's comments. Watson brushed off her complaints stating it was a "guy thing." These statements then [**19] are Watson's who participated in the interviewing process and whose name appeared in a memo announcing Shelby's promotion. As the majority found, there was sufficient evidence from which a reasonable jury could conclude that Watson was involved in the employment decision not to promote Covington.

The second step is to examine the substance of the remark to determine its relevancy to a plaintiff's claim that an impermissible factor motivated the adverse [*845] employment action against the plaintiff. *Ercegovich, 154 F.3d at 355*. "Although we believe a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant." *Id.* "When assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." *Id. at 356.* [**20]

In this case, the comment by Watson, in response to complaints about Shelby. is relevant. Watson at the time of the interviews had knowledge of the comments made by Shelby. It could be argued by Covington that Watson shared Shelby's views based on his response that it was a "guy thing" and because he failed to do anything about Shelby's comments. Although the majority does not find Anderson's (Center Manager and a decision maker) interview notes connected his supposed concerns about Covington's home life to Watson's comments, I find that Covington could argue that Anderson's interview notes, coupled with Watson's comments, show that Covington's gender was an issue in their promotion decision. Anderson's notes indicated that Shelby had a "stronger commitment" and had "no distractions." By themselves, these notations would not be probative of gender discrimination. However, Covington submitted evidence that Anderson was aware that Covington's child was gravely ill. In addition to this cited testimony and evidence, there was other sufficient evidence to show Shelby's promotion was motivated by gender bias. As noted by the majority, the position title was changed from "Senior Manager" [**21] to "Segment Manager." Covington could argue that the change in title, which was unfamiliar to others at MCI. was changed in order to accommodate Shelby's lack of experience for promotion to a Senior Manager position. Covington was more

experienced and had received awards for her management skills and for exceeding sales goals, which Covington properly argued contradicted Anderson's interview notes that Covington was "not focused on goals or sales."

I respectfully disagree that the testimony by Covington about the statements made by Shelby and Watson was not relevant and that the material was highly prejudicial. I would affirm the district court's denial of MCI's motion for judgment as a matter of law and motion for a new trial as to liability.