UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BARBARA LODER HILDEBRANDT, : | |
| : | |
| Plaintiff : | |
| : | CASE NO.  C-1-02-0003 |
| vs. : | |
| : | Judge Beckwith |
| HYATT CORPORATION, *et al*., : | Magistrate Judge Black |
| : | |
| Defendants : | |
| : | |

**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF BRUCE SMALL REGARDING HIS "STUDY" OF PLAINTIFF'S ACCOUNTS**

Plaintiff, pursuant to this Court's procedural order for the filing of motions in limine, respectfully moves this Court to exclude the testimony of Bruce Small, a Hyatt employee, on the subject of an alleged "study" he performed on Plaintiff's accounts at an unspecified time at least two years before Plaintiff was terminated by Hyatt.  The reason that Small's testimony should be excluded is because it is completely irrelevant to the issues in this case and because Hyatt's counsel prevented a complete examination of Small on this subject matter by improperly instructing him not to answer a question regarding why he kept no records of his alleged study.

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE**

Motions in limine to exclude evidence should only be granted when it is established that the evidence in question is clearly inadmissible for any purpose. *Indiana Insurance Co. v. General Electric Co.*, 2004 WL 1619197 (N.D.Ohio

2004). Where that standard is met, the exclusion of the evidence in question can ensure evenhanded and expeditious management of trials. *See Jonasson v. Lutheran Child and Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997).

The proposed testimony of Bruce Small is completely irrelevant to any issues in this case. Small was identified by Hyatt as its employee most familiar with Hyatt's computer system pursuant to Fed. R. Civ. P. 30(b)(6) to answer deposition questions about Hyatt's computer system and database. (Small Deposition, pp. 11-12).[1] In fact, Hyatt's attorney objected to Plaintiff's counsel asking Small about events that occurred when he was Director of Sales in Chicago and supervised Plaintiff. (Id.). Hyatt's attorney claimed that, because Small was identified as a Rule 30(b)(6) witness, he was not prepared for a deposition on the subject matter of the question. (Id). Despite this objection, when Plaintiff's counsel completed his deposition of Small on computer-related topics, Hyatt's attorney launched into questions relating to events that occurred when Small was Plaintiff's supervisor in Chicago. (Id., pp. 43 - 49).

Hyatt's attorney established that Small moved from his job as Plaintiff's supervisor in the National Sales Force to his current position in computer-related matters as Director of Sales Information Systems in the fall of 2000. (Id., p. 45). Thus, he was not in the National Sales Force when Plaintiff was terminated. Small alleged that, during the five-year period he supervised Plaintiff, he discussed with her the "lack of national sales quality clients in her geographic area." (Id., p. 47). Small asserted that "we undertook some searches, we had

---

[1] Small's deposition was filed with the Court on May 14, 2004). A courtesy hard copy is attached hereto, but not filed electronically.

2

the team in Omaha pull a number of records for us, we had some binders we went through and I don't remember all of them, but over time I spent a number of hours going through those." He concluded that, "It was very difficult to find customers that fit the national sales force criteria in that geographic area." (Id. 47-48).

On cross-examination, Small admitted that Plaintiff had a ten million dollar account base that increased every year and that she had several million-dollar accounts. (Id., p. 50). With regard to his alleged study, Small stated, "we performed a number of studies internally. We pulled down data on account history by organizations to try to identify accounts in that geographic area, passed on what we could find that seemed to fit the profile . . . (Id., p. 51). When he was asked what point during the five-year period he conducted this study, Small said, "I don't remember. . . It could have been anywhere from '96 through '99 I would say." (Id, pp. 51-52). He was asked, "Do you have any records that show when you did this study?", and he answered, "No." (Id., p. 52). He was then asked the very logical question, "Why not?" At that point, Hyatt's attorney began an emotional diatribe personally attacking Plaintiff's counsel, which included an instruction to Small not to answer the question:

> MS. GALLION: Object. That is so rude.
>
> MR. STEINBERG: I'm asking --
>
> A. I'm not --
>
> MS. GALLION: It's argumentative.
>
> MR. STEINBERG: Stop interrupting.

3

>MS. GALLION: ***You don't need to answer why not. You just don't need to answer these questions.***
>
>MR. STEINBERG: Are you instructing the witness --
>
>MS. GALLION: I am.
>
>MR. STEINBERG: -- not to answer the question "Why not"?
>
>MS. GALLION: I am. ***It is so rude and disrespectful and argumentative and inappropriate and beneath you and the dignity of everybody in this room. It's terrible.***

(Small Deposition, pp. 52-53).[2]

Rather than argue with Hyatt's counsel or provoke another emotional outburst, Plaintiff's counsel did not further pursue his questions about Small's alleged study. Placing a time on the study was certainly a relevant inquiry, as was attempting to determine why Small made no record of it. It was also relevant to impeachment of Small, because it is highly unlikely that there would be no record if such a detailed study had actually occurred. Hyatt's attorney's objection to any questions about Small's activities as Plaintiff's supervisor on direct examination, coupled with the instruction not to answer the above question relating to his activities as Plaintiff's supervisor during cross examination, prevented Plaintiff from obtaining an adequate deposition of Small.

The alleged "study" is not relevant in this case. First, it did not occur on or around the time Defendants were making their termination decision in September of 2001. According to Small, it occurred somewhere between two to five years previously (1996 to 1999). There is no evidence that the results of this alleged

---

[2] Fed. R. Civ. P. 30(d)(1) requires objections to be stated concisely and in a non-argumentative and non-suggestive manner. "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to

4

study were presented to Jack Horne, the person who decided to terminate Plaintiff. Horne himself makes no reference to the alleged study or any type of study in the only termination documents he created (Joint Exhibits XI and XXII). (Id.). Horne's changing reasons for terminating Plaintiff, articulated in his depositions and in documents he created, do not refer to any study made by Small. (Horne Deposition). Thus, Small's study could not have possibly been a basis for terminating Plaintiff. If Small's statement is offered to prove the truth thereof, it is hearsay. The underlying information in the study is not available. It would be extremely prejudicial to allow Small to try to convince the jury that Plaintiff's accounts were not adequate where appropriate cross examination was frustrated by Hyatt's attorney and where the time period of the "study" is not only vague, but too stale to be of any probative value. To allow Small to try to convince the jury of the results of a "study" that does not exist would be very prejudicial, compared to its probative value, which is zero. See Fed. R. Evid. 403.

         Respectfully submitted,

         s/Robert A. Steinberg
         Stanley M. Chesley (0000852)
         Robert A. Steinberg (0032932) (Trial Attorney)
         **WAITE, SCHNEIDER, BAYLESS**
          **& CHESLEY CO., L.P.A.**
         1513 Fourth and Vine Tower
         Cincinnati, OH 45202
         513-621-0267
         bobsteinberg@wsbclaw.cc

         and

---

present a motion under Rule 30(d)(4)." Thus, counsel's instruction was clearly improper.

>Michael J. O'Hara (0014966)
>**O'HARA, RUBERG, TAYLOR, SLOAN**
>   **& SERGENT**
>209 Thomas More Park, Suite C
>P.O. Box 17411
>Covington, Kentucky 41017-0411
>(606) 331-2000
>mohara@ortlaw.com

## CERTIFICATE OF SERVICE

   The undersigned hereby certifies that a copy of the foregoing Motion was served by electronic filing via the CM/ECF System to Theresa M. Gallion, Esq. and Nadine Abrahams, Esq. this 30th day of July, 2004.

>s/Robert A. Steinberg
>Robert A. Steinberg

United States District Court,
N.D. Ohio,
Western Division.

INDIANA INSURANCE CO., et al., Plaintiff,
v.
GENERAL ELECTRIC CO., et al., Defendant.

**Case No. 3:03 CV 7511.**

July 16, 2004.

Andrew R. Malone, Smith, Rolfes & Skavdahl, Columbus, OH, for Plaintiffs.

Laura M. Faust, Ronald B. Lee, Moira M. Pietrowski, Roetzel & Andress, Akron, OH, for Defendant.

*MEMORANDUM OPINION*

KATZ, Judge.

***1** Pending before the Court is Defendant's motion to strike (Doc. No. 58) as to which Plaintiff has filed an opposition (Doc. No. 61); Defendant's motion in limine to exclude the expert testimony of Bernard Doran and Steve Claytor (Doc. No. 48) as to which Plaintiff has filed an opposition (Doc. No. 54) and Defendant has filed a reply (Doc. No. 55); and Defendant's motion for summary judgment (Doc. No. 47) as to which Plaintiff has filed an opposition (Doc. No. 56) and Defendant has filed a reply (Doc. No. 57). [FN1]

> FN1. Defendant has requested oral argument and an evidentiary hearing on its motion in limine, and oral argument on its motion for summary judgment. These requests are denied.

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1332. For the reasons stated below, Defendant's motion in limine will be granted. Defendant's motion for summary judgment will also be granted. Defendant's motion to strike will be denied as moot.

BACKGROUND

This subrogation action arises out of a fire that occurred at the residence of Plaintiffs Robert and Paula Fleming (the "Flemings"), Willshire, Ohio, on March 26, 2000. Subsequent to the fire the Flemings filed a claim with Plaintiff Indiana Insurance Company ("Indiana"), which paid the Flemings $88,815.00 on their claim. Indiana retained experts Steven Claytor ("Claytor") and Bernard Doran ("Doran") to investigate the incident. Plaintiffs contend that the fire originated in the General Electric refrigerator located in the Fleming's basement.

Plaintiffs filed suit against Defendant General Electric Company ("GE") in the Court of Common Pleas, Hamilton County, Ohio, seeking to recover the amount paid to the Flemings. They allege *inter alia* negligent manufacture, negligence as a supplier, manufacturing defects, design defects, failure to warn, failure to conform with representations, breach of warranty of merchantability, willful and wanton misconduct, breach of warranty, breach of implied warranty and strict liability. GE removed the case to the Southern District of Ohio, Western Division. Defendant then filed a motion to transfer venue to the Northern District of Ohio, Western Division, which was granted. GE now moves to exclude the testimony of Plaintiffs' experts, and to dispose of the case on summary judgment.

DISCUSSION

A. MOTION IN LIMINE

1. Motion in Limine Standard

Motions in limine are generally used to ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose. See *Jonasson v. Lutheran Child and Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997). The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds. Cf. *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984) (federal district courts have authority to make in limine rulings pursuant to their authority to manage trials). Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. (citations omitted). Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine. See *United States v. Connelly,* 874 F.2d 412, 416 (7th Cir.1989) (citing *Luce,* 469 U.S. at 41, 105 S.Ct. at 463) ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400-01 (N.D.Ill.1993).

2. *Daubert* Standard--Admissibility of Expert Testimony

*2 The legal standard to be used in *Daubert* challenges was accurately articulated by Judge Bechtle in his memorandum opinion issued on February 1, 2001:

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert,* 509 U.S. at 589). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than subjective belief or speculation. *Id.* at 589-590. Further, Rule 702 requires that expert testimony assist the trier of fact, i.e., it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93. Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used. *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

In *Daubert,* the Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. *Daubert,* 509 U.S. at 593-94. These factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller,* 167 F.3d at 152.

In addition, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000). In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1179 (4th Cir.1997); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382b (5th Cir.1996).

Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1987); *STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), *aff'd,* No. 99- 1540, 2000 WL 564010 (Fed.Cir. May 8, 2000); *Sec. & Exch. Comm'n v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

*3 Lastly, the court "should also be mindful of other applicable rules." *Daubert,* 509 U.S. at 595. Federal Rule of Evidence 703 "provides that expert opinions based on otherwise inadmissible hearsay are to be

8

admitted only if the facts and data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' " *Id.* (quoting Fed.R.Evid. 703). Under Rule 703, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." In re Paoli RR. Yard PCB Litig., 35 F.3d [717,] 748 (quoting In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1223, 1245 (E.D.N.Y.1985).

*In re: "Diet Drugs (Phenermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.,* No. MDL 1203, 2001 WL 454586, at *5-6 (E.D.Pa. Feb. 1, 2001) (footnotes omitted). The district court is not required to hold a hearing to address a *Daubert* issue. *See* Greenwell v. Boatwright, 184 F.3d 492, 498 (6th Cir.1999). Defendant claims that the testimony of Claytor and Doran is unreliable, and should be excluded based on Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) due to unreliable investigations that fail to conform to standard practice embodied in National Fire Protection Association ("NFPA") 921 entitled "Guide for Fire and Explosion Investigations." (Doc. No. 48, Ex. C). GE also contends that neither Claytor nor Doran are qualified.

3. Qualifications

a. Claytor

Defendant unpersuasively argues that Claytor is not qualified to testify as an expert because he never designed or manufactured a refrigerator, and would not know whether a product defect caused the fire, directing the Court to *Bogosian v. Mercedes-Benz of N. Am., Inc.,* 104 F.3d 472 (1st Cir.1996). In *Bogosian,* the court affirmed the exclusion of an expert witness because of "a lack of any significant expertise--by way of knowledge, skill, experience, training, or education--in relevant areas such as the design or manufacture of automobiles or their components." *Id.* at 477. The *Bogosian* court noted the "lack of a mechanical engineering degree or other engineering expertise." *Id.*

Claytor is the cause and origin expert, and left to Doran the determination of the defect that gave rise to the fire. (Doc. No. 52, Claytor Dep., pp. 30-31, 118). In this capacity, he has significant training and experience. Claytor has been a firefighter since 1972. *Id.* at 13. He has been employed full time with the Green Township, Ohio, fire department since 1980, for whom he is a firefighter and in charge of fire investigation. *Id.* at 12-13. He is a team captain for the Hamilton County Arson Task Force, and has worked for a number of firms that provide investigative consulting services including O.C.A. Consultants, Inc. ("O.C.A.") (for whom he worked at the time of this investigation) and Q.E.D. Consultants, Inc. ("Q.E.D."), a similar firm started by Doran. *Id.* at 14-15. Claytor investigated hundreds of fires for O.C.A. *Id.* at 15-16. He has taken fire investigation courses through the University of Cincinnati and National Fire Academy, and is a certified fire investigator and inspector through the State of Ohio. *Id.* at 18-20.

b. Doran

**\*4** Defendant also mistakenly contends that Doran is not qualified to testify as an expert because he has no experience in the design or manufacture of a refrigerator. Doran is the President of Q.E.D., in which he serves as a fire investigator, forensic engineer and company President. *Id.* at 5. He obtained a two year Associate of Science in electronic technology from Franklin University in the mid-1950s, and has a Bachelor of Science in Physics from The Ohio State University. *Id.* at 6-7. While Doran does not have a bachelor's degree in electrical engineering, he became a professionally registered electrical engineer in the State of Ohio in 1969, having satisfied the amount of experience and education to take the exam. *Id.* at 8. GE's contention that he failed to examine information regarding the refrigerator, including electrical drawings and its history, or perform testing, goes to the reliability and weight of his testimony.

4. Reliability of Testimony

NFPA-921 is a recognized guide for assessing the reliability of expert testimony in fire investigations. *See* Royal Ins. Co. of Am. v. Joseph Daniel Constr. Co., 208 F.Supp.2d 423, 426-27 (S.D.N.Y .2002); Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F.Supp.2d 360, 366 (D.Conn.2001). Claytor and Doran try to follow NFPA-921. (Doc. No. 52, Claytor Dep., p. 37; Doc. No. 53, Doran Dep ., p. 64). NFPA-921

provides in pertinent part:

**2-3 Relating Fire Investigation to the Scientific Method.** The scientific method ... is a principal of inquiry that forms a basis for legitimate scientific and engineering processes, including fire incident investigation. The scientific method is applied using the following six steps.

**2-3.1 Recognize the Need.** First, one should determine that a problem exists. In this case, a fire or explosion has occurred and the cause should be determined and listed so that future, similar incidents can be prevented.

**2-3.2 Define the Problem.** Having determined that a problem exists, the investigator or analyst should define in what manner the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.

**2-3.3 Collect Data.** Facts about the fire incident are now collected. This is done by observation, experiment, or other direct data gathering means. This is called empirical data because it is based on observation or experience and is capable of being verified.

**2-3.4 Analyze the Data (Inductive Reasoning).** All of the collected and observed information is analyzed by inductive reasoning. This is the process in which the total body of empirical data collected is carefully examined in the light of the investigator's knowledge, training and experience. Subjective or speculative information cannot be included in the analysis, only facts that can be clearly proven by observation or experiment.

**\*5 2-3.5 Develop a Hypothesis.** Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire or explosion incident. This hypothesis should be based solely on the empirical data that the investigator has collected.

**2-3.6 Test the Hypothesis (Deductive Reasoning).** All other reasonable origins and causes should be eliminated. The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. This is done by the process of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis tested. This may include the collection of new data or reanalysis of existing data. This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

(Doc. No. 48, Ex C., pp. 921-9-10).

a. Claytor

Plaintiffs direct the Court to Claytor's Summary Report to demonstrate that his opinion is the end product of a reliable process that conforms to NFPA-921. (Doc. No. 54, Ex. A). They contend that Claytor recognized the need based on Indiana's request to conduct an investigation, and defined the problem by interviewing Mr. Fleming and surveying the residence. Claytor collected data by taking photos, and removing artifacts for examination by Doran, including the refrigerator, electric receptacle and breaker panel. He prepared a schematic diagram, and analyzed fire patterns at the scene. From this process, he determined "[t]he point of origin was in the lower left-hand corner of the refrigerator, in the area of the power cord and condensing fan. The cause of the fire was an electrical malfunction." *Id.* at 2.

Defendant, however, persuasively maintains that there are a number of infirmities, especially Claytor's collection of evidence (on which Doran's analysis relies), that demonstrates his investigation is unreliable, and therefore his testimony is inadmissible. Claytor initially testified that a portion of the power cord he believed to be from the refrigerator was plugged into an electrical receptacle behind the stove, and from which he unplugged the cord. (Doc. No. 52, Claytor Dep., pp. 59-60, 62). [FN2] He later testified, however, that the power cord was lying on top of the trash compactor next to the stove. *Id.* at 106-07. Claytor's effort at matching the power cord to the refrigerator consisted of:

> FN2. Other appliances in the Flemings' basement included a microwave, a gas stove, water tank, water softner and trash compactor. (Doc. No. 50, Paula Fleming Dep., pp. 36-43).

>Just examining the cord, holding it there, it appeared to me at the time that that was the one that came from the refrigerator. It was the only cord in the area that was burned.
>
>*Id.* at 107.

Further, Claytor could not identify the electrical receptacle into which the refrigerator was plugged. He initially identified the receptacle behind the stove. [FN3] After examining photos of the scene, however, Claytor concluded that that receptacle was not for the refrigerator as it had a switch and a plug-in, and the refrigerator receptacle he took did not have a switch. *Id.* at 84, 86. Claytor then testified about two other potential receptacles into which the refrigerator may have been plugged. His ambivalence on this important aspect of his investigation is summarized by:

>FN3. While Claytor could not recall if it used electricity, photos revealed that the stove had a clock. *Id.* at 82, 85.

>**\*6** Q. As we went through these with the plug-in and stuff, isn't it a fact, as you sit here today, you're not 100 percent sure what plug-in was for the refrigerator?
>A. That's correct.
>
>*Id.* at 105. [FN4]

>FN4. While asserting that he believed nothing else was on the branch circuit to the refrigerator from the breaker panel, Claytor acknowledged that he really did not know. *Id.* at 61-62. Though a number of breakers were tripped, he attributed most to heat, and could not remember if the circuit breaker for the refrigerator was tripped. *Id.* at 91.

His confusion regarding the power cord and the receptacle illustrates Claytor's failure to follow NFPA-921, Section 9-5.1 entitled "Documenting the Collection of Physical Evidence." (Doc. No. 48, Ex. C, p. 921-63). [FN5]

>FN5. Section 9-5.1 calls for thorough documentation of physical evidence before removal in part to "assist the fire investigator in establishing the origin of the physical evidence, including not only its location at the time of discovery, but also its condition and relationship to the fire investigation." *Id.*

b. Doran

As with Claytor, Plaintiffs direct the Court to Doran's Technical Report to show that his opinion is the result of a reliable investigation that followed NFPA-921. (Doc. No. 54, Ex. B). Doran conducted a non-destructive examination of the refrigerator, power cord, the receptacle and circuit breaker panel Claytor had taken from the scene, along with six (6) photographs. Since the exterior was damaged only due to exposure, and nothing in the interior of the panel indicated "an active role in the fire," the circuit breaker panel was eliminated as a cause. He also ruled out the power cord due to a lack of faulting, and the receptacle showed damage only from exposure. Doran concluded "that the fire was the result of extensive electrical faulting in the condenser area of the compressor compartment located at the bottom of the refrigerator." *Id.* at 2. He observed numerous faulted wires in the compressor compartment, and opined that a wire(s) had become loose or broke due to the vibration of the compressor's internal components and/or others nearby.

(Doc. No. 54, Ex. B.,p. 1; Doc. No. 53, Doran Dep., pp. 95-96). The fire then extended to the foam insulation. (Doc. No. 54, Ex. B .,p.1). He also testified:
>Q. We talked about, again, your technical report, the examination of the refrigerator, and you indicated the fire started in the compressor compartment of the refrigerator. What else supported your opinion for that?

11

> A. Well, the fire patterns on the refrigerator itself; the consuming of the foam in it, the apparent travel through the hole above the compressor compartment into the insulating foam; the faulting observed in the compressor section, electrical faulting; elimination of the power cord.

*Id.* at 82.

Granted, expert testimony has been held to be consistent with NFPA-921, and satisfy *Daubert* without independent testing. *See McCoy v. Whirlpool Corp.,* No. 02-2064-KHV, 2003 U.S. Dist. LEXIS 6909, at *10-13 (D.Kan. Apr. 21, 2003). However, the "[f]ailure to test, although not determinative of a proffered expert's status, is instructive. The Sixth Circuit has found that a failure to test a hypothesis may disqualify a witness from testifying as an expert." *Coffey v. Dowley Mfg., Inc.,* 187 F.Supp.2d 958, 977 (M.D.Tenn.2002), *aff'd, Coffey v. Dowley Mfg. Inc.,* 2003 U.S.App. LEXIS 26610 (6th Cir. Dec. 18, 2003). *See, e.g., Pride v. Bic Corp.,* 218 F.3d 566, 578 (6th Cir.2000) (affirming exclusion of expert testimony regarding the cause and origin of a fire purportedly caused by a lighter, due to a failure to conduct testing). This is especially true here, due to Doran's inability to rely on critical aspects of Claytor's investigation.

**\*7** While Claytor's testimony regarding the power cord creates doubt as to whether this was the power cord attached to the refrigerator, it is clearer that Doran can no longer rely on Claytor's investigation to eliminate the receptacle as a potential cause of the fire. Moreover, Plaintiffs concede that testing is needed to conclusively determine that the fire was the result of a defect. (Doc. No. 54, p. 2). [FN6] The impact of Doran's failure to conduct destructive testing is evident throughout his testimony. Doran does not know if there was a loose connection due to vibration, because his non-destructive examination did not include removing and analyzing the compressor section. (Doc. No. 53, Doran Dep., pp. 96-97). He further testified:

> FN6. Plaintiffs complain that the need for testing did not become evident until after the completion of Claytor's and Doran's depositions on February 24, 2004, which was just before the March 1, 2004 discovery deadline. They maintain that testing became impossible due to Defendant's unwillingness to extend discovery. Doran's testimony, however, shows that Plaintiffs already knew that testing was necessary. Plaintiffs do not dispute that Defendant was not contacted concerning possible testing until March 18, 2004. Also, the discovery deadline had already been extended twice due in part due to difficulties in arranging Plaintiffs' experts depositions.

> Q. Right. As you sit here today, can you tell me if a wire broke in this refrigerator and caused this fire?
> A. Only on a basis of that it is the probable cause.
> Q. Okay. So the next question then is--
> A. Fault.
> Q. --if--if there is a faulted wire that causes fire, which wire was it?
> A. I knew that was the next question. That is almost impossible to determine because of the extent of damage observed here. To do that would require the destructive examination. That is the point when we would procure the wiring diagram for this, possibly an exemplar, and very carefully take this completely apart.
> Q. Have you been asked to do that?
> A. Not at this time.
> Q. *But you agree that that is something that could be done to help determine if there was a faulted wire* and which faulted wire may have been involved in the fire?
> A. *Yes, because my examination was a visual, nondestructive examination* for purposes of identifying the probable cause of the fire as this particular GE refrigerator, and at that point I would expect if the litigation--if there is litigation, that other parties would come and look at it, and perhaps a destructive examination would be performed of the wiring and components in the area.

*Id.* at 100-02 (emphasis added).

Doran also testified:
> Q. You indicate on Page 2 of the technical report which is part of Exhibit 4 that--you make the statement at the end, "This is a manufacturing defect." Can you tell me what defect there is in manufacturing?
> A. Well, we have the first portion of the paragraph, so based upon the fact evidence and information

discovered at this time in the investigation, and, again, this is prior to a destructive examination--

...

Q. Exhibit--again, Exhibit 4, you indicated in the last sentence of your technical report, "[T]his is a manufacturing defect." My question to you, once again, what is the manufacturing defect?
A. I didn't answer that, did I?
Q. No. I think that is when we had technical problems.
A. Yeah. Again, I think you got in probably the earlier portion of that paragraph, where it says, "Based on the facts, evidence, information discovered at this time in the investigation, it is the opinion of O.C.A. Consultants, Inc., that the fire was the result of extensive electrical faulting in the condenser area of the compressor compartment located in the bottom of the refrigerator."
*8 Electrical faulting is certainly not intended by the manufacturer to be a normal portion of the operation of a refrigerator. The exact cause of the faulting is-as I've indicated, could only be determined by destructive examination. It is related to a number of different issues, the compressor vibrations certainly being one of the suspect parameters that would cause this. Other issues could occur such as-as you pointed out, we do not know about the fan. The faulting could have occurred actually in the fan, in the fan motor, the windings. We would only learn that by a destructive examination, so I cannot at this stage identify the exact component that failed.

...

Q. And we've established also that when you look at the evidence of faulting, by just looking at that alone, you can't tell whether it was the cause of the fire or caused by the fire, correct?
A. By that--by looking at the faulting itself, that is correct. *You have to eliminate other items, and that decision as the cause of the fire is based upon the elimination of all other components nearby.*
Q. *So basically to get down to that, you have to eliminate every other possible cause of that fire, correct?*
A. *Yes, other items in the area.*
Q. *And that would be done during the cause-and-origin investigation out at the scene?*
A. *In general, that's when it's performed. There were other items taken that I eliminated, such as the receptacle,* the circuit breaker panel.
Id. at 115-19 (emphasis added).

Doran's reliance on Claytor's suspect investigation, together with his failure to conduct any testing, impugns the reliability of his analysis. [FN7] Accordingly, Defendant's motion in limine is granted.

> FN7. Defendant also contends that Plaintiffs' failed to fully investigate the possibility that fire may have externally attacked the refrigerator due to falling debris.

B. SUMMARY JUDGMENT

1. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. Id. at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

*9 Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its

13

pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap,* 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.,* 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 249); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams,* 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 130 F.Supp.2d 928, 930 (S.D.Ohio 1999).Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52; *see also Atchley v. RK Co.,* 224 F.3d 537, 539 (6th Cir.2000).

2. Defendant's Motion for Summary Judgment

GE moves for summary judgment based on the inadmissibility of Claytor's and Doran's testimony under FRE 702 and *Daubert,* and the exclusion of Plaintiffs' expert opinions due to the purported spoilation of evidence. The exclusion of Plaintiffs' expert testimony opinions under FRE 702 and *Daubert* is dispositive. [FN8] Under Ohio law, a plaintiff may proceed on products liability claims under either strict liability and/or negligence. *McConnell v. Cosco, Inc.,* 238 F.Supp.2d 970, 974-75 (S.D.Ohio 2003). "Strict product liability claims in Ohio are governed by Ohio Revised Code sections 2307.71 though 2307.80," the Ohio Products Liability Act ("OPLA"). *Id.* Under OPLA, "[a] plaintiff cannot recover on a product liability claim unless he establishes, by a preponderance of the evidence, that the product was defective in manufacture or construction, was defective in design or formulation, was defective due to inadequate warning or instruction, or because it did not conform to a representation made by its manufacturer." *United States Aviation Underwriters, Inc. v. B.F. Goodrich Co.,* 778 N.E.2d 122, 126 (Ohio Ct.App. 9th Dist.2002) (citing Ohio Revised Code § 2307.73(A)(1)).

> FN8. GE contends that exclusion of Claytor's and Doran's testimony is the appropriate sanction for Plaintiffs' alleged spoilation of evidence as a result of Plaintiffs' failure to timely notify Defendant that its refrigerator may have been involved in a fire, and having cleaned up the basement and disposed of important artifacts such as the stove and microwave after Claytor's investigation. The Court, however, need not rule on this issue.
> Further, GE's motion to strike seeks to strike exhibits C, D and G attached to Plaintiffs' opposition to Defendant's motion for summary judgment to rebut Defendant's position on the spoilation issue, and is therefore denied as moot.

**\*10** To recover on a products liability claim, it must be proven by a preponderance of the evidence that: "(1) [t]here was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss." *Shaw v. Toyotomi Am., Inc.,* 654 N.E.2d 1337, 1339 (Ohio Ct.App.3d Dist.1995) (citations omitted); *see also Schwarze v. Divers Supply,* No.2001CA301, 2002 Ohio App. LEXIS 4061, at \* \*17-18 (Ohio Ct.App. 5th Dist. July 22, 2002). "To prevail on a negligence claim, Plaintiffs must demonstrate the traditional elements of duty, breach, causation, and injury." *McConnell,* 238 F.Supp.2d at 975. Since the Court has excluded Claytor's and Doran's testimony, Plaintiffs

are without any admissible evidence to sustain their claims.

Plaintiffs maintain, however, that circumstantial evidence may be used to prove causation. *See Truck Ins. Exch. v. MagneTek, Inc.,* 360 F.3d 1206, 1214-15 (10th Cir.2004). They point out that Ohio courts have allowed the use of circumstantial evidence. In *Gast v. Sears Roebuck & Co.,* 313 N.E.2d 831 (Ohio 1974), the court stated:

> [A] defective condition [in a product at the time it left the control of the manufacturer] may be proved by circumstantial evidence, where such evidence * * * [shows] that the accident was caused by a defect and not other possibilities, although it is not necessary in a civil action to eliminate all other possibilities * * *.

*Id.* at 833 (quoting *State Auto Mut. Ins. Co. v. Chrysler Corp.,* 304 N.E.2d 891, 895 (Ohio 1973)); *see also State Farm Fire & Cas. Co v. Chrysler Corp.,* 523 N.E.2d 489, 493-94 (Ohio 1988). In *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.,* 502 N .E.2d 651 (Ohio Ct.App. 10th Dist.1985), the court stated.

> We conclude that reasonable jurors could find that a defect-free main electrical cable harness of a motor vehicle does not ordinarily start fires; that the reasonable expectations of a buyer of a motor vehicle is that the main electrical cable harness of such vehicle will not start a fire; and that an inference of a defect can be made from the fact that a fire originated in a main cable harness without any known causes by users of such motor vehicles. We further hold that the fact that plaintiff's expert witness did not know either the function of the particular wire which showed evidence of arcing and shorting or why such arcing and shorting occurred went to the weight of his testimony but did not disqualify his testimony.
> In this case, a distinction has to be made between the cause of the fire, which plaintiff's evidence indicates as the shorting and arcing of a wire in the main electrical cable harness, and the cause of such shorting and arcing, which was not established by plaintiff's evidence. We presume that, if such main electrical cable harness was properly designed and manufactured, such shorting and arcing of wires in the main electrical cable harness would not occur through normal use of the vehicle.

**\*11** *Id.* at 655. The *Truck Ins. Exch* court, however, asserted:

> [B]efore a plaintiff can rely on circumstantial evidence or the process of elimination ... the plaintiff must at least present evidence to show why the defendant's product should not be among the possible causes to be eliminated.

*Truck Ins. Exch,* 360 F.3d at 1215. Moreover, in *Nationwide Mut. Fire Ins. Co. v. B & B Appliance Co.,* No. 54107, 1988 Ohio App. LEXIS 2870 (Ohio Ct.App. 8th Dist. July 14, 1988) the court distinguished *Gast* stating:

> It is true that a television absent a defect would normally not cause a fire. However, the evidence failed to establish the television caused the fire. It is equally probable that other electrical equipment near the television caused the fire. In all the cases relied upon by plaintiffs regarding the proposition a defect may be shown by circumstantial evidence, there was only one probable cause of the fire established at trial. In the case sub judice, no single probable cause of fire had been established.

*Id.* at \*13 (internal citation omitted).

The only evidence Plaintiffs present that the refrigerator was the probable cause of the fire is the inadmissible testimony of Claytor and Doran, on which Plaintiffs may not rely. *See Truck Ins. Exch.,* 360 F.3d at 1216. In fact, multiple possibilities existed that have not been eliminated. Moreover, in *Gast* and *State Auto Mut.,* the damage due to the alleged defect occurred within three (3) months or less of their purchase, and within approximately five (5) months in *State Farm Fire*. The *Volkswagen* court approved the use of circumstantial evidence where a fire erupted in car five (5) years after its purchase. *Volkswagen,* 502 N.E.2d at 654-56. The refrigerator, however, was eight (8) years old at the time of the fire. [FN9] Accordingly, Defendant's motion for summary judgment is granted.

> FN9. GE maintains that the refrigerator was twelve (12) years old. Doran's report, however, notes that the refrigerator was manufactured in 1992. (Doc. No. 54, Ex. B, p. 1).

CONCLUSION

For the reasons stated above, Defendant's motion in limine to exclude the expert testimony of Bernard

Doran and Steve Claytor (Doc. No. 48) is granted. Defendant's motion for summary judgment (Doc. No. 47) is also granted. Defendant's motion to strike (Doc. No. 58) is denied as moot.

IT IS SO ORDERED.

2004 WL 1619197 (N.D.Ohio)

END OF DOCUMENT